UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

YOUNG AMERICA'S FOUNDATION,
*et al*.,

       Plaintiffs,

  -against-          3:20-CV-0822 (LEK/ML)

HARVEY STENGER, *et al.*,

       Defendants.

---

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

  This case uniquely illuminates the delicate balance between freedom of speech and

student protest on college campuses, as well as the effect of political polarization on this balance.

As Justice Louis Brandeis wrote nearly a century ago:

> Those who won our independence believed that the final end of the
> state was to make men free to develop their faculties . . . They
> believed that freedom to think as you will and to speak as you think
> are means indispensable to the discovery and spread of political
> truth[.]

Whitney v. California, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

  A few months before the events in this case, Defendant Harvey Stenger as President of

State University of New York at Binghamton ("SUNY-Binghamton") issued a statement titled

"Freedom of speech is fundamental to our mission," which stated:

> The University deplores all acts of racism and any action that limits
> the expression of ideas. **Freedom of speech is fundamental to the
> core mission of the University; academic inquiry and the
> exchange of ideas rest on the principle that all have a right to
> express their beliefs.** We strongly condemn any acts that impede the
> expression of those beliefs and **caution anyone who attempts to
> inhibit another's free speech**. We will protect, support and

> encourage the right of every individual to express concerns freely and
> to engage in peaceful protest. Our campus is resolute in its support
> for those of any race, faith, gender, sexual orientation, background or
> identity.

Harvey G. Stenger, University Statement, *Freedom of speech is fundamental to our mission*,

BINGHAMTON UNIVERSITY (May 8, 2019),

https://www.binghamton.edu/president/statements.html (emphasis in original).

In contrast with this strong declaration about freedom of speech, Plaintiffs accuse SUNY-Binghamton of stifling speech and contributing to political polarization while merely paying lip service to the First Amendment, and violating its own core mission.

Plaintiffs Young America's Foundation ("YAF"), Binghamton University College Republicans, and Jon Lizak bring this action against defendants Harvey Stenger, Brian Rose, John Pelletier, College Progressives, Progressive Leaders of Tomorrow ("PLOT"), and the Student Association of Binghamton University ("Student Association") under the First Amendment, Fourteenth Amendment, and 42 U.S.C. §§ 1985(3), 1986. Dkt. No. 1 ("Complaint"). Presently before the Court is Stenger's, Rose's, and Pelletier's (collectively "State Defendants") motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim for which relief can be granted. Dkt. Nos. 32 ("Motion to Dismiss"); 32-2 ("State Defendants' Memorandum of Law"); 40 ("Opposition"); and 41 ("Reply"). For the reasons that follow, State Defendants' motion is granted in part and denied in part.

## II.     BACKGROUND

### A.  Factual Allegations

At the motion to dismiss stage, the Court "must accept as true all of the factual allegations contained in the complaint." Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n.1

(2002) (emphasis added). Thus, all of the following eight sections containing factual allegations are assumed to be true. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 76 (2d Cir. 2015).

### 1. The Parties

YAF is a nonprofit organization whose mission is to educate the public on the ideas of individual freedom, a strong national defense, free enterprise, and traditional values. Compl. ¶ 10. YAF partners with like-minded student organizations on university campuses to, among other things, co-host speakers. Id. ¶ 11.

Plaintiff Binghamton University College Republicans ("College Republicans") is an unincorporated association of SUNY-Binghamton students. Id. ¶ 12. College Republicans regularly engage in expressive, political activities on campus. Id. ¶ 44.

Plaintiff Jon Lizak is a full-time student at SUNY-Binghamton, and the president of College Republicans. Id. ¶ 16.

Defendant Stenger is the president of SUNY-Binghamton. Id. ¶ 18. As President, Stenger is responsible for adopting, approving, creating, and enforcing SUNY's Board of Trustees' and SUNY-Binghamton's policies, rules, and regulations regarding student and student group speech activities on the SUNY-Binghamton campus. Id. ¶ 19.

Defendant Rose is the vice president for student affairs of SUNY-Binghamton. Id. ¶ 26. As vice president for student affairs, Rose is responsible for adopting, approving, creating, and enforcing the policies, rules, and regulations regarding student and student group speech activities on the SUNY-Binghamton campus. Id. ¶ 27.

Defendant Pelletier is the Chief of the New York State University Police Department at Binghamton ("UPD"). Id. ¶¶ 19, 30. As Chief of UPD, Pelletier is responsible for enforcing the policies, rules, and regulations regarding student and student group speech activities on the SUNY-Binghamton campus. Id. ¶ 31.

Defendant College Progressives is an unincorporated association of SUNY-Binghamton students. Id. ¶ 33.

Defendant PLOT is a non-student group based in Binghamton, New York. Id. ¶ 35. PLOT is a collective of advocates who organize around issues of race, class, gender, and economics, and who sometimes work in concert with College Progressives. Id. ¶ 36.

Defendant Student Association is a non-profit legal entity that has its offices within the University Union on SUNY-Binghamton's campus. Id. ¶ 39. The Student Association describes itself as "not only a forum for student activism, but the primary financial system which hundreds of clubs and student organizations receive their funding and legal protection through." Id.

### 2. Speech Suppression Policy

Accepting the allegations in the Complaint, SUNY-Binghamton has an unwritten policy that it uses to censor, restrict, and inhibit unpopular student speech (the "Speech Suppression Policy"). Id. ¶ 22. The Speech Suppression Policy has been enacted, created, and put in place by Stenger as a policy maker. Id. ¶ 23. The Speech Suppression Policy authorizes SUNY-Binghamton officials, including Stenger, Rose, and Pelletier, to prohibit, chill, oppose, and shut down speech with which they, or other students and faculty, disagree. Id. ¶ 24.

