UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

YOUNG AMERICA'S FOUNDATION, *et al.*,

                Plaintiffs,

    -against-                          3:20-CV-0822 (LEK/TWD)

HARVEY STENGER, *et al*.,

                Defendants.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Young America's Foundation ("YAF"), the Binghamton University College Republicans ("College Republicans"), and Jon Lizak (collectively, "Original Plaintiffs") brought this action pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986 against Harvey Stenger, Brian Rose, John Pelletier, the College Progressives, the Progressive Leaders of Tomorrow ("PLOT"), and the Student Association of Binghamton University (collectively, "Original Defendants"), alleging infringement of the Original "Plaintiffs' fundamental rights to free speech and equal protection of law by state actors on their own and in conspiracy with private actors." Dkt. No. 1 ("Complaint") ¶ 2.

On March 23, 2023, the Court granted Lizak's motion to voluntarily dismiss his claims against the Original Defendants pursuant to Federal Rule of Civil Procedure 41(b). Dkt. No. 223 ("March 2023 Order") at 15–16. However, the Court denied the Original Plaintiffs' motion for a default judgment against PLOT, an unincorporated association with no legal existence independent of its members. Id. at 18–22. Given PLOT's lack of independent legal existence, the Court sua sponte dismissed the claims against PLOT for lack of subject matter jurisdiction. Id.

In the same order, the Court also sua sponte examined its subject matter jurisdiction over other claims in the action—namely, (1) all claims brought on behalf of the College Republicans, another unincorporated association, and (2) all of YAF and the College Republicans' (collectively, "Plaintiffs") claims against the College Progressives, also an unincorporated association. Id. at 22–24. The Court ordered Plaintiffs to show cause as to why the Court should not sua sponte dismiss these two sets of claims for lack of Article III standing. Id.

Having reviewed the Complaint, Plaintiffs' memorandum of law to show cause, Dkt. No. 227 ("Plaintiffs' Response"), and the accompanying declaration, Dkt. No. 227-1 ("Declaration of Rein Bey" or "Bey Declaration"), the Court has determined that it retains Article III subject matter jurisdiction over the College Republicans' claims *on behalf of its members* against Stenger, Rose, Pelletier, and the Student Association of Binghamton University, but *not over claims on behalf of the organization itself*. Plaintiffs have also failed to show that the Court has Article III subject matter jurisdiction over their claims against the College Progressives. The Court therefore dismisses those claims and terminates the College Progressives as a defendant to this action. For related reasons set forth below, the Court also finds it necessary to vacate its prior order finding that non-party Masai Andrews is authorized to accept service on behalf of PLOT. See Dkt. No. 142 ("February 2022 Order"); Young America's Foundation v. Stenger, No. 20-CV-0822, 2022 WL 474152 (N.D.N.Y. Feb. 16, 2022) (Kahn, J.).

## II.    BACKGROUND

### A.  The Parties

When the Original Plaintiffs filed their Complaint in July 2020, Jon Lizak was "a full-time student at SUNY-Binghamton," and was President of the College Republicans. Compl. ¶ 16. However, Lizak "stepped down as the [P]resident of the . . . College Republicans . . . in

December 2021," Dkt. No. 208-2 ¶ 2, and "graduated . . . in May 2022," id. ¶ 4. With the Court's permission, Lizak voluntarily dismissed his claims against the Original Defendants in early 2023, and thus he is no longer a plaintiff to this action. Mar. 2023 Order at 15–16.

Lizak's dismissal left the College Republicans and YAF as the only remaining Plaintiffs. See Docket. The College Republicans are "an unincorporated association of SUNY-Binghamton students." Compl. ¶ 12 (footnote omitted); Bey Decl. ¶ 5. "As of November 2019," the College Republicans were "a fully chartered [SUNY-Binghamton] Registered Student Organization," but after the events giving rise to the Complaint, the "College Republicans' full charter" was "revoked . . . and replaced . . . with a provisional charter." Bey Decl. ¶¶ 12–13. As of April 2023, the College Republicans continue to operate at SUNY-Binghamton, where they "hold weekly meetings and routinely post flyers in connection with those weekly meetings." Id. ¶ 6.

Plaintiff YAF, on the other hand, "is a nonprofit [501(c)(3)] organization," headquartered in Virginia. Compl. ¶ 10; see also Internal Revenue Service, Tax Exempt Organization Search, https://apps.irs.gov/app/eos/ (last visited May 19, 2023). YAF's "mission is to educate the public on the ideas of individual freedom, a strong national defense, free enterprise, and traditional values." Compl. ¶ 10. "YAF partners with like-minded student organizations on university campuses to, among other things, co-host speakers." Id. ¶ 11.

When they initiated suit in July 2020, the Original Plaintiffs named Harvey Stenger, Brian Rose, John Pelletier, the College Progressives, PLOT, and the Student Association of Binghamton University ("Student Association") as the Original Defendants. See Compl. To date, all the Original Defendants have remained in the action except for PLOT, "a non-student group based in Binghamton, New York." Id. ¶ 35; see Mar. 2023 Order at 22, 24 (sua sponte dismissing all claims brought against PLOT for lack of Article III subject matter jurisdiction).

Stenger, Rose, and Pelletier (collectively, "State Defendants") are SUNY-Binghamton administrators. "Stenger is, and was at all times relevant to th[e] Complaint, the President of SUNY-Binghamton . . . ." Compl. ¶ 18. "Rose is, and was at all times relevant to th[e] Complaint, the Vice President for Student Affairs of SUNY-Binghamton . . . ." Id. ¶ 26. "Pelletier is, and was at all times relevant to th[e] Complaint, the Chief of UPD," i.e., "the New York State University Police Department at Binghamton ('UPD') . . . ." Id. ¶¶ 19, 30.

The Student Association "is a non-profit legal entity that has its offices within the University Union on SUNY-Binghamton's campus." Id. ¶ 39. "The Student Association describes itself as 'not only a forum for student activism, but the primary financial system which hundreds of clubs and student organizations receive their funding and legal protection through.'" Id. (footnote omitted). "The . . . administration permits the Student Association to operate with a limited degree of independence, but the administration retains the power to direct Student Association decisions." Id. ¶ 40. "Acting at the direction of Stenger and Rose, the Student Association has the power to suspend and reinstate student organizations." Id. (footnote omitted).

The College Progressives are "a registered student organization at SUNY-Binghamton and an unincorporated association of SUNY-Binghamton students." Id. ¶ 33. When the Original Plaintiffs filed their Complaint, the College Progressives allegedly "ha[d] more than 100 members," and "describe[d] themselves as a voice for progressive leftist politics on campus, as well as a center to concentrate activist conduct among students." Id. ¶ 34 (footnote omitted). However, in August 2022, the attorney who appeared on behalf of the College Progressives in 2020, see Dkt. No. 29, represented that the group "is no longer an active organization at Binghamton University" and that he is not "aware of [any] former members who are still at the University or in the immediate area," Dkt. No. 181 at 2.

4

### B.  The Original Plaintiffs' Allegations of Injury

The Original Plaintiffs' allegations of injury date back to October 2019, when "a Constitutions Assistant in the office of the Executive Vice President of the Student Association refused to grant official recognition to Young Americans for Freedom—a chapter of Plaintiff [YAF]—due to an anti-communism provision in the group's constitution that the Constitutions Assistant described as 'problematic' . . . ." Compl. ¶ 42 (footnote omitted). "When YAF and Young Americans for Freedom pushed back on the Student Association's viewpoint discrimination, the Constitutions Assistant relented." Id. ¶ 43.

"Soon thereafter, however, the Student Association alleged new deficiencies with the Young Americans for Freedom's request for recognition and demanded the group find a faculty sponsor or secure police presence at all of its campus events." Id. "These new requirements—which the Student Association did not demand of any other student organization—were entirely manufactured as roadblocks to prevent Young Americans for Freedom from being recognized on campus due to their expressed ideological views." Id.

The following month, "[o]n Thursday, November 14, 2019, [the] College Republicans organized a tabling event in a high-traffic area of SUNY-Binghamton's campus known as 'the Spine.'" Id. ¶ 47. "As they (and many other student organizations) had done previously, [the] College Republicans did not obtain a permit from the Student Association to table on this date." Id. ¶ 48. "This tabling event promoted an upcoming lecture by renowned economist and presidential advisor Dr. Arthur Laffer titled 'Trump, Tariffs, and Trade Wars' that [the] College Republicans w[ere] co-hosting with YAF on Monday, November 18, 2019 ('Dr. Laffer Event')." Id. ¶ 49.

After "close to three hours without incident . . . at approximately 1:30 [PM], a mob [comprised of the] College Progressives confronted [the] College Republicans over the content of their tabling." Id. ¶¶ 50–51. The "College Progressives incited other members to join the mob by sending messages to group chatrooms with numerous other students." Id. ¶ 51. These messages included:

> "I heard there's only like 3 supporters there"; "Yeah there's not that many but fuck em [sic] up anyways"; and, "Today on the spine Trump supporters are actively advocating for the Trump administration and gun violence. Join us at 2 [PM] as we disrupt this disgusting space that Binghamton has allowed students to create and protect the racism, homophobia, and xenophobia that has erupted from Trump and his supporters."

Id. ¶ 52 (brackets in original) (citing id. at 44–45 ("Exhibit 1")).

 "Shortly thereafter, the mob incited by the College Progressives—approximately 200 persons at this point—attacked [the] College Republicans' table." Id. ¶ 53. "The . . . mob confiscated and destroyed [the] College Republicans' Dr. Laffer Event flyers and posters, broke down and carried away their table, hurled insults and obscenities at their members who were tabling, and physically assaulted one member," by "forcibly removing her hat bearing the political slogan 'Make America Great Again.'" Id. ¶ 54.

The "UPD arrived at the scene and, instead of dispersing the mob and protecting [the] College Republicans' right to free speech," the UPD "demand[ed] that [the] College Republicans leave the Spine while the College Progressives chanted 'Pack it up.'" Id. ¶ 55 (footnote omitted). The UPD's demand was a manifestation of SUNY-Binghamton's "unwritten policy that it uses to censor, restrict, and inhibit unpopular student speech . . . (the 'Speech Suppression Policy')." Id. ¶¶ 22, 55. Stenger allegedly "created" and "enacted" this Speech Suppression Policy, id. ¶ 23, which "authorizes SUNY-Binghamton officials, including . . . Stenger, Rose, and Pelletier, to

prohibit, chill, oppose, and shut down speech with which they, or other students and faculty, disagree," id. ¶ 24. After the UPD demanded that the College Republicans leave the Spine, Lizak and another member of College Republicans "filed police reports with [the] UPD over the physical and verbal harassment they received from the College Progressive mob." Id. ¶ 56.

Four days after the tabling event, "[o]n Monday, November 18, 2019, Rose issued a statement regarding the disruption . . . ." Id. ¶ 58 (citing id. at 46–48 ("Exhibit 2")). In the statement, "Rose faulted [the] College Republicans for exercising their free speech rights in what he disparaged as a 'provocative' manner and gave a knowingly false account of the events designed to support [the] College Progressives." Id. ¶ 59. For instance, "Rose inaccurately grouped [the] College Republicans in with another student organization that had an adjacent table and claimed that the 'groups' display included provocative posters with gun imagery.'" Id. ¶ 60. "Rose continued that the 'groups intended to be provocative.'" Id. But "[c]ontrary to Rose's statement, [the] College Republicans did not have a poster that included gun imagery and they did not intend to be provocative; they were merely promoting the upcoming Dr. Laffer Event." Id. "Stenger also responded to the event with a short statement that both 'strongly condemn[ed] any acts that impede the expression of one's beliefs' but also defended the police's actions to completely shut down [the] College Republicans' expression of their beliefs." Id. ¶ 64 (citing id. at 49–56 ("Exhibit 3")). "Stenger's statement . . . contrast[ed] starkly with his response to an unrelated May 2019 incident" in which he "strongly demonstrated his support of [a] pro-Palestinian group" and its right to engage in expressive activity. Id. ¶ 65.

"Immediately following the . . . tabling disruption . . . YAF took measures to ensure [that] the Dr. Laffer Event (scheduled for Monday, November 18, 2019) would proceed . . . ." Id. ¶ 68. "First, YAF hired two agents from the private security firm Pinkerton to provide personal

protection to Dr. Laffer." Id. ¶ 69. "Second, YAF's then-general counsel . . . contacted [a lawyer representing SUNY-Binghamton] on Friday, November 15, 2019[,] to obtain assurances that SUNY-Binghamton was taking measures to fulfill its [constitutional] duty to . . . ensur[e] that the Dr. Laffer Event would be able to proceed." Id. ¶ 70. "Specifically, [YAF's then-general counsel] sought assurances that if protests occurred at the Dr. Laffer Event, [the] UPD would remove the disruptors and not the speaker . . . ." Id. ¶ 71. But "SUNY-Binghamton's [attorney] refused to provide . . . such assurances." Id. ¶ 72.

"In between the tabling incident . . . and the Dr. Laffer Event . . . PLOT posted a flyer to social media encouraging its members and others to disrupt the Dr. Laffer Event." Id. ¶¶ 73–75 (citing id. at 65–66 ("Exhibit 5")). The "College Progressives [then] reposted PLOT's flyer to their Instagram account," id. ¶ 76 (citing id. at 67–68 ("Exhibit 6")), and in another post, "explicitly asked its supporters via Instagram to '[c]ome out and support BING PLOT . . . to speak out against College [R]epublicans . . .' and to 'come out to lecture hall 8 . . . and put an end to this clownery,'" id. ¶ 76 (alterations in original) (citing id. at 69–70 ("Exhibit 7")).

