# *Exhibit 5*

Page 1

```
1     UNITED STATES DISTRICT COURT
2     NORTHERN DISTRICT OF NEW YORK
3     _____
4     YOUNG AMERICA'S FOUNDATION; BINGHAMTON UNIVERSITY
      COLLEGE REPUBLICANS; AND JON LIZAK, PRESIDENT OF THE
5     COLLEGE REPUBLICANS OF BINGHAMTON UNIVERSITY,
6                        Plaintiffs,
7
               vs.    Civil Action No: 3:20-cv-822(LEK/ML)
8
9     HARVEY STENGER, President of SUNY-Binghamton, in his
      official and individual capacities;
10    BRIAN ROSE, Vice President for Student Affairs of
      SUNY-Binghamton, in his official and individual
11    capacities; JOHN PELLETIER, Chief of SUNY-Binghamton UPD,
      in his official and individual capacities; COLLEGE
12    PROGRESSIVES, a student organization of SUNY-Binghamton;
      PROGRESSIVE LEADERS OF TOMORROW ("PLOT"); STUDENT
13    ASSOCIATION OF BINGHAMTON UNIVERSITY,
14                        Defendants.
      _____
15                        DEPOSITION
16
17
      WITNESS:            Harvey Stenger
18
      DATE:               2/24/23
19
      START TIME:         9:00 a.m.
20    END TIME:           3:00 p.m.
21    LOCATION:           DoubleTree by Hilton-Binghamton
                          225 Water Street
22                        Binghamton, New York 13901
23    REPORTER:           Delores Hauber
24
25
```

Page 2

```
 1      APPEARANCES:
 2
        KING & SPALDING
 3      ATTORNEYS AT LAW
        1185 Avenue of the Americas
 4      New York, New York 10036-2601
        By:  ANDREW C. HRUSKA, ESQ.
 5           ahruska@kslaw.com
        Attorneys for the Plaintiffs
 6
 7      OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
        Assistant Attorney General
 8      The Capital
        Albany, New York 12224
 9      By:  JOHN F. MOORE, ESQ.
             john.moore@ag.ny.gov
10           AMANDA KURYLUK, ESQ.
             amanda.kuryluk@ag.ny.gov
11      Appearing for the Defendants, Harvey Stenger,
          Brian Rose and John Pelletier
12
13      ASWAD & INGRAHAM
        ATTORNEYS AT LAW
14      46 Front Street
        Binghamton, New York 13902
15      By:  TOM SAITTA, ESQ. (via videoconference)
             tom.saitta@ailaw.com
16      Appearing for the Defendants, Student Association of
          Binghamton University
17
18      Also Present:
          KEVIN HAYDEN, ESQ., Binghamton University Chief
19           Campus Counsel
20
21
22
23
24
25
```

Page 3

1              I N D E X   O F   T E S T I M O N Y

2

3      Examination of Harvey Stenger                    Page

4      By Mr. Hruska                                       6

5      By Mr. Saitta                                     183

6      By Mr. Hruska                                     188

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1              I N D E X   O F   E X H I B I T S

2                    (Retained by counsel)

3      Exhibit              Description                Page

4       HS-1   Message from President Stenger, 11/15/19  42

5       HS-2   e-mail chain                              54

6       HS-3   e-mail chain                              76

7       HS-4   e-mail to Sheldon Goldfarb, dated 11/20   85

8       HS-5   e-mail to Darcy Fauci, dated 11/20        96

9       HS-6   e-mail to Mitchell Goldstein, dated 11/20 97

10      HS-7   e-mail from Sheila Doyle, dated 11/21/19 104

11      HS-8   e-mail from Stenger to Rose and Fauci    116

12      HS-9   e-mail from K. Johnson to H. Stenger

13             dated 11/22/19                           118

14      HS-10  e-mail from Stenger to McCabe and Yarosh

15             dated 11/27/19                           134

16      HS-11  e-mails from T. Chronopoulos to Stenger,

17             dated 12/23/19 and 12/24/19              159

18      HS-12  a 1/2/20 letter signed by K. Johnson

19             and H. Stenger to Brian Kolb            162

20      HS-13  e-mail from Ryan Yarosh to Stenger

21             dated January 24, 2020                   165

22

23

24

25

Page 5

1                        FEDERAL STIPULATIONS

2

3           IT IS HEREBY STIPULATED AND AGREED by and between

4      the attorneys for the respective parties that the presence

5      of the Referee be waived;

6           IT IS FURTHER STIPULATED AND AGREED that the witness

7      shall read and sign the minutes of the transcript within

8      30 days upon receipt, and that the filing of the

9      transcript be waived;

10          IT IS FURTHER STIPULATED AND AGREED that all

11     objections except as to form are reserved until the time

12     of trial;

13          IT IS FURTHER STIPULATED AND AGREED that this

14     Deposition may be utilized for all purposes as provided by

15     the Federal Rules of Civil Procedure;

16          AND FURTHER STIPULATED AND AGREED that all rights

17     provided to all parties by the Federal Rules of Civil

18     Procedure shall not be deemed waived and the appropriate

19     sections of the Federal Rules of Civil Procedure shall be

20     controlling with respect thereto.

21

22

23

24

25

```
                                              Page 6
 1                  H A R V E Y   S T E N G E R,
 2        having been called as a witness, having been duly sworn
 3        testified as follows:
 4                    MR. HRUSKA:  Andrew Hruska for plaintiffs,
 5              Young America's Foundation and College
 6              Republicans of Binghamton University.
 7                    MR. MOORE:  John Moore for the defendants
 8              Stenger, Rose and Pelletier from the New York
 9              State Attorney General's Office.
10                    MR. HAYDEN:  Kevin Hayden for Binghamton
11              University chief campus counsel.
12                    MS. KURYLUK:  Amanda Kuryluk from the
13              Attorney General's Office also on behalf of the
14              defendants.
15                    MR. SAITTA:  Tom Saitta here representing
16              the Student Association.
17        EXAMINATION BY
18        MR. HRUSKA:
19             Q    So, President Stenger, is that how I should
20         refer to you, sir?
21             A    You can refer to me that.  That's fine.
22         Whatever is comfortable for you.
23             Q    Whatever you would prefer.
24             A    I'm good with anything.
25             Q    I'm going to cover a few background points
```

```
 1        before we start, the ground rules for this deposition.
 2        First of all do you understand that you are being
 3        deposed in the case of Young America's Foundation versus
 4        Harvey Stenger and others?
 5             A    Yes.
 6             Q    Have you ever been deposed before?
 7             A    I don't think so.
 8             Q    Could you state your full name and address for
 9        the record?
10             A    Harvey Glen Stenger, Junior, 946 Vestal Avenue,
11        Binghamton, New York 13903.
12             Q    Do you understand that you have taken an oath
13        to tell the truth?
14             A    Yes.
15             Q    Is there anything that would stop you from
16        being able to give true and accurate testimony today?
17             A    No.
18             Q    Let me go over some grounds rules about how
19        this deposition will be conducted.  I'll ask questions.
20        You'll give the answers.  Do you understand how that
21        will work?
22             A    Yes.
23             Q    And if I ask a question that you don't
24        understand, please tell me that you don't understand it.
25        As I'm sure Mr. Moore will tell you it's not helpful if
```

Page 8

1          we miscommunicate and you give an answer to a question

2          that you don't understand; is that understood?

3               A    Yes.

4               Q    The court reporter is taking down everything we

5          say and so it's important that we speak slowly and

6          clearly enough so that we can have an accurate record.

7          Do you understand that?

8               A    Yes.

9               Q    Wait for me to finish my question and I'll wait

10         for you to finish your answer and that will help us

11         develop a clear record, understood?

12              A    Yes.

13              Q    If you need to take a break at any time, just

14         let us know and we can take a break.  There is no

15         compulsion to stay on the record.  With the one

16         exception that if there is a question pending, I would

17         strongly prefer you finish your answer so we can have a

18         clear record before you take a break, understood?

19              A    Yes.

20              Q    In advance of today's deposition did you

21         refresh your recollection of the events of November 2019

22         which are the centerpiece of this lawsuit?

23              A    Could you repeat that?

24              Q    In advance of today's deposition did you

25         refresh your recollection of the events of November 2019

Page 9

```
 1      which are at the center of this lawsuit?

 2          A    The entire month of November 2019?

 3          Q    The events that are at the center of it.  There

 4      are primarily two events.  There was an incident in

 5      which there were students who were advertising a speech

 6      by Dr. Laffer on November 14th, 2019 were harassed by

 7      other students and perhaps others.  And there was a

 8      subsequent event on November 18th, 2019 in which Dr.

 9      Laffer attempted to address a preplanned assembly and he

10      was shouted down by students.  Do you recall those

11      events?

12               MR. MOORE:  Objection to the form of the

13          question, the characterization of the events.

14          You can answer.

15          Q    Do you recall those events?

16          A    That was not the question you had asked.  You

17      asked if I had prepared.

18          Q    I asked if you refreshed your recollection of

19      those events and you asked me what events so I'm telling

20      you those are the events that are the center of this

21      lawsuit.  Have you refreshed your recollection about

22      those events?

23          A    Yes.

24          Q    It will help by way of reference if we refer to

25      the first event that I mentioned as the tabling event
```

                                                     Page 10

1          which I will stipulate to you it was November 14th,

2          2019.  And the second event as the Laffer event which

3          was November 18th, 2019.  Do you understand that?

4               A    Yes.

5               Q    So you'll understand what I mean when I refer

6          to the tabling event and the Laffer event respectively?

7               A    Yes.

8               Q    So did you refresh your recollection of the

9          tabling event and the Laffer event before this

10         deposition?

11              A    Yes.

12              Q    Did you review any videos of those events?

13                   MR. MOORE:  I'm going to object to the

14              extent that you're asking him to describe any

15              meetings with counsel.

16              Q    I don't want to, nothing I say in this

17         deposition should imply nor should you infer that I want

18         you to say anything about your discussions with Mr.

19         Moore or any of your other counsel.  I'm just asking

20         whether in the process of preparing for today's meeting,

21         which is in 2023, you reviewed any video of the tabling

22         event or the Laffer which occurred in 2019?

23              A    I have not reviewed them.

24              Q    All right.  Why don't we back up a bit and tell

25         us about your educational and professional background.

```
                                              Page 11
 1          Where did you go to school, where have you worked?
 2              A     Where would you like to start?
 3              Q     Why don't you start with college.
 4              A     Okay.  I was an undergraduate at Cornell,
 5          graduated in 1979.  Graduate student at MIT, graduated
 6          1984.
 7              Q     In what subjects?
 8              A     Chemical engineering.
 9              Q     And then what is your professional background?
10              A     Chemical engineer.
11              Q     And what jobs have you held?
12              A     I was a faculty member.  Professor at Lehigh
13          University.  I was an administrator, associate dean,
14          center director, department chair and dean of the
15          college of engineering and applied sciences at Lehigh.
16          I then was a faculty member again at Lehigh University
17          for a while.  And then I went to the University of
18          Buffalo where I was the dean of the school of
19          engineering and applied sciences.
20              Q     Let me stop you there for a moment.  When did
21          you move over to the University of Buffalo?
22              A     2006, August 2006.
23              Q     And is that, is that SUNY Buffalo or is that
24          the private university?
25              A     That's SUNY Buffalo.
```

```
                                               Page 12

 1          Q    So part of the same State University of New

 2     York system which you are now also employed?

 3          A    Yes.

 4          Q    When did that employment start?  2006 did you

 5     say?

 6          A    August 2006.

 7          Q    Okay.  Sorry for the interruption.  Please

 8     continue from there.

 9          A    I left in January of 2012 to become the

10     president at Binghamton University.  I served a short

11     term, about eight months, as the interim provost at the

12     University of Buffalo before I left.

13          Q    Other than the provost position at Buffalo what

14     were your other administrative as opposed to teaching

15     responsibilities at the University of Buffalo?

16          A    I was the dean of the school of engineering and

17     applied sciences.

18          Q    And in that role what responsibilities did you

19     have for the administration as opposed to education of

20     the school of applied sciences?

21               MR. MOORE:  Objection to form.  You can

22          answer if you understand.

23          Q    Is that clear enough?  I'm not trying to ask

24     you about chemical engineering.  I'm asking about what

25     your responsibilities were for the administrating of the
```

Page 13

1        school.

2            A    Well, the dean of the school manages the

3        faculty and staff.  Department chairs report to the

4        dean.  The dean manages the finances of the school and

5        helps with fundraising.  Dean work.

6            Q    Did dean work at the University of Buffalo

7        during the period you were there did that include

8        discipline of students?

9            A    For academic dishonesty, yes.

10           Q    How about for any other reason other than

11       academic dishonesty?

12           A    No.

13           Q    When you moved into your position, as I think I

14       have it correct, provost at University of Buffalo for a

15       short period of time?

16           A    Right.

17           Q    How did your responsibilities change?

18           A    I had the dean's report to me.  And the

19       management of the, all of the deans' budgets was my

20       responsibility.

21           Q    And did you assume any responsibility for

22       discipline outside of the category of academic

23       dishonesty at that point?

24           A    No.

25           Q    During the time you were at University of

```
                                                   Page 14
 1        Buffalo did you receive any training in adherence to

 2        First Amendment protections as required by government

 3        officials?

 4                      MR. MOORE:  Objection to form.  You can

 5              answer.

 6        A     I don't remember.

 7        Q     And you left University of Buffalo in 2012 I

 8        think you testified to, correct?

 9        A     Uh huh.

10        Q     And did you immediately move into your current

11        position --

12        A     Uh huh.

13        Q     -- as president of Binghamton University,

14        correct?

15                      MR. MOORE:  Harvey, you can't say uh huh.

16              The stenographer will need to take verbal

17              answers, so it's got to be yes or no.

18        Q     Am I correct you moved directly into your

19        position as president of Binghamton University?

20        A     Yes.

21        Q     And describe please your responsibilities as

22        president of Binghamton University, have they remained

23        the same throughout or have they changed over time?

24        A     They have remained the same.

25        Q     And if you could summarize, I realize there's a
```

Page 15

1       broad array of responsibilities, but can you summarize

2       your responsibilities as president?

3            A    I managed the overall well-being of the

4       university.

5            Q    And who reports to you in your role as

6       president?

7            A    Vice presidents and directors, executive

8       directors.

9            Q    Roughly how many vice presidents are there and

10      how many executive directors?  If that has changed over

11      time, tell us that as well.

12           A    I have to write them down.

13                   MR. MOORE:  Don't take any notes.  Just

14            best recollection.  There's no need to.

15           A    I don't even know how to count sometimes.

16                   MR. MOORE:  He's just looking for your best

17            recollection.

18           A    There's six vice presidents.  Maybe there's six

19      I think.

20           Q    Are there others who are executive directors?

21           A    Yes.

22           Q    How many executive directors are there?

23           A    There's three of those, approximately three.

24           Q    So you supervise directly roughly nine reports

25      so to speak; is that correct?  If you understand what I

```
                                          Page 16
 1      mean.
 2           A     No.  It's more than that.
 3           Q     More than that.  Well, tell us about your other
 4      direct reports then.
 5           A     Campus auditor.  Campus counsel.  Faculty
 6      advisor to the president.  Chief of staff.
 7      Administrative assistant to the president.  That's it.
 8           Q     And you don't need to go through them, but have
 9      those individuals changed over time during the period
10      while you've been president, are there different people
11      in those roles or has it been the same consistently?
12           A     They have changed.  Some have changed.
13           Q     What as president is your relationship with the
14      state university system as a whole?  How do you interact
15      with the State University of New York?
16           A     I have meetings with other presidents and the
17      chancellor maybe twice a year, three times a year.
18      That's about it.
19           Q     Do you have a reporting relationship with the
20      chancellor?  Do you report to her?
21           A     Yes, to him.  Yes, I report to the chancellor.
22           Q     And what is his name?
23           A     John King.
24           Q     Has that changed recently?
25           A     Yes.
```

```
                                           Page 17
 1          Q    Was the former chancellor Kristina Johnson; is

 2     that right?

 3          A    No.

 4          Q    Who was the former chancellor?

 5          A    Debra Stanley.

 6          Q    And when was that change between Miss Stanley

 7     and the current Mr. King?

 8          A    About a month ago.  Maybe two months ago.

 9          Q    So what is the nature of that reporting

10     relationship?  Are you a subject to the direction of the

11     chancellor; is that a fair characterization?

12          A    There's been five chancellors since I've been

13     president and they all work differently with the

14     presidents so I'm not, I'm not sure how I would work

15     with John.

16          Q    But as a formal matter are you responsible to

17     take the instructions you receive from the chancellor;

18     is that a fair?

19          A    If the chancellor gave me instructions, I would

20     follow them.

21          Q    As a matter of your occupational requirement or

22     as a matter of prudence?

23          A    Prudence.

24          Q    Because you thought it was a good idea?

25          A    Thought it was a good idea.
```

```
                                             Page 18
 1          Q    But are you obligated as part of the employment
 2     relationship to follow instructions that come from the
 3     chancellor?
 4          A    No.  My contract does not say that I'm
 5     obligated to follow him.
 6          Q    That's the question I want to answer.  You have
 7     an independent scope of authority outside of the
 8     chancellor's direction; is that correct?
 9          A    Yes.
10          Q    So while you might respect a view that you
11     receive from your consultation with the chancellor,
12     ultimately the decisions that you make in the scope of
13     your employment are yours; is that correct?
14                    MR. MOORE:  Objection to form.  You can
15              answer.
16          A    Yes.
17          Q    If you would like me to rephrase any question
18     that is not clear, please tell me.  I'm not trying to
19     trick or trap.  I'm just trying to understand your view
20     on this.
21          A    Okay.
22          Q    When you ascended to the presidency of
23     Binghamton University and since then have you received
24     any training in First Amendment issues?
25          A    No.
```

Page 19

1          Q     Have you received any training in the

2    management of crowd events?

3          A     No.

4          Q     Have you received any training in event

5    planning?

6          A     Training?

7          Q     Training, yes.

8          A     As a formal certificate of completing a module

9    or some in person or remote class or course of study,

10   no.

11         Q     Have you received any informal training on that

12   subject?

13         A     Training is still the word, no.

14         Q     So you were defining training stipulatively as

15   a formal process that results in the award of a

16   certificate.  I'm trying to use the word in a different

17   sense so I'm going to change words.  Have you received

18   any instruction informally as to how to deal with First

19   Amendment issues other than what you received from legal

20   counsel?

21         A     Instruction?

22         Q     Instruction.

23         A     No instruction.

24         Q     How about education on that topic?

25         A     Not education.

```
                                                    Page 20
 1          Q    So it's been a learning on the job experience
 2     for you; is that correct?
 3                    MR. MOORE:  Objection to form.  You can
 4             answer.
 5          A    I think I've received advice.
 6          Q    Other than legal advice, what advice have you
 7     received on the topic of handling First Amendment issues
 8     at Binghamton University?
 9          A    Other than, I didn't say legal advice.  I said
10     advice.
11          Q    I wanted to specifically exclude legal advice
12     because I'm not trying to intrude on your
13     attorney-client privilege.  So other than that if you
14     received any at all, I don't presuppose that you did,
15     what advice have you received on First Amendment issues?
16          A    During conversations with other university
17     presidents outside of the State of University of New
18     York.  People who run organizations that oversee some of
19     the activities of public universities and the
20     association of public and land grant universities.  So
21     there are some opportunities to talk to colleagues and
22     get their advice on how to, how to manage First
23     Amendment issues.
24          Q    Has any of that advice been more formalized,
25     even if short of the formal certificated training that
```

```
                                          Page 21
 1        you testified about a moment ago, has it resulted in any
 2        written communication?
 3             A     No.
 4             Q     What training have you received with respect to
 5        the university discipline of students in your role as
 6        president of Binghamton University?
 7             A     No training.
 8             Q     None whatsoever?
 9             A     I'm not going to, I don't think the word
10        training is appropriate.
11             Q     Well, how did you learn about the university
12        disciplinary process in your role as president of
13        Binghamton University?
14             A     Through reading the student code of conduct.
15        Asking questions of the vice president of student
16        affairs.
17             Q     Any other sources?
18             A     Those were the major sources.
19             Q     And what as you understand it is your role in
20        the university disciplinary process for students?
21             A     I do not have a role.
22             Q     Do you have an advisory role?
23             A     No.
24             Q     Are you called upon to give advice to those who
25        do have a role in that process?
```

```
                                              Page 22
 1          A     No.

 2          Q     Do you educate yourself as to the evolving

 3    disciplinary issues that exist at the university?

 4          A     Yes.

 5          Q     How do you do that?

 6          A     Through conversations with the vice president

 7    of student affairs.

 8          Q     And who is the vice president of student

 9    affairs?

10          A     Brian Rose.

11          Q     Has he been in that role for the entire time

12    you've been president?

13          A     Yes.

14          Q     As you understand it is Mr. Rose the final

15    authority of student disciplinary issue at the

16    university?

17          A     Yes.

18          Q     And he reports directly to you, correct?

19          A     Correct.

20          Q     What do you -- strike that.  Do you understand

21    how the student disciplinary process works in

22    Binghamton?

23          A     Yes.

24          Q     And can you lead us through that please?  How

25    does the process work?
```

```
                                                    Page 23
 1        A     A complaint is filed with the office of student
 2     conduct.  The director of the office of student conduct
 3     then manages that complaint.
 4        Q     And who is in charge of the office of student
 5     conduct if you know?
 6        A     Currently?
 7        Q     Currently, sure.
 8        A     Amy Zieziula.
 9        Q     And was Miss Zieziula also in charge of that
10     office in November 2019?
11        A     No.
12        Q     Who was in charge at that point?
13        A     I don't remember.
14        Q     And to whom does the officer in charge of the
15     office of student conduct report directly?
16        A     I'm not certain.
17        Q     Does that chain of reporting ultimately go up
18     to Brian Rose, that's your testimony, correct?
19        A     Yes.
20        Q     And in the process of managing a complaint what
21     processes are applied in order to reach the resolution
22     of that complaint process?
23        A     I've never been formally involved in it.
24        Q     Despite what you've testified is a lack of a
25     formal rule, have you nonetheless advised on appropriate
```

Page 24

1      disciplinary processes at Binghamton University?

2           A     I don't remember.

3           Q     Do you recall instances in which you've

4      consulted with Mr. Rose on disciplinary issues?

5           A     Yes.

6           Q     In the course of that consultation have you

7      offered Mr. Rose your advice about how to proceed on

8      student disciplinary issues?

9           A     I've made suggestions, but I wouldn't call it

10     advice.

11          Q     Do you recall any instances in which Mr. Rose

12     rejected your suggestions and acted contrary to the

13     course that you had suggested?

14          A     I don't remember any specific cases where I

15     advised him to do anything with regard to a student

16     conduct case.  I don't remember any of the cases.

17          Q     I'm sorry.  I just want to make sure I have

18     your testimony correct.  You don't recall any instance

19     in which you gave him any suggestion about a student

20     conduct case, have I got that correct?

21          A     I may have, but I'm not sure.

22          Q     But you don't have a concrete recollection of

23     any specific cases; is that your testimony?

24          A     Correct.

25          Q     You're aware of a component of the university

```
                                            Page 25
1        called the university police department, correct?
2             A     Yes.
3             Q     And that department is subject to the direction
4        of Binghamton University, correct?
5             A     Yes.
6                   MR. MOORE:  Objection to form.  You can
7                answer.
8             Q     How does that direction function as you
9        understand it?
10            A     Direction?
11            Q     Well, explain as you understand it the
12       relationship between the university police department
13       and the leadership of Binghamton University.
14            A     There's a chief of police and currently that
15       chief of police reports to the vice president of
16       operations.
17            Q     In 2019 was the vice president of operations
18       Mr. Faughnan, Tim Faughnan?
19            A     No.
20            Q     Who was it then?
21            A     JoAnn Navarro.
22            Q     What was Mr. Faughnan's role in 2019?
23            A     Well, in 2019 there was an associate vice
24       president, Mr. Faughnan.  The chief of police reported
25       to him then.  He is retired and now the chief of police
```

                                                        Page 26

1        reports directly to the vice president of operations

2        because we did not replace Mr. Faughnan.

3            Q    Understood.  And in November 2019 the chief of

4        police was Mr. Pelletier, correct?

5            A    Correct.

6            Q    What is your responsibility for oversight of

7        the university police department?

8                    MR. MOORE:  Objection to form.  You can

9            answer.

10           A    I allow the vice president of operations to

11       manage that department.

12           Q    And does the management of the university

13       police department include making decisions about the

14       handling of potential criminal matters?

15           A    Yes.

16           Q    And does the university police department have

17       the authority to charge individuals with New York State

18       crimes?

19           A    Yes.

20           Q    Does it have the authority to make arrests?

21           A    Yes.

22           Q    And does the administration have the authority

23       to ultimately make decisions about what arrests the

24       university police department makes?

25           A    The university?

```
                                            Page 27
 1          Q    The university administration by which I mean
 2     the vice president and president, the relevant vice
 3     president and president.
 4                    MR. MOORE:  Objection to form.  Do you
 5              understand the question?
 6          A    The question seems to be can the police
 7     department arrest somebody without any advice from the
 8     administration, yes, they can.
 9          Q    Let me rephrase because I think that we have
10     miscommunicated.  The question is whether the
11     administration -- let me be more specific -- whether the
12     director of administration; is that the correct title?
13                    MR. MOORE:  Director of operations.
14          Q    Director of operations.  Can the director of
15     operations instruct the police to make an arrest?
16          A    Vice president of operations.  I believe that
17     the university police has to follow police protocol to
18     determine when an arrest is made.
19          Q    Let me repeat the question.  Is the vice
20     president of operations empowered under the rules
21     governing Binghamton University to instruct the police
22     to make an arrest if that arrest is within police
23     protocols?
24                    MR. MOORE:  Instruct?
25          Q    Yes, instruct.
```

```
                                              Page 28

1          A    I don't know.

2          Q    Who would know?

3          A    I don't know.

4          Q    Would the vice president of operations know the

5     answer to that question?

6          A    You'd have to ask her.

7          Q    But she is somebody who reports to you,

8     correct?

9          A    Yes.

10         Q    Do you know if the vice president of operations

11    can instruct the university police department not to

12    make an arrest in a circumstance in which the university

13    police intends to make an arrest?

14         A    I don't know.

15         Q    Do you recall the issue of whether or not to

16    make an arrest based on student conduct came to your

17    attention in your role as president of the university?

18         A    Student conduct?

19         Q    Student conduct, yes.

20         A    We don't arrest for student conduct charges.

21         Q    I'm using the term in its normal layman sense

22    of conduct by a student.  Are you aware of any

23    circumstance in which you as president of the university

24    are asked to advise on whether the university police

25    department should make an arrest for conduct by
```

```
                                                      Page 29
 1      students?
 2                  MR. MOORE:  Are you talking about criminal
 3            arrests, not student conduct charges?
 4                  MR. HRUSKA:  There is only one kind of
 5            arrest, Mr. Moore.
 6                  MR. MOORE:  But there is also, you're using
 7            the word student conduct.
 8      Q    I'll use a different word.  For bad things that
 9      students have done.
10                  MR. MOORE:  Objection to form.
11      A    It's a pretty poorly phrased question.  Bad
12      things?
13      Q    That's usually why people are arrested, Mr.
14      Stenger, for doing bad things.  Do you recall any
15      circumstance in which the university administration,
16      specifically the vice president of operations, was
17      called upon to decide whether or not the university
18      police should make an arrest for bad things that
19      students have done?
20      A    No.
21      Q    Let me switch topics.  Are you familiar with
22      the New York Code of Rules and Regulations governing the
23      State University of New York?
24      A    Not much.
25      Q    But you're aware that such a document exists,
```

Page 30

1      correct?

2          A    Yes.

3          Q    And you're aware that the significance of that

4      document as it comprises the formal regulations of the

5      state govern the university of which you're president,

6      correct?

7                    MR. MOORE:  Objection to form.  If you

8              know.

9          A    I don't know.

10         Q    So your testimony is you're not aware of the

11     relevance of the New York State Code of Rules and

12     Regulations governing SUNY?

13         A    I know it exists.

14         Q    What is your relationship with that body of

15     law?

16         A    I know that it exists.

17         Q    Are you aware of the content of it?

18         A    No, not much.

19         Q    Has the content of that body of law been the

20     subject of discussion among university presidents within

21     the State University of New York system in your

22     recollection?

23         A    No.

24                    MR. MOORE:  In his experience?

25         A    Not with me involved.

```
                                                        Page 31
 1                    MR. HRUSKA:  Let me start with our exhibits
 2              then.  I'll draw your attention to, it's actually
 3              toward the back of the binder.  Referring to tab
 4              25.  I don't think it has a sticker yet so I'll
 5              ask.
 6                    MR. MOORE:  I believe this was previously
 7              marked in Joe's deposition.  I don't know how you
 8              want to handle that.  I don't have the number.
 9                    MR. HRUSKA:  I don't have the number off
10              the top of my head.  I don't want to repeat
11              numbers.  Let me give it a provisional number now
12              and go back and fix it.
13                    MS. KURYLUK:  It was, I have it marked as
14              Exhibit 9 for Brian Rose's deposition.
15                    MR. HRUSKA:  So we'll call it BR-9 then.
16         Q   So, President Stenger, if you look at this page
17      this is a printout from the New York Code of Rules and
18      Regulations.  It is the version that was in place in
19      2019.
20                    MR. SAITTA:  Excuse me.  Which document are
21              we looking at?
22                    MR. HRUSKA:  We are looking at, it was
23              Brian Rose's Exhibit 9.  It is a printout of New
24              York Code of Rules and Regulations.
25                    MR. SAITTA:  Okay.  Do you know what tab it
```

1          is?

2                    MR. MOORE:  25.

3                    MR. HRUSKA:  It's 25 of today's.  I'm

4          sorry, is that Tom?  I can't see.

5                    MR. SAITTA:  Yes.  My camera isn't working.

6          On a break I'm going to try to reenter and come

7          back in, but I can still hear you.

8                    MR. HRUSKA:  No worries.  I just wanted to

9          make sure you have the right exhibit in front of

10         you.

11                   MR. SAITTA:  Yep.  I've got tab 25.

12         Thanks.

13         Q    President Stenger, you'll see that this

14    provision is a list of prohibited conduct Section 535.3

15    of 8 Code of Rules and Regulations and it applies to the

16    State, Chapter 5 of the State University of New York.

17    And it states that, and I'm going to skip a section just

18    so I'm reading the relevant parts, but if you would like

19    to read further please take your time.  At the very top

20    it states "no person, either singly or in concert with

21    others shall:"  And then dropping down to Section(i)

22    "deliberately disrupt or prevent the peaceful and

23    orderly conduct of classes, lectures and meetings or

24    deliberately interfere with the freedom of any person to

25    express his views including invited speakers."  Were you

```
                                             Page 33
 1        familiar with that provision of law before the tabling

 2        event and the Laffer event in 2019?

 3             A    No.

 4             Q    Have you since had occasion to learn of that

 5        provision other than through a conversation with counsel

 6        before sitting here today for this deposition?

 7             A    No.

 8             Q    You're aware as we've already discussed and as

 9        you've testified that the University of Buffalo is part

10        of the State University of New York system, correct?

11             A    Yes.

12             Q    As part of the same State University of New

13        York system in which you are now an employee and

14        president of Binghamton University, correct?

15             A    Yes.

16             Q    Are you aware that in 2017 the State University

17        of New York entered into a stipulation in a lawsuit

18        involving First Amendment issues with respect to conduct

19        at the University of Buffalo?

20                       MR. MOORE:  Objection to form.  You can

21             answer.

22             A    No.

23             Q    Well, I would like you to please turn to

24        document 26 in your binder.

25                       MR. MOORE:  So this was also marked the
```

Page 34

1                other day.

2                        MS. KURYLUK:  It was previously marked as

3                BR-10.

4                        MR. HRUSKA:  This is Exhibit BR-10.

5                        MR. SAITTA:  What tab number is that?

6                        MR. HRUSKA:  Tab Number 26.

7                        MR. SAITTA:  Thank you.

8           Q    And this is a document, it is a court document

9      from the US District Court for the Western District of

10     New York in the case of Center for Bio-Ethical Reform

11     against Dennis R. Black, et al.  And the title of it is

12     Stipulation of Settlement and Discontinuance Pursuant to

13     Rule 41(A).  So, President Stenger, obviously feel free

14     to read through this to whatever extent you wish, but

15     what I would like you to do is draw your attention to

16     the provision on the second page of the document.  This

17     is a document which is the instrument that was used to

18     settle a lawsuit on First Amendment issues.  You'll see

19     that on the second page, beginning with the third

20     paragraph it says "now, therefore, it is hereby

21     stipulated and agreed."  And then jumping down, if you

22     need more time just please tell me.

23                        MR. MOORE:  You're referring to the

24                paragraph that says "now, therefore, it is hereby

25                stipulated and agreed, by and between the

Page 35

1        undersigned attorneys of record for all of the

2        parties in the above-entitled action as follows"?

3             MR. HRUSKA:  I'm getting there, but I see

4        President Stenger wants to read the document and

5        I want to let him do that and direct his

6        attention when he has done so.

7        Q    I would like to direct your attention to the

8   second page of the document where it says in the

9   beginning of the third paragraph "now, therefore, it is

10  hereby stipulated and agreed, by and between the

11  undersigned attorneys of record for all of the parties

12  in the above-entitled action as follows."  And then

13  jumping down to the paragraph number two, "that the

14  State University of New York agrees that it will not

15  engage in" and there's a reference to the parties

16  involved in the specific lawsuit.  "And that it will

17  take all reasonable measures to enforce these policies

18  against deliberately disrupting and preventing the

19  freedom of any person to express his or her views."  Do

20  you see the, President Stenger?

21       A    Uh huh.

22       Q    Are you familiar with this document?

23       A    No.

24       Q    Are you familiar with the lawsuit that this

25  document resolved?

```
                                                    Page 36
 1          A     No.
 2          Q     Had you been instructed at any point before the
 3     Laffer event that the State of University of New York
 4     had made a legally binding commitment to take all
 5     reasonable measures to enforce its policies against
 6     deliberately disrupting or preventing the freedom of any
 7     person to express his or her views?
 8                     MR. MOORE:  Objection.  I'm just objecting
 9             on the record.  You can answer.
10          A     No.
11          Q     You testified earlier that you consult with
12     other presidents in the State University of New York
13     system from time to time; is that correct?
14          A     I did not say that.
15          Q     You testified that you have discussions with
16     other presidents in the State University of New York
17     system from time to time; is that correct?
18          A     That is correct that I have had discussions
19     with other presidents in the system.  I'm not sure if I
20     actually said that before, but I'll say it now.
21          Q     Well, we can go back and read your testimony if
22     there is any uncertainty, but that's my recollection of
23     the substance of your testimony.  But it is correct you
24     have from time to time discussions with other presidents
25     in the State University of New York system, correct?
```

```
                                              Page 37

 1          A    Yes.

 2                   MR. MOORE:  Asked and answered.

 3          Q    Have you discussed the subject of the Laffer

 4     event with the president of the University of Buffalo?

 5          A    No.

 6          Q    Have you discussed the issue of the maintenance

 7     of First Amendment rights by the State University of New

 8     York with the president of the University of Buffalo?

 9          A    No.

10          Q    All right.  Let's go back.  I'm going to go,

11     I'm going to try to go as closely to chronological

12     sequence as I can because I think it aids in

13     understanding.  It's possible that I will go slightly

14     out of sequence.  And if I ask you a question that

15     appears to be out of sequence, then please alert me

16     because I'm trying to walk through these events as

17     closely as I can to the way in which they occurred and

18     in which the people in them experienced them,

19     understood?

20          A    Yes.

21          Q    Beginning before the Laffer event, before the

22     tabling event in 2019 what was your understanding of

23     your responsibility as the president of Binghamton

24     University to defend the First Amendment rights of

25     students at the university?
```

1             MR. MOORE:  Objection to form.  If you

2         understand the question, you can answer.

3       A    I think I was aware of it.

4       Q    What was your understanding of it though?  How

5    did your responsibility translate into policy from your

6    perspective?

7       A    I don't think, I don't think it did.

8       Q    So your testimony is that -- let me back up.

9    So you're testimony is that you acknowledge that you

10   understood that you have a responsibility to defend the

11   First Amendment rights of students at Binghamton

12   University, correct?

13      A    Yes.

14      Q    In what form did that responsibility take in

15   terms of the policy that you understood you were

16   obligated to exercise as the president of Binghamton

17   University?

18            MR. MOORE:  Objection to form.

19      A    I don't understand the question.

20            MR. MOORE:  Are you asking if there was a

21       policy?

22            MR. HRUSKA:  I'm asking him what his policy

23       was.

24      Q    You have testified that you had an obligation

25   and the question is designed to elicit from you how that

Page 39

```
1        obligation manifests itself in terms of action.

2        A    I don't have policies.  The university has

3     policies.

4        Q    What was the university policy as you

5     understood it at the time?

6        A    To protect the First Amendment.

7        Q    And what actions did you understand were

8     necessary in order to enforce that policy?

9             MR. MOORE:  Objection to form.

10       A    To enforce the policy.

11            MR. MOORE:  Are you asking about particular

12        situations or in a general?

13            MR. HRUSKA:  I want to understand what the

14        policy was.

15       Q    You have testified that you had this obligation

16    and I want you to put flesh on the bone and make the

17    record clear as to what actions you were obligated to

18    take in order to protect First Amendment rights.

19       A    And I said I am obligated to protect First

20    Amendment rights.

21       Q    What about situations in which you perceive

22    there might be some threat of harm to students, in that

23    situation what actions did you understand you were

24    required to take in order to balance the threat of harm

25    against the First Amendment considerations?
```

```
 1        A    I don't understand the question.
 2             MR. MOORE:  Yeah.  I'm going to object to
 3        the form of the question.
 4        Q    Let's walk through it in concrete then.  So you
 5     recall that we defined the tabling event for the
 6     purposes of this deposition as the incident that
 7     occurred on November 14th, 2019; is that correct?
 8        A    Yes.
 9        Q    So you'll understand what I mean when I say the
10     tabling event?
11        A    Yes.
12        Q    When did you first become aware of the tabling
13     event?
14        A    I heard it from my window.
15        Q    You actually heard the noise that was created
16     during the event; is that your testimony?
17        A    Yes.
18        Q    And what did you do when you heard that noise?
19        A    I looked out the window.
20        Q    And what did you see?
21        A    I could see a partial view of the tabling area.
22        Q    What was visible to you?
23        A    A significant number of people.
24        Q    Roughly how far away from you was that crowd?
25        A    Probably eight stories in height and maybe 300
```

```
                                             Page 41
 1      yards in distance.
 2          Q    So not close enough to discern individual faces
 3      for instance, correct?
 4          A    Correct.
 5          Q    Were you able to however despite the distance
 6      estimate the numbers of people gathered?
 7          A    No.
 8          Q    Were you able to discern whether there was a
 9      police presence on the site?
10          A    No.
11          Q    So beyond seeing a large group of people
12      gathered, you weren't close enough to see any detail; is
13      that correct?
14          A    Correct.
15          Q    What did you do then after you had identified
16      that there was a crowd and that they were making a noise
17      that you could hear from your office?
18          A    I don't remember.
19          Q    Do you recall taking any action based on that
20      observation?
21               MR. MOORE:  Asked and answered.  You can
22          answer.
23          A    I don't remember.
24          Q    Do you recall speaking with anybody at that
25      moment about the events that you were seeing from a
```

```
                                                    Page 42
 1      distance out of your window?

 2          A    I don't remember.

 3          Q    Was there anybody else with you in your office

 4      at the time?

 5          A    I don't remember.

 6          Q    What is the next thing you remember about the

 7      tabling event?

 8          A    That it occurred.

 9          Q    On November 15th you made a statement about the

10      event.  Do you recall doing that, making a public

11      statement about the event the next day?

12          A    In what form?

13                   MR. HRUSKA:  Well, why don't we just go to

14              it.  If we turn to tab one in the binder.  We

15              will label that HS-1 unless you tell me it's

16              already labeled.

17                   (EXHIBIT HS-1 WAS MARKED FOR

18              IDENTIFICATION.)

19                   MR. MOORE:  I'm not aware of it having been

20              labeled.  It might have been referenced in

21              conjunction with the complaint, but not

22              individually marked.

23                   MR. HRUSKA:  Take a moment to read that.

24                   MR. SAITTA:  What tab number is that?

25                   MR. HRUSKA:  Tab 1.
```

1          MR. MOORE:  Can we take a quick bathroom

2       break?

3              MR. HRUSKA:  Fine.  Any time.  Let's go off

4       the record.

5              (RECESS TAKEN.)

6       Q    President Stenger, have you had a chance to

7       take a look at the document which has been labeled HS-1,

8       a message from President Stenger, November 15th, 2019?

9       A    Yes.

10      Q    Is that a statement that you made on November

11      15th, 2019?

12      A    Define made.  Could you define the word made?

13      Q    Did you make the statement?  Is that your

14      statement?

15      A    Make.

16      Q    Did you adopt this statement as your own?

17      A    Yes.

18      Q    Did you draft the statement?

19      A    No.

20      Q    Do you know who did?

21      A    I know approximately who did.

22      Q    Who approximately did?

23      A    Office of communications.

24      Q    What individuals if you know?

25      A    Greg Delviscio.

1          Q    Anybody else?

2          A    Probably Brian Rose.

3          Q    Anybody else?

4          A    Could be, but I don't know.

5                    MR. MOORE:  When you say probably, are you

6            guessing?

7          A    Yes.

8          Q    Don't guess.  If you know, testify.  If you

9      don't know, just say you don't know.

10          A    Then I don't know.

11          Q    Before you adopted this statement who educated

12      you about the substance of the statement?

13          A    I read it.

14          Q    Did you receive information from anybody else

15      about the substance of the statement?

16          A    No.

17          Q    What were your sources of information that

18      supported the substance of the statement?

19                    MR. MOORE:  Objection to form.

20          A    I don't remember.

21          Q    Let's take a look at the statement.  The

22      statement begins by describing a "contentious gathering"

23      from the day before; is that correct?

24          A    That's what it says.

25          Q    And so you are referring here to what we for

```
                                               Page 45
 1      the purposes of the deposition called the tabling event,
 2      correct?
 3          A    Yes.
 4          Q    You state that the "police response was
 5      appropriate," do you see that?  That's the second
 6      sentence in the first paragraph.
 7          A    Third sentence.  Second sentence, yes.
 8          Q    Third sentence.  Sorry.  You're correct.
 9      "Police response was appropriate and important to make
10      sure that every student involved in this matter was safe
11      and remained safe."
12          A    Uh huh.
13                  MR. MOORE:  Got to be verbal, yes?
14          A    I don't think it was a question.
15          Q    It was a question.  I want to make sure that
16      you affirm that I had correctly read the statement.
17          A    You correctly read the statement.
18          Q    Yes, that's the question.  Because lawyers
19      often do that to make sure that both the witness and
20      lawyer are looking at the same thing and reading the
21      same thing.  So have I correctly read the statement?
22          A    Do you want to read it again?
23          Q    "Police response was appropriate and important
24      to make sure that every student involved in this matter
25      was safe and remained safe."
```

```
                                                Page 46
 1          A     You read it correctly.
 2          Q     Thank you.  What was your source for stating
 3     that the police response was appropriate?
 4          A     I don't remember.
 5          Q     Was that your own opinion?
 6          A     I don't remember.
 7          Q     Did you discuss the appropriateness of the
 8     police response with anybody else to your recollection?
 9          A     I don't remember.
10          Q     What characterizes an appropriate police
11     response, President Stenger?
12          A     That it is appropriate.
13          Q     And is the key characteristic of an appropriate
14     response that as you state here "every student involved
15     in this matter was safe and remained safe"?
16          A     That is appropriate.
17          Q     Let me jump down to the second paragraph now.
18     You state "this incident from all perspectives was
19     unfortunate.  As a university we encourage everyone to
20     consider the perspectives of others -- and the damaging
21     impact words and images can have -- even if they are
22     protected as free speech under the First Amendment."
23     Did I read that correctly?
24          A     Yes.
25          Q     What about the incident was unfortunate?
```

```
                                                Page 47
 1          A    That it occurred.
 2          Q    But beyond its occurrence, what aspects of the
 3     incident were unfortunate?
 4          A    That's my answer.  That it occurred.
 5          Q    But it occurred and lots of things occur all
 6     the time, but this one you have chosen to inform the
 7     entire university community it was unfortunate.  There
 8     must be more content to your estimation of the incident
 9     than merely that it occurred.  What about the incident
10     was unfortunate?
11          A    That it occurred.
12          Q    There must be more to it than that, President
13     Stenger.  There must be some aspect of it you found
14     unfortunate that you were criticizing and wanted to draw
15     the entire attention of the university to.  There is
16     literally nothing else other than it occurred; is that
17     your testimony?
18          A    Yes.
19          Q    So nothing about the students who were shouting
20     at other students and causing a commotion as you could
21     hear from your office 300 yards away?
22          A    That occurred.
23          Q    Was that unfortunate?
24          A    That was part of the occurrence.
25          Q    It was indeed.  But was the fact that some
```

1      students were shouting at other students and you could

2      hear the noise 300 yards away, is that aspect of the

3      occurrence unfortunate?

4           A     Yes.

5           Q     Why was that unfortunate?

6           A     Because it was unfortunate.

7           Q     That's a totality, President Stenger.  There

8      must have been a reason that you drew the attention of

9      the entire university in a message from the president to

10     this unfortunate occurrence and it had to go beyond the

11     mere volume of the noise.  What about that incident was

12     unfortunate?

13                    MR. MOORE:  Harvey, I think he is looking

14             your perspective on what about the incident was

15             unfortunate other than the fact that it was

16             unfortunate.  Is that a fair statement?

17                    MR. HRUSKA:  That's a good repetition, Mr.

18             Moore, of what I've been asking.

19          A     I think it's clear that it was unfortunate.

20          Q     Well, you do point to a few things.  You do say

21     "that conversations were getting loud, aggressive and

22     possibly volatile."  Is that the part of the incident

23     that was unfortunate?  I'm quoting from your statement

24     in the first paragraph.

25          A     There were reports that conversations were

Page 49

1      getting loud, aggressive and possibly volatile.  That

2      was part of the event and that is what occurred.

3          Q    And was that loudness, aggressiveness and

4      possible volatility, was that the source of the

5      estimation that this was unfortunate that you applied to

6      the incident and informed the university community of?

7          A    I think I've answered that.

8          Q    I don't think you have.  I think we're having

9      trouble getting to the point here, President Stenger.

10     You're making a statement to the entire university here,

11     correct?  That's the purpose of this document, correct?

12         A    It was a statement that I made.

13         Q    How often do you make statements to the entire

14     university through a message from the president?

15         A    I could look it up and tell you how often, but

16     I don't know.

17         Q    Roughly speaking.  Is it every day, is it every

18     week, is it every month?

19         A    Probably on an every month basis.

20         Q    And when you do that it's because you want

21     everybody in the university to pay attention to

22     information that is coming from the president of the

23     university, correct?

24         A    Yes.

25         Q    And so here you're telling the university that

Page 50

1    there was an incident which was sufficiently significant

2    that you wanted the university community to pay

3    attention to it and you were telling them that it was

4    unfortunate, correct?

5        A    Correct.

6        Q    And the reason you thought it was unfortunate

7    is the goal of my question.  So far you have cited the

8    volume of noise and the reports that there was

9    aggressive action and the concern that there was

10   possible volatility as the reasons that this incident

11   was unfortunate?

12       A    Correct.

13       Q    Is there anything else about it?

14       A    No.  I think this statement is the statement

15   that is accurate I think.

16       Q    That's not the question.  I want to make sure

17   I've exhausted all the sources of information that you

18   were working on in making your statement and you've

19   cited to these reports in the first paragraph and then

20   in the second paragraph you have characterized the

21   incident from all perspectives as unfortunate.  In the

22   second sentence of that second paragraph you state "as a

23   university we encourage everyone to consider the

24   perspectives of others and the damaging impact words and

25   images can have even if they were protected as free

```
                                              Page 51
 1        speech under the First Amendment."  What did you have in
 2        mind when you referred to the damaging impact words and
 3        images can have when you made that statement?
 4             A    The videotape.
 5             Q    Please explain what you mean by the videotape?
 6             A    There was a videotape of the incident posted on
 7        the internet.
 8             Q    And why was that videotape, was it the
 9        videotape itself that was damaging or what was depicted
10        on the tape that was damaging?
11             A    The images and words.
12             Q    And what were those images and words that were
13        depicted in the videotape that were damaging?
14             A    Loud, aggressive and possibly volatile
15        conversations.
16             Q    And what were the subjects of those loud,
17        aggressive and possibly volatile conversations?
18                       MR. MOORE:  Are you asking what they said?
19                       MR. HRUSKA:  Yeah.
20                       MR. MOORE:  Do you remember?
21             A    Shouting.  Curse words.
22             Q    And so is it your testimony that the police
23        response here was appropriate because of the loudness
24        and aggressiveness of the people who you later saw on
25        the videotape who were shouting; is that why?  Is that
```

```
                                                        Page 52
 1        why the police response was appropriate?
 2             A    I think the police response was appropriate.
 3             Q    Because you wanted the police to stop the
 4        students from shouting and behaving aggressively?
 5                       MR. MOORE:  Are you asking if he directed
 6                  the police that day?
 7                       MR. HRUSKA:  No.
 8             Q    I'm asking why he thought the police response
 9        was appropriate in this instance.
10             A    The police response was appropriate and
11        important to make sure that every student involved in
12        this matter was safe and remained safe.  It was
13        appropriate because they were there to make sure that
14        people remained safe.
15             Q    And when you refer to, when you use the phrase
16        "protected as free speech under the First Amendment"
17        what exactly are you referring to?  What is the speech
18        that you're referring to?  Let me be more specific.
19             A    General free speech.  That free speech is
20        protected.
21             Q    Did you believe that any of the participants in
22        the tabling incident had acted in such a way that the
23        First Amendment rights of students had been curtailed?
24             A    I could not tell.
25             Q    Did you make any inquiry to determine the
```

```
                                              Page 53
 1     answer to that question?
 2          A     I don't remember.
 3          Q     Do you know whether the police instructed the
 4     tabling students to leave the location where they had
 5     been exercising their First Amendment rights?
 6          A     I have heard that that was said, but I do not
 7     have first hand knowledge of that.
 8          Q     Did you make any inquiry to determine the
 9     answer to that question?
10          A     No.
11          Q     Why not?
12          A     I didn't think to ask it.
13          Q     You testified already that you understood that
14     you had a responsibility to the protect students' First
15     Amendment rights.  And you have a situation in which you
16     yourself were implicating First Amendment as part of the
17     considerations involved in the incident, correct?
18          A     Correct.
19          Q     And yet you didn't think to ask the question as
20     to whether there had been any inappropriate action that
21     infringed on the First Amendment rights of students?
22          A     I couldn't say that I had knowledge of the
23     First Amendment rights of students being infringed upon.
24          Q     No.  I understand that.  I understand your
25     testimony that you didn't have that knowledge at that
```

```
 1      point.  What I'm asking is something different which is
 2      why didn't you inquire to find the answer to that
 3      question about whether there had been a violation of the
 4      First Amendment right?
 5           A    I inquired was everyone safe.
 6           Q    Understood.  And I understand that is your
 7      testimony and that is also your statement.  I'm asking
 8      you a different question, President Stenger.  Why didn't
 9      you inquire at that point following the tabling incident
10      on November 15, 2019 or thereabouts as to whether there
11      had been any inappropriate infringement of First
12      Amendment rights?
13           A    I don't remember.
14           Q    Looking back now do you, can you think about
15      why you would not have inquired about that?
16                MR. MOORE:  Objection.  Asked and answered.
17           A    I don't remember.
18           Q    Okay.  Understood.  Let's move a little bit
19      forward in time.  I want to draw your attention to a set
20      of correspondence that is under tab two.  I'll label it
21      HS-2.
22                (EXHIBIT HS-2 WAS MARKED FOR
23           IDENTIFICATION.)
24                MR. SAITTA:  What tab is that?
25                MR. HRUSKA:  Tab two.
```

```
                                              Page 55
 1         Q    It is several pages and so I recommend that you
 2    begin reading at the back for the earliest e-mail which
 3    is the one I will actually direct your attention to and
 4    it's the one that begins at the bottom of the second
 5    page which is labeled 1233 at the bottom and it is an
 6    e-mail from you to a group of others.
 7         A    Yep.
 8              MR. MOORE:  Just for clarity of the record
 9         let's state that this is bates stamped from State
10         defendant's disclosure from 1232 to 1235.
11              MR. HRUSKA:  Yep, thank you.
12              MR. MOORE:  And HS-1 was bates stamped one
13         from the State defendant's disclosure.
14              MR. HRUSKA:  Thank you, Mr. Moore.
15         Q    Do you recognize this document?
16         A    Yes.
17         Q    Do you recall this as an e-mail you sent on or
18    about Saturday, November 16th, 2019 at 8:29 a.m.?
19         A    Yes.
20         Q    Just in terms of situating us in time, that is
21    between the tabling event on the 14th and the Laffer
22    event on the 18th?
23         A    Correct.
24         Q    And so what is the group to which you directed
25    this e-mail?
```

```
                                            Page 56
 1           A     Senior officers group.

 2           Q     And who is that?

 3           A     Their names are listed.

 4           Q     What's the composition of that group in terms

 5      of their relevance to the university?

 6           A     They are senior officers of the university.

 7           Q     And does it include the vice presidents?

 8           A     Yes.

 9           Q     Does it include, you said executive directors?

10           A     Yes.

11           Q     Are these, all the recipients of this e-mail

12      are they direct reports to you at this point?

13           A     Not all of them.

14           Q     Which ones are not if you can recall?

15           A     Michael McGoff was not.

16           Q     What was his role?

17           A     He was the chief financial officer and he

18      reported to Donald Nieman.

19           Q     Anybody else?

20           A     No.  Everybody else reports to me.

21           Q     And why did you choose to send this message to

22      this group at this point?

23           A     I was leaving for a trip and I wanted to make

24      sure that everybody was in a good understanding of what

25      they should be working on for me while I was traveling.
```

```
                                             Page 57
 1            Q     Where were you traveling to?

 2            A     Texas and California.

 3            Q     For how long?

 4            A     For about five days.  Maybe six days.

 5            Q     And did you in fact make that trip?

 6            A     Yes.

 7            Q     And you start, if you look at the third page of

 8     this document, bates stamped 1234, you start the message

 9     by saying "sorry to bother you on Saturday, but this is

10     important."  Why did you think this was important?

11            A     You'd have to read the rest of it.

12            Q     I'm asking you for the summary.  I can read the

13     text, but you're expressing a view of significance.  Why

14     were the events that you relate in the rest of the

15     message important such that you wanted to draw their

16     attention to it on Saturday?

17            A     The word important means that it is important.

18            Q     But why?  Why were these events important?

19            A     Well, I was getting a lot of e-mails from

20     people and there was a lot of concern about what had

21     happened so it was important.

22            Q     And because it was important you wanted this

23     group to pay attention to it?

24            A     Right.

25            Q     In the middle of that e-mail there is a
```

```
                                             Page 58
 1      paragraph that begins "I would like."  Do you see that?
 2      It's about three quarters of the way down the page.
 3           A    Yes.
 4           Q    "I would like to charge Brian Rose and Greg
 5      with the task of determining the next steps.  This is a
 6      communications, student conduct and student association
 7      issue."  Did I read that correctly?
 8           A    Yes.
 9           Q    And Brian Rose I think you already testified
10      was the vice president and, or one of the vice
11      presidents for student affairs.  And who is Greg?
12           A    Greg Delviscio, vice president of
13      communications and marketing.
14           Q    And I want to look at this list of three that
15      you put in the second sentence of that paragraph.  I
16      think communications is, seems to be self-evident as a
17      matter of communicating with the outside word if that's
18      what you mean, correct, as well as the university
19      community?
20                     MR. MOORE:  Objection to form.
21           A    This is a communications issue.
22           Q    Did that mean communicating with the outside
23      world and with the community and the university?
24           A    It means communicating.
25           Q    With who?
```

```
                                            Page 59
 1          A     With the appropriate people.
 2          Q     In which case, in this case who are the
 3     appropriate people?
 4          A     That was to be determined.
 5          Q     What is the set of possible appropriate groups
 6     with whom you would wish to communicate about these
 7     incidents?
 8          A     Campus, students, faculty, staff, community
 9     members, residents of New York State, residents of the
10     United States, residents of the world, elected
11     officials, everybody.
12          Q     And student conduct, what did it mean for this
13     to be a student conduct issue?
14          A     Student conduct means the process that we would
15     use to investigate a student conduct issue.
16          Q     Okay.  So it's not used in the layman's sense
17     of just any old conduct, you're talking specifically
18     about the evaluation of student conduct for potential
19     disciplinary purposes?
20          A     Correct.
21          Q     And a student association issue, what does that
22     mean?
23          A     The student association is a formal body of
24     students recognized by the university.
25          Q     For what purpose?
```

```
                                              Page 60
 1           A     They have many purposes.
 2           Q     What were the purposes relevant for this issue?
 3           A     They are the, they are the authority that
 4     approves, manages student organizations.
 5           Q     And why was this a student association issue
 6     for that purpose?
 7           A     Because the concern around the event of who was
 8     responsible for the tabling reservations and management
 9     of it.
10           Q     And so in your mind at this point the student
11     association issue was directed to the handling of
12     reservations for tabling; is that accurate?
13           A     Yes.
14           Q     Any other student associations issue or is that
15     the full set of concerns related to the student
16     association?
17           A     At that time that was the major concern.
18           Q     Were there any minor concerns other than that
19     that you can recall?
20           A     No.  I think it was, it was the reservation of
21     the tabling.
22           Q     Next paragraph.  You say "I do not want my
23     office, government affairs, DEI or UPD to be involved in
24     any actions or communications.  They can help to inform,
25     but should not take action or make statements."  So what
```

```
                                          Page 61
 1      did you mean by my office?
 2           A     My office meaning the secretary who answers the
 3      phone, the two secretaries that answer the phone and the
 4      chief of staff.
 5           Q     Which was Darcy Fauci at that point?
 6           A     Uh huh.
 7           Q     What is government affairs?
 8           A     That is also Darcy Fauci.
 9           Q     Anybody else in government affairs?
10           A     No.
11           Q     What about DEI, what does that mean?
12           A     Diversity, equity and inclusion.
13           Q     Is that a group of people or just a concept?
14           A     It is a division of the university.
15           Q     And who is in charge of that division?
16           A     At that time it was Nicole Sirju-Johnson.
17           Q     Is there anybody else on your list of
18      recipients of this e-mail who is in that division DEI?
19           A     No.
20           Q     And UPD we've already discussed, the university
21      police department, correct?
22           A     Correct.
23           Q     And why did you not want those components of
24      the university to be involved in any actions or
25      communications?
```

```
                                                   Page 62
 1          A     They could help to inform, but I wanted to make
 2    sure that only, there was a single voice after all the
 3    information was gathered.
 4          Q     Understood.  At that point, I'm no longer
 5    directing you to a specific provision.  I'm just asking
 6    you about a general communication that you're having
 7    with your senior officers group right now.  At that
 8    point what were your concerns about the communication?
 9    What is it that you wanted to communicate?
10          A     I wanted them to meet as a group.  I wanted
11    Brian Rose and Greg to discuss what should we do next.
12    What should we do now.  So it was up to them to work
13    together to determine what the next steps were going to
14    be.
15          Q     Earlier on in that message you reference the
16    chancellor and the fact that a state assemblyman had
17    copied a letter to the chancellor.  Who was the
18    chancellor at that point?
19          A     Kristina Johnson.
20          Q     And why was that relevant that she had been
21    copied on the letter from the state assemblyman?
22          A     Because I report to her.
23          Q     And what about your reporting relationship with
24    her made that communication with the assemblyman
25    relevant to this discussion?
```

```
                                              Page 63
 1          A     The assemblyman wrote to me and copied her.
 2          Q     But why is it relevant that she was copied?
 3     That's what I'm getting at.
 4                MR. MOORE:  Objection to form.
 5          A     That she was going to have involvement, a
 6     concern about what happened.  And it was just to
 7     indicate the level of who is involved and what's
 8     happening since that tabling event.
 9          Q     Had you had any communication with Miss Johnson
10     at that point about the tabling event?
11          A     I don't remember.
12          Q     Did you have any communication with her between
13     the time of this e-mail on Saturday and the Laffer event
14     on Monday?
15          A     I don't remember.
16          Q     How frequently during this period would you
17     communicate with her in general?
18          A     Maybe, when appropriate.
19          Q     And was that a matter of daily, weekly, monthly
20     communication?  How, as a general matter what was the
21     cadence of your communication?
22          A     Sporadic.  Maybe, maybe less than monthly.
23     More than weekly.
24          Q     And on what topic?
25          A     On any topic.
```

Page 64

1        Q    And what topics would you generally communicate

2     or is it difficult to summarize?

3        A    This is November 2019, I think two, three weeks

4     -- oh, no.  If was like three weeks before that I told

5     her that one of our professors had won the Nobel price.

6     I thought she would want to know that.

7        Q    Do you recall at what point you did discuss the

8     topic of the tabling event with Miss Johnson?

9        A    I don't remember.

10        Q    We'll move on.  All right.  So I'm going to

11     move forward in time to the Laffer event and I realize

12     that things happened very quickly at that point.  And

13     before we get to any of the written documents I just

14     want to ask you what your knowledge was of the

15     circumstances around the Laffer event on the day of the

16     event before it occurred with the understanding that you

17     were traveling and were not physically present in

18     Binghamton.  Before the Laffer event occurred what was

19     your understanding of what was going on with respect to

20     the event on campus?  And I'm not referring to the

21     document right now.  I'm just asking you for your

22     recollection.

23        A    That he was going to speak on campus.  And that

24     there was a potential, there was a potential for a group

25     of students or there was a potential for some people to

```
                                                          Page 65
  1          arrive at the event and try to disrupt it.
  2               Q    What were your sources of information with
  3          respect to that?
  4               A    I don't remember.
  5                    MR. HRUSKA:  Let me, this is out of order
  6               in terms of the binder, but I want to jump to tab
  7               27.  I'm sorry.  It's a late addition.  It's an
  8               exhibit previously labeled JP-6 and it bears the
  9               sequential bates number 1065 --
 10                    MR. SAITTA:  And what tab?
 11                    MR. MOORE:  27.
 12                    MR. SAITTA:  Thank you.
 13                    MR. HRUSKA:  1065 through 1070.
 14               Q    Take your time and read it.  Let me know when
 15          you're ready.
 16               A    I've read it.
 17               Q    Do you recall this document?
 18               A    No.
 19               Q    You will see if you look at the beginning of
 20          this chain of e-mail, which starts on the page numbered
 21          1068 at the bottom, you were copied on a message from
 22          John Pelletier at 12:11 p.m. on that Monday, November
 23          18th.  Do you recall reading --
 24                    MR. MOORE:  Let's make sure we are at the
 25               right place.
```

```
                                                Page 66

1                     MR. HRUSKA:  Can you help him?  Thank you.

2          A     I wasn't copied on the other one.

3          Q     Well, I'm focused on this beginning e-mail in

4     the chain which starts on the page I mentioned in which

5     you are copied from Mr. Pelletier.

6          A     This is the one 12:11 p.m.?

7          Q     Correct.

8          A     I am on the, I was a recipient of it.  I was

9     traveling and probably had limited access to e-mail.

10         Q     That's my question.  Do you recall receiving

11    this?

12         A     No.

13         Q     Did you have other sources of information as to

14    events on campus that afternoon prior to the event from

15    which you were receiving information in real time?

16         A     Somebody called me around lunchtime.  I was in

17    Texas.  So I got a phone call in the middle of that

18    lunch.

19         Q     Do you recall who it was that called you?

20         A     I think it was a group of people.  Might have

21    been a speaker phone call.

22         Q     Do you know whether it included Mr. Pelletier?

23         A     It was a call.  It could have included him.

24    I'm just speculating.

25         Q     I don't want you to speculate.  Would it have
```

```
 1        made sense given the context of the call that it would

 2        have included the university police chief?

 3             A    May have, but it could have been somebody else.

 4             Q    Do you remember whether Mr. Rose was part of

 5        that group that called you?

 6             A    I don't remember.  It was a call.  It was hard

 7        to remember.  There is no faces.  Just voices.

 8             Q    Understood and I'm trying to plumb the depths

 9        of your recollection.  And if there are any specific

10        people you remember being involved in the call, please

11        testify to that.

12             A    I would have to, I really don't.

13             Q    I'm not asking you to speculate.

14             A    I really don't know.

15             Q    You will see as you read this e-mail that, the

16        one I was just pointing to at the beginning of this

17        chain, that Mr. Pelletier describes an approach that the

18        police are taking to, I'm quoting now, "trying to link

19        up with Dr. Laffer at the airport prior to this to

20        inform him of the potential protest.  His plane arrives

21        at 1:40 and we will try to ride with him to inform him

22        of what has transpired so far and the risk going

23        forward."  Do you remember learning about that effort by

24        the university police prior to the Laffer event?

25             A    I do not remember.  I do not remember these
```

```
                                                    Page 68
1        e-mails.

2            Q    No, I understand.  You've testified to that.

3        But what I'm asking now is whether you remember these

4        events, the approach that Mr. Pelletier is describing

5        towards Dr. Laffer prior to the event, meeting him at

6        the airport, warning him of the risk?

7            A    I remember the phone call.

8            Q    Was that described in the phone call?

9            A    I don't remember.

10           Q    Do you remember anything about the substance of

11       that phone call?

12           A    I remember that we were concerned about

13       protecting the safety of anyone who was there and

14       concerned with protecting the First Amendment.  And so

15       those were the top, the most important topics, safety

16       and First Amendment.

17           Q    What was the discussion, as best you can

18       recall, about the topic of protecting the safety of

19       those present?

20           A    There were probably, nothing specific about

21       safety.  You certainly can imagine an open event

22       something could happen.  It was not a restricted or

23       ticketed event.  Anyone could come in from anywhere.

24       And we needed to make sure that everyone who was there

25       was safe.  So I wanted to make sure, I wanted to confirm
```

Page 69

```
 1        to myself that all the appropriate actions were being

 2        taken to protect the safety of the people that were

 3        attending.

 4             Q    And were you able to confirm that during that

 5        phone call?

 6             A    We didn't know what was going to happen at that

 7        time, but we were trying to prepare for disruptions.

 8             Q    And you've testified that you wanted to assure

 9        that the appropriate measures were taken to protect the

10        safety of those present.  What measures did you

11        understand the university would take in order to achieve

12        that goal?

13             A    That if students or if an attendee was

14        dangerous or threatening.  If an attendee, and this was

15        the second part protecting freedom of speech of the

16        speaker that we invited, if someone was disruptive that

17        both of those actions should be dealt with

18        significantly.  And I asked Chief Pelletier will you

19        arrest people at this and he said yes.  And I remember

20        he and I, because it was him on the phone, that he and I

21        probably confirmed that arrest is good.  I did not give

22        him an order because he really needed to act

23        independently because he would be in the scene and I

24        would not be in the scene.  But that he would have to

25        make the decision to arrest someone who was either
```

```
                                              Page 70

1        preventing freedom of speech or jeopardizing the safety

2        of people that was there.

3            Q     So just to be clear your revising your

4        testimony from a minute ago.  You know recall it was

5        Chief Pelletier?

6            A     He must have been there, yeah.

7            Q     As part of the group who called you.  Was there

8        any other phone communication you had with any

9        individual or group of university officials between that

10       roughly lunchtime call on Monday and the event itself?

11           A     No.  That was the only communication that I

12       recall.  It's the only communication that I recall.  I

13       had a flight in the late afternoon that day to

14       California.

15           Q     You've recalled that Mr. Pelletier was part of

16       that conversation.  Do you now recall whether anybody

17       else specifically was part of that conversation?

18           A     No.  I think it was, because I remember

19       specifically talking about arrest.  And he would be the

20       only one that I could imagine who was there that that

21       would be an issue that I would have to address

22       specifically with him.

23           Q     Do you recall how the topic of potential

24       arrests came up in the conversation?

25           A     I think I brought it up.
```

Page 71

```
 1          Q    Why did you bring it up?
 2                   MR. MOORE:  Objection.  Asked and answered.
 3            You can elaborate.
 4          A    I was curious.  I wanted to know what he was
 5     prepared to do.
 6          Q    And how did he respond?
 7          A    Yes.  We will arrest people if there is a
 8     potential safety concern or freedom of speech concern.
 9     He didn't add all of those, but he said yes, we will be
10     ready to arrest.
11          Q    But the context as you understood it in that
12     conversation was not that you were giving him a
13     direction; is that correct?
14          A    Correct.
15          Q    And that's because, and I don't want to
16     misstated your prior testimony so please correct me if
17     I'm wrong, that is because as you testified you didn't
18     have the power to direct him; is that correct?
19          A    I do not have the authority to determine
20     whether a crime is being committed.  I do not have that
21     authority.  I'm not a sworn police officer.  I can, I
22     can say to him and I can ask from him are you going to
23     do this if those are, if those concerns are significant
24     and so he responded yes.
25          Q    And the question is in conducting that dialogue
```

```
                                                      Page 72
 1        with Mr. Pelletier were you simply asking him for his
 2        intentions as a matter of understanding the developing
 3        context regarding this event at the university or were
 4        you intending to give him some direction as a, as the
 5        president through your role as a supervisor of the
 6        administration of the university?
 7                     MR. MOORE:  Objection.  Asked and answered.
 8               You can answer.
 9        A    So it was probably a unique situation.  As I've
10        said I do not have the authority or a license to arrest
11        anyone, but I can say to the chief of police about my
12        concerns of the well-being of the campus.  And that if,
13        and that if he is looking for me to be supportive of
14        something that, action that he will take that there was
15        some confirmation in this call that, that we would
16        arrest anyone who was either a safety concern or a First
17        Amendment concern.  So it wasn't, it wasn't that I was
18        saying, because I didn't know what was going to happen.
19        But I said if, if arrests are going to occur, I'm okay
20        with that.  I'm not saying you have to, but I'm saying
21        I'm okay with that.  So they were looking for a kind of
22        consensus in a very unique, very unusual case.  I think
23        people were just checking in to make sure that we were
24        going to be okay with that course of action that night
25        knowing though that the police department would have the
```

Page 73

```
 1       on ground expertise to do what they are, what they are
 2       certified to do which is to make arrests.
 3           Q    At that point in the afternoon of Monday,
 4       November 18th were you aware whether or not there had
 5       been any arrests with respect to the tabling incident
 6       four days before?
 7           A    I would have been told.  I did not have any
 8       information.  I did not have any information if anyone
 9       was arrested at the tabling event at that time.
10           Q    Right.  That's the question.  Did you
11       subsequently learn whether anybody had been arrested
12       with respect to the tabling event?
13           A    Yes.
14           Q    When did you learn that?
15           A    Probably in January, December.  Weeks, several
16       weeks after I probably confirmed it.  But I do get a
17       police report every Monday with every action of the
18       police for the previous seven days.  And I read it every
19       Monday morning and I did not see that any arrests were
20       made at that event.  That would have been the Monday of
21       the 25th or so, that next Monday.
22           Q    Just to confirm your testimony is that you were
23       not aware until December at the earliest as to whether
24       there had been any arrests --
25           A    So I did not see it --
```

Page 74

1          Q    Let me finish so we have a clear record --

2     whether there had been any arrests with respect to the

3     tabling event?

4          A    I did not see any arrests in a police report

5     that I received the week after the tabling event.  I did

6     not see any.  Later on because there was a question

7     about whether or not an arrest was made I found out

8     whether an arrest was made.  I don't remember how I

9     found that out, but I do remember learning that there

10    were no arrests at the tabling event.

11         Q    Going back to the document that we were focused

12    on a moment ago, Exhibit JB-6, if you move further up

13    the document that is forward in time there are

14    additional e-mails and you are copied on e-mails above

15    that in the chain.  So you would have received the

16    intermediate e-mails even though in the form they were

17    delivered to us they don't show who the recipients are.

18    If you look at the page labeled 1067 on the bottom,

19    which is the third page of the document, you'll see a

20    brief e-mail from Timothy Faughnan.  Do you see where

21    I'm indicating?

22         A    In the middle?

23         Q    Yeah, in the middle.

24         A    Okay.

25         Q    You'll see in the second sentence he says "I

Page 75

1    will provide them with the opportunity to hold their

2    speak-out event while at the same time respecting

3    College Republicans' right to sponsor an event."  Do you

4    recall discussion of this topic, the speak-out event?

5    Does any of this make sense to you based on your

6    understanding of the events at the time?

7         A    I'm having lunch with a potential donor.  I was

8    going to rush to the airport.  I might have seen this on

9    my phone, but I don't really remember.

10        Q    I understand that you were in limited

11   communication and you've already testified to that fact.

12   What I'm asking now is whether this concept of a

13   speak-out event is something you recalled from that time

14   period?

15        A    It is, it was, I don't.  So they were going to

16   hold a speak-out event.

17        Q    Does there mean something to you, a speak-out

18   event?

19        A    I think it means give them a space to have a

20   meeting of the people who would like to speak against

21   the speaker that was going to be presenting.  Give them

22   an opportunity to have their venue to present counter

23   discussion of what the proposed speaker was going to be

24   presenting.  And I remember that that is something that

25   we would typically want to do if a protest was going to

                                                    Page 76

1          happen on campus that we give them a space to do that

2          protest.

3                          MR. HRUSKA:  Let's go back in the binder to

4                  tab three and a document which I'll mark, unless

5                  you tell me it's already been marked, as HS-3.

6                          (EXHIBIT HS-3 WAS MARKED FOR

7                  IDENTIFICATION.)

8                          MR. MOORE:  I don't believe this version

9                  has been marked.  I know the statement has, but I

10                 don't believe this has.

11                         MR. HRUSKA:  It's a document bearing the

12                 sequential bates numbers 142 to 145.

13         Q     And you'll see this is actually a collection of

14         two e-mails.  I'm going to ask you about the second and

15         third pages of this which are an e-mail from Kristina

16         Johnson.

17                         MR. SAITTA:  Do you know what tab number

18                 that is?

19                         MR. HRUSKA:  Three.

20                         MR. MOORE:  Are you talking about bates

21                 stamp 144 and 145?

22                         MR. HRUSKA:  Yes.  And your response.

23         Q     Do you recall this correspondence?

24         A     Which part?

25         Q     Any of them.  Let's start with the base e-mail,

Page 77

1       the one that is sent by Miss Johnson at 4:41 p.m. that

2       afternoon Monday, November 18th.

3            A    I don't remember.

4            Q    Do you know from context what Miss Johnson

5       means by our CDO Teresa?

6            A    Chief Diversity Officer of State University of

7       New York Central Office Teresa Miller.

8            Q    And it appears that this is a message from, is

9       this also Teresa Terry, is Terry Teresa's nickname?

10           A    Yes.

11           Q    To Miss Johnson and that she is sending it to

12      you.  Is that a fair reading of this as you understand

13      it based on your history of communication with Miss

14      Johnson what's going on in this e-mail?

15           A    So Kristina says "Dear Harvey, see below from

16      CDO Teresa."  And then there is the e-mail from Terry to

17      the chancellor.  Yes.

18           Q    I understand that you don't recall the specific

19      e-mail, but do you recall discussing the subject with

20      Miss Johnson, this proposed communication from Teresa?

21                     MR. MOORE:  Other than this e-mail

22           exchange?

23                     MR. HRUSKA:  Well, he's testified that he

24           doesn't remember the e-mail exchange.

25           A    I've responded it looks like later that

```
                                                   Page 78
 1      evening.
 2           Q     You did.  I'm asking, we'll get to that, but
 3      I'm asking right now about the original e-mail at 4:49.
 4           A     I don't remember that e-mail.
 5           Q     Do you remember Miss Johnson expressing any of
 6      the ideas that are described in the draft message here
 7      that is being shown to you?
 8           A     Could you repeat that?
 9           Q     Let me rephrase because I wasn't clear.  Do you
10      recall the substance of this message from Teresa to Miss
11      Johnson that is copied in the e-mail, do you recall that
12      substance being discussed between you and Miss Johnson?
13           A     No.
14           Q     Let's jump up to your e-mail from 9:36 p.m.
15      which as I read it it doesn't actually appear to respond
16      to the earlier e-mail in the sense that you don't engage
17      with the substance of it.  Is that an accurate
18      understanding?
19           A     It appears that, yes.
20           Q     And you state "my understanding of what
21      happened tonight:  the speaker Arthur Laffer was greeted
22      by angry protesters while using a bullhorn.  He declined
23      to speak and left.  We have taken two students into
24      custody.  Charges are pending.  We are preparing a
25      statement to be issued tonight.  Harvey."  Why did you
```

1      make this report to Miss Johnson?

2          A     Because I was responding to her e-mail concern

3      about the event.

4          Q     The e-mail concern seems to be focused on a

5      different event, on the tabling event, and you have now

6      informed her about the Laffer event.  And the question

7      is was there some other communication you had with her

8      about the Laffer event or is this the first you're

9      telling her of it?

10         A     I don't know.  It's hard to say.

11         Q     Can you recall any earlier communication than

12     the one that at 9:36 p.m. on that evening of the Laffer

13     event?

14         A     No.

15         Q     What was your source of information for the

16     content of that message to Miss Johnson?

17         A     I don't remember.

18         Q     You make the statement "he declined to speak

19     and left," referring to Dr. Laffer?

20         A     Right.

21         Q     Do you recall how you came to have that

22     impression?

23         A     I don't remember.

24         Q     You make the statement "we have taken two

25     students into custody."  Do you know what was meant by

Page 80

```
 1     that?

 2         A     We have taken two students into custody.

 3         Q     Uh huh.

 4         A     That's what I meant by that.

 5         Q     What do you mean by custody?

 6         A     That they had been arrested.

 7         Q     Were you, were you, that is the university,

 8     continuing to hold those students in custody?

 9         A     I don't know.

10         Q     Why did you use that word then?

11         A     It meant, it was supposed to mean arrested.

12         Q     Do you understand the difference between the

13     words arrest and custody?

14         A     No.

15                  MR. MOORE:  Objection.

16         Q     And you say "charges are pending."  What

17     charges?

18         A     My limited knowledge of this process would be

19     that you're arrested and then you're, I don't know,

20     you're taken to a judge and they figure out what the

21     charges are and why you've been arrested.  I don't

22     really know the criminal system well enough to know.

23         Q     And I don't ask you to opine about the criminal

24     system at all.  All I'm trying to do is understand the

25     extent of your knowledge at that time.  So please answer
```

```
                                           Page 81
1        the question as to what was your source of information
2        for making the statement charges are pending at that
3        time, if you recall?
4            A    I don't remember.
5                     MR. MOORE:  I believe that's asked and
6              answered.
7            A    I don't remember.
8            Q    You see on the front page of this document --
9                     MR. MOORE:  Andrew, can we take a quick
10             break?
11                    MR. HRUSKA:  Let me just finish this.  I
12             only have one question.
13           Q    You see on the front page of this exhibit, page
14       number 142, there's a statement from Brian Rose?
15           A    I can't read the statement.
16           Q    I know it's very --
17           A    I can't read any of it.
18           Q    I know it's very dim, but if you can make out a
19       message from Brian Rose.  Do you recall Brian Rose
20       making a statement that evening that you were aware of
21       at the time?  I'm not going to ask you about the
22       substance of it.
23           A    I was traveling and I probably got this in my
24       e-mail.
25           Q    So just to clarify --
```

```
                                                    Page 82
 1           A     So I was aware of it.

 2           Q     You became aware of it, but were you aware of

 3      it before he made the statement, were you asked to

 4      comment on any potential statement?

 5           A     I don't remember.

 6                 MR. HRUSKA:   Okay.   Let's take a break.

 7                 (RECESS TAKEN.)

 8           Q     Before we get to the next document, President

 9      Stenger, you had testified earlier that in the

10      conversation that occurred on the afternoon of Monday,

11      November 18th while you were traveling that one of the

12      subjects was actions in defense of First Amendment

13      rights and I want to make sure that we fully explored

14      that topic.   It's possible that it was covered by some

15      of your earlier answers.   If there is more that you can

16      recall on that subject, please tell us now.

17           A     I wanted to make sure that Professor Laffer was

18      able to give his speech.   That was very important to me.

19      And I was very disappointed when it couldn't happen.   I

20      wasn't there.   The time of the speech was probably about

21      the time I was halfway to California.   I don't remember

22      whether I had purchased internet or not, whether I was

23      reading e-mail or not.   Sometimes you can't even

24      connect.   But I was worried about what was going to

25      happen that night.   And I was really hoping that my
```

Page 83

```
 1     staff and my team did the best that they could to make
 2     sure that everybody was safe and that Laffer was able to
 3     speak.
 4          Q    And you earlier testified about your
 5     conversation with Mr. Pelletier on the concept of
 6     arrests.  In addition to that was there any other
 7     measure that you specifically discussed with the
 8     university employees on the site concerning protection
 9     of First Amendment rights?
10          A    It was, I remember the conversation.  I was on
11     the cell phone.  It came during lunch.  I was with the
12     CEO of Ulysses and is an alum and I had to break away
13     from lunch to walk to a parking lot outside of the
14     restaurant to take the call.  And I remember listening,
15     listening, listening mostly.  And probably the only
16     thing that I remember I said was it's okay if you arrest
17     tonight.  I'm not going to object to that.  But that was
18     about all that I remember.  But they knew what I was
19     meaning.  That we want to protect, we want to protect
20     everyone's safety and we want to protect freedom of
21     speech.  Do the best you can tonight, please.
22          Q    Do you recall discussing in advance of the
23     Laffer event with Mr. Pelletier the adequacy of the
24     police presence in terms of the numbers of police who
25     would be present at the event?
```

Page 84

1          A     No.

2          Q     Do you recall that being a concern of yours

3     whether you discussed it or not?

4          A     No.   John's very good.  I knew that he was

5     going to manage the situation with the appropriate

6     amount of officers present and concern.  So I didn't, I

7     did not get involved in asking him how many officers

8     and whether they were undercover or uniformed.  I didn't

9     because I assumed and I trusted him to make that

10    decision.

11         Q     And so just to be clear you had no knowledge

12    about the numbers of police that would be present and in

13    what way they would be deployed during the Laffer event

14    in advance of the event?

15                    MR. MOORE:  Asked and answered.

16         A     In advance of the event, no.

17         Q     With apologies for breaking the chronological

18    sequence, I want to go back to the documents.  I now

19    want to draw your attention to the document that is

20    under tab four, Tom, which I will label HS-4.  It's a

21    document that bears the sequential bates numbers 553.

22    Just the one page, 553.  And it's an e-mail from you to

23    Sheldon Goldfarb copying Brian Rose on Wednesday,

24    November 20th so two days after the Laffer event.  Do

25    you recognize that document?

```
                                             Page 85
 1              (EXHIBIT HS-4 WAS MARKED FOR

 2          IDENTIFICATION.)

 3      A    I've read it and, I've read the document, yes.

 4      Q    Do you recall having this correspondence with

 5   Mr. Goldfarb?

 6      A    No.

 7      Q    Who is Mr. Goldfarb?

 8      A    He is an alum.

 9      Q    What's his significance in terms of the

10   operation of the university?

11      A    He was the past chairman of our university

12   foundation.

13      Q    What's the role of the university foundation?

14      A    They manage our fundraising activities and our

15   endowment.

16      Q    In the e-mail that is at the top of that chain

17   you write "yes, this is a teachable moment, but I fear

18   that the small number of students who are leading this

19   effort are unteachable, while the other 99 percent of

20   our students know that free speech is a critical part of

21   society."  Do you recall having that idea around that

22   time that specifically the small number of students who

23   are leading this effort are unteachable?

24      A    Do I recall having that thought?

25      Q    Yes.
```

Page 86

1          A    I don't recall having that thought, but I read

2     that I said it.

3          Q    I can read it, too, and what I'm asking is

4     whether you recall having that thought that you

5     expressed --

6                    MR. MOORE:   Objection, asked and answered.

7          Q    -- at the time?

8          A    I don't think I would have written it if I

9     didn't have that thought.

10         Q    Do you still think of that as a valid

11    assessment of the situation having had now several years

12    to reflect?

13         A    Sheldon is a friend.  He worries about the

14    university quite a bit.  He follows us very closely.

15    And I was trying to just give him a feeling that we're

16    okay.  Our students are, most of our students are here

17    to get a good education and they are doing hard work and

18    maybe, maybe some of them aren't, but freedom of speech

19    is an absolute.  So I was just trying to make sure that

20    he was, he was responded to respectfully because I

21    didn't want him to think that we were not taking this

22    seriously.

23         Q    I want to focus on the concept of

24    unteachability.  What does that concept mean to you?

25         A    So, you know, I think what I'm talking about

Page 87

```
 1        here is, so we got the tabling event and the Laffer
 2        event.  They are almost contiguous in time.  They are
 3        certainly contiguous in intent and the organizations
 4        that were in this battle.  I think that my response to
 5        him was more about what happened at the tabling event
 6        than what happened at the Laffer event.  Now he is
 7        commenting on the Laffer event, but I think I'm really
 8        commenting back on what happened at the tabling event
 9        because I felt at that time, that was Wednesday so I was
10        still in the middle of the trip, that I was, I was, I
11        was, what I felt bad about is how the tabling event,
12        that it was disruptive.  And that's what I was referring
13        to.  Not as much the Laffer event.  But then also the
14        Laffer event you got some students in there -- and who
15        knows if they were students.  They could have been
16        anybody -- who were protesting and stopping him from
17        speaking.  And again, you know, I look at that and I
18        just say where do you get that from.  This man has come
19        from, he is a very important economist.  He has taken
20        the time to come to Binghamton University.  He's a
21        pretty important speaker.  Why would you ever think that
22        this was an appropriate way to respond to a speaker who
23        has come to your campus.  Grabbing a bullhorn, standing
24        on a chair and yelling at him.  If you have that level
25        of intensity about causing a disruption, I think the
```

```
                                                  Page 88
 1      word unteachable is probably assignable to at least that
 2      person who did, who took that action because it's
 3      inexplicable why you would have done that.
 4          Q    As the president of the university did you feel
 5      that you had any obligation to attempt to teach those
 6      who you had determined were unteachable?
 7          A    They were arrested.
 8          Q    Who is they in your statement?
 9          A    The two students at the Laffer event that were
10      arrested.
11          Q    So were those?
12          A    The two people, I'm sorry, two people because I
13      don't know if they were both students.
14          Q    And therefore those two people who were
15      arrested, those were the ones who you were referred to
16      as unteachable, whereas the remainder of the audience at
17      the event and the participants in the tabling event they
18      are all teachable?
19          A    I didn't say that.
20               MR. MOORE:  Objection to form.
21          Q    Help me understand what the reaction is to --
22      strike that.
23          A    I said that those two were unteachable.  I
24      didn't say everyone that was there was unteachable.  Why
25      do you align --
```

Page 89

1              MR. MOORE:  There is no question pending.

2        Wait for a question.

3        Q    The question is putting aside the two persons

4    arrested, were the others teachable at the Laffer event?

5        A    I didn't make a comment.

6              MR. MOORE:  Objection.

7        Q    It's a question, President Stenger.  I'm not

8    making an assertion.  I'm asking a question.  Listen to

9    the question.  Answer the question.

10             MR. MOORE:  What others?

11       Q    The other persons who interfered with Dr.

12   Laffer's attempts to speak, were they teachable?

13             MR. MOORE:  Objection.  What others

14        interfered with his attempts to speak?

15       A    You have to identify the students or the

16   people, but I would say that is uncertain.  That's

17   uncertain.

18             MR. HRUSKA:  Let's move on.  And I want to

19        go to the next tab which is tab five which I'll

20        mark HS --

21             MR. MOORE:  This one has been marked

22        before.

23             MR. HRUSKA:  Okay.  Apologies.

24             MR. MOORE:  Do you know which one this was?

25             MR. HAYDEN:  It was marked as Brian's, but

```
                                                    Page 90
 1              it was unredacted.

 2                      MR. MOORE:  No.  No.  His was, I believe

 3              Brian's was redacted as well.  It definitely was

 4              on the list.

 5                      MR. HRUSKA:  Well, let's do this.  I'm

 6              going to mark it as temporary Exhibit HS-A and we

 7              will go back and redesignate it.

 8                      MR. MOORE:  I'll try to find it.

 9       Q    It's a document that is two pages and bates

10    stamped 263 to 264.  And I apologize for the quality of

11    the printing, but it's how it was produced to us.  At

12    the top of the document is an e-mail from you to Darcy

13    Fauci dated Wednesday, November 20th at 6:22 p.m.  Do

14    you recognize this document?

15       A    Yes.

16       Q    You do?

17       A    Yes.

18       Q    You see at the bottom of the document there's

19    an e-mail from Mr. Gallagher to Mr. Pelletier.  Do you

20    know who Mr. Gallagher is?

21       A    He is an investigator of the New York State

22    University Police.

23       Q    Is he somebody who you know from your contact

24    with the University Police Department?

25       A    I could not identify him.  I know his name, but
```

```
                                                        Page 91
 1        I could not identify him.
 2             Q     And you'll see that in his message there's, and
 3        it's been redacted by Mr. Moore, but there is a list of
 4        names, something called B number, date of birth and
 5        classification of charges, do you see that?
 6             A     Yes.
 7             Q     Do you understand that that is a list of
 8        individuals and potential criminal charges against them?
 9             A     Yes.
10             Q     And if you go one step up in the e-mail it's an
11        e-mail from, the document is an e-mail from Mr.
12        Pelletier to a group of university officials and he
13        states "the top two will be arrested.  The next six we
14        can discuss, student conduct only or arrest only.  These
15        are positive 100% identifications.  We have a few more
16        we are trying to 100% ID.  The DA's office is aware and
17        supportive of the charge."  Do you see that?
18             A     Yes.
19             Q     It's not clear from this e-mail chain exactly
20        how this was communicated to you such that you have this
21        e-mail to send to Miss Fauci, but it appears that you
22        did receive it at some point.  Do you recall receiving
23        this information?
24             A     No.
25             Q     If you look at the top e-mail where you write
```

```
                                                      Page 92
 1        "I talked to Brian a few minutes ago."  Do you know who
 2        you meant by Brian?
 3             A     Brian Rose.
 4             Q     You write that "I think he is taking a good
 5        approach on building strong cases against these students
 6        before calling them to a hearing.  Timing is important
 7        since there will be some martyrs as a result of
 8        sanctions.  He has decided not to charge" -- sorry, I
 9        misread that.  "He has decided not to charge the
10        students who tore down the tables and I accept his
11        reasoning."  Do you recall having a conversation with
12        Brian Rose along the lines of this subject at that time?
13             A     I'm still traveling.  I was in California.  I
14        had a phone call with Brian and he told me his reasons
15        for not charging the students who tore down the tables
16        and I accepted it, yes.
17             Q     What did Mr. Rose explain was his reason for
18        not charging the students who tore down the tables?
19             A     I don't remember.
20             Q     Do you remember anything about that
21        conversation with greater specificity than what you just
22        testified?
23             A     I don't remember.
24             Q     Do you remember coming to your own view about
25        the appropriateness of a decision not to charge any of
```

Page 93

```
 1      the students who had torn down the tables in the tabling

 2      event?

 3          A     I probably thought it wasn't the right idea,

 4      the right thing to do.

 5          Q     Why not?

 6          A     Because I thought that what they had done was,

 7      was inappropriate.  I thought the way that the students

 8      had acted, the people who were protesting the tables was

 9      certainly not the way I would want our students to

10      interact.  Whether or not that confrontation was

11      chargeable under our student code of conduct, I'm not

12      the expert on that.  It's really up to Brian to make

13      that decision and the office of student conduct.  But I

14      felt that something should be done to those students

15      because I thought what they did was wrong.  But Brian

16      looked at it and said that he felt there wasn't cases to

17      be charging against them.

18          Q     What in your view would require a student

19      conduct offense to be charged with respect to student

20      activity that violates other students First Amendment

21      rights?

22                 MR. MOORE:  Objection.  Are you asking for

23             a hypothetical?

24          Q     I'm asking for, if you can answer the question,

25      answer the question.
```

```
                                                    Page 94
 1           A     I forgot the question.
 2           Q     What is your approach to determining whether or
 3     not specific student actions merit a student conduct
 4     disciplinary charge?
 5                 MR. MOORE:  Objection.  I don't think he
 6             testified that it was his decision ever.
 7           Q     That's not the question.  The question is what
 8     is your approach to addressing the question?
 9           A     To delegate it.
10           Q     Is it entirely to delegate, you formed no
11     independent view on that subject?
12           A     I can have an independent view, but I delegate
13     the authority to the vice president.
14           Q     I haven't asked about the delegation.  I'm
15     asking about your view.  In your view how do you
16     approach the question of whether specific student
17     activity merits student, merits discipline for student
18     conduct?
19           A     In general?
20           Q     Yes.
21           A     That they violate the code of student conduct.
22           Q     But I think you've testified there are
23     instances in which the provision of the student conduct
24     code has been violated and yet your view is that there
25     should not be student discipline, is that a fair summary
```

Page 95

1       of your testimony?

2                   MR. MOORE:  Objection.

3           A    I think I said the opposite.

4           Q    So your testimony is that any time there is any

5       violation of the rules of student conduct there should

6       be discipline imposed by the university?

7           A    They should follow the conduct process by the

8       university.

9           Q    What I'm asking is whether that process should

10      result in the imposition of disciplinary measures and

11      not, I understand that you are not involved directly in

12      that process.  The question is what is your view as

13      president of the university as to when discipline should

14      be imposed?

15                  MR. MOORE:  Objection to form.

16          A    If the process is followed properly and the

17      process results in a sanction, which is what we call

18      discipline, then there is an appeal process.  And if

19      everything has been taken through the right process, I

20      am completely satisfied with that outcome.

21          Q    So you have no view as to the substance of the

22      conduct at issue on whether that conduct merits a

23      sanction independent of the process that is followed to

24      achieve a decision?

25                  MR. MOORE:  Objection to form.

                                                            Page 96

1           A    I am not the person who oversees student

2      conduct process and rules.   That's Brian's

3      responsibility.   So I can have an opinion on it.   I can

4      say what these students did was bad, but I cannot judge

5      them and I cannot provide sanctions to them, nor should

6      I because the process of student conduct involves many

7      steps that requires peer review and hearings.   So I

8      cannot overstep that process.   That would be like the

9      mayor making a decision for a judge.   It's just uncalled

10     for.

11          Q    Looking at this exhibit temporarily marked

12     HS-A.

13                    MR. MOORE:   To that end, I don't find that

14             this particular, I know this chain has been

15             marked as several other exhibits.   I'm not sure

16             that this was marked.   Let's call it HS-5.

17                    (EXHIBIT HS-5 WAS MARKED FOR

18             IDENTIFICATION.)

19                    MR. MOORE:   And I'll follow up with a

20             request for marked copies.

21                    MR. HRUSKA:   We'll make sure it gets to

22             you.   I don't want any confusion about the

23             documents.

24          Q    If you understand do you know which incident

25     Investigator Gallagher is referring to in his e-mail at

1     the bottom here, whether that's the tabling incident or

2     whether it's with respect to the Laffer incident?

3          A    I don't think you can tell from the e-mail, the

4     text in the e-mail, but I'm pretty sure that it is the

5     Laffer event.

6          Q    Did you and Brian Rose speak about potential

7     student conduct and discipline with respect to the

8     Laffer event, also?

9          A    I don't remember.

10         Q    At some point you did however, correct?

11         A    On the Laffer event?

12         Q    Yeah.

13         A    Did we speak about student conduct charges for

14    the Laffer event?  I'm sure we did.  I'm sure we did.

15                   MR. HRUSKA:  So actually let's turn to the

16              next document which I'll label HS-6.  It's a

17              bates number 177.  It's a one-page document

18              e-mail exchange between Harvey Stenger and

19              Mitchell Goldstein.  It's dated Wednesday,

20              November 20th.

21                   (EXHIBIT HS-6 WAS MARKED FOR

22              IDENTIFICATION.)

23         Q    Do you recognize that document?

24         A    Yes.

25                   MR. MOORE:  Did you say this is bates

Page 98

```
 1                stamped 177?
 2                     MR. HRUSKA:  Yes.  Tom, it's tab six.
 3                     MR. SAITTA:   Thanks.
 4           Q    Who is Mitchell Goldstein?
 5           A    He is an alumnus and a member of our foundation
 6       board of directors.
 7           Q    And do you remember telling him what is written
 8       in this e-mail from you "we are continuing to review
 9       tapes and hold interviews to bring student conduct
10       charges.  Justice is something that can't be served
11       overnight, but we will get to the bottom of this and
12       hold people accountable."  Do you recall that?
13           A    I said it right there.
14           Q    Do you recall saying it?
15           A    I see it right now, so I'm now recalling it.
16           Q    What did you mean when you said "we'll get to
17       the bottom of this"?
18           A    What are we referring to here?
19           Q    That's my question to you.
20           A    I don't think it's clear whether we are
21       referring to Laffer or to the, or the protester, the
22       tabling event.  Is it clear?
23           Q    It appears as though you have corresponded with
24       Mr. Goldstein about a video of the Laffer event and the
25       subject is VIDEO:  Protesters disrupt Arthur Laffer
```

Page 99

1     presentation at Binghamton U.  Does that refresh your

2     recollection?

3          A     Partially, yes.  But remember there's two

4     events.  Both were videoed, there were videos of both.

5     And they were kind of a common tie.  So if somebody

6     would be writing about a video about an event, he could

7     have been referring to the tabling event, he could have

8     been referring to the Laffer event.  I think he is

9     referring to the Laffer event because he attaches the

10    connection to that press story.  But again I'm

11    responding to a lot of e-mails at this point in time.

12    And I could in my mind easily have thought that I was

13    looking at the tabling events or at the Laffer event.

14    So I'm not sure which one, but let's assume it was the

15    Laffer event.  There was some video taken of the Laffer

16    event.  And this was on, this was on Wednesday so it had

17    just taken place a day and a half before this.  So I was

18    anticipating, while I was traveling I was anticipating

19    that police, student conduct would be looking at those

20    tapes which were tapes that were made by us because it's

21    the tape, it's the video system in the classroom that we

22    would be looking at them to see if there should be

23    student conduct charges against any of the students that

24    were involved in them.  That's what I was saying.

25          Q     And what did you mean by the phrase "hold

Page 100

1      people accountable"?

2          A    If we found somebody had broken the code of

3      conduct that we would hold them accountable meaning that

4      we would take them through the student conduct process

5      and let the student conduct process determine what

6      action should be taken.

7          Q    Is it possible that there is a circumstance

8      where a student is arrested and charged with a crime

9      under New York Penal Law, but he is not guilty of

10     violating a student conduct rule and therefore

11     appropriately sanctioned?

12         A    It is possible to be arrested for a violation,

13     a criminal violation and it not be charged as a student

14     conduct, but it's unlikely.  It's unlikely.  I'm trying

15     to think of one that might be that.

16         Q    Assuming for the sake of argument that it's

17     something, it's conduct by a student, actions by a

18     student that occur on campus.

19         A    Right.  Right.  So I'm thinking a student

20     throws a rock through a window or a student gets

21     arrested for a DWI or they are caught with alcohol and

22     they are underage, all those would be an offense that is

23     arrestable and criminal, but they are also all of them

24     are student conduct violations as well.  They follow

25     completely different processes.  They even have

Page 101

1     different standards of whether or not they are a

2     violation.  One says you have to have absolute evidence

3     and one says propensity.  You're probably familiar with

4     that.  But I can't, I can think of ones where a student

5     is not arrested, but brought up on student conduct

6     charges.  But I can't think of one where they violated,

7     where if they are arrested, they probably did something

8     against the code of conduct.  It's not, they are

9     separate though.  They are completely separate.

10        Q    I understand that they are separate processes,

11     but I want to fairly characterize or summarize your

12     testimony which is that you cannot think of an instance

13     in which an arrest for an action that a student took on

14     campus would not also be a violation of student conduct

15     rules?

16        A    Correct.  Now when that happens, and that does

17     happen, that there is an arrest and a student conduct

18     charge we hold the student conduct case until the arrest

19     court procedure is completed because we don't want the

20     student conduct case to create evidence and testimony

21     that influences the court case.  So it's the timing of

22     the two that would be distinct here.  That the students

23     who were arrested would want, we would want them to go

24     through their arrest process, court process before we

25     would charge them with student conduct charges.

1          Q    In that circumstance does the university

2     continue to collect information upon which it could base

3     student conduct charges following the resolution of the

4     criminal process?

5          A    Yes.  Yes.

6          Q    So the work continues, the work of

7     investigating the incident doesn't wait until the

8     conclusion of the criminal process, correct?

9          A    Correct.  Right.  There is evidence that is

10     gathered and evaluated.

11          Q    And who in the university, what university

12     employee is responsible for keeping track of the

13     criminal process with respect to a student for whom the

14     university may wish to bring student conduct charges?

15          A    It would be a combination.  It could be

16     university counsel or it could be the police, the

17     university police department.  Those would be the two

18     that would have appropriate access to the court.

19          Q    And in any given instance how does the

20     university determine which employee will be charged with

21     that responsibility, the police or university counsel or

22     both?

23          A    Well, it depends on who is in place.  Right now

24     Kevin is our counsel and Kevin might take that role.  I

25     would let them decide.  I would let the chief of police

1    and counsel make that decision who wants to contact him.

2    And it's probably mostly going to be the police

3    department that's going to contact him.

4        Q    But in whichever case is it your understanding

5    that some university employee is responsible for keeping

6    track of the criminal process and reporting back to

7    others within the university with the results of that

8    process, correct?

9        A    Correct.

10               MR. HRUSKA:  All right.  So flip ahead a

11           little bit.  All right.  I want to move forward a

12           day in time to tab number nine.

13               MR. SAITTA:  Thank you.

14               MR. HRUSKA:  Which is a document that, has

15           this been marked yet?  I don't think so.

16               MR. MOORE:  I think it has.  I believe this

17           was part of the Rose record.

18               MR. HRUSKA:  I will temporarily mark it

19           HS-A.  It's a document --

20               MR. MOORE:  Maybe it wasn't.

21               MS. KURYLUK:  I don't have it.

22               MR. HRUSKA:  Withdrawn.  I will mark it

23           HS-7.  It's a document bearing sequential bates

24           numbers 273 through 283.  And at the top there is

25           an e-mail from Sheila Doyle to a large group

Page 104

1          dated Thursday, November 21st, 2019 and one of

2          the recipients is President Stenger.

3                    (EXHIBIT HS-7 WAS MARKED FOR

4          IDENTIFICATION.)

5      Q    Do you recognize this document or need time to

6   read through it?

7      A    I recognize it now.  I do not recall it, but

8   I've read it.

9      Q    Do you recognize it from a time other than the

10  immediate preparation for this deposition?

11     A    No.

12     Q    Do you recall that there was a process in the

13  week following the Laffer event to collect information

14  that is contained in this document?

15     A    It appears that there was a process in place to

16  prepare this document as kind of a chronology of what

17  happened from our perspective.

18     Q    Do you recognize the group to whom this e-mail

19  is directed as being one composed of university

20  employees collected for a specific function?

21     A    The majority of these are foundation board

22  members.  There's a few staff members on here, Rebecca

23  Benner, Sheila Doyle and everybody else, and John Cook.

24  Everybody else is a member of the foundation board.

25     Q    So they are not employees?

Page 105

1     A     No.

2     Q     They are outside?

3     A     Correct.

4     Q     And do you understand what the purpose was for

5     Miss Doyle to send this information to them at this

6     point?

7     A     This is a very important group of people.  They

8     are, they volunteer a significant amount of their time

9     to help the university, mostly financially.  And when

10    things happen on campus, we try to communicate with them

11    as quickly as possible with as much information as

12    possible so that they know what they are hearing through

13    other channels is better, better delivered to them

14    through our lens and our thoughts.  So it's a way for us

15    to summarize everything that happened for them.

16    Q     Do you know what the process was to compile

17    this information?

18    A     I don't.

19    Q     The first, if you turn the page to the page

20    marked 274, the summary and overview of campus

21    demonstration of November 18, 2019.  In the background

22    section the authors refer to an organization called

23    Progressive Leaders Of Tomorrow, PLOT.  Is that an

24    organization that you're familiar with?

25    A     I've heard of them.

Page 106

1          Q     In what context?

2          A     That their name is PLOT and that it stands for

3     Progressive Leaders Of Tomorrow.  That's really all I

4     know.

5          Q     Do you know anything about the composition of

6     the organization?

7          A     No.

8          Q     Do you know anything about the role that they

9     may have played in the events of November 18, 2019?

10         A     No.

11         Q     Do you know why the authors of this document

12    have chosen to focus on them in the introduction?

13         A     I don't know.

14         Q     Do you recall any discussion of the role of

15    PLOT in the events of November 2019 among your executive

16    group at the university following those events that

17    week?

18         A     Nope.  No, I do not recall us talking about

19    PLOT.  In fact this is the first time it sort of appears

20    I think in any description of what happened there.

21    Literally what is PLOT.  It's perhaps a group of people,

22    but it really is just the words PLOT and the name.  I do

23    not know if it has an official not-for-profit

24    corporation status or that it is a membership club that

25    has been formed in some way or it's just perhaps a term

Page 107

1     that people use to represent a group of people that may

2     not even be identifiable.  I think if you looked up and

3     tried to find who is in PLOT, I don't know if you would

4     find it.  I don't really know.

5                    MR. MOORE:  Wait for a question.

6          Q     Do you know if any university employees are

7     members of PLOT?

8          A     I don't know any members.

9          Q     Have you had a chance to review this document?

10         A     Yes.

11         Q     Because I would like to ask you about some

12    specific passages and whether that squares with your

13    understanding of events.  If you look down at the bottom

14    of the page marked 274 at the bottom, the one we've just

15    been looking at, there's a heading that says university

16    preparation.  And that discusses what is described as

17    the plan of action that the university developed and

18    undertook.  And there's a series of seven points that

19    follow that and flow onto the next page.  Do you see

20    where I'm referencing?

21         A     Yes.

22         Q     So I'm not going to ask you about all of them,

23    but there are a couple of them that I want to draw your

24    attention to see what your understanding is.  Number

25    three on that point, on that list of points it says "the

1    university secured an adjacent lecture hall of similar

2    size in the same building that the Laffer talk would be

3    held (nearly adjacent) and the availability of this

4    space for a counter-demonstration was communicated to

5    the College Progressives so that they would have an

6    opportunity to express their perspective on Laffer's

7    ideas."  And then in brackets it says "[No one chose to

8    use this adjacent space.]"  Are you familiar with the

9    activity that this point discusses?

10        A    I have heard about it, yes.

11        Q    What had you heard?

12        A    That it, that we reserved a classroom next to

13   or near the classroom where the Laffer event was going

14   to be held.

15        Q    Were you also aware that the space was not

16   actually used for the purpose that it was designated?

17        A    Again I was traveling at the time.  And whether

18   or not it was used might have been the subject of

19   conversation, but I don't recall.

20        Q    I realize you were traveling at the time and

21   your communication at the time was limited, but this

22   document was prepared several days later.  My question

23   is whether in the interval around the preparation of

24   this document you had learned about the facts that

25   support the statement that no one chose to use this

```
                                                    Page 109
 1      adjacent space?

 2                  MR. MOORE:  Asked and answered, but you can

 3             answer.

 4      A    I didn't know if the space had been used or

 5   not.  I'm seeing it now and there probably might have

 6   been a conversation where somebody had said to me that

 7   the space wasn't used, but I don't recall.

 8      Q    Don't speculate.  Just asking.

 9      A    Well, it sounds like you want me to speculate.

10   Your questions tend to lead me to speculate.

11      Q    I don't want to curtail your answers, President

12   Stenger, I just want your recollection.  And if you

13   think that my question is calling for speculation, then

14   please be advised it's really not.  I only want your

15   best recollection.

16                  MR. MOORE:  If you don't recall, you can

17             say you don't recall.

18      A    I'm just trying to be helpful.

19                  MR. MOORE:  Don't be helpful.  If you don't

20             recall, you don't recall.

21                  MR. HRUSKA:  What's most helpful is just to

22             give us your best recollection.

23                  MR. MOORE:  He wants to know what you know.

24             Not your speculation.  So if you don't know or

25             don't recall, it's certainly fair to say that.
```

```
                                            Page 110
  1            He'll follow up if he needs to.
  2       A    Okay.  I'll do the best I can.
  3       Q    Point five says "university staff and police
  4   met with the College Republicans as event sponsors to
  5   review a plan to attempt to manage disruption by
  6   communicating to attendees that they were expected to
  7   respect Laffer's presentation and hold questions and
  8   comments until after his talk."  Do you recall
  9   discussion of that issue specifically in the time
 10   between the Laffer event and the preparation of this
 11   event?
 12       A    No, I don't remember that.
 13       Q    Do you know whether or not there was a
 14   communication to attendees of the event that they were
 15   expected to respect the presentation and hold questions?
 16       A    I do not remember that.
 17       Q    Point seven, "we contacted faculty governance
 18   to explore the possibility of a faculty member(s)
 19   introducing the talk to try and set a respectful tone,
 20   but the evolving intensity of demonstration led faculty
 21   governance leaders to conclude they could not be
 22   effective in that capacity."  When you received this
 23   document did you understand who the faculty governance
 24   leaders were?
 25       A    I don't recognize this document.
```

```
1          Q     Separate from this document, what does the
2    phrase faculty governance leaders mean to you in the
3    context of the university?
4          A     There is a group of faculty who we call the
5    governance leaders.
6          Q     And who are they?
7          A     They are the president or chair, president of
8    the faculty senate, the president or chair of the
9    faculty senate executive committee, the two faculty
10   campus representatives to SUNY, a faculty senate and one
11   more who is I think the vice president of the faculty
12   senate.  So I think it's five people.  We call them the
13   campus governance leaders, but they are really the
14   faculty governance leaders.
15         Q     And what persons occupy those positions at this
16   time, November 2019?
17         A     I don't remember.
18         Q     None of them, you don't remember a single one
19   of them?
20         A     I don't remember them, no.
21         Q     Who are they now?  Who are those people in
22   position now?
23         A     Now, Natalia Malocavik (phonetic), Jonathan
24   Krazno (phonetic), Melissa Zenkin, Sarah Rider and Barry
25   Jones.  I think that's it.
```

Page 112

1          Q    Do those positions change frequently such that

2     you would expect it would have been a different set of

3     people several years ago?

4          A    Every two years.

5          Q    If you had to check what documents would you

6     refer to to figure out the answer to the question was in

7     2019?

8          A    I would look at the faculty senate website.

9          Q    Which would list historical occupants of those

10    positions?

11         A    I don't know, but that's where I would look.

12         Q    And if you had to confirm that quickly by

13    asking another university employee, who would you ask?

14         A    I would ask the person who manages their

15    meetings.  There's a secretary assigned to manage their

16    meetings.

17         Q    What's the name of that person?

18         A    Currently it's, what's her last name?

19    Havanchik (phonetic).  First name is Kelly Havanchik,

20    but it wasn't the same then.

21         Q    I presume you don't recall who it was, the name

22    of the person then; is that correct?

23         A    I'm thinking.  I don't remember.  I could

24    guess, but I don't remember.

25                   MR. MOORE:  Don't guess.

1          Q    All right.  Flipping to the next page, page

2     276.  Under the heading immediate aftermath it says that

3     "administrative staff and law enforcement gathered at

4     university police headquarters to discuss the incident,

5     develop a statement for the campus and media inquiries

6     (see attached) and to consider further response."

7     President Stenger, were you involved in that discussion

8     remotely at the time?  Did anyone communicate with you

9     from that meeting since I understand you were not

10    physically on campus then?

11         A    I don't remember.

12         Q    Continuing.  It says "at this time we are

13    taking the following actions and approach:"  and it

14    lists a series of bullet points.  Were you consulted

15    about this list of actions?

16         A    I don't remember.

17         Q    Were you consulted at any point about this list

18    of actions even after they were announced?

19         A    I don't remember.

20         Q    Your testimony is as the president of the

21    university you don't remember whether or not you were

22    consulted about this series of actions?

23         A    This document.

24         Q    No, no, not the document.

25         A    Oh, I thought you were referring to this

Page 114

```
 1     document.
 2          Q    No.  The actions that the document describes.
 3     I realize you've already testified about the document.
 4     I'm asking about the substance.
 5          A    Well, let's go through them.
 6          Q    Okay.  Number one, it says "through video,
 7     personal knowledge and observation we are identifying
 8     demonstrators who actively disrupted the event, incited
 9     other to disrupt the event and/or interfered with the
10     police."
11          A    Yes.
12          Q    Yes what?
13          A    We were doing that.
14          Q    Who was doing that?
15          A    I believe, I don't know who was doing that.
16          Q    Was it the university police?
17          A    I can't speculate.
18          Q    How do you know that somebody was doing it
19     then?
20          A    It seems like a logical thing that we should
21     have done.
22          Q    It does indeed, but did somebody tell you that
23     it was in fact being done?
24          A    I don't remember.
25          Q    So what is your source of assurance that it was
```

Page 115

1    being done?

2         A    That it sort of makes sense that it was being

3    done.

4                   MR. MOORE:  Don't guess.  Do you remember

5              someone telling you this was done?

6         A    No.

7                   MR. MOORE:  Okay.  That's the answer.

8         Q    So the answer is you don't know?

9         A    I don't know.  I don't remember.  Right.  I

10   don't remember.  I don't know.

11        Q    Second point, "through social media monitoring

12   we are identifying students and organizations who

13   incited the demonstration or otherwise encouraged

14   violation of the law/university policy."  Do you know if

15   that was being done?

16                  MR. MOORE:  If you know.

17        A    I don't know how to answer it.

18        Q    Did somebody tell you that was being done?

19        A    I don't remember.

20        Q    Did you witness somebody doing that activity,

21   monitoring social media for that purpose?

22        A    No.

23        Q    Were you informed of the result of any media,

24   of any social media monitoring for that purpose?

25        A    I don't remember.

```
                                            Page 116

 1        Q    I'd like to turn to the final pages of this

 2    document, four pages starting at 280.  And there is a

 3    heading near the bottom of that page.  It says e-mail

 4    from College Progressives, November 16th, 2019 so two

 5    days before the Laffer event.  Are you familiar with

 6    this portion of the document, President Stenger?

 7        A    I'm seeing it right now for the first time.

 8        Q    All right.  I will not further ask you about

 9    the contents, but I will ask you did anybody within the

10    university administration refer to a message that had

11    come from the College Progressives concerning the Laffer

12    event in advance of the event?

13        A    I don't remember.

14        Q    You remember no discussion of that topic, a

15    message from College Progressives concerning the

16    upcoming Laffer event?

17        A    I don't remember.

18             MR. MOORE:  Asked and answered.

19             MR. HRUSKA:  Turning now to tab ten.  This

20        is a document that I will mark HS-8.  The top of

21        the e-mail is from Harvey Stenger to Brian Rose

22        and Darcy Fauci, bates numbered 496 to 497.

23             (EXHIBIT HS-8 WAS MARKED FOR

24        IDENTIFICATION.)

25        Q    Take a look at this and see if you recognize
```

```
                                                 Page 117
 1        that, President Stenger.  Do you recognize this
 2        document?
 3             A    Do I recognize it?  Uh huh.
 4             Q    That's the question.  Do you recognize the
 5        document?
 6                      MR. MOORE:  Are you asking if he recalls
 7                 this document?
 8             Q    Yes.  Do you recall this document?
 9             A    No.
10             Q    Do you recall that there were many
11        communications coming from people associated with
12        Binghamton either as graduates or parents or students
13        expressing their concern about the way the university
14        was handling the Laffer event and its aftermath coming
15        in the several days following the event?
16             A    Yes.
17             Q    Did you adopt a policy on the manner of
18        responding or not responding to those communications?
19             A    When things like this happen I try to respond
20        to everybody who writes to me, but when it gets to a
21        certain volume I can't keep up with it.  And in this
22        case I was at the point where I couldn't keep up with it
23        and so we were not going to, I was not going to
24        personally respond.
25             Q    Just because of too much communication?
```

Page 118

1          A     Couldn't keep up with it.

2          Q     Too much time?

3          A     Too much time.

4          Q     And that was independent of the substance of

5     the communication, it was merely a volume consideration;

6     is that your testimony?

7          A     Well, if it was from somebody that I don't

8     know, even a parent it would have a lower priority than

9     an alum on the foundation board.  So yeah, some would

10    get responses if I knew them, if they were personally, I

11    was personally aware of what their concerns might be.

12    But if it was just a general complaint, I couldn't, I

13    didn't have time to respond to this.

14               MR. HRUSKA:  HS-9 is a very brief e-mail

15          and it bears the bates number 206 from Kristina

16          Johnson to Harvey Stenger and the subject line is

17          "are you thinking about an apology to Laffer?"

18          It's dated Friday, November 22nd, 2019 and the

19          full text of the e-mail is "might be a good thing

20          to do" and a series of ellipses points.

21               (EXHIBIT HS-9 WAS MARKED FOR

22          IDENTIFICATION.)

23          Q     Do you recall this communication, President

24    Stenger?

25          A     I see it now, but I don't remember it.

```
                                              Page 119
 1           Q    And does Miss Johnson typically communicate

 2      with you from her personal e-mail address

 3      kmj117@gmail.com?

 4           A    I don't remember.

 5           Q    Do you recall her ever communicating with you

 6      from that e-mail address?

 7                     MR. MOORE:  Other than this e-mail?

 8                     MR. HRUSKA:  No, at all because he said he

 9             doesn't remember the e-mail.

10           A    No.

11           Q    Do you have any doubt that this is an e-mail

12      from the same Kristina Johnson who was the chancellor of

13      the State University system at the time?

14           A    I have no reason to believe that it is not

15      Kristina Johnson.

16           Q    Do you recall discussing whether in print or

17      orally with her the concept of making apologies to Dr.

18      Laffer for the events of November 18?

19           A    No, I don't remember.

20           Q    Did you consider making an apology to Dr.

21      Laffer for those events?

22           A    Yes.

23           Q    What was your consideration?

24           A    That I should apologize to him.

25           Q    And did you do so?
```

```
                                               Page 120

 1          A    I don't remember.

 2          Q    What did you weigh in your mind as you

 3     considered whether or not to make an apology?

 4          A    Well, I said I think I should make an apology.

 5          Q    Why did you think you should make an apology?

 6          A    Because I didn't think he was treated very

 7     nicely when he came to our campus.

 8          Q    If you had made an apology, do you think he

 9     would recall it?

10          A    No.  It was three years ago.  I write a lot of

11     letters.

12          Q    Have you ever spoken with Dr. Laffer to your

13     recollection on any topic at any time?

14          A    No.

15          Q    If you had done so, if you had made an apology

16     do you think it would have been written as opposed to

17     oral as a matter of practice?

18          A    I've never had to apologize to somebody for

19     something like this so I don't know.  If I had to

20     speculate.

21          Q    No, don't speculate.

22          A    Then I can't answer.

23          Q    I thought you might have a practice that you

24     adhere to and therefore you could testify as matter of

25     habit, but I guess that is not the case.
```

```
 1        A    There are no habits that are associated with
 2   this kind of event.
 3                    MR. HRUSKA:  Why don't we break now.
 4                    (OFF-THE-RECORD DISCUSSION.)
 5                    MR. MOORE:  Under the federal rules of
 6             civil procedure we are suppose to advise you that
 7             we want the witness to have the opportunity to
 8             review and inspect the transcript so I'm making
 9             that request.
10                    MR. HRUSKA:  Okay.
11                    (RECESS TAKEN.)
12        Q    Before we broke, President Stenger, we were
13   discussing the events in the week following the Laffer
14   event and the documents we were reviewing show that
15   there is a great deal of focus on discovering what
16   happened at the event and determining how to respond to
17   it.  What's your role generally speaking in that
18   process?
19                    MR. MOORE:  Objection.  Do you understand
20             what process he is referring to?
21        Q    The process of determining what happened at the
22   event and how to respond to it on behalf of the
23   University.
24        A    Responding to it through communications?
25        Q    Through any means.
```

```
                                           Page 122
 1          A     Yes.

 2          Q     What's your role?  I don't want to presume.  I

 3    see you copied on many, many messages and if I

 4    understood your role better, it will help us focus on

 5    what role you actually played here and what you know and

 6    therefore what we should get on the record.

 7          A     Is there a specific process that you're asking

 8    was I involved in?

 9          Q     I'll just ask you questions about the

10    documents, but I was hoping to get some direction as to

11    where to focus.  Let's take a look at tab 14 in the

12    binder which has been previously marked as RY-6.  It's a

13    document that bears the bates numbers 565 through 567.

14    And at the top there's an e-mail from Brian Rose to

15    Harvey Stenger and others on Friday, November 22nd,

16    2019.  The e-mail attaches a document beginning at 566

17    that is entitled "Laffer and tabling incidents,

18    follow-up issue list November 22nd, 2019."  Do you

19    recall this communication, President Stenger?

20          A     I don't recall the specific communication.

21          Q     Do you recall the process that created

22    communications of this sort at this time period during

23    the week following the Laffer event?

24          A     I don't recall.

25          Q     Do you recall being asked for your advice with
```

Page 123

1    respect to communication issues in the week immediately

2    following the Laffer event?

3         A    I don't recall.

4         Q    When did you return from your trip to out of

5    state back to Binghamton?

6         A    Near the end of that week.

7         Q    Did you upon your return become involved in

8    meetings in which university officials discussed the

9    proper response to those events?

10        A    I don't remember.

11        Q    I'm talking about in the immediate aftermath

12   during the week following the Laffer event.

13        A    No, I don't remember.

14        Q    I'm going to direct your attention to the

15   attachment to that document because there is some

16   specific statements in there that I want to see whether

17   in the absence of recollection of the specific document

18   you nonetheless are familiar with the concepts they

19   refer to.  Starting at Point B, which is labeled

20   SA/status of BU Progressives.  The statement in the

21   first sentence is "the BU Progressive communication

22   calling upon student members of certain cultural groups

23   to shut down the Laffer talk is a "smoking gun" as to

24   the role the organization played in inciting the

25   violations of law/policy that occurred at the Laffer

```
 1        event."  Do you understand that statement in context?
 2        A     Yes.
 3        Q     Do you agree with that statement?
 4        A     I don't have an opinion.
 5        Q     Do you understand what the source of that
 6        statement is, the BU Progressive communication that it
 7        refers to?
 8                    MR. SAITTA:  Object to form.
 9        A     I believe it was written by Brian Rose
10        according to the e-mail.
11        Q     This document that we're looking at right now
12        that is Exhibit RY-6 you're referring to, that's what
13        you're saying was written by Brian Rose?
14        A     That is what it says in this e-mail.
15                    MR. MOORE:  And, Andrew, I know you weren't
16               here, I'm not trying to interrupt you, but I
17               believe Brian Rose testified he prepared this.
18                    MR. HRUSKA:  I know that and I've reviewed
19               his testimony.  I want President Stenger's
20               testimony.
21        Q     I'm not asking about the authorship of the
22        document.  I'm asking about the concept the document
23        reflects and whether you understand what Mr. Rose was
24        referring to when he wrote "the BU Progressive
25        communication."  Do you understand what that is?
```

Page 125

1          A      What the BU Progressive communication is?

2          Q      Uh huh.

3          A      I think we've seen it in here somewhere.

4          Q      Thank you.  And do you think that Mr. Rose was

5     correct in referring to it as a smoking gun as to the

6     role that the organization played?

7          A      I don't have an opinion.

8          Q      Did you discuss that issue with Mr. Rose at

9     that time?

10         A      I don't remember.

11         Q      Did you think it was correct of Mr. Rose to

12    attribute that communication to the BU Progressives?

13         A      I don't have an opinion.

14         Q      Did you have any communication with Mr. Rose

15    concerning the status of the BU Progressives with

16    respect to their activity with relation to the Laffer

17    event?

18              MR. MOORE:  Other than this document?

19              MR. HRUSKA:  Well, he hasn't testified that

20         he had any discussions.  That's what I'm asking.

21         A      I don't remember.  I don't remember.

22         Q      Mr. Rose says "it will be difficult for the SA

23    to avoid considering action against the BUPs having

24    taken action against the CPs," by which he must mean

25    parenthetically to College Republicans, not the College

```
                                                    Page 126
 1      Progressives, "for a violation of a reservation policy."
 2      So that sentence appears to refer to consideration of
 3      action against the Binghamton University Progressives.
 4      Do you recall any discussion of potential action against
 5      the Binghamton University Progressives that took place
 6      during this time period?
 7           A    Yes.
 8           Q    What was that discussion?
 9           A    It was in a meeting with the Student
10      Association executives, vice president and president.
11           Q    Do you recall when that took place?
12           A    No.
13           Q    Do you recall roughly the sequence in which it
14      took place, was it after, I assume it was after the
15      Laffer event, correct?
16           A    It was after the Laffer event, yes.
17           Q    That's my question.
18           A    Yes.
19           Q    And who else took part in that discussion?
20           A    I don't remember.
21           Q    And what do you recall about the substance of
22      the discussion?
23           A    That Brian was asking them what they were going
24      to do about the sanctions to Progressives versus College
25      Republicans and was their action balanced between the
```

Page 127

```
 1        two actions that they took.
 2            Q    And what was the response?
 3            A    I think that the Student Association said, they
 4        did not make an answer.  They did not answer him.  They
 5        said we would keep thinking about it.
 6            Q    Was that an acceptable response to you?
 7            A    Yeah.  They are a separate independent
 8        organization.
 9            Q    Just to be clear your testimony is that the
10        Student Association is a separate independent
11        organization from the University?
12            A    Correct.
13                    MR. MOORE:  Asked and answered.
14            Q    Where does the Student Association receive its
15        money from?
16            A    Student fees.
17            Q    Who collects those fees?
18            A    State University, the State of New York.
19            Q    Does the State of New York have the ability to
20        prevent the Student Association from receiving money
21        through the student fee collection?
22            A    I don't know.
23            Q    What influence does the university have over
24        the operations of the Student Association?
25            A    Advisory.
```

Page 128

1          Q    So if the Student Association were to make a

2     decision with which you as the president disagreed,

3     would you have the power to reverse that decision?

4          A    I don't believe so.

5          Q    Moving further in the document there's a

6     heading C, right at the bottom, individual students

7     arrested/subject to arrest.  It says "we have a meeting

8     scheduled for December 3rd to discuss what action should

9     be taken under either criminal statutes or rules of

10    conduct as to a list of ten students identified as

11    having disrupted the Laffer event and/or interfered with

12    police."  So was there in fact a meeting that took place

13    on December 3rd to discuss those topics as far as you

14    recall?

15         A    I don't remember.

16         Q    Do you remember taking place -- strike that.

17    Do you remember taking part in a meeting on those topics

18    which included Mr. Rose roughly in this time period,

19    late November, early December?

20         A    I don't remember.

21         Q    Do you remember learning that such a meeting

22    during which those topics were considered had taken

23    place?

24         A    I don't remember.

25         Q    Do you recall that the question of whether to

                                              Page 129

1          advance criminal charges against a group of students

2          following the Laffer event was under consideration by

3          university officials during this time period?

4               A    Yes.

5               Q    What do you remember about that?

6               A    That there was consideration about taking

7          action against those students.

8               Q    Criminal action?

9               A    Criminal action.

10              Q    And who was involved in that consideration?

11              A    I don't remember.

12              Q    Were you involved?

13              A    Not directly.

14              Q    Were you involved indirectly?

15              A    Yes.

16              Q    In what way?

17              A    Most likely that my chief staff attended those

18         meetings.

19              Q    Miss Fauci?

20              A    Yes.

21              Q    And in what way did she inform you about the

22         progress of that consideration?

23              A    I don't remember.

24              Q    And did you give her any opinions on the

25         progress of that consideration?

Page 130

1        A    I don't remember.

2        Q    Did you give her any direction to convey

3    concerning the evaluation of those issues?

4        A    I don't remember.

5        Q    At this time this issue was the subject, as

6    you've previously testified, of a tremendous amount of

7    public attention in which you were directly involved.

8    Is that a fair summary of your testimony?

9             MR. MOORE:  Objection.  You can answer.

10        Q    Do you understand the question?

11        A    No.

12        Q    At this time this issue was the subject of a

13    tremendous amount of public attention in which you were

14    directly involved through the contact that you were

15    receiving from many members of the community and even

16    beyond the community.

17             MR. MOORE:  Objection to form.  What do you

18         mean by this issue, the arrest or the Laffer

19         event?

20             MR. HRUSKA:  The Laffer event.

21        A    I don't understand the question.  Can you

22    repeat the question?

23        Q    Do you recall many people contacting you and

24    having many discussions concerning the Laffer event

25    during the weeks immediately succeeding the event?

Page 131

1      A     Yes, we talked about that.

2      Q     You've testified about that at some length in

3   fact?

4      A     Yes.

5      Q     And yet you don't recall a discussion about the

6   evaluation of specific students on the question of

7   whether or not the university should support criminal

8   charges against them?

9      A     I don't remember being involved in a

10   conversation about making criminal charges against the

11   students.

12      Q     Nor do you remember being told that such a

13   conversation was occurring; is that your testimony?

14      A     I don't remember.

15      Q     You don't remember that.  Just below the

16   portion that I just read it's written that "the arrest

17   or charging of additional students will likely trigger a

18   reaction from Progressives and allies who will likely

19   frame it as a police/administration hostility toward

20   students of color."  Do you remember that concept being

21   discussed among university officials with respect to the

22   Laffer event during this time period?

23      A     No.  You want me to repeat that?

24              MR. MOORE:  No, I got it.  Wait for the

25         next question.

```
                                                 Page 132
 1          Q    The final sentence there in that paragraph says
 2     "failure to take action runs the risk of empowering
 3     students to fail to follow directives of police in
 4     future contexts."  Do you remember a discussion of that
 5     point among university officials during this time
 6     period?
 7          A    No.
 8          Q    Do you remember talking to Mr. Pelletier, the
 9     chief of university police, concerning the question of
10     whether failure to take action with respect to students
11     who had disrupted the Laffer event would run the risk of
12     empowering students to fail to follow directives of the
13     police in future contexts?
14          A    No.
15          Q    Do you remember discussing that topic with Mr.
16     Rose?
17          A    No.
18          Q    So if Mr. Rose believes that you did discuss
19     that topic, that's something completely outside of your
20     recollection?
21          A    Correct.
22          Q    You have no comment on that whatsoever based on
23     your memory?
24               MR. MOORE:  Objection.  Asked and answered.
25          A    Correct.
```

1          Q    On the next page Section D, event policies and

2     practice, the memo in the document state's "our existing

3     policies and practices on space use/reservation and

4     event management as they pertain to potentially

5     controversial programs and displays are not likely to

6     withstand the close scrutiny that comes with

7     controversy."  Do you remember Mr. Rose discussing that

8     concern with you during the weeks immediately succeeding

9     the Laffer event?

10         A    No.

11         Q    Do you agree with the statement?

12         A    I don't have an opinion.

13         Q    Did you feel that there was any need to change

14    the space use/reservation and event management policies

15    following the Laffer event?

16         A    I didn't have an opinion.

17         Q    Do you know what these space use/reservation

18    and events management policies and practices were prior

19    the Laffer event?

20         A    No.

21         Q    Do you know if they have changed since?

22         A    No.

23              MR. HRUSKA:  All right.  I'm skipping ahead

24         to tab 16 which is a document bearing sequential

25         bates numbers 319 through 339.  And unless it's

1            been previously marked, I'm going to mark it

2            HS-10.

3                    (EXHIBIT HS-10 WAS MARKED FOR

4            IDENTIFICATION.)

5                    MR. MOORE:  I believe a version of this has

6            been marked, but not this.

7       Q    At the top of the document is an e-mail from

8    you to Dennis McCabe and Ryan Yarosh dated Wednesday,

9    November 27, 2019.  Do you recognize this document?

10      A    Yes.

11      Q    What is it?

12      A    It was a set of slides that Ryan Yarosh put

13   together to try to explain what happened.

14      Q    During the November 2019 events that we've been

15   discussing, correct?

16      A    Tabling events and the Laffer event, correct.

17      Q    Did you review Mr. Yarosh's work at the time?

18      A    I don't remember.

19      Q    Who is Dennis McCabe?

20      A    Dennis McCabe is a member of the university

21   council.

22      Q    And what is that body, university council?

23      A    It is a governor appointed body that is an

24   advisory group and advocacy group for the university,

25   for Binghamton University.  Every SUNY campus has a

Page 135

```
 1      university council.
 2          Q    Is he a full-time employee or is this a
 3      part-time responsibility?
 4          A    He is a volunteer.
 5          Q    And how many members of that council are there?
 6          A    Seven, six or seven.
 7          Q    And does that council have any formal power or
 8      is it merely advisory?
 9          A    They have some power.
10          Q    As you understand it what are their powers with
11      respect to your work?
12          A    Their one distinct power is that annually we
13      review the student code of conduct and they approve any
14      changes to the student code of conduct.
15          Q    And are there any other powers that they have
16      with respect to the university?
17          A    I think one other one is they can approve the
18      naming of space on campus, an honorific naming of space
19      on campus.  I think they also review our parking fee,
20      parking charges, but they don't have any
21      responsibilities.  I think those are the three main
22      ones.
23          Q    And then what is the range of topics on which
24      they advise the university as opposed to exercising some
25      direct power?
```

Page 136

```
1          A    We meet six times a year and at each meeting
2      there's presentations by the vice presidents and
3      executive directors on their area and their current
4      projects that are in place and accomplishments and they
5      listen and they provide feedback.
6          Q    So it could be any matter that is presented to
7      them?
8          A    Right.
9          Q    Why were you sending this set of talking points
10     to Mr. McCabe at this point?
11         A    I don't know.
12         Q    I'd like to take a look at just a few of the
13     materials.  There is a portion of that document, if you
14     advance to page 334 which is several pages in, which is
15     titled Binghamton University, State University of New
16     York, Office of Communications and Marketing, Talking
17     Points-November 2019 Incidents.
18              MR. MOORE:  Can we specify that this e-mail
19          that we're talking about was sent on November 27,
20          2019?
21              MR. HRUSKA:  I believe I did.
22              MR. MOORE:  Okay.  I wasn't sure if that
23          was in the record so I apologize.
24         Q    Do you recall a set of talking points that
25     resembles this set of talking points that you are aware
```

Page 137

1        of during this time period in late November, early

2        December of 2019?

3            A     Yes.

4            Q     Were you aware of this specific set of talking

5        points?

6            A     I don't recall.

7            Q     So I'm going to ask you some questions about

8        these talking points.  And if you believe that other

9        talking points with which you were aware differed in

10       some material respect, tell me please.  The statement in

11       the second paragraph of the text of that document --

12       well, actually let me back up and strike that.  What do

13       you understand was the purpose of this set of talking

14       points?

15           A     I don't know.

16           Q     What was the purpose of having talking points

17       at all at this point in late November of 2019?

18           A     We typically develop talking points that people

19       can read in case constituents call them.  Like our

20       alumni office gets phone calls or our call center might

21       get phone calls or our foundation might get phone calls

22       and so talking points are distributed to all of those

23       offices so that they can know the facts that we want

24       them, because otherwise they would have to talk from

25       hearsay.  So it's usually for external constituents

Page 138

1    reaching into us so that the answers can be consistent.

2         Q    And which university personnel would employ

3    these talking points in their conversations with

4    external constituents?

5         A    Alumni affairs.  Foundation.  Parents, parents

6    group.  Those would be the three big ones probably.

7         Q    Would you or your immediate staff use talking

8    points of this sort in dealing with outside inquiries?

9         A    No.

10        Q    What is the process for reviewing talking

11   points prepared by communications for use in the role

12   that you just testified about?

13        A    I don't know.

14        Q    Are you part of any review process for talking

15   points to be used by university officials in that

16   process?

17        A    In some cases, yes.

18        Q    Were you involved in the review of talking

19   points around the Laffer event issues during this time

20   period?

21        A    I don't recall.

22        Q    Take a look at the second paragraph in this set

23   of talking points where it says "the university will not

24   tolerate any activity that aims to disrupt or shut down

25   gatherings where ideas are being shared or where

Page 139

1    academic and personal freedoms are being exercised.

2    Those who continue to display such destructive behavior

3    will face the appropriate consequences up to and

4    including student conduct charges, expulsion and

5    criminal prosecution."  Is that an accurate statement of

6    the university's position as of the end of November

7    2019?

8         A    Yes.

9         Q    What does it mean to you not to tolerate any

10   activity that aims to disrupt or shut down gatherings?

11        A    Not to tolerate, where is that?

12        Q    The university will not tolerate.  I'm focusing

13   on the words will not tolerate.

14        A    So depending upon the situation, depending upon

15   the facts of the situation and what occurred and the

16   process from those facts through the appropriate

17   channels, whether it's police or student conduct, we

18   would, we would then take those facts through that

19   process.  So not tolerate means that we're not going to

20   ignore it.  We're going to assess it and take it through

21   a process to determine what happened and whether there

22   are charges that need to be taken, need to be filed.

23        Q    Do you know what the author here meant by

24   "continue to display such destructive behavior" with the

25   emphasis on the word continue, do you understand what he

Page 140

1      meant by that?

2           A      Well, there's two choices.   One is to continue

3      during the current event and the other is to continue

4      after the current event.   I think that's obvious.

5                       MR. MOORE:   I think what he's asking is do

6               you understand what the author meant by that?

7           A      No.

8           Q      You said you agreed with the statement so I

9      want to understand what it is you're agreeing with.

10     What is your, what meaning do you ascribe to that

11     statement "those who continue to display such

12     destructive behavioral will face the appropriate

13     consequences"?

14                      MR. MOORE:   That's a different question.

15          A      That's the assessment of what occurred would

16     include that information.

17          Q      Which information?

18          A      Whether it continued or not.

19          Q      And continued in what sense because you are

20     spelling out two different senses of the word?

21          A      Right.

22          Q      What sense is the meaningful one for you?

23          A      I think it could be both.

24          Q      So you would assess whether destructive

25     behavior continued during an incident and also whether

1    it occurred over a period of time that extended beyond

2    the incident?

3         A    Correct.

4         Q    If you turn to page 336 under point four there

5    is a series of bullet points under the heading "the

6    university made numerous accommodations to make the

7    event on Monday, November 18 happen," the Laffer event.

8    The second bullet point is "demonstrators were provided

9    the opportunity to hold their own speak-out in an

10   adjacent lecture hall."  My question to you is in what

11   sense did that constitute an accommodation to make the

12   Laffer event happen?

13        A    They were provided the opportunity to hold

14   their own speak-out in an adjacent lecture hall.

15        Q    In what way did that constitute an

16   accommodation to make the Laffer event happen?

17        A    To give them an opportunity to hold a speak-out

18   event in an adjacent lecture hall.  Instead of going to

19   the Laffer event, they would go to this other lecture

20   hall and have a conversation about Laffer's talk.

21        Q    So the concept as you understand it was that

22   the demonstrators would not go to the Laffer event and

23   would go to a separate location, therefore not interfere

24   with the Laffer event, have I captured it correctly?

25        A    That is the intent.

Page 142

1     Q     In that case why was it relevant or desirable

2     that it be an adjacent lecture hall?

3     A     I think that is an appropriate accommodation.

4     Q     Why?

5     A     Because the students have arrived at a place

6     where they thought that they were going to be able to be

7     involved and then we don't want to send them to the

8     other side of campus.  So we try to make it as close as

9     possible.

10     Q     Wouldn't it increase the risk that the

11     protesting students would actually be enabled to disrupt

12     the Laffer event if they are placed in an adjacent hall?

13          MR. MOORE:  Objection.  Are you asking him

14          to speculate?

15     Q     No.  I'm asking about the fact, your

16     experience, based on your experience is that the case?

17     Or if you don't have experience, just tell me that.

18          MR. MOORE:  Experience with this case or

19          with other --

20          MR. HRUSKA:  Experience with other prior

21          events.

22          MR. MOORE:  Let me finish my objection.

23          I'm just trying to clarify the question because

24          it seems vague to me.  Are you asking him to talk

25          about other times this was done or are you asking

Page 143

1          him to talk about?

2                    MR. HRUSKA:   I'm asking about his

3          experience.

4          Q    What is your experience with respect to the

5     placement of potentially disrupting students with

6     respect to student events on campus?

7          A    The one experience I have was in the early

8     teens that Governor Cuomo would come to campus and there

9     would be a group of people who would want to protest

10    about natural gas fracking.  And I remember that we

11    would create with the guidance of the governor's office

12    space for those protesters as close as possible to where

13    he was going to speak, but not so close that it would

14    disrupt.  And so we kind of took from that that you put

15    them near the event, you give them space, show them what

16    the boundaries are and we thought, this is the first

17    time we had ever done this.

18         Q    During the Cuomo event you're testifying about?

19         A    The Cuomo event was something that I saw and

20    sort of understood oh, that's how you handle that.  But

21    then when we decided to do this event, this is the first

22    time where we were really managing it.  The governor's

23    office managed the fracking one.  This was the first

24    time we were managing this kind of a controversial,

25    potentially controversial meeting.  So we, we were doing

```
                                                    Page 144
 1          it in a way that we thought was most appropriate.
 2               Q     And your basis and experience for that was your
 3          observation of the Cuomo fracking event that you
 4          testified about?
 5               A     It was my observation.
 6               Q     Did others give you other basis and experience
 7          from which to draw on?
 8               A     No.  No.  I listened to whoever wanted to do it
 9          there and again I was not even in, I was not locally
10          available, but somebody said let's do this and let's do
11          it there and that's what we did.
12               Q     Do you recall who it was that suggested that?
13               A     No, I don't.
14               Q     Then the fourth point in the series of points
15          it says "attendees at the lecture were asked to allow
16          the presentation to go forward and reserve their
17          questions until the end."  Do you know whether such a
18          statement was made before the Laffer event?
19               A     I wasn't there.
20               Q     Have you since learned whether or not it was
21          made?
22               A     I have not seen it being made.  I have not
23          observed it being made.  I wasn't there.
24               Q     Are there people who work for you in the
25          university who told you that it was made?
```

Page 145

1        A    Yes.

2        Q    As far as you can recall?

3        A    Yes.

4        Q    Who told you that?

5        A    I don't remember.

6        Q    Did whomever it was who told you that this

7    happened tell you who made that statement?

8        A    I don't remember.

9        Q    On the second to last page of this document,

10    the very top -- turn the page.  It's the page marked

11    338.  At the very top is the statement "we are

12    continuing our investigation of these events and will

13    bring criminal or student conduct charges against any

14    students or student organizations that have participated

15    in these behaviors."  Take a look at the whole paragraph

16    so that you understand the context before I ask the

17    question.  So the first question about that is did the

18    university in fact bring criminal charges against any

19    students or student organizations that had participated

20    in those behaviors?

21        A    Yes.

22        Q    Which ones?

23        A    I know there were the two students arrested at

24    the Laffer event and two -- no, I'm saying students.

25    Two people arrested at the Laffer event and two people

Page 146

1      were arrested, not arrested at, but charges were brought

2      at the tabling event.

3           Q    Your testimony earlier was you couldn't recall

4      whether any charges were brought from the tabling event.

5      Are you revising that testimony?

6           A    I don't know.  It's a good question.

7           Q    Well, it's your recollection now at this moment

8      that there were charges brought with respect to the

9      tabling event; is that correct?

10          A    I do know that, yes.

11          Q    How do you know that?

12          A    I was told that.

13          Q    By whom?

14          A    By my attorney.

15          Q    Other than what your attorney has told you

16     which I don't want to hear about.

17                    MR. MOORE:  Don't talk about --

18          A    You asked the question.

19                    MR. MOORE:  Anything he is asking doesn't

20          have to do with communications with counsel.  Did

21          you know that charges were filed related to the

22          tabling event before you met with counsel?

23          A    No.

24          Q    Okay.

25          A    But I do now.

```
                                              Page 147

 1           Q     That's fine, but that's not what we're

 2     specifically asking.  And I made a remark at the

 3     beginning of this deposition and I want to be very

 4     clear, I wasn't asking about any communications you had

 5     with your lawyers.

 6                       MR. MOORE:  He's asking what you knew or

 7               what you know not based on conversations with

 8               counsel.

 9           Q     Was that the complete set of students or

10     student organizations that had participated in those

11     behaviors, the ones that were charged to your

12     understanding following the tabling and Laffer events?

13           A     I don't understand the question.

14           Q     Was that everybody who had been involved in

15     those behaviors?  You've testified --

16                       MR. MOORE:  Objection to form.

17           Q     You've testified that you know of two students

18     or two people, let me revise that, two people who were

19     charged with respect to the Laffer event.  Let's

20     concentrate on the Laffer event for a minute.  In this

21     statement the university is saying that they will bring

22     criminal or student conduct charges against any students

23     or student organizations that are participating in those

24     behaviors.  And I'm asking right now about the criminal

25     part of that statement.  And you've testified that there
```

```
                                                Page 148
 1        were two people charged and I'm asking you was that
 2        everybody who was involved in those behaviors, those two
 3        people?
 4                       MR. MOORE:  If you know.
 5        A     I still don't understand the question.
 6        Q     You've seen the video of the Laffer event,
 7        correct?
 8        A     Yes.
 9        Q     You've discussed the Laffer event with your
10        police personnel, correct?
11        A     Yes.
12        Q     You're aware that the police were recommending
13        that a list of people be charged with respect to that
14        event at least ten, correct?
15        A     Yes.
16        Q     And so how can it be that the university is
17        taking the position that all of the students and student
18        organizations that have participated in those behaviors
19        would be either criminally charged or have student
20        conduct charges against them when at least with respect
21        to the criminal part of that that's not when happened?
22                       MR. MOORE:  Objection to form.
23        A     Correct.
24        Q     What about the student conduct part?  You've
25        previously testified that student conduct charges were
```

Page 149

```
 1        not brought against any of the participants in this
 2        event; isn't that correct?
 3             A    Correct.
 4             Q    So this statement is incorrect, the statement
 5        in this document on page 338 of document HS-10 is not a
 6        correct statement; isn't that right?
 7             A    Correct.
 8             Q    You're agreeing with my statement?
 9             A    I don't know who wrote this document.  I'm
10        saying yes, it's incorrect.
11             Q    That's what I wanted to clarify.  Thank you.
12        Did you take any -- strike that.  Were you aware that
13        this incorrect statement was being circulated within the
14        university as a basis for which to make statements to
15        various groups in the public?
16                  MR. MOORE:  Objection.  I think it's
17             ultimately incorrect, but this is.
18             A    These are two separate documents.  These are
19        not the statement documents.
20             Q    That's not part of the talking points?
21             A    No.  They are separate documents.
22             Q    Do you understand what --
23             A    Different fonts.  Different language.  They are
24        different documents.
25                  MR. HRUSKA:  Well, let's move on.  Let's
```

Page 150

```
 1              move on.  Tab 17 document, 398 through 399 that
 2              we'll mark HS-11.
 3                     MR. MOORE:  This was marked as Faughnan's
 4              exhibit as long as we're talking about 398
 5              through 400.
 6                     MR. HRUSKA:  Yeah.
 7                     MR. MOORE:  This was TF-5 marked at the
 8              deposition of Timothy Faughnan.
 9         Q    In the center of the document on the first
10    page, President Stenger, there is an e-mail from you to
11    John, JoAnn and Tim.  It's dated November 27, 2019.
12         A    Yes.
13         Q    And you write to them and you ask them, and
14    this is in the second paragraph, "I would like the three
15    of you" -- let em start at the beginning of the
16    sentence.  "Now that the incidents are in our rear view
17    mirror and things are quiet, I would like the three of
18    you to assess how we handled the two events and
19    incidents and what we would do differently in the future
20    to gain outcomes that could be better."  Do you recall
21    assigning Miss Navarro, Mr. Pelletier and Mr. Faughnan
22    to that task?
23         A    Yes.
24         Q    And what process did they undertake in order to
25    comply with your request?
```

```
 1          A    I don't know.
 2          Q    Did they come back to you with the assessment
 3     that you had requested?
 4          A    I believe so.
 5          Q    Did that take written form?
 6          A    I don't remember.
 7          Q    Do you remember getting an oral report from
 8     them on that topic?
 9          A    I don't remember.
10          Q    Do you remember having discussions with any of
11     the three of them on those topics?
12          A    I don't remember.
13          Q    So you gave a direction to Mr. Faughnan, Miss
14     Navarro and Mr. Pelletier to assess the handling of
15     these incidents and you have no recollection of whether
16     they responded to that or not --
17               MR. MOORE:  Objection.  Asked and answered.
18          Q    -- is that correct?
19               MR. MOORE:  He has answered the question.
20          Move on.  He can't answer the same question
21          twice.  You've been doing that throughout this
22          deposition.  He's answered the question.  He can
23          answer again.
24          Q    Are you in the habit of giving instructions to
25     your staff and them not responding to you?
```

```
                                          Page 152
 1              MR. MOORE:  Are you asking him to talk
 2         about other incidents?
 3              MR. HRUSKA:  I'm asking for his practice.
 4     A    I didn't say that they didn't give a response.
 5     I just said I don't remember.
 6     Q    Is it possible they responded, but it wasn't
 7     sufficiently significant for you to recall?
 8              MR. MOORE:  Objection.  Calls for
 9         speculation.
10     Q    Let's go to the next sentence.  It says "for
11     instance, what we could have done if we wanted to not
12     have the YAF video be so disturbing."  By YAF did you
13     mean the Young America's Foundation, the plaintiff in
14     this lawsuit?
15     A    Yes.
16     Q    What did you mean by "the YAF video be so
17     disturbing," what are you referring to if you recall?
18     A    "What could we have done if we wanted to not
19     have the YAF video be so disturbing?"
20     Q    What's the video and what is disturbing about
21     it?  Let's start with that.
22     A    That's what I said to them that it was
23     disturbing.
24     Q    What video?  The video of the Laffer event; is
25     that what you're referring?
```

```
                                                 Page 153
  1                   MR. MOORE:  Listen to the question.  Does
  2              that refer to the tabling event video?
  3         Q    Tabling event video.  And what was disturbing
  4      about it?
  5         A    That it was disturbing.
  6         Q    Disturbing describes an effect, not the
  7      underlying conduct that it displayed.
  8                   MR. MOORE:  Harvey, what he is asking is
  9              for your recollection of the video, what you
 10              personally found disturbing about it.
 11         A    I found that it was uncivil.
 12         Q    And was the incivility on the part of the
 13      students disrupting my clients exercising their First
 14      Amendment rights; is that what you're referring to?
 15                   MR. MOORE:  Objection to form.
 16         A    No.  It was the entire event.
 17         Q    Do you ascribed some responsibility to the
 18      College Republicans for that disturbing event?
 19         A    Yes.
 20         Q    Why?
 21         A    Because they did not follow the Student
 22      Association guidelines for reserving tables.
 23         Q    And that's why they were responsible for the
 24      disturbing nature of the event; is that your testimony?
 25                   MR. MOORE:  Objection.  It's a
```

Page 154

1          mischaracterization.

2      Q    I'm asking if I got it right.  Have I got it

3  right or am I mischaracterizing it?

4      A    No.  Just that they violated a rule and that

5  was part of what disturbed me.

6      Q    They violated a Student Association rule, not a

7  university rule, correct?

8      A    Correct.

9              MR. MOORE:  Objection.

10     Q    And it disturbed you they violated a Student

11 Association rule?

12     A    Yes.

13     Q    That's the significant lesson to draw from that

14 episode?

15             MR. MOORE:  Objection.  That's not what he

16         said.  I think he talked about other things that

17         happened in the video.

18     A    Right.  That was, that was one of the things

19 that disturbed me is that I want the Student Association

20 to have the ability to be an autonomous, well governed

21 organization that manages its clubs and organizations in

22 a way that promotes the best possible outcomes for our

23 students on campus.  And when that organization is

24 stressed in certain ways, for example not following the

25 rules, that's not good.  That's unhealthy for the

```
                                                  Page 155
 1      campus.  The rest of what disturbed me was the shouting,

 2      the language that was used by the students that came to

 3      protest it.  But yes, it was disturbing.

 4          Q    You also used this group to report back to you

 5      about "what could we have done to insure the Laffer

 6      lecture was held," reading from that same paragraph.

 7      Did any of those three ever make a report to you on that

 8      subject of what the university could have done to insure

 9      the Laffer lecture was held?

10          A    I don't remember.

11                    MR. MOORE:  Asked and answered.  He said he

12              didn't remember.

13                    MR. HRUSKA:  I'm turning now to tab 18.

14              This is a document with sequential bates numbers

15              419 through 422 which has been previously entered

16              as Exhibit RY-8.

17          Q    It's an e-mail at the top from Ryan Yarosh to

18      you with several copies Tuesday, December 17, 2019 and

19      Mr. Yarosh is sending you a document which is a draft,

20      I'm quoting now, "drafted a piece that will be signed by

21      you and Kristina" which I take it is Kristina Johnson,

22      the university chancellor.  Take a look at it.  Do you

23      recall this document?

24          A    Yes.

25          Q    Turning to page 420 it's dated December 10th,
```

Page 156

```
 1        2019 and it's addressed to members of the Assembly
 2        Minority Conference.  If you turn to the second page of
 3        that document, that part of the document which is
 4        labeled 421, in the center of the document, center
 5        paragraph of that page in the fourth paragraph, fourth
 6        sentence the one that starts "that's why arrests were
 7        made."  Do you see where I'm pointing?  It's the
 8        paragraph that starts "both of these incidents," that's
 9        the fourth sentence.
10                    MR. MOORE:  Read the entire paragraph.
11        Q    Take your time and read it if you want to.
12                    MR. MOORE:  Do you want an opportunity to
13             read the entire document?
14        A    No.  Okay.  I read it.
15        Q    The sentence I'm pointing you to, and if you
16        want to refer to other portions of the paragraph or of
17        the document please do, but I want to focus on this
18        sentence.  "That's why arrests were made and why student
19        conduct charges are being pursued."  So was that a
20        correct statement on December 10, 2019 that student
21        conduct charges are being pursued?
22                    MR. MOORE:  On December 10th, that's your
23             question?
24                    MR. HRUSKA:  That's the question.
25        A    I interpreted the word pursued as being in
```

Page 157

1    process, being evaluated.

2         Q    So I repeat my question.  Is that a correct

3    statement that student conduct charges are being pursued

4    as of December 10, 2019?

5         A    With the definition that pursued means an

6    investigation.

7         Q    And with the preface that the answer to the

8    question is yes and then your definition; is that

9    correct?

10        A    Yes.

11        Q    As of December 10, 2019 what was that process?

12   What was proceeding with respect to potential student

13   conduct charges?

14             MR. MOORE:  Objection.  I think this has

15        been asked and answered.

16        A    That the office of student conduct was still

17   doing an analysis of whether student conduct charges

18   should be stated, should be made.  Pursuing is I

19   interpret as investigating.  Not actually having made

20   the charge.  So the student conduct office was still

21   reviewing, but hadn't made the charges yet as of

22   December 10th.

23        Q    And when did that process that you just

24   described end?

25        A    I don't remember.

                                        Page 158

1          Q    Did it end in December 2019?

2          A    I don't remember.

3          Q    Did it end in January 2020?

4          A    I don't remember.

5          Q    Is it still going on?

6          A    I still don't remember.

7          Q    It might still be going on, they might still be

8     considering those student conduct charges?

9               MR. MOORE:  Objection.

10         Q    I want to know whether that's logically

11    possible.  Is it possible that the consideration of

12    student conduct charges with respect to the Laffer event

13    in November of 2019 is still ongoing at the University

14    of Binghamton?

15         A    I don't know.

16         Q    Is it logically possible that it might be?

17         A    I don't know.

18         Q    Can student conduct charges still be considered

19    after students have graduated?

20         A    I don't know.

21              MR. HRUSKA:  I want to turn to the next

22         document which is tab 19.  And I don't think this

23         has been previously entered so I'll label it

24         HS-11.  It's a document bearing sequential bates

25         numbers 244 through 262.

Page 159

1              (EXHIBIT HS-11 WAS MARKED FOR

2         IDENTIFICATION.)

3              MR. HRUSKA:  And it's an e-mail

4         correspondence at the top of which is an e-mail

5         from Tina Chronopoulos that has a Binghamton.edu

6         address to you.  The top e-mail is December 24th,

7         2019 and the original e-mail is December 23rd,

8         2019.

9    Q    Do you recall this correspondence with Miss

10   Chronopoulos?

11   A    Yes.

12   Q    Who is Miss Chronopoulos?

13   A    She is a professor.

14   Q    A professor at Binghamton?

15   A    Yes.

16   Q    And what do you recall about this

17   correspondence?

18   A    She wrote me asking if she could meet with me

19   on a topic that I don't remember and I said yes, we can

20   meet and I gave her some times and dates.

21   Q    If you read the e-mail she appears to be

22   requesting a meeting concerning the, some of the events

23   that we've been discussing including the tabling event.

24   Do you recall discussing that topic with her at this

25   time?

Page 160

```
 1        A    I remember meeting with her, but I don't
 2   remember the discussion.
 3        Q    You remember nothing about the substance of the
 4   discussion?
 5        A    No.
 6        Q    How frequently do you meet with Miss
 7   Chronopoulos?
 8        A    I had never met with her before.
 9        Q    Did she have any administrative role at the
10   university?
11        A    Not that I know of.
12        Q    And have you met with her since this meeting as
13   best you can remember?
14        A    I have been in the same location with her, but
15   we've never had another one-on-one meeting.
16        Q    Have you ever had a meeting even in a group
17   where you had a discussion directly with her that you
18   recall other than this instance?
19        A    I was at a lunch with her for an awards
20   ceremony and we had a lunch conversation, but other than
21   that no.
22        Q    And would it refresh your recollection to look
23   at this correspondence now that is HS-11?
24        A    This is the e-mail that she wrote to me?
25        Q    Yes.  Does that refresh your recollection at
```

Page 161

1      all?

2          A    Of the meeting?

3          Q    Yes.

4          A    No.

5                    MR. HRUSKA:  Let me move to the next

6               document.  I'll mark it HS-12 which is a document

7               at tab 20 bearing the bates numbers 413 through

8               415.  It's a letter signed by Kristina Johnson

9               and Harvey Stenger to Members of the Assembly

10              Minority Conference.

11                   MR. MOORE:  I don't think this one is

12              signed.  The next one is signed.  21 I believe is

13              the signed letter.  This one isn't signed.

14                   MR. HRUSKA:  Sometimes it's difficult to

15              tell with the reproduction.  And you know what,

16              given the substance of what I want to ask about

17              is identical between the two documents, I'll just

18              dispense with HS-12 and move directly to HS-13.

19                   MR. MOORE:  You still want to keep it as

20              HS-12?

21                   MR. HRUSKA:  Strike the earlier reference

22              to HS-12.  I'm now labeling as HS-12 a document

23              with bates numbers 416 through 418 which appears

24              at tab 21 in the book which is a letter signed by

25              Kristina Johnson and Harvey Stenger, January 2nd,

```
                                        Page 162
 1          2020 to Brian Kolb, Minority Leader, New York
 2          State Assembly.
 3                  (EXHIBIT HS-12 WAS MARKED FOR
 4          IDENTIFICATION.)
 5                  MR. MOORE:  Do you need a chance to read
 6          that, Harvey, so I can take a bathroom break?
 7          Off the record.
 8                  (OFF-THE-RECORD DISCUSSION.)
 9      Q    Do you recall this document?
10      A    Not really.
11      Q    Did you sign this document?
12      A    My electronic signature was put on it.
13      Q    Did you authorize the imposition of your
14      electronic signature on it?
15      A    Yes.
16      Q    Did you review the document before you signed
17      it?
18      A    I read it.
19      Q    Did you go through any process to verify the
20      accuracy of the statements in the document before you
21      signed it?
22      A    No.
23      Q    Do you typically go through such a process
24      before signing documents?
25      A    Yes.
```

Page 163

1        Q    Why did you not do so in this case?

2        A    It was written by my boss.

3        Q    And therefore you deferred to what your boss

4     wrote, correct?

5        A    Correct.

6        Q    And you didn't feel the need to check the

7     accuracy of it, correct?

8        A    Correct.

9        Q    In the document on the second page, which is

10     marked 417, there's a statement which is virtually

11     identical to the one that we were just looking at in

12     another document which says, and it's in a paragraph

13     starting "both of these incidents are deeply

14     disturbing."  You get four sentences in it says "that's

15     why arrests were made and why student conduct charges

16     are being pursued."  Do you know whether student conduct

17     charges were being pursued on January 2nd, 2020?

18        A    I don't recall.

19        Q    Do you know whether you had gone through any

20     process to determine whether that was in fact the case

21     as of January 2nd, 2020?

22        A    I don't recall.

23        Q    So your testimony is you permitted your boss to

24     sign a letter with a statement that you don't recall

25     whether or not had been verified?

```
 1          A    I don't recall.
 2          Q    I want to move ahead.  Following the Laffer
 3     event you've already testified that there was
 4     significant media attention to those, to the incident,
 5     correct?  Is that a fair characterization of your
 6     testimony, there was significant national media
 7     attention to the Laffer event?
 8                    MR. MOORE:  Objection.  I don't remember
 9          him testifying.
10          A    Significant national?  Those are subjective
11     terms.
12          Q    That's why I'm asking whether it's a fair
13     characterization.  If you don't think that's right, how
14     would you characterize it?  Was there some media
15     attention?
16          A    Some.
17          Q    Did you participate in any media statements
18     concerning those events?
19          A    We made statements.
20          Q    Did you personally make statements?
21          A    Other than the written statements?
22          Q    Other than the written statement, correct.
23          A    Not that I recall.
24          Q    Do you recall making any statements on a video,
25     media coverage of the Laffer event?
```

Page 165

1          A    I don't recall.

2                   MR. HRUSKA:  Let me direct your attention

3               to a document that is at tab 23 which I don't

4               know if it's been previously marked.  But if not,

5               I'll mark is HS-13.  It's an e-mail from Ryan

6               Yarosh to you on January 24, 2020 and its bates

7               number 431.  It's a single page.

8                   (EXHIBIT HS-13 WAS MARKED FOR

9               IDENTIFICATION.)

10         Q    Do you recognize this document?

11         A    No.

12         Q    Do you recall what appears to be some form of

13    interview that you participated in in which you made

14    these statements?

15         A    No.

16         Q    Having read these statements do you think they

17    accurately reflect your thoughts at the time in January

18    of 2020?

19                   MR. MOORE:  Take your time and read it

20               before answering any questions.

21         A    "I think we had protected students that were on

22    both sides at that point."  I agree with that.  "We have

23    policies on campus that if you expect to have a

24    counter-protest because of the content of something that

25    is happening, let us know so that we can be prepared."

Page 166

1        I agree with that.  "We were prepared for Dr. Laffer's

2        visit.  We had police in the room.  We had police

3        outside, undercover, plainclothes, as well as in

4        uniform.  As soon as that student stood up on the chair

5        with the bullhorn, police took action.  Had enough

6        police there to make as many arrests as necessary.  He

7        didn't give us a chance to do that."  Yes, that is

8        accurate.

9            Q    I want to focus your attention on the second to

10       last paragraph where you're quoted as saying "the

11       university had enough police there to make as many

12       arrests as necessary."  What information do you have

13       that supports that statement?

14           A    It was an assumption that I made.

15           Q    What is the basis for the assumption?

16           A    That I trust our police department to make good

17       decisions.

18           Q    So you don't actually know whether there were

19       enough police there to make as many arrests as

20       necessary, you in fact just assume that that was the

21       case, correct?

22           A    I had every expectation that was the case.

23           Q    But you don't have any actual information that

24       that was the case?  In other words nobody told you that

25       that was the case, correct?

Page 167

1                    MR. MOORE:  Objection.  Form of the

2           question.  I think he's answered it.  Go ahead.

3           Is the question did someone tell him that?

4                    MR. HRUSKA:  Yeah.

5                    MR. MOORE:  Did someone tell you that

6           information?

7      A     I don't remember.

8      Q     Do you recall meeting with Congressman Tom Reed

9    in January 2020 concerning the tabling and Laffer

10   events?

11     A     Yes.

12     Q     And what did you do to prepare for that meeting

13   with Congressman Reed?

14     A     I asked some people, I don't know who, who

15   should be involved in the meeting.

16     Q     And who was, who did you decide should be

17   involved in the meeting?

18     A     We decided that Brian Rose should join me and

19   that Darcy Fauci should participate in the event that he

20   was having with the students outside.

21     Q     And did you do anything in preparation for that

22   meeting to review the events and refresh your

23   recollection of what had happened two months before?

24     A     Nothing specific, no.

25     Q     Do you feel the events of November 2019 were

Page 168

1        fresh in your mind in January 2020?

2            A     I don't remember.

3                      MR. HRUSKA:   I would like to play for you

4                parts of an audiotape that were taken of that

5                meeting which are referenced in our complaint.   I

6                would be happy to play the entire audiotape for

7                you if that would help refresh your recollection,

8                but there are only specific segments of it that I

9                want to ask you about.   So I'll allow you right

10               now time to listen to the entire tape if that is

11               helpful, but from my perspective that's not

12               necessary since I want to focus on specific

13               passages.   So tell me how you would like to

14               proceed.

15                      MR. MOORE:   I believe, and I'll leave it up

16               to Harvey, but I believe Harvey has reviewed the

17               transcript.   And I'll state for the record that I

18               assume you're going to the transcript.

19                      MR. HRUSKA:   I'll use the transcript with

20               the acknowledgment that the transcript is only an

21               interpretive aid and it's the actual audiotape

22               which I reference in our complaint is what I'd

23               like to refer you to.   We're providing the

24               transcript as a convenience because it's helpful

25               to be able to follow along.

1           MR. MOORE:  Joe did this the other day with
2       Brian Rose.  We have no objection to you playing
3       portions of it.  If the witness needs an
4       opportunity to hear more or to consult the
5       transcript, I would ask that he be given the
6       opportunity to do that.  Is that okay with you?
7       You tell me or we can listen to the entire
8       recording now.  Do you want to take a break and
9       talk?  Why don't we do that.  Let me find out
10      what the witness wants to do.
11          MR. HRUSKA:  Absolutely.  Off the record.
12          (RECESS TAKEN.)
13          MR. MOORE:  The understanding is that we
14      have no objection to you playing portions of the
15      recording for purposes of refreshing the
16      witness's recollection.  We would only ask that
17      you point him to wherever the recording reflects
18      in the transcript so we can also look at that.
19          MR. HRUSKA:  That's exactly what I plan to
20      do.
21          MR. MOORE:  And I'll state for the record
22      that the transcript was marked as BR-8 I believe
23      at Brian Rose's deposition so we should give it
24      the same designation.
25          (MR. SAITTA LEAVES THE VIDEOCONFERENCE.)

Page 170

1               MR. HRUSKA:  So I'm going to play for you
2          an audio file that is referenced in our complaint
3          at footnote 29 from YouTube.  And the first
4          section that I'm going to play for you is
5          beginning at 8:53 in the file which corresponds
6          to page 12 of the transcript.
7               MR. MOORE:  Minute eight, seconds 53?
8               MR. HRUSKA:  Correct.  So if you go down to
9          line 17 of page 12 of the transcript that's where
10         I'm planning to start.  And I think I said before
11         the transcript is not perfect and it's really the
12         audio file which will govern here, but we're
13         providing the transcript as an interpretive aid.
14         So begin playing at 8:53.
15               (AUDIO FILE PLAYED.)
16               MR. HRUSKA:  All right.  Stopping the audio
17         file at 10 minutes, 57 seconds which corresponds
18         to page 15, line one of the transcript.
19               MR. MOORE:  BR-8.
20               MR. HRUSKA:  BR-8.
21    Q    I know there were several voices that figured
22    in that audio recording, but is the main voice that is
23    speaking yours, President Stenger?
24    A    Yes.
25    Q    So on that tape in the conversation with

Page 171

1     Congressman Reed you make the statement that "we turned
2     to Mr. Laffer and said how long will you wait for us to
3     clear the room."  What's your source for that?
4          A     John Pelletier.
5          Q     Mr. Pelletier told you that in those words?
6          A     Yes.
7          Q     When did he tell you that?
8          A     I don't remember.  After the event and before
9     this meeting.
10         Q     Was that an oral conversation?
11         A     Yes.
12         Q     Did he also give you that information in
13    writing?
14         A     No.
15         Q     So solely oral?
16         A     Right.
17         Q     You then say, and this is at the bottom of page
18    12, top of page 13 in the transcript.  "He said to our
19    police officer ten minutes.  He then left."  In that
20    statement you are referring to the words that Mr.
21    Pelletier ascribed to Dr. Laffer; is that correct?
22         A     No.  I think I misspoke there.  Where is that
23    again?
24         Q     Bottom of page 12.  I'm just continuing with
25    the next sentence, bottom of page 12, top of page 13 in

```
1        the transcript.
2            A      "He said to our police officer ten minutes." I
3        misspoke there.
4            Q      Had you spoken correctly, what would you have
5        meant?
6            A      "He turned to Mr. Laffer and said how long will
7        you wait for us to clear the room," and I think what I
8        had heard from John Pelletier is not that.  I think what
9        I heard from Mr. Pelletier was we had asked him could he
10       wait ten minutes and he said yes.
11           Q      So just to be precise what you mean is that Mr.
12       Pelletier had asked Mr. Laffer to wait 15 minutes?
13           A      Right, right.  And that he said yes to him.
14           Q      And Dr. Laffer responded orally to Mr.
15       Pelletier yes?
16           A      Correct.
17           Q      And that's what Mr. Pelletier told you?
18           A      That's what I recall Mr. Pelletier telling me,
19       yes.
20           Q      You also make the statement, and this is at the
21       bottom of that carryover paragraph top of page 13, and
22       I'm able to fix the transcript somewhat because I just
23       listened to the recording, "but we had enough police
24       there to make as many arrests as necessary in order to
25       have that talk go off."  Do you recall making that
```

Page 173

1      statement?

2           A    Yes.

3           Q    And what was your source for that statement?

4           A    My belief that the police had organized enough

5      police representatives to make this happen.

6           Q    Is that also based on an oral statement from

7      Mr. Pelletier?

8           A    No.

9           Q    Was there some other source?

10          A    No.

11          Q    This is just your assumption again based on?

12          A    My belief that he was doing his job properly.

13          Q    Did you ever ask Mr. Pelletier that question

14     whether there were enough police there to make as many

15     arrests as necessary?

16          A    I don't remember.

17          Q    Did you ask after your meeting with Congressman

18     Reed whether that was in fact an accurate statement?

19               MR. MOORE:  Objection.  I think that was

20          asked and answered.

21          A    I think the, I think the how long it would take

22     was unknown.

23          Q    That's not the question I'm asking.  The

24     sufficiency of the police presence is the question.

25     Enough police there to make as many arrests as necessary

```
                                                  Page 174
 1        in order to have that talk go off.
 2                    MR. MOORE:  What's the question?
 3        Q    Whether he had asked Mr. Pelletier after the
 4   meeting with Congressman Reed whether that statement was
 5   accurate?
 6                    MR. MOORE:  Did you make that inquiry to
 7            Pelletier?
 8        A    No.
 9        Q    That's the answer.  And carrying on on page 13
10   of the transcript you say "that morning on the phone I
11   spoke with everybody that was going to be there and I
12   said we're making arrests until we get that room
13   cleared."  Do you recall making that statement to
14   Congressman Reed?
15        A    Yes.
16        Q    Do you recall making a statement in substance
17   to that effect to a group of university officials before
18   the Laffer event?
19        A    Similar.
20        Q    And was the substance of the statement that you
21   had made at that time before the Laffer event that the
22   university police should make arrests until the room was
23   cleared?
24        A    Yes.
25        Q    And did the university police say that they
```

Page 175

1        would execute on that direction?

2             A     I don't remember.

3             Q     You next state "he didn't give us a chance to

4        do that unfortunately."  Are you referring to Dr.

5        Laffer?

6             A     Yes.

7             Q     And is your point that Dr. Laffer did not give

8        the police enough chance to carry out sufficient arrests

9        to clear the room so as to allow the talk to go off?

10            A     Yes.

11            Q     Okay.  At the top of page 14 in the first, at

12       lines two and three you state "the room was filled with

13       policeman.  They weren't in uniform."  Is it correct

14       that university police or at least some university

15       police I should say were present at the event and not in

16       uniform?

17            A     I believe that is accurate.

18            Q     And is your source on that again Mr. Pelletier?

19            A     No.

20            Q     What's your source?

21            A     That I assumed that Chief Pelletier was

22       performing his duty appropriately.

23                       MR. HRUSKA:  All right.  I'm going to play

24            another section.  I'm going to skip ahead to page

25            40, line 21 which corresponds to 30 minutes, 25

Page 176

```
1               second on the tape.
2                    (AUDIO FILE PLAYED.)
3      A    Can you stop that for a second?  I don't know
4      where we are.  I'm at the wrong page.
5      Q    Page 40, line 21.
6      A    But that is Brian Rose speaking.
7      Q    Okay.
8               MR. MOORE:  I think that was established at
9           the prior deposition.
10              MR. HRUSKA:  The transcript may be
11          inaccurate.
12              MR. MOORE:  That was clarified at --
13              MR. HRUSKA:  That's fine.  I still would
14          like you to listen.
15     A    I just wanted to know where we were.
16              MR. HRUSKA:  That's fine.
17              MR. MOORE:  So we're right about here.
18     Q    You want me to start from the beginning of the
19     segment?
20     A    Yeah.
21              MR. MOORE:  And where are we on the
22          recording?
23              MR. HRUSKA:  30 minutes, 25 seconds.
24                   (AUDIO FILE PLAYED.)
25              MR. HRUSKA:  Let me stop there at 31
```

```
 1              minutes, two seconds.
 2         Q    So you at that point heard a voice which you've
 3    identified as Mr. Rose make a statement.  Do you recall
 4    him making that statement during the meeting?
 5         A    Yes.
 6         Q    And in that statement he says "we can't
 7    tolerate action by the Student Association which
 8    ultimately receives their dollars through the state
 9    process."  And before that he says "we have a
10    responsibility to insure that, you know,
11    constitutionally protected rights of all of our students
12    are in fact protected."  Mr. Rose is stating that the
13    university has control over the Student Association,
14    correct?
15              MR. MOORE:  Objection.  That's not what it
16         says.  Is there a question?  Is that the
17         question?
18         Q    That's the question.  Is that correct?
19         A    Control.
20         Q    Well, he said "he can't tolerate action by the
21    Student Association which ultimately receives their
22    dollars through the state process."
23         A    Where does it say that?
24         Q    On lines five through eight on page 41 in the
25    transcript.
```

Page 178

```
 1              MR. MOORE:  Are you asking him to interpret
 2         someone else's comments?
 3     A    I can't comment on his statement.
 4     Q    Do you recall, you said you recalled hearing
 5     him make that statement at the time, correct?
 6     A    Yes.
 7     Q    Did you disagree with the statement?
 8     A    Did I then?
 9     Q    Yeah.
10     A    I didn't say anything.
11     Q    Did you hold your tongue because for whatever
12     reason, but you nevertheless disagreed with it?
13     A    Well, "we can't tolerate which ultimately
14     receives their dollars through the state process," he
15     hasn't said anything.  He said "we can't tolerate
16     action" and then he says "which ultimately receives
17     their dollars through," but he hasn't said what he would
18     do with that information so I don't think he's made a
19     statement of action at all.
20     Q    And do you think that the university has the
21     ability to withhold funding from the Student Association
22     if the Student Association is engaged in conduct that
23     the university cannot tolerate?
24     A    I don't know.  It's never been tested.
25              MR. HRUSKA:  Let me keep playing here.  I'm
```

```
                                        Page 179
 1          going to start again at 31 minutes, two seconds.

 2                  (AUDIO FILE PLAYED.)

 3                  MR. HRUSKA:  Stopping at 31 minutes, 41

 4          seconds.

 5      Q    So here Mr. Rose is talking about intervention

 6      by the university in the activity of the Student

 7      Association, correct?

 8      A    Correct.

 9                  MR. MOORE:  The statement speaks for

10          itself.

11      A    Correct.

12                  MR. MOORE:  I mean he said what he said.

13      Q    And did you agree with that statement at the

14      time it was made?

15      A    I didn't have any basis to agree or disagree

16      with it because I was not there during this case that he

17      is talking about.

18      Q    What about the principle that he invokes "that

19      we would intervene precisely the same way if the scale

20      or nature of their response was unfair or, you know,

21      ultimately violated your rights as students to organize

22      consistent with all the regular rules and regulations of

23      both the university and the SA."

24                  MR. MOORE:  Objection.  What's the

25          question?
```

```
                                                    Page 180
 1          A    I can't agree or disagree because there is no
 2     statement in here to agree or disagree with.
 3          Q    Well, you have a congressman who is asking
 4     questions about the activity of the state university.
 5                    (MR. SAITTA RETURNS TO VIDEOCONFERENCE.)
 6          Q    And someone who reports directly to you is
 7     responding to him telling him that the university has
 8     the ability to affect the actions of the Student
 9     Association.  Isn't that what's going on here?
10          A    He's saying what he said is that "we can't
11     tolerate action by Student Association which ultimately
12     receives their dollars through the state process."  That
13     doesn't say what he would do.
14          Q    Well, he talks about a historical example where
15     he says the university did intervene.
16          A    What did they do?
17          Q    And then he promises the congressman that they
18     would intervene if necessary.
19                    MR. MOORE:  Objection to counsel's
20               characterization of what Rose meant.  Rose has
21               testified on this.  So if you have a question for
22               President Stenger.
23          Q    Well, what did you understand by this exchange?
24     Did you understand what Mr. Rose was talking about?
25          A    Yes.
```

Page 181

1          Q     What did you understand by it?

2          A     That we tried to keep a good relationship

3     between us and the Student Association.  That we would

4     work with them and advise them to take the appropriate

5     actions.  What Brian is saying here is that we would, we

6     would do something to them more severe than just giving

7     them advice and letting them reject our advice.  And I

8     am not sure that he is correct.  If he was to be asked,

9     he is not being asked, whether or not there are any

10    actions that the university could take against the

11    Student Association with regards to their funding, I do

12    not know whether that is true or not.  Whether that is

13    an allowable action by us in the State University of New

14    York system.

15         Q     It sounds as though you are somewhat skeptical

16    that it is allowable; is that correct?

17         A     I would say that doing it would probably be a

18    bad idea to even try to do it because again we're trying

19    to create a relationship between the students,

20    administration, faculty that is collaborative, not in

21    controversy.  To do this would have said you've lost all

22    chance to work closely with your Student Association.

23    But he is not saying that.  Nowhere in here does he say

24    I'm going to take their funding away.  He doesn't say

25    that.

Page 182

```
 1        Q    Well, he seems to be saying something that he
 2    ascribed significance to because he is raising it with a
 3    congressman who is asking some very pointed questions.
 4    What he seems to be saying is that the university has
 5    the opportunity to intervene in some meaningful way in
 6    the operation of the Student Association.
 7                  MR. MOORE:  Objection.  That is not a
 8             question.  It's your interpretation of this
 9             document.  It's not an appropriate vehicle for a
10             deposition.  If you have a question, ask the
11             witness a question.
12        Q    My question is did you address this issue after
13    the meeting with Mr. Rose to properly understand what it
14    was he was saying on this point?
15        A    I don't remember.  The word intervene could
16    mean a lot of things.  It could mean let's sit down and
17    have a really good conversation with them, Harvey.
18    Let's see if we can convince them.  That's an
19    intervention.
20        Q    And that might be a good reason to raise it in
21    a conversation with Mr. Rose, but your testimony is you
22    don't recall having such a conversation, correct?
23                  MR. MOORE:  Objection to form.
24        A    No, I didn't raise it here.
25                  MR. HRUSKA:  Let me take a minute and go
```

Page 183

1            off the record and see whether I have any further

2            questions.

3                    (OFF-THE-RECORD DISCUSSION.)

4       EXAMINATION BY

5       MR. SAITTA:

6            Q    Dr. Stenger, I'm Tom Saitta.  I'm representing

7        the Student Association in this matter.  I'll ask you

8        just to abide by the same rules that were discussed

9        before about answering and I'll try not to repeat what's

10       already been asked of you.

11                   MR. SAITTA:  Can we take a five minute

12            break?  I'm getting a call I absolutely need to

13            take.

14            A    No.

15                   MR. MOORE:  Tom, we're here for the

16            deposition now.  We all have a long way to drive.

17            Q    In one of the, I think it was tab two of the

18       exhibits on page 1234 you reference the Student

19       Association issues or concerns.  What Student

20       Association issues did that involve?

21                   MR. MOORE:  You're talking about Exhibit

22            HS-2 at page 1234 three quarters of the way down

23            the page?

24                   MR. SAITTA:  Yeah.

25            Q    "I'd like to charge Brian and Greg with the

```
1      task of determining the next steps.  This is a
2      communications, student conduct and Student Association
3      issue."  What does Student Association issue mean in
4      that context as you understand it?
5                 MR. MOORE:  I'll object simply to the
6            extent that Mr. Hruska had already asked that
7            question and an answer was given, but go ahead.
8            I mean, Tom, that was asked and answered, but if
9            you have a follow up.
10     Q    All right.  Let me ask it to you this way.  Did
11     the Student Association issue involve the Student
12     Association's decision to charge the College Republicans
13     with a tabling sanction?
14     A    That was part of it.
15     Q    And did it also involve the Student
16     Association's decision not to charge the College
17     Progressives for inciting the Laffer incident?
18     A    Yes, I believe so.
19                 MR. HAYDEN:  Can we note for the record
20            that he is referring to an e-mail that was sent
21            before the Laffer event?
22                 MR. MOORE:  Yeah, Tom, this is a November
23            16th e-mail.  This has nothing to do with the
24            Laffer event.  The Laffer event hasn't happened.
25                 MR. SAITTA:  Okay.  Got you.
```

1      Q     You also talked about the outdoor space

2      reservation policy of the university in terms of

3      reserving space for tabling.  That's a function for the

4      university, not the Student Association, correct?  Let

5      me ask it this way.

6      A     I don't know.  I don't know, Tom.

7      Q     Let me ask it this way.  If you don't know,

8      that's fine.  When a student organization wants to

9      reserve a space to table, that gets approved by the

10     university as opposed to the Student Association or

11     don't you know?

12     A     I don't know.

13     Q     All right.  And in terms of the letter that has

14     been discussed as the smoking gun in Mr. Rose's

15     communication before, do you have any personal knowledge

16     as to whether or not that letter was either generated or

17     approved or disseminated by the College Progressives?

18     A     I do not know the answer to that.

19     Q     Okay.  So you don't have any knowledge if I

20     understand what you're saying as to that, as to whether

21     the Progressives actually were involved in generating or

22     disseminating that letter?

23                    MR. MOORE:  Asked and answered.

24     A     Don't know.

25     Q     You don't know if you have any knowledge or you

Page 186

1      don't have any knowledge I guess is what I'm getting at?

2          A    I don't have any knowledge.

3          Q    Okay.  Thanks.  That's what I needed to know.

4      Has anybody ever provided you, other than the letter

5      that has been referred to as the smoking gun has anybody

6      ever provided you any other evidence that the College

7      Progressives were involved in inciting the protests that

8      occurred at the Laffer speech?

9          A    I don't, I don't know.  I don't recall.

10         Q    So you don't recall seeing any other evidence?

11         A    No.

12         Q    And with respect to the sanctions that the SA,

13     Student Association can impose on a student

14     organization, to do that is it your understanding that

15     they have to have proof that more than just a student

16     was involved, that it has to be the organization itself

17     that is either approving or sanctioning the conduct?

18         A    I don't know their rules that well.

19         Q    Would you at least, would you agree that there

20     is a difference between one student who is a College

21     Progressive causing a problem as opposed the College

22     Progressives as a group creating a problem?

23         A    I think that would be up to the Student

24     Association.  I don't know what the rules are.

25         Q    Okay.  Did you ever have any discussions with

1          the Student Association officers or employees regarding

2          sanctioning the College Progressives over the Laffer

3          event or the tabling event?

4                A    I never had a conversation with them about it.

5                Q    And did you ever have any conversations with

6          any SA officers or employees regarding lifting the

7          sanction against the College Republicans for the tabling

8          violation?

9                A    Again I was not part of the conversation, but I

10         was in the room when the conversation occurred between

11         Brian Rose and the SA leadership.

12               Q    And when Brian Rose raised it, did he direct

13         the Student Association to lift the sanction against the

14         College Republicans?

15               A    I don't recall.

16               Q    And do you recall whether or not he directed

17         the Student Association to charge the College

18         Progressives?

19               A    I don't recall.

20               Q    Did you have any opinion whether or not the

21         Student Association should have charged the College

22         Republicans?

23               A    No.  I don't have an opinion on that.

24               Q    And in the student conduct charges that you

25         were referring to, those are through the university as

```
                                                Page 188
 1        opposed to the Student Association; is that correct?
 2             A    The term student conduct implies the student
 3        conduct process of the university.
 4             Q    Okay.  And that is different than the Student
 5        Association bringing a disciplinary action against a
 6        group, correct?
 7             A    Yes.
 8                  MR. SAITTA:  All right.  Those are all the
 9             questions I have for you.  Thank you.
10                  MR. HRUSKA:  I just have one more question.
11        REEXAMINATION BY
12        MR. HRUSKA:
13             Q    The question is whether this refreshes your
14        recollection.  Two days ago Mr. Rose testified that in
15        the context of the consideration of arrests following
16        the Laffer event, of students following the Laffer event
17        that Darcy Fauci told him that you had expressed a
18        desire to avoid arrests if possible.  Does that refresh
19        your recollection?
20             A    Yes.
21             Q    What do you remember about it?
22             A    It sounds accurate.
23             Q    So you did in fact tell Ms. Fauci to tell
24        others that you wanted to avoid arrests of students
25        following the Laffer event?
```

```
                                                    Page 189

1            A    I don't remember.

2            Q    But if that statement sounds accurate, what do

3       you base your recollection on if you don't remember?

4       I'm just trying to understand what is the full set of

5       your recollection.

6            A    It's partial recollection.

7            Q    And is it anything other than what I just said

8       in that you stated sounded accurate, is there anything

9       more to the memory than that?

10           A    Well, again I'm saying it sounds like me, but I

11      don't remember saying it.

12                    MR. HRUSKA:  Okay.  That's it.

13                    THE REPORTER:  I just need to get orders on

14            the record, orders for the transcript.  Are you

15            splitting, Mr. Saitta?

16                    MR. SAITTA:  I'm splitting, yes.  And I'll

17            just need a PDF.

18                    THE REPORTER:  Are you going to want it

19            expedited?

20                    MR. SAITTA:  No, that's okay.

21                    MR. MOORE:  We'll get our copy from

22            plaintiff's counsel for review.  He's going to

23            send it to us for the witness to review and sign

24            and we can take that as a PDF.

25                    MR. HRUSKA:  PDF.
```

Page 190

1            MR. MOORE:  The original to us and we'll

2        have that signed and sent.

3            MR. HRUSKA:  As opposed to hard copy which

4        would be awkward.  So PDF is fine.

5            THE REPORTER:  And you want it expedited

6        for 3/1?

7            MR. HRUSKA:  Yes.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 191

1                    CERTIFICATE OF REPORTER

2

3         I, Delores Hauber, hereby certify:

4

5         That the foregoing proceedings were taken before me

6    at the time and place therein set forth;

7

8         That the proceedings were taken down stenographically

9    by me and thereafter formatted into a full, true, and

10   correct transcript of same;

11

12        I further certify that I am neither counsel for nor

13   related to any parties to said action, nor in any way

14   interested in the outcome thereof,

15

16        DATED this 28th day of February, 2023,

17

18

19        _____

20         DELORES HAUBER

21         Shorthand Reporter

22

23

24

25

```
                                              Page 192

 1    John Moore, Esq.

 2    john.moore@ag.ny.gov

 3                        February 28, 2023

 4    RE:    Young America'S Foundation v. Stenger Et Al.

 5         2/24/2023, Harvey Stenger (#5777614)

 6         The above-referenced transcript is available for

 7    review.

 8         Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com.

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                      Yours,

23                      Veritext Legal Solutions

24

25
```

Page 193

1    Young America'S Foundation v. Stenger Et Al.

2    Harvey Stenger (#5777614)

3                E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Harvey Stenger                                Date

25

Page 194

1    Young America'S Foundation v. Stenger Et Al.

2    Harvey Stenger (#5777614)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Harvey Stenger, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Harvey Stenger                      Date

13   *If notary is required

14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                   _____ DAY OF _____, 20___.

16

17

18                   _____

19                   NOTARY PUBLIC

20

21

22

23

24

25

## &

**&**   2:2,13

## 1

**1**   4:4 42:15,17
  42:25 43:7
  55:12
**1/2/20**   4:18
**10**   4:14 34:3,4
  134:2,3 149:5
  156:20 157:4
  157:11 170:17
**100**   91:15,16
**10036-2601**   2:4
**104**   4:10
**1065**   65:9,13
**1067**   74:18
**1068**   65:21
**1070**   65:13
**10th**   155:25
  156:22 157:22
**11**   4:16 150:2
  158:24 159:1
  160:23
**11/15/19**   4:4
**11/20**   4:7,8,9
**11/21/19**   4:10
**11/22/19**   4:13
**11/27/19**   4:15
**116**   4:11
**118**   4:13
**1185**   2:3
**12**   4:18 161:6
  161:18,20,22
  161:22 162:3
  170:6,9 171:18

171:24,25
**12/23/19**   4:17
**12/24/19**   4:17
**12224**   2:8
**1232**   55:10
**1233**   55:5
**1234**   57:8
  183:18,22
**1235**   55:10
**12:11**   65:22
  66:6
**13**   4:20 161:18
  165:5,8 171:18
  171:25 172:21
  174:9
**134**   4:15
**13901**   1:22
**13902**   2:14
**13903**   7:11
**14**   122:11
  175:11
**142**   76:12
  81:14
**144**   76:21
**145**   76:12,21
**14th**   9:6 10:1
  40:7 55:21
**15**   54:10
  170:18 172:12
**159**   4:17
**15th**   42:9 43:8
  43:11
**16**   133:24
**162**   4:19

**165**   4:21
**16th**   55:18
  116:4 184:23
**17**   150:1
  155:18 170:9
**177**   97:17 98:1
**18**   105:21
  106:9 119:18
  141:7 155:13
**183**   3:5
**188**   3:6
**18th**   9:8 10:3
  55:22 65:23
  73:4 77:2
  82:11
**19**   158:22
**1979**   11:5
**1984**   11:6
**1:40**   67:21

## 2

**2**   4:5 54:21,22
  183:22
**2/24/2023**
  192:5
**2/24/23**   1:18
**20**   161:7
  194:15
**2006**   11:22,22
  12:4,6
**2012**   12:9 14:7
**2017**   33:16
**2019**   8:21,25
  9:2,6,8 10:2,3
  10:22 23:10
  25:17,22,23

26:3 31:19
33:2 37:22
40:7 43:8,11
54:10 55:18
64:3 104:1
105:21 106:9
106:15 111:16
112:7 116:4
118:18 122:16
122:18 134:9
134:14 136:17
136:20 137:2
137:17 139:7
150:11 155:18
156:1,20 157:4
157:11 158:1
158:13 159:7,8
167:25
**2020**   4:21
  158:3 162:1
  163:17,21
  165:6,18 167:9
  168:1
**2023**   10:21
  191:16 192:3
**206**   118:15
**20th**   84:24
  90:13 97:20
**21**   161:12,24
  175:25 176:5
**21st**   104:1
**225**   1:21
**22nd**   118:18
  122:15,18

**23** 165:3
**23521** 191:19
**23rd** 159:7
**24** 4:21 165:6
**244** 158:25
**24th** 159:6
**25** 31:4 32:2,3
32:11 175:25
176:23
**25th** 73:21
**26** 33:24 34:6
**262** 158:25
**263** 90:10
**264** 90:10
**27** 65:7,11
134:9 136:19
150:11
**273** 103:24
**274** 105:20
107:14
**276** 113:2
**28** 192:3
**280** 116:2
**283** 103:24
**28th** 191:16
**29** 170:3
**2nd** 161:25
163:17,21

**3**

**3** 4:6 76:5,6
**3/1** 190:6
**30** 5:8 175:25
176:23 192:17
**300** 40:25
47:21 48:2

**31** 176:25
179:1,3
**319** 133:25
**334** 136:14
**336** 141:4
**338** 145:11
149:5
**339** 133:25
**398** 150:1,4
**399** 150:1
**3:00** 1:20
**3:20** 1:7
**3rd** 128:8,13

**4**

**4** 4:7 84:20
85:1
**40** 175:25
176:5
**400** 150:5
**41** 34:13
177:24 179:3
**413** 161:7
**415** 161:8
**416** 161:23
**417** 163:10
**418** 161:23
**419** 155:15
**42** 4:4
**420** 155:25
**421** 156:4
**422** 155:15
**431** 165:7
**46** 2:14
**496** 116:22

**497** 116:22
**4:41** 77:1
**4:49** 78:3

**5**

**5** 4:8 32:16
96:16,17 150:7
**53** 170:7
**535.3** 32:14
**54** 4:5
**553** 84:21,22
**565** 122:13
**566** 122:16
**567** 122:13
**57** 170:17
**5777614** 192:5
193:2 194:2

**6**

**6** 3:4 4:9 65:8
74:12 97:16,21
122:12 124:12
**6:22** 90:13

**7**

**7** 4:10 103:23
104:3
**76** 4:6

**8**

**8** 4:11 32:15
116:20,23
155:16 169:22
170:19,20
**822** 1:7
**85** 4:7
**8:29** 55:18

**8:53** 170:5,14

**9**

**9** 4:12 31:14,15
31:23 118:14
118:21
**946** 7:10
**96** 4:8
**97** 4:9
**99** 85:19
**9:00** 1:19
**9:36** 78:14
79:12

**a**

**a.m.** 1:19 55:18
**abide** 183:8
**ability** 127:19
154:20 178:21
180:8
**able** 7:16 41:5
41:8 69:4
82:18 83:2
142:6 168:25
172:22
**above** 35:2,12
74:14 192:6
194:7
**absence** 123:17
**absolute** 86:19
101:2
**absolutely**
169:11 183:12
**academic** 13:9
13:11,22 139:1

**accept** 92:10
**acceptable**
  127:6
**accepted** 92:16
**access** 66:9
  102:18
**accommodati...**
  141:11,16
  142:3
**accommodati...**
  141:6
**accomplishm...**
  136:4
**accountable**
  98:12 100:1,3
**accuracy**
  162:20 163:7
  192:9
**accurate** 7:16
  8:6 50:15
  60:12 78:17
  139:5 166:8
  173:18 174:5
  175:17 188:22
  189:2,8
**accurately**
  165:17
**achieve** 69:11
  95:24
**acknowledge**
  38:9
**acknowledge...**
  194:3
**acknowledg...**
  168:20 192:12

**act** 69:22
**acted** 24:12
  52:22 93:8
**action** 1:7 35:2
  35:12 39:1
  41:19 50:9
  53:20 60:25
  72:14,24 73:17
  88:2 100:6
  101:13 107:17
  125:23,24
  126:3,4,25
  128:8 129:7,8
  129:9 132:2,10
  166:5 177:7,20
  178:16,19
  180:11 181:13
  188:5 191:13
**actions** 39:7,17
  39:23 60:24
  61:24 69:1,17
  82:12 94:3
  100:17 113:13
  113:15,18,22
  114:2 127:1
  180:8 181:5,10
**actively** 114:8
**activities** 20:19
  85:14
**activity** 93:20
  94:17 108:9
  115:20 125:16
  138:24 139:10
  179:6 180:4

**actual** 166:23
  168:21
**actually** 31:2
  36:20 40:15
  55:3 76:13
  78:15 97:15
  108:16 122:5
  137:12 142:11
  157:19 166:18
  185:21
**add** 71:9
**addition** 65:7
  83:6
**additional**
  74:14 131:17
**additions** 194:6
**address** 7:8 9:9
  70:21 119:2,6
  159:6 182:12
**addressed**
  156:1
**addressing**
  94:8
**adequacy**
  83:23
**adhere** 120:24
**adherence** 14:1
**adjacent** 108:1
  108:3,8 109:1
  141:10,14,18
  142:2,12
**administrating**
  12:25
**administration**
  12:19 26:22

27:1,8,11,12
  29:15 72:6
  116:10 131:19
  181:20
**administrative**
  12:14 16:7
  113:3 160:9
**administrator**
  11:13
**adopt** 43:16
  117:17
**adopted** 44:11
**advance** 8:20
  8:24 83:22
  84:14,16
  116:12 129:1
  136:14
**advertising** 9:5
**advice** 20:5,6,6
  20:9,10,11,15
  20:22,24 21:24
  24:7,10 27:7
  122:25 181:7,7
**advise** 28:24
  121:6 135:24
  181:4
**advised** 23:25
  24:15 109:14
**advisor** 16:6
**advisory** 21:22
  127:25 134:24
  135:8
**advocacy**
  134:24

**affairs** 1:10 21:16 22:7,9 58:11 60:23 61:7,9 138:5
**affect** 180:8
**affirm** 45:16
**aftermath** 113:2 117:14 123:11
**afternoon** 66:14 70:13 73:3 77:2 82:10
**ag.ny.gov** 2:9 2:10 192:2
**aggressive** 48:21 49:1 50:9 51:14,17
**aggressively** 52:4
**aggressiveness** 49:3 51:24
**ago** 17:8,8 21:1 70:4 74:12 92:1 112:3 120:10 188:14
**agree** 124:3 133:11 165:22 166:1 179:13 179:15 180:1,2 186:19
**agreed** 5:3,6,10 5:13,16 34:21 34:25 35:10 140:8

**agreeing** 140:9 149:8
**agrees** 35:14
**ahead** 103:10 133:23 164:2 167:2 175:24 184:7
**ahruska** 2:5
**aid** 168:21 170:13
**aids** 37:12
**ailaw.com** 2:15
**aims** 138:24 139:10
**airport** 67:19 68:6 75:8
**al** 34:11 192:4 193:1 194:1
**albany** 2:8
**alcohol** 100:21
**alert** 37:15
**align** 88:25
**allies** 131:18
**allotted** 192:20
**allow** 26:10 144:15 168:9 175:9
**allowable** 181:13,16
**alum** 83:12 85:8 118:9
**alumni** 137:20 138:5
**alumnus** 98:5

**amanda** 2:10 6:12
**amanda.kuryl...** 2:10
**amendment** 14:2 18:24 19:19 20:7,15 20:23 33:18 34:18 37:7,24 38:11 39:6,18 39:20,25 46:22 51:1 52:16,23 53:5,15,16,21 53:23 54:4,12 68:14,16 72:17 82:12 83:9 93:20 153:14
**america's** 1:4 6:5 7:3 152:13
**americas** 2:3
**america's** 192:4 193:1 194:1
**amount** 84:6 105:8 130:6,13
**amy** 23:8
**analysis** 157:17
**andrew** 2:4 6:4 81:9 124:15
**angry** 78:22
**announced** 113:18
**annually** 135:12

**answer** 8:1,10 8:17 9:14 12:22 14:5 18:6,15 20:4 25:7 26:9 28:5 33:21 36:9 38:2 41:22 47:4 53:1,9 54:2 61:3 72:8 80:25 89:9 93:24,25 109:3 112:6 115:7,8 115:17 120:22 127:4,4 130:9 151:20,23 157:7 174:9 184:7 185:18
**answered** 37:2 41:21 49:7 54:16 71:2 72:7 81:6 84:15 86:6 109:2 116:18 127:13 132:24 151:17,19,22 155:11 157:15 167:2 173:20 184:8 185:23
**answering** 165:20 183:9
**answers** 7:20 14:17 61:2 82:15 109:11 138:1

| | | | |
|---|---|---|---|
| **anticipating** 99:18,18 | **applies** 32:15 | **area** 40:21 136:3 | 166:12,19 172:24 173:15 |
| **anybody** 41:24 42:3 44:1,3,14 46:8 56:19 61:9,17 70:16 73:11 87:16 116:9 186:4,5 | **appointed** 134:23 | **argument** 100:16 | 173:25 174:12 174:22 175:8 188:15,18,24 |
| | **approach** 67:17 68:4 92:5 94:2,8,16 113:13 | **array** 15:1 | **arrive** 65:1 |
| | | **arrest** 27:7,15 27:18,22,22 28:12,13,16,20 28:25 29:5,18 69:19,21,25 70:19 71:7,10 72:10,16 74:7 74:8 80:13 83:16 91:14 101:13,17,18 101:24 128:7 130:18 131:16 | **arrived** 142:5 |
| **apologies** 84:17 89:23 119:17 | **appropriate** 5:18 21:10 23:25 45:5,9 45:23 46:3,10 46:12,13,16 51:23 52:1,2,9 52:10,13 59:1 59:3,5 63:18 69:1,9 84:5 87:22 102:18 139:3,16 140:12 142:3 144:1 181:4 182:9 | | **arrives** 67:20 |
| | | | **arthur** 78:21 98:25 |
| **apologize** 90:10 119:24 120:18 136:23 | | | **ascended** 18:22 |
| | | | **ascribe** 140:10 |
| **apology** 118:17 119:20 120:3,4 120:5,8,15 | | | **ascribed** 153:17 171:21 182:2 |
| **appeal** 95:18 | | | **aside** 89:3 |
| **appear** 78:15 | | **arrestable** 100:23 | **asked** 9:16,17 9:18,19 28:24 37:2 41:21 54:16 69:18 71:2 72:7 81:5 82:3 84:15 86:6 94:14 109:2 116:18 122:25 127:13 132:24 144:15 146:18 151:17 155:11 157:15 167:14 172:9 172:12 173:20 174:3 181:8,9 183:10 184:6,8 185:23 |
| **appearances** 2:1 | | **arrested** 29:13 73:9,11 80:6 80:11,19,21 88:7,10,15 89:4 91:13 100:8,12,21 101:5,7,23 128:7 145:23 145:25 146:1,1 | |
| **appearing** 2:11 2:16 | **appropriately** 100:11 175:22 | | |
| **appears** 37:15 77:8 78:19 91:21 98:23 104:15 106:19 126:2 159:21 161:23 165:12 | **appropriaten...** 46:7 92:25 | | |
| | **approve** 135:13 135:17 | | |
| | **approved** 185:9,17 | | |
| **appended** 194:7 | **approves** 60:4 | **arrests** 26:20 26:23 29:3 70:24 72:19 73:2,5,19,24 74:2,4,10 83:6 156:6,18 163:15 166:6 | |
| **applicable** 192:8 | **approving** 186:17 | | |
| **applied** 11:15 11:19 12:17,20 23:21 49:5 | **approximately** 15:23 43:21,22 | | **asking** 10:14,19 12:24 21:15 |

38:20,22 39:11
48:18 51:18
52:5,8 54:1,7
57:12 62:5
64:21 67:13
68:3 72:1
75:12 78:2,3
84:7 86:3 89:8
93:22,24 94:15
95:9 109:8
112:13 114:4
117:6 122:7
124:21,22
125:20 126:23
140:5 142:13
142:15,24,25
143:2 146:19
147:2,4,6,24
148:1 152:1,3
153:8 154:2
159:18 164:12
173:23 178:1
180:3 182:3
**aspect** 47:13
48:2
**aspects** 47:2
**assembly** 9:9
156:1 161:9
162:2
**assemblyman**
62:16,21,24
63:1
**assertion** 89:8
**assess** 139:20
140:24 150:18

151:14
**assessment**
86:11 140:15
151:2
**assignable** 88:1
**assigned**
112:15
**assigning**
150:21
**assistant** 2:7
16:7
**associate** 11:13
25:23
**associated**
117:11 121:1
**association**
1:13 2:16 6:16
20:20 58:6
59:21,23 60:5
60:11,16
126:10 127:3
127:10,14,20
127:24 128:1
153:22 154:6
154:11,19
177:7,13,21
178:21,22
179:7 180:9,11
181:3,11,22
182:6 183:7,19
183:20 184:2,3
184:11 185:4
185:10 186:13
186:24 187:1
187:13,17,21

188:1,5
**association's**
184:12,16
**associations**
60:14
**assume** 13:21
99:14 126:14
166:20 168:18
**assumed** 84:9
175:21
**assuming**
100:16
**assumption**
166:14,15
173:11
**assurance**
114:25
**assure** 69:8
**aswad** 2:13
**attached** 113:6
192:11
**attaches** 99:9
122:16
**attachment**
123:15
**attempt** 88:5
110:5
**attempted** 9:9
**attempts** 89:12
89:14
**attended**
129:17
**attendee** 69:13
69:14

**attendees** 110:6
110:14 144:15
**attending** 69:3
**attention** 28:17
31:2 34:15
35:6,7 47:15
48:8 49:21
50:3 54:19
55:3 57:16,23
84:19 107:24
123:14 130:7
130:13 164:4,7
164:15 165:2
166:9
**attorney** 2:7,7
6:9,13 20:13
146:14,15
192:13
**attorneys** 2:3,5
2:13 5:4 35:1
35:11
**attribute**
125:12
**audience** 88:16
**audio** 170:2,12
170:15,16,22
176:2,24 179:2
**audiotape**
168:4,6,21
**auditor** 16:5
**august** 11:22
12:6
**author** 139:23
140:6

**[authority - binghamton]** Page 7

**authority** 18:7
22:15 26:17,20
26:22 60:3
71:19,21 72:10
94:13
**authorize**
162:13
**authors** 105:22
106:11
**authorship**
124:21
**autonomous**
154:20
**availability**
108:3
**available**
144:10 192:6
**avenue** 2:3 7:10
**avoid** 125:23
188:18,24
**award** 19:15
**awards** 160:19
**aware** 24:25
28:22 29:25
30:3,10,17
33:8,16 38:3
40:12 42:19
73:4,23 81:20
82:1,2,2 91:16
108:15 118:11
136:25 137:4,9
148:12 149:12
**awkward** 190:4

**b**

**b** 4:1 91:4
123:19
**back** 10:24
31:3,12 32:7
36:21 37:10
38:8 54:14
55:2 74:11
76:3 84:18
87:8 90:7
103:6 123:5
137:12 151:2
155:4
**background**
6:25 10:25
11:9 105:21
**bad** 29:8,11,14
29:18 87:11
96:4 181:18
**balance** 39:24
**balanced**
126:25
**barry** 111:24
**base** 76:25
102:2 189:3
**based** 28:16
41:19 75:5
77:13 132:22
142:16 147:7
173:6,11
**basis** 49:19
144:2,6 149:14
166:15 179:15
**bates** 55:9,12
57:8 65:9

76:12,20 84:21
90:9 97:17,25
103:23 116:22
118:15 122:13
133:25 155:14
158:24 161:7
161:23 165:6
**bathroom** 43:1
162:6
**battle** 87:4
**bearing** 76:11
103:23 133:24
158:24 161:7
**bears** 65:8
84:21 118:15
122:13
**beginning**
34:19 35:9
37:21 65:19
66:3 67:16
122:16 147:3
150:15 170:5
176:18
**begins** 44:22
55:4 58:1
**behalf** 6:13
121:22
**behaving** 52:4
**behavior** 139:2
139:24 140:25
**behavioral**
140:12
**behaviors**
145:15,20
147:11,15,24

148:2,18
**belief** 173:4,12
**believe** 27:16
31:6 52:21
76:8,10 81:5
90:2 103:16
114:15 119:14
124:9,17 128:4
134:5 136:21
137:8 151:4
161:12 168:15
168:16 169:22
175:17 184:18
**believes** 132:18
**benner** 104:23
**best** 15:14,16
68:17 83:1,21
109:15,22
110:2 154:22
160:13
**better** 105:13
105:13 122:4
150:20
**beyond** 41:11
47:2 48:10
130:16 141:1
**big** 138:6
**binder** 31:3
33:24 42:14
65:6 76:3
122:12
**binding** 36:4
**binghamton**
1:4,5,9,10,11
1:12,13,21,22

2:14,16,18 6:6
6:10 7:11
12:10 14:13,19
14:22 18:23
20:8 21:6,13
22:22 24:1
25:4,13 27:21
33:14 37:23
38:11,16 64:18
87:20 99:1
117:12 123:5
126:3,5 134:25
136:15 158:14
159:14
**binghamton.e...**
159:5
**bio** 34:10
**birth** 91:4
**bit** 10:24 54:18
86:14 103:11
**black** 34:11
**board** 98:6
104:21,24
118:9
**body** 30:14,19
59:23 134:22
134:23
**bone** 39:16
**book** 161:24
**boss** 163:2,3,23
**bother** 57:9
**bottom** 55:4,5
65:21 74:18
90:18 97:1
98:11,17

107:13,14
116:3 128:6
171:17,24,25
172:21
**boundaries**
143:16
**br** 31:15 34:3,4
169:22 170:19
170:20
**brackets** 108:7
**break** 8:13,14
8:18 32:6 43:2
81:10 82:6
83:12 121:3
162:6 169:8
183:12
**breaking** 84:17
**brian** 1:10 2:11
4:19 22:10
23:18 31:14,23
44:2 58:4,9
62:11 81:14,19
81:19 84:23
92:1,2,3,12,14
93:12,15 97:6
116:21 122:14
124:9,13,17
126:23 162:1
167:18 169:2
169:23 176:6
181:5 183:25
187:11,12
**brian's** 89:25
90:3 96:2

**brief** 74:20
118:14
**bring** 71:1 98:9
102:14 145:13
145:18 147:21
**bringing** 188:5
**broad** 15:1
**broke** 121:12
**broken** 100:2
**brought** 70:25
101:5 146:1,4
146:8 149:1
**bu** 123:20,21
124:6,24 125:1
125:12,15
**budgets** 13:19
**buffalo** 11:18
11:21,23,25
12:12,13,15
13:6,14 14:1,7
33:9,19 37:4,8
**building** 92:5
108:2
**bullet** 113:14
141:5,8
**bullhorn** 78:22
87:23 166:5
**bups** 125:23

**c**

**c** 2:4 128:6
**cadence** 63:21
**california** 57:2
70:14 82:21
92:13

**call** 24:9 31:15
66:17,21,23
67:1,6,10 68:7
68:8,11 69:5
70:10 72:15
83:14 92:14
95:17 96:16
111:4,12
137:19,20
183:12
**called** 6:2 21:24
25:1 29:17
45:1 66:16,19
67:5 70:7 91:4
105:22
**calling** 92:6
109:13 123:22
**calls** 137:20,21
137:21 152:8
**camera** 32:5
**campus** 2:19
6:11 16:5,5
59:8 64:20,23
66:14 72:12
76:1 87:23
100:18 101:14
105:10,20
111:10,13
113:5,10 120:7
134:25 135:18
135:19 142:8
143:6,8 154:23
155:1 165:23
**capacities** 1:9
1:11,11

**capacity**
  110:22
**capital** 2:8
**captured**
  141:24
**carry** 175:8
**carrying** 174:9
**carryover**
  172:21
**case** 7:3 24:16
  24:20 34:10
  59:2,2 72:22
  101:18,20,21
  103:4 117:22
  120:25 137:19
  142:1,16,18
  163:1,20
  166:21,22,24
  166:25 179:16
**cases** 24:14,16
  24:23 92:5
  93:16 138:17
**category** 13:22
**caught** 100:21
**causing** 47:20
  87:25 186:21
**cdo** 77:5,16
**cell** 83:11
**center** 9:1,3,20
  11:14 34:10
  137:20 150:9
  156:4,4
**centerpiece**
  8:22

**central** 77:7
**ceo** 83:12
**ceremony**
  160:20
**certain** 23:16
  117:21 123:22
  154:24
**certainly** 68:21
  87:3 93:9
  109:25
**certificate** 19:8
  19:16 191:1
**certificated**
  20:25
**certified** 73:2
**certify** 191:3,12
**chain** 4:5,6
  23:17 65:20
  66:4 67:17
  74:15 85:16
  91:19 96:14
**chair** 11:14
  87:24 111:7,8
  166:4
**chairman**
  85:11
**chairs** 13:3
**chance** 43:6
  107:9 162:5
  166:7 175:3,8
  181:22
**chancellor**
  16:17,20,21
  17:1,4,11,17,19
  18:3,11 62:16

  62:17,18 77:17
  119:12 155:22
**chancellor's**
  18:8
**chancellors**
  17:12
**change** 13:17
  17:6 19:17
  112:1 133:13
  193:4,7,10,13
  193:16,19
**changed** 14:23
  15:10 16:9,12
  16:12,24
  133:21
**changes** 135:14
  192:10 194:6
**channels**
  105:13 139:17
**chapter** 32:16
**characteristic**
  46:13
**characterizati...**
  9:13 17:11
  164:5,13
  180:20
**characterize**
  101:11 164:14
**characterized**
  50:20
**characterizes**
  46:10
**charge** 23:4,9
  23:12,14 26:17
  58:4 61:15

  91:17 92:8,9
  92:25 94:4
  101:18,25
  157:20 183:25
  184:12,16
  187:17
**chargeable**
  93:11
**charged** 93:19
  100:8,13
  102:20 147:11
  147:19 148:1
  148:13,19
  187:21
**charges** 28:20
  29:3 78:24
  80:16,17,21
  81:2 91:5,8
  97:13 98:10
  99:23 101:6,25
  102:3,14 129:1
  131:8,10
  135:20 139:4
  139:22 145:13
  145:18 146:1,4
  146:8,21
  147:22 148:20
  148:25 156:19
  156:21 157:3
  157:13,17,21
  158:8,12,18
  163:15,17
  187:24
**charging** 92:15
  92:18 93:17

**[charging - communicating]**

131:17
**check** 112:5
  163:6
**checking** 72:23
**chemical** 11:8
  11:10 12:24
**chief** 1:11 2:18
  6:11 16:6
  25:14,15,24,25
  26:3 56:17
  61:4 67:2
  69:18 70:5
  72:11 77:6
  102:25 129:17
  132:9 175:21
**choices** 140:2
**choose** 56:21
**chose** 108:7,25
**chosen** 47:6
  106:12
**chronological**
  37:11 84:17
**chronology**
  104:16
**chronopoulos**
  4:16 159:5,10
  159:12 160:7
**circulated**
  149:13
**circumstance**
  28:12,23 29:15
  100:7 102:1
**circumstances**
  64:15

**cited** 50:7,19
**civil** 1:7 5:15
  5:17,19 121:6
**clarified**
  176:12
**clarify** 81:25
  142:23 149:11
**clarity** 55:8
**class** 19:9
**classes** 32:23
**classification**
  91:5
**classroom**
  99:21 108:12
  108:13
**clear** 8:11,18
  12:23 18:18
  39:17 48:19
  70:3 74:1 78:9
  84:11 91:19
  98:20,22 127:9
  147:4 171:3
  172:7 175:9
**cleared** 174:13
  174:23
**clearly** 8:6
**client** 20:13
**clients** 153:13
**close** 41:2,12
  133:6 142:8
  143:12,13
**closely** 37:11
  37:17 86:14
  181:22

**club** 106:24
**clubs** 154:21
**code** 21:14
  29:22 30:11
  31:17,24 32:15
  93:11 94:21,24
  100:2 101:8
  135:13,14
**collaborative**
  181:20
**colleagues**
  20:21
**collect** 102:2
  104:13
**collected**
  104:20
**collection**
  76:13 127:21
**collects** 127:17
**college** 1:4,5,11
  6:5 11:3,15
  75:3 108:5
  110:4 116:4,11
  116:15 125:25
  125:25 126:24
  153:18 184:12
  184:16 185:17
  186:6,20,21
  187:2,7,14,17
  187:21
**color** 131:20
**combination**
  102:15
**come** 18:2 32:6
  68:23 87:18,20

87:23 116:11
  143:8 151:2
**comes** 133:6
**comfortable**
  6:22
**coming** 49:22
  92:24 117:11
  117:14
**comment** 82:4
  89:5 132:22
  178:3
**commenting**
  87:7,8
**comments**
  110:8 178:2
**commitment**
  36:4
**committed**
  71:20
**committee**
  111:9
**common** 99:5
**commotion**
  47:20
**communicate**
  59:6 62:9
  63:17 64:1
  105:10 113:8
  119:1
**communicated**
  91:20 108:4
**communicating**
  58:17,22,24
  110:6 119:5

**communication**
21:2 62:6,8,24
63:9,12,20,21
70:8,11,12
75:11 77:13,20
79:7,11 108:21
110:14 117:25
118:5,23
122:19,20
123:1,21 124:6
124:25 125:1
125:12,14
185:15
**communicati...**
43:23 58:6,13
58:16,21 60:24
61:25 117:11
117:18 121:24
122:22 136:16
138:11 146:20
147:4 184:2
**community**
47:7 49:6 50:2
58:19,23 59:8
130:15,16
**compile**   105:16
**complaint**   23:1
23:3,20,22
42:21 118:12
168:5,22 170:2
**complete**   147:9
194:8
**completed**
101:19 192:17

**completely**
95:20 100:25
101:9 132:19
**completing**
19:8
**comply**   150:25
**component**
24:25
**components**
61:23
**composed**
104:19
**composition**
56:4 106:5
**comprises**   30:4
**compulsion**
8:15
**concentrate**
147:20
**concept**   61:13
75:12 83:5
86:23,24
119:17 124:22
131:20 141:21
**concepts**
123:18
**concern**   50:9
57:20 60:7,17
63:6 71:8,8
72:16,17 79:2
79:4 84:2,6
117:13 133:8
**concerned**
68:12,14

**concerning**
83:8 116:11,15
125:15 130:3
130:24 132:9
159:22 164:18
167:9
**concerns**   60:15
60:18 62:8
71:23 72:12
118:11 183:19
**concert**   32:20
**conclude**
110:21
**conclusion**
102:8
**concrete**   24:22
40:4
**conduct**   21:14
23:2,2,5,15
24:16,20 28:16
28:18,19,20,22
28:25 29:3,7
32:14,23 33:18
58:6 59:12,13
59:14,15,17,18
91:14 93:11,13
93:19 94:3,18
94:21,23 95:5
95:7,22,22
96:2,6 97:7,13
98:9 99:19,23
100:3,4,5,10,14
100:17,24
101:5,8,14,17
101:18,20,25

102:3,14
128:10 135:13
135:14 139:4
139:17 145:13
147:22 148:20
148:24,25
153:7 156:19
156:21 157:3
157:13,16,17
157:20 158:8
158:12,18
163:15,16
178:22 184:2
186:17 187:24
188:2,3
**conducted**   7:19
**conducting**
71:25
**conference**
156:2 161:10
**confirm**   68:25
69:4 73:22
112:12
**confirmation**
72:15
**confirmed**
69:21 73:16
**confrontation**
93:10
**confusion**
96:22
**congressman**
167:8,13 171:1
173:17 174:4
174:14 180:3

180:17 182:3
**conjunction**
  42:21
**connect** 82:24
**connection**
  99:10
**consensus**
  72:22
**consequences**
  139:3 140:13
**consider** 46:20
  50:23 113:6
  119:20
**consideration**
  118:5 119:23
  126:2 129:2,6
  129:10,22,25
  158:11 188:15
**considerations**
  39:25 53:17
**considered**
  120:3 128:22
  158:18
**considering**
  125:23 158:8
**consistent**
  138:1 179:22
**consistently**
  16:11
**constituents**
  137:19,25
  138:4
**constitute**
  141:11,15

**constitutional...**
  177:11
**consult** 36:11
  169:4
**consultation**
  18:11 24:6
**consulted** 24:4
  113:14,17,22
**contact** 90:23
  103:1,3 130:14
**contacted**
  110:17
**contacting**
  130:23
**contained**
  104:14
**content** 30:17
  30:19 47:8
  79:16 165:24
**contentious**
  44:22
**contents** 116:9
**context** 67:1
  71:11 72:3
  77:4 106:1
  111:3 124:1
  145:16 184:4
  188:15
**contexts** 132:4
  132:13
**contiguous**
  87:2,3
**continue** 12:8
  102:2 139:2,24
  139:25 140:2,3

140:11
**continued**
  140:18,19,25
**continues**
  102:6
**continuing**
  80:8 98:8
  113:12 145:12
  171:24
**contract** 18:4
**contrary** 24:12
**control** 177:13
  177:19
**controlling**
  5:20
**controversial**
  133:5 143:24
  143:25
**controversy**
  133:7 181:21
**convenience**
  168:24
**conversation**
  33:5 70:16,17
  70:24 71:12
  82:10 83:5,10
  92:11,21
  108:19 109:6
  131:10,13
  141:20 160:20
  170:25 171:10
  182:17,21,22
  187:4,9,10
**conversations**
  20:16 22:6

48:21,25 51:15
  51:17 138:3
  147:7 187:5
**convey** 130:2
**convince**
  182:18
**cook** 104:23
**copied** 62:17,21
  63:1,2 65:21
  66:2,5 74:14
  78:11 122:3
**copies** 96:20
  155:18 192:14
**copy** 189:21
  190:3
**copying** 84:23
**cornell** 11:4
**corporation**
  106:24
**correct** 13:14
  14:8,14,18
  15:25 18:8,13
  20:2 22:18,19
  23:18 24:18,20
  24:24 25:1,4
  26:4,5 27:12
  28:8 30:1,6
  33:10,14 36:13
  36:17,18,23,25
  38:12 40:7
  41:3,4,13,14
  44:23 45:2,8
  49:11,11,23
  50:4,5,12
  53:17,18 55:23

58:18 59:20
61:21,22 66:7
71:13,14,16,18
97:10 101:16
102:8,9 103:8
103:9 105:3
112:22 125:5
125:11 126:15
127:12 132:21
132:25 134:15
134:16 141:3
146:9 148:7,10
148:14,23
149:2,3,6,7
151:18 154:7,8
156:20 157:2,9
163:4,5,7,8
164:5,22
166:21,25
170:8 171:21
172:16 175:13
177:14,18
178:5 179:7,8
179:11 181:8
181:16 182:22
185:4 188:1,6
191:10 194:8
**corrections**
194:6
**correctly**  45:16
45:17,21 46:1
46:23 58:7
141:24 172:4
**corresponded**
98:23

**corresponden...**
54:20 76:23
85:4 159:4,9
159:17 160:23
**corresponds**
170:5,17
175:25
**council**  134:21
134:22 135:1,5
135:7
**counsel**  2:19
4:2 6:11 10:15
10:19 16:5
19:20 33:5
102:16,21,24
103:1 146:20
146:22 147:8
189:22 191:12
192:14
**counsel's**
180:19
**count**  15:15
**counter**  75:22
108:4 165:24
**couple**  107:23
**course**  19:9
24:6,13 72:24
**court**  1:1 8:4
34:8,9 101:19
101:21,24
102:18
**cover**  6:25
**coverage**
164:25

**covered**  82:14
**cps**  125:24
**create**  101:20
143:11 181:19
**created**  40:15
122:21
**creating**  186:22
**crime**  71:20
100:8
**crimes**  26:18
**criminal**  26:14
29:2 80:22,23
91:8 100:13,23
102:4,8,13
103:6 128:9
129:1,8,9
131:7,10 139:5
145:13,18
147:22,24
148:21
**criminally**
148:19
**critical**  85:20
**criticizing**
47:14
**crowd**  19:2
40:24 41:16
**cs**  192:15
**cultural**  123:22
**cuomo**  143:8
143:18,19
144:3
**curious**  71:4
**current**  14:10
17:7 136:3

140:3,4
**currently**  23:6
23:7 25:14
112:18
**curse**  51:21
**curtail**  109:11
**curtailed**  52:23
**custody**  78:24
79:25 80:2,5,8
80:13
**cv**  1:7

**d**

**d**  3:1 4:1 133:1
**da's**  91:16
**daily**  63:19
**damaging**
46:20 50:24
51:2,9,10,13
**dangerous**
69:14
**darcy**  4:8 61:5
61:8 90:12
116:22 167:19
188:17
**date**  1:18 91:4
193:24 194:12
**dated**  4:7,8,9
4:10,13,15,17
4:21 90:13
97:19 104:1
118:18 134:8
150:11 155:25
191:16
**dates**  159:20

| | | | |
|---|---|---|---|
| **day** 34:1 42:11 44:23 49:17 52:6 64:15 70:13 99:17 103:12 169:1 191:16 194:15 | **decision** 69:25 84:10 92:25 93:13 94:6 95:24 96:9 103:1 128:2,3 184:12,16 | **delegation** 94:14 **deliberately** 32:22,24 35:18 36:6 **delivered** 74:17 105:13 | **deposed** 7:3,6 **deposing** 192:13 **deposition** 1:15 5:14 7:1,19 8:20,24 10:10 10:17 31:7,14 |
| **days** 5:8 57:4,4 73:6,18 84:24 108:22 116:5 117:15 188:14 192:17 | **decisions** 18:12 26:13,23 166:17 | **delores** 1:23 191:3,20 **delviscio** 43:25 58:12 | 33:6 40:6 45:1 104:10 147:3 150:8 151:22 169:23 176:9 182:10 183:16 |
| **deal** 19:18 121:15 | **declare** 194:4 **declined** 78:22 79:18 | **demonstration** 105:21 108:4 110:20 115:13 | **depths** 67:8 **describe** 10:14 14:21 |
| **dealing** 138:8 **dealt** 69:17 **dean** 11:13,14 11:18 12:16 13:2,4,4,5,6 | **deemed** 5:18 194:6 **deeply** 163:13 **defend** 37:24 38:10 | **demonstrators** 114:8 141:8,22 **dennis** 34:11 134:8,19,20 **department** | **described** 68:8 78:6 107:16 157:24 **describes** 67:17 114:2 153:6 |
| **dean's** 13:18 **deans** 13:19 **dear** 77:15 **debra** 17:5 **december** 73:15,23 128:8 128:13,19 137:2 155:18 155:25 156:20 156:22 157:4 157:11,22 158:1 159:6,7 | **defendant's** 55:10,13 **defendants** 1:14 2:11,16 6:7,14 **defense** 82:12 **deferred** 163:3 **define** 43:12,12 **defined** 40:5 **defining** 19:14 **definitely** 90:3 **definition** 157:5,8 | 11:14 13:3 25:1,3,12 26:7 26:11,13,16,24 27:7 28:11,25 61:21 72:25 90:24 102:17 103:3 166:16 **depending** 139:14,14 **depends** 102:23 **depicted** 51:9 51:13 | **describing** 44:22 68:4 **description** 4:3 106:20 **designated** 108:16 **designation** 169:24 **designed** 38:25 **desirable** 142:1 **desire** 188:18 **despite** 23:24 |
| **decide** 29:17 102:25 167:16 **decided** 92:8,9 143:21 167:18 | **dei** 60:23 61:11 61:18 **delegate** 94:9 94:10,12 | **deployed** 84:13 **deponent** 192:13 194:3 | 41:5 **destructive** 139:2,24 |

140:12,24

**detail** 41:12

**determine**
27:18 52:25
53:8 62:13
71:19 100:5
102:20 139:21
163:20

**determined**
59:4 88:6

**determining**
58:5 94:2
121:16,21
184:1

**develop** 8:11
113:5 137:18

**developed**
107:17

**developing**
72:2

**dialogue** 71:25

**differed** 137:9

**difference**
80:12 186:20

**different** 16:10
19:16 29:8
54:1,8 79:5
100:25 101:1
112:2 140:14
140:20 149:23
149:23,24
188:4

**differently**
17:13 150:19

**difficult** 64:2
125:22 161:14

**dim** 81:18

**direct** 16:4 35:5
35:7 55:3
56:12 71:18
123:14 135:25
165:2 187:12

**directed** 52:5
55:24 60:11
104:19 187:16

**directing** 62:5

**direction** 17:10
18:8 25:3,8,10
71:13 72:4
122:10 130:2
151:13 175:1

**directives**
132:3,12

**directly** 14:18
15:24 22:18
23:15 26:1
95:11 129:13
130:7,14
160:17 161:18
180:6

**director** 11:14
23:2 27:12,13
27:14,14

**directors** 15:7
15:8,10,20,22
56:9 98:6
136:3

**disagree** 178:7
179:15 180:1,2

**disagreed**
128:2 178:12

**disappointed**
82:19

**discern** 41:2,8

**disciplinary**
21:12,20 22:3
22:15,21 24:1
24:4,8 59:19
94:4 95:10
188:5

**discipline** 13:8
13:22 21:5
94:17,25 95:6
95:13,18 97:7

**disclosure**
55:10,13

**discontinuance**
34:12

**discovering**
121:15

**discuss** 46:7
62:11 64:7
91:14 113:4
125:8 128:8,13
132:18

**discussed** 33:8
37:3,6 61:20
78:12 83:7
84:3 123:8
131:21 148:9
183:8 185:14

**discusses**
107:16 108:9

**discussing**
77:19 83:22
119:16 121:13
132:15 133:7
134:15 159:23
159:24

**discussion**
30:20 62:25
68:17 75:4,23
106:14 110:9
113:7 116:14
121:4 126:4,8
126:19,22
131:5 132:4
160:2,4,17
162:8 183:3

**discussions**
10:18 36:15,18
36:24 125:20
130:24 151:10
186:25

**dishonesty** 13:9
13:11,23

**dispense**
161:18

**display** 139:2
139:24 140:11

**displayed**
153:7

**displays** 133:5

**disrupt** 32:22
65:1 98:25
114:9 138:24
139:10 142:11
143:14

**disrupted**
114:8 128:11
132:11
**disrupting**
35:18 36:6
143:5 153:13
**disruption**
87:25 110:5
**disruptions**
69:7
**disruptive**
69:16 87:12
**disseminated**
185:17
**disseminating**
185:22
**distance**   41:1,5
42:1
**distinct**   101:22
135:12
**distributed**
137:22
**district**   1:1,2
34:9,9
**disturbed**
154:5,10,19
155:1
**disturbing**
152:12,17,19
152:20,23
153:3,5,6,10,18
153:24 155:3
163:14
**diversity**   61:12
77:6

**division**   61:14
61:15,18
**document**
29:25 30:4
31:20 33:24
34:8,8,16,17
35:4,8,22,25
43:7 49:11
55:15 57:8
64:21 65:17
74:11,13,19
76:4,11 81:8
82:8 84:19,21
84:25 85:3
90:9,12,14,18
91:11 97:16,17
97:23 103:14
103:19,23
104:5,14,16
106:11 107:9
108:22,24
110:23,25
111:1 113:23
113:24 114:1,2
114:3 116:2,6
116:20 117:2,5
117:7,8 122:13
122:16 123:15
123:17 124:11
124:22,22
125:18 128:5
133:2,24 134:7
134:9 136:13
137:11 145:9
149:5,5,9

150:1,9 155:14
155:19,23
156:3,3,4,13,17
158:22,24
161:6,6,22
162:9,11,16,20
163:9,12 165:3
165:10 182:9
**documents**
64:13 84:18
96:23 112:5
121:14 122:10
149:18,19,21
149:24 161:17
162:24
**doing**   29:14
42:10 86:17
114:13,14,15
114:18 115:20
143:25 151:21
157:17 173:12
181:17
**dollars**   177:8
177:22 178:14
178:17 180:12
**donald**   56:18
**donor**   75:7
**doubletree**
1:21
**doubt**   119:11
**doyle**   4:10
103:25 104:23
105:5
**dr**   9:6,8 67:19
68:5 79:19

89:11 119:17
119:20 120:12
166:1 171:21
172:14 175:4,7
183:6
**draft**   43:18
78:6 155:19
**drafted**   155:20
**draw**   31:2
34:15 47:14
54:19 57:15
84:19 107:23
144:7 154:13
**drew**   48:8
**drive**   183:16
**dropping**   32:21
**duly**   6:2
**duty**   175:22
**dwi**   100:21

**e**

**e**   3:1,1 4:1,1,5,6
4:7,8,9,10,11
4:12,14,16,20
6:1,1,1 55:2,6
55:17,25 56:11
57:19,25 61:18
63:13 65:20
66:3,9 67:15
68:1 74:14,14
74:16,20 76:14
76:15,25 77:14
77:16,19,21,24
78:3,4,11,14,16
79:2,4 81:24
82:23 84:22

**[e - event]** Page 17

85:16 90:12,19
91:10,11,11,19
91:21,25 96:25
97:3,4,18 98:8
99:11 103:25
104:18 116:3
116:21 118:14
118:19 119:2,6
119:7,9,11
122:14,16
124:10,14
134:7 136:18
150:10 155:17
159:3,4,6,7,21
160:24 165:5
184:20,23
193:3,3,3
**earlier** 36:11
62:15 78:16
79:11 82:9,15
83:4 146:3
161:21
**earliest** 55:2
73:23
**early** 128:19
137:1 143:7
**easily** 99:12
**economist**
87:19
**educate** 22:2
**educated** 44:11
**education**
12:19 19:24,25
86:17

**educational**
10:25
**effect** 153:6
174:17
**effective**
110:22
**effort** 67:23
85:19,23
**eight** 12:11
40:25 170:7
177:24
**either** 32:20
69:25 72:16
117:12 128:9
148:19 185:16
186:17
**elaborate** 71:3
**elected** 59:10
**electronic**
162:12,14
**elicit** 38:25
**ellipses** 118:20
**else's** 178:2
**em** 150:15
**emphasis**
139:25
**employ** 138:2
**employed** 12:2
**employee** 33:13
102:12,20
103:5 112:13
135:2
**employees** 83:8
104:20,25
107:6 187:1,6

**employment**
12:4 18:1,13
**empowered**
27:20
**empowering**
132:2,12
**enabled** 142:11
**encourage**
46:19 50:23
**encouraged**
115:13
**endowment**
85:15
**enforce** 35:17
36:5 39:8,10
**enforcement**
113:3
**engage** 35:15
78:16
**engaged** 178:22
**engineer** 11:10
**engineering**
11:8,15,19
12:16,24
**entered** 33:17
155:15 158:23
**entire** 9:2 22:11
47:7,15 48:9
49:10,13
153:16 156:10
156:13 168:6
168:10 169:7
**entirely** 94:10
**entitled** 35:2,12
122:17

**episode** 154:14
**equity** 61:12
**errata** 192:11
192:13,17
**esq** 2:4,9,10,15
2:18 192:1
**established**
176:8
**estimate** 41:6
**estimation** 47:8
49:5
**et** 34:11 192:4
193:1 194:1
**ethical** 34:10
**evaluated**
102:10 157:1
**evaluation**
59:18 130:3
131:6
**evening** 78:1
79:12 81:20
**event** 9:8,25,25
10:2,2,6,6,9,9
10:22 19:4
33:2,2 36:3
37:4,21,22
40:5,10,13,16
42:7,10,11
45:1 49:2
55:21,22 60:7
63:8,10,13
64:8,11,15,16
64:18,20 65:1
66:14 67:24
68:5,21,23

70:10 72:3
73:9,12,20
74:3,5,10 75:2
75:3,4,13,16,18
79:3,5,5,6,8,13
83:23,25 84:13
84:14,16,24
87:1,2,5,6,7,8
87:11,13,14
88:9,17,17
89:4 93:2 97:5
97:8,11,14
98:22,24 99:6
99:7,8,9,13,15
99:16 104:13
108:13 110:4
110:10,11,14
114:8,9 116:5
116:12,12,16
117:14,15
121:2,14,16,22
122:23 123:2
123:12 124:1
125:17 126:15
126:16 128:11
129:2 130:19
130:20,24,25
131:22 132:11
133:1,4,9,14,15
133:19 134:16
138:19 140:3,4
141:7,7,12,16
141:18,19,22
141:24 142:12
143:15,18,19

143:21 144:3
144:18 145:24
145:25 146:2,4
146:9,22
147:19,20
148:6,9,14
149:2 152:24
153:2,3,16,18
153:24 158:12
159:23 164:3,7
164:25 167:19
171:8 174:18
174:21 175:15
184:21,24,24
187:3,3 188:16
188:16,25
**events** 8:21,25
9:3,4,11,13,15
9:19,19,20,22
10:12 19:2
37:16 41:25
57:14,18 66:14
68:4 75:6 99:4
99:13 106:9,15
106:16 107:13
119:18,21
121:13 123:9
133:18 134:14
134:16 142:21
143:6 145:12
147:12 150:18
159:22 164:18
167:10,22,25
**everybody**
49:21 56:20,24

59:11 83:2
104:23,24
117:20 147:14
148:2 174:11
**everyone's**
83:20
**evidence** 101:2
101:20 102:9
186:6,10
**evident** 58:16
**evolving** 22:2
110:20
**exactly** 52:17
91:19 169:19
**examination**
3:3 6:17 183:4
**example**
154:24 180:14
**except** 5:11
**exception** 8:16
**exchange** 77:22
77:24 97:18
180:23
**exclude** 20:11
**excuse** 31:20
**execute** 175:1
**executive** 15:7
15:10,20,22
56:9 106:15
111:9 136:3
**executives**
126:10
**exercise** 38:16
**exercised** 139:1

**exercising** 53:5
135:24 153:13
**exhausted**
50:17
**exhibit** 4:3
31:14,23 32:9
34:4 42:17
54:22 65:8
74:12 76:6
81:13 85:1
90:6 96:11,17
97:21 104:3
116:23 118:21
124:12 134:3
150:4 155:16
159:1 162:3
165:8 183:21
**exhibits** 31:1
96:15 183:18
**exist** 22:3
**existing** 133:2
**exists** 29:25
30:13,16
**expect** 112:2
165:23
**expectation**
166:22
**expected** 110:6
110:15
**expedited**
189:19 190:5
**experience** 20:1
30:24 142:16
142:16,17,18
142:20 143:3,4

143:7 144:2,6
**experienced**
  37:18
**expert** 93:12
**expertise** 73:1
**explain** 25:11
  51:5 92:17
  134:13
**explore** 110:18
**explored** 82:13
**express** 32:25
  35:19 36:7
  108:6
**expressed** 86:5
  188:17
**expressing**
  57:13 78:5
  117:13
**expulsion**
  139:4
**extended** 141:1
**extent** 10:14
  34:14 80:25
  184:6
**external** 137:25
  138:4

        **f**

**f** 2:9 3:1 4:1
**face** 139:3
  140:12
**faces** 41:2 67:7
**fact** 47:25
  48:15 57:5
  62:16 75:11
  106:19 114:23

128:12 131:3
142:15 145:18
163:20 166:20
173:18 177:12
188:23
**facts** 108:24
137:23 139:15
139:16,18
**faculty** 11:12
11:16 13:3
16:5 59:8
110:17,18,20
110:23 111:2,4
111:8,9,9,10,11
111:14 112:8
181:20
**fail** 132:3,12
**fails** 192:19
**failure** 132:2
132:10
**fair** 17:11,18
48:16 77:12
94:25 109:25
130:8 164:5,12
**fairly** 101:11
**familiar** 29:21
33:1 35:22,24
101:3 105:24
108:8 116:5
123:18
**far** 40:24 50:7
67:22 128:13
145:2
**fauci** 4:8,11
61:5,8 90:13

91:21 116:22
129:19 167:19
188:17,23
**faughnan**
25:18,18,24
26:2 74:20
150:8,21
151:13
**faughnan's**
25:22 150:3
**fear** 85:17
**february**
191:16 192:3
**federal** 5:1,15
5:17,19 121:5
**fee** 127:21
135:19
**feedback** 136:5
**feel** 34:13 88:4
133:13 163:6
167:25
**feeling** 86:15
**fees** 127:16,17
**felt** 87:9,11
93:14,16
**figure** 80:20
112:6
**figured** 170:21
**file** 170:2,5,12
170:15,17
176:2,24 179:2
**filed** 23:1
139:22 146:21
**filing** 5:8

**filled** 175:12
**final** 22:14
116:1 132:1
**finances** 13:4
**financial** 56:17
**financially**
105:9
**find** 54:2 90:8
96:13 107:3,4
169:9
**fine** 6:21 43:3
147:1 176:13
176:16 185:8
190:4
**finish** 8:9,10,17
74:1 81:11
142:22
**first** 7:2 9:25
14:2 18:24
19:18 20:7,15
20:22 33:18
34:18 37:7,24
38:11 39:6,18
39:19,25 40:12
45:6 46:22
48:24 50:19
51:1 52:16,23
53:5,7,14,16,21
53:23 54:4,11
68:14,16 72:16
79:8 82:12
83:9 93:20
105:19 106:19
112:19 116:7
123:21 143:16

143:21,23
145:17 150:9
153:13 170:3
175:11
**five**   17:12 57:4
89:19 110:3
111:12 177:24
183:11
**fix**   31:12
172:22
**flesh**   39:16
**flight**   70:13
**flip**   103:10
**flipping**   113:1
**flow**   107:19
**focus**   86:23
106:12 121:15
122:4,11
156:17 166:9
168:12
**focused**   66:3
74:11 79:4
**focusing**
139:12
**follow**   17:20
18:2,5 27:17
95:7 96:19
100:24 107:19
110:1 122:18
132:3,12
153:21 168:25
184:9
**followed**   95:16
95:23

**following**   54:9
102:3 104:13
106:16 113:13
117:15 121:13
122:23 123:2
123:12 129:2
133:15 147:12
154:24 164:2
188:15,16,25
**follows**   6:3
35:2,12 86:14
**fonts**   149:23
**footnote**   170:3
**foregoing**
191:5 194:5
**forgot**   94:1
**form**   5:11 9:12
12:21 14:4
18:14 20:3
25:6 26:8 27:4
29:10 30:7
33:20 38:1,14
38:18 39:9
40:3 42:12
44:19 58:20
63:4 74:16
88:20 95:15,25
124:8 130:17
147:16 148:22
151:5 153:15
165:12 167:1
182:23
**formal**   17:16
19:8,15 20:25
23:25 30:4

59:23 135:7
**formalized**
20:24
**formally**   23:23
**formatted**
191:9
**formed**   94:10
106:25
**former**   17:1,4
**forth**   191:6
**forward**   54:19
64:11 67:23
74:13 103:11
144:16
**found**   47:13
74:7,9 100:2
153:10,11
**foundation**   1:4
6:5 7:3 85:12
85:13 98:5
104:21,24
118:9 137:21
138:5 152:13
192:4 193:1
194:1
**four**   73:6 84:20
116:2 141:4
163:14
**fourth**   144:14
156:5,5,9
**fracking**
143:10,23
144:3
**frame**   131:19

**free**   34:13
46:22 50:25
52:16,19,19
85:20
**freedom**   32:24
35:19 36:6
69:15 70:1
71:8 83:20
86:18
**freedoms**   139:1
**frequently**
63:16 112:1
160:6
**fresh**   168:1
**friday**   118:18
122:15
**friend**   86:13
**front**   2:14 32:9
81:8,13
**full**   7:8 60:15
118:19 135:2
189:4 191:9
**fully**   82:13
**function**   25:8
104:20 185:3
**funding**   178:21
181:11,24
**fundraising**
13:5 85:14
**further**   5:6,10
5:13,16 32:19
74:12 113:6
116:8 128:5
183:1 191:12

**future** 132:4,13
150:19

**g**

**g** 6:1
**gain** 150:20
**gallagher** 90:19
90:20 96:25
**gas** 143:10
**gathered** 41:6
41:12 62:3
102:10 113:3
**gathering**
44:22
**gatherings**
138:25 139:10
**general** 2:7,7
39:12 52:19
62:6 63:17,20
94:19 118:12
**general's** 6:9
6:13
**generally** 64:1
121:17
**generated**
185:16
**generating**
185:21
**getting** 35:3
48:21 49:1,9
57:19 63:3
151:7 183:12
186:1
**give** 7:16,20 8:1
21:24 31:11
69:21 72:4

75:19,21 76:1
82:18 86:15
109:22 129:24
130:2 141:17
143:15 144:6
152:4 166:7
169:23 171:12
175:3,7
**given** 67:1
102:19 161:16
169:5 184:7
194:9
**giving** 71:12
151:24 181:6
**glen** 7:10
**gmail.com**
119:3
**go** 7:18 11:1
16:8 23:17
31:12 36:21
37:10,10,11,13
42:13 43:3
48:10 76:3
84:18 89:19
90:7 91:10
101:23 114:5
141:19,22,23
144:16 152:10
162:19,23
167:2 170:8
172:25 174:1
175:9 182:25
184:7
**goal** 50:7 69:12

**going** 6:25
10:13 19:17
21:9 32:6,17
37:10,11 40:2
62:13 63:5
64:10,19,23
67:22 69:6
71:22 72:18,19
72:24 74:11
75:8,15,21,23
75:25 76:14
77:14 81:21
82:24 83:17
84:5 90:6
103:2,3 107:22
108:13 117:23
117:23 123:14
126:23 134:1
137:7 139:19
139:20 141:18
142:6 143:13
158:5,7 168:18
170:1,4 174:11
175:23,24
179:1 180:9
181:24 189:18
189:22
**goldfarb** 4:7
84:23 85:5,7
**goldstein** 4:9
97:19 98:4,24
**good** 6:24
17:24,25 48:17
56:24 69:21
84:4 86:17

92:4 118:19
146:6 154:25
166:16 181:2
182:17,20
**govern** 30:5
170:12
**governance**
110:17,21,23
111:2,5,13,14
**governed**
154:20
**governing**
27:21 29:22
30:12
**government**
14:2 60:23
61:7,9
**governor**
134:23 143:8
**governor's**
143:11,22
**grabbing** 87:23
**graduate** 11:5
**graduated** 11:5
11:5 158:19
**graduates**
117:12
**grant** 20:20
**great** 121:15
**greater** 92:21
**greeted** 78:21
**greg** 43:25 58:4
58:11,12 62:11
183:25

| ground 7:1 | h | 167:23 184:24 | headquarters |
|---|---|---|---|

ground 7:1
73:1
grounds 7:18
group 41:11
55:6,24 56:1,4
56:22 57:23
61:13 62:7,10
64:24 66:20
67:5 70:7,9
91:12 103:25
104:18 105:7
106:16,21
107:1 111:4
129:1 134:24
134:24 138:6
143:9 155:4
160:16 174:17
186:22 188:6
groups 59:5
123:22 149:15
guess 44:8
112:24,25
115:4 120:25
186:1
guessing 44:6
guidance
143:11
guidelines
153:22
guilty 100:9
gun 123:23
125:5 185:14
186:5

**h**

h 4:1,12,19 6:1
193:3
habit 120:25
151:24
habits 121:1
half 99:17
halfway 82:21
hall 108:1
141:10,14,18
141:20 142:2
142:12
hand 53:7
handle 31:8
143:20
handled 150:18
handling 20:7
26:14 60:11
117:14 151:14
happen 68:22
69:6 72:18
76:1 82:19,25
101:17 105:10
117:19 141:7
141:12,16
173:5
happened
57:21 63:6
64:12 78:21
87:5,6,8
104:17 105:15
106:20 121:16
121:21 134:13
139:21 145:7
148:21 154:17

167:23 184:24
happening 63:8
165:25
happens
101:16
happy 168:6
harassed 9:6
hard 67:6
79:10 86:17
190:3
harm 39:22,24
harvey 1:9,17
2:11 3:3 7:4,10
14:15 48:13
77:15 78:25
97:18 116:21
118:16 122:15
153:8 161:9,25
162:6 168:16
168:16 182:17
192:5 193:2,24
194:2,4,12
hauber 1:23
191:3,20
havanchik
112:19,19
haven's 94:14
hayden 2:18
6:10,10 89:25
184:19
he'll 110:1
head 31:10
heading 107:15
113:2 116:3
128:6 141:5

headquarters
113:4
hear 32:7 41:17
47:21 48:2
146:16 169:4
heard 40:14,15
40:18 53:6
105:25 108:10
108:11 172:8,9
177:2
hearing 92:6
105:12 178:4
hearings 96:7
hearsay 137:25
height 40:25
held 11:11
108:3,14 155:6
155:9
help 8:10 9:24
60:24 62:1
66:1 88:21
105:9 122:4
168:7
helpful 7:25
109:18,19,21
168:11,24
helps 13:5
hereto 194:7
hilton 1:21
historical 112:9
180:14
history 77:13
hold 75:1,16
80:8 98:9,12
99:25 100:3

101:18 110:7
110:15 141:9
141:13,17
178:11
**honorific**
135:18
**hoping** 82:25
122:10
**hostility** 131:19
**hruska** 2:4 3:4
3:6 6:4,4,18
29:4 31:1,9,15
31:22 32:3,8
34:4,6 35:3
38:22 39:13
42:13,23,25
43:3 48:17
51:19 52:7
54:25 55:11,14
65:5,13 66:1
76:3,11,19,22
77:23 81:11
82:6 89:18,23
90:5 96:21
97:15 98:2
103:10,14,18
103:22 109:21
116:19 118:14
119:8 121:3,10
124:18 125:19
130:20 133:23
136:21 142:20
143:2 149:25
150:6 152:3
155:13 156:24

158:21 159:3
161:5,14,21
165:2 167:4
168:3,19
169:11,19
170:1,8,16,20
175:23 176:10
176:13,16,23
176:25 178:25
179:3 182:25
184:6 188:10
188:12 189:12
189:25 190:3,7
**hs** 4:4,5,6,7,8,9
4:10,11,12,14
4:16,18,20
42:15,17 43:7
54:21,22 55:12
76:5,6 84:20
85:1 89:20
90:6 96:12,16
96:17 97:16,21
103:19,23
104:3 116:20
116:23 118:14
118:21 134:2,3
149:5 150:2
158:24 159:1
160:23 161:6
161:18,18,20
161:22,22
162:3 165:5,8
183:22
**huh** 14:9,12,15
35:21 45:12

61:6 80:3
117:3 125:2
**hypothetical**
93:23

**i**

**idea** 17:24,25
85:21 93:3
181:18
**ideas** 78:6
108:7 138:25
**identical**
161:17 163:11
**identifiable**
107:2
**identification**
42:18 54:23
76:7 85:2
96:18 97:22
104:4 116:24
118:22 134:4
159:2 162:4
165:9
**identifications**
91:15
**identified**
41:15 128:10
177:3
**identify** 89:15
90:25 91:1
**identifying**
114:7 115:12
**ignore** 139:20
**images** 46:21
50:25 51:3,11
51:12

**imagine** 68:21
70:20
**immediate**
104:10 113:2
123:11 138:7
**immediately**
14:10 123:1
130:25 133:8
**impact** 46:21
50:24 51:2
**implicating**
53:16
**implies** 188:2
**imply** 10:17
**important** 8:5
45:9,23 52:11
57:10,10,15,17
57:17,18,21,22
68:15 82:18
87:19,21 92:6
105:7
**impose** 186:13
**imposed** 95:6
95:14
**imposition**
95:10 162:13
**impression**
79:22
**inaccurate**
176:11
**inappropriate**
53:20 54:11
93:7
**incident** 9:4
40:6 46:18,25

47:3,8,9 48:11
48:14,22 49:6
50:1,10,21
51:6 52:22
53:17 54:9
73:5 96:24
97:1,2 102:7
113:4 140:25
141:2 164:4
184:17
**incidents** 59:7
122:17 136:17
150:16,19
151:15 152:2
156:8 163:13
**incited** 114:8
115:13
**inciting** 123:24
184:17 186:7
**incivility**
153:12
**include** 13:7
26:13 56:7,9
140:16
**included** 66:22
66:23 67:2
128:18
**including** 32:25
139:4 159:23
**inclusion** 61:12
**incorrect** 149:4
149:10,13,17
**increase** 142:10
**independent**
18:7 94:11,12

95:23 118:4
127:7,10
**independently**
69:23
**indicate** 63:7
**indicating**
74:21
**indirectly**
129:14
**individual** 1:9
1:10,11 41:2
70:9 128:6
**individually**
42:22
**individuals**
16:9 26:17
43:24 91:8
**inexplicable**
88:3
**infer** 10:17
**influence**
127:23
**influences**
101:21
**inform** 47:6
60:24 62:1
67:20,21
129:21
**informal** 19:11
**informally**
19:18
**information**
44:14,17 49:22
50:17 62:3
65:2 66:13,15

73:8,8 79:15
81:1 91:23
102:2 104:13
105:5,11,17
140:16,17
166:12,23
167:6 171:12
178:18
**informed** 49:6
79:6 115:23
**infringed** 53:21
53:23
**infringement**
54:11
**ingraham** 2:13
**inquire** 54:2,9
**inquired** 54:5
54:15
**inquiries** 113:5
138:8
**inquiry** 52:25
53:8 174:6
**inspect** 121:8
**instance** 24:18
41:3 52:9
101:12 102:19
152:11 160:18
**instances** 24:3
24:11 94:23
**instruct** 27:15
27:21,24,25
28:11
**instructed** 36:2
53:3

**instruction**
19:18,21,22,23
**instructions**
17:17,19 18:2
151:24
**instrument**
34:17
**insure** 155:5,8
177:10
**intending** 72:4
**intends** 28:13
**intensity** 87:25
110:20
**intent** 87:3
141:25
**intentions** 72:2
**interact** 16:14
93:10
**interested**
191:14
**interfere** 32:24
141:23
**interfered**
89:11,14 114:9
128:11
**interim** 12:11
**intermediate**
74:16
**internet** 51:7
82:22
**interpret**
157:19 178:1
**interpretation**
182:8

**interpreted**
156:25
**interpretive**
168:21 170:13
**interrupt**
124:16
**interruption**
12:7
**interval** 108:23
**intervene**
179:19 180:15
180:18 182:5
182:15
**intervention**
179:5 182:19
**interview**
165:13
**interviews** 98:9
**introducing**
110:19
**introduction**
106:12
**intrude** 20:12
**investigate**
59:15
**investigating**
102:7 157:19
**investigation**
145:12 157:6
**investigator**
90:21 96:25
**invited** 32:25
69:16
**invokes** 179:18

**involve** 183:20
184:11,15
**involved** 23:23
30:25 35:16
45:10,24 46:14
52:11 53:17
60:23 61:24
63:7 67:10
84:7 95:11
99:24 113:7
122:8 123:7
129:10,12,14
130:7,14 131:9
138:18 142:7
147:14 148:2
167:15,17
185:21 186:7
186:16
**involvement**
63:5
**involves** 96:6
**involving** 33:18
**issue** 22:15
28:15 37:6
58:7,21 59:13
59:15,21 60:2
60:5,11,14
70:21 95:22
110:9 122:18
125:8 130:5,12
130:18 182:12
184:3,3,11
**issued** 78:25
**issues** 18:24
19:19 20:7,15

20:23 22:3
24:4,8 33:18
34:18 123:1
130:3 138:19
183:19,20

**j**

**january** 4:21
12:9 73:15
158:3 161:25
163:17,21
165:6,17 167:9
168:1
**jb** 74:12
**jeopardizing**
70:1
**joann** 25:21
150:11
**job** 20:1 173:12
**jobs** 11:11
**joe** 169:1
**joe's** 31:7
**john** 1:11 2:9
2:11 6:7 16:23
17:15 65:22
104:23 150:11
171:4 172:8
192:1
**john's** 84:4
**john.moore** 2:9
192:2
**johnson** 4:12
4:18 17:1
61:16 62:19
63:9 64:8
76:16 77:1,4

77:11,14,20
78:5,11,12
79:1,16 118:16
119:1,12,15
155:21 161:8
161:25
**join** 167:18
**jon** 1:4
**jonathan**
111:23
**jones** 111:25
**jp** 65:8
**judge** 80:20
96:4,9
**jump** 46:17
65:6 78:14
**jumping** 34:21
35:13
**junior** 7:10
**justice** 98:10

**k**

**k** 4:12,18
**keep** 117:21,22
118:1 127:5
161:19 178:25
181:2
**keeping** 102:12
103:5
**kelly** 112:19
**kevin** 2:18 6:10
102:24,24
**key** 46:13
**kind** 29:4 72:21
99:5 104:16
121:2 143:14

143:24
**king**  2:2 16:23
17:7
**kmj117**  119:3
**knew**  83:18
84:4 118:10
147:6
**know**  8:14
15:15 23:5
28:1,2,3,4,10
28:14 30:8,9
30:13,16 31:7
31:25 43:20,21
43:24 44:4,8,9
44:9,10 49:16
53:3 64:6
65:14 66:22
67:14 69:6
70:4 71:4
72:18 76:9,17
77:4 79:10,25
80:9,19,22,22
81:16,18 85:20
86:25 87:17
88:13 89:24
90:20,23,25
92:1 96:14,24
105:12,16
106:4,5,8,11,13
106:23 107:3,4
107:6,8 109:4
109:23,23,24
110:13 112:11
114:15,18
115:8,9,10,14

115:16,17
118:8 120:19
122:5 124:15
124:18 127:22
133:17,21
136:11 137:15
137:23 138:13
139:23 144:17
145:23 146:6
146:10,11,21
147:7,17 148:4
149:9 151:1
158:10,15,17
158:20 160:11
161:15 163:16
163:19 165:4
165:25 166:18
167:14 170:21
176:3,15
177:10 178:24
179:20 181:12
185:6,6,7,11,12
185:18,24,25
186:3,9,18,24
**knowing**  72:25
**knowledge**
53:7,22,25
64:14 80:18,25
84:11 114:7
185:15,19,25
186:1,2
**knows**  87:15
**kolb**  4:19 162:1
**krazno**  111:24

**kristina**  17:1
62:19 76:15
77:15 118:15
119:12,15
155:21,21
161:8,25
**kslaw.com**  2:5
**kuryluk**  2:10
6:12,12 31:13
34:2 103:21

**l**

**label**  42:15
54:20 84:20
97:16 158:23
**labeled**  42:16
42:20 43:7
55:5 65:8
74:18 123:19
156:4
**labeling**  161:22
**lack**  23:24
**laffer**  9:6,9
10:2,6,9,22
33:2 36:3 37:3
37:21 55:21
63:13 64:11,15
64:18 67:19,24
68:5 78:21
79:6,8,12,19
82:17 83:2,23
84:13,24 87:1
87:6,7,13,14
88:9 89:4 97:2
97:5,8,11,14
98:21,24,25

99:8,9,13,15,15
104:13 108:2
108:13 110:10
116:5,11,16
117:14 118:17
119:18,21
120:12 121:13
122:17,23
123:2,12,23,25
125:16 126:15
126:16 128:11
129:2 130:18
130:20,24
131:22 132:11
133:9,15,19
134:16 138:19
141:7,12,16,19
141:22,24
142:12 144:18
145:24,25
147:12,19,20
148:6,9 152:24
155:5,9 158:12
164:2,7,25
167:9 171:2,21
172:6,12,14
174:18,21
175:5,7 184:17
184:21,24,24
186:8 187:2
188:16,16,25
**laffer's**  89:12
108:6 110:7
141:20 166:1

land 20:20
language
  149:23 155:2
large 41:11
  103:25
late 65:7 70:13
  128:19 137:1
  137:17
law 2:3,13
  30:15,19 33:1
  100:9 113:3
  115:14 123:25
lawsuit 8:22
  9:1,21 33:17
  34:18 35:16,24
  152:14
lawyer 45:20
lawyers 45:18
  147:5
layman 28:21
layman's 59:16
lead 22:24
  109:10
leader 162:1
leaders 1:12
  105:23 106:3
  110:21,24
  111:2,5,13,14
leadership
  25:13 187:11
leading 85:18
  85:23
learn 21:11
  33:4 73:11,14

learned 108:24
  144:20
learning 20:1
  67:23 74:9
  128:21
leave 53:4
  168:15
leaves 169:25
leaving 56:23
lecture 108:1
  141:10,14,18
  141:19 142:2
  144:15 155:6,9
lectures 32:23
led 110:20
left 12:9,12
  14:7 78:23
  79:19 171:19
legal 19:19
  20:6,9,11
  192:23
legally 36:4
lehigh 11:12,15
  11:16
lek 1:7
length 131:2
lens 105:14
lesson 154:13
letter 4:18
  62:17,21 161:8
  161:13,24
  163:24 185:13
  185:16,22
  186:4

letters 120:11
letting 181:7
level 63:7 87:24
license 72:10
lift 187:13
lifting 187:6
likely 129:17
  131:17,18
  133:5
limited 66:9
  75:10 80:18
  108:21
line 118:16
  170:9,18
  175:25 176:5
  193:4,7,10,13
  193:16,19
lines 92:12
  175:12 177:24
link 67:18
list 32:14 58:14
  61:17 90:4
  91:3,7 107:25
  112:9 113:15
  113:17 122:18
  128:10 148:13
listed 56:3
listen 89:8
  136:5 153:1
  168:10 169:7
  176:14
listened 144:8
  172:23
listening 83:14
  83:15,15

lists 113:14
literally 47:16
  106:21
little 54:18
  103:11
lizak 1:4
locally 144:9
location 1:21
  53:4 141:23
  160:14
logical 114:20
logically
  158:10,16
long 57:3 150:4
  171:2 172:6
  173:21 183:16
longer 62:4
look 31:16 43:7
  44:21 49:15
  57:7 58:14
  65:19 74:18
  87:17 91:25
  107:13 112:8
  112:11 116:25
  122:11 136:12
  138:22 145:15
  155:22 160:22
  169:18
looked 40:19
  93:16 107:2
looking 15:16
  31:21,22 45:20
  48:13 54:14
  72:13,21 96:11
  99:13,19,22

107:15 124:11
163:11
**looks** 77:25
**lost** 181:21
**lot** 57:19,20
83:13 99:11
120:10 182:16
**lots** 47:5
**loud** 48:21 49:1
51:14,16
**loudness** 49:3
51:23
**lower** 118:8
**lunch** 66:18
75:7 83:11,13
160:19,20
**lunchtime**
66:16 70:10

**m**

**m** 3:1
**made** 24:9
27:18 36:4
42:9 43:10,12
43:12 49:12
51:3 62:24
67:1 73:20
74:7,8 82:3
99:20 120:8,15
141:6 144:18
144:21,22,23
144:25 145:7
147:2 156:7,18
157:18,19,21
163:15 164:19
165:13 166:14

174:21 178:18
179:14 194:5
**mail** 4:5,6,7,8,9
4:10,11,12,14
4:20 55:2,6,17
55:25 56:11
57:25 61:18
63:13 65:20
66:3,9 67:15
74:20 76:15,25
77:14,16,19,21
77:24 78:3,4
78:11,14,16
79:2,4 81:24
82:23 84:22
85:16 90:12,19
91:10,11,11,19
91:21,25 96:25
97:3,4,18 98:8
103:25 104:18
116:3,21
118:14,19
119:2,6,7,9,11
122:14,16
124:10,14
134:7 136:18
150:10 155:17
159:3,4,6,7,21
160:24 165:5
184:20,23
**mails** 4:16
57:19 68:1
74:14,14,16
76:14 99:11

**main** 135:21
170:22
**maintenance**
37:6
**major** 21:18
60:17
**majority**
104:21
**make** 18:12
24:17 26:20,23
27:15,22 28:12
28:13,16,25
29:18 32:9
39:16 43:13,15
45:9,15,19,24
49:13 50:16
52:11,13,25
53:8 56:23
57:5 60:25
62:1 65:24
68:24,25 69:25
72:23 73:2
75:5 79:1,18
79:24 81:18
82:13,17 83:1
84:9 86:19
89:5 93:12
96:21 103:1
120:3,4,5
127:4 128:1
141:6,11,16
142:8 149:14
155:7 164:20
166:6,11,16,19
171:1 172:20

172:24 173:5
173:14,25
174:6,22 177:3
178:5
**makes** 26:24
115:2
**making** 26:13
41:16 42:10
49:10 50:18
81:2,20 89:8
96:9 119:17,20
121:8 131:10
164:24 172:25
174:12,13,16
177:4
**malocavik**
111:23
**man** 87:18
**manage** 20:22
26:11 84:5
85:14 110:5
112:15
**managed** 15:3
143:23
**management**
13:19 19:2
26:12 60:8
133:4,14,18
**manages** 13:2,4
23:3 60:4
112:14 154:21
**managing**
23:20 143:22
143:24

**[manifests - mind]** Page 29

**manifests** 39:1
**manner** 117:17
**mark** 76:4
  89:20 90:6
  103:18,22
  116:20 134:1
  150:2 161:6
  165:5
**marked** 31:7
  31:13 33:25
  34:2 42:17,22
  54:22 76:5,6,9
  85:1 89:21,25
  96:11,15,16,17
  96:20 97:21
  103:15 104:3
  105:20 107:14
  116:23 118:21
  122:12 134:1,3
  134:6 145:10
  150:3,7 159:1
  162:3 163:10
  165:4,8 169:22
**marketing**
  58:13 136:16
**martyrs** 92:7
**material**
  137:10
**materials**
  136:13
**matter** 17:16
  17:21,22 45:10
  45:24 46:15
  52:12 58:17
  63:19,20 72:2

120:17,24
  136:6 183:7
**matters** 26:14
**mayor** 96:9
**mccabe** 4:14
  134:8,19,20
  136:10
**mcgoff** 56:15
**mean** 10:5 16:1
  27:1 40:9 51:5
  58:18,22 59:12
  59:22 61:1,11
  75:17 80:5,11
  86:24 98:16
  99:25 111:2
  125:24 130:18
  139:9 152:13
  152:16 172:11
  179:12 182:16
  182:16 184:3,8
**meaning** 61:2
  83:19 100:3
  140:10
**meaningful**
  140:22 182:5
**means** 57:17
  58:24 59:14
  75:19 77:5
  121:25 139:19
  157:5
**meant** 79:25
  80:4,11 92:2
  139:23 140:1,6
  172:5 180:20

**measure** 83:7
**measures** 35:17
  36:5 69:9,10
  95:10
**media** 113:5
  115:11,21,23
  115:24 164:4,6
  164:14,17,25
**meet** 62:10
  136:1 159:18
  159:20 160:6
**meeting** 10:20
  68:5 75:20
  113:9 126:9
  128:7,12,17,21
  136:1 143:25
  159:22 160:1
  160:12,15,16
  161:2 167:8,12
  167:15,17,22
  168:5 171:9
  173:17 174:4
  177:4 182:13
**meetings** 10:15
  16:16 32:23
  112:15,16
  123:8 129:18
**melissa** 111:24
**member** 11:12
  11:16 98:5
  104:24 110:18
  134:20
**members** 59:9
  104:22,22
  107:7,8 123:22

130:15 135:5
  156:1 161:9
**membership**
  106:24
**memo** 133:2
**memory** 132:23
  189:9
**mentioned** 9:25
  66:4
**mere** 48:11
**merely** 47:9
  118:5 135:8
**merit** 94:3
**merits** 94:17,17
  95:22
**message** 4:4
  43:8 48:9
  49:14 56:21
  57:8,15 62:15
  65:21 77:8
  78:6,10 79:16
  81:19 91:2
  116:10,15
**messages** 122:3
**met** 110:4
  146:22 160:8
  160:12
**michael** 56:15
**middle** 57:25
  66:17 74:22,23
  87:10
**miller** 77:7
**mind** 51:2
  60:10 99:12
  120:2 168:1

| | | | |
|---|---|---|---|
| **minor** 60:18 | **monday** 63:14 | 63:4 65:11,24 | 161:11,19 |
| **minority** 156:2 | 65:22 70:10 | 71:2 72:7 76:8 | 162:5 164:8 |
| 161:10 162:1 | 73:3,17,19,20 | 76:20 77:21 | 165:19 167:1,5 |
| **minute** 70:4 | 73:21 77:2 | 80:15 81:5,9 | 168:15 169:1 |
| 147:20 170:7 | 82:10 141:7 | 84:15 86:6 | 169:13,21 |
| 182:25 183:11 | **money** 127:15 | 88:20 89:1,6 | 170:7,19 |
| **minutes** 5:7 | 127:20 | 89:10,13,21,24 | 173:19 174:2,6 |
| 92:1 170:17 | **monitoring** | 90:2,8 91:3 | 176:8,12,17,21 |
| 171:19 172:2 | 115:11,21,24 | 93:22 94:5 | 177:15 178:1 |
| 172:10,12 | **month** 9:2 17:8 | 95:2,15,25 | 179:9,12,24 |
| 175:25 176:23 | 49:18,19 | 96:13,19 97:25 | 180:19 182:7 |
| 177:1 179:1,3 | **monthly** 63:19 | 103:16,20 | 182:23 183:15 |
| **mirror** 150:17 | 63:22 | 107:5 109:2,16 | 183:21 184:5 |
| **mischaracteri...** | **months** 12:11 | 109:19,23 | 184:22 185:23 |
| 154:1 | 17:8 167:23 | 112:25 115:4,7 | 189:21 190:1 |
| **mischaracteri...** | **moore** 2:9 6:7,7 | 115:16 116:18 | 192:1 |
| 154:3 | 7:25 9:12 | 117:6 119:7 | **morning** 73:19 |
| **miscommuni...** | 10:13,19 12:21 | 121:5,19 | 174:10 |
| 8:1 | 14:4,15 15:13 | 124:15 125:18 | **move** 11:21 |
| **miscommuni...** | 15:16 18:14 | 127:13 130:9 | 14:10 54:18 |
| 27:10 | 20:3 25:6 26:8 | 130:17 131:24 | 64:10,11 74:12 |
| **misread** 92:9 | 27:4,13,24 | 132:24 134:5 | 89:18 103:11 |
| **misspoke** | 29:2,5,6,10 | 136:18,22 | 149:25 150:1 |
| 171:22 172:3 | 30:7,24 31:6 | 140:5,14 | 151:20 161:5 |
| **misstated** | 32:2 33:20,25 | 142:13,18,22 | 161:18 164:2 |
| 71:16 | 34:23 36:8 | 146:17,19 | **moved** 13:13 |
| **mit** 11:5 | 37:2 38:1,18 | 147:6,16 148:4 | 14:18 |
| **mitchell** 4:9 | 38:20 39:9,11 | 148:22 149:16 | **moving** 128:5 |
| 97:19 98:4 | 40:2 41:21 | 150:3,7 151:17 | **n** |
| **ml** 1:7 | 42:19 43:1 | 151:19 152:1,8 | **n** 3:1,1 4:1 6:1 |
| **module** 19:8 | 44:5,19 45:13 | 153:1,8,15,25 | **name** 7:8 16:22 |
| **moment** 11:20 | 48:13,18 51:18 | 154:9,15 | 90:25 106:2,22 |
| 21:1 41:25 | 51:20 52:5 | 155:11 156:10 | 112:17,18,19 |
| 42:23 74:12 | 54:16 55:8,12 | 156:12,22 | 112:21 |
| 85:17 146:7 | 55:14 58:20 | 157:14 158:9 | |

**names**   56:3
   91:4
**naming**   135:18
   135:18
**natalia**   111:23
**national**   164:6
   164:10
**natural**   143:10
**nature**   17:9
   153:24 179:20
**navarro**   25:21
   150:21 151:14
**near**   108:13
   116:3 123:6
   143:15
**nearly**   108:3
**necessary**   39:8
   166:6,12,20
   168:12 172:24
   173:15,25
   180:18 194:6
**need**   8:13 14:16
   15:14 16:8
   34:22 104:5
   133:13 139:22
   139:22 162:5
   163:6 183:12
   189:13,17
**needed**   68:24
   69:22 186:3
**needs**   110:1
   169:3
**neither**   191:12
**never**   23:23
   120:18 160:8

160:15 178:24
   187:4
**nevertheless**
   178:12
**new**   1:2,22 2:4
   2:4,7,8,14 6:8
   7:11 12:1
   16:15 20:17
   26:17 29:22,23
   30:11,21 31:17
   31:23 32:16
   33:10,12,17
   34:10 35:14
   36:3,12,16,25
   37:7 59:9 77:7
   90:21 100:9
   127:18,19
   136:15 162:1
   181:13
**nicely**   120:7
**nickname**   77:9
**nicole**   61:16
**nieman**   56:18
**night**   72:24
   82:25
**nine**   15:24
   103:12
**nobel**   64:5
**noise**   40:15,18
   41:16 48:2,11
   50:8
**nope**   106:18
**normal**   28:21
**northern**   1:2

**notary**   194:13
   194:19
**note**   184:19
   192:10
**noted**   194:7
**notes**   15:13
**november**   8:21
   8:25 9:2,6,8
   10:1,3 23:10
   26:3 40:7 42:9
   43:8,10 54:10
   55:18 64:3
   65:22 73:4
   77:2 82:11
   84:24 90:13
   97:20 104:1
   105:21 106:9
   106:15 111:16
   116:4 118:18
   119:18 122:15
   122:18 128:19
   134:9,14
   136:17,19
   137:1,17 139:6
   141:7 150:11
   158:13 167:25
   184:22
**number**   31:8,9
   31:11 34:5,6
   35:13 40:23
   42:24 65:9
   76:17 81:14
   85:18,22 91:4
   97:17 103:12
   107:24 114:6

118:15 165:7
**numbered**
   65:20 116:22
**numbers**   31:11
   41:6 76:12
   83:24 84:12,21
   103:24 122:13
   133:25 155:14
   158:25 161:7
   161:23
**numerous**
   141:6
**ny**   192:15

**o**

**o**   3:1,1 4:1
**oath**   7:12
**object**   10:13
   40:2 83:17
   124:8 184:5
**objecting**   36:8
**objection**   9:12
   12:21 14:4
   18:14 20:3
   25:6 26:8 27:4
   29:10 30:7
   33:20 36:8
   38:1,18 39:9
   44:19 54:16
   58:20 63:4
   71:2 72:7
   80:15 86:6
   88:20 89:6,13
   93:22 94:5
   95:2,15,25
   121:19 130:9

130:17 132:24
142:13,22
147:16 148:22
149:16 151:17
152:8 153:15
153:25 154:9
154:15 157:14
158:9 164:8
167:1 169:2,14
173:19 177:15
179:24 180:19
182:7,23
**objections** 5:11
**obligated** 18:1
18:5 38:16
39:17,19
**obligation**
38:24 39:1,15
88:5
**observation**
41:20 114:7
144:3,5
**observed**
144:23
**obvious** 140:4
**obviously**
34:13
**occasion** 33:4
**occupants**
112:9
**occupational**
17:21
**occupy** 111:15
**occur** 47:5
72:19 100:18

**occurred** 10:22
37:17 40:7
42:8 47:1,4,5,9
47:11,16,22
49:2 64:16,18
82:10 123:25
139:15 140:15
141:1 186:8
187:10
**occurrence**
47:2,24 48:3
48:10
**occurring**
131:13
**offense** 93:19
100:22
**offered** 24:7
**office** 2:7 6:9
6:13 23:1,2,4
23:10,15 41:17
42:3 43:23
47:21 60:23
61:1,2 77:7
91:16 93:13
136:16 137:20
143:11,23
157:16,20
**officer** 23:14
56:17 71:21
77:6 171:19
172:2
**officers** 56:1,6
62:7 84:6,7
187:1,6

**offices** 137:23
**official** 1:9,10
1:11 106:23
**officials** 14:3
59:11 70:9
91:12 123:8
129:3 131:21
132:5 138:15
174:17
**oh** 64:4 113:25
143:20
**okay** 11:4 12:7
18:21 31:25
54:18 59:16
72:19,21,24
74:24 82:6
83:16 86:16
89:23 110:2
114:6 115:7
121:10 136:22
146:24 156:14
169:6 175:11
176:7 184:25
185:19 186:3
186:25 188:4
189:12,20
**old** 59:17
**ones** 56:14
88:15 101:4
135:22 138:6
145:22 147:11
**ongoing** 158:13
**open** 68:21
**operation**
85:10 182:6

**operations**
25:16,17 26:1
26:10 27:13,14
27:15,16,20
28:4,10 29:16
127:24
**opine** 80:23
**opinion** 46:5
96:3 124:4
125:7,13
133:12,16
187:20,23
**opinions**
129:24
**opportunities**
20:21
**opportunity**
75:1,22 108:6
121:7 141:9,13
141:17 156:12
169:4,6 182:5
**opposed** 12:14
12:19 120:16
135:24 185:10
186:21 188:1
190:3
**opposite** 95:3
**oral** 120:17
151:7 171:10
171:15 173:6
**orally** 119:17
172:14
**order** 23:21
39:8,18,24
65:5 69:11,22

150:24 172:24 174:1

**orderly** 32:23

**orders** 189:13 189:14

**organization** 1:12 105:22,24 106:6 123:24 125:6 127:8,11 154:21,23 185:8 186:14 186:16

**organizations** 20:18 60:4 87:3 115:12 145:14,19 147:10,23 148:18 154:21

**organize** 179:21

**organized** 173:4

**original** 78:3 159:7 190:1

**outcome** 95:20 191:14

**outcomes** 150:20 154:22

**outdoor** 185:1

**outside** 13:22 18:7 20:17 58:17,22 83:13 105:2 132:19 138:8 166:3 167:20

**overall** 15:3

**overnight** 98:11

**oversee** 20:18

**oversees** 96:1

**oversight** 26:6

**overstep** 96:8

**overview** 105:20

**own** 43:16 46:5 92:24 141:9,14

**p**

**p.m.** 1:20 65:22 66:6 77:1 78:14 79:12 90:13

**page** 3:3 4:3 31:16 34:16,19 35:8 55:5 57:7 58:2 65:20 66:4 74:18,19 81:8,13,13 84:22 97:17 105:19,19 107:14,19 113:1,1 116:3 133:1 136:14 141:4 145:9,10 145:10 149:5 150:10 155:25 156:2,5 163:9 165:7 170:6,9 170:18 171:17 171:18,24,25 171:25 172:21

174:9 175:11 175:24 176:4,5 177:24 183:18 183:22,23 193:4,7,10,13 193:16,19

**pages** 55:1 76:15 90:9 116:1,2 136:14

**paragraph** 34:20,24 35:9 35:13 45:6 46:17 48:24 50:19,20,22 58:1,15 60:22 132:1 137:11 138:22 145:15 150:14 155:6 156:5,5,8,10,16 163:12 166:10 172:21

**parent** 118:8

**parenthetically** 125:25

**parents** 117:12 138:5,5

**parking** 83:13 135:19,20

**part** 12:1 18:1 33:9,12 47:24 48:22 49:2 53:16 67:4 69:15 70:7,15 70:17 76:24 85:20 103:17

126:19 128:17 135:3 138:14 147:25 148:21 148:24 149:20 153:12 154:5 156:3 184:14 187:9

**partial** 40:21 189:6

**partially** 99:3

**participants** 52:21 88:17 149:1

**participate** 164:17 167:19

**participated** 145:14,19 147:10 148:18 165:13

**participating** 147:23

**particular** 39:11 96:14

**parties** 5:4,17 35:2,11,15 191:13

**parts** 32:18 168:4

**passages** 107:12 168:13

**past** 85:11

**pay** 49:21 50:2 57:23

**pdf** 189:17,24 189:25 190:4

peaceful 32:22
peer 96:7
pelletier 1:11
  2:11 6:8 26:4
  65:22 66:5,22
  67:17 68:4
  69:18 70:5,15
  72:1 83:5,23
  90:19 91:12
  132:8 150:21
  151:14 171:4,5
  171:21 172:8,9
  172:12,15,17
  172:18 173:7
  173:13 174:3,7
  175:18,21
penal 100:9
pending 8:16
  78:24 80:16
  81:2 89:1
people 16:10
  20:18 29:13
  37:18 40:23
  41:6,11 51:24
  52:14 57:20
  59:1,3 61:13
  64:25 66:20
  67:10 69:2,19
  70:2 71:7
  72:23 75:20
  88:12,12,14
  89:16 93:8
  98:12 100:1
  105:7 106:21
  107:1,1 111:12

111:21 112:3
  117:11 130:23
  137:18 143:9
  144:24 145:25
  145:25 147:18
  147:18 148:1,3
  148:13 167:14
perceive 39:21
percent 85:19
perfect 170:11
performing
  175:22
period 13:7,15
  16:9 63:16
  75:14 122:22
  126:6 128:18
  129:3 131:22
  132:6 137:1
  138:20 141:1
permitted
  163:23
person 19:9
  32:20,24 35:19
  36:7 88:2 96:1
  112:14,17,22
personal 114:7
  119:2 139:1
  185:15
personally
  117:24 118:10
  118:11 153:10
  164:20
personnel
  138:2 148:10

persons 89:3,11
  111:15
perspective
  38:6 48:14
  104:17 108:6
  168:11
perspectives
  46:18,20 50:21
  50:24
pertain 133:4
phone 61:3,3
  66:17,21 68:7
  68:8,11 69:5
  69:20 70:8
  75:9 83:11
  92:14 137:20
  137:21,21
  174:10
phonetic
  111:23,24
  112:19
phrase 52:15
  99:25 111:2
phrased 29:11
physically
  64:17 113:10
piece 155:20
place 31:18
  65:25 99:17
  102:23 104:15
  126:5,11,14
  128:12,16,23
  136:4 142:5
  191:6

placed 142:12
placement
  143:5
plainclothes
  166:3
plaintiff 152:13
plaintiff's
  189:22
plaintiffs 1:6
  2:5 6:4
plan 107:17
  110:5 169:19
plane 67:20
planning 19:5
  170:10
play 168:3,6
  170:1,4 175:23
played 106:9
  122:5 123:24
  125:6 170:15
  176:2,24 179:2
playing 169:2
  169:14 170:14
  178:25
please 7:24
  12:7 14:21
  18:18 22:24
  32:19 33:23
  34:22 37:15
  51:5 67:10
  71:16 80:25
  82:16 83:21
  109:14 137:10
  156:17

**[plot - prepared]**

| | | | |
|---|---|---|---|
| **plot** 1:12 | 149:20 | 133:1,3,14,18 | **posted** 51:6 |
| 105:23 106:2 | **police** 25:1,12 | 165:23 | **potential** 26:14 |
| 106:15,19,21 | 25:14,15,24,25 | **policy** 38:5,15 | 59:18 64:24,24 |
| 106:22 107:3,7 | 26:4,7,13,16,24 | 38:21,22 39:4 | 64:25 67:20 |
| **plumb** 67:8 | 27:6,15,17,17 | 39:8,10,14 | 70:23 71:8 |
| **point** 13:23 | 27:21,22 28:11 | 115:14 117:17 | 75:7 82:4 91:8 |
| 23:12 36:2 | 28:13,24 29:18 | 123:25 126:1 | 97:6 126:4 |
| 48:20 49:9 | 41:9 45:4,9,23 | 185:2 | 157:12 |
| 54:1,9 56:12 | 46:3,8,10 | **poorly** 29:11 | **potentially** |
| 56:22 60:10 | 51:22 52:1,2,3 | **portion** 116:6 | 133:4 143:5,25 |
| 61:5 62:4,8,18 | 52:6,8,10 53:3 | 131:16 136:13 | **power** 71:18 |
| 63:10 64:7,12 | 61:21 67:2,18 | **portions** | 128:3 135:7,9 |
| 73:3 91:22 | 67:24 71:21 | 156:16 169:3 | 135:12,25 |
| 97:10 99:11 | 72:11,25 73:17 | 169:14 | **powers** 135:10 |
| 105:6 107:25 | 73:18 74:4 | **position** 12:13 | 135:15 |
| 108:9 110:3,17 | 83:24,24 84:12 | 13:13 14:11,19 | **practice** 120:17 |
| 113:17 115:11 | 90:22,24 99:19 | 111:22 139:6 | 120:23 133:2 |
| 117:22 123:19 | 102:16,17,21 | 148:17 | 152:3 |
| 132:5 136:10 | 102:25 103:2 | **positions** | **practices** 133:3 |
| 137:17 141:4,8 | 110:3 113:4 | 111:15 112:1 | 133:18 |
| 144:14 165:22 | 114:10,16 | 112:10 | **precise** 172:11 |
| 169:17 175:7 | 128:12 131:19 | **positive** 91:15 | **precisely** |
| 177:2 182:14 | 132:3,9,13 | **possibility** | 179:19 |
| **pointed** 182:3 | 139:17 148:10 | 110:18 | **preface** 157:7 |
| **pointing** 67:16 | 148:12 166:2,2 | **possible** 37:13 | **prefer** 6:23 |
| 156:7,15 | 166:5,6,11,16 | 49:4 50:10 | 8:17 |
| **points** 6:25 | 166:19 171:19 | 59:5 82:14 | **preparation** |
| 107:18,25 | 172:2,23 173:4 | 100:7,12 | 104:10 107:16 |
| 113:14 118:20 | 173:5,14,24,25 | 105:11,12 | 108:23 110:10 |
| 136:9,17,24,25 | 174:22,25 | 142:9 143:12 | 167:21 |
| 137:5,8,9,14,16 | 175:8,14,15 | 152:6 154:22 | **prepare** 69:7 |
| 137:18,22 | **policeman** | 158:11,11,16 | 104:16 167:12 |
| 138:3,8,11,15 | 175:13 | 188:18 | **prepared** 9:17 |
| 138:19,23 | **policies** 35:17 | **possibly** 48:22 | 71:5 108:22 |
| 141:5 144:14 | 36:5 39:2,3 | 49:1 51:14,17 | 124:17 138:11 |

165:25 166:1
**preparing**
10:20 78:24
**preplanned** 9:9
**presence** 5:4
41:9 83:24
173:24
**present** 2:18
64:17 68:19
69:10 75:22
83:25 84:6,12
175:15
**presentation**
99:1 110:7,15
144:16
**presentations**
136:2
**presented**
136:6
**presenting**
75:21,24
**presidency**
18:22
**president** 1:4,9
1:10 4:4 6:19
12:10 14:13,19
14:22 15:2,6
16:6,7,10,13
17:13 21:6,12
21:15 22:6,8
22:12 25:15,17
25:24 26:1,10
27:2,2,3,3,16
27:20 28:4,10
28:17,23 29:16

30:5 31:16
32:13 33:14
34:13 35:4,20
37:4,8,23
38:16 43:6,8
46:11 47:12
48:7,9 49:9,14
49:22 54:8
58:10,12 72:5
82:8 88:4 89:7
94:13 95:13
104:2 109:11
111:7,7,8,11
113:7,20 116:6
117:1 118:23
121:12 122:19
124:19 126:10
126:10 128:2
150:10 170:23
180:22
**presidents** 15:7
15:9,18 16:16
17:14 20:17
30:20 36:12,16
36:19,24 56:7
58:11 136:2
**press** 99:10
**presume**
112:21 122:2
**presuppose**
20:14
**pretty** 29:11
87:21 97:4
**prevent** 32:22
127:20

**preventing**
35:18 36:6
70:1
**previous** 73:18
**previously** 31:6
34:2 65:8
122:12 130:6
134:1 148:25
155:15 158:23
165:4
**price** 64:5
**primarily** 9:4
**principle**
179:18
**print** 119:16
**printing** 90:11
**printout** 31:17
31:23
**prior** 66:14
67:19,24 68:5
71:16 133:18
142:20 176:9
**priority** 118:8
**private** 11:24
**privilege** 20:13
**probably** 40:25
44:2,5 49:19
66:9 68:20
69:21 72:9
73:15,16 81:23
82:20 83:15
88:1 93:3
101:3,7 103:2
109:5 138:6
181:17

**problem**
186:21,22
**procedure** 5:15
5:18,19 101:19
121:6
**proceed** 24:7
168:14
**proceeding**
157:12
**proceedings**
191:5,8
**process** 10:20
19:15 21:12,20
21:25 22:21,25
23:20,22 59:14
80:18 95:7,9
95:12,16,17,18
95:19,23 96:2
96:6,8 100:4,5
101:24,24
102:4,8,13
103:6,8 104:12
104:15 105:16
121:18,20,21
122:7,21
138:10,14,16
139:16,19,21
150:24 157:1
157:11,23
162:19,23
163:20 177:9
177:22 178:14
180:12 188:3
**processes** 23:21
24:1 100:25

101:10
**produced**
90:11
**professional**
10:25 11:9
**professor** 11:12
82:17 159:13
159:14
**professors** 64:5
**profit** 106:23
**programs**
133:5
**progress**
129:22,25
**progressive**
1:12 105:23
106:3 123:21
124:6,24 125:1
186:21
**progressives**
1:12 108:5
116:4,11,15
123:20 125:12
125:15 126:1,3
126:5,24
131:18 184:17
185:17,21
186:7,22 187:2
187:18
**prohibited**
32:14
**projects** 136:4
**promises**
180:17

**promotes**
154:22
**proof** 186:15
**propensity**
101:3
**proper** 123:9
**properly** 95:16
173:12 182:13
**proposed** 75:23
77:20
**prosecution**
139:5
**protect** 39:6,18
39:19 53:14
69:2,9 83:19
83:19,20
**protected**
46:22 50:25
52:16,20
165:21 177:11
177:12
**protecting**
68:13,14,18
69:15
**protection** 83:8
**protections**
14:2
**protest** 67:20
75:25 76:2
143:9 155:3
165:24
**protester** 98:21
**protesters**
78:22 98:25
143:12

**protesting**
87:16 93:8
142:11
**protests** 186:7
**protocol** 27:17
**protocols** 27:23
**provide** 75:1
96:5 136:5
**provided** 5:14
5:17 141:8,13
186:4,6
**providing**
168:23 170:13
**provision** 32:14
33:1,5 34:16
62:5 94:23
**provisional**
31:11
**provost** 12:11
12:13 13:14
**prudence** 17:22
17:23
**public** 20:19,20
42:10 130:7,13
149:15 194:19
**purchased**
82:22
**purpose** 49:11
59:25 60:6
105:4 108:16
115:21,24
137:13,16
**purposes** 5:14
40:6 45:1
59:19 60:1,2

169:15
**pursuant** 34:12
**pursued** 156:19
156:21,25
157:3,5 163:16
163:17
**pursuing**
157:18
**put** 39:16 58:15
134:12 143:14
162:12
**putting** 89:3

**q**

**quality** 90:10
**quarters** 58:2
183:22
**question** 7:23
8:1,9,16 9:13
9:16 18:6,17
27:5,6,10,19
28:5 29:11
37:14 38:2,19
38:25 40:1,3
45:14,15,18
50:7,16 53:1,9
53:19 54:3,8
66:10 71:25
73:10 74:6
79:6 81:1,12
89:1,2,3,7,8,9,9
93:24,25 94:1
94:7,7,8,16
95:12 98:19
107:5 108:22
109:13 112:6

| | **r** | **real** 66:15 | 70:4,12,12,16 |
|---|---|---|---|
| 117:4 126:17 | | | |
| 128:25 130:10 | **r** 6:1,1 34:11 | **realize** 14:25 | 70:23 75:4 |
| 130:21,22 | 193:3,3 | 64:11 108:20 | 76:23 77:18,19 |
| 131:6,25 132:9 | **raise** 182:20,24 | 114:3 | 78:10,11 79:11 |
| 140:14 141:10 | **raised** 187:12 | **really** 67:12,14 | 79:21 81:3,19 |
| 142:23 145:17 | **raising** 182:2 | 69:22 75:9 | 82:16 83:22 |
| 145:17 146:6 | **range** 135:23 | 80:22 82:25 | 84:2 85:4,21 |
| 146:18 147:13 | **reach** 23:21 | 87:7 93:12 | 85:24 86:1,4 |
| 148:5 151:19 | **reaching** 138:1 | 106:3,22 107:4 | 91:22 92:11 |
| 151:20,22 | **reaction** 88:21 | 109:14 111:13 | 98:12,14 104:7 |
| 153:1 156:23 | 131:18 | 143:22 162:10 | 104:12 106:14 |
| 156:24 157:2,8 | **read** 5:7 32:19 | 170:11 182:17 | 106:18 108:19 |
| 167:2,3 173:13 | 34:14 35:4 | **rear** 150:16 | 109:7,16,17,20 |
| 173:23,24 | 36:21 42:23 | **reason** 13:10 | 109:20,25 |
| 174:2 177:16 | 44:13 45:16,17 | 48:8 50:6 | 110:8 112:21 |
| 177:17,18 | 45:21,22 46:1 | 92:17 119:14 | 117:8,10 |
| 179:25 180:21 | 46:23 57:11,12 | 178:12 182:20 | 118:23 119:5 |
| 182:8,10,11,12 | 58:7 65:14,16 | 192:11 193:6,9 | 119:16 120:9 |
| 184:7 188:10 | 67:15 73:18 | 193:12,15,18 | 122:19,20,21 |
| 188:13 | 78:15 81:15,17 | 193:21 | 122:24,25 |
| **questions** 7:19 | 85:3,3 86:1,3 | **reasonable** | 123:3 126:4,11 |
| 21:15 109:10 | 104:6,8 131:16 | 35:17 36:5 | 126:13,21 |
| 110:7,15 122:9 | 137:19 156:10 | **reasoning** | 128:14,25 |
| 137:7 144:17 | 156:11,13,14 | 92:11 | 130:23 131:5 |
| 165:20 180:4 | 159:21 162:5 | **reasons** 50:10 | 136:24 137:6 |
| 182:3 183:2 | 162:18 165:16 | 92:14 | 138:21 144:12 |
| 188:9 | 165:19 192:9 | **rebecca** 104:22 | 145:2 146:3 |
| **quick** 43:1 81:9 | 194:5 | **recall** 9:10,15 | 150:20 152:7 |
| **quickly** 64:12 | **reading** 21:14 | 24:3,11,18 | 152:17 155:23 |
| 105:11 112:12 | 32:18 45:20 | 28:15 29:14 | 159:9,16,24 |
| **quiet** 150:17 | 55:2 65:23 | 40:5 41:19,24 | 160:18 162:9 |
| **quite** 86:14 | 77:12 82:23 | 42:10 55:17 | 163:18,22,24 |
| **quoted** 166:10 | 155:6 | 56:14 60:19 | 164:1,23,24 |
| **quoting** 48:23 | **ready** 65:15 | 64:7 65:17,23 | 165:1,12 167:8 |
| 67:18 155:20 | 71:10 | 66:10,19 68:18 | 172:18,25 |

174:13,16
177:3 178:4
182:22 186:9
186:10 187:15
187:16,19
**recalled** 70:15
75:13 178:4
**recalling** 98:15
**recalls** 117:6
**receipt** 5:8
192:18
**receive** 14:1
17:17 18:11
44:14 91:22
127:14
**received** 18:23
19:1,4,11,17,19
20:5,7,14,15
21:4 74:5,15
110:22
**receives** 177:8
177:21 178:14
178:16 180:12
**receiving** 66:10
66:15 91:22
127:20 130:15
**recently** 16:24
**recess** 43:5
82:7 121:11
169:12
**recipient** 66:8
**recipients**
56:11 61:18
74:17 104:2

**recognize**
55:15 84:25
90:14 97:23
104:5,7,9,18
110:25 116:25
117:1,3,4
134:9 165:10
**recognized**
59:24
**recollection**
8:21,25 9:18
9:21 10:8
15:14,17 24:22
30:22 36:22
46:8 64:22
67:9 99:2
109:12,15,22
120:13 123:17
132:20 146:7
151:15 153:9
160:22,25
167:23 168:7
169:16 188:14
188:19 189:3,5
189:6
**recommend**
55:1
**recommending**
148:12
**record** 7:9 8:6
8:11,15,18
35:1,11 36:9
39:17 43:4
55:8 74:1
103:17 121:4

122:6 136:23
162:7,8 168:17
169:11,21
183:1,3 184:19
189:14
**recording**
169:8,15,17
170:22 172:23
176:22
**redacted** 90:3
91:3
**redesignate**
90:7
**reed** 167:8,13
171:1 173:18
174:4,14
**reenter** 32:6
**reexamination**
188:11
**refer** 6:20,21
9:24 10:5
52:15 105:22
112:6 116:10
123:19 126:2
153:2 156:16
168:23
**referee** 5:5
**reference** 9:24
35:15 62:15
161:21 168:22
183:18
**referenced**
42:20 168:5
170:2 192:6

**referencing**
107:20
**referred** 51:2
88:15 186:5
**referring** 31:3
34:23 44:25
52:17,18 64:20
79:19 87:12
96:25 98:18,21
99:7,8,9
113:25 121:20
124:12,24
125:5 152:17
152:25 153:14
171:20 175:4
184:20 187:25
**refers** 124:7
**reflect** 86:12
165:17
**reflects** 124:23
169:17
**reform** 34:10
**refresh** 8:21,25
10:8 99:1
160:22,25
167:22 168:7
188:18
**refreshed** 9:18
9:21
**refreshes**
188:13
**refreshing**
169:15
**regard** 24:15

regarding   72:3
187:1,6
regards   181:11
regular   179:22
regulations
29:22 30:4,12
31:18,24 32:15
179:22
reject   181:7
rejected   24:12
relate   57:14
related   60:15
146:21 191:13
relation   125:16
relationship
16:13,19 17:10
18:2 25:12
30:14 62:23
181:2,19
relevance
30:11 56:5
relevant   27:2
32:18 60:2
62:20,25 63:2
142:1
remainder
88:16
remained   14:22
14:24 45:11,25
46:15 52:12,14
remark   147:2
remember   14:6
23:13 24:2,14
24:16 41:18,23
42:2,5,6 44:20

46:4,6,9 51:20
53:2 54:13,17
63:11,15 64:9
65:4 67:4,6,7
67:10,23,25,25
68:3,7,9,10,12
69:19 70:18
74:8,9 75:9,24
77:3,24 78:4,5
79:17,23 81:4
81:7 82:5,21
83:10,14,16,18
92:19,20,23,24
97:9 98:7 99:3
110:12,16
111:17,18,20
112:23,24
113:11,16,19
113:21 114:24
115:4,9,10,19
115:25 116:13
116:14,17
118:25 119:4,9
119:19 120:1
123:10,13
125:10,21,21
126:20 128:15
128:16,17,20
128:21,24
129:5,11,23
130:1,4 131:9
131:12,14,15
131:20 132:4,8
132:15 133:7
134:18 143:10

145:5,8 151:6
151:7,9,10,12
152:5 155:10
155:12 157:25
158:2,4,6
159:19 160:1,2
160:3,13 164:8
167:7 168:2
171:8 173:16
175:2 182:15
188:21 189:1,3
189:11
remote   19:9
remotely   113:8
repeat   8:23
27:19 31:10
78:8 130:22
131:23 157:2
183:9
repetition
48:17
rephrase   18:17
27:9 78:9
replace   26:2
report   13:3,18
16:20,21 23:15
62:22 73:17
74:4 79:1
151:7 155:4,7
reported   25:24
56:18
reporter   1:23
8:4 189:13,18
190:5 191:1,21

reporting
16:19 17:9
23:17 62:23
103:6
reports   15:5,24
16:4 22:18
25:15 26:1
28:7 48:25
50:8,19 56:12
56:20 180:6
represent
107:1
representatives
111:10 173:5
representing
6:15 183:6
reproduction
161:15
republicans   1:4
1:5 6:6 75:3
110:4 125:25
126:25 153:18
184:12 187:7
187:14,22
request   96:20
121:9 150:25
requested
151:3
requesting
159:22
require   93:18
required   14:2
39:24 194:13
requirement
17:21

**requires** 96:7
**resembles**
    136:25
**reservation**
    60:20 126:1
    133:3,14,17
    185:2
**reservations**
    60:8,12
**reserve** 144:16
    185:9
**reserved** 5:11
    108:12
**reserving**
    153:22 185:3
**residents** 59:9
    59:9,10
**resolution**
    23:21 102:3
**resolved** 35:25
**respect** 5:20
    18:10 21:4
    33:18 64:19
    65:3 73:5,12
    74:2 93:19
    97:2,7 102:13
    110:7,15 123:1
    125:16 131:21
    132:10 135:11
    135:16 137:10
    143:4,6 146:8
    147:19 148:13
    148:20 157:12
    158:12 186:12

**respectful**
    110:19
**respectfully**
    86:20
**respecting** 75:2
**respective** 5:4
**respectively**
    10:6
**respond** 71:6
    78:15 87:22
    117:19,24
    118:13 121:16
    121:22
**responded**
    71:24 77:25
    86:20 151:16
    152:6 172:14
**responding**
    79:2 99:11
    117:18,18
    121:24 151:25
    180:7
**response** 45:4,9
    45:23 46:3,8
    46:11,14 51:23
    52:1,2,8,10
    76:22 87:4
    113:6 123:9
    127:2,6 152:4
    179:20
**responses**
    118:10
**responsibilities**
    12:15,18,25
    13:17 14:21

15:1,2 135:21
**responsibility**
    13:20,21 26:6
    37:23 38:5,10
    38:14 53:14
    96:3 102:21
    135:3 153:17
    177:10
**responsible**
    17:16 60:8
    102:12 103:5
    153:23
**rest** 57:11,14
    155:1
**restaurant**
    83:14
**restricted**
    68:22
**result** 92:7
    95:10 115:23
**resulted** 21:1
**results** 19:15
    95:17 103:7
**retained** 4:2
**retired** 25:25
**return** 123:4,7
    192:13,17
**returns** 180:5
**reverse** 128:3
**review** 10:12
    96:7 98:8
    107:9 110:5
    121:8 134:17
    135:13,19
    138:14,18

162:16 167:22
    189:22,23
    192:7
**reviewed** 10:21
    10:23 124:18
    168:16
**reviewing**
    121:14 138:10
    157:21
**revise** 147:18
**revising** 70:3
    146:5
**ride** 67:21
**rider** 111:24
**right** 10:24
    13:16 17:2
    32:9 37:10
    54:4 57:24
    62:7 64:10,21
    65:25 73:10
    75:3 78:3
    79:20 93:3,4
    95:19 98:13,15
    100:19,19
    102:9,23
    103:10,11
    113:1 115:9
    116:7,8 124:11
    128:6 133:23
    136:8 140:21
    147:24 149:6
    154:2,3,18
    164:13 168:9
    170:16 171:16
    172:13,13

**[right - says]**                                    Page 42

175:23 176:17
184:10 185:13
188:8
**rights**  5:16
37:7,24 38:11
39:18,20 52:23
53:5,15,21,23
54:12 82:13
83:9 93:21
153:14 177:11
179:21
**risk**  67:22 68:6
132:2,11
142:10
**rock**  100:20
**role**  12:18 15:5
21:5,12,19,21
21:22,25 22:11
25:22 28:17
56:16 72:5
85:13 102:24
106:8,14
121:17 122:2,4
122:5 123:24
125:6 138:11
160:9
**roles**  16:11
**room**  166:2
171:3 172:7
174:12,22
175:9,12
187:10
**rose**  1:10 2:11
4:11 6:8 22:10
22:14 23:18

24:4,7,11 44:2
58:4,9 62:11
67:4 81:14,19
81:19 84:23
92:3,12,17
97:6 103:17
116:21 122:14
124:9,13,17,23
125:4,8,11,14
125:22 128:18
132:16,18
133:7 167:18
169:2 176:6
177:3,12 179:5
180:20,20,24
182:13,21
187:11,12
188:14
**rose's**  31:14,23
169:23 185:14
**roughly**  15:9
15:24 40:24
49:17 70:10
126:13 128:18
**rule**  23:25
34:13 100:10
154:4,6,7,11
**rules**  5:15,17
5:19 7:1,18
27:20 29:22
30:11 31:17,24
32:15 95:5
96:2 101:15
121:5 128:9
154:25 179:22

183:8 186:18
186:24
**run**  20:18
132:11
**runs**  132:2
**rush**  75:8
**ry**  122:12
124:12 155:16
**ryan**  4:20
134:8,12
155:17 165:5

| **s** |

**s**  3:1 4:1 6:1
110:18 193:3
**sa**  123:20
125:22 179:23
186:12 187:6
187:11
**safe**  45:10,11
45:25,25 46:15
46:15 52:12,12
52:14 54:5
68:25 83:2
**safety**  68:13,15
68:18,21 69:2
69:10 70:1
71:8 72:16
83:20
**saitta**  2:15 3:5
6:15,15 31:20
31:25 32:5,11
34:5,7 42:24
54:24 65:10,12
76:17 98:3
103:13 124:8

169:25 180:5
183:5,6,11,24
184:25 188:8
189:15,16,20
**sake**  100:16
**sanction**  95:17
95:23 184:13
187:7,13
**sanctioned**
100:11
**sanctioning**
186:17 187:2
**sanctions**  92:8
96:5 126:24
186:12
**sarah**  111:24
**satisfied**  95:20
**saturday**  55:18
57:9,16 63:13
**saw**  51:24
143:19
**saying**  57:9
72:18,20,20
98:14 99:24
124:13 145:24
147:21 149:10
166:10 180:10
181:5,23 182:1
182:4,14
185:20 189:10
189:11
**says**  34:20,24
35:8 44:24
74:25 77:15
101:2,3 107:15

107:25 108:7
110:3 113:2,12
114:6 116:3
124:14 125:22
128:7 132:1
138:23 144:15
152:10 163:12
163:14 177:6,9
177:16 178:16
180:15
**scale** 179:19
**scene** 69:23,24
**scheduled**
128:8
**school** 11:1,18
12:16,20 13:1
13:2,4
**sciences** 11:15
11:19 12:17,20
**scope** 18:7,12
**scrutiny** 133:6
**second** 10:2
34:16,19 35:8
45:5,7 46:17
50:20,22,22
55:4 58:15
69:15 74:25
76:14 115:11
137:11 138:22
141:8 145:9
150:14 156:2
163:9 166:9
176:1,3
**seconds** 170:7
170:17 176:23

177:1 179:1,4
**secretaries** 61:3
**secretary** 61:2
112:15
**section** 32:14
32:17,21
105:22 133:1
170:4 175:24
**sections** 5:19
**secured** 108:1
**see** 32:4,13
34:18 35:3,20
40:20,21 41:12
45:5 58:1
65:19 67:15
73:19,25 74:4
74:6,19,20,25
76:13 77:15
81:8,13 90:18
91:2,5,17
98:15 99:22
107:19,24
113:6 116:25
118:25 122:3
123:16 156:7
182:18 183:1
**seeing** 41:11,25
109:5 116:7
186:10
**seems** 27:6
58:16 79:4
114:20 142:24
182:1,4
**seen** 75:8 125:3
144:22 148:6

**segment** 176:19
**segments** 168:8
**self** 58:16
**senate** 111:8,9
111:10,12
112:8
**send** 56:21
91:21 105:5
142:7 189:23
**sending** 77:11
136:9 155:19
**senior** 56:1,6
62:7
**sense** 19:17
28:21 59:16
67:1 75:5
78:16 115:2
140:19,22
141:11
**senses** 140:20
**sent** 55:17 77:1
136:19 184:20
190:2 192:14
**sentence** 45:6,7
45:7,8 50:22
58:15 74:25
123:21 126:2
132:1 150:16
152:10 156:6,9
156:15,18
171:25
**sentences**
163:14
**separate** 101:9
101:9,10 111:1

127:7,10
141:23 149:18
149:21
**sequence** 37:12
37:14,15 84:18
126:13
**sequential** 65:9
76:12 84:21
103:23 133:24
155:14 158:24
**series** 107:18
113:14,22
118:20 141:5
144:14
**seriously** 86:22
**served** 12:10
98:10
**set** 54:19 59:5
60:15 110:19
112:2 134:12
136:9,24,25
137:4,13
138:22 147:9
189:4 191:6
**settle** 34:18
**settlement**
34:12
**seven** 73:18
107:18 110:17
135:6,6
**several** 55:1
73:15 86:11
96:15 108:22
112:3 117:15
136:14 155:18

170:21
**severe** 181:6
**shared** 138:25
**sheet** 192:11
**sheila** 4:10
  103:25 104:23
**sheldon** 4:7
  84:23 86:13
**short** 12:10
  13:15 20:25
**shorthand**
  191:21
**shouted** 9:10
**shouting** 47:19
  48:1 51:21,25
  52:4 155:1
**show** 74:17
  121:14 143:15
**shown** 78:7
**shut** 123:23
  138:24 139:10
**side** 142:8
**sides** 165:22
**sign** 5:7 162:11
  163:24 189:23
  192:12
**signature**
  162:12,14
  191:19
**signed** 4:18
  155:20 161:8
  161:12,12,13
  161:13,24
  162:16,21
  190:2 192:20

**significance**
  30:3 57:13
  85:9 182:2
**significant**
  40:23 50:1
  71:23 105:8
  152:7 154:13
  164:4,6,10
**significantly**
  69:18
**signing** 162:24
**similar** 108:1
  174:19
**simply** 72:1
  184:5
**single** 62:2
  111:18 165:7
**singly** 32:20
**sir** 6:20
**sirju** 61:16
**sit** 182:16
**site** 41:9 83:8
**sitting** 33:6
**situating** 55:20
**situation** 39:23
  53:15 72:9
  84:5 86:11
  139:14,15
**situations**
  39:12,21
**six** 15:18,18
  57:4 91:13
  98:2 135:6
  136:1

**size** 108:2
**skeptical**
  181:15
**skip** 32:17
  175:24
**skipping**
  133:23
**slides** 134:12
**slightly** 37:13
**slowly** 8:5
**small** 85:18,22
**smoking**
  123:23 125:5
  185:14 186:5
**social** 115:11
  115:21,24
**society** 85:21
**solely** 171:15
**solutions**
  192:23
**somebody** 27:7
  28:7 66:16
  67:3 90:23
  99:5 100:2
  109:6 114:18
  114:22 115:18
  115:20 118:7
  120:18 144:10
**somewhat**
  172:22 181:15
**soon** 166:4
**sorry** 12:7
  24:17 32:4
  45:8 57:9 65:7
  88:12 92:8

**sort** 106:19
  115:2 122:22
  138:8 143:20
**sounded** 189:8
**sounds** 109:9
  181:15 188:22
  189:2,10
**source** 46:2
  49:4 79:15
  81:1 114:25
  124:5 171:3
  173:3,9 175:18
  175:20
**sources** 21:17
  21:18 44:17
  50:17 65:2
  66:13
**space** 75:19
  76:1 108:4,8
  108:15 109:1,4
  109:7 133:3,14
  133:17 135:18
  135:18 143:12
  143:15 185:1,3
  185:9
**spalding** 2:2
**speak** 8:5 15:25
  64:23 75:2,4
  75:13,16,17,20
  78:23 79:18
  83:3 89:12,14
  97:6,13 141:9
  141:14,17
  143:13

| | | | |
|---|---|---|---|
| **speaker** 66:21 | **speculating** | **stands** 106:2 | **stated** 157:18 |
| 69:16 75:21,23 | 66:24 | **stanley** 17:5,6 | 189:8 |
| 78:21 87:21,22 | **speculation** | **start** 1:19 7:1 | **statement** 42:9 |
| **speakers** 32:25 | 109:13,24 | 11:2,3 12:4 | 42:11 43:10,13 |
| **speaking** 41:24 | 152:9 | 31:1 57:7,8 | 43:14,16,18 |
| 49:17 87:17 | **speech** 9:5 | 76:25 150:15 | 44:11,12,15,18 |
| 121:17 170:23 | 46:22 51:1 | 152:21 170:10 | 44:21,22 45:16 |
| 176:6 | 52:16,17,19,19 | 176:18 179:1 | 45:17,21 48:16 |
| **speaks** 179:9 | 69:15 70:1 | **starting** 116:2 | 48:23 49:10,12 |
| **specific** 24:14 | 71:8 82:18,20 | 123:19 163:13 | 50:14,14,18 |
| 24:23 27:11 | 83:21 85:20 | **starts** 65:20 | 51:3 54:7 76:9 |
| 35:16 52:18 | 86:18 186:8 | 66:4 156:6,8 | 78:25 79:18,24 |
| 62:5 67:9 | **spelling** 140:20 | **state** 2:7 6:9 | 81:2,14,15,20 |
| 68:20 77:18 | **splitting** 189:15 | 7:8 12:1 16:14 | 82:3,4 88:8 |
| 94:3,16 104:20 | 189:16 | 16:15 20:17 | 108:25 113:5 |
| 107:12 122:7 | **spoke** 174:11 | 26:17 29:23 | 123:20 124:1,3 |
| 122:20 123:16 | **spoken** 120:12 | 30:5,11,21 | 124:6 133:11 |
| 123:17 131:6 | 172:4 | 32:16,16 33:10 | 137:10 139:5 |
| 137:4 167:24 | **sponsor** 75:3 | 33:12,16 35:14 | 140:8,11 |
| 168:8,12 | **sponsors** 110:4 | 36:3,12,16,25 | 144:18 145:7 |
| **specifically** | **sporadic** 63:22 | 37:7 45:4 | 145:11 147:21 |
| 20:11 29:16 | **squares** 107:12 | 46:14,18 50:22 | 147:25 149:4,4 |
| 59:17 70:17,19 | **staff** 13:3 16:6 | 55:9,9,13 59:9 | 149:6,8,13,19 |
| 70:22 83:7 | 59:8 61:4 83:1 | 62:16,21 77:6 | 156:20 157:3 |
| 85:22 110:9 | 104:22 110:3 | 78:20 90:21 | 163:10,24 |
| 147:2 | 113:3 129:17 | 119:13 123:5 | 164:22 166:13 |
| **specificity** | 138:7 151:25 | 127:18,18,19 | 171:1,20 |
| 92:21 | **stamp** 76:21 | 136:15 162:2 | 172:20 173:1,3 |
| **specify** 136:18 | **stamped** 55:9 | 168:17 169:21 | 173:6,18 174:4 |
| **speculate** 66:25 | 55:12 57:8 | 175:3,12 177:8 | 174:13,16,20 |
| 67:13 109:8,9 | 90:10 98:1 | 177:22 178:14 | 177:3,4,6 |
| 109:10 114:17 | **standards** | 180:4,12 | 178:3,5,7,19 |
| 120:20,21 | 101:1 | 181:13 | 179:9,13 180:2 |
| 142:14 | **standing** 87:23 | **state's** 133:2 | 189:2 |

**[statements - students]** Page 46

**statements**
49:13 60:25
123:16 149:14
162:20 164:17
164:19,20,21
164:24 165:14
165:16
**states** 1:1 32:17
32:20 59:10
91:13
**stating** 46:2
177:12
**status** 106:24
123:20 125:15
**statutes** 128:9
**stay** 8:15
**stenger** 1:9,17
2:11 3:3 4:4,11
4:12,14,16,19
4:20 6:8,19 7:4
7:10 29:14
31:16 32:13
34:13 35:4,20
43:6,8 46:11
47:13 48:7
49:9 54:8 82:9
89:7 97:18
104:2 109:12
113:7 116:6,21
117:1 118:16
118:24 121:12
122:15,19
150:10 161:9
161:25 170:23
180:22 183:6

192:4,5 193:1
193:2,24 194:1
194:2,4,12
**stenger's**
124:19
**stenographer**
14:16
**stenographic...**
191:8
**step** 91:10
**steps** 58:5
62:13 96:7
184:1
**sticker** 31:4
**stipulate** 10:1
**stipulated** 5:3,6
5:10,13,16
34:21,25 35:10
**stipulation**
33:17 34:12
**stipulations** 5:1
**stipulatively**
19:14
**stood** 166:4
**stop** 7:15 11:20
52:3 176:3,25
**stopping** 87:16
170:16 179:3
**stories** 40:25
**story** 99:10
**street** 1:21 2:14
**stressed** 154:24
**strike** 22:20
88:22 128:16
137:12 149:12

161:21
**strong** 92:5
**strongly** 8:17
**student** 1:10,12
1:12 2:16 6:16
11:5 21:14,15
22:7,8,15,21
23:1,2,4,15
24:8,15,19
28:16,18,19,20
28:22 29:3,7
45:10,24 46:14
52:11 58:6,6
58:11 59:12,13
59:14,15,18,21
59:23 60:4,5
60:10,14,15
91:14 93:11,13
93:18,19 94:3
94:3,16,17,17
94:21,23,25
95:5 96:1,6
97:7,13 98:9
99:19,23 100:4
100:5,8,10,13
100:17,18,19
100:20,24
101:4,5,13,14
101:17,18,20
101:25 102:3
102:13,14
123:22 126:9
127:3,10,14,16
127:20,21,24
128:1 135:13

135:14 139:4
139:17 143:6
145:13,14,19
147:10,22,23
148:17,19,24
148:25 153:21
154:6,10,19
156:18,20
157:3,12,16,17
157:20 158:8
158:12,18
163:15,16
166:4 177:7,13
177:21 178:21
178:22 179:6
180:8,11 181:3
181:11,22
182:6 183:7,18
183:19 184:2,2
184:3,11,11,15
185:4,8,10
186:13,13,15
186:20,23
187:1,13,17,21
187:24 188:1,2
188:2,4
**students** 9:5,7
9:10 13:8 21:5
21:20 29:1,9
29:19 37:25
38:11 39:22
47:19,20 48:1
48:1 52:4,23
53:4,14,21,23
59:8,24 64:25

69:13 78:23
79:25 80:2,8
85:18,20,22
86:16,16 87:14
87:15 88:9,13
89:15 92:5,10
92:15,18 93:1
93:7,9,14,20
96:4 99:23
101:22 115:12
117:12 128:6
128:10 129:1,7
131:6,11,17,20
132:3,10,12
142:5,11 143:5
145:14,19,23
145:24 147:9
147:17,22
148:17 153:13
154:23 155:2
158:19 165:21
167:20 177:11
179:21 181:19
188:16,24
**study**   19:9
**subject**   17:10
19:12 25:3
30:20 37:3
77:19 82:16
92:12 94:11
98:25 108:18
118:16 128:7
130:5,12 155:8
**subjective**
164:10

**subjects**   11:7
51:16 82:12
**subscribed**
194:14
**subsequent**   9:8
**subsequently**
73:11
**substance**
36:23 44:12,15
44:18 68:10
78:10,12,17
81:22 95:21
114:4 118:4
126:21 160:3
161:16 174:16
174:20
**succeeding**
130:25 133:8
**sufficiency**
173:24
**sufficient**   175:8
**sufficiently**
50:1 152:7
**suggested**
24:13 144:12
**suggestion**
24:19
**suggestions**
24:9,12
**summarize**
14:25 15:1
64:2 101:11
105:15
**summary**   57:12
94:25 105:20

130:8
**suny**   1:9,10,11
1:12 11:23,25
30:12 111:10
134:25
**supervise**   15:24
**supervisor**   72:5
**support**   108:25
131:7
**supported**
44:18
**supportive**
72:13 91:17
**supports**
166:13
**suppose**   121:6
**supposed**   80:11
**sure**   7:25 17:14
23:7 24:17,21
32:9 36:19
45:10,15,19,24
50:16 52:11,13
56:24 62:2
65:24 68:24,25
72:23 82:13,17
83:2 86:19
96:15,21 97:4
97:14,14 99:14
136:22 181:8
**switch**   29:21
**sworn**   6:2
71:21 194:14
**system**   12:2
16:14 30:21
33:10,13 36:13

36:17,19,25
80:22,24 99:21
119:13 181:14

**t**

**t**   3:1,1 4:1,16
6:1 193:3,3
**tab**   31:3,25
32:11 34:5,6
42:14,24,25
54:20,24,25
65:6,10 76:4
76:17 84:20
89:19,19 98:2
103:12 116:19
122:11 133:24
150:1 155:13
158:22 161:7
161:24 165:3
183:17
**table**   185:9
**tables**   92:10,15
92:18 93:1,8
153:22
**tabling**   9:25
10:6,9,21 33:1
37:22 40:5,10
40:12,21 42:7
45:1 52:22
53:4 54:9
55:21 60:8,12
60:21 63:8,10
64:8 73:5,9,12
74:3,5,10 79:5
87:1,5,8,11
88:17 93:1

**[tabling - testify]**

| | | | |
|---|---|---|---|
| 97:1 98:22 | 95:19 99:15,17 | **tapes**  98:9 | 172:10 |
| 99:7,13 122:17 | 100:6 121:11 | 99:20,20 | **tend**  109:10 |
| 134:16 146:2,4 | 125:24 128:9 | **task**  58:5 | **teresa**  77:5,7,9 |
| 146:9,22 | 128:22 139:22 | 150:22 184:1 | 77:16,20 78:10 |
| 147:12 153:2,3 | 168:4 169:12 | **teach**  88:5 | **teresa's**  77:9 |
| 159:23 167:9 | 191:5,8 | **teachable** | **term**  12:11 |
| 184:13 185:3 | **talk**  20:21 | 85:17 88:18 | 28:21 106:25 |
| 187:3,7 | 108:2 110:8,19 | 89:4,12 | 188:2 |
| **take**  8:13,14,18 | 123:23 137:24 | **teaching**  12:14 | **terms**  38:15 |
| 14:16 15:13 | 141:20 142:24 | **team**  83:1 | 39:1 55:20 |
| 17:17 32:19 | 143:1 146:17 | **teens**  143:8 | 56:4 65:6 |
| 35:17 36:4 | 152:1 169:9 | **tell**  7:13,24,25 | 83:24 85:9 |
| 38:14 39:18,24 | 172:25 174:1 | 10:24 15:11 | 164:11 185:2 |
| 42:23 43:1,7 | 175:9 | 16:3 18:18 | 185:13 |
| 44:21 60:25 | **talked**  92:1 | 34:22 42:15 | **terry**  77:9,9,16 |
| 65:14 69:11 | 131:1 154:16 | 49:15 52:24 | **tested**  178:24 |
| 72:14 81:9 | 185:1 | 76:5 82:16 | **testified**  6:3 |
| 82:6 83:14 | **talking**  29:2 | 97:3 114:22 | 14:8 21:1 |
| 100:4 102:24 | 59:17 70:19 | 115:18 137:10 | 23:24 33:9 |
| 116:25 122:11 | 76:20 86:25 | 142:17 145:7 | 36:11,15 38:24 |
| 132:2,10 | 106:18 123:11 | 161:15 167:3,5 | 39:15 53:13 |
| 136:12 138:22 | 132:8 136:9,16 | 168:13 169:7 | 58:9 68:2 69:8 |
| 139:18,20 | 136:19,24,25 | 171:7 188:23 | 71:17 75:11 |
| 145:15 149:12 | 137:4,8,9,13,16 | 188:23 | 77:23 82:9 |
| 151:5 155:21 | 137:18,22 | **telling**  9:19 | 83:4 92:22 |
| 155:22 156:11 | 138:3,7,10,14 | 49:25 50:3 | 94:6,22 114:3 |
| 162:6 165:19 | 138:18,23 | 79:9 98:7 | 124:17 125:19 |
| 169:8 173:21 | 149:20 150:4 | 115:5 172:18 | 130:6 131:2 |
| 181:4,10,24 | 179:5,17 | 180:7 | 138:12 144:4 |
| 182:25 183:11 | 180:24 183:21 | **temporarily** | 147:15,17,25 |
| 183:13 189:24 | **talks**  180:14 | 96:11 103:18 | 148:25 164:3 |
| **taken**  7:12 43:5 | **tape**  51:10 | **temporary**  90:6 | 180:21 188:14 |
| 69:2,9 78:23 | 99:21 168:10 | **ten**  116:19 | **testify**  44:8 |
| 79:24 80:2,20 | 170:25 176:1 | 128:10 148:14 | 67:11 120:24 |
| 82:7 87:19 | | 171:19 172:2 | |

**[testifying - time]**

**testifying**
  143:18 164:9
**testimony**  7:16
  23:18 24:18,23
  30:10 36:21,23
  38:8,9 40:16
  47:17 51:22
  53:25 54:7
  70:4 71:16
  73:22 95:1,4
  101:12,20
  113:20 118:6
  124:19,20
  127:9 130:8
  131:13 146:3,5
  153:24 163:23
  164:6 182:21
  192:9,18 194:8
**texas**  57:2
  66:17
**text**  57:13 97:4
  118:19 137:11
**tf**  150:7
**thank**  34:7 46:2
  55:11,14 65:12
  66:1 103:13
  125:4 149:11
  188:9
**thanks**  32:12
  98:3 186:3
**thereabouts**
  54:10
**thereof**  191:14
**thereto**  5:20

**thing**  42:6
  45:20,21 83:16
  93:4 114:20
  118:19
**things**  29:8,12
  29:14,18 47:5
  48:20 64:12
  105:10 117:19
  150:17 154:16
  154:18 182:16
**think**  7:7 13:13
  14:8 15:19
  20:5 21:9 27:9
  31:4 37:12
  38:3,7,7 45:14
  48:13,19 49:7
  49:8,8 50:14
  50:15 52:2
  53:12,19 54:14
  57:10 58:9,16
  60:20 64:3
  66:20 70:18,25
  72:22 75:19
  86:8,10,21,25
  87:4,7,21,25
  92:4 94:5,22
  95:3 97:3
  98:20 99:8
  100:15 101:4,6
  101:12 103:15
  103:16 106:20
  107:2 109:13
  111:11,12,25
  120:4,5,6,8,16
  125:3,4,11

  127:3 135:17
  135:19,21
  140:4,5,23
  142:3 149:16
  154:16 157:14
  158:22 161:11
  164:13 165:16
  165:21 167:2
  170:10 171:22
  172:7,8 173:19
  173:21,21
  176:8 178:18
  178:20 183:17
  186:23
**thinking**
  100:19 112:23
  118:17 127:5
**third**  34:19
  35:9 45:7,8
  57:7 74:19
  76:15
**thought**  17:24
  17:25 50:6
  52:8 64:6
  85:24 86:1,4,9
  93:3,6,7,15
  99:12 113:25
  120:23 142:6
  143:16 144:1
**thoughts**
  105:14 165:17
**threat**  39:22,24
**threatening**
  69:14

**three**  15:23,23
  16:17 58:2,14
  64:3,4 76:4,19
  107:25 120:10
  135:21 138:6
  150:14,17
  151:11 155:7
  175:12 183:22
**throws**  100:20
**thursday**  104:1
**ticketed**  68:23
**tie**  99:5
**tim**  25:18
  150:11
**time**  1:19,20
  5:11 8:13
  13:15,25 14:23
  15:11 16:9
  22:11 32:19
  34:22 36:13,13
  36:17,17,24,24
  39:5 42:4 43:3
  47:6 54:19
  55:20 60:17
  61:16 63:13
  64:11 65:14
  66:15 69:7
  73:9 74:13
  75:2,6,13
  80:25 81:3,21
  82:20,21 85:22
  86:7 87:2,9,20
  92:12 95:4
  99:11 103:12
  104:5,9 105:8

| | | | |
|---|---|---|---|
| 106:19 108:17 | **together**   62:13 | 122:14 134:7 | 169:18,22 |
| 108:20,21 | 134:13 | 145:10,11 | 170:6,9,11,13 |
| 110:9 111:16 | **told**   64:4 73:7 | 155:17 159:4,6 | 170:18 171:18 |
| 113:8,12 116:7 | 92:14 131:12 | 171:18,25 | 172:1,22 |
| 118:2,3,13 | 144:25 145:4,6 | 172:21 175:11 | 174:10 176:10 |
| 119:13 120:13 | 146:12,15 | **topic**   19:24 | 177:25 189:14 |
| 122:22 125:9 | 166:24 171:5 | 20:7 63:24,25 | 191:10 192:6 |
| 126:6 128:18 | 172:17 188:17 | 64:8 68:18 | 192:20 194:5,8 |
| 129:3 130:5,12 | **tolerate**   138:24 | 70:23 75:4 | **translate**   38:5 |
| 131:22 132:5 | 139:9,11,12,13 | 82:14 116:14 | **transpired** |
| 134:17 135:2,3 | 139:19 177:7 | 120:13 132:15 | 67:22 |
| 137:1 138:19 | 177:20 178:13 | 132:19 151:8 | **trap**   18:19 |
| 141:1 143:17 | 178:15,23 | 159:19,24 | **traveling**   56:25 |
| 143:22,24 | 180:11 | **topics**   29:21 | 57:1 64:17 |
| 156:11 159:25 | **tom**   2:15 6:15 | 64:1 68:15 | 66:9 81:23 |
| 165:17,19 | 32:4 84:20 | 128:13,17,22 | 82:11 92:13 |
| 168:10 174:21 | 98:2 167:8 | 135:23 151:11 | 99:18 108:17 |
| 178:5 179:14 | 183:6,15 184:8 | **tore**   92:10,15 | 108:20 |
| 191:6 192:19 | 184:22 185:6 | 92:18 | **treated**   120:6 |
| **timeframe** | **tom.saitta**   2:15 | **torn**   93:1 | **tremendous** |
| 192:8 | **tomorrow**   1:12 | **totality**   48:7 | 130:6,13 |
| **times**   16:17 | 105:23 106:3 | **toward**   31:3 | **trial**   5:12 |
| 136:1 142:25 | **tone**   110:19 | 131:19 | **trick**   18:19 |
| 159:20 | **tongue**   178:11 | **towards**   68:5 | **tried**   107:3 |
| **timing**   92:6 | **tonight**   78:21 | **track**   102:12 | 181:2 |
| 101:21 | 78:25 83:17,21 | 103:6 | **trigger**   131:17 |
| **timothy**   74:20 | **took**   88:2 | **training**   14:1 | **trip**   56:23 57:5 |
| 150:8 | 101:13 126:5 | 18:24 19:1,4,6 | 87:10 123:4 |
| **tina**   159:5 | 126:11,14,19 | 19:7,11,13,14 | **trouble**   49:9 |
| **title**   27:12 | 127:1 128:12 | 20:25 21:4,7 | **true**   7:16 |
| 34:11 | 143:14 166:5 | 21:10 | 181:12 191:9 |
| **titled**   136:15 | **top**   31:10 32:19 | **transcript**   5:7,9 | 194:8 |
| **today**   7:16 33:6 | 68:15 85:16 | 121:8 168:17 | **trust**   166:16 |
| **today's**   8:20,24 | 90:12 91:13,25 | 168:18,19,20 | **trusted**   84:9 |
| 10:20 32:3 | 103:24 116:20 | 168:24 169:5 | |

**truth** 7:13
**try** 32:6 37:11
  65:1 67:21
  90:8 105:10
  110:19 117:19
  134:13 142:8
  181:18 183:9
**trying** 12:23
  18:18,19 19:16
  20:12 37:16
  67:8,18 69:7
  80:24 86:15,19
  91:16 100:14
  109:18 124:16
  142:23 181:18
  189:4
**tuesday** 155:18
**turn** 33:23
  42:14 97:15
  105:19 116:1
  141:4 145:10
  156:2 158:21
**turned** 171:1
  172:6
**turning** 116:19
  155:13,25
**twice** 16:17
  151:21
**two** 9:4 17:8
  35:13 54:20,25
  61:3 64:3
  76:14 78:23
  79:24 80:2
  84:24 88:9,12
  88:12,14,23

89:3 90:9
91:13 99:3
101:22 102:17
111:9 112:4
116:4 127:1
140:2,20
145:23,24,25
145:25 147:17
147:18,18
148:1,2 149:18
150:18 161:17
167:23 175:12
177:1 179:1
183:17 188:14
**typically** 75:25
  119:1 137:18
  162:23

---

**u**

**u** 99:1
**uh** 14:9,12,15
  35:21 45:12
  61:6 80:3
  117:3 125:2
**ultimately**
  18:12 23:17
  26:23 149:17
  177:8,21
  178:13,16
  179:21 180:11
**ulysses** 83:12
**uncalled** 96:9
**uncertain**
  89:16,17
**uncertainty**
  36:22

**uncivil** 153:11
**under** 27:20
  46:22 51:1
  52:16 54:20
  84:20 93:11
  100:9 113:2
  121:5 128:9
  129:2 141:4,5
**underage**
  100:22
**undercover**
  84:8 166:3
**undergraduate**
  11:4
**underlying**
  153:7
**undersigned**
  35:1,11
**understand** 7:2
  7:12,20,24,24
  8:2,7 10:3,5
  12:22 15:25
  18:19 21:19
  22:14,20 25:9
  25:11 27:5
  38:2,19 39:7
  39:13,23 40:1
  40:9 53:24,24
  54:6 68:2
  69:11 75:10
  77:12,18 80:12
  80:24 88:21
  91:7 95:11
  96:24 101:10
  105:4 110:23

113:9 121:19
124:1,5,23,25
130:10,21
135:10 137:13
139:25 140:6,9
141:21 145:16
147:13 148:5
149:22 180:23
180:24 181:1
182:13 184:4
185:20 189:4
**understanding**
  37:13,22 38:4
  56:24 64:16,19
  72:2 75:6
  78:18,20 103:4
  107:13,24
  147:12 169:13
  186:14
**understood** 8:2
  8:11,18 26:3
  37:19 38:10,15
  39:5 53:13
  54:6,18 62:4
  67:8 71:11
  122:4 143:20
**undertake**
  150:24
**undertook**
  107:18
**unfair** 179:20
**unfortunate**
  46:19,25 47:3
  47:7,10,14,23
  48:3,5,6,10,12

48:15,16,19,23
49:5 50:4,6,11
50:21
**unfortunately**
175:4
**unhealthy**
154:25
**uniform**  166:4
175:13,16
**uniformed**  84:8
**unique**  72:9,22
**united**  1:1
59:10
**universities**
20:19,20
**university**  1:4,5
1:13 2:16,18
6:6,11 11:13
11:16,17,21,24
12:1,10,12,15
13:6,14,25
14:7,13,19,22
15:4 16:14,15
18:23 20:8,16
20:17 21:5,6
21:11,13,20
22:3,16 24:1
24:25 25:1,4
25:12,13 26:7
26:12,16,24,25
27:1,17,21
28:11,12,17,23
28:24 29:15,17
29:23 30:5,20
30:21 32:16

33:9,10,12,14
33:16,19 35:14
36:3,12,16,25
37:4,7,8,24,25
38:12,17 39:2
39:4 46:19
47:7,15 48:9
49:6,10,14,21
49:23,25 50:2
50:23 56:5,6
58:18,23 59:24
61:14,20,24
67:2,24 69:11
70:9 72:3,6
77:6 80:7 83:8
85:10,11,13
86:14 87:20
88:4 90:22,24
91:12 95:6,8
95:13 102:1,11
102:11,14,16
102:17,20,21
103:5,7 104:19
105:9 106:16
107:6,15,17
108:1 110:3
111:3 112:13
113:4,21
114:16 115:14
116:10 117:13
119:13 121:23
123:8 126:3,5
127:11,18,23
129:3 131:7,21
132:5,9 134:20

134:22,24,25
135:1,16,24
136:15,15
138:2,15,23
139:12 141:6
144:25 145:18
147:21 148:16
149:14 154:7
155:8,22
158:13 160:10
166:11 174:17
174:22,25
175:14,14
177:13 178:20
178:23 179:6
179:23 180:4,7
180:15 181:10
181:13 182:4
185:2,4,10
187:25 188:3
**university's**
139:6
**unknown**
173:22
**unredacted**
90:1
**unteachability**
86:24
**unteachable**
85:19,23 88:1
88:6,16,23,24
**unusual**  72:22
**upcoming**
116:16

**upd**  1:11 60:23
61:20
**use**  19:16 29:8
52:15 59:15
80:10 107:1
108:8,25 133:3
133:14,17
138:7,11
168:19
**used**  34:17
59:16 108:16
108:18 109:4,7
138:15 155:2,4
192:20
**using**  28:21
29:6 78:22
**usually**  29:13
137:25
**utilized**  5:14

**v**

**v**  6:1 192:4
193:1 194:1
**vague**  142:24
**valid**  86:10
**various**  149:15
**vehicle**  182:9
**venue**  75:22
**verbal**  14:16
45:13
**verified**  163:25
**verify**  162:19
192:9
**veritext**  192:14
192:23

**veritext.com.**
  192:15
**version** 31:18
  76:8 134:5
**versus** 7:3
  126:24
**vestal** 7:10
**vice** 1:10 15:7,9
  15:18 21:15
  22:6,8 25:15
  25:17,23 26:1
  26:10 27:2,2
  27:16,19 28:4
  28:10 29:16
  56:7 58:10,10
  58:12 94:13
  111:11 126:10
  136:2
**video** 10:21
  98:24,25 99:6
  99:15,21 114:6
  148:6 152:12
  152:16,19,20
  152:24,24
  153:2,3,9
  154:17 164:24
**videoconfere...**
  2:15 169:25
  180:5
**videoed** 99:4
**videos** 10:12
  99:4
**videotape** 51:4
  51:5,6,8,9,13
  51:25

**view** 18:10,19
  40:21 57:13
  92:24 93:18
  94:11,12,15,15
  94:24 95:12,21
  150:16
**views** 32:25
  35:19 36:7
**violate** 94:21
**violated** 94:24
  101:6 154:4,6
  154:10 179:21
**violates** 93:20
**violating**
  100:10
**violation** 54:3
  95:5 100:12,13
  101:2,14
  115:14 126:1
  187:8
**violations**
  100:24 123:25
**virtually**
  163:10
**visible** 40:22
**visit** 166:2
**voice** 62:2
  170:22 177:2
**voices** 67:7
  170:21
**volatile** 48:22
  49:1 51:14,17
**volatility** 49:4
  50:10

**volume** 48:11
  50:8 117:21
  118:5
**volunteer**
  105:8 135:4
**vs** 1:7

|  |
| :---: |
| **w** |

**wait** 8:9,9 89:2
  102:7 107:5
  131:24 171:2
  172:7,10,12
**waived** 5:5,9,18
**walk** 37:16
  40:4 83:13
**want** 10:16,17
  18:6 24:17
  31:8,10 35:5
  39:13,16 45:15
  45:22 49:20
  50:16 54:19
  58:14 60:22
  61:23 64:6,14
  65:6 66:25
  71:15 75:25
  82:13 83:19,19
  83:20 84:18,19
  86:21,23 89:18
  93:9 96:22
  101:11,19,23
  101:23 103:11
  107:23 109:9
  109:11,12,14
  121:7 122:2
  123:16 124:19
  131:23 137:23

140:9 142:7
  143:9 146:16
  147:3 154:19
  156:11,12,16
  156:17 158:10
  158:21 161:16
  161:19 164:2
  166:9 168:9,12
  169:8 176:18
  189:18 190:5
**wanted** 20:11
  32:8 47:14
  50:2 52:3
  56:23 57:15,22
  62:1,9,10,10
  68:25,25 69:8
  71:4 82:17
  144:8 149:11
  152:11,18
  176:15 188:24
**wants** 35:4
  103:1 109:23
  169:10 185:8
**warning** 68:6
**water** 1:21
**way** 9:24 37:17
  52:22 58:2
  84:13 87:22
  93:7,9 105:14
  106:25 117:13
  129:16,21
  141:15 144:1
  154:22 179:19
  182:5 183:16
  183:22 184:10

**[way - york]** Page 54

185:5,7 191:13
**ways** 154:24
**we've** 33:8
61:20 107:14
125:3 134:14
159:23 160:15
**website** 112:8
**wednesday**
84:23 87:9
90:13 97:19
99:16 134:8
**week** 49:18
74:5 104:13
106:17 121:13
122:23 123:1,6
123:12
**weekly** 63:19
63:23
**weeks** 64:3,4
73:15,16
130:25 133:8
**weigh** 120:2
**went** 11:17
**western** 34:9
**whatsoever**
21:8 132:22
**whichever**
103:4
**window** 40:14
40:19 42:1
100:20
**wish** 34:14 59:6
102:14
**withdrawn**
103:22

**withhold**
178:21
**withstand**
133:6
**witness** 1:17
5:6 6:2 45:19
115:20 121:7
169:3,10
182:11 189:23
192:8,10,12,19
**witness's**
169:16
**won** 64:5
**word** 19:13,16
21:9 29:7,8
43:12 57:17
58:17 80:10
88:1 139:25
140:20 156:25
182:15
**words** 19:17
46:21 50:24
51:2,11,12,21
80:13 106:22
139:13 166:24
171:5,20
**work** 7:21 13:5
13:6 17:13,14
22:25 62:12
86:17 102:6,6
134:17 135:11
144:24 181:4
181:22
**worked** 11:1

**working** 32:5
50:18 56:25
**works** 22:21
**world** 58:23
59:10
**worried** 82:24
**worries** 32:8
86:13
**write** 15:12
85:17 91:25
92:4 120:10
150:13
**writes** 117:20
**writing** 99:6
171:13
**written** 21:2
64:13 86:8
98:7 120:16
124:9,13
131:16 151:5
163:2 164:21
164:22
**wrong** 71:17
93:15 176:4
**wrote** 63:1
124:24 149:9
159:18 160:24
163:4

| **x** |
| --- |
| **x** 3:1 4:1,1 |
| **y** |
| **y** 3:1 6:1 |

**yaf** 152:12,12
152:16,19

**yards** 41:1
47:21 48:2
**yarosh** 4:14,20
134:8,12
155:17,19
165:6
**yarosh's**
134:17
**yeah** 40:2
51:19 70:6
74:23 97:12
118:9 127:7
150:6 167:4
176:20 178:9
183:24 184:22
**year** 16:17,17
136:1
**years** 86:11
112:3,4 120:10
**yelling** 87:24
**yep** 32:11 55:7
55:11
**york** 1:2,22 2:4
2:4,7,8,14 6:8
7:11 12:2
16:15 20:18
26:17 29:22,23
30:11,21 31:17
31:24 32:16
33:10,13,17
34:10 35:14
36:3,12,16,25
37:8 59:9 77:7
90:21 100:9
127:18,19

**[york - zieziula]**                                   Page 55

| |
|---|
| 136:16 162:1 181:14 |
| **young**   1:4 6:5 7:3 152:13 192:4 193:1 194:1 |
| **youtube**   170:3 |
| **z** |
| **zenkin**   111:24 |
| **zieziula**   23:8,9 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.