UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

YOUNG AMERICA'S FOUNDATION, et al.,

                                        *Plaintiff*,

              -against-

HARVEY G. STENGER, et al.,

                                        *Defendants*.

22-CV-1119

(LEK/TWD)

## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION TO AMEND

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants Stenger, Rose and
        Pelletier
Litigation Bureau, The Capitol
Albany, NY 12224-0341

John F. Moore
Assistant Attorney General, of Counsel
Bar Roll No. 105188
Telephone:  (518) 776-2293
Fax:  (518) 915-7738
E-mail: john.moore@ag.ny.gov

Date:  June 21, 2023

# Table of Contents

TABLE OF AUTHORITIES ........................................................**Error! Bookmark not defined.**

PRELIMINARY STATEMENT/PROCEDURAL BACKGROUND ........................................... 1

LEGAL ARGUMENT ............................................................................................................. 2

STANDARDS GOVERNING MOTIONS TO AMEND A COMPLAINT ..................... 2

POINT I:      PLAINTIFF'S MOTION TO AMEND SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENTS ARE FUTILE. .......................................................... 3

A.    The proposed allegations regarding personal involvement in First Amendment and Equal Protection claims Against Defendant Rose are futile. ...................................................................................................... 3

B.    The Proposed Allegations regarding Retaliation claims Against  Defendants Rose and Stenger are Futile. ....................................................................... 13

POINT II.  REIN BEY SHOULD NOT BE ADDED AS A PLAINTIFF. ...................... 21

CONCLUSION................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                              **PAGE(S)**

*Alfaro Motors, Inc. v. Ward*,
    814 F.2d 883 (2d Cir. 1987)............................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................4

*Bass v. Jackson*,
    790 F.2d 260 (2d Cir. 1986)........................................................................................4

*Colon v. Coughlin*,
    58 F.3d 865 (2d Cir. 1995)..........................................................................................4

*Correa v. Lynch*,
    2021 U.S. Dist. LEXIS 96188, 2021 WL 2036697 (S.D.N.Y. May 20, 2021) .......................12

*Dillon v. Morano*,
    497 F.3d 247 (2d Cir. 2007)........................................................................................13

*Fabrizio v. Smith*,
    2021 U.S. Dist. LEXIS 45856 (N.D.N.Y. March 10, 2021)...........................................13, 16

*Foman v. Davis*,
    371 U.S. 178 (1962)................................................................................................ 2-3

*Gem Fin. Serv. v. City of New York*,
    2014 U.S. Dist. LEXIS 34770 (E.D.N.Y. March 17, 2014) .................................................21

*In re New York City Policing During Summer 2020 Demonstrations*,
    548 F. Supp. 3d 383 (S.D.N.Y. 2021)...........................................................................7

*Johnakin v. NYC Dep't of Corr.*,
    2013 U.S. Dist. LEXIS 144059, 2013 WL 5519998 (E.D.N.Y. Sept. 30, 2013) ..................21

*Kshel Realty Corp. v. City of New York*,
    2003 U.S. Dist. LEXIS 8357, 2003 WL 21146650 (S.D.N.Y. May 16, 2003) ......................21

*Manson v. Stacescu*,
    11 F.3d 1127 (2d Cir. 1993)........................................................................................2

*McAvey v. Orange-Ulster BOCES*,
    805 F. Supp. 2d 30 (S.D.N.Y. 2011)............................................................................14

*Robinson v. Davis*,
　2010 U.S. Dist. LEXIS 110147, 2010 WL 4062863 (D. Vt. Oct. 15, 2010) .........................22

*Schachter v. United States Life Ins. Co.*,
　77 Fed. Appx. 41 (2d Cir. 2003) .....................................................................................21, 24

*Tangreti v. Bachmann*,
　983 F.3d 609 (2d Cir. 2020) .....................................................................................................4

*Vedder v Nutting*,
　2012 U.S. Dist. LEXIS 57276, 2012 WL 1416266 (N.D.N.Y Apr. 24, 2012) ................. 12-13

*Williams v. Novoa*,
　2021 U.S. Dist. LEXIS 22941, 2021 WL 431445 (S.D.N.Y. Feb. 5, 2021) .........................12

*Wright v. Smith*,
　21 F.3d 496 (2d Cir. 1994) .......................................................................................................3

## FEDERAL STATUTES

42 U.S.C.
　§ 1983 ................................................................................................................... passim

## RULES

FRCP 12(b)(6) ...............................................................................................................................3

FRCP 15(a)(2) ...............................................................................................................................2

## PRELIMINARY STATEMENT/PROCEDURAL BACKGROUND

Defendants Brian Rose, John Pelletier and Harvey Stenger[1] ("State Defendants"), submit this memorandum of law in opposition to Plaintiffs' motion to amend the complaint, ECF No. 245. The motion should be denied.

Plaintiffs' motion to amend the Complaint seeks to add factual allegations of Defendant Rose's alleged personal involvement in the purported suppression of speech under the First Amendment (Count I), and alleged violation of the Equal Protection clause of the Fourteenth Amendment (Count IV), and also seeks to add allegations of Defendants Rose and Stenger's alleged personal involvement in Plaintiffs' First Amendment Retaliation claims (Count II). ECF No. 245. Plaintiffs claim that during depositions of defendants Pelletier (on November 10, 2022), Binghamton University ("BU") Associate Vice-President ("AVP") of Emergency Services Tim Faughnan (on February 17, 2023), Defendant Rose (on February 22, 2023) and Defendant Stenger (on February 24, 2023), facts were discovered which purportedly showed Defendants Rose and Stenger's personal involvement in alleged violations of Plaintiffs' constitutional rights. ECF No. 245-2, ¶¶ 7 – 9; ECF No. 245-1, p. 18 of 24. Plaintiffs' motion papers do not detail what deposition testimony led them to such a conclusion.

