## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **YOUNG AMERICA'S FOUNDATION**; **BINGHAMTON UNIVERSITY COLLEGE REPUBLICANS**; and **REIN BEY**, in her official capacity as President of the College Republicans of Binghamton University,<br><br>      **Plaintiffs,**<br><br>    v.<br><br>**HARVEY STENGER**, President of SUNY-Binghamton, in his official and individual capacities; **BRIAN ROSE**, Vice President for Student Affairs of SUNY-Binghamton, in his official and individual capacities; **JOHN PELLETIER**, Chief of SUNY-Binghamton UPD, in his official and individual capacities; and **STUDENT ASSOCIATION OF BINGHAMTON UNIVERSITY**,<br><br>      **Defendants.** | Civil Action No. <u>3:20-cv-822 (LEK/TWD)</u><br><br>**DEMAND FOR JURY TRIAL**<br><br>**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONETARY AND PUNITIVE DAMAGES, AND ATTORNEYS' FEES AND COSTS** |

Plaintiffs Young America's Foundation, Binghamton University College Republicans, and Rein Bey in her official capacity as President of the College Republicans, (collectively referred to as "Plaintiffs"), by and through their undersigned counsel, file this Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

**INTRODUCTION**

1. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. . . .  The classroom is peculiarly the 'marketplace of ideas.'"[1]  Indeed, the state government has the legal obligation to protect and defend the constitutional free speech rights of its students.

2. This is a civil rights action brought under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1985(3), and 1986 and concerns the denial of Plaintiffs' fundamental rights to free speech and equal protection of law by state actors on their own and in conspiracy with private actors.

3. Plaintiffs seek a declaration that Defendants Stenger, Rose, and Pelletier violated their clearly established constitutional rights as set forth in this Complaint; a permanent injunction enjoining Stenger, Rose, and Pelletier from ratifying heckler's vetoes, unlawfully permitting protestors to disrupt and silence Plaintiffs' speech and related activities, or otherwise enforcing the Speech Suppression Policy; and, a judgment awarding nominal, compensatory, and punitive damages against Defendants Stenger, Rose, and Pelletier in their individual capacities only.

4. Plaintiffs seek a permanent injunction enjoining Defendants Stenger, Rose, and Student Association from retaliating against Plaintiffs for their speech and related activities.  Plaintiffs also seek an order that Defendants Stenger, Rose,

---

[1] *Keyishian v. Board of Regents,* 385 U.S. 589, 603 (1967) (citation omitted).

and Student Association reinstate College Republicans as a registered student organization with all attendant rights.

5.    Plaintiff Young America's Foundation seeks an order that Defendants Stenger, Rose, and Student Association recognize its Young Americans for Freedom chapter as a registered student organization.[2]

## JURISDICTION AND VENUE

6.    This is a civil rights action that arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this court pursuant to 28 U.S.C. §§ 1331 and 1343.

7.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this court.  Plaintiffs' claim for damages against certain Defendants sued in their individual capacities is authorized under 42 U.S.C. §§ 1343, 1983, and 1986.

8.    Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred in this district.

## PLAINTIFFS

9.    Plaintiff Young America's Foundation ("YAF") is a nonprofit organization, incorporated in the State of Tennessee, whose mission is to educate the

---

[2] Plaintiffs have removed the Progressive Leaders of Tomorrow ("PLOT") and the College Progressives as Defendants, pursuant to the Court's Orders (ECF Nos. 223 and 238).  Plaintiffs reserve the right to appeal the Court's decisions to dismiss PLOT and the College Progressives once a final judgment has been rendered.

public on the ideas of individual freedom, a strong national defense, free enterprise, and traditional values.

10.    YAF partners with like-minded student organizations on university campuses to, among other things, co-host speakers.  One of those organizations is Young Americans for Freedom, a project of YAF that helps foster the ideas of individual freedom, a strong national defense, free enterprise, and traditional values among American high school and university students.

11.    Plaintiff Binghamton University College Republicans ("College Republicans") is an expressive, registered—and not yet fully reinstated[3]—student organization at the State University of New York at Binghamton ("SUNY-Binghamton") and an unincorporated association of SUNY-Binghamton students.  It had approximately 20 members during the relevant time.

12.    The purpose of College Republicans is to make known and promote the principles of the Republican Party among members of the SUNY-Binghamton campus and community; to aid in the election of Republican candidates at all levels of government; to encourage and assist in the organization and active functioning of the Republican party at local, state, and national levels; and, to develop political skills and leadership abilities among Republican students as preparation for future service by them to the Republican Party and community.

---

[3] Since the original filing of this complaint, College Republicans have re-registered as an organization, but have not been granted all of the rights and privileges it enjoyed prior to suspension.  For example, the Student Association provided office space.

13.   College Republicans achieves this purpose primarily by being an expressive organization.  It engages in a wide variety of expressive activities, including posting flyers and signs, hosting tables with information, inviting speakers to campus, and talking with fellow students about Republican Party principles.

14.   When engaging in these expressive activities, College Republicans and its members discuss political, religious, social, cultural, and moral issues and ideas.

15.   Plaintiff Rein Bey is an adult citizen of the United States, a full-time student at SUNY-Binghamton, a member of Plaintiff College Republicans, and is currently serving as its President.

16.   Bey desires to engage in expressive activities for herself and through College Republicans.  Bey exercises her right to freedom of speech through, among other means, the activities and projects of College Republicans.

## DEFENDANTS

17.   Defendant Harvey Stenger is, and was at all times relevant to this Complaint, the President of SUNY-Binghamton, a component of the public State University of New York ("SUNY") system organized and existing under the laws of the State of New York, acting under color of state law.

18.   As President, Stenger is responsible for adopting, approving, creating, and enforcing SUNY Board of Trustees' and SUNY-Binghamton's policies, rules, and regulations regarding student and student group speech activities on the SUNY-Binghamton campus, including the enforcement of such policies, rules, and regulations by the New York State University Police at Binghamton ("UPD"), SUNY-

Binghamton administrators, and the Student Association of Binghamton University ("Student Association").

19.     Through his position as President of a SUNY institution, Stenger had actual or constructive knowledge that the Rules of the SUNY Board of Trustees prohibit the deliberate interference with the freedom of any person to express his or her views, including through invited speakers, and the willful incitement of others to do the same.[4]

20.     Through his position as President of a SUNY institution, Stenger had actual or constructive knowledge that SUNY had entered into a consent decree in June 2017 in connection with an analogous heckler's veto case at a sister institution that is also part of the State University of New York system, SUNY-Buffalo (the "SUNY-Buffalo Settlement").  In that case, the court denied a motion to dismiss by SUNY-Buffalo defendants after finding, *inter alia*, that the "plaintiffs' alleged loss of opportunities to express themselves in the way they preferred when the University defendants allowed counter-demonstrators to [block their expression] [was] sufficient to allege that the defendants took adverse actions against plaintiffs."[5]   Ultimately, SUNY stipulated and agreed to "take all reasonable measures to enforce its policies against deliberately disrupting or preventing the freedom of any person to express his or her views."[6]

---

[4] 8 CRR-NY 535.3 (i) and (k).
[5] Decision and Order Denying Motion to Dismiss, *Center for Bio-Ethical Reform v. Black*, 1:13-cv-00581-RJA-HBS (W.D.N.Y. Feb. 10, 2017), ECF No. 23.
[6] Stipulation of Settlement and Discontinuance Pursuant to Rule 41(A), *Center for Bio-Ethical Reform v. Black*, 1:13-cv-00581-RJA-HBS (W.D.N.Y. June 2, 2017), ECF

21.    Despite the SUNY policy, SUNY-Binghamton has an unwritten policy that it uses to censor, restrict, and inhibit unpopular student speech, thus unconstitutionally infringing upon students' First Amendment and Fourteenth Amendment rights (the "Speech Suppression Policy").

22.    The Speech Suppression Policy has been enacted, created, and put in place by Defendant Stenger, President of SUNY-Binghamton, as a policy maker.

23.    The Speech Suppression Policy authorizes SUNY-Binghamton officials, including Defendants Stenger, Rose, and Pelletier, to prohibit, chill, oppose, and shut down speech with which they, or other students and faculty, disagree.

24.    Stenger, Rose, and Pelletier have applied this policy against Plaintiffs and, upon information and belief, will continue to do so in the future.

25.    Defendant Brian Rose is, and was at all times relevant to this Complaint, the Vice President for Student Affairs of SUNY-Binghamton, acting under color of state law.

26.    As Vice President for Student Affairs, Rose is responsible for adopting, approving, creating, and enforcing the policies, rules, and regulations regarding student and student group speech activities on the SUNY-Binghamton campus, including the enforcement of such policies, rules, and regulations by UPD, SUNY-Binghamton administrators, and the Student Association.   Rose also directly supervises and is responsible for the Office of Student Conduct which exercises the authority to discipline students.

---

No. 30.

27.     Despite claiming no knowledge of the SUNY-Buffalo Settlement, Rose should have known and was grossly negligent in not knowing about this consent order  in connection with an analogous heckler's veto that guaranteed that SUNY would "take all reasonable measures to enforce its policies against deliberately disrupting or preventing the freedom of any person to express his or her views."[7]

28.     As Vice President for Student Affairs, Rose created, enforced, and ordered others to enforce the Speech Suppression Policy.

29.     Defendant John Pelletier was at all times relevant to this Complaint, the Chief of UPD, acting under color of state law, and reporting directly SUNY-Binghamton's Administration.

30.     As Chief of UPD, Pelletier was responsible for enforcing the policies, rules, and regulations regarding student and student group speech activities on the SUNY-Binghamton campus.

31.     As Chief of UPD, Pelletier enforced and ordered others to enforce the Speech Suppression Policy.  Despite claiming no knowledge of the SUNY-Buffalo Settlement, Pelletier should have known and was grossly negligent in not knowing about the settlement as it was relevant to his responsibility to enforce SUNY policies, rules, and regulations regarding speech on campus.

32.     Defendant Student Association is a non-profit legal entity that has its offices within the University Union on SUNY-Binghamton's campus.  The Student

---

[7] Stipulation of Settlement and Discontinuance Pursuant to Rule 41(A), *Center for Bio-Ethical Reform v. Black*, 1:13-cv-00581-RJA-HBS (W.D.N.Y. June 2, 2017), ECF No. 30.

