UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **YOUNG AMERICA'S FOUNDATION**; **BINGHAMTON UNIVERSITY COLLEGE REPUBLICANS**; AND **REIN BEY**, IN HER OFFICIAL CAPACITY AS PRESIDENT OF THE COLLEGE REPUBLICANS OF BINGHAMTON UNIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>**HARVEY STENGER**, President of SUNY-Binghamton, in his official and individual capacities; **BRIAN ROSE**, Vice President for Student Affairs of SUNY Binghamton, in his official and individual capacities; **JOHN PELLETIER**, Chief of SUNY-Binghamton UPD, in his official and individual capacities; **STUDENT ASSOCIATION OF BINGHAMTON UNIVERSITY**,<br><br>Defendants. | **STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT HARVEY STENGER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Civil Action No.:<br>3:20-cv-00822-(LEK)(TWD) |

Defendant Harvey Stenger ("Pres. Stenger") submits the following statement of Material Facts in support of his Motion For Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1. All references are to pleadings on file with the Court, to the declarations and exhibits submitted by Pres. Stenger on this motion, and to publicly available information.

**Parties**

1.  Plaintiff Young America's Foundation ("YAF") is a "nonprofit organization. . . whose mission is to educate the public on the ideas of individual freedom, a strong national defense, free enterprise, and traditional value." Exhibit A, ¶ 9. To that end, YAF "partners with

like-minded student organizations on university campuses to, among other things, co-host speakers." Exhibit[1] A, ¶ 10.

2. Plaintiff Binghamton University College Republicans ("CR") is a registered student organization at the State University of New York at Binghamton (the "University"). *See* Exhibit A, ¶ 11. CR's purpose is to "make known and promote the principles of the Republican Party among members of the SUNY-Binghamton campus and community; to aid in the election of Republican candidates at all levels of government; to encourage and assist in the organization and active functioning of the Republican party at local, state, and national levels; and, to develop political skills and leadership abilities among Republican students as preparation for future service by them to the Republican Party and Community." Exhibit A, ¶ 12.

3. Plaintiff Rein Bey ("Bey") was the Vice President of CR during the fall 2019 semester and during the spring semester of 2023, was President of CR. *See* Exhibit D, pg. 18. Bey is no longer a student at the University and is no longer a member or president of CR. *See* Finch Dec., ¶¶6-9.

4. Pres. Stenger has been the President of the University since January, 2012. *See* Exhibit P, pg. 12; Declaration of Pres. Stenger, dated May 31, 2024, submitted in support of the motion ("Stenger Dec."), ¶¶ 2-3.

5. Defendant Brian Rose ("VP Rose") has been the Vice President for Student Affairs at the University since 2008. *See* Exhibit O, Pg. 10.

---

[1] All references to "Exhibit" refer to the exhibits to the Declaration of Matthew J. Larkin, dated May 31, 2024, submitted in support of the motion.

6. Defendant Chief John Pelletier ("Chief Pelletier") was the Chief of the University's Police Department ("UPD") from December of 2018 until his retirement in July of 2022. *See* Exhibit Q, pg. 14.

7. Defendant Student Association of Binghamton University, Inc. ("SA") is an incorporated entity, separate and distinct from the University. *See* Stenger Dec., ¶ 19. SA oversees and charters subsidiary student organizations pursuant to SA's criteria and rules and provides resources to those organizations. *See* Exhibit W, pgs. 12, 21-22, 32, 42-43, 65-66, 75-81, 84-85; Exhibit X; Exhibit Y; Exhibit AA; Stenger Dec., ¶ 19. SA also handles, among other things, discipline of student organizations. *Id.*

**Parties Previously Dismissed**

8. Progressive Leaders of Tomorrow ("PLOT") is a community group existing outside the University. *See* Exhibit J, Pg. 169.

9. The claims against PLOT were dismissed for lack of subject matter jurisdiction. *See* Dkt. No. 223.

10. College Progressives is a student group at the University. *See* Exhibit J, pg. 171.

11. The claims against College Progressive were dismissed for lack of subject matter jurisdiction. *See* Dkt. No. 238.

**SA's Relationship with the University**

12. SA is a separate and independent organization from the University. *See* Exhibit P, pg. 127; Exhibit V, pg. 17; Stenger Dec., ¶ 19.

13. SA is managed by six executive board and two congress members. *See* Exhibit V, pgs. 13-14. All eight individuals are University students elected to the position. *Id.*

14. SA also has two professional non-student staff members, Matthew Johnson and Ornella Harvey. *Id*. Johnson works entirely and solely for SA and does not take any direction from any University employee. *See* Exhibit W, pgs. 21-22.

