UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

**YOUNG AMERICA'S FOUNDATION**;
**BINGHAMTON UNIVERSITY COLLEGE
REPUBLICANS**; AND **REIN BEY**, IN HER OFFICIAL
CAPACITY AS PRESIDENT OF THE COLLEGE
REPUBLICANS OF BINGHAMTON UNIVERSITY,

                Plaintiffs,

           v.

**HARVEY STENGER**, President of SUNY-Binghamton, in
his official and individual capacities; **BRIAN ROSE**, Vice
President for Student Affairs of SUNY Binghamton, in his
official and individual capacities; **JOHN PELLETIER**,
Chief of SUNY-Binghamton UPD, in his official
and individual capacities; **STUDENT ASSOCIATION OF
BINGHAMTON UNIVERSITY**,

                Defendants.

**DEFENDANT BRIAN
ROSE'S STATEMENT OF
MATERIAL FACTS**

Civil Action No.:
3:20-cv-00822-(LEK)(TWD)

      Defendant Brian Rose ("Mr. Rose" or "Defendant") pursuant to Federal Rule of Civil

Procedure 56 and Local Rule of Civil Procedure 56.1, submits the following statement of Material

Facts as to which there is no dispute in support of his Motion for Summary Judgment. All

references are to pleadings on file with the Court, to the affidavits and exhibits submitted by Mr.

Rose on this motion, and to publicly available information.

**The Parties**

      1.     Young America's Foundation ("YAF") is a national organization that assists with

on-campus activities and speaking events. (DiLorenzo Declaration - hereinafter "Dec." Exhibit E,

94:1-23). YAF helps match up students with speakers and helps organize speaking events on

campuses across the country. (Dec. Ex. I, 92:6-16). YAF is a plaintiff in this case.

2.      Binghamton University College Republicans ("College Republicans") is a group of college students who identified as conservative or republican who wanted to associate with each other. (Dec. Ex. I, 24:14-18). College Republicans is a plaintiff in this case.

3.      Rein Bey ("Ms. Bey") was the Vice President of College Republicans during the fall 2019 semester. (Dec. Ex. B, 18:2). Ms. Bey was not present at the tabling event and was not present at the Dr. Laffer event until after Dr. Laffer had already left. (*Id.*, 104, 134-146). At the time of her deposition, Ms. Bey was the President of College Republicans. (*Id.*). Ms. Bey no longer holds a position with the College Republicans. (*Id.*, Ex. PP). Ms. Bey is a plaintiff in this case.

4.      Harvey Stenger ("Dr. Stenger") is the President of the State University of New York at Binghamton ("Binghamton University"). (Dec. Ex. P, 14:18-20). He has held this position since January 2012. (*Id.*). Dr. Stenger is an individual defendant in this case.

5.      Brian Rose ("Mr. Rose") is the Vice President for Student Affairs at Binghamton University. (Dec., Ex. O, 10:13-20). He has held this position since 2008. (*Id.*). Mr. Rose reports to Dr. Stenger. (Dec. Ex. O, 12:25-13:4). Mr. Rose is an individual defendant in this case.

6.      Chief John Pelletier ("Chief Pelletier") is the former Chief of Police for Binghamton University's Police Department ("UPD"). (Dec. Ex. Q, 13:22-14:10). Chief Pelletier retired as of July 2022. (*Id.*). Chief Pelletier is an individual defendant in this case.

7.      Student Association of Binghamton University ("Student Association") is a formal body of students recognized by Binghamton University that approves and manages the student organizations at Binghamton University. (Dec. Ex. P, 59:21-60:4). Student Association is an individual defendant in this case.

17737405.2 5/31/2024

**Parties Previously Dismissed**

8.     Progressive Leaders of Tomorrow ("PLOT") is a community group outside of Binghamton University. (Dec. Ex. I, 169:16-22).

9.     College Progressives was a student group at Binghamton University. (Dec. Ex. I, 171:16-20).

**Student Association and its Relationship with Binghamton University**

10.     Student Association is a separate, self-governed, and independent organization from Binghamton University. (Dec. Ex. P, 127:6-12) (Dec. Ex. W, 17:21-18:3).

11.     Binghamton University does not exercise control over Student Association. (Dec. Ex. W, 22: 15-17).

12.     Student Association does not report to anyone at Binghamton University. (Dec. Ex. W, 20:16-18)

13.     Student Association has an executive board consisting of eight members. (Dec. Ex. W, 13:15-14:13). All eight individuals are elected to their positions and are students at Binghamton University. (*Id.*).

14.     Student Association also has two professional staff members – Matthew Johnson who oversaw Student Association businesses and Ornella Harvey who is the financial director. (Dec. Ex. W, 15:11-23).

15.     Mr. Johnson worked entirely and solely for Student Association and did not take any direction from any Binghamton University employee. (Dec. Ex. X, 21:22-22:2).

16.     Student Association funding comes from the student body by collecting a student activity fee. (Dec. Ex. V, 8:5-24). The student activity fee is a mandatory fee. However, students

are allowed to opt out of the student activity fee with approval by the Student Association executive board and proof of some sort of financial inability to pay the fee. (*Id.*, 8:15-9:12).

17.     There were no regular meetings between Student Association and Binghamton University. (Dec. Ex. W, 20:19-21).

18.     Binghamton University cannot direct the Student Association to take any action. (Dec. Ex. W, 22:12-14).

19.     There has never been an instance in which Binghamton University directed Student Association to take a certain course of action. (Dec. Ex. W, 22:18-21).

20.     Student Association does not consult or take direction from Binghamton University regarding any planned actions. (Dec. Ex. W, 22: 22-25).