### 3. November 14, 2019 Tabling Event

4

On Thursday, November 14, 2019, College Republicans organized a tabling event in a high-traffic area of SUNY-Binghamton's campus known as "the Spine." Id. ¶ 47. College Republicans did not obtain a permit from the Student Association to table on this date. Id. ¶ 48. The tabling event promoted an upcoming lecture by renowned economist and presidential advisor Dr. Arthur Laffer titled "Trump, Tariffs, and Trade Wars" that College Republicans were co-hosting with YAF on Monday, November 18, 2019 ("Laffer Event"). Id. ¶ 49. After nearly three hours without incident, at approximately 1:30 p.m., a group of College Progressives confronted College Republicans over their tabling content. Id. ¶¶ 50–51. The group then attacked College Republicans' table. Id. ¶ 53. The group confiscated and destroyed the event flyers and posters, broke down and carried away their table, hurled insults and obscenities at their members who were tabling, and physically assaulted one member, forcibly removing her hat bearing a political slogan. Id. ¶ 54. UPD arrived at the scene and applied the Speech Suppression Policy by demanding that College Republicans leave the Spine while the College Progressives chanted. Id. ¶ 55. Lizak and another member of College Republicans filed police reports with UPD over the harassment they received from the group.  Id. ¶ 56.

### 4.  Statements after the Tabling Event

On Monday, November 18, 2019, Rose issued a statement regarding the tabling event. Id. ¶ 58; Compl. Ex. 2.[1] According to the statement:

---

[1]  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a court may consider the following matters outside the four corners of the complaint: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are 'integral' to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." Lane v. Tilbe, No. 18-CV-0438, 2018 WL 6289668, at *2 (N.D.N.Y. Dec. 3, 2018) (internal citations omitted) (Kahn, J.).

The College Republicans, an organization chartered by the Student Association (SA), was joined by another group known as Turning Point that, by its own choice, is not chartered by the SA or otherwise recognized by the University. Representatives of the two groups set up tables outside the Union in a reservable space without having followed procedures to properly secure use of the space. Representatives of the Union professional staff and of the SA notified the tabling students that they were tabling without reservation in a space that had to be reserved in advance and asked them to relocate. The groups refused twice to move. The groups' display included provocative posters with gun imagery, this being the same day as the Saugus High School shooting. Self-evidently from the nature of their display and their refusal to comply with procedures for reserving the space in question, the groups intended to be provocative. Social media activity suggesting they were handing out hot chocolate and promoting an upcoming lecture fail to accurately represent the context.

Students offended by the display and disapproving of the views of the two tabling organizations gathered around the tables in increasing number. University Police were alerted by several members of the University community and responded to monitor the escalating situation. Counter-protesters began pulling down the tables and sweeping the political literature and materials of the tabling groups into boxes in an attempt to close down the tabling activity. This increased the volatility of the situation and University Police stepped in between students from the tabling groups and protesting students to try to maintain safety. Eventually the police directed the tabling groups to abandon the area and escorted them away. Some protesters viewed the actions of police as protecting the tabling students based upon race and directed chants at police. The escalating situation was successfully defused without physical injury to anyone present.

Id.

Plaintiffs take issue with the statement's characterization of events. Compl. ¶¶ 59–62. Furthermore, Rose admitted that even though there were protesters who may have violated some rules, "the University did not seek to identify or charge any protesters." Compl. Ex. 2; Compl. ¶ 67.

Stenger also responded to the event with a short statement that "strongly condemn[ed] any acts that impede the expression of one's beliefs" but also defended the police's response. Id. ¶ 64; Compl. Ex. 3.

### 5.  *Plaintiffs' Efforts to Proceed with the Laffer Event*

Following the tabling event, YAF took measures to ensure that the Laffer Event would continue. Id. ¶ 68. First, YAF hired two agents for Dr. Laffer's protection. Id. ¶ 68. Second, YAF's then-general counsel contacted a lawyer from SUNY-Binghamton to obtain assurances. Id. ¶ 70. Specifically, YAF sought assurances that if protests occurred at the Laffer Event, UPD would remove the disruptors and not the speaker. Id. ¶ 71. SUNY-Binghamton's attorney refused to provide such assurances. Id. ¶ 72.

### 6.  *Social Media Postings about the Laffer Event*

In between the tabling incident and the Laffer Event, PLOT posted a flyer to social media encouraging its members and others to disrupt the event. Id. ¶¶ 73–75; Compl. Ex. 5. College Progressives reposted PLOT's flyer to its Instagram account, and in another post, College Progressives asked its supporters to "[c]ome out and support BING PLOT . . . to speak out against College [R]epublicans . . ." and to "come out to lecture hall 8 . . . and put an end to this clownery." Compl. ¶ 76; Compl. Exs. 6–7.

### 7.  *Laffer Event*

On the day of the Laffer Event, YAF and College Republicans met with UPD and certain SUNY-Binghamton administrators. Compl. ¶ 77. Stenger, Rose, and Pelletier were not present at the meeting, but the officials present were acting at their direction. Id. At this meeting, UPD told YAF and College Republicans that UPD was aware of threats to disrupt the event by student and

non-student groups. Id. ¶ 78. UPD criticized YAF and College Republicans for hosting a public, as opposed to private (ticketed) event. Id. ¶ 79. Additionally, the SUNY-Binghamton administrators told YAF and College Republicans that they were unilaterally imposing two conditions on the Laffer Event. Id. ¶ 80. First, SUNY-Binghamton decided to increase the UPD police presence and move the event to a lecture hall with more readily available egress routes for Dr. Laffer, if needed. Id. ¶ 81. Second, SUNY-Binghamton provided College Progressives a lecture hall adjacent to the Laffer Event (and which had connecting doors to the event's lecture hall) to protest. Id. ¶ 82. YAF and College Republicans objected to SUNY-Binghamton's conditions, but the administrators refused to change their position. Id. ¶¶ 83–84. YAF and College Republicans also requested that SUNY-Binghamton announce in advance of the Laffer Event that its own written SUNY free speech policy required students and visitors to permit the Plaintiffs' free speech, and they again sought assurances that if there was a disruption, UPD would remove the disruptor and not the speaker. Id. ¶¶ 85, 87. The administrators refused to agree to make a public statement about its free speech policy or to provide any such assurances. Id. ¶¶ 86, 88.

When Dr. Laffer and his aides arrived at a nearby airport, YAF and UPD greeted them. Id. ¶¶ 89–90. UPD informed Dr. Laffer that it had concerns about the Laffer Event and that the University would prefer that Dr. Laffer return to his plane and cancel the event. Id. ¶ 91. Although Dr. Laffer told UPD that he wanted to proceed with the event, UPD showed him social media posts regarding the planned disruption of the event. Id. ¶ 92.