Then, "[o]n the day of the Dr. Laffer Event (Monday, November 18, 2019) . . . YAF and [the] College Republicans met with UPD and certain SUNY-Binghamton administrators . . . ." Id. ¶ 77. Stenger, Rose, and Pelletier were not present at the meeting, but the officials present were "acting at the[ir] direction . . . ." Id. "At this meeting, [the] UPD told YAF and [the] College Republicans that . . . [the] UPD was aware of threats to disrupt the event by student and non-student groups . . . ." Id. ¶ 78. The UPD also criticized "YAF and the College Republicans for . . . hosting a public, as opposed to [a] private (ticketed) event." Id. ¶ 79. Additionally, "the SUNY-Binghamton administrators told YAF and [the] College Republicans that they were unilaterally imposing two conditions on the planned event." Id. ¶ 80. "First, SUNY-Binghamton

. . . decided to increase the UPD police presence and move the event to a lecture hall with more readily available egress routes" for Dr. Laffer, if needed. Id. ¶ 81. "Second, SUNY-Binghamton . . . provided [the College Progressives] with the lecture hall adjacent to the Dr. Laffer Event (and which had connecting doors to the event's lecture hall) to organize the planned disruption of [the] event." Id. ¶ 82.

YAF and the College Republicans strongly objected to the conditions SUNY-Binghamton unilaterally imposed, but the administrators "refused to change their position." Id. ¶¶ 83–84. "YAF and [the] College Republicans [also] requested that SUNY-Binghamton . . . announce in advance of the Dr. Laffer Event that its own written SUNY free speech policy required students and visitors to permit the [Original] Plaintiffs' free speech," id. ¶ 85, and YAF again "sought assurances . . . that if there w[ere] a disruption at the Dr. Laffer Event, [the] UPD would remove the disruptors and not the speaker," id. ¶ 87. "The . . . administrators refused to agree to make a public statement of the University's free speech policy," or to provide any such assurances. Id. ¶¶ 86, 88.

When Dr. Laffer and his aides arrived at a nearby airport, YAF and the UPD greeted them. Id. ¶¶ 89–90. "In the ensuing conversation," the "UPD informed Dr. Laffer that it had concerns about the Dr. Laffer Event and unexpectedly conveyed SUNY-Binghamton's desire that Dr. Laffer return to his plane and cancel the event." Id. ¶ 91. "When Dr. Laffer firmly told [the] UPD that he wanted to proceed with the event as planned, [the] UPD showed him social media posts regarding [the] planned disruption of the event." Id. ¶ 92.

"Approximately one hour before the Dr. Laffer Event, the two Pinkerton agents hired by YAF met with [the] UPD." Id. ¶ 94. "At this meeting, [the] UPD stated [that] they were aware of [the] College Progressives and PLOT's planned disruption of the Dr. Laffer Event." Id. ¶ 95.

"Pelletier told the . . . agents that if disruptors approached Dr. Laffer's podium then he would order the . . . agents to escort Dr. Laffer out of the event." Id. ¶ 96. The UPD "also informed . . . Dr. Laffer's driver for the day . . . that he should stay with the vehicle since Dr. Laffer may need to make a quick getaway . . . ." Id. ¶ 97.

"At least one hour before the Dr. Laffer Event was scheduled to begin, [the] College Progressives and PLOT and their co-conspirators were lined up outside the lecture hall and packed into the adjacent lecture hall provided . . . by SUNY-Binghamton administrators." Id. ¶ 98. "Once the doors to the Dr. Laffer Event were opened, hundreds of students and non-students, many of them members of [the] College Progressives and PLOT, flooded in and packed the room." Id. ¶ 99. "[M]any of these individuals remained standing in the rows, side aisles, and back of the lecture hall." Id. ¶ 100. The "College Republicans recognized a number of the students standing in attendance at the Dr. Laffer Event as members of [the] College Progressives." Id. ¶ 101. "[M]embers of [the] College Progressives and PLOT . . . were wearing black face masks to disguise their identities, armbands (with PLOT insignia), hooded sweatshirts (with PLOT insignia), pins (with PLOT insignia), and red shirts (with PLOT insignia)." Id. ¶ 102. "At the insistence of [the] College Republicans and YAF, [the] UPD made one statement about the size of the crowd and SUNY-Binghamton's fire code and asked those standing to take their seats." Id. ¶ 104. "Pelletier and [the] UPD . . . took no further action" "when the crowd refused to clear the rows, aisles, and back of the lecture hall and take seats . . . ." Id. ¶ 105.

"The Dr. Laffer Event started promptly at 7:30 [PM] EST with John Restuccia, the then-President of the College Republicans, providing a brief two-minute introduction of Dr. Laffer." Id. ¶ 108. "Dr. Laffer took the podium and, just a few seconds in, a member of [the] College Progressives and/or . . . PLOT stood up in the second row and began shouting accusations at Dr.

Laffer . . . ." Id. ¶ 110 (footnote omitted). "The majority of those present greeted these accusations with applause, and the disrupting student was soon handed a megaphone and urged to continue." Id. ¶ 112. The "College Republicans, who were sitting in the first row, stood up and displayed 'Free Speech' signs in response to the disruptors." Id. ¶ 114. The disrupting student "spoke through the megaphone for nearly two minutes before [the] UPD took any action to restrain him." Id. ¶ 115. "Ten to fifteen members of [the] College Progressives and PLOT then formed a protective barrier around the megaphone-wielding disruptor." Id. ¶ 116. "Additional members of [the] College Progressives and PLOT flooded into the lecture hall from the adjacent room which SUNY-Binghamton administrators had provided to them and which had connecting doors to the lecture hall." Id. ¶ 117.

"During these events, Pelletier, acting pursuant to the Speech Suppression Policy, directed the Pinkerton agents to remove Dr. Laffer from the lecture hall." Id. ¶¶ 30, 118. The agents—who were "hired [by YAF] to protect Dr. Laffer's personal safety—complied with the directive and escorted Dr. Laffer and his aides out of the lecture hall into a hallway behind the podium." Id. ¶ 119.

Eventually, the UPD "removed the disruptor with the megaphone, but *only after* he handed off the megaphone" to others. Id. ¶ 122. The "College Progressives and PLOT and their supporters continued to occupy the lecture hall, surrounding hallways, and the area outside of the lecture building for more than one hour." Id. ¶ 123. "As their disruption continued, [the] College Progressives and PLOT [called] Plaintiffs . . . 'white supremacists' and 'racists,'" which Plaintiffs have characterized as slander. Id. ¶ 124. "When Plaintiffs attempted to engage them in dialogue, one disruptor stated: 'The only time we have to mobilize on issues are in these spaces.

Because we are never heard. Because you are always heard as a white male in this country.'" <u>Id.</u> "Stenger and Rose took no action to disperse [the] College Progressives and PLOT." <u>Id.</u> ¶ 125.

Later that evening, Rose issued a statement regarding the "College Progressives and PLOT's disruption of the Dr. Latter Event." <u>Id.</u> ¶ 126 (citing <u>id.</u> at 71–73 ("Exhibit 8")). The statement said that the "University anticipated that the event would attract demonstrators, given the challenges with a tabling activity by the College Republicans last week, so it took several proactive steps to manage the event following announcement of a planned disruption." Ex. 8. According to Rose, these steps included (1) "mov[ing] the event to a larger lecture hall due to safety concerns," (2) providing the demonstrators with "the opportunity to hold their own speak-out in an adjacent lecture hall," (3) "deploy[ing] a large number of police to maintain order at the event," and (4) asking the attendees "to allow the presentation to go forward and reserve their questions until the end." <u>Id.</u> In the statement, Rose also reported that the "individual using a bull horn," was arrested, as well as "another individual who attempted to interfere with police." <u>Id.</u> Rose further stated that "[t]he University is incredibly disappointed with the events that happened tonight," because "[t]he protestors chose instead to infringe on the expressive activity of others and to prevent those who wished to hear the speaker from doing so." <u>Id.</u> Rose added that the University would investigate the event and "reserve[d] the right to pursue appropriate charges or disciplinary action against those organizations and individuals as relevant information is confirmed." <u>Id.</u>

The very next day, the Student Association "sent [the] College Republicans a two-line email informing them that they were being 'suspended . . . due to [their] violation with both University and Student Association policy [*sic*] in regards to tabling without proper approval on Thursday [*sic*] November 14th.'" Compl. ¶ 130 (alterations in original) (quoting <u>id.</u> at 74–75

("Exhibit 9")). As a result of this disciplinary action, the College Republicans were unable "to receive university funding [or] reserve rooms to host expressive events for the Spring 2020 semester." Id. ¶ 133. In contrast, "Stenger, Rose, and the Student Association have not required other groups to obtain approval before tabling on campus," id. ¶ 131, nor have they taken any action against the protesters, see id. ¶ 138.

The "College Republicans and Lizak met with . . . Stenger and Rose on January 20, 2020[,] to discuss the tabling incident and the Dr. Laffer Event." Id. ¶ 134. "This meeting was facilitated by Congressman Thomas Reed, the U.S. Representative for New York's 23rd congressional district [at the time], who also attended." Id. (footnote omitted). "During this meeting, Rose admitted that he and Stenger knew that [the] College Progressives had encouraged students to violate SUNY-Binghamton policies by disrupting the Dr. Laffer Event." Id. ¶ 135. Rose also "conceded that he and Stenger had the ability—and responsibility—to personally override the Student Association's action or inaction on student organization discipline." Id. ¶ 136. Rose also "promised [the] College Republicans and Congressman Reed that he and Stenger would . . . discipline [the] College Progressives, and . . . timely inform [them] of that discipline." Id. ¶ 137. At the same meeting, "Stenger grossly misrepresented the true nature of Dr. Laffer's departure" by "contend[ing]—contrary to fact—that [the] UPD asked Dr. Laffer to wait ten minutes for them to clear the lecture hall of disruptors, but that Dr. Laffer refused and left." Id. ¶ 139.

### C. The Original Plaintiffs' Causes of Action and Requested Relief

Six months later, on July 22, 2020, the Original Plaintiffs filed their Complaint, raising six causes of action against the Original Defendants:

1. 42 U.S.C. § 1983 ("Section 1983") claims against Stenger, Rose, and Pelletier, in their official and individual capacities, for knowingly and intentionally violating YAF, Lizak, and the College Republicans' First Amendment Rights by applying the Speech Suppression Policy at the tabling incident ("Count I(A)") and the Dr. Laffer Event ("Count I(B)"), id. ¶¶ 148–56;

2. Section 1983 claims against Stenger and Rose, in their official and individual capacities, and the Student Association for unconstitutionally retaliating against the College Republicans for the views they expressed during their tabling and Dr. Laffer events by suspending their student organization and depriving them of the attendant benefits, id. ¶¶ 157–61 ("Count II");

3. 42 U.S.C. § 1985(3) ("Section 1985(3)") claims against the College Progressives and PLOT for their conspiracy to deprive YAF, Lizak, and the College Republicans of their First Amendment rights due to their affiliation with the Republican Party and their race, id. ¶¶ 162–69 ("Count III");

4. Section 1985(3) claims against Stenger, Rose, and Pelletier, in their official and individual capacities, and the College Progressives and PLOT for their conspiracy to deprive YAF, Lizak, and the College Republicans of their constitutional rights due to their affiliation with the Republican Party, id. ¶¶ 170–73 ("Count IV");

5. 42 U.S.C. § 1986 ("Section 1986") claims against Stenger, Rose, and Pelletier, in their official and individual capacities, for having knowledge of the Section 1985(3) conspiracies targeting YAF, Lizak, and the College Republicans, but neglecting or refusing to protect them, despite being empowered to do so, id. ¶¶ 174–79 ("Count V"); and

6. Section 1983 claims against Stenger, Rose, and Pelletier, in their official and

individual capacities, for violating YAF, Lizak, and the College Republicans'

rights under the Equal Protection Clause of the Fourteenth Amendment by

denying them the right to use a university forum for their expressive activity at the

tabling incident ("Count VI(A)") and the Dr. Laffer Event ("Count VI(B)") on

account of their message, id. ¶¶ 180–86.

In their Prayer for Relief, the Original Plaintiffs set forth several requests for monetary,

declaratory, and injunctive relief. See id. at 38–39. Their requested injunctive relief includes: (1)

an order permanently enjoining the Original Defendants from disrupting and silencing the

Original Plaintiffs' speech and related activities; (2) an order permanently enjoining Stenger,

Rose, and Pelletier from ratifying heckler's vetoes or otherwise enforcing the Speech

Suppression Policy; (3) an order permanently enjoining Stenger, Rose, and the Student

Association from retaliating against the Original Plaintiffs' expressed views; (4) an order

requiring Stenger, Rose, and the Student Association to reinstate the College Republicans as a

registered student organization—with all attendant rights—by lifting its suspension; and (5) an

order requiring Stenger, Rose, and the Student Association to recognize the Young Americans

for Freedom chapter as a registered student organization. See id.