Plaintiffs' proposed amendments should be denied as futile because the deposition testimony in this case provides no support whatsoever for the new factual allegations of purported personal involvement of Rose and Stenger. To the contrary, the deposition testimony taken from

---

[1] All three defendants are sued in their official capacities. Individual liability claims were dismissed against Defendants Rose and Stenger (without prejudice) in the court's decision on the motion to dismiss, and individual liability claims remain against Defendant Pelletier only. ECF No. 70.

1

various witnesses flatly contradicts Plaintiffs' allegations of personal involvement of Rose and Stenger in any purported constitutional violation.  Further, allowing the Plaintiffs to add individual liability claims against Rose and Stenger at this very late stage of litigation would be prejudicial to Defendants.

Plaintiffs' motion also seeks to add Rein Bey as a Plaintiff in her personal capacity in place of former Plaintiff Jon Lizak, who withdrew as a Plaintiff on his own motion on March 23, 2023. This motion must be denied as futile, because proposed Plaintiff Bey cannot, as is required in claims brought pursuant to 42 U.S.C. § 1983, demonstrate that she personally suffered from a violation of her civil rights.  Indeed, as illustrated in the testimony summarized below, Bey was not present at or involved in either the Tabling or Laffer Events which are central to this litigation, and cannot claim that her First Amendment Free Speech or Fourteenth Amendment Equal Protection rights were violated.

## LEGAL ARGUMENT

### STANDARDS GOVERNING MOTIONS TO AMEND A COMPLAINT

Rule 15 of the Federal Rules of Civil Procedure, which governs motions for leave to amend a complaint, states that leave to amend should be freely given "when justice so requires." FRCP 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d Cir. 1993).  Nevertheless, leave to amend a complaint is not automatic; and a court may deny a motion for leave to amend where there is an apparent or declared reason not to grant leave to amend, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

2

party by virtue of the allowance of the amendment, futility of amendment, etc." *Foman*, 371 U.S. at 182.

A district court need not grant leave if amendment would be futile, *Reed v. Friedman Mgmt. Corp.*, 541 Fed.Appx. 40, 41 (2d Cir. 2013), i.e., if the proposed claims could not withstand a motion to dismiss. *Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (stating that an "amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)"). Thus, the question before the Court is whether Plaintiffs' proposed claims of personal involvement of Rose and Stenger, and the newly alleged claims on behalf of proposed Plaintiff Rein Bey, can withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim.

## POINT I:   PLAINTIFF'S MOTION TO AMEND SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENTS ARE FUTILE.

Plaintiffs seek to supplement their complaint and resuscitate dismissed individual liability claims against Rose and Stenger.  Plaintiffs' motion to amend is futile and should be denied[2].

### A. The proposed allegations regarding personal involvement in First Amendment and Equal Protection claims Against Defendant Rose are futile.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*,

---

[2] The motion should also be denied as prejudicial to Defendants.  Plaintiffs claim that the proposed amendments are justified by the depositions of the three State Defendants and one other witness Timothy Faughnan, which were concluded by February 24, 2023.  Plaintiff did not raise this issue of amendment until less than a month before the April 28, 2023 close of discovery, in early-mid April 2023.  Thus, if the motion is granted, the belated amendments essentially have prevented the defendants from engaging in meaningful discovery as to the new allegations.

568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his or her own actions under Section 1983. See *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009). ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit's recent decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), definitively addressed how the Supreme Court's decision in *Ashroft v. Iqbal*, affected the prior standards for establishing supervisory liability in the Second Circuit's decision in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'" 983 F.3d at 618. In other words, a plaintiff is required to allege that the defendant violated constitutional rights by his or her "own conduct, not by reason of [his or her] supervision of others who committed the violation" and could not "rely on a separate test of liability specific to supervisors." *Id.* at 619 (citations omitted).

The factual allegations detailed at p. 14 of Plaintiffs' brief, ECF No. 245-1, p. 18 of 24, which are offered to support Plaintiffs' argument that Defendant Rose should be reinstated as an individual defendant in Plaintiffs' First Amendment (Suppression of Speech) and Fourteenth Amendment (Denial of Equal Protection) claims are futile.  The deposition testimony taken during discovery in this case, including the testimony of Pelletier, Faughnan, Rose and Stenger, amongst

others, does not indicate any personal involvement by Rose sufficient to state First Amendment or Equal Protection claims.

**New allegations in the Amended Complaint at ¶ 52.**  ECF No. 245-1, p. 18 of 24; ECF No. 245-4, ¶52.

Plaintiffs appear to argue that, because Defendant Brian Rose, who is Vice-President of Student Affairs at Binghamton University ("BU") observed the closing minutes of the November 14, 2019 Tabling Event, that he should be held liable for violation of Plaintiffs' First Amendment and Equal Protection rights.  This conclusion, contrary to Plaintiffs' claims, *see*, ECF No. 245-2, ¶¶ 7 – 9; ECF No. 245-1, p. 18 of 24, is unsupported by deposition testimony.   Defendant Rose testified that he learned of the Tabling Event "after the fact."   Declaration of John F. Moore, declared on June 21, 2023 ("Moore Decl."), Ex. 4 (Rose deposition), p. 15.  Defendant Rose testified that on November 14, 2019, he was advised by the Dean of Students that a protest was occurring at what is being referred to in this litigation as the "Tabling Event".  *Id.*  Rose walked from his office to the area where the Tabling Event was occurring, and from a distance of approximately 50 yards he "observed the very last moments of the tabling event at that distance." *Id.*   Rose's testimony indicates that he saw a group of students around a table, "gesticulating and yelling", and saw "police trying to, you know, keep greater separation and, you know, extending arms to try to do that."  *Id.*, p. 19.  Rose testified that he did not speak with University Police who were at the scene.  *Id.*, pp. 15 – 16, 56.  Rose "saw people leave with the police, and I saw a number of people that remained assembled there chanting something that was negative towards the police." *Id.*, p. 15.  Rose testified that he did not learn until after the event that the people who left with the police were the College Republicans who were tabling.  *Id.*, p. 16.