Association describes itself as "not only a forum for student activism, but the primary financial system which hundreds of clubs and student organizations receive their funding and legal protection through."[8]

33.    The SUNY-Binghamton administration permits the Student Association to operate with a limited degree of independence, but the administration retains the power to direct Student Association decisions.  Acting at the direction of Stenger and Rose, the Student Association has the power to suspend and reinstate student organizations.[9]

34.    The Student Association also has the power to deny official recognition to student organizations.

35.    By way of example, in October 2019, a Constitutions Assistant in the office of the Executive Vice President of the Student Association refused to grant official recognition to Young Americans for Freedom—a chapter of Plaintiff Young America's Foundation—due to an anti-communism provision in the group's constitution that the Constitutions Assistant described as "problematic" and indicated it "can not be part of the Constitution."[10]  The anti-communism provision

---

[8] Student Association of Binghamton University, https://www.binghamtonsa.org/history/, (last visited July 21, 2020).
[9]  Student Association of Binghamton University, Inc., Management Policies (Apr. 28, 2020), https://drive.google.com/file/d/1-GoWSUtVgivfKLuiRj9FtJZWtnC5vPoU/view (last visited July 21, 2020).
[10]  Spencer Brown, *Binghamton U Student Association Rejects YAF Constitution, Say Opposition to Communism is "Problematic,"* YAF, The New Guard (Oct. 8, 2019), https://www.yaf.org/news/binghamton-u-student-association-rejects-yaf-constitution-says-opposition-to-communism-is-problematic/ (last visited July 21, 2020).

was originally from the 1960 Sharon Statement, which the *Washington Post* has described as the "declaration of principles of modern conservatism"[11] and the *New York Times* has said is a "seminal document" of the Conservative Movement.[12]

36.    When YAF and Young Americans for Freedom pushed back on the Student Association's viewpoint discrimination, the Constitutions Assistant relented.  Soon thereafter, however, the Student Association alleged new deficiencies with the Young Americans for Freedom's request for recognition and demanded the group find a faculty sponsor or secure police presence at all of its campus events. These new requirements—which the Student Association did not demand of any other student organization—were entirely manufactured as roadblocks to prevent Young Americans for Freedom from being recognized on campus due to their expressed ideological views.

## STATEMENT OF FACTS

37.    Plaintiff College Republicans regularly engage in expressive, political activities on campus.

38.    These political activities include periodically "tabling" on campus. Student organizations table by setting up a folding table in a high-traffic area on

---

[11] *Id; see also* Matt Schudel, *M. Stanton Evans, guiding force in modern conservatism, dies at 80*, *Washington Post* (Mar. 5, 2015), https://www.washingtonpost.com/local/obituaries/m-stanton-evans-guiding-force-in-modern-conservatism-dies-at-80/2015/03/05/a266c59c-c2a0-11e4-ad5c-3b8ce89f1b89_story.html.

[12] Adam Clymer, *M. Stanton Evans, Who Helped Shape Conservative Movement, Is Dead at 80*, *New York Times* (Mar. 3, 2015), https://www.nytimes.com/2015/03/04/us/m-stanton-evans-pioneer-of-conservative-movement-dies-at-80.html.

campus to interact with students for event promotion, organization recruitment, and information sharing.

39.     College Republicans periodically host speakers on campus.

### Defendants' Physical Attack on
### College Republicans' Tabling Event (Nov. 14, 2019)

40.     On Thursday, November 14, 2019, College Republicans organized a tabling event in a high-traffic area of SUNY-Binghamton's campus known as "the Spine." College Republicans' table was not blocking access to buildings or pedestrian traffic.

41.     As they (and many other student organizations) had done previously, College Republicans did not obtain a permit from the Student Association to table on this date.

42.     This tabling event promoted an upcoming lecture by renowned economist and presidential advisor Dr. Arthur Laffer titled "Trump, Tariffs, and Trade Wars" that College Republicans was co-hosting with YAF on Monday, November 18, 2019 ("Dr. Laffer Event").

43.     Members of College Republicans arrived on the Spine at approximately 10 a.m. and tabled for close to three hours without incident, during which time they engaged with student passersby regarding the upcoming Dr. Laffer Event.

44.     At approximately 1:30 p.m., a mob of College Progressives confronted College Republicans over the content of their tabling.

45.     College Progressives is a registered student organization at SUNY-Binghamton and an unincorporated association of SUNY-Binghamton students.

46.     College Progressives describe themselves[13] as a voice for progressive leftist politics on campus, as well as a center to concentrate activist conduct among students.  Students formed College Progressives in response to their perceived need for a "politically oriented group on campus that emphasizes action, rather than rhetoric."  It had more than 100 members during the relevant time.

47.     College Progressives incited other members to join the mob by sending messages to group chatrooms with numerous other students.

48.     The known messages to these chatrooms consisted of the following: "I heard there's only like 3 supporters there"; "Yeah there's not that many but fuck em *[sic]* up anyways"; and, "Today on the spine Trump supporters are actively advocating for the Trump administration and gun violence.  Join us at 2 as we disrupt this disgusting space that Binghamton has allowed students to create and protect the racism, homophobia, and xenophobia that has erupted from Trump and his supporters."[14]

49.     Shortly thereafter, the mob incited by the College Progressives— approximately 200 persons at this point—attacked College Republicans' table.

50.     The College Progressive mob confiscated and destroyed College Republicans' Dr. Laffer Event flyers and posters, broke down and carried away their table, hurled insults and obscenities at their members who were tabling, and physically assaulted one member, forcibly removing her hat bearing the political

---

[13] Binghamton University College Progressives,
https://bengaged.binghamton.edu/progressives/home/, (last visited July 21, 2020).
[14] A copy of these chatroom messages is attached as Exhibit 1.

slogan "Make America Great Again."

51.    UPD arrived at the scene and, instead of dispersing the mob and protecting College Republicans' right to free speech as the written regulations required, applied the Speech Suppression policy by demanding that College Republicans leave the Spine while the College Progressives chanted "Pack it up."[15]

52.    Defendant Rose learned of the disturbance and traveled to approximately fifty yards away from the scene and observed the College Progressive mob.  Rose chose not to intervene when, enforcing the Speech Suppression Policy, UPD removed College Republicans but left the disruptors alone.

53.    Two members of College Republicans filed police reports with UPD over the physical and verbal harassment they received from the College Progressive mob.

54.    Pursuant to the Speech Suppression Policy, Defendants Stenger, Rose, and Pelletier not only failed to take action to defend College Republicans' constitutional rights but personally and actively supported the thuggish and physically abusive actions of College Progressives.

## Rose's and Stenger's Concessions and Misrepresentations Regarding the Tabling Event

55.    On Monday, November 18, 2019, Rose issued a statement regarding the disruption of College Republicans' tabling event on November 14.[16]

56.     Rose faulted Plaintiff College Republicans for exercising their free

---

[15] The incident described in paragraphs 47 – 51 is captured on video at the following link: https://www.youtube.com/watch?v=_X2-96gt9MI&feature=emb_logo.
[16] A copy of Defendant Rose's statement on the tabling event is attached as Exhibit 2.

speech rights in what he disparaged as a "provocative" manner and gave a knowingly false account of the events designed to support College Progressives.

57.     For example, Rose inaccurately grouped College Republicans in with another student organization that had an adjacent table and claimed that the "*groups'* display included provocative posters with gun imagery." Rose continued that the "*groups* intended to be provocative." Contrary to Rose's statement, College Republicans did not have a poster that included gun imagery, and they did not intend to be provocative; they were merely promoting the upcoming Dr. Laffer Event.

58.     Rose also falsely stated that "[s]ocial media activity suggesting [the tabling groups] were handing out hot chocolate and promoting an upcoming lecture fail to accurately represent the context."

59.     In fact, that is exactly what the College Republicans were doing: promoting the Dr. Laffer Event and handing out cups of hot chocolate to student passersby.

60.     Rose effectively admitted that that he and Defendant Stenger had, consistent with the Speech Suppression Policy, caused SUNY-Binghamton to violate College Republicans' free speech rights, conceding: "Eventually the [University] police directed the tabling groups to abandon the area and escorted them away."

61.     Stenger also responded to the event with a short statement that both "strongly condemn[ed] any acts that impede the expression of one's beliefs" but also defended the police's actions to completely shut down College Republicans'

expression of their beliefs.[17]

62.     Stenger's statement also contrasts starkly with his response to an unrelated May 2019 incident where an unknown student prevented a pro-Palestinian student organization's expressive activity.  In that case, Stenger strongly demonstrated his support of the pro-Palestinian group by promising to "take swift and decisive action," adding, "[w]e will protect, support, and encourage the right of every individual to express concerns freely and to engage in peaceful protest."[18]

63.     By removing College Republicans, who had been peacefully exercising their constitutional rights, as opposed to the mob of violent College Progressives, Stenger, Rose, and Pelletier endorsed a "heckler's veto" over College Republicans' free speech and denied them equal protection of their constitutional rights.

64.     Rose further threatened that while College Republicans could be disciplined for their tabling, the College Progressive mob would be neither identified nor charged.   This was notwithstanding Rose's admission that the College Progressive mob "acted in a manner that may have violated University rules."

<u>**Plaintiffs Seek Assurances**</u>
<u>**Their Rights Will Be Protected**</u>

65.     Immediately following the Thursday, November 14, 2019 tabling disruption, Plaintiff YAF took measures to ensure the Dr. Laffer Event (scheduled for Monday, November 18, 2019) would proceed despite the violent and abusive

---

[17] A copy of Defendant Stenger's statement on the tabling event is attached as Exhibit 3.
[18] A copy of Defendant Stenger's statement on the May 2019 incident is attached as Exhibit 4.

atmosphere that Stenger, Rose, Pelletier, and College Progressives created through their blatant violation of College Republicans' constitutional rights.

66.     First, YAF hired two agents from the private security firm Pinkerton to provide personal protection to Dr. Laffer.