15. SA does not report to anyone at the University. *See* Exhibit V, pg. 20.

16. There are no regular meetings between SA and the University. *Id*.

17. The University cannot direct the SA to take any action. *Id.* at pg. 22.

18. The University does not exercise any control over SA. *Id*.

19. There has never been an instance in which the University directed SA to take a certain course of action. *Id.*

20. SA does not consult or take direction from the University regarding its official actions. *See* Exhibit O, pg. 166; Exhibit U, pgs. 15, 25-26; Exhibit V, pgs. 22, 48; Exhibit W, pgs. 80, 81, 168.

21. SA is in charge of recognizing, disciplining sanctioning, suspending, and revoking charters of student organization, such as CR. *See* Exhibit W, pg. 32; Exhibit X; Exhibit Y, Section VII; Exhibit AA.

22. Pres. Stenger and the University do not have the power to direct the SA to recognize, sanction, suspend, revoke or reinstate a student organization. *Id*.; Stenger Dec., ¶¶ 21-26.

**The University and UPD's Relationship**

23. UPD was and is the primary law enforcement agency on the University campus. *See* Stenger Dec., ¶ 15.

24. At the time of Plaintiffs' allegations, Chief Pelletier, reported to the Associate Vice President of Emergency Services Tim Faughnan ("AVP Faughnan"). *See* Exhibit R, pg. 48.

25. AVP Faughnan conducted meetings with Chief Pelletier every two weeks. *See* Exhibit P, pg. 16. Both parties would bring in agenda items to discuss. *Id.*.

26. UPD has authority to make arrests and charge individuals with New York State crimes, whereas University administration handles disciplinary actions against individual students (not student organizations) for violations of University rules. *See* Exhibit P, pgs. 26, 22-23, 28, 100-101; Exhibit O, pg. 11; Exhibit R, pgs. 22-23, 123-124.

27. Pres. Stenger does not have the authority to order the UPD to make arrests. *See* Exhibit P, pg. 71; Stenger Dec., ¶ 17. There was never a time when the University administration decided whether or not the UPD should arrest anybody. *Id.* at pg. 29.

**The November 14, 2019 "Tabling Incident"**

28. The Spine is a high traffic area of the University's campus between the dining hall and the lecture halls. *See* Exhibit G, pgs. 120-122.

29. Due to the high traffic, the Spine is in high demand for tabling. *See* Exhibit K, pg. 124; Exhibit J, pgs. 177-178; Exhibit F, pg. 95.

30. Tabling is when a person or group sets up tables to promote something happening on campus. *See* Exhibit W, pgs. 49-50.

31. Because of the high demand for tabling, the University requires student organizations to reserve space in the Spine prior to tabling. *See* Exhibit W, pg. 50; Exhibit V, pg. 50.

32. Despite knowledge of the reservation requirement, CR did not attempt to make a reservation for tabling on November 14, 2019. *See* Exhibit V, pgs. 54-58, 62, 64-67, 70-72, 84-85, 89-90, 115; Exhibit K, pgs. 126, 155, 198-199; Exhibit F, pgs. 104-106, 154, 222-228; Exhibit C, pgs. 66-68, 89, 154.

33. Consequently, CR and Turning Point USA, a group that was not chartered or otherwise recognized by the SA, tabled for hours in the Spine on November 14, 2019 without a permit (the "Tabling Event"). *See* Exhibit K, pgs. 141-142; Exhibit H, pgs. 78-83, 90; Exhibit J, pg. 217; Exhibit F, pgs. 115, 117.

34. The Hillel Jewish Student Union, another student organization, had reserved the Spine so it may table on November 14, 2019, but was unable to because CR and Turning Point USA were there tabling without a permit. *See* Exhibit W, pg. 62; Exhibit DD.

35. After CR and Turning Point USA members tabled for several hours, a confrontation occurred between their members and individuals protesting them, including members of the College Progressives. *See* Exhibit F, pgs. 127-128; Exhibit H, pgs. 92-93.

36. UPD sent officers to the scene of the Tabling Event in response to several calls that reporting a disturbance between the groups of people. *See* Exhibit Q, pg. 82.

37. Approximately five to eight UPD officers responded to the scene. *See* Exhibit Q, pgs. 84-85; Exhibit H, pgs. 95-102; Exhibit F, pg. 137.

38. When UPD officers first arrived at the scene there were approximately 30 individuals there. *See* Exhibit S, pg. 62.

39. That number grew to over 100 people. *Id.* at pg. 65.

40. The arriving UPD officer was concerned that the protesters were going to get physical and unruly. *Id.* at pg. 66.

41. The officer did not believe UPD would be able to disperse the crowd safely with the number of officers that were on duty. *Id.* at pgs. 67-68.