21.     Student Association can sanction an organization depending on the nature and severity of the violation. (Dec. Ex. X, 32:2-33:7).

22.     Binghamton University does not have the power to direct the Student Association to sanction an organization. (Dec. Ex. O, 166:2-6).

23.     The Executive Vice President of Student Association decides the sanctions for non-financial infractions. (Dec. Ex. X, 35:10-20).

**UPD and its Relationship with Binghamton University**

24.     UPD has the authority to make arrests and charge individuals with New York State crimes whereas the Vice President for Student Affairs' student conduct office handles discipline for conduct issues related to Binghamton University rules. ((Dec. Ex. P, 22-23, 26, 28, 100-101) (Dec. Ex. O, p. 11). (Dec. Ex. R, p. 22-23, 123-124).

25.     At its height and at the time of Plaintiffs' allegations, UPD had thirty-one patrol officers, five supervisors, three investigators, two deputy chiefs, an assistant chief, and a chief. (Dec. Ex. Q, 44:15-46:15).

26.     Patrol officers report to supervisors; supervisors and investigators report to the deputy chiefs; the deputy chiefs report to the assistant chief; the assistant chief reports to the chief of police. (Dec. Ex. Q, 48:3-17). At the time of Plaintiffs' allegations, the Chief of Police, Chief Pelletier, reported to the Associate Vice President of Emergency Services ("AVP"), Tim Faughnan. (*Id.*, 48: 3-17).

27.     As AVP, Mr. Faughnan conducted standing meetings with the Chief of Police every two weeks. (Dec. Ex. R, 16:5-20:8). Both parties would bring agenda items to discuss. (*Id.*).

28.     UPD and Binghamton University have a cooperative relationship with information and communication flowing both ways. (Dec. Ex. R, 20:9-22:2).

**College Republicans at Binghamton University**

29.     Jon Lizak was a member of College Republicans from September 2019 through May 2022. (Dec. Ex. E, 25:8-26:17). Mr. Lizak was the secretary for College Republicans from September or October 2019 through December 2019 and president of College Republicans from December 2019 through May 2022. (*Id.*).

30.     John Restuccia was a member of College Republicans from the fall of 2018 until spring 2020. (Dec. Ex. I, 24:25-25:21). Mr. Restuccia was the president of College Republicans for summer 2019 and fall 2019. (*Id.*, 26: 8-21).

31.     Logan Blakeslee became a member of College Republicans in September 2019. (Dec. Ex. C, 17:6-21:21). Mr. Blakeslee was elected Vice President of College Republicans from fall 2020 to present. (*Id.*).

32.     Lacey Kestecher was a member of College Republicans. (Dec. Ex. F, 25:11-17).

33.     Giuseppe Badalamenti was a member of College Republicans from spring 2019 until his graduation in spring 2022. (Dec. Ex. A, 22:7-23:19).

34.     Preston Scagnelli became a member of College Republicans in fall 2019. (Dec. Ex. K, 28:15-31:10). Mr. Scagnelli held an unofficial position of Speaker Coordinator and was the treasurer in spring 2020. (*Id.*). Mr. Scagnelli resigned from College Republicans in February 2020 due to his disagreements with the direction of the club and new leadership. (*Id.*, 40:20-47:25).

35.     Spencer Haynes was a member of College Republicans from fall 2018 through his graduation from Binghamton University in spring 2021. (Dec. Ex. D, 30:23-36:40).

36.     Kyle Nelson was a member of College Republicans from fall 2019 up to September 2022. (Dec. Ex. H, 20:15-18). Mr. Nelson was elected secretary in December 2019 and treasurer for the next semester until spring 2022. (*Id.*, 21:5-17). Mr. Nelson was elected president for spring 2022 but ended his presidency in September 2022 due to health issues. (*Id.*).

37.     Dylan Roth was a member of College Republicans from fall 2018 until his graduation in August 2022. (Dex. Ex. J, 14:2-25).

38.     Brian Murray was a member of College Republicans during the fall 2019 semester. (Dec. Ex. G, 18:20-20:10).

**College Republicans' Events Prior to November 2019**

39.     In fall 2019, College Republicans had about 15-20 members. (Dec. Ex. K, 35:7-36:15).

40.     From fall 2017 up until the Dr. Laffer event, College Republicans hosted only small events. (Dec. Ex. B, 35:14-24).

17737405.2 5/31/2024

41.     Prior to the tabling event of November 14, 2019, during the fall 2019 semester, College Republicans hosted an event called "The Case Against Socialism" in September 2019. (Dec. Ex. F, 38:11-39:14). Approximately 30 people attended this event. (*Id*.).

42.     On October 25, 2019, Investigator Gallagher of the UPD reached out to Mr. Restuccia regarding security measures for the upcoming Case Against Socialism event and whether Mr. Restuccia anticipated any issues from PLOT or others. (Dec. Ex. I, 166:22-167:12).

43.     Investigator Gallagher met with Mr. Restuccia before the Case Against Socialism event to discuss concerns about the event and to provide notice that he would appear at the event in plain clothes. (Dec. Ex. I, 167:20-168:5).

44.     The Case Against Socialism event had a small disruption but otherwise proceeded successfully. (Dec. Ex. I, 168:9-19).

45.     College Republicans also hosted a Constitution Day in October 2019. (Dec. Ex. E, 47:24-53:12).

**YAF at Binghamton University**

46.     Mr. Restuccia first had contact with YAF in spring 2019 when he was trying to get a speaker to campus for the College Libertarians student group. (Dec. Ex. I, 93:10-94:13). College Libertarians were ultimately unsuccessful in bringing a speaker to campus due to lack of funding. (*Id.*).