Approximately one hour before the Laffer Event, the two agents hired by YAF met with UPD. Id. ¶ 94. At this meeting, UPD stated they were aware of College Progressives and

PLOT's planned disruption of the Laffer Event. Id. ¶ 95. Pelletier told the agents that if protesters approached Dr. Laffer's podium then he would order the agents to escort Dr. Laffer out of the event. Id. ¶ 96. UPD also informed Dr. Laffer's driver that he should stay with the vehicle since Laffer may need to make a quick getaway. Id. ¶ 97.

At least one hour before the Laffer Event was scheduled to begin, College Progressives and PLOT members were lined up outside the lecture hall and packed into the adjacent lecture hall provided by SUNY-Binghamton administrators. Id. ¶ 98. Once the doors to the Laffer Event were opened, hundreds of students and non-students, many of them members of College Progressives and PLOT, flooded in and packed the room. Id. ¶ 99. Many of these individuals remained standing in the rows, side aisles, and back of the lecture hall. Id. ¶ 100. At the insistence of College Republicans and YAF, UPD made one statement about the size of the crowd and SUNY-Binghamton's fire code and asked those standing to take their seats. Id. ¶ 104. UPD took no further action when the crowd refused to clear the rows, aisles, and back of the lecture hall. Id. ¶ 105.

The Laffer Event started promptly at 7:30 p.m. EST with John Restuccia, the then-president of College Republicans, providing a brief two-minute introduction of Dr. Laffer. Id. ¶ 108. Dr. Laffer took the podium and, just a few seconds in, a member of Defendant College Progressives and/or Defendant PLOT stood up in the second row and began shouting accusations at Dr. Laffer. Id. ¶ 110. The majority of those present greeted these accusations with applause, and the disrupting student was soon handed a megaphone and urged to continue. Id. ¶ 112. College Republicans, who were sitting in the first row, stood up and displayed "Free Speech" signs in response to the disruptors. Id. ¶ 114. The disrupting student spoke through the

9

megaphone for nearly two minutes before UPD took any action to restrain him. Id. ¶ 115. During these events, Pelletier directed the agents to remove Dr. Laffer from the lecture hall, and the agents complied with the directive and escorted Dr. Laffer out. Id. ¶¶ 118–20. Eventually, the disruptor with the megaphone was removed, but he handed off the megaphone to others. Id. ¶ 122. College Progressives and PLOT and their supporters continued to occupy the lecture hall, surrounding hallways, and the area outside of the lecture building for more than one hour. Id. ¶ 123. Stenger and Rose took no action to disperse College Progressives and PLOT. Id. ¶ 125.

### 8. *Events after the Laffer Event*

That evening, Rose issued a statement about the Laffer Event. Id. ¶ 126. The statement said that the "University anticipated that the event would attract demonstrators, given the challenges with a tabling activity by the College Republicans last week, so it took several proactive steps to manage the event following announcement of a planned disruption." Compl. Ex. 8. According to Rose, these steps included moving the event to a larger lecture hall, providing the demonstrators the opportunity to hold their own speak-out in an adjacent lecture hall, deploying a large number of police to maintain order, and telling attendees to allow the event to go forward and reserve questions until the end. Id. The student with the megaphone was arrested, as well as another individual who attempted to interfere with police. Id. Rose's statement further read that the University "[was] incredibly disappointed with the events that happened tonight," because "[t]he protestors chose instead to infringe on the expressive activity of others and to prevent those who wished to hear the speaker from doing so." Id. The University would investigate the event and "reserve[d] the right to pursue appropriate charges or

10

disciplinary action against those organizations and individuals as relevant information is confirmed." Id.

The very next day, the Student Association of Binghamton University sent College Republicans an email informing them that they were being "suspended . . . due to [their] violation with both University and Student Association policy [sic] in regards to tabling without proper approval on Thursday [sic] November 14th." Compl. Ex. 9; Compl. ¶ 130. College Republicans were not able to receive funding or reserve rooms to host expressive events for the Spring 2020 semester. Id. ¶ 133. In contrast, the Student Association has not required other groups to obtain approval before tabling on campus, id. ¶ 131, nor have they taken any action against the protesters.

College Republicans and Lizak met with Stenger and Rose on January 20, 2020 to discuss the tabling incident and the Laffer Event. Compl. ¶ 134. This meeting was facilitated by Congressman Thomas Reed, who also attended. Id. Rose admitted that he and Stenger knew that College Progressives had encouraged students to violate SUNY-Binghamton policies by disrupting the Laffer Event. Id. ¶ 135. Rose also conceded that he and Stenger had the ability to personally override the Student Association's action on student organization discipline. Id. ¶ 136. Rose also promised College Republicans and the Congressman that he and Stenger would discipline College Progressives and timely notify them of that discipline. Id. ¶ 137. Also, Stenger allegedly grossly misrepresented the true nature of Dr. Laffer's departure by contending that UPD asked Dr. Laffer to wait ten minutes for them to clear the lecture hall of disruptors, but that Dr. Laffer refused and left. Id. ¶ 139.

To date, Stenger and Rose have not taken any action against College Progressives, any students involved in the Laffer Event, or the Student Association. Id. ¶ 138. There is also no public record or other indication that criminal proceedings have ever been initiated against the disruptor with the megaphone or against any other disruptor. Id. ¶ 129.

## III.   LEGAL STANDARD

### A.  Rule 12(b)(1) Motion to Dismiss

When a defendant "moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." United States ex rel. Kreindler & Kreindler v. United Tech. Corp., 985 F.2d 1148, 1155–56 (2d Cir. 1993) (internal quotation marks and citation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "To survive a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must allege facts that affirmatively and plausibly suggest that [they have] standing to sue." Kiryas Joel Alliance v. Village of Kiryas Joel, 495 F. App'x 183, 188 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted). In considering a motion to dismiss under Rule 12(b)(1), a court must accept as true all material factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs. Buday v. N.Y. Yankees P'Ship, 486 F. App'x 894, 896 (2d Cir. 2012). Plaintiffs, as the parties asserting subject matter jurisdiction, bear the burden of establishing their standing as the proper parties to

bring this action. See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc., 697 F.3d 59, 65 (2d Cir. 2012).