### D. The State Defendants' Motion to Dismiss

The Student Association and the College Progressives promptly filed answers to the

Complaint, Dkt. Nos. 17–18, 25, but the State Defendants—i.e., Stenger, Rose, and Pelletier—

filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),

Dkt. No. 32 ("State Defendants' Motion to Dismiss"), before they answered, Dkt. No. 83. In

their Motion to Dismiss, the State Defendants broadly argued that the Original "Plaintiffs cannot

establish standing regarding the Tabling Event as it pertains to all [the Original] Plaintiffs," Dkt. No. 32-2 at 17,[1] but they only advanced specific arguments against YAF's Article III standing, <u>see id.</u> at 20–21. Specifically, the State Defendants contended that "YAF does not have standing to bring a First Amendment claim as it pertains to the 11/14/19 [tabling] incident," <u>id.</u> at 20, because YAF was not "directly involved in [it]," <u>id.</u> at 21.

After considering the parties' arguments, the Court denied the "State Defendants' Motion to Dismiss under 12(b)(1) . . . against YAF," Dkt. No. 70 ("August 2021 Order") at 32, finding that YAF, as an organization, has "standing in relation to the . . . tabling incident," because "[w]hen [the] College Republicans were forced to leave the tabling event, YAF as a funder lost its ability to promote the lecture and spread its message," <u>id.</u> at 15 (citations omitted). The Court did not directly address whether Lizak or the College Republicans satisfied Article III standing to pursue their claims against the State Defendants, <u>see id.</u> at 14–16, but proceeded to consider the merits of the Original Plaintiffs' claims against the State Defendants, <u>see id.</u> at 16–30.

In their Rule 12(b)(6) merits challenge, the State Defendants argued, among other things, that Counts I, II, IV, V, and VI failed to state cognizable claims against the State Defendants, and that the Original Plaintiffs were not entitled to their requested injunctive and declaratory relief. Dkt. No. 32-2 at 16–19, 21–32. The Court ultimately granted in part and denied in part the "State Defendants' Motion to Dismiss under 12(b)(6) . . . ." Aug. 2021 Order at 32. With respect to Counts I(A) and VI(A)—i.e., the Original Plaintiffs' First Amendment and Equal Protection claims against the State Defendants regarding the tabling incident—the Court dismissed the claims for damages against the State Defendants in their individual capacities for lack of

---

[1] For the avoidance of doubt, the Court uses the pages numbers generated by ECF—the Court's electronic filing system—when citing to specific pages in papers filed on the docket.

personal involvement, id. at 18–19, 30, but did not dismiss the claims against them in their official capacities seeking injunctive and declaratory relief, id. at 16 n.2 (citing Rother v. NYS Dep't of Corr. & Cmty. Supervision, 970 F. Supp. 2d 78, 102 (N.D.N.Y. 2013) (Kahn, J.)); id. at 30. The Court specifically noted that "the dismissal [of the individual capacity claims] is without prejudice and does not preclude a motion to amend if discovery reveals Stenger's, Rose's, or Pelletier's personal involvement." Id. at 19 (citation omitted).

        The Court, however, "reache[d] a different result with respect to" Counts I(B) and VI(B)—i.e., the First Amendment and Equal Protection claims concerning the Dr. Laffer Event. Id. at 19, 30. Observing that "Pelletier was present at the event," the Court found that the Complaint adequately stated an "individual-capacity [damages] claim against Pelletier," and thus allowed that claim to proceed. Id. at 19. However, the Court still dismissed the claims for damages against Stenger and Rose in their individual capacities for lack of personal involvement. Id. at 19–20. The Court again noted that the dismissal was "without prejudice," and that "Plaintiffs may amend and add the claim once again should the discovery process reveal Stenger's and Rose's personal involvement with the Laffer Event." Id. at 20.

        As for Count II—i.e., Lizak and the College Republicans' cause of action against Stenger, Rose, and the Student Association for First Amendment retaliation—the Court dismissed the individual capacity claims against Stenger and Rose for their lack of personal involvement, but again added that the "dismissal is without prejudice and does not preclude a motion to amend if discovery reveals evidence of personal involvement." Id. at 26 (footnote omitted). Otherwise, the Court allowed Count II to proceed. See id. With respect to the conspiracy claims in Counts IV and V, the Court dismissed both causes of action against the State Defendants for failure to state a claim upon which relief may be granted. Id. at 27–30. The

17

Court did not specify whether the dismissal was with or without prejudice. See id. The Court also rejected the State Defendants' efforts to dismiss the Original Plaintiffs' requests for injunctive and declaratory relief at the motion to dismiss stage. Id. at 30–31. Shortly after the Court issued the August 2021 Order granting in part and denying in part the State Defendants' Motion to Dismiss, the State Defendants filed their joint answer to the Complaint. Dkt. No. 83.

**E.  The Original Plaintiffs' Attempts to Secure a Default Judgment Against PLOT**

Unlike the State Defendants, the College Progressives, and the Student Association, PLOT never filed an answer to the Complaint. See Docket. The Original Plaintiffs' attempts to serve PLOT date back to September 2020, less than two months after the Original Plaintiffs filed their Complaint. On September 11, 2020, the Original Plaintiffs docketed an affidavit of service of the summons and Complaint on PLOT, representing to the Court that they delivered "a true copy thereof with [non-party] Aviva Friedman, who is a/the authorized agent of/for Progressive Leaders of Tomorrow (PLOT)." Dkt. No. 17. Then, on September 16, 2020, the Original Plaintiffs filed a similar affidavit, in which they also claimed that service was effected on PLOT "by delivering to and leaving a true copy thereof with [non-party] Masai Andrews, who is a/the Authorized Agent of/for Progressive Leaders of Tomorrow (PLOT)." Dkt. No. 20.

On September 18, 2020, the Original Plaintiffs filed a status report regarding service on PLOT, and represented to the Court that:

> We have personally served a copy of the summons and [C]omplaint on two leaders of PLOT, Aviva Friedman and Masai Andrews. PLOT is an unincorporated organization that explicitly refrains from establishing a formal hierarchy or published membership. As such, service on two individuals who are known as members and leaders constitutes effective service on the organization. . . .
>
> Additionally, to further ensure PLOT has adequate notice of the lawsuit against it, [the Original] Plaintiffs emailed a copy of the summons and [C]omplaint directly to PLOT's organizational email

> address on September, 2020[,] and sent the group a direct message
> on Facebook attaching the summons and [C]omplaint. Facebook
> provided a "read receipt" indicating that a PLOT leader operating
> the group's Facebook account viewed the direct message.

Dkt. No. 21 at 1–2 (citations omitted). In the same status report, the Original Plaintiffs provided

the Court with further information to support their position that non-parties Friedman and

Andrews are "leaders" of PLOT, and that personal service on them should count as "effect[ing]

proper service on [D]efendant PLOT." Id. at 4.

      The following month, in a Text Order dated October 13, 2020, the Honorable Miroslav

Lovric, United States Magistrate Judge, observed that PLOT's "time to answer or otherwise

respond to the Complaint . . . expired," and thus directed the Original Plaintiffs "to file either (1)

a request for [a] Clerk[']s entry of default [against PLOT], or (2) a status report." Dkt. No. 27.

On October 19, 2020, the Original Plaintiffs requested an entry of default from the Clerk of the

Court, Dkt. No. 34, which was granted the next day, Dkt. No. 35. Then, on November 19, 2020,

the Original Plaintiffs made their first motion for a default judgment against PLOT, Dkt. No. 37,

and served the motion papers on PLOT by sending them electronically to non-parties Andrews

and Friedman's work email addresses, and mailing physical copies to various addresses of theirs,

Dkt. No. 37-3.

      On December 14, 2020, non-party Andrews filed a pro se affidavit in opposition to the

Original Plaintiffs' motion for default judgment. Dkt. No. 42. In the affidavit, non-party

Andrews declared that he "was not served properly with" the Original Plaintiffs' summons and

Complaint, and that he is "not a Principal or Agent of 'PLOT.'" Id. ¶ 5. Two days later, non-

party Friedman filed a similar pro se affidavit, also declaring that she "was not served (properly

or otherwise) with" the Original Plaintiffs' summons and Complaint, and that she is "not a

Principal or Agent of 'PLOT.'" Dkt. No. 43.

On January 4, 2021, the Original Plaintiffs replied, arguing that "[t]here is no credible dispute that Plaintiffs completed valid service of process on Andrews and Friedman," and that "[t]his service constitutes valid service on PLOT because Andrews and Friedman are both known in the local Binghamton community as leaders of PLOT and are authorized agents of the organization." Dkt. No. 44 at 4.

On January 13, 2021, non-party Friedman submitted further documents to the Court "as proof that not only was [she] never properly served, but [she] was not even in the state at the time . . . [P]laintiffs claim to have served [her] at [her] home in Binghamton, NY." Dkt. No. 49 at 1. The next day, non-party Andrews also provided evidence that the process server never entered his place of employment to serve Andrews back in September 2020. Dkt. No. 50 at 1 (citing id. at 2–9). In the same filing, non-party Andrews asked the Court to "dismiss the [C]omplaint . . . ." Id. at 1.

On February 11, 2021, non-party Andrews followed up from his earlier dismissal request with a more formal pro se motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(5). Dkt. No. 51. He asked the Court to "dismiss this action against . . . PLOT because I am not an authorized agent of PLOT or otherwise affiliated," id. ¶ 8, and to dismiss the action "to the extent it involves [Andrews]" personally, id. ¶ 9.

Four days later, on February 15, 2021, the Original Plaintiffs filed new affidavits of service on non-parties Andrews and Friedman with the Court. See Dkt. Nos. 52–53. Then, in early March 2021, non-party Friedman filed two pro se letter motions, the first of which requested a 10-day extension to file an answer to the Complaint. Dkt. No. 54. The second letter motion requested dismissal pursuant to Rule 12(b)(5) on the ground that she is not a representative of PLOT. Dkt. No. 55.

On March 3, 2021, Judge Lovric denied non-party Friedman's pro se letter motion

seeking dismissal of the Complaint without prejudice. In his denial, Judge Lovric noted that:

> A person who is not an attorney may only represent himself in a pro
> se action; he may not represent another person. See 28 U.S.C. §
> 1654 (In all courts of the United States the parties may plead and
> conduct their own cases personally or by counsel as, by the rules of
> such courts, respectively, are permitted to manage and conduct
> causes therein.); United States ex rel. Mergent Servs. v.
> Flaherty, 540 F.3d 89, 92 (2d Cir. 2008) (Because [§1654] permits
> parties only to plead and conduct their own cases personally, we
> have held that an individual who is not licensed as an attorney may
> not appear on another person's behalf in the other's cause. That is,
> in order to proceed pro se, [a] person must be litigating an interest
> personal to him.).

Dkt. No. 56.

Non-party Friedman then retained counsel and moved the Court for leave to proceed as a

non-party to the action, or, in the alternative, as an amicus curiae. Dkt. No. 60. However, Judge

Lovric ordered that the Court strike this attorney-drafted filing from the docket because:

> Only a party or an attorney representing a party may file papers in
> this action. Aviva Friedman is neither a party in this action or an
> attorney. Rebecca Chapman, Esq. represents non-party Aviva
> Friedman and has not filed a notice of appearance representing any
> party in this action. Motion [at Dkt. No.] 60, as filed by Aviva
> Friedman and Rebecca Chapman, Esq., attempts to represent the
> interests of and on behalf of Defendant Progressive Leaders of
> Tomorrow ("PLOT"). But Rebecca Chapman, Esq., does not
> represent "PLOT," has never filed a notice of appearance on behalf
> of "PLOT," and therefore cannot file anything on behalf of "PLOT."
> Aviva Friedman is not an attorney nor a party in this action.
> Friedman therefore cannot file anything on behalf of "PLOT." A
> person who is not an attorney may only represent himself in a pro se
> action; he may not represent another person.

Dkt. No. 61 (citations omitted).

Given the factual and legal disputes regarding the sufficiency of service on PLOT, on

July 27, 2021, the Court ordered the Original Plaintiffs to submit another filing by August 10,

2021, "discussing whether an evidentiary hearing is needed to determine whether Andrews and Friedman were properly served before Plaintiffs filed their motion for default judgment and the impact of Plaintiffs' February 2021 service of Andrews and Friedman in relation to the motion for default judgment, especially if the initial service was not proper." Dkt. No. 68. In this Text Order, the Court specifically authorized non-parties Andrews and Friedman to submit a response to this additional filing, id., especially in light of Judge Lovric's earlier admonition prohibiting Friedman from filing based on the fact she is both (a) not a party to this action and (b) not a licensed attorney admitted in the Northern District of New York.

On August 10, 2021, the Original Plaintiffs complied with the July 27, 2021, Text Order, and submitted their additional filing regarding service on PLOT. In the filing, the Original Plaintiffs argued, inter alia, that "no hearing is necessary because . . . Andrews does not rebut facts regarding service and Plaintiffs need only serve one representative of PLOT to properly serve PLOT." Dkt. No. 69 at 2. The Original Plaintiffs added: "Even if the Court were to disregard the September 2020 service, [the Original] Plaintiffs again served PLOT in February 2021," and that extension of the service period is warranted "due to [the Original] Plaintiffs' 'reasonable efforts and diligence' to effectuate service and provide notice to PLOT . . . ." Id. at 8.