Plaintiffs' allegation appears to be that because Defendant Rose was a high-ranking University official, he violated Plaintiffs' First Amendment and Equal Protection rights by failing to stop the four University Police Department ("UPD") officers on-scene from removing College Republicans, and/or presumably instead ordering UPD to remove the protestors.  ECF No. 245-4, ¶ 52.  However, Rose testified he had no idea the College Republicans were being removed at the scene, and did not discover what the details of the incident were until after the fact.  Moore Decl., Ex. 4 at pp. 15 – 16.

Moreover, Defendant Rose testified that the Binghamton University UPD was not one of the organizations that reports to him and was not within his chain of command.  *Id.* at p. 56.  Further, Tim Faughnan, who was Defendant Police Chief Pelletier's supervisor, Moore Decl., Ex. 2 (Pelletier deposition), p. 56), testified that the BU Administration does not make law enforcement decisions for UPD.  Moore Decl., Ex. 3 (Faughnan deposition), p. 35.  AVP Faughnan had no recollection of administration giving direction to UPD on November 14, 2019, the date of the Tabling Event, or of administration directing UPD to remove the College Republicans from the area of the Tabling Event on that date.  *Id.*, p. 64.  Lt. Steven Faulkner, a UPD Lieutenant on the scene that day, confirmed that he and other UPD officers suggested to the College Republicans who were tabling that they should pack up and leave because they did not have a permit, and for their own safety because the scene was escalating. Moore Decl., Ex. 1 (Faulkner deposition), pp. 12, 74 – 77.

As such, Plaintiffs' allegations do not provide a sufficient basis from which this Court can infer that Defendant Rose had any personal involvement in the alleged violations of Plaintiffs' constitutional rights.  Rose had no authority to direct the actions of UPD on the scene and his

testimony indicated no awareness of the specifics of the situation, or who was being removed, at the time he saw the end of the Tabling Event from 50 yards away.  Plaintiffs' allegations that Defendant Rose later learned the specifics of the incident and/or wrote favorably about the UPD response to the incident is insufficient to state a claim.

Rose's involvement can be contrasted from the case cited by Plaintiffs, *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 409 – 410 (S.D.N.Y. 2021), in which it was held that a claim was stated against a defendant police chief who was alleged to have personally directed officers at the scene of a protest and approved mass use of pepper spray against demonstrators.  Here, Plaintiffs' allegations that Defendant Rose later learned the specifics of the incident and/or wrote favorably about the UPD response to the incident is insufficient to state a claim.  In that same case, *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d at 410, the Court held that claims that a Police Commissioner's praise of the NYPD's response suggests only that he approved of their tactics after the fact — not that he had any role in designing those tactics in the first place. *See also, Rahman v. Fisher,* 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("receipt of notice after the violation is insufficient to constitute personal involvement in the violation").

**New allegations in the Amended Complaint at ¶¶ 82, 85.**  ECF No. 245-1, p. 18 of 24; ECF No. 245-4, ¶¶ 82, 85.

Plaintiffs appear to suggest that Rose facilitated the disruption of the Laffer Event by providing the College Progressives a space in a lecture hall in the same building as the Laffer Event to hold a "speak out".  Deposition testimony taken to date reveals otherwise, and this allegation is futile as it pertains to Rose's personal involvement in any alleged constitutional violation.

7

Critically, the Laffer Event was not a ticketed event. Any member of the public could have entered. Moore Decl., Ex. 9 (Restuccia deposition), p. 130. Providing a space to the Progressives to hold a protest away from the room where Laffer was scheduled to speak would not have prevented any prospective protestor from entering the Laffer Event location. The College Republicans' President at the time of the Tabling and Laffer Events was John Restuccia. *Id.*, pp. 17 – 18, 20. Restuccia testified that the Laffer Event was open to the public, and that the College Republicans did not require tickets for the event: "[w]e wanted it to be open to the community, so people from the area could enjoy the speaker." *Id.*, p. 130.

There is no testimony that shows that the provision of a "speak-out room" to the College Progressives was done to facilitate disruption of the open-to-the-public Laffer lecture. Defendant Rose testified that the University reserved another lecture hall in the same building for protestors, at his suggestion. Moore Decl., Ex. 4, pp. 46 – 47. He testified that "[m]y interest in potentially providing another space was, you know, basically analogized to ways in which we have sometimes handled outdoor protests where you try to create a place of assembly for counterdemonstrators." *Id.*, p. 48. BU AVP Faughnan testified that providing protestors with a place to speak out is common practice at BU when there is a protest. Moore Decl., Ex. 3, pp. 97 – 98. The purpose was to give the protestors visibility but keep them from being disruptive. *Id.*, pp. 98 – 99. Defendant Police Chief Pelletier testified that the reason they provided the lecture hall to protestors was "that when you have a protest, that people with opposing views should be offered a space. So, as I understood it, it kind of takes away their argument, after the fact, that they were in the original space to protest because they didn't have any place to go." Moore Decl., Ex. 2, p. 174.

**New allegations in the Amended Complaint at ¶¶ 91–94.** ECF No. 245-1, p. 18 of 24; ECF No. 245-4, ¶¶ 91 – 94.

8

Plaintiffs appear to suggest that Defendant Pelletier's conversation with Dr. Laffer at the airport was a violation of Plaintiffs' First Amendment rights.  This is unsupported by the testimony and is a futile allegation.  First, it is undisputed that the conversation at the airport – even if the parties disagree as to the purpose of it – did not dissuade Laffer from going to Binghamton University speak on November 18, 2019.  ECF No. 245-4, ¶ 112.  As such, on its face it does not plead causal connection to the alleged First Amendment violation.