67.     Second, YAF's then-general counsel, Mark Trammell, contacted SUNY-Binghamton's Campus Attorney, Barbara Scarlett, on Friday, November 15, 2019 to obtain assurances that SUNY-Binghamton was taking measures to fulfill its duty to protect Plaintiffs' constitutional rights by ensuring that the Dr. Laffer Event would be able to proceed.

68.     Specifically, Trammell sought assurances that if protests occurred at the Dr. Laffer Event, UPD would remove the disruptors and not the speaker—that is, assurances that Stenger, Rose, and Pelletier would enforce the written policy protecting free speech rather than the Speech Suppression Policy they had applied in violation of the Plaintiffs' constitutional rights at the tabling event the day before.

69.     SUNY-Binghamton's Scarlett refused to provide YAF's Trammell any such assurances.

**College Progressives and PLOT
Announce Their Planned Attack on Plaintiffs' Free Speech**

70.     Progressive Leaders of Tomorrow ("PLOT") is a non-student group based in Binghamton, New York.

71.     PLOT describes itself[19] as a collective of advocates who organize around

---

[19] PLOT Website, https://binghamtonplot.wixsite.com/home, (last visited July 21, 2020).

issues of, among other things, race, class, gender and economics, and who engage in, among other things, "direct action" against the people of the Binghamton area and, in concert with the College Progressives, against the students of SUNY-Binghamton.

72.    For example, in October 2019, members of PLOT led a protest of more than 20 people (including members of College Progressives) that formed a human chain and temporarily shut down Binghamton's Columbus Day parade.[20]  A number of protesters wore masks to conceal their identities, which reportedly startled some of the Binghamton residents who attended, including children.  Police arrested four of the protesters for disorderly conduct, and the Binghamton Mayor publicly condemned PLOT's actions.[21]

73.    In November 2019, PLOT disrupted a Broome County Legislature meeting on the passage of a new law.[22]  Local police agencies arrested ten protesters for disorderly conduct, obstructing governmental administration, and resisting arrest after the protesters reportedly became unruly and refused to obey directives

[20] Jacob T. Kerr, *BU students, local residents protest Broome County Jail deaths at Columbus Day Parade*, Pipe Dream (Oct. 17, 2019), https://www.bupipedream.com/news/111057/bu-students-local-residents-protest-broome-county-jail-deaths-at-columbus-day-parade/.

[21] Kathy Whyte, *Condemnation Continues Following PLOT Columbus Day Protest*, WNBF News Radio 1290 (Oct. 16, 2019), https://wnbf.com/condemnation-continues-following-plot-columbus-day-protest/; Maggie Gilroy, *Backed by supporters, four plead not guilty to disrupting Binghamton parade*, pressconnects.com (Oct. 21, 2019), https://www.pressconnects.com/story/news/local/2019/10/21/binghamton-parade-protest-plot-arraignment-disorderly-conduct/4037294002/.

[22] Anthony Borrelli, *'Annoy the police': How a proposed law led to protest, arrests in Binghamton*, pressconnects.com (Nov. 22, 2019), https://www.pressconnects.com/story/news/public-safety/2019/11/22/broome-county-legislature-protesters-arrested-emergency-responder-harassment-protection-law-plot/4269709002/.

from security.  In between the tabling incident on Thursday (November 14, 2019) and the Dr. Laffer Event on Monday (November 18, 2019), PLOT posted a flyer to social media encouraging its members and others to disrupt the Dr. Laffer Event.

74.    This flyer included the date and time of the Dr. Laffer Event and included a picture of Dr. Laffer receiving his Presidential Medal of Freedom from President Trump graffitied to make it appear that that their eyes were crossed out.

75.    The PLOT flyer also noted their desire to suppress the expressive content of the Dr. Laffer Event and included the following text, with emphasis added: "COLLEGE REPUBLICANS . . . HAVE INVITED ARTHUR LAFFER, AN ECONOMIST / LIAR WHOSE THEORIES HAVE BEEN USED TO JUSTIFY TAX CUTS FOR THE RICH, AND RAISES ON THE POOR.  FUCK THIS & THEM. **LET'S SHOW UP, SPEAK OUT, AND DISRUPT**."[23]

76.    Working in concert with PLOT, College Progressives reposted PLOT's flyer to their Instagram account.[24]  In a second reposting, College Progressives' explicitly asked its supporters via Instagram to "[c]ome out and support BING PLOT . . . to speak out against College [R]epublicans . . ." and to "come out to lecture hall 8 . . . and put an end to this clownery."[25]

### SUNY-Administrators Facilitate Disruption of Plaintiffs' Event in Advance

77.    On the day of the Dr. Laffer Event (Monday, November 18, 2019),

---

[23] A copy of the PLOT flyer is attached as Exhibit 5.
[24] A copy of the College Progressives' Instagram post is attached as Exhibit 6.
[25] A copy of the second College Progressives' Instagram post is attached as Exhibit 7.

Plaintiffs YAF and College Republicans met with UPD and certain SUNY-Binghamton administrators acting at the direction of Defendants Stenger, Rose, and Pelletier.

78.   At this meeting, UPD told YAF and College Republicans that, through social media monitoring, UPD was aware of threats to disrupt the event by student and non-student groups, including College Progressives and PLOT's posting of PLOT's flyer.

79.   UPD also blamed YAF and College Republicans for opening their event to such disruption by hosting a public, as opposed to private (ticketed) event.

80.   At this meeting, the SUNY-Binghamton administrators told YAF and College Republicans that they were unilaterally imposing two conditions on the planned event.

81.   First, SUNY-Binghamton had decided to increase the UPD police presence and move the event to a lecture hall with more readily available egress routes that would allow UPD to remove Dr. Laffer more readily if they chose to do so.

82.   Second, after receiving written notice via a letter, written by College Progressives, PLOT, Frances Beal Society, and Truth Pharm and distributed to University students and officials, that PLOT and College Progressives planned to disrupt the Dr. Laffer Event, SUNY-Binghamton—at Defendant Rose's suggestion and direction—facilitated the planned disruption by providing them with the lecture hall adjacent to the Dr. Laffer Event (and which had connecting doors to the event's

lecture hall) to organize the planned disruption of Plaintiffs' event.

83.    Specifically, the letter called for readers, "On Monday November 18th at 7:15pm in Academic A G008, we will be taking away Turning Point USA's and the College Republicans' space by disrupting their event.  Instead of allowing their speaker to have a platform to spread their theories on economic exploitation, we will hold a speak-out against the white supremacy that these groups and the University Police Department continue to uphold and perpetuate."

84.    YAF and College Republicans expressed disbelief and strong objection to SUNY-Binghamton's intention to provide space for College Progressives to plan and organize a disruptive mob in such close proximity to the Dr. Laffer Event and urged the SUNY-Binghamton administrators to reconsider.

85.    The SUNY-Binghamton administrators, acting at the direction of Defendants Stenger and Rose and implementing the Speech Suppression Policy, refused to change their position.  Providing the adjacent lecture hall was Rose's idea, and he proposed it *after* he received written notice from PLOT and College Progressives of their intentions to disrupt the event and which specifically discussed their goal of "disrupting [College Republicans'] event" by preventing their speaker from speaking.

86.    At this meeting, YAF and College Republicans requested that SUNY-Binghamton at least announce in advance of the Dr. Laffer Event that its own written SUNY free speech policy required students and visitors to permit the Plaintiffs' free speech.

87.    The SUNY-Binghamton administrators refused to agree to make a public statement of the University's free speech policy and did not do so, since it would have contradicted the unwritten Speech Suppression Policy.

88.    YAF sought assurances for a second time that if there was a disruption at the Dr. Laffer Event, UPD would remove the disruptors and not the speaker.

89.    SUNY-Binghamton's administrators again refused to provide YAF any such assurances.

90.    A few hours before the Dr. Laffer Event, Dr. Laffer and his aides arrived at a nearby airport.

91.    YAF was not the only party there to greet them, however, as Defendant Pelletier and at least one other officer from UPD arrived and intercepted Dr. Laffer.

92.    In the ensuing conversation (in which members of YAF participated), Pelletier informed Dr. Laffer that the administration had concerns about the Dr. Laffer Event and unexpectedly conveyed SUNY-Binghamton's desire that Dr. Laffer return to his plane and cancel the event.

93.    Defendant Rose was aware of and approved Pelletier's airport confrontation of Dr. Laffer.  Rose wrote in a contemporaneous email that he was awaiting whether Dr. Laffer would silence himself, writing: "we hope to hear shortly about Laffer's intentions (go / no go)."

94.    When Dr. Laffer firmly told UPD that he wanted to proceed with the event as planned, UPD showed him social media posts regarding planned disruption of the event in an effort to intimidate him into silencing himself.

95.    UPD's message was clear: pursuant to the Speech Suppression Policy, UPD did not intend to protect Plaintiffs' constitutional rights by securing the event but instead wanted to prevent Dr. Laffer from speaking at all.

96.    Approximately one hour before the Dr. Laffer Event, the two Pinkerton agents hired by YAF met with UPD.

97.    At this meeting, UPD stated they were aware of College Progressives and PLOT's planned disruption of the Dr. Laffer Event.

98.    Pelletier told the Pinkerton agents that if disruptors approached Dr. Laffer's podium then he would order the Pinkerton agents to escort Dr. Laffer out of the event.  Plaintiffs were not made aware of, nor did they consent to, this planned violation of their constitutional rights.

99.    UPD was so convinced of inevitable disruption that it also informed YAF donor and Dr. Laffer's driver for the day, Jeffrey Coghlan, that he should stay with the vehicle since Dr. Laffer may need to make a quick getaway if the event was effectively cancelled by the disruptors.

### Defendants' Cancellation of
### Plaintiffs' Dr. Laffer Event (Nov. 18, 2019)

100.   At least one hour before the Dr. Laffer Event was scheduled to begin, College Progressives and PLOT and their co-conspirators were lined up outside the lecture hall and packed into the adjacent lecture hall provided to College Progressives by SUNY-Binghamton administrators.

101.   Defendant Rose visited and toured the lecture hall approximately twenty to forty-five minutes before the event started to observe the disruptors'

presence.

102.   Rose then traveled to a conference room in UPD headquarters where he and others from the administration had a live feed into the Dr. Laffer Event.