42. The officer did not believe it was safe at the time to make any arrests because it would have escalated the scene. *Id.* at pg. 71.

43. UPD asked CR to remove its table because CR did not have a tabling reservation. *Id.* at pg. 72-73.

44. UPD did not direct CR members to leave the Spine or otherwise remove them. *See* Exhibit T, pg. 36; Exhibit H, pgs. 97-99.

45. CR initially did not want to leave. *See* Exhibit S, pg. 74.

46. After passing out all their flyers advertising the Laffer Event, and with no further intention to remain, CR eventually removed its table and elected to leave with the UPD who drove the CR members off campus away from the hostile crowd. *See* Exhibit J, pg. 227.

47. Pres. Stenger heard the commotion of the Tabling Event from his office, looked out the window and saw a partial view of the tabling area. *See* Exhibit P, pg. 40. He saw a "significant number of people." *Id*. Other than seeing a group of people, he was too far away to discern any other details. *Id.* at pg. 41.

48. Criminal charges were later filed against two of the protestors at the Tabling Event, at the request of the CR. *See* Exhibit Q, pgs. 97-98; Exhibit S, pg. 80, Exhibit H, pgs. 110-119; Exhibit T, pgs. 42-43.

49. The day after the Tabling Event, Pres. Stenger released a statement regarding the tabling incident, which was drafted by the University's Office of Communications. *See* Exhibit P, pg. 40; Exhibit CC.

50. The following day, SA revoked CR's reservation privileges as a consequence for tabling without a reservation. Exhibit O, pgs. 92-94; Exhibit W pgs. 72-73; Exhibit T, pgs. 42-43. Those privileges were restored the following year. *Id.*

51. Pres. Stenger, nor anyone else in the University administration, had a role in revoking the CR's privileges. *See* Exhibit P, pg. 128; Stenger Dec., ¶¶ 23-26.

52. VP Rose made the decision not to pursue academic charges against the protestors because he did not believe it would serve any purpose in de-escalating the conflict that was developing on campus particularly because the student conduct process takes months; that the student conduct process would likely not separate anybody from the University; and that it would continue to stoke reaction and disruption. *See* Exhibit O, pg. 21.

**Preparation for the Laffer Event**

53. Dr. Arthur Laffer ("Dr. Laffer") is the founder and chairman of Laffer Associates, an economic research and consulting firm. *See* Exhibit M, pgs. 15-16. Dr. Laffer routinely speaks at college campuses. *Id.*.

54. He charges $20,000 - $25,000 per speaking engagement. *Id.*.

55. The payor of Dr. Laffer's fees depends on the event. Exhibit L, pg. 40. Sometimes the fee is paid entirely by YAF and other times only a portion is paid by YAF. *Id.*.

56. CR worked with YAF to arrange for Dr. Laffer to speak at the University (the "Laffer Event"). *See* Exhibit J, pgs. 97-98.

57. CR raised $15,000 for Dr. Laffer to speak at the University through donations. *Id.* at pg. 110.

58. YAF covered the remainder of Dr. Laffer's fee (at least of portion of which was also through donations) and handled the logistics of getting Dr. Laffer to the University. *Id.* at pg. 109.

59. In preparation for the Laffer Event, UPD Investigator John Gallagher ("Inv. Gallagher") emailed CR President John Restuccia to ask if Dr. Laffer had any security concerns and if Dr. Laffer had prior appearances at other colleges so that UPD could reach out to those

campuses to see if there had been any security issues. *See* Exhibit J, pg. 176; Exhibit DD. Mr. Restuccia could not recall if he ever responded to that email. *See* Exhibit J, pg. 177.

60. CR planned for about 150 people to attend the Laffer Event, which the University did not consider a large event. *See* Exhibit S, pgs. 91-93.

61. Because YAF and CR made it a non-ticket event, it was open to the public and UPD could not restrict who entered. *Id.* at 100.

62. YAF decided to hire two private security officers from Pinkerton to protect Dr. Laffer during the Laffer Event. *See* Exhibit T, pgs. 57-59; Exhibit N, pgs. 44, 51, 58-59; Exhibit L, pgs. 96-98.

63. A few days before the Laffer Event, YAF forwarded an email to UPD to alert the University about PLOT posting messages on Facebook calling for violence at the Laffer Event and equating YAF to Nazis. *See* Exhibit Q, pgs. 150-151; Exhibit RT pgs. 63-69; Exhibit L, pgs. 105-108.