47.     In summer 2019, Mr. Restuccia was approached by George Phillips (a local congressional candidate) about bringing a speaker to campus. (Dec. Ex I, 95:17-96:9). Mr. Phillips told Mr. Restuccia to look at YAF's list of speakers. (*Id.*, 97:9-13).

48.     Mr. Restuccia, along with Rein Bey and Brian Murray (the only other College Republicans members at the time), reviewed the list of YAF speakers and selected Dr. Laffer. (Dec. Ex. I, 97:17-98:7).

49.     On July 26, 2019, Mr. Phillips introduced Mr. Restuccia to Raj Kannappan at YAF. (Dec. Ex. Y).

50.     Mr. Kannappan was and is employed by YAF as the Director of the Center for Entrepreneurship and Free Enterprise. (Dec. Ex. L, 12:12-13:5).

51.     Mr. Kannappan has utilized Dr. Laffer as a speaker approximately 5-10 times per year prior to and since Dr. Laffer's November 2019 speech at Binghamton University. (Dec. Ex. L, 24:15-25:10).

**Dr. Laffer's Retention**

52.     Dr. Laffer generally charges around $20,000-$25,000 per speaking engagement. (Dec. Ex. M, 15:12-16:1). (Dec. Ex. L, 40:9-15) (Dec. Ex. N, 21:7-16).

53.     The payor of Dr. Laffer's fees depends on the event. (Dec. Ex. L, 40:16-41:2). Sometimes the fee is paid entirely by YAF and other times only a portion is covered by YAF. (*Id.*).

54.     College Republicans raised $15,000 for Dr. Laffer's speaker fee. (Dec. Ex. I, 109:11-19).

55.     Mr. Restuccia was put in contact with potential donors who each donated $1,000 towards Dr. Laffer's fee. (Dec. Ex. I, 110:2-13).

56.     YAF covered the remainder of Dr. Laffer's fee and handled the logistics of getting Dr. Laffer to Binghamton University's campus. (Dec. Ex. I, 109:20-25).

57.     To request rooms for speakers at Binghamton University, a request must be made through Binghamton University's "B There" system. (Dec. Ex. B, 89:22-90:12). A staff member with authority would receive the B There request and would approve or deny it. (*Id.*).

58.     On August 28, 2019, Mr. Restuccia received approval for his room request for the Dr. Laffer event to be held on October 7, 2019. (Dec. Ex. I, 116:12-120:3). Dr. Laffer did not speak on this date. (*Id.*).

59.     On August 28, 2019, Mr. Restuccia received approval for his room request for the Dr. Laffer event to be held on October 14, 2019. (Dec. Ex. I, 120:4-121:17). Dr. Laffer did not speak on this date. (*Id.*).

60.     On September 24, 2019, Mr. Restuccia received approval for his room request for the Dr. Laffer event to be held on November 8, 2019. (Dec. Ex. I, 121:18-123:9). Dr. Laffer did not speak on this date. (*Id.*).

61.     On October 3, 2019, Mr. Restuccia received approval for his room request for the Dr. Laffer event to be held on November 18, 2019. (Dec. Ex. I , 123:10-125:6).

62.     On October 31, 2019, Mr. Restuccia again received approval for his room request for the Dr. Laffer event to be held on November 18, 2019. (Dec. Ex. I, 125:7-126:22).

63.     On October 28, 2019, Investigator Gallagher from UPD emailed Mr. Restuccia to ask if Dr. Laffer had any security concerns and if Dr. Laffer had prior appearances at other college campuses so that Investigator Gallagher could reach out to those campuses to see if there had been any issues. (Dec. Ex. I, 176: 7-17) (Dec. Ex. Z). Mr. Restuccia could not recall if he responded to this email. (Dec. Ex. I, 177:3-5).

**Tabling on the Spine**

64.     Binghamton University sets the procedures for tabling on campus. (Dec. Ex. X, 48:24-49:14). Per these procedures, a group was required to make a reservation if they wanted to table on the Spine. (Dec. Ex. X, 50:6-9) (Dec. Ex. W, 50:2-51:20).

65.     Student Association chartered organizations, University recognized student & Greek groups, faculty, and staff are permitted to make tabling reservations. (Dec. Ex. AA).

66.     The Spine was and is a high foot traffic area between the dining hall and the lecture halls on campus. (Dec. Ex. E, 120:14-122:9).

67.     The Spine was and is in high demand for tabling events due to heavy pedestrian traffic. (Dec. Ex. K, 124) (Dec. Ex. I, 177-178) (Dec Ex. D, 95).

68.     Tabling is when a person or group sets up a table or tables to promote something, such as an event, information, or a bake sale. (Dec. Ex. X, 49-50).

69.     Tabling requests are submitted via the B There website. ((Dec. Ex. X, 50:6-9) (Dec. Ex. W, 50:2-51:20).

70.     Groups and individuals were permitted to freely associate on the Spine without a reservation, so long as they did not have a table. (Dec. Ex. S, 73, 82-83) (Dec. Ex. X, 66) (Dec. Ex. K, 199-200).

71.     College Republicans did not undertake the process to get a permit for the tabling event at the Spine held on November 14, 2019. (Dec. Ex I, 200:22-25). College Republicans knew that they were supposed to make a reservation to table in that space but intentionally did not because they felt that the reservation rule was a free speech violation. (Dec. Ex. K, 126, 155, 198-199) (Dec. Ex. D, 104-106, 152, 222-228) (Dec. Ex. A, 66-68, 89, 154).