### B. Article III Standing

Standing is an "essential aspect" of the limits of federal judicial power under Article III of the Constitution, which authorizes federal courts to decide only actual "Cases" or "Controversies." Hollingsworth v. Perry, 570 U.S. 693, 704 (2013). To have standing to invoke the power of a federal court, a litigant must prove that: (1) she "has suffered a concrete and particularized injury"; (2) the injury "is fairly traceable to the challenged conduct"; and (3) the injury "is likely to be redressed by a favorable judicial decision." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)); see also Lujan, 504 U.S. at 560 (describing these three elements as "the irreducible constitutional minimum of standing"). "To have standing, a litigant must seek relief for an injury that affects him in a personal and individual way. He must possess a direct stake in the outcome of the case." Hollingsworth, 570 U.S. at 705 (citations and quotation marks omitted). A litigant "raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large-does not state an Article III case or controversy." Lujan, 504 U.S. at 573–74.

### C. Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v.

*Twombly*, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See *id.* at 678–79.

## IV.   DISCUSSION

### A.  First Cause of Action - First Amendment Claim

#### 1.  *YAF's Standing*

State Defendants argue that YAF does not have standing to bring a First Amendment claim as it pertains to the November 14, 2019 tabling incident, State Defendants' Memorandum of Law at 14–15, while Plaintiffs disagree, Opposition at 5–8. The Court disagrees with the State Defendants and denies the Rule 12(b)(1) motion to dismiss.

A party invoking federal jurisdiction has the burden of establishing standing "for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). However, it is

well settled that where multiple parties seek the same relief, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quoting Rumsfeld v. Forum of Acad. and Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).

Here, to the extent that Plaintiffs do not all seek the same relief, the Court concludes that YAF has standing in relation to the November 14, 2019 tabling incident. State Defendants' main argument is that there was no allegation that "YAF was directly involved in this incident, or that YAF's speech was suppressed." State Defendants' Memorandum of Law at 15. However, the Complaint does allege that the tabling event was to promote an upcoming lecture that YAF was co-hosting and towards which it was contributing financially. Compl. ¶¶ 49, 145. When College Republicans were forced to leave the tabling event, id. ¶ 55, YAF as a funder lost its ability to promote the lecture and spread its message. See, e.g., Young Am.'s Found. v. Kaler, 370 F. Supp. 3d 967, 980 (D. Minn. 2019) ("It is of no moment that YAF funded the speech, rather than spoke itself."); cf. Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 400 (2000) (Breyer, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment concern—not because money is speech (it is not); but because it *enables* speech."). Thus, there is enough to state an injury-in-fact that is traceable to State Defendants and redressible. See Gerlich v. Leath, 861 F.3d 697, 704 (8th Cir. 2017) (allegation that university "violated [plaintiffs'] First Amendment rights by . . . preventing their ability to spread [their] message [was] sufficient to establish an injury in fact"); see also Ctr. for Bio-Ethical Reform, Inc. v. Black, 234 F. Supp. 3d 423, 432 (W.D.N.Y. 2017) ("[plaintiff's] claimed loss of 'the opportunity to express its message in the way it preferred,' due to the specific unconstitutional motives of defendants, is an

15

injury-in-fact, traceable to defendants and redressible, plainly sufficient to confer standing upon [plaintiff]") (quoting Irish Lesbian and Gay Org. v. Giuliani, 143 F.3d 638, 650 (2d Cir. 1998)).

### 2. Personal Involvement

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983."[2] Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (citing Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." Hendrickson v. U.S. Attorney Gen., No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). Before Iqbal, a plaintiff could establish individual liability in one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by

---

[2]  However, "'[p]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983.'" Rother v. NYS Dep't of Corr. & Cmty. Supervision, 970 F. Supp. 2d 78, 102 (N.D.N.Y. 2013) (Kahn, J.) (internal citations omitted). All that a plaintiff must show is that the official had: (1) "a direct connection to, or responsibility for, the alleged illegal action[s]"; and (2) "the authority to perform the required act." Id. (internal citation omitted). Plaintiffs sued State Defendants in both their official and individual capacities, seeking damages, declaratory relief, and injunctive relief. See Complaint. At this stage, Plaintiffs' official capacity claims for injunctive and declaratory relief can still proceed.

> failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d. Cir. 1995).

Recently, the Second Circuit addressed the effect of Iqbal on the Colon standards for establishing supervisor liability. Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020).

Joining with other circuits, the court held "there is no special rule for supervisory liability," and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 618 (quoting Iqbal, 556 U.S. at 676).

Since State Defendants filed their motion to dismiss, Tangreti replaced Colon, and the Court asked the parties to submit supplemental briefing on Tangreti's impact. See Dkt. Nos. 62, 63 ("Plaintiffs' Sur-Reply"); 64 ("State Defendants' Reply to Sur-Reply"); 65-1 ("Plaintiff's Response").

### a.  Speech Suppression Policy

First, Plaintiff argues that the creation and enforcement of the Speech Suppression Policy alone is sufficient to satisfy Tangreti. Pls.' Sur-Reply at 2–4. The Court disagrees. This argument is a rehashing of the third Colon factor ("the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom"). After Tangreti, courts have rejected the Colon factors as a sufficient method of establishing personal involvement. See Smith v. Westchester County, No. 19-CV-03605 (NSR), 2021 WL 2856515, at *6 n.4 (S.D.N.Y. July 7, 2021).