Non-party Friedman responded to this additional filing on August 24, 2021, with a filing of her own that characterizes itself as pro se. Dkt. No. 71. In the filing, non-party Friedman argued that service on two individuals who contest their relationship to PLOT "cannot constitute service on PLOT." Id. at 1. She also maintained that "the purported service on [herself in September 2020] did not occur." Id.

More than two weeks later, on September 9, 2021, the Court issued a decision, finding that the Original "Plaintiffs are entitled to a discretionary extension of time [to serve PLOT] and

22

deem[ing] the February 2021 service of the summons and [C]omplaint upon [non-parties] Andrews and Friedman as timely and proper." Dkt. No. 72 at 7. However, the Court expressly reserved judgment on the question of whether such personal service on non-parties Andrews and Friedman could amount to proper service on PLOT. Id. The Court observed that "[a]t this time, the Court does not have enough evidence to conclusively decide whether [non-parties] Friedman or Andrews are 'an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process' for PLOT." Id. at 7–8. "Therefore, the Court [allowed] [the Original Plaintiffs] the appropriate amount of time to conduct limited discovery to 1) confirm if Friedman or Andrews are the proper agents of PLOT and 2) confirm other individuals who are proper agents of PLOT, if necessary." Id. at 8. Given that it remained unclear to the Court whether service on PLOT had been effected, the Court denied the Original Plaintiffs' motion for a default judgment against PLOT with leave to renew. Id.

After the Court issued its decision on September 9, 2021, the Original Plaintiffs and the non-parties litigated several discovery disputes over documents relevant to the question of PLOT's leadership, which need not be recounted in detail here. See, e.g., Dkt. Nos. 76, 79, 80, 82, 87–89, 91, 93, 96–100, 102, 122. While the Original Plaintiffs and the non-parties continued to litigate those disputes, the Original Plaintiffs petitioned the Court for an order "holding that [non-party] Andrews is authorized to accept service on PLOT's behalf," on November 1, 2021. Dkt. No. 103 at 2. On November 19, 2021, the Court denied this request without prejudice and with leave to renew after the Original Plaintiffs submitted an updated status report by December 7, 2021. Dkt. No. 125.

On February 16, 2022, after reviewing evidence provided by the Original Plaintiffs and the non-parties regarding the non-parties' relationship to PLOT, see Dkt. Nos. 127, 129, 138,

140, the Court granted the Original Plaintiffs' "request to hold that [non-party] Andrews is authorized to accept service on PLOT's behalf . . . ." Feb. 2022 Order at 6.[2] Hence, to the extent that PLOT legally existed, the Court found that "there was proper service on PLOT via Andrews," and "afford[ed] PLOT a final **30 days** to respond to [the] Complaint." Id. at 5. However, the Court explicitly reserved on the questions of "PLOT's legal existence[,] and [its] capacity to be sued" under 42 U.S.C. § 1985(3), noting that "any future motion for default judgment" would have to address these threshold legal issues. Id.

　　　　After the Court issued the February 2022 Order, non-party Andrews then attempted to file an answer to the Complaint, wherein he reiterated his position that he has no affiliation to, or leadership position within, PLOT. Dkt. No. 144 ¶ 4.[3] But Judge Lovric ordered that this filing be stricken from the docket "because it was filed by non-party . . . Andrews, who does not appear to be an attorney and therefore cannot represent other parties." Dkt. No. 145. Then, on March 25, 2022, an attorney, who was "happy to put in an appearance for [non-party Andrews] as [PLOT's] agent," sought an extension of time to respond to the Complaint, Dkt. No. 146, but Judge Lovric ordered this filing be stricken from the docket as well "because it was filed by an attorney who

---

[2] Given this finding, the Court found it unnecessary to reach the question of whether non-party Friedman was authorized to accept service on PLOT's behalf. Dkt. No. 142 at 5 n.4.

[3] The Court acknowledges that in recounting the procedural history of this case, it is relying, in part, on filings that Judge Lovric ordered stricken from the docket. In referring to these stricken filings, the Court notes that, in general, "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." Dietz v. Bouldin, 579 U.S. 40, 47 (2016). These filings, and the reasons Judge Lovric relied upon to strike them, are crucial to understanding the complex procedural history of this case. It would neither be efficient nor expedient for the Court simply to ignore their contents in (1) evaluating the correctness of its prior February 2022 Order, and (2) determining whether the Court has Article III subject matter jurisdiction over claims against groups, such as PLOT, that have no legal existence separate and apart from their individual members.

has failed to file a Notice of Appearance on behalf of PLOT but nevertheless claims to make requests and representations on behalf of . . . PLOT," Dkt. No. 147.

Then, on March 30, 2022, another attorney filed a notice of appearance with the Court to represent non-party Andrews, "solely in his individual capacity," and not PLOT, Dkt. No. 148, and requested a conference "to clarify what the responsibilities of [non-party] Andrews in fact are," Dkt. 149. This attorney noted that non-party Andrews "approached" him because Andrews "fear[ed] that he personally has been burdened with the mantle of a group that, according to him, does not exist." Id. However, Judge Lovric denied the request for a conference because the attorney appeared to be seeking "an advisory opinion from the Court as to any possible future consequences that may be brought upon . . . [n]on-[p]arty . . . Andrews." Dkt. No. 150.

On April 5, 2022, the Original Plaintiffs sought another entry of default against PLOT from the Clerk of the Court. Dkt. No. 154. The Clerk granted the request the next day. Dkt. No. 155. A month later, on May 9, 2022, the Original Plaintiffs filed a renewed motion for default judgment as to PLOT, arguing, among other things, why PLOT has the legal capacity to be sued under Section 1985(3). Dkt. No. 163 ("Motion for Default Judgment"); Dkt. No. 163-4 ("Default Judgment Memorandum").

### F.  Lizak's Motion for the Voluntary Dismissal of His Claims

After the Original Plaintiffs filed their Motion for Default Judgment, the Original Plaintiffs and the non-PLOT Defendants continued to engage in discovery. See Dkt. Nos. 165–207. Then, on January 23, 2023, Lizak filed a motion for an order dismissing his claims without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). Dkt. No. 208. The State Defendants opposed the motion, primarily on the ground that Lizak sought to dismiss his claims to avoid sitting for a deposition while he defends against "criminal charges . . . in connection

with his involvement in the January 6, 2021[,] insurrection that took place at the U.S. Capitol." Dkt. No. 212-9 at 8. In the alternative, the State Defendants argued that Lizak's "claims should be dismissed in their entirety with prejudice and Lizak should be required by this Court to give deposition testimony in this case." Dkt. No. 212-9 at 5. In his Reply, Lizak submitted that "counsel have [already] set a mutually agreeable date for [his] deposition," and that "this Court could further order [his] deposition as a condition of dismissal . . . ." Dkt. No. 217 at 2. Lizak also represented to the Court that, "in the interest of resolving this [specific] dispute, [he] does not object to [the State] Defendants' request to dismiss his claims with prejudice, so long as this Court orders that all parties are to bear their own costs and fees associated with [his] dismissed claims." Id.

On the same day that Lizak filed his Reply, the Honorable Thérèse Wiley Dancks, United States Magistrate Judge,[4] ordered Lizak's deposition to be completed on March 16, 2023. Dkt. No. 216. On March 20, 2023, the State Defendants notified the Court that the deposition of Lizak "ha[s] been completed." Dkt. No. 220 at 1.

### G.  The March 2023 Order

On March 23, 2023, the Court granted Lizak's motion for voluntary dismissal with a conditional order of prejudice. Mar. 2023 Order at 14–16. The Court specified that "[t]he dismissal shall be with prejudice, so long as no Defendant brings a motion against Lizak for costs and fees associated with his dismissed claims. Should any Defendant bring such a motion, the dismissal of Lizak's claims shall be without prejudice." Id. at 24 (emphasis removed).

---

[4] This action was reassigned from Judge Lovric to Judge Dancks on October 26, 2022. Dkt. No. 200.

In the same order, the Court denied the Motion for Default Judgment as to PLOT. Id. at 16–22. The Court found that the Original "Plaintiffs' concession that PLOT lacks independent legal existence under New York law (and under any other law that might be relevant, including federal law)" was "fatal to their Motion [for Default Judgment], as the Court lacks the power to enter a default judgment against an entity that does not legally exist." Id. at 19 (footnote omitted). Given the lack of jurisdiction, the Court also sua sponte dismissed Plaintiffs' claims against PLOT, id. at 22 (citing Ellis v. Dyson, 421 U.S. 426, 434 (1975) ("[I]t is elemental that there must be parties before there is a[n] [Article III] case or controversy."), and terminated PLOT as a defendant to the action, id. at 24.

In a footnote, the Court also raised doubts about the correctness of its earlier finding from the February 2022 Order that service was properly effected on PLOT via personal service on non-party Andrews, which was a prerequisite to securing a default judgment against PLOT. See id. at 20 n.8. Specifically, the Court expressed concern that it had "resolved a significant factual dispute concerning non-party Andrews' relationship to PLOT in favor of [the Original] Plaintiffs without an evidentiary hearing, which raises serious due process concerns." Id. (citation omitted). However, the Court did not find it necessary to "vacate its earlier finding regarding the sufficiency of service on PLOT . . . to resolve [the] Motion for Default Judgment," but noted that it could "still do so in the future if circumstances warrant it." Id. (citing Fed. R. Civ. P. 54(b)).

Finally, in light of Lizak's voluntary dismissal from the suit and the Court's finding that it lacked subject matter jurisdiction to adjudicate claims against groups that lack independent legal existence, the Court found it necessary to reexamine its subject matter jurisdiction over the remaining claims in the action. Id. at 22–23 (citing Joseph v. Leavitt, 465 F.3d 87, 89 (2d Cir. 2006), cert. denied, 549 U.S. 1282 (2007)). The Court identified two significant issues:

> First, now that "Lizak [has] stepped down as the [P]resident of the
> . . . College Republicans," and has successfully dismissed his
> individual claims from this action, the Court has reason to believe
> that the unincorporated association of College Republicans no
> longer has Article III standing to pursue claims on behalf of its
> members. See generally Hunt v. Washington State Apple
> Advertising Com'n, 432 U.S. 333, 343 (1977) (outlining the
> circumstances under which "an association has standing to bring suit
> on behalf of its members").
>
> Second, many of the Court's concerns regarding Plaintiffs' Article
> III standing with respect to their claims against PLOT, apply with
> equal force to their claims against the College Progressives. While
> PLOT and the College Progressives are distinguishable insofar as an
> attorney has appeared on behalf of the College Progressives, Dkt.
> No. 29, whereas none has appeared on behalf of PLOT, both entities
> are unincorporated associations without independent legal existence
> under New York law. The College Progressives' attorney has also
> represented to this Court that the "College Progressives [are] no
> longer an active organization at Binghamton University," and that
> "the students who were associated with [the] College Progressives
> are no longer students" there. Dkt. No. 167.

Mar. 2023 Order at 23 (some internal citations omitted). Accordingly, the Court ordered

Plaintiffs to show cause as to why the Court should not sua sponte dismiss these two sets of

claims as well for lack of Article III standing. Id. at 23–25.

### H.  The Bey Declaration

In their Response to the order to show cause, Plaintiffs filed a memorandum of law, Pls.'

Resp., and a declaration from non-party Rein Bey, a student at SUNY-Binghamton who

currently serves as the President of the College Republicans, Bey Decl. ¶ 1. In the declaration,

Bey declares, inter alia, that she "began attending [SUNY-Binghamton] in August 2017," and

that she "became a member of College Republicans that same month . . . ." Id. ¶ 2. Around the

time of the events giving rise to the Complaint, she "served as Vice President of [the] College

Republicans," and "assisted with promotion of the [Dr.] Laffer Event by making flyers and

sharing them with members of the . . . Economics and Political Science Departments." Id. ¶ 7.

With regard to the tabling incident on November 14, 2019, Bey attests that while she "did not participate in the tabling activities that day," she "did see [other] members of [the] College Republicans working the table on her way to class . . . ." Id. ¶ 8. She adds: "I have personal knowledge of the harm to [the] College Republicans and its members that thereafter occurred, including the destruction of [the] College Republicans' flyers and overturning of [the] College Republicans' table by the riotous crowd and BU's removal of the College Republicans from the Spine." Id.

      Bey's involvement in the Dr. Laffer Event was more direct. She declares:

> On November 18, 2019, I showed up for the [Dr.] Laffer Event a few minutes before it began. But I was refused entry by uniformed [SUNY-Binghamton] police officers as numerous activists protested outside, over half of whom were wearing masks. I explained to [SUNY-Binghamton] police that I was the Vice President of [the] College Republicans and needed to be let into the event, but they denied me entry until after Dr. Laffer had been removed from the lecture hall.
>
> At some point, the [SUNY-Binghamton] police let persons standing outside the lecture hall, including me and many protesters, into the lecture hall. I walked to the front of the room and saw members of [the] College Republicans as well as students from the economics and political science departments sitting in the room in the midst of a very loud disruption to what was supposed to be a peaceful discussion of tariffs. Some of these students told me they were scared and that the police were not doing much to quell the ongoing disruption. At this point, many of the people in the room were wearing masks and screaming. I tried to console these students by telling them that [the] College Republicans never intended this to happen, that I was sorry, and that everything was going to be okay. After speaking with worried students for some period of time, and while the protesters were still screaming, I told these students they should leave.