Further, as it pertains to the effort to resuscitate individual liability claims against Rose based on these allegations, there is no evidence that the conversation occurred at Defendant Rose's behest.  Defendant Pelletier testified that he had a "gut feeling" that the speaker being brought in by the College Republicans, Dr. Laffer, was not aware there was a planned protest.  Moore Decl., Ex. 2, pp. 180 – 181.  Defendant Pelletier met Dr. Laffer at the airport, told him that there "might be something going on", but did not present Dr. Laffer the option of not proceeding with the speech.  *Id.*, pp. 181 – 182.  BU AVP Faughnan, Pelletier's supervisor, testified that he discussed with Chief Pelletier the decision to meet Dr. Laffer at the airport.  Moore Decl., Ex. 3, p. 94.  Faughnan testified that Pelletier came up with the idea on his own.  *Id.*, p. 95.  The plan was not to dissuade Dr. Laffer from speaking, but to give him the "head's up" about the protest.  *Id.*, pp. 94 – 96.

None of this was done at Rose's urging. Defendant Rose testified that he did not direct Chief Pelletier to go to the airport to speak with Dr. Laffer.  Moore Decl., Ex. 4, p. 43.  Defendant Rose testified that encouraging Dr. Laffer to not move forward with the speech was not the plan ("It was more about making sure he was aware of what may happen.")  *Id*., p. 44.

**New allegations in the Amended Complaint at ¶ 101.**  ECF No. 245-1, p. 18 of 24; ECF

No. 245-4, ¶ 101.

Plaintiffs in this new paragraph appear to suggest that Rose's presence in the lecture hall prior to – but not during – the Laffer lecture pleads the requisite personal involvement in directing the alleged acts of UPD during the event.  ECF No. 245-4, ¶ 101.  This is unsupported by the testimony and is a futile allegation.

Defendant Rose testified that he visited Lecture Hall 8 before the Laffer Event began. Moore Decl., Ex. 4, p. 60.  However, he was not privy to the event plan developed by the University Police prior to the Laffer Event.  *Id.*, pp. 57 – 58.  He did not pass on any directives to UPD because he does not supervise them.  *Id.*, p. 58.  While he "wanted there to be a strong and physical police presence, [and that] they communicate an intent …[that]… disruption wouldn't be tolerated…[t]he specifics of how the police were going to carry that out were, you know, within the prerogatives of the police and their chains of command." *Id.*, p. 59.  Rose also had no conversations with police about what to do with Dr. Laffer if things got out of control: "No. Again, those would have been details within the prerogatives of the police and their event management plan." *Id.*

**New allegations in the Amended Complaint at ¶¶ 102, 118.**[3] ECF No. 245-1, p. 18 of 24; ECF No. 245-4, ¶¶ 102, 118.

Plaintiffs appear to suggest that Defendant Rose was in a position to direct the actions of UPD at the Laffer Event due to the fact that he was watching the event from another location on campus.  A review of relevant testimony makes clear that this allegation is a futile attempt to plead

---

[3] New allegations contained in the proposed Amended Complaint, ¶¶ 118 and 130, allege that Defendant Rose characterized the response of UPD, of which Defendant Pelletier was Police Chief, to have been insufficient. This raises the specter of a conflict of interest that may entitle these Defendants to outside counsel, which may further delay this litigation if the motion to amend is granted.

personal involvement.  Again, all relevant testimony has made clear that UPD was not within Rose's chain of command.  Moore Decl., Ex. 4, at p. 56; Moore Decl., Ex. 3 at p. 35.

In addition to the fact that Rose did not have the authority to direct officers on the scene at the Laffer lecture, he did not do so, according to testimony.  Defendant Rose testified that he watched a live video feed, with no audio, of the Laffer Event from the University Police conference room basement of the University Administration Building, approximately 5 minutes from the lecture hall the Laffer Event was in.  Moore Decl., Ex. 4, pp. 62 – 64.  Present with him were various members of the administration, AVP Faughnan and Deputy Police Chief Bay.  *Id.*  Rose had no direct communication with anyone on-site at the lecture hall where Laffer was speaking.  *Id.*, p. 63; *see also* p. 65 ("I would not provide direction.").  He did not see Dr. Laffer removed from the lecture hall and does not remember any conversations about Laffer's movements.  *Id.*, p. 65.

AVP Faughnan, as noted, was also in the conference room with Defendant Rose watching the live video feed.  Moore Decl., Ex. 3, pp. 108 – 108.  Faughnan remembers no conversations about getting Dr. Laffer out of the lecture hall, and is unaware of anyone asking Dr. Laffer to leave.  *Id.*, pp. 109 – 110, 170 - 171.

The mere fact that Rose was a University official does not render him liable because he observed the Laffer Event by video and did not direct officers – who were not in his chain of command – to successfully allow the speech to go forward.  He had no personal involvement in the events which unfolded in the lecture hall.  Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint "fatally defective on its face." *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987). The fact that a

11

defendant is a supervisor is not enough to impute personal involvement onto that actor; rather, even "supervisory liability requires that the 'defendant, through the official's own individual actions, has violated the Constitution.'" *Williams v. Novoa*, 2021 U.S. Dist. LEXIS 22941, 2021 WL 431445, at *6 (S.D.N.Y. Feb. 5, 2021) (quoting *Tangreti v. Bachmann*, 983 F.3d at 618).  The facts alleged here are distinguishable from those of *Correa v. Lynch*, 2021 U.S. Dist. LEXIS 96188 at *14 – 15, 2021 WL 2036697, at *6 (S.D.N.Y. May 20, 2021), cited by Plaintiffs.  There, it was held that a failure to protect claim was stated against a defendant DOCCS officer who, along with three other defendants, opened Plaintiff's cell, rushed toward him with their fists up, and "punch[ed] at [him]."  The defendant in question was alleged to have been present while other defendants beat the plaintiff to the point of tears, and allegedly did not intervene.  This is in contrast to a lack of personal involvement from a defendant who observed an event from a distant location, and who had no authority to intervene, nor any personal involvement in any alleged constitutional violation.