103.   Once the doors to the Dr. Laffer Event were opened, hundreds of students and non-students, many of them members of College Progressives and PLOT, flooded in and packed the room.

104.   Although there were numerous open seats, many of these individuals remained standing in the rows, side aisles, and back of the lecture hall.  In doing so, they blocked other attendees from taking the open seats.

105.  Plaintiff College Republicans recognized a number of the students standing in attendance at the Dr. Laffer Event as members of College Progressives.

106.   Plaintiffs also observed that members of College Progressives and PLOT standing in the rows, side aisles, and back of the lecture hall were wearing black face masks to disguise their identities, armbands (with PLOT insignia), hooded sweatshirts (with PLOT insignia), pins (with PLOT insignia), and red shirts (with PLOT insignia).

107.   College Progressives and PLOT's use of face masks in public to disguise their identities was in direct violation of New York's anti-mask statute.[26]

108.  At the insistence of College Republicans and YAF, UPD made one statement about the size of the crowd and SUNY-Binghamton's fire code and asked

---

[26] N. Y. Penal Law § 240.35(4).  These events took place well before the New York State mask order related to COVID-19.

those standing to take their seats.

109.   However, when the crowd refused to clear the rows, aisles, and back of the lecture hall and take seats, Pelletier and UPD, pursuant to the Speech Suppression Policy, took no further action.

110.   Pelletier and UPD took no action despite having 43 sworn law enforcement officers on the force, familiarity with controlling raucous crowds at other large-scale events such as sporting events and concerts, and agreements for mutual aid and assistance with local police.

111.   Due to the size of the crowd, several invited guests of Plaintiffs and other interested students were unable to enter the lecture hall and attend the event, including Plaintiff Bey.

112.   The Dr. Laffer Event started promptly at 7:30 p.m. EST with John Restuccia, the then-President of College Republicans, providing a brief two-minute introduction of Dr. Laffer.

113.   During his introduction, Restuccia asked those in attendance who disagreed with Dr. Laffer's remarks to save their questions for the question and answer portion.  He noted that such individuals would be "more than welcome" to voice any disagreements at that time.

114.   Dr. Laffer took the podium and, just a few seconds in, a member of College Progressives stood up in the second row and began shouting accusations at Dr. Laffer,[27] yelling, "We are tired of being oppressed and we are tired of getting

---

[27] The incident described in paragraphs 100 − 125 is captured on video at the

murdered by this [Trump] Administration. . . . [t]hat you, this man, this liar, Arthur Laffer, supports."

115.  The disruptor then accused Dr. Laffer of helping the Trump Administration further "racial oppression" and a justice system that he equated with "modern-day slavery."

116.  The majority of those present greeted these accusations with applause, and the disrupting student was soon handed a megaphone and urged to continue.

117.  Although Pelletier and UPD had stationed several officers in the room, pursuant to the Speech Suppression Policy, they took no action to prevent this student from disrupting the event.

118.  Moreover, despite observing the disruption in real time so as to have instantaneous communication with UPD, and noting UPD's lack of response, Defendant Rose chose not to stop the violation of Plaintiffs' constitutional rights.

119.  College Republicans, who were standing near the front of the room, stood at the front and displayed "Free Speech" signs in response to the disruptors.

120.  The member of College Progressives spoke through the megaphone for nearly two minutes before UPD took any action to restrain him.

121.  Ten to fifteen members of College Progressives and PLOT then formed a protective barrier around the megaphone-wielding disruptor.

122.  Additional members of College Progressives and PLOT flooded into the lecture hall from the adjacent room which SUNY-Binghamton administrators

---

following link: https://www.youtube.com/watch?v=eTqlmDar_hg&t=44s.

(including Defendant Rose) had provided to them and which had connecting doors to the lecture hall.

123. During these events, Pelletier, acting pursuant to the Speech Suppression Policy, directed the Pinkerton agents to remove Dr. Laffer from the lecture hall.

124. Pinkerton—who was hired to protect Dr. Laffer's personal safety—complied with the directive and escorted Dr. Laffer and his aides out of the lecture hall into a hallway behind the podium.

125. The Pinkerton agents continued to escort Dr. Laffer out to his waiting car and he left SUNY-Binghamton's campus for the airport.

126. By removing Dr. Laffer, as opposed to the mob of disruptors, Pelletier and UPD endorsed a heckler's veto of Plaintiffs' free speech.

127. Pelletier's and UPD's minimal and delayed efforts eventually removed the disruptor with the megaphone, but *only after* he handed off the megaphone so that others could continue to disrupt the event and block Plaintiffs' expression.

128. College Progressives and PLOT and their supporters continued to occupy the lecture hall, surrounding hallways, and area outside of the lecture building for more than one hour.

129. As their disruption continued, College Progressives and PLOT slandered Plaintiffs as "white supremacists" and "racists." When Plaintiffs attempted to engage them in dialogue, one disruptor stated: "The only time we have to mobilize on issues are in these spaces. Because we are never heard. Because you

are always heard as a white male in this country."

130. Defendants Stenger and Rose took no action to disperse College Progressives and PLOT. Rose has since conceded that UPD's efforts to manage the Dr. Laffer event were not successful.

### Stenger's and Rose's Concessions and Misrepresentations Regarding the Dr. Laffer Event

131. Later that evening, Defendant Rose issued a statement endorsing College Progressives and PLOT's disruption of the Dr. Laffer Event.[28] This statement was drafted in the UPD conference room in consultation with Defendant Pelletier and other members of the administration.

132. Rose conceded that "[T]he lecture was immediately disrupted and the speaker [Dr. Laffer] was entirely prevented from addressing the audience . . . ."

133. Rose admitted that SUNY-Binghamton expected disruptions at the Dr. Laffer Event in light of the tabling incident days earlier and an "announcement of a planned disruption." Rose claimed that the disruptions occurred despite measures employed by SUNY-Binghamton to "manage the event"; in fact, such disruptions occurred *because* of the measures Stenger, Rose, and Pelletier had taken pursuant to the Speech Suppression Policy.

134. While UPD may have made two arrests at the Laffer Event, there is no public record or other indication that criminal proceedings were ever initiated against the disruptor with the megaphone or against any other disruptor. Nor have

---

[28] A copy of Defendant Rose's statement on the Dr. Laffer Event is attached as Exhibit 8.

plaintiffs received notice—as the victims of the mob—of any such criminal proceedings, as would be required under New York Criminal Procedure Law §440.50.

135.   That is despite the fact that Defendant Pelletier presented Defendants Rose and Stenger with a list of ten positively identified suspects from the Laffer Event whom Defendant Pelletier recommended to Defendants Rose and Stenger for arrest per the professional judgment of the UPD officers at the scene.

136.   This list included the vice president of College Progressives and a leader of PLOT.  Defendant Rose urged caution regarding the timing of arresting the vice president of College Progressives or of discipline of the organization, writing "she will be a lightning rod for more reaction from Progressives and their allies (e.g., PLOT) when she is arrested" and writing to other University Administrators involved in disciplinary decisions that "Should the SA take action [against College Progressives], it will likely attract strong objections from allies of the [College Progressive]'s and would likely introduce race-based tension and platforms into the next SA election . . . . External and internal audiences will compare the response to the CP's and that to the BUP's and may well frame any difference in race-based terms" and that "The arrest and charging of additional students will likely trigger a reaction from the Progressives and allies who will likely frame it as police/administration hostility toward students of color."

137.  Ultimately, during a meeting with Defendants Pelletier and Rose and other University administrators, Defendant Stenger ordered that no suspects be arrested.  Defendants Rose and Pelletier chose not to object or challenge the order,

and Defendant Pelletier subsequently relayed that order to the UPD investigators handling the case.  No further discipline against any identified individuals was pursued.

138.  Stenger and Rose did, however, cause SUNY-Binghamton to take action against College Republicans.  The day after the University had once again violated their constitutional rights, the Student Association, which is controlled by the SUNY-Binghamton administration, sent College Republicans a two-line email informing them that they were being "suspended . . . due to [their] violation with both University and Student Association policy *[sic]* in regards to tabling without proper approval on Thursday *[sic]* November 14th."[29]

139.  On information and belief, Stenger, Rose, and the Student Association have not required other groups to obtain approval before tabling on campus.

140.  This punishment was an unconstitutional enforcement of the University's tabling policy because it was motivated not by College Republicans' decision not to obtain a permit, but by Stenger, Rose, and the Student Association's disagreement with College Republicans' and YAF's views.

141.  Through this retaliatory discipline, Stenger, Rose, and the Student Association exacerbated their violation of Plaintiffs' constitutional rights by depriving them of the ability to receive university funding and reserve rooms to host expressive events.  To date, not all rights and privileges have been restored.

142.  Plaintiffs College Republicans met with Defendants Stenger and Rose

---

[29] A copy of the Student Association's discipline email is attached as Exhibit 9.

on January 20, 2020 to discuss the tabling incident and the Dr. Laffer Event.  This meeting was facilitated by Congressman Thomas Reed, the U.S. Representative for New York's 23rd congressional district, who also attended.[30]

143.  During this meeting, Rose admitted that he and Stenger knew that College Progressives had encouraged students to violate SUNY-Binghamton policies by disrupting the Dr. Laffer Event.  Rose has also since conceded that College Progressives violated university rules by inciting and participating in the disruption of the Dr. Laffer Event.  And, in contemporaneous documents, Rose described College Progressives' written notice of their intended disruption as a "smoking gun" evidencing that violation.

144.  Rose conceded that he and Stenger had the ability—and responsibility—to personally override the Student Association's action or inaction on student organization discipline.

145.  Rose further demonstrated his and Stenger's power over the Student Association when he promised College Republicans and Congressman Reed that he and Stenger would 1) ensure discipline of College Progressives, and 2) timely inform College Republicans and Congressman Reed of that discipline.

146. Although Rose and Stenger had authority to take action over the disruptors, and promised to do so, these promises were intentionally false.  To date, upon information and belief, Stenger and Rose have not taken any action against

---

[30] An audio recording of the January 20, 2020 meeting is available at the following link: https://www.youtube.com/watch?v=M5JpRiarogU&feature=youtu.be.