64. During the morning of the Laffer Event, Chief Pelletier, VP Rose, Pres. Stenger, and other University staff discussed the Laffer Event, including where it was to be held how freedom of speech may be protected and how Dr. Laffer could give his lecture safely. *See* Exhibit Q, pgs. 158-163; Exhibit O, pgs. 40-41; Exhibit P, pgs. 65-73; Exhibit R, pgs. 79, 84-97.

65. The University and UPD took four proactive steps to ensure that the Laffer Event went safely and without disruption: (1) relocating the Laffer Event to a larger lecture hall room; (2) providing a space for demonstrators to hold their "speak-out" in an adjacent lecture hall; (3) deploying a large number of police to maintain order at the event; and (4) asking attendees to reserve their questions until the end of the lecture. *See* Exhibit O, pgs. 55-56; Exhibit EE.

66. The Laffer Event was moved to a larger lecture hall room because the original room only had one door and was in the basement and far from the fire exits. *See* Exhibit O, pg. 42. With the original space, there was concern that it would be difficult to manage and that it would be difficult to protect the speaker since there was only one way in and out of the room. *Id.*.

67. With the original lecture space, UPD was concerned with ingress and egress routes, the number of seats, and the number of classrooms in the surrounding area. *See* Exhibit Q, pg. 168.

68. VP Rose suggested providing protest groups with another space to hold their "speak-out." *See* Exhibit O, pg. 47.

69. UPD prepared an Operational Order, which consisted of an incident action plan for the Laffer Event. *See* Exhibit Q, pgs. 164, 167, 199-200; Exhibit FF.

70. Chief Pelletier was unsure whether Dr. Laffer was aware of the potential safety concerns and wanted to make sure Dr. Laffer received all the information directly from him. *See* Exhibit Q, pg.180.

71. Chief Pelletier met Dr. Laffer at the airport when he arrived and talked to him for about 90 seconds. *Id.* at pg. 181.

72. Chief Pelletier did not present the option to Dr. Laffer of not proceeding with the event. *Id.* at pg. 182. Instead, Chief Pelletier simply explained to Dr. Laffer that there were potential protests planned. *Id.* at pgs. 181-182, 186-187.

73. Despite the advance communications by and between UPD, CR, and YAF regarding the potential for disruption, Dr. Laffer was unaware of any threats to disrupt his speech until he arrived at the University. *See* Exhibit M, pg. 36.

**The Laffer Event**

74. Prior to the Laffer Event beginning, there were approximately nine UPD officers, including Chief Pelletier and two other UPD chiefs, posted inside the Laffer lecture hall and 14 other officers in the nearby hallways. *See* Exhibit Q, pgs. 200-202; Exhibit I, pg. 109.

75. There was also a UPD chief posted in the incident command conference room at the UPD office to supervise via a live video feed. *See* Exhibit Q, pg. 201, 206- 207; Exhibit R, pgs. 107-110.

76. VP Rose and other members of the administration, (*not* including Pres. Stenger) were also in the incident command conference room watching the Laffer Event via a live video feed. *See* Exhibit O, pgs. 60, 62-64.

77. Chief Pelletier made an announcement for everyone in the lecture hall to take their seats and clear the aisles. *See* Exhibit Q, pgs. 213-214.

78. Restuccia proceeded to introduce Dr. Laffer and told the audience that if anyone had disagreements, they could ask questions during the question-and-answer portion after he spoke. *See* Exhibit J, pg. 283.

79. Shortly after Dr. Laffer began his speech, the event was disrupted. *See* Exhibit T, pgs. 93-95.

80. A male in the second row stood from his seat and began yelling comments from his phone. *Id.* at pgs. 95-97. A second individual then gave him a megaphone to further amplify his comments. *Id*.

81. UPD officers attempted to approach the individual shouting into the megaphone to stop the disruption, prompting other members of the audience to form a barrier around him. *Id.* at pgs. 97-98.

82. Meanwhile, CR members held up "free speech" signs and made a wall to protect Dr. Laffer. *See* Exhibit J, pg. 289.

83. The "free speech" signs were provided by YAF. *Id.*.

84. Inv. Gallagher was fearful for everyone's safety in that lecture hall. *See* Exhibit T, pg. 103.

85. CR feared for their safety. *See* Exhibit H, pg. 145; Exhibit G, pg. 154.

86. YAF's representative was concerned for Dr. Laffer's safety. *See* Exhibit L, pgs. 214-215.

87. During the disruption, when asked by Inv. Gallagher how he was doing, Dr. Laffer responded that he would like to give it another ten minutes to see if it calmed down. *See* Exhibit Q, pgs. 223-224; Exhibit T, pgs. 99-100; Declaration of Inv. Gallagher, executed May 31, 2024, submitted in support of the motion ("Gallagher Dec."), ¶ 15.