**Tabling Incident – Thursday, November 14, 2019**

72.     College Republicans coordinated the tabling event with Turning Point. (Dec. Ex. I, 209:7-23).

73.     Turning Point ("TPUSA") is an organization that promotes free enterprise, freedom, liberty, and American values on college campuses. (Dec. Ex. K, 29:14-19).

74.     Ms. Kestecher was the President and Founder of TPUSA. (Dec. Ex. K, 29:20-30:13).

75.     TPUSA never became a chartered organization by the Student Association. (*Id.*, 29:20-30:13; 34:23-25).

76.     Mr. Lizak was also a member of TPUSA. (Dec. Ex. I, 187:23-188:6).

77.     TPUSA tabled a half foot to a few feet away from the College Republicans' table. (Dec. Ex. F, 82:25-83:5); (Dec. Ex. A, 93:15-94:14).

78.     The TPUSA table had a sign that says "I'm pro-choice, pick your gun" with images of guns. (Dec. Ex. F, 87:21-90:6) (Dec. Ex. BB). Such controversial message was exacerbated by the fact that there had been a high school shooting that same morning. (Dec. Ex. S, 62-66) (Dec. Ex. K, 157) (Dec. Ex. D, 120, 130-131, 151).

79.     The TPUSA table also had a poster with an image of a rainbow in the shape of an AR-15. (*Id.*).

80.     Ms. Kestecher went back and forth between the College Republicans' table and the TPUSA table. (Dec. Ex. F, 78:24-79:17).

81.     Mr. Lizak was also present at TPUSA's table and helped hand out TPUSA flyers. (Dec. Ex. B, 112:13-20) (Dec. Ex. E, 129:7-131:15).

82.     College Republicans members arrived on the Spine at approximately 10:00 a.m. and tabled for a few hours without incident. (Dec. Ex. F, 90:7-12) (Dec. Ex. QQ). College Republicans planned to table until 2:00 p.m. or 3:00 p.m. (Dec. Ex. I, 217-218).

83.     Binghamton University staff and Student Association personnel asked the individuals tabling to relocate their tabling since they did not reserve the space to table. (Dec. Ex. T, 72-74, 83) (Dec. Ex. X, 64-67, 86-87) (Dec. Ex. F, 96-97, 121-124, 202-203) (Dec. Ex. A, 108). In fact, another group, the Hillel Jewish Student Union, had reserved that space to hold there own tabling event but were unable to do so because of the College Republicans and TPUSA. (Dec. Ex. X, 62).

84.     At approximately 1:30 p.m., a confrontation occurred between the members of the two tabling groups, College Republicans and TPUSA, and individuals protesting, including members of Binghamton University's College Progressives student group. (Dec. Ex. F, 92: 15-93:21) (Dec. Ex. QQ).

85.     College Republicans did not comply. (Dec. Ex. X, 66) (Dec. Ex. F, 124) (Dec. Ex. A, 108).

86.     While College Republicans were permitted to be on the Spine and engage in speech, they could not put up a table at that space without a reservation. (Dec. Ex. S, 73, 82-83) (Dec. Ex. X, 66).

87.     Chief Pelletier received multiple phone calls that there were groups of people yelling at each other on the Spine and that he should send police officers. (Dec. Ex. Q, 77:15-78:3; 80:7-21).

88.     Chief Pelletier went into a Deputy Chief's office and was told that UPD was already sending officers over to the Spine. (Dec. Ex. Q, 82:1-16).

12

89.  Chief Pelletier did not go to the Spine himself. (Dec. Ex. Q, 82:24-83:2).

90.  All of the officers that were on duty (approximately four officers) went to the Spine. (Dec. Ex. Q, 84:20-85:4).

91.  UPD Lieutenant Steven Faulkner was one of the UPD officers on duty who responded to a radio call regarding an incident on the Spine. (Dec. Ex. S, 57: 5-17). Lieutenant Faulkner has been a lieutenant with UPD since December 2013. (Dec. Ex. S, 12:3-21).

92.  UPD Investigator Joseph Gallagher was another UPD officer on duty during the tabling incident. Investigator Gallagher joined UPD as a police officer in 2007 and became an investigator in August 2019. (Dec. Ex. T, 14:1-15:18).

93.  When Lieutenant Faulkner arrived at the Spine, there were approximately 30 people at the scene. (Dec. Ex. S, 62:8-14). The people were agitated, yelling, and causing a disturbance. (*Id.*) (Dec. Ex. QQ).

94.  The group of people protesting grew in size to over a hundred individuals. (Dec. Ex. S, 65: 1-7) (Dec. Ex. QQ).

95.  The larger group was surrounding the smaller group (College Republicans) and had them backed up against a brick wall.(Dec. Ex. CC).

96.  The group of people was agitated, and Lieutenant Faulkner was concerned that they were going to get physical and that it would get out of control. (Dec. Ex. S, 66: 2-16).

97.  The larger group began ripping up flyers and took the tables away from College Republicans. (Dec. Ex. CC) (Dec. Ex. QQ).

98.  Lieutenant Faulkner did not believe UPD would be able to disperse the crowd safely without having many more officers. (Dec. Ex. S, 67:10-68:23).

13

99.     Lieutenant Faulkner did not believe it was safe at that time to make any arrests as it would have escalated the scene. (Dec. Ex. S, 71:3-13).

100.     UPD asked College Republicans to break down their table since they did not have a tabling permit. (Dec. Ex. S, 72:18-73:17).

101.     The crowd continued to be aggressive towards College Republicans, yelled obscenities, and surrounded College Republicans. (*Id.*) (Dec. Ex. QQ).

102.     College Republicans initially did not want to leave. (Dec. Ex. S, 74:13-22).

103.     UPD suggested that College Republicans leave for their safety. (Dec. Ex. S, 75:1-16). Had College Republicans continued to stay there, UPD could not have guaranteed their safety. (*Id.*).