Still, Plaintiffs rely on the recent decision of Zielinski v. Annucci, No. 17-CV-1042, 2021 WL 2744684, at *7 (N.D.N.Y. July 2, 2021) for the proposition that a supervisor "could be held

17

personally responsible for 'creating or ensuring the continuance of' the policy or practice that caused [the constitutional violations]." See Pls.' Resp. at 1. Without passing judgment on Zielinski, the Court notes that "[Plaintiffs'] conclusory allegations that [State Defendants were] involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement." Koehl v. Bernstein, No. 10-CV-3808, 2011 WL 2436817, at *21 (S.D.N.Y. June 17, 2011), report and recommendation adopted, No. 10-CV-3808, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); cf. In re New York City Policing During Summer 2020 Demonstrations, No. 20-CV-8924, 2021 WL 2894764, at *16 (S.D.N.Y. July 9, 2021) (finding mayor was "personally involved in the development of the tactics employed by the NYPD" at the motion to dismiss stage when mayor stated in press conference after the fact that "'[he] approved the broad strategies and sometimes very specific choices.'").

### b. Tabling Event

Next, the Court analyzes whether any of the State Defendants were personally involved in the constitutional deprivations at the tabling event. Once again, the Court disagrees with Plaintiffs. Stenger, Rose, and Pelletier were not present at the tabling event, and UPD officers were the ones who removed College Republicans from the scene. Compl. ¶ 55. Pelletier cannot face supervisory liability. Equally unpersuasive, after the incident, Stenger and Rose released statements that Plaintiffs took issue with. Id. ¶¶ 58–67. It is unclear how this shows personal involvement without relying on the rejected Colon factors, and so, the Court finds that Plaintiffs failed to meet their burden to show that Stenger, Rose, and Pelletier, each through their own individual actions, violated Plaintiffs' Constitutional rights. See In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 2894764, at *16 (finding that NYPD

Commissioner was not personally involved despite praising NYPD's handling and criticizing the protestors because "[h]is praise of the NYPD's response suggests only that he approved of their tactics after the fact – not that he had any role in designing those tactics in the first place."). However, the dismissal is without prejudice and does not preclude a motion to amend if discovery reveals Stenger's, Rose's, or Pelletier's personal involvement. See Reinhardt v. City of Buffalo, No. 21-CV-206, 2021 WL 2155771, at *5 (W.D.N.Y. May 27, 2021) ("Dismissal is without prejudice and does not preclude a motion to amend if discovery reveals evidence of [individual defendant's] personal involvement.").

### c. Laffer Event

The Court reaches a different result with respect to the Laffer Event. This time, Pelletier was present at the event. Compl. ¶ 106. In fact, before the event, Pelletier told the private agents hired to protect Dr. Laffer that he would order them to escort Dr. Laffer out of the room if protestors approached the podium. Id. ¶ 96. That is exactly what happened: Pelletier personally directed the agents to remove Dr. Laffer. Id. ¶ 118; see also In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 2894764, at *15 (raising an inference of personal involvement in alleged violations when supervisor "was present at and personally led the NYPD's response to the June 4 protest in Mott Haven, where he personally directed officers to kettle, subdue and arrest protesters" and "personally approved the mass use of pepper spray against protesters" in another protest). Thus, the Complaint states an individual-capacity claim against Pelletier with respect to the Laffer Event.

As for Stenger and Rose, the Complaint does not sufficiently allege their individual participation to provide a basis to hold them individually liable for the alleged Laffer Event

deprivations. In addition to the reasons in the previous section, Plaintiffs point to the University administrators, who were acting at the direction of Stenger and Rose, and their actions before the Laffer Event. Pls.' Sur-Reply at 5. "These vague and conclusory allegations are insufficient to demonstrate that [Stenger and Rose were] personally involved in any of the alleged misconduct." Blockchain Luxembourg S.A. v. Paymium, SAS, No. 18-CV-8612, 2019 WL 4199902, at *12 (S.D.N.Y. Aug. 7, 2019); see also Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs., 727 F.3d 917, 926–27 (9th Cir. 2013) (holding that simply alleging "[o]n information and belief" that an act was carried out "at the direction of defendants" was a "[c]onclusory allegation" and thus "insufficient"). The University's statement merely states that the University took "several proactive steps to manage the [Laffer Event] following announcement of a planned disruption[.]" Compl. Ex. 8. Although the statement came from Rose, there is nothing at this point to indicate that either Rose or Stenger themselves planned or approved any "proactive steps" before the Laffer Event. Cf. In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 2894764, at *16 (finding mayor was "personally involved in the development of the tactics employed by the NYPD" at the motion to dismiss stage when mayor stated in press conference after the fact that "'[he] approved the broad strategies and sometimes very specific choices.'"). Thus, with respect to Stenger and Rose, Plaintiffs failed to meet their burden. However, the Court dismisses this claim without prejudice. Plaintiffs may amend and add the claim once again should the discovery process reveal Stenger's and Rose's personal involvement with the Laffer Event.

   3.  *Forum Analysis*

The right to a public forum for expression of ideas is fundamental to a democracy.

Concerned Jewish Youth v. McGuire, 621 F.2d 471, 473 (2d Cir.1980). However, "[t]he existence of a right of access to public property" for the purpose of speaking there and "the standard by which limitations on such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983). A plaintiff asserting a First Amendment claim under § 1983 "must demonstrate that his conduct is deserving of First Amendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by his exercise of free speech." Rattner v. Netburn, 930 F.2d 204, 208 (2d Cir. 1991). To determine whether the First Amendment protects particular speech, we must first "examine the nature of the forum in which the speaker's speech is restricted." Huminski v. Corsones, 396 F.3d 53, 89 (2d Cir. 2004). The Court must then assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985).

Plaintiffs contend that the areas on the SUNY-Binghamton campus where the events in this action took place are designated public fora. Opposition at 8. A "designated public forum" is a place that, although not traditionally open for public assembly and debate, "the government has taken affirmative steps to open for general public discourse." Johnson v. Perry, 859 F.3d 156, 172 (2d Cir. 2017) (internal citation omitted). "Speech in a designated public forum is entitled to the same constitutional protection as that extended to expression in a traditional public forum, so long as the state continues to designate the forum for such use." Id. (internal citation omitted). In traditional and designated public fora, content-based regulations of speech must be "necessary to serve a compelling state interest." Id.

Defendants, on the other hand, argue that the areas in question are limited public fora. Reply at 4. A "limited public forum" is a subset of the designated public forum, created when the government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects. Make the Road By Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004). "In a limited public forum, regulations governing the content of speech are allowed, so long as they are 'reasonable' and 'viewpoint-neutral.'" Johnson, 859 F.3d at 172. A limited public forum triggers a lower level of scrutiny than a designated public forum. See Hershey v. Goldstein, 938 F. Supp. 2d 491, 506 (S.D.N.Y. 2013).