Id. ¶¶ 9–10.

      The remainder of Bey's declaration attests to the injuries suffered by the College Republicans as a student organization, including the group's suspension from a platform to

reserve rooms for expressive events and its inability to receive funds from the Student

Association. See id. ¶¶ 11–14. Bey maintains that the "College Republicans . . . seek through this

lawsuit full restoration of its rights as a registered student organization and damages for the

pecuniary and non-pecuniary losses and injuries it sustained as a result of Defendants'

unconstitutional and illegal conduct." Id. ¶ 15.

### I.  Subsequent Developments

After Plaintiffs filed their Response to the Court's order to show cause, the parties

continued to engage in discovery. See Dkt. Nos. 228–31. In response to discovery issues raised

by the State Defendants on April 26, 2023, Dkt. No. 234, Plaintiffs represented to the Court that:

> Some delays in making [certain] productions [of documents] were
> unavoidable. Many of these depositions were of former . . . members
> [of the College Republicans], whom . . . counsel represented only in
> their capacity as party witnesses. These witnesses are largely young
> adults who are no longer affiliated with a student group at a
> university they graduated from one or more years ago regarding
> events three-and-a-half years ago.

Dkt. No. 237 at 3.

### III.  SUBJECT MATTER JURISDICTION

"Article III, Section 2 of the [United States] Constitution limits the subject-matter

jurisdiction of the federal courts to 'Cases' and 'Controversies.'" SM Kids, LLC v. Google LLC,

963 F.3d 206, 211 (2d Cir. 2020) (citing Dhinsa v. Krueger, 917 F.3d 70, 77 (2d Cir. 2019)).

"The standing doctrine, which emerges from Article III, is designed 'to ensure that federal courts

do not exceed their authority as it has been traditionally understood.'" SM Kids, 963 F.3d at 211

(quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)). Given that Article III standing is an

essential element of federal subject matter jurisdiction, see Lujan v. Defenders of Wildlife, 504

U.S. 555, 559–60 (1992), it follows that if "a plaintiff lacks [Article III] standing to bring suit, a

court has no subject matter jurisdiction over the case." In re U.S. Catholic Conf., 885 F.2d 1020, 1023 (2d Cir. 1989). And given that "a plaintiff must demonstrate [Article III] standing for each claim he seeks to press," it also follows that if a plaintiff lacks Article III standing to pursue a given claim, a court has no subject matter jurisdiction over that claim. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006); see also Rehab. Support Servs., Inc. v. Town of Esopus, N.Y., 226 F. Supp. 3d 113, 125 (N.D.N.Y. 2016) ("Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it." (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000))).

To satisfy Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S at 338. An injury-in-fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at 339. This is "a low threshold, which helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736 (2d Cir. 2017) (internal citations and quotation marks omitted).

As for the traceability prong, standing requires "a causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560. While a plaintiff's injury must be "fairly traceable" to a defendant's actions, the causal connection element of standing "does not create an onerous standard. For example, it is a standard lower than that of proximate causation." Carter v. HealthPort Technologies, LLC, 822 F.3d 47, 55 (2d Cir. 2016) (citing Rothstein v. UBS AG, 708 F.3d 82, 91–92 (2d Cir. 2013)). "A defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing." Carter, 822 F.3d at 55–56 (citing Rothstein, 708 F.3d at 91).

The third prong of redressability refers to a "non-speculative likelihood that the injury can be remedied by the requested relief." Guan v. Mayorkas, 530 F. Supp. 3d 237, 262–63 (E.D.N.Y. 2021) (quoting W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106–07 (2d Cir. 2008)). "Plaintiffs' injuries are redressable if their requested relief can compensate them for their losses or eliminate any effects caused by the defendants' challenged conduct." Guan, 530 F. Supp. 3d at 263 (cleaned up). And given that the redressability analysis hinges on a plaintiff's requested relief, it follows that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017) (quoting Davis v. Federal Election Comm'n, 554 U.S. 724, 734 (2008)).

Organizations, just like individuals, may have standing to seek judicial relief from injury. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 n.19 (1982) ("[O]rganizations are entitled to sue on their own behalf . . . ."). Therefore, an association, like any other organization, may "have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association *itself* may enjoy." Warth v. Seldin, 422 U.S. 490, 511 (1975) (emphasis added). And while Article III standing generally requires that a "defendant's allegedly unlawful conduct cause[] injury to the plaintiff" bringing suit—whether that be a natural person or an organization—"[t]here are various exceptions to this general principle . . . ." Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 & n.3 (2d Cir. 2012) (citing Powers v. Ohio, 499 U.S. 400, 410–11 (1991) (discussing third-party standing)). One of those exceptions is associational standing, which allows for an association to "have standing solely as the representative of its members," "[e]ven in the absence of injury to [the association] itself . . . ." Warth, 422 U.S. at 511 (citing Nat'l Motor Freight Traffic Ass'n v. United States, 372 U.S. 246 (1963)); see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517

U.S. 544, 552 (1996) (stating that "'associational standing' is only one strand" of "the entire doctrine of 'representational standing'").

"When a requirement goes to subject-matter jurisdiction," such as Article III standing, "courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." Gonzalez v. Thaler, 565 U.S. 134, 141 (2012) (citing United States v. Cotton, 535 U.S. 625, 630 (2002)); see also Lujan, 504 U.S. at 560–61 (explaining why Article III standing is an essential element of federal subject matter jurisdiction). "Generally, the plaintiff, as the party asserting subject matter jurisdiction, has the burden of proving that it exists by a preponderance of the evidence." Broidy Cap. Mgmt. LLC v. Benomar, 944 F.3d 436, 443 (2d Cir. 2019) (citing Makarova, 201 F.3d at 113). "In resolving th[e] issue [of subject matter jurisdiction], the court 'must accept as true all material factual allegations in the complaint, but [it is] not to draw inferences from the complaint favorable to plaintiffs.'" Nicholson v. Allied Interstate, LLC, 91 F.Supp.3d 365, 368 (E.D.N.Y. 2015) (quoting J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004)). In addition, the court "may refer to evidence outside the pleadings" to resolve the jurisdictional issue. Makarova, 201 F.3d at 113 (citing Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

### A. The College Republicans

First, the Court addresses whether the College Republicans retain Article III standing to pursue claims against the State Defendants and the Student Association in the wake of Lizak's voluntary dismissal. As noted earlier, Lizak is a former member of the College Republicans who was serving as their President when the Original Plaintiffs filed suit. See supra Section II.A. In the Complaint, the Original Plaintiffs described harms that Lizak suffered individually and that the College Republicans suffered organizationally as a student group because of the State

Defendants and the Student Association's conduct. See, e.g., Compl. ¶¶ 55–57 (alleging that
Lizak and an unidentified member of the College Republicans were "physical[ly] and verbal[ly]
harass[ed]" by a mob of students, who were enabled and encouraged by the State Defendants'
Speech Suppression Policy); id. ¶¶ 130, 133 (alleging that the Student Association, at the State
Defendants' behest, suspended the College Republicans' student organization, which resulted in
them being unable "to receive university funding [or] reserve rooms to host expressive events for
the Spring 2020 semester"). While the Original Plaintiffs also described some harms that other
individual members of the College Republicans experienced, they did not identify those
individuals by name. See, e.g., id. ¶¶ 53–54, 55, 57 (generally alleging that "the mob incited by
the College Progressives," and enabled by the State Defendants' inaction, "hurled insults and
obscenities at [unidentified members of the College Republicans] who were tabling, and
physically assaulted [another unidentified] member," by "forcibly removing her hat bearing the
political slogan 'Make American Great Again'").

### 1. Standing on Behalf of the Organization Itself

The first argument the College Republicans have advanced in their Response to the order
to show cause is that the student organization itself has Article III standing to pursue these
claims, regardless of any harm to the individual members. See Pls.' Resp. at 2–7.

As noted earlier, an organization can "have standing *in its own right* to seek judicial relief
from injury *to itself* and to vindicate whatever rights and immunities [it] *itself may enjoy*." Warth
v. Seldin, 422 U.S. at 511 (emphasis added); Havens, 455 U.S. at 379 n.19 ("[O]rganizations are
entitled to sue on their own behalf . . . ."). The Second Circuit has routinely referred to "this
theory of [standing as] 'organizational' standing . . . ." N.Y. C.L. Union v. N.Y. City Transit
Auth., 684 F.3d 286, 294 (2d Cir. 2012). Accordingly, the Court will follow the Second Circuit's

lead and use the term "organizational standing" to refer to the circumstances under which an

organization may invoke the Article III jurisdiction of the federal courts to vindicate the

organization's *own* rights. See id. However, in doing so, this Court recognizes that federal courts

have used the term "organizational standing" inconsistently, leading to some confusion. For

instance, the Supreme Court has previously used the term "organizational standing" as a

synonym for "associational standing," in which an organization does not sue on its own behalf

but rather on behalf of its individual members. See, e.g., Summers v. Earth Island Inst., 555 U.S.

488, 497–99 (2009) (stating that "the law of organizational standing . . . require[s] plaintiff-

organizations to make specific allegations establishing that at least one identified member ha[s]

suffered or w[ill] suffer harm"); cf. United Food, 517 U.S. at 554–55 (stating that the test for

"associational standing" requires that "at least one of the organization's members would have

standing to sue on his own"). So has Black's Law Dictionary. See Standing, Black's Law

Dictionary (11th ed. 2019) (stating that "associational standing" is "[a]lso termed *organizational*

*standing*").

But "[u]nder th[e] [Second Circuit's formulation] of 'organizational' standing, the

organization is just another person—*albeit a legal person*—seeking to vindicate a right." N.Y.

C.L. Union, 684 F.3d at 294 (emphasis added). If an organization does not "legally exist" at the

time of filing suit, it follows that the organization itself has no legal rights of its own to vindicate

in court, and thus lacks standing to sue on behalf of itself. Fund Liquidation Holdings LLC v.

Bank of Am. Corp., 991 F.3d 370, 384 (2d Cir. 2021); see also Standing, Black's Law

Dictionary (11th ed. 2019) (defining "standing" as "[a] party's right to make a legal claim or

seek judicial enforcement of a duty or right"). "After all, '[t]he most elemental requirement of

adversary litigation is that there be two or more parties,' meaning that '[a]bsent a plaintiff with

legal existence, there can be no Article III case or controversy.'" <u>Fund</u>, 991 F.3d at 384

(alterations in original) (quoting <u>House v. Mitra QSR KNE LLC</u>, 796 Fed. App'x 783, 787 (4th

Cir. 2019)). While "[f]ederal law sets the parameters on what is necessary to possess Article III

standing . . . state law . . . can supply the answers to certain antecedent questions relevant to

whether those federal requirements are satisfied," including "[w]hether a particular corporation

or partnership" or some other organization has "legal existence . . . ." <u>Fund</u>, 991 F.3d at 385.

Here, Plaintiffs concede that the College Republicans are "an unincorporated association"

comprised of individuals. Pls.' Resp. at 4. Therefore, under New York law, the College

Republicans as an organization has "no legal existence separate and apart from its individual

members." <u>L&L Assoc. Holding Corp. v. Charity United Baptist Church</u>, 935 N.Y.S.2d 450, 452

(N.Y. Dist. Ct. 2011) (citing Vincent C. Alexander, Practice Commentaries to McKinney's

CPLR 1025, at C1025:2); <u>see also</u> <u>Pascual v. Rustic Woods Homeowners Ass'n, Inc.</u>, 21 N.Y.S.

3d 687, 687–88 (N.Y. App. Div. 2015). It necessarily follows that the College Republicans—as

an association lacking legal existence independent of its individual members, with no legal rights

of its own—does not have organizational standing to sue *on its own behalf*. Plaintiffs' arguments

to the contrary do not warrant different conclusion.

First, Plaintiffs argue that this Court, in its August 2021 Order, already "implicitly

recognized" that the College Republicans have "organizational standing . . . ." Pls.' Resp. at 6 &

n.6 (citations omitted). Specifically, Plaintiffs emphasize that the Court "already ruled that [the]

College Republicans properly alleged First and Fourteenth Amendment violations, against State

Defendants in their official capacities, related to both the [t]abling [i]ncident and [the Dr.] Laffer

Event." <u>Id.</u> at 5 (citing Aug. 2021 Order at 32–33). While Plaintiffs are correct that the August

2021 Order's analysis of the merits implies a threshold finding that the College Republicans had

36

Article III standing to pursue their claims against the State Defendants when they filed suit, see Friends of Gateway v. Slater, 257 F.3d 74, 77–78 (2d Cir. 2001) ("[T]his Court must address any jurisdictional standing question first, before deciding a case on the merits."), Plaintiffs are wrong to suggest that such standing was anything other than associational, as opposed to organizational. Given the Court's silence on the nature of the College Republicans' Article III standing in the August 2021 Order, the Court will not read in a prior finding of organizational standing when such a finding would be at odds with the requirement that an organization be a legal person with attendant legal rights to assert standing on its own behalf.