The current allegations are also distinguishable from the facts in *Vedder v Nutting*, 2012 U.S. Dist. LEXIS 57276, at * 8 – 9, 2012 WL 1416266 (N.D.N.Y Apr. 24, 2012), also cited by Plaintiffs, where this Court granted a motion to amend where depositions taken after the most recent complaint revealed the personal involvement of three defendants who plaintiffs sought to re-plead based on personal involvement.  There, Plaintiffs alleged they were initially unaware of the identity of individuals who searched their home and seized a briefcase in a search or who authorized same, and that subsequent testimony revealed who those individuals were, thus necessitating amendment.  *Id.*  This is in contrast to the present case, where testimony does not show Rose was personally involved in any complained-of alleged constitutional violations.

**B.  The Proposed Allegations regarding Retaliation claims Against Defendants Rose and Stenger are Futile.**

Plaintiffs also argue that Defendants Rose and Stenger should be reinstated as individual defendants as it pertains to Count II – First Amendment (Retaliation).   ECF No. 245-1, pp. 14 – 15. To state a prima facie claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants *took adverse action* against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to *take action against the plaintiff. Fabrizio v. Smith*, 2021 U.S. Dist. LEXIS 45856, * 14 – 15 (N.D.N.Y. March 10, 2021) (emphasis added) (citing, *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).

Plaintiffs' initial Complaint and proposed Amended Complaint allege one arguably "adverse action" taken against Plaintiff College Republicans – that Defendant Student Association ("SA") "suspended" College Republicans as a student group, and the disingenuous claim that Stenger and Rose "caused" this to occur.  ECF No. 245-4, Proposed Amended Complaint, ¶138; ECF No. 1, Complaint, ¶ 130.

The record evidence established to date indicates no personal involvement by Stenger or Rose in the complained of alleged constitutional violation.  Plaintiffs' argument that Defendants Rose and Stenger should be reinstated in their individual capacities as defendants in Plaintiffs' retaliation claim is futile and should be rejected, as relevant testimony refutes such claims. As above, the paragraphs following each "new" allegation detail relevant testimony.

13

**New allegations in the Amended Complaint, at ¶ 26.**  ECF No. 245-1, pp. 18 – 19 of 24; ECF No. 245-4, ¶ 26.

This "new" paragraph states that Rose supervised the office of Student Conduct.  ECF No. 245-4, ¶ 26.  The implication arising from this "new" factual claim appears to be that Rose could have, after the Laffer Event concluded, used his authority over the Office of Student Conduct to discipline members of College Progressives and/or other student protestors who disrupted the Laffer Event, and that his failure to do so constituted retaliation against College Republicans.  This contention is without merit.  In the context of an employment First Amendment retaliation claim, a failure to discipline co-workers does not establish retaliation and cannot form the basis of a retaliation claim.  *McAvey v. Orange-Ulster BOCES*, 805 F. Supp. 2d 30, 43 (S.D.N.Y. 2011).  The same should hold true here.

Defendant Rose oversees the Office of Student Conduct along with numerous other departments as Vice-President of Student Affairs.  Moore Decl., Ex. 4, p. 11.  Neither the original Complaint nor the proposed Amended Complaint alleges that any members of Plaintiffs College Republicans were disciplined by the Office of Student Conduct.  ECF No. 1; ECF No. 245-4.  No student conduct charges were pursued against any individuals involved in the Tabling or Laffer Events.  Moore Decl., Ex. 4, pp. 20 – 21.  Allegations against Rose based on not pursuing student conduct charges against non-parties does not state a claim for adverse retaliatory action <u>against</u> Plaintiffs.

**New allegations in the Amended Complaint at ¶¶ 135 – 137.**  ECF No. 245-1, p. 19 of 24; ECF No. 245-4, ¶¶ 135 – 137.

Plaintiffs' allegations in these new paragraphs appear to suggest a claim of retaliation against Stenger (and, perhaps, Rose) because additional protestors were not arrested.  This failure

14

to take additional action against non-parties who happen to be Plaintiffs' political enemies does not plead the requisite adverse action as against Plaintiffs.  ECF No. 245-4, ¶¶ 135 – 137.

First, it is undisputed that no members of the College Republicans were arrested by UPD at the Tabling and Laffer Events, nor is that alleged in either the initial or proposed Amended Complaint.  ECF No. 1; ECF No. 245-4; *see, e.g.*, Moore Decl., Ex. 10, pp. 193-94 (College Republicans member Spencer Haynes testifying that no College Republicans were arrested).

It is also undisputed that two protestors *were* arrested at the Laffer Event.[4]  ECF No. 245-4, ¶ 134 (conceding that two protesters were arrested at the Laffer Event); Moore Decl., Ex. 2, pp. 219 – 220, 224 – 226; Ex. 4, p. 81.  Pelletier testified that the DA pursued charges against those two individuals.  Moore Decl., Ex. 2, p. 239.  Pelletier also testified that there was a group consensus by about eleven people to not make further arrests.  *Id.*, pp. 240 – 241.  Pelletier testified that he was never told not to make additional arrests, but it was "suggested" that he not make additional arrests.  *Id.*, pp. 250 – 251.  Pelletier testified that the investigators who identified the additional individuals took the suggestion not to arrest.  *Id.*, p. 256.