College Progressives or any students involved in the disruption of the Dr. Laffer Event.  Rose has since conceded that he and the Student Association decided not to discipline College Progressives, in part, because of their fears of inciting racial tensions with the College Progressives against Defendants Stenger and Rose.

147. Also during this January 20, 2020 meeting, Stenger grossly misrepresented the true nature of Dr. Laffer's departure from the Dr. Laffer Event. Stenger contended—contrary to fact—that UPD asked Dr. Laffer to wait ten minutes for them to clear the lecture hall of disruptors, but that Dr. Laffer refused and left.

148. Stenger's misrepresentation to College Republicans and Lizak contradicts Pelletier's statements made to the Pinkerton agents (described above in paragraph 98) and the video of the event (showing Pelletier's and UPD's complete failure to take any meaningful action to prevent or end College Progressives' disruption, which continued for close to one hour).

149.  By allowing, encouraging, and assisting PLOT and College Progressives and their supporters to engage in disorderly and disruptive conduct to silence Plaintiffs' free speech and by making no effort afterward to defend Plaintiffs' free speech even retrospectively, Defendants Stenger, Rose, and Pelletier caused the deprivation of Plaintiffs' constitutional rights and engaged in content- and viewpoint-based censorship of Plaintiffs' speech.

150.  In fact, Stenger, Rose, and Pelletier personally conspired with College Progressives and PLOT to deprive Plaintiffs of their constitutional rights by intentionally: 1) failing to discipline the College Progressive disruptors at the

November 14, 2019 tabling incident (thereby encouraging College Progressives and PLOT's future disruption of Plaintiffs' speech); 2) aiding and abetting College Progressives' disruption of the Dr. Laffer Event by providing the lecture hall adjacent to the Dr. Laffer Event as a staging room for their disruption; 3) allowing College Progressives and PLOT into the lecture hall despite their prior announcements of their intentions to disrupt the Dr. Laffer Event; and, 4) enforcing the Speech Suppression Policy in removing Dr. Laffer but failing to disperse the disruptive College Progressives and PLOT from the event.

151.   Stenger and Rose encouraged and permitted the deployment of College Progressives and PLOT to achieve their objective to suppress the free speech of groups and messages they dislike through violence and intimidation, in accordance with the Speech Suppression Policy, by ensuring no consequences redounded onto College Progressive or PLOT members.   This tactic allowed Stenger and Rose to maintain the pretense of compliance with the law while creating, assisting, and supporting the denial of Plaintiffs' constitutional rights.

152.   Through the discriminatory enforcement of and in accordance with the Speech Suppression Policy, Stenger, Rose, and Pelletier denied Plaintiffs their constitutional rights.

153.   By failing to perform their constitutional duty to protect Plaintiffs' free speech activity in the form of the Dr. Laffer Event, and by actively encouraging, participating in, and permitting the disruption of that event, Stenger, Rose, and Pelletier caused financial damages to Plaintiffs totaling $37,717.93.   This total

includes Dr. Laffer's honorarium, transportation, and private security, YAF's flights, transportation, meals, and accommodations, and the hiring of an event photographer and mailing of marketing materials.

154.  Plaintiffs desire to once again host Dr. Laffer and similar speakers on SUNY-Binghamton's campus.  However, Plaintiffs reasonably fear that if they do, Stenger, Rose, and Pelletier will again enforce the Speech Suppression Policy to conspire with, encourage, and permit disruptors (including College Progressives and PLOT) to engage in disruptive and disorderly conduct designed to suppress Plaintiffs' message.

155.  Plaintiffs reasonably fear that Stenger, Rose, and Pelletier will again grossly disregard their constitutional duty to protect Plaintiffs and their free speech activity from the disruptive behavior of those who are intent on suppressing Plaintiffs' speech.  Consequently, Plaintiffs fear returning speakers to the SUNY-Binghamton campus absent a court order enjoining Defendants from continuing their pattern of illegal and unconstitutional conduct.

### FIRST CAUSE OF ACTION
### AGAINST DEFENDANTS STENGER, ROSE, AND PELLETIER
### (Freedom of Speech—First Amendment—42 U.S.C. § 1983)

156.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 – 155 of this Complaint, as if set forth fully herein.

157.  42 U.S.C. § 1983 provides a federal cause of action for violations of federally protected rights when such violations occurred under color of state law.

158.  Speech, especially political speech, is entitled to comprehensive

protection under the First Amendment and such protection extends to campuses of state universities, including SUNY-Binghamton.

159.  The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination for student speech and expression on the campus of a public university.

160.  Based upon the allegations set forth above, Defendants Stenger, Rose, and Pelletier knowingly and intentionally deprived Plaintiffs of their right to freedom of speech and engaged in content and viewpoint discrimination of student speech and expression on the campus of a public university, in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

161.  On November 14 and November 18, 2019, it was clearly established that Stenger, Rose, and Pelletier had a constitutional duty not to ratify and effectuate heckler's vetoes nor to aid or join disruptors (including College Progressives and PLOT) intent on suppressing Plaintiffs' speech.  Stenger, Rose, and Pelletier grossly disregarded that duty and knowingly and intentionally violated Plaintiffs' rights protected by the First Amendment, while acting under color of state law, in accordance with the Speech Suppression Policy.

162.  Stenger and Rose paid lip service to the idea of free speech, but intentionally violated Plaintiffs' constitutional rights notwithstanding their actual or constructive notice of SUNY Board of Trustees' and SUNY-Binghamton's free

speech policies and the SUNY-Buffalo Settlement.   Rather, these intentional violations were in accordance with the Speech Suppression Policy.

163.  By ratifying a heckler's veto and permitting and joining disruptors (including College Progressives and PLOT) intent on suppressing speech, Stenger, Rose, and Pelletier denied Plaintiffs the right to engage in their expressive activity based on the content and viewpoint of Plaintiffs' message in violation of the First Amendment.

164.  As a direct and proximate result of Defendants Stenger, Rose, and Pelletier's violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

### SECOND CAUSE OF ACTION
### AGAINST DEFENDANTS STENGER, ROSE, AND STUDENT ASSOCIATION
### (Freedom of Speech—First Amendment—42 U.S.C. § 1983)

165.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 – 155 of this Complaint, as if set forth fully herein.

166.  Based upon the allegations set forth above, Defendants Stenger, Rose, and Student Association knowingly and intentionally used state power to retaliate against College Republicans for the views they expressed during their tabling and Dr. Laffer event.

167.  Stenger, Rose, and Student Association unconstitutionally retaliated against College Republicans' expressed views by using their authority to suspend them, while failing to hold PLOT and College Progressives accountable for

35

disrupting the tabling and Dr. Laffer event.

168.  The Student Association's retaliation against College Republicans' expressed views was part of a pattern of discriminatory behavior, as evidenced by its prior attempts to block the expression of other conservative groups like the Young Americans for Freedom.

169.  As a direct and proximate result of Stenger, Rose, and Student Association's unconstitutional retaliation, they deprived College Republicans of the attendant rights of a registered student organization, including the ability to receive funding from the university and to reserve rooms to host expressive events. To date, not all rights and privileges have been restored.

**~~THIRD CAUSE OF ACTION~~**
**~~AGAINST DEFENDANT COLLEGE PROGRESSIVES~~**
**~~(Freedom of Speech—First Amendment—42 U.S.C. § 1985(3))~~**

~~170.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 – 155 of this Complaint, as if set forth fully herein.~~

~~171.  42 U.S.C. § 1985(3) provides a federal cause of action to a member of an identifiable class of persons injured by an act in furtherance of a conspiracy to deprive that person of his or her civil rights against any perpetrator of said conspiracy.~~

~~172.  Speech, including political speech, is entitled to comprehensive protection under the First Amendment and such protection extends to campuses of state universities, including SUNY-Binghamton.~~

~~173.  The First Amendment's Free Speech Clause, incorporated and made~~

applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination in the public forums for student speech and expression on the campus of a public university.

174. Based on the allegations set forth above, PLOT and Defendant College Progressives conspired to deprive Plaintiffs of their constitutional rights due to their affiliation with the Republican party (an identifiable and protected class), in violation of 42 U.S.C. § 1985(3).

175. PLOT and Defendant College Progressives also conspired to deprive Plaintiffs of their constitutional rights because of the very color of their skin, admitting during their disruption that they were taking over Plaintiffs' event because "white male[s]" are "always heard." Their disruption was based on race (an identifiable and protected class), in violation of 42 U.S.C. § 1985(3).

176. College Progressives and PLOT conspired to deprive Plaintiffs of their constitutional rights by jointly: 1) planning the disruption of Plaintiffs' expression at the Dr. Laffer event; 2) posting flyers created by PLOT to their social media accounts announcing that disruption; 3) using the lecture hall given to College Progressives adjacent to the Dr. Laffer Event as a staging room for their disruption; 4) disrupting the event itself; and, 5) protecting those who were disrupting from being removed by UPD.

177. As a direct and proximate result of Defendants College Progressives and PLOT's violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to

~~declaratory and injunctive relief and damages.~~

~~**FOURTH CAUSE OF ACTION**~~
~~**AGAINST DEFENDANTS STENGER, ROSE, PELLETIER, AND COLLEGE**~~
~~**PROGRESSIVES**~~
~~**(Freedom of Speech – First Amendment – 42 U.S.C. § 1985(3))**~~

~~178.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 – 155 of this Complaint, as if set forth fully herein.~~

~~179.  Based on the allegations set forth above, Defendants Stenger, Rose, and Pelletier joined PLOT and Defendant College Progressives' conspiracy to deprive Plaintiffs of their constitutional rights due to their affiliation with the Republican party (an identifiable and protected class), in violation of 42 U.S.C. § 1985(3).~~

~~180.  Stenger, Rose, and Pelletier conspired with College Progressives and PLOT to deprive Plaintiffs of their constitutional rights by intentionally: 1) failing to prohibit or discipline the College Progressive disruptors at the November 14, 2019 tabling incident (thereby encouraging College Progressives and PLOT's future disruption of Plaintiffs' speech); 2) aiding and assisting in the disruption and violation by providing College Progressives with the lecture hall adjacent to the Dr. Laffer Event as a staging room for their disruption; 3) allowing College Progressives and PLOT into the lecture hall despite their prior announcements of their intentions to disrupt the Dr. Laffer Event while ignoring the violations of the state Anti-Mask Law and the local fire code; and, 4) failing to disperse the disrupting College Progressives and PLOT from the Dr. Laffer Event while instead removing Dr. Laffer.~~

~~181.  As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their~~

fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

**FIFTH CAUSE OF ACTION**
**AGAINST DEFENDANTS STENGER, ROSE, AND PELLETIER**
**(Freedom of Speech—First Amendment—42 U.S.C. § 1986)**

182. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 – 155 of this Complaint, as if set forth fully herein.