88. Protestors and disruptors continued to approach towards the front of the lecture hall room, where Dr. Laffer and the CR members were located. *See* Gallagher Dec., ¶ 16.

89. Restuccia then stated that they leave the lecture hall. *See* Exhibit T, pgs. 99-100; Gallagher Dec., ¶ 18.

90. Dr. Laffer was then escorted out of the lecture hall by a mix of Pinkerton agents and UPD officers. *See* Exhibit J, pg. 298; Gallagher Dec., ¶ 19.

91. UPD officers arrested two protesters at the Laffer Event. *See* Exhibit Q, pg. 229. One of those arrested was a student who was charged with disorderly conduct, and the other individual arrested was not a student and was charged with disorderly conduct and obstruction of governmental administration. *Id.* at pgs. 188, 220, 225-226, 229, 237.

92. At the time of the Laffer Event, Pres. Stenger was traveling to Texas and California and was not on campus. *See* Exhibit P, pg. 57; Stenger Dec., ¶¶ 34-35. He was not aware of the disruption as it happened and did not give any orders in regards to the actions taken by the UPD during the Laffer Event. *See* Exhibit P, pg. 57; Stenger Dec., ¶¶ 36.

**Post-Laffer Event**

93. In addition to the two individuals previously arrested, UPD identified eight additional individuals that were involved and could be arrested and/or subject to student conduct charges. *See* Exhibit O, pgs. 80-81; Exhibit GG.

94. The Broome County District Attorney thought charges could be pursued and did pursue charges for the two individuals who were arrested at the Laffer Event. Exhibit Q, pg. 239.

95. For the eight remaining individuals, the UPD and University officials deliberated in the several days that followed as to whether to conduct arrests or proceed with school disciplinary action. *See* Exhibit O, pgs. 80-84.

96. Darcy Fauci, Pres. Stenger's Chief of Staff, communicated the Pres. Stenger's personal desire to avoid further arrests if possible. *Id.* at pg. 85.

97. However, the ultimate decision as to whether to arrest was made by the UPD. *See* Exhibit Q, pgs. 254-255; Stenger Dec., ¶ 37.

98. Pres. Stenger does not have the authority to determine whether arrests are made. *See* Exhibit P, pg. 71; Exhibit Q, pg. 67; Stenger Dec., ¶ 16, 37.

99. The UPD decided not to arrest the remaining individuals. *See* Exhibit O, pg. 256.

**Damages**

100. None of the claimed monetary damages, which include Dr. Laffer's speaking fee and attorneys' fees and costs, were sustained by CR. *See* Exhibit L, pg. 182.

**The Alleged "Speech Suppression Policy"**

101. None of the CR witnesses are aware of or have read any so-called "speech suppression policy." *See* Exhibit C, pg. 128; Exhibit D, pg. 177; Exhibit E, pg. 103; Exhibit F, pgs. 179-180; Exhibit J, pg. 285; Exhibit I, pg. 110.

102. The "speech suppression policy" does not exist. *See* Stenger Dec., ¶ 12.

103. The University's supports free speech and promotes the right to freely express opinions in words or actions that are constitutionally protected under the First Amendment. *Id.,* ¶ 9.

104. UPD also enforces regulations which prohibit the deliberate disruption or interference of lectures and speaking engagements in University facilities. *See* 8 NYCRR 535.3.

**SUNY-Buffalo Settlement**

105. Plaintiffs contend that SUNY had entered into a consent decree in June of 2017 in connection with a heckler's veto case at SUNY Buffalo (the "SUNY-Buffalo Settlement"). *See* Exhibit A, ¶ 20.

106. The SUNY-Buffalo Settlement did not involve the University, YAF, CR, or any of the same parties as this action. *See* Exhibit HH.

107. The SUNY-Buffalo Settlement did not contain any factual findings or admissions of liability. *Id*.

108. The SUNY-Buffalo Settlement agreement provides "That this Stipulation of Settlement and Discontinuance and any Order entered thereon shall have no precedential value or effect whatsoever and shall not be admissible in any other action or proceeding as evidence or for any other purpose except in an action or proceeding to enforce this Stipulation and Discontinuance." *Id.*, ¶ 12.

Dated:  May 31, 2024

**BARCLAY DAMON LLP**

By: _____

Matthew J. Larkin

*Attorneys for Defendant Harvey Stenger,*
*President of SUNY-Binghamton, in his*
*official and individual capacities*
Office and Post Office Address
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202