104.     UPD offered to escort College Republicans out of the area and College Republicans agreed to do so. (Dec. Ex. CC).

105.     College Republicans agreed that they needed to leave for their safety. (*Id.*).

106.     UPD directed College Republicans to their police cars so UPD could drive them off campus. (Dec. Ex. I, 227:6-19).

107.     Mr. Rose was in his office when Randall Edouard notified him of a disruption involving a tabling event. (Dec. Ex. O, 15:2-9).

108.     Mr. Rose and Mr. Edouard walked over to an area about 50 yards away from the Spine and observed the very last moments of the tabling incident from that distance. (*Id.*).

109.     Mr. Rose observed approximately the last 10-12 minutes of the incident, mostly after the individuals tabling (College Republicans) had already left. (Dec. Ex. O, 153:23-154:3).

110.     At that time, Mr. Rose was not aware of who was in the tabling crowd or who UPD took away. (Dec. Ex. O; 16:9-15).

**Post-Tabling Incident**

111.    The next day, on November 15, 2019, Dr. Stenger released a statement regarding the tabling incident. (Dec. Ex. DD). Dr. Stenger's statement was drafted by Binghamton University's Office of Communications and adopted by him. (Dec. Ex. P, 43:10-25).

112.    By the day after the tabling incident, Mr. Rose met with UPD supervisors (including Tim Faughnan and Chief Pelletier), Mr. Edouard's staff, Orrin Kenyon, and Peter Nardone. (Dec. Ex. O, 16:20-17:6).

113.    The initial focus after the tabling incident was: (1) to issue a statement in response to the inquiries Binghamton University received; and (2) to plan for the Laffer event to ensure that the event went off safely. (Dec. Ex. O, 19:1-10; 20:7-12).

114.    In the meetings, there was a brief discussion about whether to pursue student conduct charges against individuals. (*Id.*, 21:2-5).

115.    Mr. Rose made the decision not to pursue student conduct charges since he did not believe it would serve any purpose in de-escalating the conflict that was developing. (*Id.*, 21: 6-12).

116.    Mr. Rose was concerned with the fact that the student conduct process takes months; that the student conduct process would likely not separate anybody from Binghamton University; and that it would continue to stoke reaction and disruption. (*Id.* 21: 12-19).

117.    On November 18, 2019, Mr. Rose released a statement regarding the tabling incident. (Dec. Ex. EE). Mr. Rose drafted this statement and shared it with others who had given him information to ensure the statement was accurate. (Dec. Ex. O, 23:16-22).

**Preparation for Dr. Laffer Event**

118.   YAF hired Pinkerton agents after the tabling incident on or about November 15, 2019 for Dr. Laffer's upcoming speech. (Dec. Ex. L, 97:10-98:23).

119.   Mr. Rose learned of the Dr. Laffer event within a day or sooner after the tabling incident. (Dec. Ex. O, 32:15-20).

120.   Mr. Rose had no role in approving the Dr. Laffer event. (*Id.*, 32:21-25).

121.   After the tabling incident, UPD had concerns that there would be a demonstration at the Dr. Laffer event. (*Id.*, 33:1-7).

122.   On November 18, 2019, Mr. Yarosh sent an email to Mr. Rose, Chief Pelletier, and others containing a post purportedly from Binghamton University College Progressives, PLOT, Frances Beal Society, and Truth Pharm. (Dec. Ex. FF). Mr. Yarosh cut and pasted the Google document into an email because it was not a public document. (Dec. Ex. U, 44:3-16).

123.   At this point, Mr. Rose was already meeting with others to try to ensure the Laffer event went off safely. (Dec. Ex. O, 40:13-25). Mr. Yarosh's email reiterated what Mr. Rose already understood to be  a concern. (*Id.*).

124.   Binghamton University and UPD took at least four proactive steps to ensure that the Laffer event went off smoothly and safely: (1) moving the event to a larger lecture hall; (2) providing a space for demonstrators to hold their speak-out in an adjacent lecture hall; (3) deploying a large number of police to maintain order at the event; and (4) asking attendees to reserve their questions until the end of the lecture. (Dec. Ex. O, 55-56) (Dec. Ex. GG).

125.   The event was moved to a larger lecture hall since the original room only had one door and was in the basement and far from the fire exits. (Dec. Ex. O, 42:1-15). With the original

space, there was concern that it would be difficult to manage and that it would be difficult to protect the speaker since there was only one way in and out of the room. (*Id.*).

126.     The decision to move the event to a larger lecture hall was UPD's idea, which Mr. Rose agreed with. (Dec. Ex. O, 55).

127.     With the original lecture space, UPD was concerned with ingress and egress routes, the number of seats, and the number of classrooms in the surrounding area. (Dec. Ex. Q, 168-15-22).

128.     Mr. Rose suggested providing protest groups with another space to hold their speak-out. (Dec. Ex. O, 47: 4-12). This was standard practice when there was a protest so that the individuals protesting could have their own designated space to express their opposing views while the Dr.  Laffer event occurred. The room that was reserved for the protestors was adjacent to Dr. Laffer's lecture hall and there was a hallway between the two rooms. (Dec. Ex. Q, 162-163, 172, 174, 184) (Dec. Ex. S, 103-104) (Dec. Ex, O, 46-49) (Dec. Ex. P, 75-76, 141-143) (Dec. Ex. R, 98-101) (Dec. Ex. L, 126-127),  Dec. Ex. D, 164) (Dec. Ex. H, 95).