The Second Circuit has articulated the factors that this Court should consider in the forum analysis:

> In conducting forum analysis, we examine a variety of factors, including "the forum's physical characteristics and the context of the property's use, including its location and purpose." We have held that the "primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used." Also relevant is the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations. Finally, we consider whether the property in question "is part of a class of property which by history or tradition has been open and used for expressive activity."

Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 342 (2d Cir. 2010) (internal citations omitted).

### a.  The Spine

"It is clear that the forum analysis that the Court must undertake is a fact intensive analysis." Wandering Dago Inc. v. New York State Off. of Gen. Servs., 992 F. Supp. 2d 102, 123 (N.D.N.Y. 2014). The Complaint only alleges that the Spine was in a high traffic area on the

22

campus, and the table did not block access to buildings or pedestrians. Compl. ¶ 47. Without

anything more in the factual record, the Court finds that it cannot classify the Spine at this time

and it must deny the motion as it relates to the tabling incident. See, e.g., id. ("Given the nature

of this inquiry and the lack of a developed factual record, the Court finds that it is premature to

classify the forum at this time."); Lederman v. Benepe, No. 12-CV-6028, 2014 WL 1318356, at

*9 (S.D.N.Y. Mar. 28, 2014) ("The forum issue often involves a 'a fact intensive analysis' that is

not well-suited to a motion to dismiss.").

### b.  The Lecture Hall

By contrast, the Court finds that based on the current factual record and for purposes of

this motion, the lecture hall is a limited public forum. See Hickok v. Orange Cty. Cmty. Coll.,

472 F. Supp. 2d 469, 475 (S.D.N.Y. 2006) ("The lecture hall at the College is a limited public

forum"); Kaler, 370 F. Supp. 3d at 983 ("the Supreme Court and Eighth Circuit have generally

held that [] university property (like lecture halls) . . . are 'limited public forums.'") (collecting

cases); see also Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity,

AFL CIO v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 545 (2d Cir. 2002)

("Examples of limited public fora include state university meeting facilities opened for student

groups . . . .").

Even as a limited public forum, the Court finds that Plaintiffs are able to sustain a First

Amendment claim because it is plausible that State Defendants' conduct constituted viewpoint

discrimination. Rose had previously said that College Republicans "intended to be provocative"

and State Defendants were on notice that there was a planned disruption to the Laffer Event.

Compl. Exs. 2, 8. Before the event, State Defendants provided demonstrators a lecture hall

adjacent to the Laffer Event (and which had connecting doors to the event's lecture hall) to protest. Compl. ¶ 82. Also, UPD informed Dr. Laffer that the University would prefer that Dr. Laffer cancel the event. Id. ¶ 91. Finally, Pelletier told the private agents hired to protect Dr. Laffer that he would order them to escort Dr. Laffer out of the room if protestors approached the podium, which is exactly what happened. Id. ¶¶ 96, 118. Drawing all reasonable inferences in favor of Plaintiffs, the Court finds it plausible that State Defendants' actions effectively amounted to a cancellation of the Laffer Event and that such cancellation was not viewpoint neutral. Therefore, State Defendants' Motion to Dismiss is denied.

The tension between student activism and freedom of speech on college campuses is not a new phenomenon. See, e.g., Healy v. James, 408 U.S. 169, 187 (1972). SUNY-Binghamton officials had clear forewarning by social media and the tabling incident that protestors planned to disrupt the Laffer Event. At this stage of the case, while the Court recognizes that the protestors have a First Amendment right to protest, SUNY-Binghamton officials facilitated the protest and did practically nothing to protect Plaintiffs' free speech. In effect, SUNY-Binghamton officials sanctioned the protest to denigrate into suppressive conduct, or "enforced silence." See Whitney, 274 U.S. at 377 (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression.") (emphasis added).

By removing the speaker from the lecture hall instead of the unruly protesters, State Defendants were not only plausibly violating this basic constitutional right, but also preventing fruitful discussion—not the role of an enlightened university. See also id., 274 U.S. at

375 (Brandeis, J., concurring) ("discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.").

"Our Founding Fathers recognized the occasional tyrannies of those in power and, in doing so, amended the Constitution so that free speech and a free press should be guaranteed." Maholick v. WNEP TV, Div. of New York Times Co., No. 90-CV-1517, 1992 WL 132543, at *5 (M.D. Pa. Apr. 1, 1992), aff'd sub nom. Maholick v. WNEP TV, a Div. of New York Times Co., 981 F.2d 1247 (3d Cir. 1992). In preserving the inalienable right to freedom of speech, the Founding Fathers were especially concerned with protecting unpopular speech. See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55, (1988) (citation omitted) ("[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.").

### B.  Second Cause of Action - First Amendment Retaliation

To prove a First Amendment retaliation claim a plaintiff must show: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. County of Nassau, 732 F.3d 157, 160 (2d Cir. 2013) (per curiam) (citing Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)).

The retaliation in question refers to the Student Association's suspension of Plaintiffs the day after the Laffer Event. State Defendants argue once more that Plaintiffs cannot show personal involvement. State Defs.' Mem. of Law at 19–20. The Court agrees. Plaintiffs allege

that Stenger and Rose caused the injury since they control the Student Association. See Compl. ¶ 130. This is a conclusory statement and it is insufficient to show personal involvement. Cf. Wilson v. Dantas, No. 12-CV-3238, 2013 WL 92999, at *5 (S.D.N.Y. Jan. 7, 2013), aff'd, 746 F.3d 530 (2d Cir. 2014) ("[I]t is an insufficient, conclusory allegation that Citibank caused [a third party] to not pay [plaintiff].") To the extent Plaintiffs rely on the Speech Suppression Policy to show personal involvement, this also fails for the reasons explained in Section IV(A)(2)(a). Furthermore, even though Rose and Stenger may have conceded that they had the ability to override the Student Association's discipline, this too does not show that they had any role with the underlying suspension decision in the first place. See In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 2894764, at *16 (failing to demonstrate personal involvement when "[NYPD's Commissioner's] praise of the NYPD's response suggests only that he approved of their tactics after the fact – not that he had any role in designing those tactics in the first place."). Plaintiffs' allegations do not provide a sufficient basis from which the Court can infer that Stenger or Rose had any personal involvement in the suspension decision.[3] However, like before, dismissal is without prejudice and does not preclude a motion to amend if discovery reveals evidence of personal involvement.[4]