Second, Plaintiffs contend that the Court's express finding in the August 2021 Order that YAF has standing as an organization to pursue claims on its own behalf renders moot the separate inquiry into the College Republicans' organizational standing, at least with respect to their claims concerning the tabling incident. See Pls.' Resp. at 5–6. Specifically, Plaintiffs point to the Court's prior reliance on Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104 (2d Cir. 2017), in the August 2021 Order, where the Court stated that "it is well settled that where multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" Aug. 2021 Order at 14–15 (quoting Centro de la Comunidad Hispana, 868 F.3d at 109). But that principle of law is plainly inapplicable to the College Republicans' request for damages in connection with the tabling incident. See Compl. at 38–39. The requested damages would have to be tailored to the harms experienced by the College Republicans, and not YAF; therefore, the College Republicans and YAF do not "seek the same relief." Centro de la Comunidad Hispana, 868 F.3d at 109. The same can be said for many other components of the Complaint, including (1) the College Republicans' First Amendment retaliation claims against the State Defendants and the Student

Association, which were not brought on YAF's behalf, see Compl. ¶¶ 157–61, and (2) the College Republicans' request for an order requiring Stenger, Rose, and the Student Association to reinstate the College Republicans as a registered student organization, which has nothing to do with YAF, see id. at 38–39. Accordingly, Plaintiffs' argument that YAF's standing as an organization necessarily means the College Republicans have standing as an organization (or that the Court need not inquire into it) is unavailing.

Third, Plaintiffs submit that because New York law recognizes "unincorporated associations" in a capacity-to-sue provision, the College Republicans "legally exist" and therefore have Article III standing as an organization. Pls.' Resp. at 9 (citing N.Y. Gen. Ass'ns Law § 12, and Ctr. for Bio-Ethical Reform, Inc. v. Black, 234 F. Supp. 3d 423, 432 (W.D.N.Y. 2017)). But this argument confuses the concept of legal existence—a threshold requirement for an organization to assert standing on its own behalf—with a procedural mechanism allowing, under certain circumstances, an unincorporated group of individuals to maintain one suit to pursue claims that they otherwise could have pursued individually. See Sperry Products v. Ass'n of Am. Railroads, 132 F.2d 408, 410–11 (2d Cir. 1942) (noting that unincorporated associations can be treated as singular entities for "procedural incidents" such as "service of process" and "venue," but that "for most purposes," including "jurisdiction over [] subject matter," the law "looks at such associations as mere aggregations of individuals").

At its core, the question of whether an organization has legal existence for the purposes of Article III standing is simply another way of asking whether an organization has independent and substantive legal rights enforceable at law. See generally William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 229 (1988) ("The essence of a true standing question is the following: Does the plaintiff have a legal right to judicial enforcement of an asserted legal

38

duty?"). Without any legal rights, an organization does not "legally exist," as it is not an "artificial," "legal," or "juridical person." Person, Black's Law Dictionary (11th ed. 2019) ("An entity, such as a corporation, created by law and given certain legal rights and duties of a human being; a being, real or imaginary, who for the purpose of legal reasoning is treated more or less as a human being."). Plaintiffs themselves concede that the College Republicans are an unincorporated association under New York law and that, under such law, the College Republicans' "legal existence is not *independent* of its members." Id. Therefore, as an entity, the "College Republicans" association has no independent legal rights of its own that it could possibly vindicate in this lawsuit. It necessarily follows that the College Republicans, as a group, lacks legal personhood, and does not possess organizational standing to sue on its own behalf. See N.Y. C.L. Union, 684 F.3d at 294 ("Under this theory of 'organizational' standing, the organization is just another person—*albeit a legal person*—seeking to vindicate a right." (emphasis added)).

The fact that New York law allows for unincorporated associations to bring suit via its president or treasurer, see N.Y. Gen. Ass'ns Law § 12, does not change the fact that under New York state law, unincorporated associations like the College Republicans have no legal existence of their own, see Pascual, 21 N.Y.S. 3d at 687–88. A close reading of New York's capacity-to-sue provision reveals that it is a procedural mechanism to allow for individuals who associate with one another to bring suit under a theory of associational, as opposed to organizational, standing:

> An action or special proceeding may be maintained, by the president or treasurer of an unincorporated association to recover any property, or upon any cause of action, *for or upon which all the associates may maintain such an action or special proceeding, by reason of their interest or ownership therein, either jointly or in common.*

39

N.Y. Gen. Ass'ns Law § 12 (emphasis added). As the emphasized text reveals, the provision

authorizes a president or treasurer of an unincorporated association of individuals to bring suit to

recover *on behalf of the individuals* who "by reason of their interest or ownership" in the cause

of action or commonly held property could have maintained suits in their individual names. That

provision is a far cry from vesting unincorporated associations under New York law with legal

personhood, capable of recovering on their own behalf, independent of their individual members.

     As for Plaintiffs' reliance on Ctr. for Bio-Ethical Reform, in which a district court in the

Western District of New York found that an unincorporated association of students at the State

University of New York at Buffalo had Article III standing to sue on its own behalf as an

organization, 234 F. Supp. at 432, that case is simply wrong. The district court never directly

addressed the student group's possible lack of independent legal existence under New York law

when it found that the student group had organizational standing to sue on its own behalf.[5]

Therefore, the district court's opinion is unpersuasive as an authority on the relationship between

legal existence and organizational standing. See id.

     The same can be said for Plaintiffs' reliance on a district court opinion from the

previously mentioned Centro de la Comunidad Hispana case, where a district court in the Eastern

District of New York found that an unincorporated association under New York law had

organizational standing to seek judicial relief on its own behalf. See Centro De La Comunidad

---

[5] Of course, it remains possible that some other source of law vested that student group with legal personhood. While the general rule under New York state law is that unincorporated associations have "no legal existence separate and apart from its individual members," L&L Assoc., 935 N.Y.S.2d at 452, other state statutes, like the New York Election Law, may vest unincorporated associations with rights of their own enforceable at law. See N.Y. Elec. Law § 2-100 *et seq.* However, the district court opinion in Ctr. for Bio-Ethical Reform never addresses what that source of law might be.

Hispana de Locust Valley v. Town of Oyster Bay, 954 F. Supp. 2d 127, 135–37 (E.D.N.Y.

2013). Again, that court failed to grapple with the unincorporated association's possible lack of

independent legal existence in the court's standing analysis. See id. Notably, on appeal, the

Second Circuit did not review the lower court's finding that the unincorporated association had

organizational standing to sue on its own behalf. 868 F.3d at 109. Instead, the Second Circuit

found that a co-plaintiff organization, incorporated under the laws of New York, separately

satisfied the test for organizational standing. Id. at 109–10. Therefore, the court proceeded to the

merits of the co-plaintiffs' claims without analyzing the standing of the unincorporated

association because both organizations were seeking the same injunctive relief. Id. at 109 (citing

Rumsfeld v. Forum of Acad. and Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).

      While the Second Circuit was silent on the issue of independent legal existence for the

purposes of Article III standing in Centro De La Comunidad Hispana de Locust Valley, Plaintiffs

maintain that the Second Circuit has elsewhere found that unincorporated associations lacking

independent legal existence under New York law have organizational standing to sue on their

own behalf. See Pls.' Resp. at 2. Plaintiffs offer Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d

638, 649 (2d Cir. 1998), in support of this assertion. In that case, the plaintiff-appellant was the

Irish Lesbian and Gay Organization, an unincorporated association of individuals based in New

York. See id. at 643; Brief for Plaintiff-Appellant at i, Irish Lesbian & Gay Org., 143 F.3d 638

(No. 97-7064), 1997 WL 34607333. In its analysis, the Second Circuit ultimately concluded that

the organization had Article III standing to bring a claim for compensatory damages on its own

behalf to vindicate its First Amendment rights. Irish Lesbian & Gay Org., 143 F.3d at 649–51.

      However, in arriving at that conclusion, the Second Circuit never examined whether the

organization's possible lack of independent legal existence as an unincorporated association

under New York law might jeopardize the organization's ability to recover on its own behalf. Nor did the Second Circuit point to any other source of law vesting the organization with legal rights of its own. Rather, the Second Circuit simply relied on the Supreme Court's observation that "'[c]orporations and other associations, like individuals,'" can have First Amendment rights, id. at 650 (quoting Pacific Gas and Elec. Co. v. Pub. Utilities Comm'n of Cal., 475 U.S. 1, 8 (1986)), to conclude that the Irish Lesbian & Gay Organization had First Amendment rights of its own, independent of the rights of its individual members. But that conclusion was likely in error. The Supreme Court's observation that "corporations and other associations, like individuals," can assert First Amendment rights, Pacific Gas, 475 U.S. at 8, is a far cry from vesting all associations of individuals everywhere with legal personhood and its attendant constitutional rights. Rather, the Supreme Court was merely noting that the speech of artificial persons, which may include certain associations other than just corporations, is protected by the First Amendment. See id.

Moreover, in the decades since the Second Circuit decided Irish Lesbian and Gay Organization, the Second Circuit has issued at least two more decisions implicitly casting doubt on the application of organizational standing in that case. For instance, in 2012, the Second Circuit clearly stated that "[u]nder th[e] theory of 'organizational' standing, the organization is just another person—albeit a legal person—seeking to vindicate a right." N.Y. C.L. Union, 684 F.3d at 294. The Second Circuit restated this proposition in 2021. See Fac. v. N.Y. Univ., 11 F.4th 68, 75 (2d Cir. 2021), cert. denied sub nom. Fac., Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ., 142 S. Ct. 2813 (2022).[6] Here, Plaintiffs have failed to point to any

---

[6] In these two cases, the Second Circuit only cites Irish Lesbian & Gay Org. for the propositions that (1) "associational" standing refers to when an organization sues on its members behalf, Fac., 11 F.4th at 75 n.28; N.Y. C.L. Union, 684 F.3d at 294; and (2) "[t]o qualify [for organizational

source of law suggesting that the College Republicans is a legal person with constitutional rights of its own to vindicate in court.

Accordingly, the College Republicans, as an unincorporated association of individuals under New York law, does not have Article III organizational standing to bring suit on its own behalf. To find otherwise would vest the College Republicans with legal personhood the group does not otherwise have under the laws of New York, or any other law for that matter. It would also unnecessarily encroach upon the federal courts' carefully constructed doctrine of associational standing, which allows for a group of individuals to sue together under the group's collective banner if certain requirements are satisfied. See infra Section III.A.2.

### 2. Associational Standing

The College Republicans have also argued that as an unincorporated association, it "has associational standing to assert constitutional claims on behalf of its members." Pls.' Resp. at 7.

"The modern doctrine of associational standing, under which an organization may sue to redress its members' injuries, even without a showing of injury to the association itself, emerges from a trilogy of cases." United Food, 517 U.S. at 552. The first of these was Warth, where the Supreme Court stated in 1975 that:

> The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . . [S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

---

standing], the organization itself 'must "meet[ ] the same standing test that applies to individuals,"'" id. (alterations in original) (quoting Irish Lesbian & Gay Org., 143 F.3d at 649).

422 U.S. at 511. Two years later, in Hunt, the Supreme Court distilled these requirements into a three-pronged test:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343. Nine years after Hunt, the Supreme Court reaffirmed and applied the three-part test emerging from Warth and Hunt in Auto. Workers v. Brock, where it held that a union had associational standing to challenge an agency's construction of a statute providing benefits to workers who lost their jobs, even though the union did not allege any injury to itself. See 477 U.S. 274, 281–93 (1986).

While the three-pronged test from Hunt remains good law, the Supreme Court determined in 1996 that only the first two prongs of the test are of a constitutional character, whereas the third prong is prudential. See United Food, 517 U.S. at 553–58 ("[T]he third prong of the associational standing test is best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.")). Because the third prong "is a general limitation, judicially fashioned and prudentially imposed," id. at 558, it necessarily follows that it need not be met to satisfy Article III's case-or-controversy requirement, see Thole v. U.S. Bank N.A, 140 S. Ct. 1615, 1633 (2020) (Sotomayor, J., dissenting) ("All Article III requires is that a member '"would otherwise have standing to sue in their own right"' and that '"the interests [the association] seeks to protect are germane to the organization's purpose."'" (quoting United Food, 517 U.S. at 553)).

Here, when the Original Plaintiffs initiated suit, the College Republicans identified in the Complaint at least one member who otherwise would have Article III standing to sue in his own

right—Jon Lizak. However, after Lizak represented to the Court that he was no longer actively affiliated with the College Republicans, see Dkt. No. 208-2 ¶¶ 2, 4, the Court found it necessary to examine whether the College Republicans retained associational standing to pursue claims on other members' behalf, given that no others were identified by name in the Complaint. See Mar. 2023 Order at 22–23. Accordingly, the Court ordered Plaintiffs to show cause as to why the College Republicans retained Article III associational standing to pursue their claims. See id.

In their Response, Plaintiffs provided the Court with a declaration from non-party Rein Bey, a student at SUNY-Binghamton who currently serves as the President of the College Republicans. Bey Decl. ¶ 1. She has sworn that, around the time of the events giving rise to the Complaint, she "served as Vice President of [the] College Republicans," and that she "assisted with promotion of the [Dr.] Laffer Event by making flyers and sharing them with members of the . . . Economics and Political Science Departments." Id. ¶ 7. While Bey did not directly participate in the tabling activities on November 14, 2019, id. ¶ 8, she, like YAF, "lost [her] ability to promote the [Dr. Laffer Event] and spread its message[]" when the "College Republicans were forced to leave the tabling event" due to the State Defendants' alleged actions. Aug. 2021 Order at 15. These facts are "enough to state an injury-in-fact [related to the tabling incident] that is traceable to [the] State Defendants and redress[a]ble." Id. (citation omitted).