While Stenger was not present for group meetings relating to arrests of other individuals identified at the Laffer Event he expressed a desire to avoid further arrests. Moore Decl., Ex. 4, pp. 85 – 86. Rose initially was in favor of additional arrests and disagreed with Stenger's desire not to arrest, but his opinion evolved with the passage of time.  *Id.*, pp. 85 – 89.

Stenger was not present for the Laffer Event.  Moore Decl., Ex. 5 (Stenger deposition), p. 82.  Laffer's speech took place at a time when Stenger was on a plane, halfway between Texas and

---

[4] In addition, two other protestors at the Tabling Event were charged based on complaints filed by members of College Republicans.  Moore Decl., Ex. 2, pp. 97, 136.  There has been no testimony that any Plaintiff filed criminal complaints related to the Laffer Event.

California.  *Id.*  Stenger testified that he can mention his concerns to the chief of Police but he, as University President, does not have the power to arrest.  *Id.*, p. 72.  Stenger does not recall if, following the Laffer Event, he told Darcy Fauci from his office that he would prefer to avoid further arrests of additional students, but testified that "it sounds accurate."  *Id.*, p. 188.

Whether or not Stenger was the source of the decision to not arrest further students[5] and other protestors after the Laffer Event, this inaction against non-parties does not form the basis for an individual liability claim against Stenger.  Two protestors were arrested.  No College Republicans were arrested.  The fact that additional protestors did not face criminal charges does not establish that Stenger *took adverse action* against the Plaintiffs, or that there was a causal connection between the Tabling Event, Laffer Event and any decision not to arrest more students— in other words, the Amended Complaint is absent of any suggestion that the protected conduct was a "substantial or motivating factor" in the defendants' decision to *take action against the plaintiffs.* *Fabrizio v. Smith*, 2021 U.S. Dist. LEXIS 45856, * 14 – 15 (a plaintiff must plead that a defendant took adverse action *against* the plaintiff).

> **New allegations in the Amended Complaint at ¶¶ 138, 143, 146.**  ECF No. 245-1, p. 19 of 24; ECF No. 245-4, ¶¶ 138, 143, 146.

Plaintiffs in these paragraphs appear to allege that "Rose and Stenger" caused the Student Association ("SA") to discipline Plaintiffs and that Rose "and the Student Association decided not to discipline College progressives, in part, because they feared inciting racial tensions with the College Progressives against Stenger and Rose." ECF No. 245-4, ¶¶ 138, 143, 146.  These allegations by Plaintiffs are disingenuous and in stark contrast to the actual record evidence

---

[5] There has been no testimony that Rose was the source of that decision.

established at depositions.

On November 19, 2019, the Executive Vice-President of the Defendant SA, Erin Bishop, e-mailed the Plaintiff College Republicans and stated the following: "I am emailing to inform you that the B-there account for College Republicans has been suspended.  Due to your violation with both University and Student association policy in regards to tabling without proper approval on Thursday November 14th."[6]  ECF No. 1, p. 75 of 75 (Exhibit 9 to Complaint); ECF No. 245-4, p. 80 of 80; Moore Decl., Ex. 9 (Restuccia deposition), pp. 337 – 339.  John Restuccia, then-president of College Republicans, received the e-mail. Moore Decl., Ex. 9, p. 339.  Defendants Rose, Stenger and Pelletier were not copied on the e-mail.  *Id.,* p. 345.  Restuccia had no idea if Defendants Rose or Stenger had any involvement in the suspension of the College Republicans' B-there account. *Id.*, pp. 345 – 346[7].  Restuccia admitted that no other suspensions were issued to College Republicans other than the suspension of the B-there account.  *Id.*, p. 350.

The "B-there" account is used by student groups to book rooms.  *Id.*, p. 341.  Suspension of this account did not prevent College Republicans from holding 2-3 additional group meetings during the Fall 2019 semester after November 19, 2019.  *Id.*, p. 342.

It is undisputed, based on the admissible testimony taken in this litigation, that State defendants, including Defendant Rose, had no involvement in the decision to suspend the College

---

[6] Plaintiffs' original Complaint, and the Amended Complaint at ¶138, offer a selectively edited reading of this e-mail which is worded to suggest that the College Republicans were suspended as a group.

[7] Numerous former members of College Republicans were deposed, and not a single member of the group had any knowledge that Rose (or Stenger) had any involvement in the suspension of College Republicans' B-there account, but as Restuccia was President at the relevant time, only his testimony is appended (Rein Bey, whose testimony is also appended, also has no personal knowledge that Rose or Stenger had any involvement in the decision – Moore Decl. Ex. 8, pp. 153 – 155).

17

Republicans' B-there account.  To the contrary, Rose made efforts to get the SA to reverse that decision, and also discipline College Progressives.

Matthew Johnson, who was Associate Director of Defendant SA in November 2019 and at the time of his January 27, 2023 deposition, testified that SA takes no direction from any employee of BU.  Moore Decl. Ex. 7, p. 21.  SA can discipline BU student groups, and sanctions depend upon the rule violation.  *Id.*, pp. 31 – 32.  The Executive Vice-President ("EVP") of SA decides whether rule-based violations have been proven.  *Id.*, p. 35.  The BU administration has no role in the disciplinary process that SA can utilize against BU student groups.  *Id.*, pp. 79 – 80.  Johnson testified that neither Rose nor any other member of the BU administration has any input into the sanction levied against the College Republicans on November 19, 2019.  *Id.*, p. 81.  SA is not controlled by SUNY Binghamton administration.  *Id.*, p. 164 ("Not in any way.")

Johnson confirmed that the November 19, 2019 e-mail to College Republicans suspended Plaintiff's B-there account.  *Id.*, p. 163.  That e-mail did not suspend the College Republicans as a group.  *Id.*  Johnson confirmed that the e-mail was not sent at the behest of either Rose or Stenger. *Id.*, p. 164.