183. 42 U.S.C. § 1986 provides a cause of action against individuals who have knowledge of § 1985(3) conspiracies but neglect or refuse to protect victims of them, despite being empowered to do so.

184. Based on the allegations set forth above, Defendants Stenger, Rose, and Pelletier intentionally refused to prevent the above-mentioned violations of 42 U.S.C. § 1985(3), despite having the power to do so, in violation of 42 U.S.C. § 1986.

185. Stenger, Rose, and Pelletier, through their published statements and contemporaneous conversations with Plaintiffs, admitted that they were aware of College Progressives' and PLOT's intention to disrupt the Dr. Laffer Event. Stenger, Rose, and Pelletier, on their own and through UPD, refused to act to reasonably and sufficiently prevent such disruption, and in fact joined such disruption.

186. Stenger, Rose, and Pelletier are therefore liable under 42 U.S.C. § 1986 to Plaintiffs for all damages caused by Defendants' conspired disruptions.

187. As a direct and proximate result of Defendants Stenger, Rose, and Pelletier's violation of 42 U.S.C. § 1986, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to

~~declaratory and injunctive relief and damages.~~

## SIXTH CAUSE OF ACTION
## AGAINST DEFENDANTS STENGER, ROSE, AND PELLETIER
### (Equal Protection—Fourteenth Amendment—42 U.S.C. § 1983)

188.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 – 155 of this Complaint, as if set forth fully herein.

189.  42 U.S.C. § 1983 provides a federal cause of action for violations of federally protected rights when such violations occurred under color of state law.

190.  The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the equal protection of the laws, which prohibits Defendants Stenger, Rose, and Pelletier from treating Plaintiffs differently than similarly situated persons.

191.  The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

192.  By enforcing the Speech Suppression Policy, and thereby ratifying and effectuating a heckler's veto and permitting and joining disruptors (including College Progressives and PLOT) intent on suppressing speech as set forth in this Complaint, Stenger, Rose, and Pelletier have denied Plaintiffs the right to use a university forum for their expressive activity based on Plaintiffs' message, when other messages, even opposing ones are permitted, in violation of the Equal Protection Clause of the Fourteenth Amendment.

193.  Stenger, Rose, and Pelletier lack a rational or compelling state interest

for such disparate treatment of Plaintiffs.

194. As a direct and proximate result of Defendants Stenger, Rose, and Pelletier's violation of the Equal Protection Clause, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this court to:

A)   declare that Defendants violated Plaintiffs' clearly established and fundamental constitutional rights as set forth in this Complaint;

B)   permanently enjoin Defendants from disrupting and silencing Plaintiffs' speech and related activities as set forth in this Complaint;

C)   permanently enjoin Defendants Stenger, Rose, and the new chief of UPD from ratifying heckler's vetoes or otherwise enforcing the Speech Suppression Policy;

D)   permanently enjoin Defendants Stenger, Rose, and Student Association from retaliating against Plaintiffs' expressed views as set forth in this Complaint;

E)   order Stenger, Rose, and Student Association to reinstate College Republicans as a registered student organization with all attendant rights;

F)   order Stenger, Rose, and Student Association to recognize the Young Americans for Freedom chapter as a registered student organization.

G)   award Plaintiffs nominal, compensatory, and punitive damages against Defendants Stenger, Rose, and Pelletier in their individual capacities;

H)   award Plaintiffs their reasonable attorneys' fees, costs, and expenses

pursuant to 42 U.S.C. § 1988 and other applicable law; and

I)     grant such other and further relief as this court should find just and

proper.

Respectfully submitted this 21st day of November, 2023

*/s/ Andrew C. Hruska*
ANDREW C. HRUSKA
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
ahruska@kslaw.com

*/s/ Joseph L. Zales*
JOSEPH L. ZALES
KING & SPALDING LLP
(212) 556-2100
jzales@kslaw.com

*/s/ Tyson C. Langhofer*
TYSON C. LANGHOFER*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(480) 444-0020
tlanghofer@ADFlegal.org

(*Admitted *pro hac vice*)

*Counsel for Plaintiffs*

# EXHIBIT 1



Meme

The Culture

2-1 SINGLE WELL DRINKS

Angie Daniella Duran
I heard there's only like 3 supporters there

♥ 3

Rebecca Hirsch
yeah there's not that many but fuck em up
anyways

♥ 13

Merry Madiou
"Pick your gun" on the day a shooting occurred,
that's literally disgusting

♥ 73

Thursday, 2:18 PM

char
Today on the spine Trump supporters are actively
advocating for the Trump administration and gun
violence. Join us at 2 as we disrupt this disgusting
space that Binghamton has allowed students to
create and protest the racism, homophobia, and
xenophobia that has erupted from Trump and his
supporters

♥ 13

♡ 5

○ ○ ○

# EXHIBIT 2

**From:** **College Republicans SA**  republicans@binghamtonsa.org
**Subject:** Fwd: B-line News Addition - Nov 18: A message from Vice President Brian Rose about Thursday, Nov. 14
**Date:** November 18, 2019 at 12:02 PM
**To:** Raj Kannappan  rkannappan@yaf.org

CS

---

---------- Forwarded message ---------
From: **John P Restuccia** <jrestuc1@binghamton.edu>
Date: Mon, Nov 18, 2019 at 12:01 PM
Subject: Fwd: B-line News Addition - Nov 18: A message from Vice President Brian Rose about Thursday, Nov. 14
To: <republicans@binghamtonsa.org>

---------- Forwarded message ---------
From: **B-line** <b-line@binghamton.edu>
Date: Mon, Nov 18, 2019 at 12:00 PM
Subject: B-line News Addition - Nov 18: A message from Vice President Brian Rose about Thursday, Nov. 14
To: <B-LINE@listserv.binghamton.edu>



## B-Line Addition: Monday, November 18

### A message from Vice President Brian Rose about Thursday, Nov. 14

On Thursday, Nov. 14, two groups tabling outside of the Union attracted counter-protesters. The tension between the groups tabling and protesters became volatile and University Police intervened to remove the tabling groups in the interest of the safety of all involved.

Social media posts have misrepresented the course of events and encouraged political pressure upon the University based upon those misrepresentations. What actually transpired and how the University did and will respond is as follows:

The College Republicans, an organization chartered by the Student Association (SA), was joined by another group known as Turning Point that, by its own choice, is not chartered by the SA or otherwise recognized by the University. Representatives of the two groups set up tables outside the Union in a reservable space without having followed procedures to properly secure use of the space. Representatives of the Union professional staff and of the SA notified the tabling students that they were tabling without reservation in a space that had to be reserved in advance and asked them to relocate. The groups refused twice to move. The groups' display included provocative posters with gun imagery, this being the same day as the Saugus High School shooting. Self-evidently from the nature of their display and their refusal to comply with procedures for reserving the space in question, the groups intended to be provocative. Social media activity suggesting they were handing out hot chocolate and promoting an upcoming lecture fail to accurately represent the context.

Students offended by the display and disapproving of the views of the two tabling organizations gathered around the tables in increasing number. University Police were alerted by several members of the University community and responded to monitor the escalating situation. Counter-protesters began pulling down the tables and sweeping the political literature and materials of the tabling groups into boxes in an attempt to close down the tabling activity. This increased the volatility of the situation and University Police stepped in between students from the tabling groups and protesting students to try to maintain safety. Eventually the police directed the tabling groups to abandon the area and escorted them away. Some protesters viewed the actions of police as protecting the tabling students based upon race and directed chants at police. The escalating situation was successfully defused without physical injury to anyone present.

The University's response was and will be guided by principles and values related to safety, equity, free expression and reason. As the College Republicans were advised prior to the incident escalating, they had violated applicable procedures related to reserving the space in question. The purpose of those procedures is to avoid conflicts among groups for use of the space and to allow the University to safely manage activity in this area. Had the group followed procedures, the University would have had the opportunity to plan for what was self-evidently a provocative presentation in a manner that may have facilitated expressive activity by both the tabling groups and those who wished to demonstrate against them. Any future action taken against the College Republicans will pertain to their violation of University and SA policies and procedures and not to the content of their message. The University will also work with the SA to ensure that there is clarity and understanding around policies and procedures related to the use of space by campus-

affiliated groups and others, and will review how to best respond to those violating these policies and procedures.

There were also protesters who acted in a manner that may have violated University rules. In the context of the incident and in keeping with the principles and values noted above, the University did not seek to identify or charge any protesters. To do so would have escalated an already volatile situation and run counter to the primary interest in safely de-escalating the situation. In other circumstances, the University has taken action against individuals infringing upon expressive activity without regard to viewpoint. Our response has and will continue to take into account the full context in each instance.

We acknowledge the larger political context in our country that is polarizing our society. It is unfortunate that interests external to the campus have seized upon this incident and attempted to mischaracterize it to feed their own narrative and to attempt to influence our response. We will not be responding to those external voices or altering our approach as a result of external pressure. We will continue to work within our community to facilitate the expression of the many diverse viewpoints that are present on our campus, to encourage members of our community to respect one another through disagreement, to maintain a safe campus community and to exercise professional judgment fairly to achieve those ends.