129.     Someone from the Binghamton University staff or from UPD made College Progressives aware of the space reserved for them. (Dec. Ex. O, 49: 10-14).

130.     UPD utilized pretty much every officer available for the Laffer event. (Dec. Ex. Q, 176: 5-9).

131.     To manage the event, UPD would have developed some sort of event plan. (Dec. Ex. O, 57:19-58:4). Mr. Rose was not privy to the contents and did not see the plan. (*Id.*).

132.     Mr. Rose does not supervise UPD and did not pass along any directives, but expressed his interest that there be a strong and physical law enforcement presence at the event to set a tone that disruption would not be tolerated. (Dec. Ex. O, 58:12-22).

133.    Representatives of Binghamton University conveyed to College Republicans to make a statement at the lecture to allow the presentation to go forward and for attendees to reserve their questions until the end. (Dec. Ex. O, 56:13-57:18).

134.    Mr. Rose expressed his desire that this message be conveyed by UPD. (*Id*.).

135.    UPD made the decision to add cameras to the lecture hall where Dr. Laffer would be speaking. (Dec. Ex. Q, 178:17-179:24). The purpose of this was to have a record of the event and view what occurred, it was not to direct officers. (*Id.*).

**Dr. Laffer's Arrival at Binghamton University**

136.    Chief Pelletier was unsure whether Dr. Laffer was aware of the current situation and wanted to personally deliver the necessary information to him. (Dec. Ex. Q, 180:6-22).

137.    Mr. Rose participated in discussions concerning communicating an update to Dr. Laffer at the airport. (Dec. Ex. O 43:18-44:16). The motivating concern was to make sure Dr. Laffer was aware of what may happen. (*Id.*).

138.    Mr. Rose did not direct Chief Pelletier to go to the airport to speak to Dr. Laffer. (Dec. Ex. O, 43:15-17).

139.    Chief Pelletier met Dr. Laffer at the airport when he arrived and talked to him for about 90 seconds. (Dec. Ex. Q, 181: 10-24).

140.    Chief Pelletier did not present the option to Dr. Laffer of not proceeding with the event. (Dec. Ex. Q, 182: 7-9). Instead, Chief Pelletier explained to Dr. Laffer what was going on. (*Id.*, 186:22-187:8). Chief Pelletier did not drive with Dr. Laffer to campus. (*Id.*, 181:18-182:6).

141.    Mr. Rose does not know if Chief Pelletier encouraged Dr. Laffer to not move forward with the speech, but that was not part of the discussions in which he participated. (Dec. Ex. O, 44: 13-17).

142.    Dr. Laffer was unaware of any threats to disrupt his speech until he arrived at the airport. (Dec. Ex. M, 36: 16-25).

143.    Prior to his speech, Dr. Laffer attended a lunch at a hotel in Binghamton with some members of College Republicans. (Dec. Ex. I, 140:22-142:14) (Dec. Ex. M, 21:24-22:2; 31:7-19) (Dec. Ex. N, 46:4-49:2).

144.    After the lunch, Dr. Laffer attended a press conference with George Phillips, a local candidate. (Dec. Ex. M, 32:20-33:116) (Dec. Ex. I, 144:12-22) (Dec. Ex. N, 50:20-51:24).

145.    Approximately one hour before the Dr. Laffer event, two of the Pinkerton agents hired by YAF met with UPD. (Dec. Ex. I, 270: 19-24).

**Dr. Laffer Event – Monday, November 18, 2019**

146.    YAF and College Republicans chose for the Dr. Laffer event to be open to the public and not ticketed because they wanted to attract as many people as possible, including those who agreed with Dr. Laffer's message and those who disagreed with it. (Dec. Ex. L, 119-120) (Dec. Ex. I, 130).

147.    A large crowd entered the room when the lecture hall was made available. (Dec. Ex. C, 94-95).

148.    Chief Pelletier made an announcement for everyone in the lecture hall to take their seats and clear the aisles. (Dec. Ex. Q, 213:16-214:14)

149.    Mr. Restuccia briefly introduced Dr. Laffer and told the audience that if anyone had disagreements, they could ask questions during the question-and-answer portion at the end. (Dec. Ex. I, 283: 3-10).

150.    Shortly after Dr. Laffer began his speech, the event was disrupted. (Dec. Ex. T, 93:10-95:12) (Dec. Ex. RR).

151.    A male individual stood and began reading from his phone. (Dec. Ex. T, 95:13-97:8) (Dec. Ex. RR). A second individual provided the first individual with a megaphone. (*Id*.).

152.    UPD attempted to approach the disruptor, but other members of the audience formed a barrier around the disruptor to shield him. (Dec. Ex. T, 97:12-98:24) (Dec. Ex. RR).

153.    UPD ultimately broke through the human barrier and physically removed the disruptor from the lecture hall. The individual was arrested and charged with disorderly conduct. (Dec. Ex. Q, 188, 219-220, 225-226, 229, 239) (Dec. Ex. T, 98-105) (Dec. Ex. S, 130-134, 136, 156-156) (Dec. Ex. A, 126) (Dec. Ex. RR).

154.    UPD also physically removed the individual who handed off the megaphone, arrested him, and charged him with disorderly conduct. (Dec. Ex. Q, 188, 220, 225-2226, 229, 237, 239) (Dec. Ex. T, 99, 105) (Dec. Ex. S, 129-131, 136, 146-147, 156-157).

155.    The crowd grew louder and more aggressive towards the UPD officers. (Dec. Ex. HH) (Dec. Ex. RR).

156.    After the disruption began, Investigator Gallagher asked Dr. Laffer how he was doing, Dr. Laffer mentioned giving it another ten minutes to see if it calmed down. (Dec. Ex. Q, 223:13-224:6) (Dec. Ex. T, 99:1-100:17).