---

[3] Before Tangreti, Plaintiffs could have potentially relied on the Colon factors to show personal involvement, especially if Rose and Stenger had an affirmative duty to correct an ongoing constitutional violation. Now, "[t]he violation must be established against the supervisory official directly." Tangreti, 983 F.3d at 618. Put differently, Stenger and Rose are allegedly "supervisors" of the Student Association, and "[they] are not liable solely because of their positions of leadership or authority." Kellier v. Billups, No. 21-CV-3921, 2021 WL 2435556, at *5 (S.D.N.Y. June 14, 2021). If Plaintiffs wish to hold Stenger and Rose liable, they must allege facts showing their personal involvement in the suspension decision.

[4] Once more, this only applies to the individual capacity claims and not the official capacity claims seeking declaratory or injunctive relief. See supra n.2.

### C. Fourth and Fifth Causes of Action - Conspiracy Claims

#### 1. 42 U.S.C. § 1985(3)

Section 1985 provides a statutory remedy where a plaintiff can prove a conspiracy to violate his civil rights. Vertical Broad., Inc. v. Town of Southampton, 84 F. Supp. 2d 379, 389 (E.D.N.Y. 2000). Section 1985 does not create any substantive rights, but rather provides a remedy for the deprivation of rights guaranteed by the United States Constitution. Id.

To state a claim under § 1985(3), a plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.

Grant v. City of Syracuse, No. 15-CV-445, 2017 WL 5564605, at *9 (N.D.N.Y. Nov. 17, 2017) (Kahn, J.) (internal citations omitted).

"A conspiracy is an agreement between two or more individuals, where one individual acts in furtherance of the objective of the conspiracy, and each member has knowledge of the nature and scope of the agreement." Dove v. Fordham Univ., 56 F. Supp. 2d 330, 337 (S.D.N.Y. 1999). A plaintiff must provide "some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110–11 (2d Cir. 2003) (quoting Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). In addition, a plaintiff "must allege, with at least some degree of particularity, overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999). Finally, a plaintiff must also show that the conspiracy was motivated by "some racial or perhaps

otherwise class-based, invidious discriminatory animus behind the conspirators' action." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993) (quoting United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 829 (1983)).

The Court begins its analysis by noting that "it is unclear whether under Second Circuit law a political party is a protected group satisfying § 1985's class-based discrimination requirement[.]" Fotopolous v. Bd. of Fire Comm'rs of Hicksville Fire Dist., 11 F. Supp. 3d 348, 369 (E.D.N.Y. 2014); see also Frasco v. Mastic Beach Prop. Owners' Ass'n, No. 12-CV-2756, 2014 WL 3735870, at *5 n.7 (E.D.N.Y. July 29, 2014) (explaining the tension between the Second Circuit's decision and subsequent Supreme Court case law). "[S]ome district courts in this Circuit have since concluded that political affiliation alone does not constitute a protected 'class' under Section 1985." Vidurek v. Koskinen, No. 17-CV-9064, 2018 WL 3597644, at *12 (S.D.N.Y. July 25, 2018), aff'd, 789 F. App'x 889 (2d Cir. 2019); see also Fulani v. McAuliffe, No. 04-CV-6973, 2005 WL 2276881, at *6 (S.D.N.Y. Sept. 19, 2005) (concluding the Second Circuit "does not recognize political affiliations for purposes of class membership under § 1985"). Even this Court adopted a Report-Recommendation where "[i]n [the § 1985(3)] context, 'class-based animus' encompasses only those groups with discrete and immutable characteristics such as race, national origin, and sex." Layou v. Crews, No. 11-CV-0114, 2013 WL 5494062, at *3, *17 (N.D.N.Y. Sept. 30, 2013) (Kahn, J.).

Even if political affiliation does constitute a protected class, the Court must still dismiss Plaintiffs' § 1985(3) claim. Plaintiffs only asserted conclusory allegations that Defendants conspired against Plaintiffs "due to their affiliation with the Republican party." Compl. ¶¶ 166, 171. "Conclusory allegations of discriminatory intent alone are insufficient to survive a motion

to dismiss a Section 1985(3) claim." <u>Hickey-McAllister v. Brit. Airways</u>, 978 F. Supp. 133, 139

n.4 (E.D.N.Y. 1997); <u>see also</u> <u>Vidurek</u>, 2018 WL 3597644, at *12 (finding that the plaintiffs

"ple[d] no facts whatsoever in support of their bald assertions of animus on the basis of [a

political] affiliation" (citation omitted)), <u>aff'd</u>, 789 F. App'x 889 (2d Cir. 2019). "[C]ourts in the

Second Circuit have found that discriminatory animus is adequately alleged when particularized

facts are pled." <u>Masri v. Thorsen</u>, No. 17-CV-4094, 2020 WL 1489799, at *8 (S.D.N.Y. Mar. 27,

2020) (collecting cases). Here, Plaintiffs argue that State Defendants made their animus clear in

their contemporaneous statements. Opposition at 20. Even drawing all reasonable inferences in

favor of Plaintiffs, the Court cannot infer from these statements that State Defendants acted with

discriminatory animus because the statements do not appear to be "directed at Plaintiffs . . .

because of their [political affiliation]." <u>Zhang Jingrong v. Chinese Anti-Cult World All.</u>, 287 F.

Supp. 3d 290, 301 (E.D.N.Y. 2018). There is nothing to indicate that State Defendants made any

anti-Republican remarks or that they took hostile actions explicitly directed toward Plaintiffs'

affiliation with the Republican Party. Plaintiffs' claims amount to discrimination based on

conservative views, but this alone is not akin to discriminatory animus based on political

affiliation. <u>See</u> <u>Turner v. Boyle</u>, 116 F. Supp. 3d 58, 95 (D. Conn. 2015) (". . . nor do

[individuals] receive protected status [under section 1985] based on an allegation of

discrimination on the basis of one's political views.") (citations omitted). Accordingly,

Plaintiffs' § 1985(3) claims are dismissed.