As for the Dr. Laffer Event, Bey's alleged injuries-in-fact were more direct. See Bey Decl. ¶¶ 9–10 (declaring, among other things, that she "was refused entry by [SUNY-Binghamton] police officers as numerous activists protested outside"). So too were the harms she experienced because of the College Republicans' suspension from the student platform to reserve rooms at SUNY-Binghamton for expressive events, and the College Republicans' inability to receive funds from the Student Association. See id. ¶¶ 11–14. Because these described injuries

would be enough to satisfy Article III standing on Bey's own behalf, the College Republicans have necessarily satisfied the first prong of the associational standing test articulated in Hunt. See 432 U.S. at 343. The College Republicans also satisfy the second prong of the test because the Complaint makes clear that the College Republicans, in bringing this suit on behalf of its members, "seek to protect interests that are not only germane, but vitally central to its purpose of promoting the discussion of political ideas." Pls.' Resp. at 8.

The analysis of associational standing, however, is less forgiving to Plaintiffs with respect to the third prong, which demands that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt, 432 U.S. at 343. As the Supreme Court previously stated in United Food:

> [The third prong] may well promote adversarial intensity. It may guard against the hazard of litigating a case to the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity. And it may hedge against any risk that the damages recovered by the association will fail to find their way into the pockets of the members on whose behalf injury is claimed.

517 U.S. at 556. Given that the College Republicans have sought compensatory damages on behalf of their membership, see Compl. at 38–39, the Court has serious doubts that the third prong of the associational standing test is satisfied, at least with respect to that requested relief, see Warth, 422 U.S. 490, 515–16 ("[W]hatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof. Thus, to obtain relief in damages, each member of [the association] who claims injury as a result of [the defendants'] practices must be a party to the suit . . . ."); see also Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004) ("We know of no Supreme Court or federal appeals ruling that an association has [prudential] standing to pursue damages

claims on behalf of its members."). The Court also has concerns on this prong with respect to the action generally, as counsel for the College Republicans have recently justified their discovery delays primarily based on the fact that many witnesses to the complained-of events "are no longer affiliated with" the College Republicans. See Dkt. No. 237 at 3.

Nevertheless, because the third prong "is a general limitation, judicially fashioned and prudentially imposed," United Food, 517 U.S. at 558, it follows that it need not be met to satisfy Article III's case-or-controversy requirement, see Thole, 140 S. Ct. at 1633. Accordingly, the Court finds it premature to dismiss any of the College Republicans' claims on the basis that they fail to satisfy the third prong of the Hunt associational standing test, which has no bearing on the Court's subject matter jurisdiction. See Emps. Committed For Just. v. Eastman Kodak Co., 407 F. Supp. 2d 423, 435 (W.D.N.Y. 2005) (declining to decide whether an association's suit "will involve the fact intensive and individual participation of each member" "[a]t this early point in the litigation" because "the third prong of Hunt is a prudential concern").

The Court also need not rule on the capacity-to-sue and failure-to-state-a-claim issues Plaintiffs raised in their Response to the Court's order to show cause, which only concerned the Court's subject matter jurisdiction over Plaintiffs' claims. See Pls.' Resp. at 9–12; Mar. 2023 Order at 22–23. These issues include:

1. Whether the College Republicans, as an unincorporated association, may maintain suit in its own name after Lizak's voluntary dismissal, despite Federal Rule of Civil Procedure 17(b)(3) and N.Y. Gen. Ass'ns Law § 12;

2. Whether Plaintiffs may amend their Complaint to join non-party Rein Bey as a named plaintiff in her official capacity as the President of the College

47

Republicans to comply with Federal Rule of Civil Procedure 17(b)(3) and N.Y. Gen. Ass'ns Law § 12; and

3. Whether the College Republicans—having satisfied Article III associational standing through the first two prongs of the Hunt test—may recover under Section 1983 for the violations of rights of its members despite the Second Circuit's decisions in Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1973), League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors, 737 F.2d 155 (2d Cir. 1984), and Nnebe v. Daus, 644 F.3d 147 (2d Cir. 2011).

Plaintiffs themselves acknowledge that "[c]apacity [to sue and be sued] is 'non-jurisdictional' and only addresses whether an entity 'may act as a litigant' . . . ." Id. at 9 n.10 (quoting Fund, 991 F.3d at 382, 386). And even though the Second Circuit has previously characterized the rule of Aguayo—which prohibits associations in the Second Circuit from suing under Section 1983 for the violations of rights of members, see 473 F.2d at 1099—as a matter of standing, see Nnebe, 644 F.3d at 156 ("It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under [Section] 1983 . . . ."), that rule has nothing to do with the constitutional requirements for an Article III case-or-controversy. Rather, that rule arises from the Second Circuit's interpretation and application of Section 1983. See Auguayo, 473 F.2d at 1099–1100.

It remains possible that Aguayo and its progeny may preclude the College Republicans from recovering under Section 1983 on behalf of its members, but that would be because of a failure to state cognizable claims under Section 1983, not because the Court lacks subject matter jurisdiction over the claims. See New York v. Scalia, 464 F. Supp. 3d 528, 547, 548 n.13 (S.D.N.Y. 2020) (noting that after Lexmark Int'l, Inc. v. Static Control Components, Inc., 572

U.S. 118 (2014), it is clear that "prudential standing doctrine" and its inquiry into "whether the plaintiff has a valid 'cause of action under [a given] statute[]' do[] not implicate the Court's subject-matter jurisdiction but whether the plaintiff has a valid cause of action"). Accordingly, the Court retains subject matter jurisdiction over the College Republicans' claims on behalf of its membership against the State Defendants and the Student Association.

### B.  The College Progressives

In the March 2023 Order, the Court also ordered Plaintiffs to show cause as to why the Court should not sua sponte dismiss all claims stated against the College Progressives for lack of subject matter jurisdiction, given that the College Progressives lack independent legal existence under New York law. Mar. 2023 Order at 22–24. In their Response to the order to show cause, Plaintiffs acknowledge that the College Progressives "have no legal existence independent from its members," but still maintain that they "can face suit." Pls.' Resp. at 12.

The legal question of whether an alleged entity has legal existence is "separate and distinct" from the question of whether that entity has the capacity to be sued. Roby v. Corp. of Lloyd's, 796 F. Supp. 103, 110 (S.D.N.Y. 1992), aff'd, 996 F.2d 1353 (2d Cir. 1993); see also Fund, 991 F.3d at 382–83 (collecting cases). An inquiry into an alleged entity's legal existence is necessary to determine whether a plaintiff may invoke the Article III jurisdiction of the federal courts against that entity because, as the Supreme Court has previously stated, "it is elemental that there must be parties before there is a[n] [Article III] case or controversy." Ellis, 421 U.S. at 434. If a defendant does not possess legal personhood under federal, state, or some other law, then it necessarily follows that no Article III case or controversy exists. While "[f]ederal law sets the parameters on what is necessary to" invoke the Article III jurisdiction of the federal courts, "state law . . . can supply the answers to certain antecedent questions relevant to whether those

49

federal requirements are satisfied," including "[w]hether a particular corporation or partnership" or some other organization has "legal existence . . . ." Fund, 991 F.3d at 385.

Here, Plaintiffs concede that the College Progressives "have no legal existence independent from its members . . . ." Pls.' Resp. at 12. That is because, under New York law, unincorporated associations have "no legal existence separate and apart from [their] individual members." L&L Assoc., 935 N.Y.S.2d at 452 (citation omitted); see also Pascual, 21 N.Y.S. 3d at 687–88. It necessarily follows that the College Progressives—as an association lacking legal existence independent of its individual members under New York law (or any other law for that matter)—does not have the requisite legal personhood for Plaintiffs to invoke the Article III jurisdiction of this Court against them as a collective unit.

Plaintiffs' arguments to the contrary do not warrant a different conclusion. For instance, Plaintiffs contend that because New York law recognizes "unincorporated associations" in a capacity-to-be-sued provision, the College Progressives have "[l]egal existence" as an association "and thus can face suit." Pls.' Resp. at 12. But this argument blurs the line between the substantive concept of legal existence and the procedural rules for bringing suit. While the Court agrees with Plaintiffs that the College Progressives are an unincorporated association under New York law, id. at 12–14, the agreement ends there. The relevant question for the purposes of invoking the Article III jurisdiction of the federal courts against an alleged entity is whether that entity is a legal person, *with legal rights and obligations of its own*. Plaintiffs themselves concede that the College Progressives are an unincorporated association under New York law, and that under such law, the College Progressives "have no legal existence independent from its members . . . ." Id. at 12 (citing L&L Assocs., 935 N.Y.S.2d at 452). It

necessarily follows that Plaintiffs may not invoke the Article III jurisdiction of this Court against

the College Progressives as a group, which lacks legal personhood.

     The fact that New York law allows for "lawsuits [to] be maintained against

unincorporated associations if brought against its president or treasurer," id. (citing N.Y. Gen.

Ass'ns Law § 13), does not change the above conclusion. The relevant provision states that:

> An action or special proceeding may be maintained, against the
> president or treasurer of such an association, to recover any
> property, or upon any cause of action, for or upon which the plaintiff
> may maintain such an action or special proceeding, *against all the*
> *associates, by reason of their interest or ownership, or claim of*
> *ownership therein, either jointly or in common, or their liability*
> *therefor, either jointly or severally.*

N.Y. Gen. Ass'ns Law § 13 (emphasis added). As the emphasized text reveals, the provision

authorizes a plaintiff to bring one suit to recover against individuals who associate with one

another under a common banner by virtue of (1) those individuals' joint or common interest or

ownership in any property the plaintiff seeks to recover, or (2) those individuals' actions against

the plaintiff which gave rise to causes of action that would have otherwise allowed the plaintiff

to bring suit against all the association's members individually. In other words, General

Associations Law Section 13 ("Section 13") allows plaintiffs to sue associations *in their capacity*

*as a representative defendant*. See Martin v. Curran, 303 N.Y. 276, 282 (N.Y. 1951) ("So, for

better or worse, wisely or otherwise, the Legislature has limited such suits against association

officers, whether for breaches of agreements or for tortious wrongs, to cases where *the individual*

*liability of every single member can be alleged and proven*. Despite procedural changes,

substantive liability in such cases is still, as it was at common law, 'that of the members

severally.'" (emphasis added)).

If a Section 13 suit were to come before a federal court, an Article III case or controversy would exist by virtue of the alleged injuries-in-fact against the *members* of the association. Such cases would be necessarily limited to claims that implicate the joint duties or interests of the unincorporated association's members. Such cases are, of course, in stark contrast to suits against legal persons, such as corporations, which have independent rights and obligations that can give rise to suit without any reference to the rights and duties of the individuals associated with them. This Court will not read Section 13—which is fundamentally a procedural mechanism for suit— as somehow vesting all unincorporated associations under New York law with legal personhood, and in turn authorizing plaintiffs to recover against the associations themselves under some theory of agency.

An examination of L&L Associates—a New York case upon which Plaintiffs heavily rely in their Response, see Pls.' Resp. at 12–13—confirms the narrow import of Section 13. In L&L Associates, a landlord brought a non-payment eviction proceeding against an unincorporated church concerning property that certain associates of the church group rented from the landlord. 935 N.Y.S.2d at 450–51. In dismissing the proceeding for insufficient service of process under Section 13, the court noted that "since the Church, itself, is an unincorporated entity that 'cannot hold property directly,' [the landlord's] eviction proceeding must necessarily be brought against responsible Church representatives before this Court can exercise jurisdiction over the *actual affected parties*." Id. at 453 (emphasis added) (internal citation omitted). While Plaintiffs may be correct that L&L Associates confirms that, under certain circumstances, courts may "permit[] belated corrections to a caption naming only the association as the defendant" so that the responsible representative of the association is named instead, id., the case also confirms that the

liability at issue in such suits does not apply against the association itself but rather against its individual members.

As for Plaintiffs' reliance on federal and New York cases in which courts entertained suits against unincorporated labor organizations and local political party committees, such reliance is misplaced. See Pls.' Resp. at 12–14 (citing United Min. & Chem. Corp. v. United Mechanics' Union, 252 N.Y.S. 2d 581, 582 (N.Y. Sup. Ct. 1964); Matter of Motor Haulage Co., 81 N.E.2d 91 (1948); Montalvo v. Bakery & Confectionery Workers Int'l Union of Am., 524 N.Y.S.2d 249 (N.Y. App. Div. 1988); Burns, Jackson, Miller, Summit & Spitzer v. Lindner, 437 N.Y.S.2d 895, 909 (N.Y. Sup. Ct. 1981); Jund v. Town of Hempstead, 941 F.2d 1271, 1279–80 (2d Cir. 1991)). In Jund, the Second Circuit allowed for Section 1983 liability against the Town of Hempstead Republican Committee and Nassau County Republican Committee, despite their identities as unincorporated associations, in part because:

> [A] statutory recognition and authorization [of these Committees] can be found in the New York Election Law. New York law specifically allows for the maintenance of assets by the Committees, and implicitly provides for the maintenance of bank accounts, solicitation of funds, procurement of credit, etc. The Committees, under these provisions, are required to file with the state a copy of the Committees' rules and amendments to such rules, an obligation analogous to the requirement that a corporation file a copy of its charter and Articles of Incorporation.