Following the SA's suspension of College Republicans' B-there account, SA had several meetings with University officials, including Rose.  *Id.*, p. 81, see also, pp. 46 – 47.  SA's sanction against the College Republicans had been imposed *before* any meetings with Rose.  *Id.*, p. 81. According to Johnson's testimony, "we were being pressured [by Rose] to change that decision [to sanction the College Republicans] and to take action against the [BU College] Progressives." *Id.*, p. 47; *see also* pp. 165 - 166.  According to SA Associate Director Johnson, despite repeated attempts by Rose to get SA to remove sanctions from College Republicans and sanction College

18

Progressives, SA concluded that they had no evidence to sanction College Progressives, and did not remove the sanctions against College Republicans. *Id.*, pp. 112 – 114, 167 - 168.

Daniel Rocabado, who is the current EVP of SA, also testified. *See* Moore Decl. Exhibit. 6. Rocabado confirmed that the University is not able to direct SA to take any action and does not exercise any control over SA. *Id.*, p. 22. EVP Rocabado was unaware of any instance where the University has directed the SA to take a certain course of action. *Id.*

Contrary to Plaintiffs' intimation that the College Republicans were suspended as a student group, ECF No. 245-4, ¶ 138, SA EVP Rocabado confirmed that the SA never "pulled" the College Republicans' charter as a student group. *Id.*, p. 31. In July 2020, the month the Complaint in this litigation was originally filed, *see* ECF No. 1, the College Republicans were inactive because they failed to re-register at the end of the 2019 – 2020 academic year. *Id.*; Moore Decl., Ex. 7, p. 28. While this testimony occurred during discovery, Plaintiffs do not correct this misstatement in the proposed Amended Complaint.[8]

Further, EVP Rocabado confirmed that selection of sanctions is an EVP decision. Ex. 6, pp. 57 – 58, 87. During SA's disciplinary process, it does not consult BU administration. *Id.*, pp. 140 – 141.

Defendant Rose also testified about the SA's sanction of the College Republicans. He was aware that SA suspended College Republicans reservation privileges through the end of the academic year. Moore Decl. Ex. 4, pp. 92 – 94. Following SA's suspension of the College

---

[8] The Court is also referred to Defendant SA's opposition to this motion to amend, which provides additional evidence showing that College Republicans' B-there account suspension lasted only one semester, and that the College Republicans' charter was not revoked. Rather, it was placed on inactive status for failing to recertify and then placed back on active status with privileges restored in September of 2020. ECF No. 252.

Republicans' B-there account, Rose discussed with SA whether they had responded to College Progressives' violations of SA policy the way they had with College Republicans. *Id.*, pp. 95 – 96. Rose was not contemplating overriding SA's decision, but rather was contemplating attempting to influence SA's consideration of their own actions. *Id.*, p. 100. Rose testified he has the ability to talk to SA and give them the administration's view of events, but does not have the power to direct the SA to sanction an organization. *Id.*, pp. 165 – 166. Rose believed a letter posted online and signed by College Progressives regarding planned disruption of the Laffer Event warranted SA action against College Progressives, and he shared this perspective with SA over the course of 2 – 3 meetings. *Id.*, p. 102. Rose testified about the conversation at one meeting with SA.

Rose testified that he believed the SA needed to respond in an evenhanded manner to the Progressives the same way they responded to concerns about the Republicans, and that he expressed this to SA. *Id.*, pp. 106 – 107, 122; see also pp. 134 – 135; 163 – 164. Rose testified that SA told him they determined that they could not establish that the "letter" had been authored by members of College Progressives. *Id.*, pp. 127 – 128; 134 - 135.[9] Rose also conceded that he had no direct evidence that College Progressives were involved in disrupting the Laffer lecture. *Id.*, p. 168. Rose testified that by January 31, 2020, SA had indicated that they would not change

---

[9] Rose did not testify that "he and the Student Association decided not to discipline College Progressives, in part, because of they feared inciting racial tensions with the College Progressives against Defendants Stenger and Rose," as Plaintiffs falsely plead in the proposed Amended Complaint. ECF No. 245-4, ¶ 146. Rather, he testified to a hearsay statement by an SA officer, Khaleel James, who told Rose that *SA leadership* were afraid to take action against College Progressives and be painted as racist, in a later conversation. Moore Decl., Ex. 4, p. 128 (emphasis added). However, no SA witness confirmed this and no witness, included Rose, testified that Rose held such views.

the sanction against College Republicans, or take action against College Progressives, and he didn't think he had sufficient information to continue to press the issue as it pertained to College Progressives. *Id.*, p. 133, *see also*, pp. 168 - 169.

Plaintiffs' motion to add Defendants Rose and Stenger as defendants in their individual capacities should be denied as futile. Plaintiffs should not be permitted to misconstrue and misstate the record evidence in an attempt to resuscitate dismissed individual liability claims against two defendants who had no involvement in any adverse action against Plaintiffs based upon the evidence established by discovery to date. The motion to amend should be denied.