Brian T. Rose
Vice President for Student Affairs

**More Info**

Contact Katie Ellis

# EXHIBIT 3

Office of the President

# UNIVERSITY STATEMENTS

Home (/) › Office of the President (https://www.binghamton.edu/president) › Statements (https://www.binghamton.edu/president/statements.html)

| | |
|---|---|
| **Jul 14, 2020: Actions to be taken to address sexual assault policies at Binghamton University** | + |
| **Jul 13, 2020: A message from Provost Donald Nieman on rescinded guidelines for international students** | + |
| **Jul 08, 2020: A message about the status of our international students** | + |
| **Jul 03, 2020: A message from President Harvey Stenger** | + |
| **Jun 22, 2020: A message from President Harvey Stenger** | + |
| **Jun 19, 2020: A message from President Harvey Stenger** | + |
| **Jun 10, 2020: A message from President Harvey Stenger** | + |
| **May 30, 2020: A message from President Harvey Stenger** | + |
| **May 18, 2020: A message about returning to normal from President Harvey Stenger** | + |
| **May 15, 2020: Congratulations to the Class of 2020!** | + |
| **May 04, 2020: A message to continuing students about the fall semester from President Harvey Stenger** | + |
| **Apr 27, 2020: An updated message about the tenure process** | |

Apr 20, 2020: What will a return to normalcy look like?                                                    +

Apr 20, 2020: A Commencement update from President Harvey Stenger                                           +

Apr 03, 2020: A message from Provost Donald Neiman on Graduate Student
Satisfactory/Unsatisfactory (S/U) and other policies for spring 2020                                       +

Apr 02, 2020: A message from President Harvey Stenger about refunds                                         +

Mar 30, 2020: A message from Provost Donald Nieman on Undergraduate Pass/Fail and
other policies for spring 2020                                                                             +

Mar 26, 2020: A COVID-19 message to campus                                                                 +

Mar 26, 2020: An update about Binghamton University Commencement from President
Harvey Stenger                                                                                             +

Mar 23, 2020: A COVID-19 message from President Harvey Stenger                                              +

Mar 19, 2020: Video: Words of advice and encouragement from President Harvey Stenger                       +

Mar 18, 2020: A letter from President Harvey Stenger: Our collective responsibility                         +

Mar 18, 2020: Residential Life update message from Vice President Brian Rose                                +

Mar 15, 2020: A message to students from Provost Donald Nieman                                              +

Mar 14, 2020: Binghamton University□□s response to K-12 school closures                                     +

Mar 11, 2020: A message from President Harvey Stenger                                                       +

Mar 10, 2020: An update from President Harvey Stenger about COVID-19                                        +

Mar 08, 2020: A message to students about COVID-19                                                          +

Mar 07, 2020: A message from the vice president for research regarding COVID-19                    +

Mar 06, 2020: Message from the provost on preparing for academic disruption                    +

Mar 04, 2020: Practice good health habits on campus and when traveling/faculty
assistance requested                                                                           +

Feb 28, 2020: University-funded travel to South Korea on hold, web page for COVID-19
created                                                                                        +

Jan 31, 2020: University-funded travel to China on hold                                        +

Jan 30, 2020: Campus supports those impacted by coronavirus, travel restrictions              +

Jan 27, 2020: Coronavirus update                                                               +

Jan 23, 2020: Campus is monitoring coronavirus                                                 +

Jan 14, 2020: Recommitting to Dr. Martin Luther King Jr.'s ideals                             +

Dec 23, 2019: An end-of-the-year message from President Harvey Stenger                          +

Nov 18, 2019: A message from Vice President for Student Affairs Brian Rose                      +

Nov 15, 2019: A message from President Stenger                                                  –

# A message from President Stenger

Nov. 15, 2019

There was a contentious gathering on campus Thursday afternoon that required the
intervention of University Police. Police were dispatched to the area because there were reports
that conversations were getting loud, aggressive and possibly volatile. Police response was
appropriate and important to make sure that every student involved in this matter was safe and
remained safe. The incident ended and the crowd was able to be dispersed without anyone
getting injured.

This incident from all perspectives was unfortunate. As a University, we encourage everyone to consider the perspectives of others — and the damaging impact words and images can have — even if they are protected as free speech under the First Amendment. As an institution of higher education, **freedom of speech is fundamental to our core mission; academic inquiry and the exchange of ideas rest on the principle that all have a right to express their beliefs**. We strongly condemn any acts that impede the expression of one's beliefs but also encourage everyone on this campus to enter into meaningful interactions with respectful dialogue and actions.

Harvey G. Stenger
President

Oct 23, 2019: A message for students about respect                                    +

Oct 17, 2019: Celebrating our Nobel laureate                                           +

Oct 10, 2019: Celebrating National LGBTQ History Month                                 +

Oct 04, 2019: We focus on student mental health                                        +

Aug 15, 2019: Welcome back to campus!                                                  +

Aug 09, 2019: It's ranking season                                                      +

Jul 09, 2019: Reasons to be proud                                                      +

Jun 09, 2019: Celebrating LGBT Pride Month                                             +

May 30, 2019: End of the academic year                                                 +

May 08, 2019: Freedom of speech is fundamental to our mission                          +

Apr 30, 2019: Not all stress is bad stress!                                            +

Apr 23, 2019: A reminder to get enough sleep



Apr 15, 2019: A reminder to focus on healthy eating and exercise                                +

Apr 05, 2019: A message regarding the death of Shakeel Khan                                     +

Mar 25, 2019: Top five tips on finishing the semester strong                                    +

Mar 14, 2019: Binghamton University's growing reputation                                        +

Feb 01, 2019: Binghamton University is proud to celebrate February as Black History
Month                                                                                           +

Jan 22, 2019: Partial shutdown of the United States federal government                          +

Dec 21, 2018: Year-end Statement                                                                +

Nov 28, 2018: Financial plans for 2018-19 and 2019-20, Part II                                  +

Nov 07, 2018: Financial plans for 2018-19 and 2019-20                                           +

Oct 29, 2018: Tree of Life Congregation in Pittsburgh                                           +

Oct 04, 2018: October is National Domestic Violence Awareness Month                             +

Aug 21, 2018: A safe campus, but one that we continually strive to make safer.                  +

Jun 10, 2018: Looking ahead                                                                     +

May 07, 2018: A Letter to Campus on Inclusiveness                                               +

Apr 26, 2018: A Letter to Campus on Safety Initiatives                                          +

Apr 16, 2018: A Letter to Campus on Recent Tragedies                                            +

Apr 09, 2018: A statement about freedom of expression and peaceful protest                      +

Mar 27, 2018: A Letter about "Campus Speech: What Are the Limits?"                                    +

Mar 15, 2018: A Letter about an offensive email message sent to their listserv                       +

Mar 12, 2018: A Statement on the death of Haley Anderson                                             +

Feb 21, 2018: A Message about sexual harassment and sexual assault                                   +

Jan 24, 2018: A Letter about our values                                                              +

Jan 12, 2018: DACA remains a major concern for Binghamton University                                 +

Dec 06, 2017: A Letter about Tax Cut and Jobs Act                                                    +

Nov 28, 2017: President Stenger votes in favor of Faculty Senate statement on free
expression and inclusiveness                                                                         +

Nov 07, 2017: A Letter to U.S. Congresswoman Claudia Tenney about Tax Cut and Jobs Act
concerns                                                                                             +

Oct 24, 2017: Police investigating swastika left on Post-it note in residence hall                   +

Oct 09, 2017: A Message about a racist incident                                                      +

Oct 06, 2017: A Message about a racist drawing                                                        +

Sep 12, 2017: A letter was sent to The Honorable Claudia Tenney, U.S. Representative for
the 22nd Congressional District:                                                                     +

Sep 07, 2017: An updated message on DACA                                                             +

Sep 05, 2017: A message on DACA                                                                      +

Aug 16, 2017: A message on Charlottesville, Va.                                                      +

Aug 14, 2017: A message to the University of Virginia President Teresa A. Sullivan     +

May 05, 2017: A letter to the campus about student protest     +

Apr 28, 2017: A statement about the "blue-light" proposal     +

Mar 23, 2017: A letter concerning death of a student     +

Mar 07, 2017: A letter concerning a new Executive Order     +

Jan 29, 2017: Report on offer of resources to international students     +

# EXHIBIT 4

**BINGHAMTON
UNIVERSITY**
STATE UNIVERSITY OF NEW YORK

Office of the President

# UNIVERSITY STATEMENTS

Home (/) › Office of the President (https://www.binghamton.edu/president) › Statements (https://www.binghamton.edu/president/statements.html)

| | |
|---|---|
| **Jul 14, 2020: Actions to be taken to address sexual assault policies at Binghamton University** | + |
| **Jul 13, 2020: A message from Provost Donald Nieman on rescinded guidelines for international students** | + |
| **Jul 08, 2020: A message about the status of our international students** | + |
| **Jul 03, 2020: A message from President Harvey Stenger** | + |
| **Jun 22, 2020: A message from President Harvey Stenger** | + |
| **Jun 19, 2020: A message from President Harvey Stenger** | + |
| **Jun 10, 2020: A message from President Harvey Stenger** | + |
| **May 30, 2020: A message from President Harvey Stenger** | + |
| **May 18, 2020: A message about returning to normal from President Harvey Stenger** | + |
| **May 15, 2020: Congratulations to the Class of 2020!** | + |
| **May 04, 2020: A message to continuing students about the fall semester from President Harvey Stenger** | + |
| **Apr 27, 2020: An updated message about the tenure process** | ⬆ |

Apr 20, 2020: What will a return to normalcy look like?                                                    +

Apr 20, 2020: A Commencement update from President Harvey Stenger                                           +

Apr 03, 2020: A message from Provost Donald Neiman on Graduate Student
Satisfactory/Unsatisfactory (S/U) and other policies for spring 2020                                       +

Apr 02, 2020: A message from President Harvey Stenger about refunds                                         +

Mar 30, 2020: A message from Provost Donald Nieman on Undergraduate Pass/Fail and
other policies for spring 2020                                                                             +

Mar 26, 2020: A COVID-19 message to campus                                                                 +

Mar 26, 2020: An update about Binghamton University Commencement from President
Harvey Stenger                                                                                             +

Mar 23, 2020: A COVID-19 message from President Harvey Stenger                                             +

Mar 19, 2020: Video: Words of advice and encouragement from President Harvey Stenger                      +

Mar 18, 2020: A letter from President Harvey Stenger: Our collective responsibility                       +

Mar 18, 2020: Residential Life update message from Vice President Brian Rose                               +

Mar 15, 2020: A message to students from Provost Donald Nieman                                             +

Mar 14, 2020: Binghamton University□□s response to K-12 school closures                                    +

Mar 11, 2020: A message from President Harvey Stenger                                                      +