157.    During the disruption, College Republicans members held up "free speech" signs in front of Dr. Laffer's podium. (Dec. Ex. I, 289:2-16). The "free speech" signs were provided by YAF in advance of the speech to be used for a potential disruption. (*Id.*).

158.    No one from UPD or from Binghamton University prevented the College Republicans from displaying their "free speech" signs. (Dec. Ex. N, 86) (Dec. Ex. L, 161) (Dec. Ex. K, 181-182) (Dec. Ex. F, 141) (Dec. Ex. I, 293-294) (Dec. Ex. D, 188) (Dec. Ex. A, 130-131) (Dec. Ex. H, 115-116).

159.     Investigator Gallagher was fearful for everyone's safety in that lecture hall. (Dec. Ex. T, 103:19-24).

160.     College Republicans also feared for their safety. (Dec. Ex. F, 145) (Dec. Ex. E, 230).

161.     Mr. Kannappan from YAF was also fearful for Dr. Laffer's safety during the disruption. (Dec. Ex. L, 214-215).

162.     Mr. Restuccia suggested that they get out of the lecture hall. (Dec. Ex. T, 99:1-100:17).

163.     It was Dr. Laffer's choice to remain at the event unless he was in danger. (Dec. Ex. T, 101:14-104:22).

164.     At that point, Dr. Laffer, his staff and security officers (the Pinkerton agents), Mr. Restuccia and other College Republicans, and Investigator Gallagher left the building. Dr. Laffer got in his vehicle and his driver drove them away. Dr. Laffer was escorted out of the lecture hall by a mix of Pinkerton agents and UPD. (Dec. Ex. Q, 188-189, 230-239) (Dec. Ex. T, 107-113, 122-124) (Dec. Ex. S, 157).

165.     Two arrests were made at the Dr. Laffer event. (Dec. Ex. Q, 229: 16-22).

166.     Mr. Rose was not present at the Laffer event. (Dec. Ex. O, 60:2-5).

167.     Mr. Rose watched the lecture from UPD headquarters' conference room. (*Id.*, 63:1-8).

168.     Mr. Rose did not have audio of the lecture, only video. (*Id.*, 64: 17-21).

169.     Mr. Rose was not directly communicating with anyone on site in the lecture hall. (*Id.*, 63:16-22).

**Post-Laffer Event**

170.     After the event, there was a meeting in a UPD conference room to debrief the event. (Dec. *Ex. O*, 68: 20-25). Mr. Rose was present at this meeting. (*Id.*).

171.     Mr. Rose participated in the drafting of a statement in consultation with others at the debriefing meeting. (Dec. Ex. O, 69: 6-12) (Dec. Ex. GG). The statement was sent to the Binghamton University community the same evening as the Dr. Laffer event. (*Id.*).

172.     After the event, there were meetings to discuss: (1) developing guidelines on managing disruptive events; (2) continuing response, including possible arrests or student conduct charges; and (3) management of communications and the university's reputation. (Dec. Ex. O, 85: 5-15).

173.     In addition to the two individuals previously arrested, UPD had identified eight additional individuals that were involved and could be arrested. (Dec. Ex. O, 80:21-:81:3) (Dec. Ex. II).

174.     The District Attorneys' office thought charges could be pursued and did pursue charges for the two individuals who were arrested at the Laffer event. (Dec. Ex. Q, 239: 8-11).

175.     For the eight remaining individuals, there were discussions with UPD and Binghamton University on how to handle. (Dec. Ex. O, 80:21-81:3).

176.     Mr. Rose initially wanted to arrest the eight remaining individuals. (Dec. Ex. O, 86: 11-25) (Dec. Ex. T, 123:9-126:17).

177.     Darcy Fauci, Dr. Stenger's Chief of Staff, communicated Dr. Stenger's desire to avoid arrest if possible. (Dec. Ex. O, 85: 21-25).

178.     Mr. Rose pushed back on Dr. Stenger's view to not arrest individuals. (Dec. Ex. O, 87: 10-15).

179.   However, once Dr. Stenger made his recommendation, Mr. Rose supported it. (Dec. Ex O, 86: 11-25).

180.   The ultimate decisionmakers on whether to arrest would be the UPD investigators. (Dec. Ex. Q, 254:17-255:8).

181.   Mr. Pelletier informed the UPD investigators of Dr. Stenger's preference not to arrest individuals. (Dec. Ex. Q, 256: 1-10) (Dec. Ex. T, 111:8-114:8).

182.   The UPD investigators did not arrest the additional individuals identified. (Dec. Ex. O, 256: 12-22).

**Discipline of College Republicans and College Progressives**

183.   During the tabling event, multiple Student Association staff members witnessed College Republicans violating reservation policies, including Ms. Bishop, the Executive Vice President of SA. (Dec. Ex. X, 64:15-65:23).

184.   During the tabling event, College Republicans were warned that they were in violation of tabling policies, were asked to move, and did not have a confirmed reservation for the Spine. (*Id.*). College Republicans refused to comply. (Dec. Ex. X, 66: 4-23).

185.   On November 14, 2019, the same day as the tabling incident and four days before Dr. Laffer's event, Erin Bishop of Student Association requested that College Republicans have its B There account suspended due to violations of policy regarding tabling without approval and refusing to cooperate after being notified of their violations. (Dec. Ex. JJ).

186.   Per the Student Association's policy, the Dr. Laffer event should have been cancelled due to Student Associations' revocation of the College Republicans' reservation privileges, but Binghamton University did not cancel the Laffer event. (Dec. Ex. X, 90-92, 124) (Dec. Ex. A, 168-173).