     *2.  42 U.S.C. § 1986*

     Plaintiffs also allege claims pursuant to 42 U.S.C. § 1986. Section 1986 "provides a

cause of action against anyone who 'having knowledge that any of the wrongs conspired to be

done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so.'" Adams v. Smith, No. 07-CV-0452, 2007 WL 2323435, at *2 (N.D.N.Y. Aug. 9, 2007) (Kahn, J.) (internal citations omitted). A plaintiff's "failure to state a claim under Section 1985 is fatal to [the] Section 1986 claim." Id. (internal citations omitted). Since Plaintiffs' § 1985 claims are dismissed, Plaintiffs' § 1986 claims must also be dismissed.

### D.  Sixth Cause of Action - Equal Protection Claim

"When a plaintiff's equal protection claims are based on alleged First Amendment violations, the former 'coalesce [ ] with the latter.'" Gentile v. Nulty, 769 F. Supp. 2d 573, 582–83 (S.D.N.Y. 2011) (internal citation omitted); see also Kempkes v. Downey, No. 07-CV-1298, 2008 WL 852765, at *6 (S.D.N.Y. Mar. 31, 2008) ("Where this is the case, the equal protection claim is dependent on the First Amendment claim; in other words where the First Amendment claim has failed, the equal protection claim fails, too."). Because the Court granted the motion to dismiss with respect to some of the individual capacity First Amendment claims, see supra Section IV(A)(2), and denied the motion to dismiss with respect to the other First Amendment claims, see supra n.2 and Section IV(A)(3)(a)–(b), it must also similarly grant and deny the motion with respect to the § 1983 equal protection claim.

### E.  Issues with the Relief Sought

State Defendants lastly argue that some of the claims for relief sought should be denied. State Defendants' Memorandum of Law at 20 n.9, 25–26.

#### 1.  Subd. (A)

Plaintiffs seek a declaration that State Defendants violated Plaintiffs' constitutional rights. Compl., PRAYER FOR RELIEF, subd. (A). State Defendants argue that since all claims

must be dismissed, this includes any claim for declaratory relief. State Defendants'

Memorandum of Law at 26. However, since the Court is not dismissing all of the claims, the

Court still retains jurisdiction to grant declaratory relief.

       *2.  Subd. (B) – (D)*

State Defendants also contend that Plaintiffs are seeking "obey the law" injunctions. Id.

at 25–26. At this time, the Court need not address State Defendants' arguments because they are

premature at the motion to dismiss stage. See Chachkes v. David, No. 20-CV-2879, 2021 WL

101130, at *14 (S.D.N.Y. Jan. 12, 2021) ("[Plaintiff] has not moved for a preliminary injunction

and the attack on the request for permanent injunctive relief is premature here at the motion to

dismiss stage."); City of N.Y. v. A-1 Jewelry & Pawn, Inc., 247 F.R.D. 296, 353 (E.D.N.Y.

2007) ("a motion for failure to state a claim properly addresses the cause of action alleged, not

the remedy sought"); id. ("Only when th[e] remedy has been determined may defendants contest

its application on grounds of vagueness or some other violation of Rule 65(d) of the Federal

Rules of Civil Procedure.").

       *3.  Subd. (F)*

Finally, in a footnote, State Defendants argue that the Court should dismiss the claim for

relief that Defendants Stenger, Rose, and the Student Association "recognize the Young

Americans for Freedom chapter as a registered student organization." State Defendants'

Memorandum of Law at 20 n.9. Although Plaintiffs did not discuss this point in their Opposition,

the State Defendants did not properly place this argument before the Court. See Stensrud v.

Rochester Genesee Reg'l Transportation Auth., No. 19-CV-06753, 2020 WL 7378957, at *11

(W.D.N.Y. Dec. 16, 2020) ("[T]he Court does not even reach these issues because RGRTA has

not properly placed the sufficiency of the second cause of action before this Court, by only

dropping a reference to it in a footnote in its initial memorandum of law"); see F.T.C. v. Tax

Club, Inc., 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled . . . that a court need

not consider arguments relegated to footnotes[.]"); see also Primmer v. CBS Studios, Inc., 667 F.

Supp. 2d 248, 256 n.4 (S.D.N.Y. 2009) ("[B]ecause the argument is made wholly in a footnote . .

., the Court may choose to disregard it."). Thus, at this time, the Court will not consider this

argument.

## V.    CONCLUSION

Freedom of speech is a crucial aspect of our democracy. It is especially to be protected

and promoted on a college campus, which remains the bulwark of our education system and

where the free exchange of ideas is the bedrock of education itself.

Accordingly, it is hereby:

**ORDERED**, that State Defendants' Motion to Dismiss under 12(b)(1) (Dkt. No. 32)

against YAF is **DENIED**; and it is further

**ORDERED**, that State Defendants' Motion to Dismiss under 12(b)(6) (Dkt. No. 32) is

**GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Plaintiffs' First

Amendment and Equal Protection claims related to the tabling event against Stenger, Rose, and

Pelletier in their individual capacities; Plaintiffs' First Amendment and Equal Protection claims

related to the Laffer Event against Stenger and Rose in their individual capacities; Plaintiffs'

First Amendment retaliation claims against Stenger and Rose in their individual capacities; and

Plaintiffs' conspiracy claims. The motion is **DENIED** as to Plaintiffs' First Amendment and

Equal Protection claims related to the tabling event and the Laffer Event against Stenger, Rose,

and Pelletier in their official capacities; Plaintiffs' First Amendment and Equal Protection claims related to the Laffer Event against Pelletier in his individual capacity; and Plaintiffs' First Amendment retaliation claims against Stenger and Rose in their official capacities; and it is further

      **ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

      **IT IS SO ORDERED.**

DATED:     August 24, 2021
             Albany, New York

LAWRENCE E. KAHN
United States District Judge