941 F.2d at 1282. Plaintiffs have pointed to no such equivalent statutory recognition and authorization of the College Progressives as a legal person under New York state law. As for the cases allowing for suit against unincorporated labor organizations, the Supreme Court in 1922 observed that federal and state law has "brought affirmative legal recognition of their existence and usefulness and provisions for their protection," and has "given [them] distinct and separate representation" in certain legal proceedings. United Mine Workers of Am. v. Coronado Coal Co.,

259 U.S. 344, 385–86 (1922). Again, Plaintiffs have failed to point the Court to any comparable recognition of the College Progressives' independent legal existence in federal, state, or other relevant law.

Plaintiffs' remaining argument that the "College Progressives responded [to the Complaint] by filing an answer expressly verified by its President," Pls.' Resp. at 13, and thereby waived any service or capacity-related defenses, see id. at 14 & n.15, is immaterial to the question of subject matter jurisdiction. While Plaintiffs are correct that such defenses may be waived, the College Progressives cannot submit to this Court's jurisdiction where the Constitution does not grant it. See Cotton, 535 U.S. at 625 ("Because subject-matter jurisdiction involves a court's power to hear a case, it can never be forfeited or waived.").

In dismissing all claims against the College Progressives as an entity for lack of Article III subject matter jurisdiction, the Court acknowledges that the Supreme Court and the Second Circuit have written very little about whether a plaintiff make ever invoke the Article III jurisdiction of the federal courts to bring suit against an association whose legal existence is entirely dependent upon on its individual members. However, the scarcity of controlling decisional law on that topic is rather unsurprising, given how rare the maneuver is. It is common sense that many plaintiffs do not wish to waste their time and money suing groups of people who can easily abandon their association with one another. See, e.g., Dkt. No. 181 at 2 (informing the Court that the "College Progressives [are] no longer an active organization at Binghamton University"). While plaintiffs with deep pockets may enjoy the headlines that are generated by suing roaming groups of individuals as fluid as the Jets and the Sharks, see generally Leonard Bernstein et al., West Side Story (1957), plaintiffs on a budget tend to act more prudently with their limited resources, bringing suit against natural or legal persons, who have real incentives to

respond to a lawsuit because they may face very real financial and other consequences if the court ultimately enters a judgment against them.

Rather than sue individuals affiliated with PLOT or the College Progressives who may have been personally responsible for the harms alleged in the Complaint, Plaintiffs made the choice to sue PLOT and the College Progressives as groups instead. While that choice may have generated some flashy headlines against PLOT and the College Progressives, it has ultimately resulted in the failure to recover against any individual affiliated with PLOT or the College Progressives who may have wronged Plaintiffs back in November 2019.

## IV.  THE FEBRUARY 2022 ORDER

In the March 2023 Order, the Court also signaled in a footnote that recent "developments in this case, see Dkt. Nos. 145, 147–50, and a more searching review of the record have led the Court to doubt the correctness of its earlier finding that service was properly effected on PLOT via personal service on non-party Andrews." Mar. 2023 Order at 20 n.8 (citing Feb. 2022 Order at 5, and Young America's Foundation v. Stenger, No. 20-CV-0822, 2022 WL 474152, at *2–3 (N.D.N.Y. Feb. 16, 2022) (Kahn, J.)). While it was unnecessary at the time for the Court to "vacate [this] earlier finding regarding the sufficiency of service on PLOT . . . to resolve [the Original] Plaintiffs' Motion for Default Judgment," id., the Court finds that it must do so now because Plaintiffs have continued to rely on the February 2022 Order in their Response to the order to show cause, see Pls.' Resp. at 13–14 (citing Feb. 2022 Order at 3).

Federal Rule of Civil Procedure 54(b) states that:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). However, the decisions referenced in Rule 54(b) "may not usually be changed unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'" Official Comm. of Unsecured Creditors of the Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) (citing Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). This standard allows for decisions to be revisited "subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" Id. (citing Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964)).

Here, in the months leading up to the February 2022 Order, the Original Plaintiffs petitioned the Court for an order "holding that [non-party] Andrews is authorized to accept service on PLOT's behalf." Dkt. No. 103 at 2. In support of this request, the Original Plaintiffs provided the Court with several pieces of evidence concerning non-party Andrews' relationship to PLOT, including a declaration from Richard C. David, the former mayor of Binghamton, Dkt. No. 44-6 ("Mayor Declaration"), a police bulletin from the Southern Tier Crime Analysis Center, Dkt. No. 127-1 ("Police Bulletin"), and the deposition testimony of non-party Tarik Abdelazim, Dkt. No. 127-3 ("Abdelazim Deposition"). In opposition to the request, non-party Andrews filed a declaration pro se, in which he contested the facts of his relationship to PLOT and provided the Court with documents in support of his position. Dkt. No. 129 ("Andrews' Opposition").

After reviewing this evidence, this Court granted the Original Plaintiffs' "request to hold that [non-party] Andrews is authorized to accept service on PLOT's behalf" in a short seven-page order, while deferring on the question of "PLOT's legal existence . . . ." Feb. 2022 Order at 5–6. In arriving at this finding, the Court credited the former mayor's declaration that "Masai

Andrews is known to me and in the local Binghamton community as a leader of PLOT," Mayor

Decl. ¶ 3, as well as "police records identifying non-party Andrews as a 'leader/organizer' of

PLOT," Feb. 2022 Order at 4 (citing Police Bulletin at 3) (other citation omitted). The Court also

found persuasive non-party Abdelazim's deposition testimony that non-party Andrews "was a

PLOT supporter and that Andrews was one of the individuals who reenergized PLOT." Id.

(citing Abdelazim Dep. at 15:16–18; 44:1–17).

        Shortly after crediting the Original Plaintiffs' evidence, the Court acknowledged that

non-party Andrews, in his Opposition, declared that "he has 'no past or present involvement with

PLOT'" and attacked the Original Plaintiffs' evidence as "'speculation and hearsay[.]'" Id.

(quoting Andrews Opp'n at 1–2). However, despite this clear factual dispute concerning non-

party Andrews' relationship to PLOT, the Court did not order an evidentiary hearing, and instead

resolved the dispute on the papers alone in favor of the Original Plaintiffs. See id. The Court

justified this resolution in favor of the Original Plaintiffs by citing to Top Form Mills, Inc. v.

Sociedad Nationale Industria Applicazioni Viscosa, 428 F. Supp. 1237, 1251 (S.D.N.Y. 1977),

for the proposition that "'[i]n assessing the foregoing facts it must be borne in mind that

compliance with the rules governing service of process is to be construed in a manner reasonably

calculated to effectuate their primary purpose: to give the defendant adequate notice that an

action is pending.'" Feb. 2022 Order at 4 (quoting Top Form Mills, 428 F. Supp. at 1251).

        But this Court's reliance on Top Form Mills to resolve the factual dispute concerning

non-party Andrews' relationship to PLOT was clearly in error. The court in Top Form Mills was

not burdened with the difficult task of resolving a factual dispute over an individual's

relationship with an unincorporated association for the purposes of service. Rather, the Top Form

Mills court was tasked with deciding between two interpretations of Federal Rule of Civil

Procedure 4(d). <u>See</u> 428 F. Supp. at 1250–51. The court ultimately opted for a more liberal interpretation of Rule 4(d), allowing for service to be effected on an organization by serving a "representative so integrated with the organization that he will know what to do with the papers," even if that representative did not belong to "a restricted class of formally titled officials . . . ." <u>Id.</u> at 1251. The court found that this liberal construction of the rule was warranted because the "primary purpose" of the federal service rules is "to give the defendant adequate notice that an action is pending." <u>Id.</u> (citing <u>Montclair Elecs., Inc. v. Electra/Midland Corp.</u>, 326 F. Supp. 839 (S.D.N.Y. 1971)) (other citations omitted). That case did not require the resolution of any factual dispute. <u>See</u> <u>id.</u>

The Second Circuit has stated on numerous occasions that "a judge should not resolve a factual dispute on affidavits or depositions, for then he is merely showing a preference for 'one piece of paper to another.'" <u>Forts v. Ward</u>, 566 F.2d 849, 851–52 (2d Cir. 1977) (quoting <u>Sims v. Greene</u>, 161 F.2d 87, 88 (3d Cir. 1947)). "This is particularly so when the judge[,] without holding an evidentiary hearing, resolves the bitterly disputed facts in favor of the party who has the burden of establishing his right to [his requested] relief." <u>Id.</u> at 852 (reviewing a district court's adjudication of a request for preliminary injunctive relief). When it comes to service of process, "the plaintiff bears the burden of establishing that service was sufficient." <u>TAGC Mgmt., LLC v. Lehman</u>, 842 F. Supp. 2d 575, 580 (S.D.N.Y. 2012). Therefore, the Second Circuit has found that an individual's sworn denial regarding effective service necessitates an evidentiary hearing. <u>See</u> <u>Davis v. Musler</u>, 713 F.2d 907, 914 (2d Cir. 1983) (holding that the district court abused its discretion by failing to hold an evidentiary hearing to resolve the issue of whether service had been effected in light of the directly conflicting affidavits submitted by the process server and by the defendants).

Here, non-party Andrews provided enough evidence to the Court in his Opposition to raise significant doubts about the veracity of the Original Plaintiffs' representations concerning his relationship to PLOT. The Court's decision to discount that evidence and quickly resolve the factual dispute regarding non-party's Andrews' relationship to PLOT without an evidentiary hearing was thus in clear error, and thereby warrants vacating the February 2022 Order.

The developments in this case after the Court issued the February 2022 Order further demonstrate why the failure to hold an evidentiary hearing amounted to a manifest injustice. After the Court issued the February 2022 Order, non-party Andrews then attempted to file an answer to the Complaint, wherein he reiterated his position that he has no affiliation to, or leadership position within, PLOT. Dkt. No. 144 ¶ 4. But Judge Lovric ordered that this filing be stricken from the docket given Andrews' status as a non-party. Dkt. No. 145. Shortly thereafter, an attorney filed a notice of appearance with the Court to represent non-party Andrews, Dkt. No. 148, and requested a conference "to clarify what the responsibilities of [non-party] Andrews in fact are," Dkt. 149. This attorney noted that non-party Andrews "approached" him because Andrews "fear[ed] that he personally has been burdened with the mantle of a group that, according to him, does not exist." Id. But Judge Lovric denied the request for a conference because the attorney was seeking "an advisory opinion from the Court as to any possible future consequences that may be brought upon . . . [n]on-[p]arty . . . Andrews." Dkt. No. 150.

Despite the Original Plaintiffs having made no allegations in the Complaint against non-party Andrews as an individual, they were able to tie him up in litigation, all while relying on his status as a non-party to prevent him from putting forth a meaningful defense. This litigation tactic is impermissible in Article III courts, which may not exercise their judicial power if they "doubt the existence of sufficient adversary interest to stimulate the parties to a full presentation

of the facts and arguments." Wright & Miller, 13 Fed. Prac. & Proc. Juris. § 3530 (3d ed.).

Accordingly, because the February 2022 Order was in clear error and worked a manifest

injustice on non-party Andrews, the Court vacates it under Rule 54(b). Given that the Court

already terminated PLOT as a defendant to this action, Plaintiff's request to hold that non-party

Andrews is authorized to accept service on PLOT's behalf is denied as moot.

## V.  CONCLUSION

In sum, the Court retains Article III subject matter jurisdiction over the College

Republicans' claims *on behalf of its members* against the State Defendants and the Student

Association, even in the wake of Lizak's voluntary dismissal. The Court also continues to have

Article III subject matter jurisdiction over YAF's claims against the same Defendants. The

parties may continue to litigate the merits of these claims.

However, the Court does not have Article III subject matter jurisdiction over any claims

that the College Republicans, as an organization, has brought *on behalf of itself*, as the group

lacks independent legal existence separate and distinct from its individual members. Nor does the

Court have Article III subject matter jurisdiction over any claims against PLOT or the College

Progressives, both of which also lack independent legal existence separate and distinct from their

individual members.

It was clear error and manifest injustice to hold that non-party Masai Andrews is

authorized to accept service on PLOT's behalf without an evidentiary hearing. The Court vacates

that holding. To the extent that reopens Plaintiffs' earlier request to hold that non-party Andrews

is authorized to accept service on PLOT's behalf, the Court denies that request as moot, as PLOT

is no longer a defendant in this action.

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' claims against the College Progressives are **DISMISSED** for lack of subject matter jurisdiction; and it is further

**ORDERED**, that the Clerk of the Court is respectfully directed to **TERMINATE** the College Progressives from the docket of this action; and it is further

**ORDERED**, that the February 2022 Order (Dkt. No. 142) is **VACATED**; and it is further

**ORDERED**, that Plaintiff's request to hold that non-party Masai Andrews is authorized to accept service on PLOT's behalf (Dkt. No. 127) is **DENIED as moot**; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on the two attorneys who attempted to appear on behalf of non-party Masai Andrews earlier in this litigation (Dkt. Nos. 149–50). The Court requests that one or both attorneys inform non-party Masai Andrews of the contents of this Memorandum-Decision and Order.

**IT IS SO ORDERED.**

DATED:     May 19, 2023
           Albany, New York

LAWRENCE E. KAHN
United States District Judge