### POINT II.  REIN BEY SHOULD NOT BE ADDED AS A PLAINTIFF.

Plaintiffs also move to add Rein Bey as a Plaintiff, in the wake of former Plaintiff Jon Lizak's withdrawl from the litigation. This motion should be denied. To have standing to bring a claim under 42 USC §1983, a Plaintiff must demonstrate that he or she personally suffered a violation of their civil rights. *Schachter v. United States Life Ins. Co.*, 77 Fed. Appx. 41, 42 (2d Cir. 2003) (noting that "standing to pursue a claim under 42 U.S.C. § 1983" requires personal injury); *Johnakin v. NYC Dep't of Corr.*, 2013 U.S. Dist. LEXIS 144059, 2013 WL 5519998, at *9 (E.D.N.Y. Sept. 30, 2013) ("Thus, to have standing to bring a claim under 42 U.S.C. § 1983, plaintiffs must demonstrate that they personally suffer from a violation of their civil rights." (citation and internal quotation marks omitted)); *Kshel Realty Corp. v. City of New York*, 2003 U.S. Dist. LEXIS 8357, 2003 WL 21146650, at *8 (S.D.N.Y. May 16, 2003) ("An agent of a principal does not have standing to assert a claim pursuant to Section 1983 on behalf of the principal."). Although "[t]he same conduct may result in injury to both the corporation and the individual," *Robinson v. Davis*, 2010 U.S. Dist. LEXIS 110147, 2010 WL 4062863, at *2 (D. Vt.

Oct. 15, 2010), it does not follow that Plaintiff can bring a § 1983 action on her own behalf based on alleged constitutional injuries to College Republicans, nor can Bey piggyback on the student group's alleged constitutional injuries when she herself suffered none.  *Gem Fin. Serv. v. City of New York*, 2014 U.S. Dist. LEXIS 34770, at *27 – 28, fn. 8 (E.D.N.Y. March 17, 2014).

Plaintiff's proposed Amended Complaint makes no allegations which detail proposed Plaintiff Bey's involvement in the facts of this case, nor injuries flowing therefrom.  *See* ECF No. 245-4, ¶¶ 15 – 16, 111.  Those paragraphs only state that Bey "desires to engage in expressive activities", and that she was unable to attend the Laffer lecture due to the size of the crowd.  As detailed above, the event was open to the public.  This was College Republicans' decision, not the doing of State Defendants

On March 3, 2023, State Defendants took Rein Bey's deposition.  Bey's testimony did not establish any involvement by Bey in the events detailed in the Complaint, nor any constitutional injury suffered by this proposed Plaintiff.  Bey is the current BU College Republicans President, and was the Vice-President in Fall 2019.  Moore Decl., Ex. 8, pp. 17 – 18.  She was not present at either the Tabling Event or Laffer Event.  *Id.,* pp. 104, 110, 135 – 36. Bey testified that she did not personally have access to the republicans@binghamtonsa.org email address in Fall 2019 ("I believe only John Restuccia had access to it at that time").  *Id.*, pp. 152 – 53.  She never saw the B-there suspension e-mail.  *Id.*, p. 32, 152.  She isn't aware that the College Republicans regained B-there access after July 2020 because she was not on the College Republicans' executive board then.  *Id.*, p. 33.

Bey was not present for the November 14, 2019 Tabling Event which is one of the incidents central to this litigation. *Id.*, p. 104.  According to Bey, "I was not able to attend that day, I was

busy." *Id.*, p. 110.  John Restuccia asked her if she could table with him, and she told him she was not able to, and had no other conversations with him about the Tabling Event. *Id.*, p. 113.  She does not know how many flyers were prepared for the tabling. *Id.*, pp. 110 – 111.  She does not know that College Republicans coordinated the Tabling Event with Turning Point USA, the group which tabled with the College Republicans that day. *Id.*, pp. 111 – 113.  She was not present when the protest occurred at the Tabling Event. *Id.*, p. 117.  Although she testified that she briefly walked by the Tabling on her way to class, she could not recall what was displayed at the College Republicans or Turning Point USA tables, and did not recognize a photo of the tabling taken that day and shown to her at deposition. *Id.*, pp. 115 – 117.

Bey was also not at the Laffer Event.  She was not aware that Plaintiff Young America's Foundation had involvement in bringing Dr. Laffer to campus and did not find that out until recently. *Id.*, p. 86.  Her only involvement was in giving flyers for the speech to the University's economics and political science departments and she did not testify that she was prevented or discouraged from doing so by any Defendant. *Id.,* p. 87.  She had no involvement in reserving the room for the Laffer Event. *Id.*, p. 89.  She was not present for the lead up to the event and did not ever see Dr. Laffer. *Id.*, pp. 135 – 136.  She claims she arrived at the lecture hall after the doors were closed, and blocked by "PLOT protestors," and that a uniformed police officer would not allow her to enter. *Id.*, pp. 138, 145 – 146[10].  In fact, she was not present for any pertinent events alleged in the complaint pertaining to the Laffer Event. *Id.*, pp. 139 – 145.  Indeed, she did not

---

[10] This cannot be realistically painted as any constitutional violation by any Defendant – as noted, Restuccia testified that the group wanted the Laffer Event open to the public, Moore Decl., Ex. 9, p. 130, and Plaintiffs cannot now be heard to complain that she was prevented from entering due to the size of the crowd.  ECF No. 245-4, ¶ 111.

enter the lecture hall until after Dr. Laffer had left.  *Id.*, p. 146.

To act as a 42 USC § 1983 Plaintiff, proposed Plaintiff Bey must allege some kind of injury (along with participation in the events alleged).  *Schachter v. United States Life Ins. Co.*, 77 Fed. Appx. at 42.  She has not done so, and the Court should deny the motion to add her as a Plaintiff.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion to Amend should be denied, together with such other and further relief that the Court deems just.

Dated:  Albany, New York
       June 15, 2023

                                   LETITIA JAMES
                                   Attorney General of the State of New York
                                   Attorney for State Defendants
                                   The Capitol
                                   Albany, New York 12224-0341
                                   By:  s/ *John F. Moore*
                                   John F. Moore
                                   Assistant Attorney General, of Counsel
                                   Bar Roll No. 105188
                                   Phone: (518) 776-2293
                                   Fax:  (518) 915-7738 (Not for service of papers)
                                   Email: John.Moore@ag.ny.gov

TO (via ECF): All Counsel