Mar 10, 2020: An update from President Harvey Stenger about COVID-19                                       +

Mar 08, 2020: A message to students about COVID-19                                                         +

Mar 07, 2020: A message from the vice president for research regarding COVID-19   +

Mar 06, 2020: Message from the provost on preparing for academic disruption   +

Mar 04, 2020: Practice good health habits on campus and when traveling/faculty assistance requested   +

Feb 28, 2020: University-funded travel to South Korea on hold, web page for COVID-19 created   +

Jan 31, 2020: University-funded travel to China on hold   +

Jan 30, 2020: Campus supports those impacted by coronavirus, travel restrictions   +

Jan 27, 2020: Coronavirus update   +

Jan 23, 2020: Campus is monitoring coronavirus   +

Jan 14, 2020: Recommitting to Dr. Martin Luther King Jr.'s ideals   +

Dec 23, 2019: An end-of-the-year message from President Harvey Stenger   +

Nov 18, 2019: A message from Vice President for Student Affairs Brian Rose   +

Nov 15, 2019: A message from President Stenger   +

Oct 23, 2019: A message for students about respect   +

Oct 17, 2019: Celebrating our Nobel laureate   +

Oct 10, 2019: Celebrating National LGBTQ History Month   +

Oct 04, 2019: We focus on student mental health   ⬆

**Aug 15, 2019: Welcome back to campus!**                                    +

**Aug 09, 2019: It's ranking season**                                        +

**Jul 09, 2019: Reasons to be proud**                                        +

**Jun 09, 2019: Celebrating LGBT Pride Month**                               +

**May 30, 2019: End of the academic year**                                   +

**May 08, 2019: Freedom of speech is fundamental to our mission**            –

# Freedom of speech is fundamental to our mission

May 8, 2019

Dear Students and Campus Community,

A recent incident occurred in the Bartle Library lobby that is currently being investigated by Binghamton University Police and the Dean of Students Office, who will take swift and decisive action once the investigation concludes.

The University deplores all acts of racism and any action that limits the expression of ideas. **Freedom of speech is fundamental to the core mission of the University; academic inquiry and the exchange of ideas rest on the principle that all have a right to express their beliefs.** We strongly condemn any acts that impede the expression of those beliefs and **caution anyone who attempts to inhibit another's free speech.** We will protect, support and encourage the right of every individual to express concerns freely and to engage in peaceful protest. Our campus is resolute in its support for those of any race, faith, gender, sexual orientation, background or identity.

Sincerely,

Harvey G. Stenger
President

**Apr 30, 2019: Not all stress is bad stress!**                            

Apr 23, 2019: A reminder to get enough sleep                                              +

Apr 15, 2019: A reminder to focus on healthy eating and exercise                          +

Apr 05, 2019: A message regarding the death of Shakeel Khan                               +

Mar 25, 2019: Top five tips on finishing the semester strong                              +

Mar 14, 2019: Binghamton University's growing reputation                                  +

Feb 01, 2019: Binghamton University is proud to celebrate February as Black History
Month                                                                                     +

Jan 22, 2019: Partial shutdown of the United States federal government                    +

Dec 21, 2018: Year-end Statement                                                          +

Nov 28, 2018: Financial plans for 2018-19 and 2019-20, Part II                            +

Nov 07, 2018: Financial plans for 2018-19 and 2019-20                                     +

Oct 29, 2018: Tree of Life Congregation in Pittsburgh                                     +

Oct 04, 2018: October is National Domestic Violence Awareness Month                       +

Aug 21, 2018: A safe campus, but one that we continually strive to make safer.            +

Jun 10, 2018: Looking ahead                                                               +

May 07, 2018: A Letter to Campus on Inclusiveness                                         +

Apr 26, 2018: A Letter to Campus on Safety Initiatives                                    +

Apr 16, 2018: A Letter to Campus on Recent Tragedies                                      +

Apr 09, 2018: A statement about freedom of expression and peaceful protest  +

Mar 27, 2018: A Letter about "Campus Speech: What Are the Limits?"  +

Mar 15, 2018: A Letter about an offensive email message sent to their listserv  +

Mar 12, 2018: A Statement on the death of Haley Anderson  +

Feb 21, 2018: A Message about sexual harassment and sexual assault  +

Jan 24, 2018: A Letter about our values  +

Jan 12, 2018: DACA remains a major concern for Binghamton University  +

Dec 06, 2017: A Letter about Tax Cut and Jobs Act  +

Nov 28, 2017: President Stenger votes in favor of Faculty Senate statement on free expression and inclusiveness  +

Nov 07, 2017: A Letter to U.S. Congresswoman Claudia Tenney about Tax Cut and Jobs Act concerns  +

Oct 24, 2017: Police investigating swastika left on Post-it note in residence hall  +

Oct 09, 2017: A Message about a racist incident  +

Oct 06, 2017: A Message about a racist drawing  +

Sep 12, 2017: A letter was sent to The Honorable Claudia Tenney, U.S. Representative for the 22nd Congressional District:  +

Sep 07, 2017: An updated message on DACA  +

Sep 05, 2017: A message on DACA  +

<u>Aug 16, 2017: A message on Charlottesville, Va.</u>                                                +

<u>Aug 14, 2017: A message to the University of Virginia President Teresa A. Sullivan</u>            +

<u>May 05, 2017: A letter to the campus about student protest</u>                                    +

<u>Apr 28, 2017: A statement about the "blue-light" proposal</u>                                     +

<u>Mar 23, 2017: A letter concerning death of a student</u>                                          +

<u>Mar 07, 2017: A letter concerning a new Executive Order</u>                                       +

<u>Jan 29, 2017: Report on offer of resources to international students</u>                          +

# EXHIBIT 5

# MONDAY
# 11/18 7:15PM

## MEET UP @ LECTURE HALL

COLLEGE REPUBLICANS AND TURNING POINT HAVE INVITED ARTHUR LAFFER, AN ECONOMIST/ LIAR WHOSE THEORIES HAVE BEEN USED TO JUSTIFY TAX CUTS FOR THE RICH, AND RAISES ON THE POOR. FUCK THIS & THEM.

## LET'S SHOW UP, SPEAK OUT, AND DISRUPT.



# EXHIBIT 6

**buprogressives**
Lecture Hall 8



# EXHIBIT 7

LECTURE HALL 8

**TURNING POINT USA HS INVITED ARTHUR LAFFER, AN ECONOMIST/ LIAR WHOSE THEORIES HAVE BEEN USED TO JUSTIFY TAX CUTS FOR THE RICH, AND RAISES ON MARGINALIZED ENTITIES.**

**LET'S SHOW UP SPEAK OUT, AND *PEACEFULLY* DISRUPT.**



      

**2 likes**

**buprogressives** Come out and support BING PLOT, gathering voices to speak out  against College republicans and Turning Point USA😡🖕come out to lecture hall 8!!!at 6:45pm to hear the LIES they are feeding republicans !!!!we must put an end to this clownery. See you there 🤗🤞🏾

4 minutes ago

# EXHIBIT 8

**From:** **College Republicans SA**  republicans@binghamtonsa.org
**Subject:** Fwd: B-line News Addition - Nov 18: A message from Vice President Brian Rose
**Date:** November 18, 2019 at 10:30 PM
**To:** Raj Kannappan  rkannappan@yaf.org

---------- Forwarded message ---------
From: **John P Restuccia** <jrestuc1@binghamton.edu>
Date: Mon, Nov 18, 2019 at 10:29 PM
Subject: Fwd: B-line News Addition - Nov 18: A message from Vice President Brian Rose
To: <republicans@binghamtonsa.org>

---------- Forwarded message ---------
From: **B-line** <b-line@binghamton.edu>
Date: Mon, Nov 18, 2019 at 10:27 PM
Subject: B-line News Addition - Nov 18: A message from Vice President Brian Rose
To: <B-LINE@listserv.binghamton.edu>



## B-Line Addition: Monday, November 18

### A message from Vice President Brian Rose

This evening, Monday, Nov. 18, a speaker sponsored by the College Republicans was disrupted and ultimately prevented from presenting by a large group of students and others. The University anticipated that the event would attract demonstrators, given the challenges with a tabling activity by the College Republicans last week, so it took several proactive steps to manage the event following announcement of a planned disruption:

1. The University moved the event to a larger lecture hall due to safety concerns.
2. Demonstrators were provided the opportunity to hold their own speak-out in an adjacent lecture hall.
3. The University deployed a large number of police to maintain order at the event.
4. Attendees at the lecture were asked to allow the presentation to go forward and reserve their questions until the end.

Despite those measures, the lecture was immediately disrupted and the speaker was entirely prevented from addressing the audience led by an individual using a bull horn. That individual was arrested, as was another individual who attempted to interfere with police.

The University is incredibly disappointed with the events that happened tonight, particularly given that demonstrators were provided an adjacent lecture hall to engage in a counter discussion. The protestors chose instead to infringe on the expressive activity of others and to prevent those who wished to hear the speaker from doing so.

The investigation of student organizations and individual students who encouraged or participated in any activity that violated applicable law and University policies continues. The University reserves the right to pursue appropriate charges or disciplinary action against those organizations and individuals as relevant information is confirmed.

As an institution of higher education, freedom of speech is fundamental to our core mission; academic inquiry and the exchange of ideas rest on the principle that all have a right to express their beliefs.

Brian T. Rose
Vice President for Student Affairs

**More Info**

Contact Katie Ellis

# EXHIBIT 9

---------- Forwarded message ---------
From: **Executive Vice President SA** ▬▬@binghamtonsa.org>
Date: Tue, Nov 19, 2019 at 10:49 AM
Subject: B-There Account Suspension
To: College Republicans SA ▬▬▬▬@binghamtonsa.org>
Cc: Matthew Johnson ▬▬▬▬@binghamtonsa.org>

Good morning,

I am emailing to inform you that the B-there account for College Republicans has been suspended. Due to your violation with both University and Student Association policy in regards to tabling without proper approval on Thursday November 14th.

Let me know if you have any questions.

Best,
Erin



**Erin Bishop**
Executive Vice President
Student Association at Binghamton University, Inc.
▬▬▬ |
binghamtonsa.org | UUW 203