187.     Mr. Rose was not involved nor consulted with respect to the decision to revoke College Republicans' B There reservation privileges. (Dec. Ex. X, 125: 11-14; 129:10-17).

188.     On November 22, 2019, a meeting was held between Binghamton University and Student Association. (Dec. Ex. X, 96:2-99:19). Mr. Rose was present at this meeting. (*Id.*).

189.     In the November 22 meeting, Mr. Rose asked Student Association if it was going to take action against the College Progressives group. (*Id.*). Student Association told Mr. Rose that it had no evidence of any organizational activity so it would not be taking any action. (*Id.*).

190.     Mr. Rose ultimately met with Student Association multiple times in part to ensure that Student Association responded to other organizations similarly to how Student Association responded to College Republicans. (Dec. Ex. O, 95:7-96:10).

191.     Mr. Rose urged Student Association multiple times to take action against College Progressives and told Student Association that College Progressives should be suspended based on the communication that it intended to incite and disrupt the Dr. Laffer event. (Dec. Ex. O, 95:7-109:5).

192.     Student Association was unaware of the communication from College Progressives encouraging people to protest the Laffer event until the November 22 meeting with Mr. Rose. (Dec. Ex. X, 100:13-101:22). Mr. Rose sent Student Association a copy of the College Progressives' communication on November 22 after the meeting. (*Id.*, 102:1-18) (Dec. Ex. KK).

193.     Student Association doubted that the letter was authentic and was unable to prove authorship or ownership by College Progressives. (Dec. Ex. X, 100:13-101:22; 104:10-106:3).

194.     On January 22, 2020, Mr. Rose again met with Student Association and urged Student Association to remove sanctions from College Republicans and to sanction College Progressives. (Dec. Ex. X, 107:14-109:8).

195.     Student Association reaffirmed strongly that it would not remove sanctions from College Republicans and would not be sanctioning College Progressives. (Dec. Ex. X, 107:14-109:8).

196.     On January 31, 2020, the President of Student Association confirmed to Mr. Rose that Student Association would not be taking action against College Progressives and would not be removing sanctions from College Republicans. (Dec. Ex. O, 108:4-12) (Dec. Ex. LL).

197.     After Mr. Rose received the January 31, 2020 email, he decided to no longer press the issue with Student Association. (Dec. Ex. O, 133: 6-19). Mr. Rose also became preoccupied with the COVID-19 pandemic. (*Id.*).

**College Republicans' Events Post-Fall 2019**

198.     In spring 2020, College Republicans held unofficial meetings approximately every two weeks. (Dec. Ex. D, 36:15-39:20).

199.     After the Dr. Laffer event, College Republicans invited people to come to campus, including John Restuccia and Tom Reed. (Dec. Ex. A, 53:22-54:22).

200.     In January 2020, College Republicans invited Representative Tom Reed to Binghamton University. (Dec. Ex. E, 53:13-55:15). College Republicans tabled for the Tom Reed appearance and then had a meeting with Dr. Stenger and Congressman Reed. (*Id.*).

201.     In spring 2020, College Republicans had missed their annual re-registration period, despite several extensions and reminders. (Dec. Ex. X, 28: 2-13) (Dec. Ex. MM).

202.     When an organization misses the re-registration period, their page is temporarily hidden on B Engaged since Student Association does not know if that organization intends to be active for the next academic year. (Dec. Ex. X, 74:20-75:13).

203.    The decision to temporarily freeze Student Association privileges for organizations who fail to complete the annual re-registration process, like College Republicans had, is not a punitive measure, but an administrative one. (Dec. Ex. X, 76:13-77:19). If nobody has informed Student Association who is in charge of an organization, then there is no authorized leader. (*Id.*). Therefore, the organization's page is hidden, and they cannot access their budget since there is no trained treasurer. (*Id.*).

204.    On September 17, 2020, Student Association sent a reminder email to organizations who failed to register at the end of the 2019-2020 academic year, including College Republicans. (Dec. Ex. NN). Student Association requested that organizations reach out if they are interested in reactivation. (*Id.*).

**Damages**

205.    None of the financial damages came from College Republicans' funds. (Dec. Ex. L, 182:12-22).

**"Speech Suppression" Policy**

206.    Section 535.3(i) of 8 NYCRR 535.3, applicable to SUNY universities including Binghamton University, prohibited the deliberate disruption of meetings and the deliberate interference with the freedom of any person to express their views, including invited speakers. (Dec. Ex. O, 137-140) (Dec. Ex. OO).

207.    There is no evidence of any alleged "speech suppression" policy and none of the witnesses are aware of or have read the so-called "speech suppression" policy repeatedly described in the amended complaint. (Dec. Ex. A, 128: 13-19) (Dec. Ex. B, 177: 17-21) (Dec. Ex. C, 103: 13-16) (Dec. Ex. D, 179:23-180:18) (Dec. Ex. E, 143:14-145:11) (Dec. Ex. F, 133) (Dec. Ex. H, 110) (Dec. Ex. I, 285:9-13) (Dec. Ex. K, 185) (Dec. Ex. L, 153) (Dec Ex. N, 70-71).

17737405.2 5/31/2024

Dated:  May 31, 2024                                    BOND, SCHOENECK & KING, PLLC


By:  /s/Louis P. DiLorenzo
Louis P. DiLorenzo
Mallory A. Campbell
*Attorneys for Defendant Brian Rose*
600 Third Avenue, 22nd Floor
New York, New York 10016-1915
Telephone: (646) 253-2300
dilorel@bsk.com
mcampbell@bsk.com

17737405.2 5/31/2024