**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

**YOUNG AMERICA'S FOUNDATION**; **BINGHAMTON UNIVERSITY COLLEGE REPUBLICANS**; and **REIN BEY**, in her official capacity as President of the College Republicans of Binghamton University,

**Plaintiffs,**

**v.**

**HARVEY STENGER**, President of SUNY-Binghamton, in his official and individual capacities; **BRIAN ROSE**, Vice President for Student Affairs of SUNY-Binghamton, in his official and individual capacities; **JOHN PELLETIER**, Chief of SUNY-Binghamton UPD, in his official and individual capacities; and **STUDENT ASSOCIATION OF BINGHAMTON UNIVERSITY,**

**Defendants.**

Civil Action No. 3:20-cv-822 (LEK/TWD)

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Young America's Foundation, Binghamton University College Republicans, and Rein Bey[1] in her official capacity as President of the College Republicans (collectively, "Plaintiffs"), through their undersigned counsel, file this omnibus memorandum of law in opposition to the summary judgment motions filed by Defendants Harvey Stenger ("Stenger"), Brian Rose ("Rose"), John Pelletier

[1] Plaintiffs have concurrently filed a letter requesting a non-dispositive motion conference with the Court to discuss Plaintiffs' request to file a procedural motion to substitute Mr. Shane Rossi (as a plaintiff in his *official* capacity as the current President of College Republicans) in the place of Ms. Bey.

("Pelletier") (collectively, "State Defendants"), and Student Association of Binghamton University, Inc. ("Student Association") (all collectively, "Defendants").

**[*Intentionally Left Blank*]**

## TABLE OF CONTENTS

**INTRODUCTION AND KEY FACTS** ..... **1**

**LEGAL STANDARD** ..... **6**

**ARGUMENT** ..... **7**

**I. Defendants are not entitled to summary judgment on any claim.** ..... **7**

A. State Defendants are not entitled to summary judgment on Plaintiffs' speech suppression claim. ..... 8

1. The First Amendment clearly protects Plaintiffs' speech. ..... 8

2. The campus venues are designated public fora. ..... 10

3. By attacking and silencing Plaintiffs, State Defendants violated Plaintiffs' First Amendment rights, no matter the fora. ..... 14

B. State Defendants are not entitled to summary judgment on Plaintiffs' equal protection claim. ..... 20

C. Defendants Stenger, Rose, and Student Association are not entitled to summary judgment on Plaintiff College Republicans's unconstitutional retaliation claim. ..... 21

1. Genuine disputes of material fact preclude summary judgment to Stenger and Rose. ..... 22

2. Genuine disputes of material fact preclude summary judgment to Student Association. ..... 26

**II. State Defendants are not entitled to summary judgment on their damages-based defenses to Plaintiffs' individual capacity claims.** ..... **28**

A. State Defendants were personally involved in the violation of Plaintiffs' constitutional rights. ..... 29

B. Rose and Pelletier are not entitled to qualified immunity. ..... 30

1. Defendants cannot meet their qualified immunity burden because Plaintiffs' right to freedom from viewpoint discrimination in any fora is clearly established. ..... 31

2. The evidence shows Rose and Pelletier violated Plaintiffs' clearly established rights, and a reasonable jury could find their unconstitutional actions were not objectively reasonable. ..... 33

**III. State Defendants are not entitled to summary judgment on any of their defenses to Plaintiffs' official capacity claims.** ..... **35**

A. State Defendants violated Plaintiffs' constitutional rights under the

unwritten Speech Suppression Policy. ........ 35

B. State Defendants' other arguments are unavailing........ 36

C. State Defendants are not entitled to summary judgment on any of their remedies-based defenses to official capacity claims. ........ 39

**IV. Defendants are not entitled to summary judgment on any of their other arguments. ........ 42**

A. Plaintiffs do not seek "obey-the-law" injunctions and, in any case, State Defendants' challenge is premature. ........ 42

B. A reasonable jury could award punitive damages. ........ 44

C. College Republicans are entitled to seek nominal, compensatory, and punitive damages at trial. ........ 47

D. State Defendants' standing argument is still meritless. ........ 49

**CONCLUSION ........ 50**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abboud v. Cnty. of Onondaga, N.Y.*,
341 F. Supp. 3d 164 (N.D.N.Y. 2018) ........ 45, 46

*Adler v. Pataki*,
185 F.3d 35 (2d Cir. 1999) ........ 29

*Akinlawon v. Mayo*,
2024 WL 1053170 (N.D.N.Y. Mar. 11, 2024) ........ 44

*Amidon v. Student Ass'n of SUNY at Albany*,
508 F.3d 94 (2d Cir. 2007) ........ 15, 21

*Aponte v. Perez*,
75 F.4th 49 (2d Cir. 2023) ........ 46, 48

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ........ 10, 11

*BD v. DeBuono*,
130 F. Supp. 2d 401 (S.D.N.Y. 2000) ........ 40

*Beebe v. Birkett*,
749 F. Supp. 2d 580 (E.D. Mich. 2010) ........ 43

*Bible Believers v. Wayne Cnty., Mich.*,
805 F.3d 228 (6th Cir. 2015) ........ *passim*

*Bowman v. White*,
444 F.3d 967 (8th Cir. 2006) ........ 12

*Brady v. Wal-Mart Stores, Inc.*,
531 F.3d 127 (2d Cir. 2008) ........ 36

*Brown v. New York*,
975 F. Supp. 2d 209 (N.D.N.Y. 2013) ........ 41

*Burrell v. DOCCS*,
655 F. Supp. 3d 112 (N.D.N.Y. 2023) ........ 44

*Ctr. for Bio-Ethical Reform, Inc. v. Black*,
234 F. Supp. 3d 423 (W.D.N.Y. 2017) ..... 16

*Cameron v. City of N.Y.*,
598 F.3d 50 (2d Cir. 2010) ..... 45, 46

*Chachkes v. David*,
2021 WL 101130 (S.D.N.Y. Jan. 12, 2021) ..... 42

*Chappell & Co. v. Frankel*,
367 F.2d 197 (2d Cir. 1966) ..... 43

*Child. First Found., Inc. v. Martinez*,
169 F. App'x 637 (2d Cir. 2006) ..... 31

*City of N.Y. v. A-1 Jewelry & Pawn, Inc.*,
247 F.R.D. 296 (E.D.N.Y. 2007) ..... 42, 43

*Cole-Hatchard v. Hoehmann*,
2020 WL 5645815 (S.D.N.Y. Sept. 21, 2020) ..... 20

*Concerned Citizens of Albany-Shaker Rd. v. State*,
528 N.Y.S.2d 230 (3d Dep't 1988) ..... 50

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985) ..... 8, 10

*Davis v. Stratton*,
575 F. Supp. 2d 410 (N.D.N.Y. 2008), *rev'd on other grounds*, 360 F. App'x 182 (2d Cir. 2010) ..... 12

*Deegan v. City of Ithaca*,
444 F.3d 135 (2d Cir. 2006) ..... 16

*Deferio v. City of Syracuse*,
306 F. Supp. 3d 492 (N.D.N.Y. 2018), *aff'd*, 770 F. App'x 587 (2d Cir. 2019) ..... 14, 17

*Dublino v. McCarthy*,
2019 WL 2053829 (N.D.N.Y. May 9, 2019) ..... 44

*Dunlap v. City of Chi.*,
435 F. Supp. 1295 (N.D. Ill. 1977) ..... 34

*Elend v. Basham*,
471 F.3d 1199 (11th Cir. 2006) ..... 43, 44

*Friend v. Gasparino*,
61 F.4th 77 (2d Cir. 2023) ........................................................................ 8

*Healy v. James*,
408 U.S. 169 (1972) ................................................................................. 8

*Hill v. Colorado*,
530 U.S. 703 (2000) ................................................................................. 8

*Hoggard v. Rhodes*,
141 S. Ct. 2421 (2021) ............................................................................ 31

*Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of N.Y. Dep't of Parks & Recreation*,
311 F.3d 534 (2d Cir. 2002) ..................................................................... 14

*Iancu v. Brunetti*,
588 U.S. 388 (2019) ................................................................................. 17

*Irish Lesbian & Gay Org. v. Giuliani*,
143 F.3d 638 (2d Cir. 1998) ..................................................................... 48

*Jackler v. Byrne*,
658 F.3d 225 (2d Cir. 2011) ..................................................................... 30

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
702 F.3d 364 (7th Cir. 2012) .................................................................... 40

*Johnson v. Perry*,
859 F.3d 156 (2d Cir. 2017) ............................................................ 30, 32, 33

*Just. for All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) .................................................................... 13

*Karam v. Cnty. of Rensselaer, N.Y.*,
2016 WL 51252 (N.D.N.Y. Jan. 4, 2016) ................................................... 46

*Kentucky v. Graham*,
473 U.S. 159 (1985) ................................................................................. 35

*Kerman v. City of N.Y.*,
261 F.3d 229 (2d Cir. 2001) ................................................................ 21, 27

*Lee v. Edwards*,
101 F.3d 805 (2d Cir. 1996) ..................................................................... 47

*Levick v. Maimonides Med. Ctr.*,
2011 WL 1673782 (E.D.N.Y. May 3, 2011) ... 37

*Levine v. New York State Police*,
2022 WL 4465588 (N.D.N.Y. Sept. 26, 2022) ... 41

*Manfredonia v. Barry*,
401 F. Supp. 762 (E.D.N.Y. 1975) ... 34

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) ... 6, 21

*Matusick v. Erie Cnty. Water Auth.*,
757 F.3d 31 (2d Cir. 2014) ... 47

*McDonald v. City of Pompano Beach, Fla.*,
556 F. Supp. 3d 1334 (S.D. Fla. 2021) ... 14

*McNichol v. Falco*,
2020 WL 5802492 (S.D.N.Y. Sept. 28, 2020) ... 21

*Molina v. New York*,
697 F. Supp. 2d 276 (N.D.N.Y. 2010) ... 6, 21, 30

*New Hope Fam. Servs., Inc. v. Poole*,
626 F. Supp. 3d 575 (N.D.N.Y. 2022) ... 6

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
442 F.3d 101 (2d Cir. 2006) ... 45, 47

*Peck v. United States*,
470 F. Supp. 1003 (S.D.N.Y. 1979) ... 34

*Peregrine Myanmar Ltd. v. Segal*,
89 F.3d 41 (2d Cir. 1996) ... 44

*Perry v. McDonald*,
280 F.3d 159 (2d Cir. 2001) ... 31

*Pierre v. N.Y. State Dep't of Corr. Servs.*,
2009 WL 1583475 (S.D.N.Y. June 1, 2009) ... 41

*Plyler v. Doe*,
457 U.S. 202 (1982) ... 20

*Police Dep't of City of Chi. v. Mosley*,
408 U.S. 92 (1972) .......... 20

*Pro-Life Cougars v. Univ. of Hous.*,
259 F. Supp. 2d 575 (S.D. Tex. 2003) .......... 12

*Quinn v. Green Tree Credit Corp.*,
159 F.3d 759 (2d Cir. 1998), *abrogation recognized, Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 103 (2d Cir. 2020) .......... 41

*Reynolds v. Vill. of Chittenango*,
2023 WL 6460417 (N.D.N.Y. Oct. 4, 2023) .......... 33

*Roberts v. Haragan*,
346 F. Supp. 2d 853 (N.D. Tex. 2004) .......... 12

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 16

*Rowe v. N.Y. State Div. of Budget*,
2012 WL 4092856 (N.D.N.Y. Sept. 17, 2012) .......... 44

*Sackman v. Maritas*,
595 N.Y.S.2d 655 (Sup. Ct. Nassau Cnty. 1992) .......... 50

*Schneider v. New Jersey*,
308 U.S. 147 (1939) .......... 9

*Smith v. Wade*,
461 U.S. 30 (1983) .......... 47

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 9

*Startzell v. City of Phila.*,
533 F.3d 183 (3d Cir. 2008) .......... 9

*Stephentown Concerned Citizens v. Herrick*,
636 N.Y.S.2d 470 (3d Dep't 1996) .......... 50

*Terminiello v. City of Chi.*,
337 U.S. 1 (1949) .......... 32

*Tieman v. City of Newburgh*,
2015 WL 1379652 (S.D.N.Y. Mar. 26, 2015) .......... 37

*Toll Land V Ltd. P'ship v. Plan. Bd. of Vill. of Tarrytown*,
12 N.Y.S. 3d 874 (Sup. Ct. Westchester Cnty. 2015) .......... 50

*Toran v. Cnty. of Nassau*,
2024 WL 1158982 (E.D.N.Y. Mar. 18, 2024) .......... 26

*Trebor Sportswear Co., Inc. v. Ltd. Stores, Inc.*,
865 F.2d 506 (2d Cir. 1989) .......... 37

*Trello v. McKeighan*,
624 F. Supp. 3d 150 (N.D.N.Y. 2022) .......... 39

*Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams*,
2012 WL 2160969 (S.D. Ohio June 12, 2012) .......... 12

*Vargas v. APL Ltd.*,
431 F. Supp. 3d 82 (E.D.N.Y. 2019) .......... 30

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002) .......... 39

*Vincent v. Yelich*,
718 F.3d 157 (2d Cir. 2013) .......... 30

*Wandering Dago, Inc. v. Destito*,
879 F.3d 20 (2d Cir. 2018) .......... 34

*Wandering Dago Inc. v. N.Y. State Off. of Gen. Servs.*,
992 F. Supp. 2d 102 (N.D.N.Y. 2014) .......... 11, 14

*Wang v. Bethlehem Cent. Sch. Dist.*,
2022 WL 3154142 (N.D.N.Y. Aug. 8, 2022) .......... 26

*Widmar v. Vincent*,
454 U.S. 263 (1981) .......... 11, 14

*Williston v. Eggleston*,
379 F. Supp. 2d 561 (S.D.N.Y. 2005) .......... 39, 41

*Wright v. Smith*,
21 F.3d 496 (2d Cir. 1994) .......... 29

*Yunus v. Robinson*,
2019 WL 168544 (S.D.N.Y. Jan. 11, 2019) .......... 43

*Zalaski v. City of Bridgeport Police Dep't*,
613 F.3d 336 (2d Cir. 2010) .......... 13, 14

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .......... 31

**Statutes**

42 U.S.C. § 1983 .......... *passim*

**Other Authorities**

Fed. R. Civ. P. 17(b)(3) .......... 49

Fed. R. Civ. P. 21 .......... 49

Fed. R. Civ. P. 56(a) .......... 6

Fed. R. Civ. P. 65(d) .......... 42, 43, 44

Fed. R. Civ. P. 403 .......... 37

Fed. R. Civ. P. 408 .......... 37

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.4(a) .......... 22

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.3(i) .......... 22

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.3(l) .......... 22

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.5(c) .......... 22

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.7(a) .......... 23

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.10 .......... 25, 36, 38

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.10(a) .......... 22

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.10(b) .......... 23

N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.10(c) .......... 23

## INTRODUCTION AND KEY FACTS

Leading up to, during, and following the events of November 2019, Defendants restricted and silenced dissenting political speech on campus pursuant to an unwritten Speech Suppression Policy despite their roles as *state* actors empowered and required to protect Plaintiffs' free speech. (*See* Plaintiffs' Statement of Additional Material Facts in Dispute ("Pltfs' Add'l SOMF") at ¶ 5 (Stenger testified he was "obligated to protect First Amendment rights"); Plaintiffs' Response ("Pltfs' Resp.") to Stenger's Statement of Material Facts ("Stenger SOMF") at ¶ 15 (Stenger admitted "we have a responsibility to ensure that, you know, constitutionally protected rights of all of our students are in fact protected.").

The Policy's contours are readily apparent from Defendants' actions:

(1) Enable leftist disruptors from College Progressives, PLOT and allied groups to attack Plaintiffs' free speech through violence and threat of violence.

- Pelletier refused to make arrests at the Tabling Event (*see* Pltfs' Resp. to Stenger SOMF at ¶¶ 101–102(1)–(2));
- Pelletier refused to use standard police procedures to contain the crowd at the Tabling Event and Laffer Event (*see id.*; Pltfs' Resp. to Pelletier's Statement of Material Fact ("Pelletier SOMF") at ¶ 56);
- Pelletier conceded that, at the Laffer Event, he had not given "clearer guidance to officers about expectations if we are going to arrest or simply remove people from the venue" (*see* Pltfs' Resp. to Pelletier SOMF at ¶ 79(a));
- Pelletier allowed Stenger and Rose to overrule what Pelletier conceded was his own independent judgment to make eight additional arrests after the Laffer Event or even to pursue justice related to the two arrests they did make (*id.* at ¶ 131; Pltfs' Resp. to Stenger SOMF at ¶¶ 101–102); and
- Stenger was the final policymaker for the use of police powers on

campus, and admitted that he delegated "management of the university police department includ[ing] making decisions about the handling of potential criminal matters" including "arrests" to the Vice President of Operations (*see* Pltfs' Add'l SOMF at ¶ 2).

(2) Use the threat of violence (that they themselves enabled) as a pretext to suppress Plaintiffs' speech citing "safety" concerns. At the Tabling Event, UPD "convinced the BU College Republicans to leave for their safety" (Pltfs' Resp. to Stenger SOMF at ¶¶ 101–102); told the tabling College Republicans that the police could not protect them on government property (*see id.*), and Pelletier attempted to intimidate Dr. Laffer to cancel his speech and return to his plane (Pltfs' Resp. to Pelletier SOMF at ¶ 93).

(3) Vilify Plaintiffs for daring to attempt to exercise their free speech rights.

- Pelletier criticized the tabling students for speaking about political topics and in defense of constitutional rights (*see* Pltfs' Resp. to Stenger SOMF at ¶¶ 101–02(3));
- Stenger blamed the attack on the Plaintiffs at the tabling event on "not follow[ing] Student Association guidelines" (*see id.*); and
- Rose blamed Plaintiffs for being "provocative" and causing a "volatile" situation (*see* Pltfs' Resp. to Defendant Brian Rose's Statement of Material Fact ("Rose SOMF") at ¶ 117);

(4) Reward the disruptors with virtual impunity.

- Stenger intervened to ensure no further disruptors were arrested, overruling UPD's recommendation, while repeatedly falsely claiming that the disrupting students would be charged with university conduct violations (*see* Pltfs' Resp. to Stenger SOMF at ¶¶ 101–02);
- Stenger pretended to prolong the student conduct investigation to deflect criticism, causing the SUNY Chancellor to falsely support this claim (*see id.*);
- Stenger acknowledged that he could not think of any student action on campus subject to arrest that would not also constitute a violation of the student conduct rules (*see id.*);

(5) All the while congratulating themselves for successfully suppressing Plaintiffs' speech. (*See id.* at ¶¶ 101–02(5) (noting "Police response was appropriate and important to ensure that every student involved in this matter was safe and remained safe").

When, in accordance with their policy and plan, the inevitable confrontation occurred, Defendants allowed the progressive mob to threaten Plaintiffs so they could claim public safety required action. And instead of restoring safety by removing the speech-suppressing and aggressive offenders, Defendants removed Plaintiffs and, utilizing the predictable and predicted actions of the progressive activists, accomplished the Policy's goal of suppressing Plaintiffs' disfavored political speech.

When Plaintiffs attempted to promote and hold a speech by Art Laffer, a renowned economist, on campus, they were beset and shut down by a politically opposed student group and the University Police ("UPD"), acting pursuant to the Speech Suppression Policy. At the Tabling Event on November 14, 2019, while Plaintiffs were promoting the upcoming speech peaceably and without disruption (*see* Dkt. No. 307-54[2] at 2:07:36), UPD, in accordance with the Speech Suppression Policy, allowed the unruly mob of progressive students to destroy property, assault Plaintiffs, and grow to unmanageable proportions. (*See* Pltfs' Resp. to Pelletier SOMF at ¶ 56.) After allowing the threat to Plaintiffs to grow, UPD at first told Plaintiffs they would not be protected, then when that was insufficient to cause Plaintiffs to self-censor, ordered Plaintiffs to cease speaking and leave the area. (*See id.*; *see also* Pltfs' Resp. to Rose SOMF at ¶¶ 103, 105.)

In the aftermath, State Defendants issued public statements paying lip service to the violations of Plaintiffs' First Amendment rights but blaming Plaintiffs for

[2] The video of the Tabling Event was submitted to the Court on a USB drive. (*See* Dkt. No. 315.)

engaging in "provocative" speech—*i.e.*, speech that Defendants publicly and officially denigrated as an excuse for mob actions that the Defendants absolved—and guaranteeing that those involved would not face punishment. (*See* Pltfs' Resp. to Rose SOMF at ¶ 117.) The call to action was clear, as was the response. College Progressives and others rallied their members to shut down the event and further suppress Plaintiffs' political speech. (*See id.*)

At this key moment, when aggressive action to counter the announced threat from College Progressive and PLOT could have addressed the source of that threat, State Defendants instead decided to try to suppress Plaintiffs' speech, dispatching Defendant Pelletier to meet Dr. Laffer at the airport in an effort to intimidate him into silence with the planned disruption. (*See* Pltfs' Resp. to Pelletier SOMF at ¶¶ 79(b), 93; Pltfs' Resp. to Rose SOMF at ¶¶ 136–38, 140–42.) Failing that, they moved Dr. Laffer's speech to a larger venue to allow College Progressives and others greater access, and provided the adjacent lecture hall as a staging area for the planned disruption. (*See* Pltfs' Resp. to Rose SOMF at ¶¶ 124–25, 127–28; Pltfs' Resp. to Pelletier SOMF at ¶¶ 83, 85, 88.) And they prearranged for the evacuation of Dr. Laffer (and cancellation of his speech) when, as anticipated, College Progressives began to disrupt, and without forming a plan for the speech to continue after any disruption. (*See id.*; Pltfs' Resp. to Pelletier SOMF at ¶¶ 78–79, 81.)

Following the Laffer Event, Defendants performed a disingenuous pantomime, pretending to consider disciplinary action to placate the public critics, but in reality overriding the professional judgment of the line UPD officers to make additional

arrests and refusing to pursue the paltry number of arrests that had been made. (*See* Pltfs' Resp. to Pelletier SOMF at ¶ 131.) Despite acknowledging that the College Progressives had broken the law—for admittedly political reasons—Defendants imposed ***zero*** discipline against any of the identified individuals nor against the organization. Paired with Defendant Rose's announcement after the Tabling Event that no punishment would be forthcoming, this glaring lack of discipline conveyed a continuing message to College Progressives and their cohort: continue to suppress the speech of those we do not like, and we will have your back.

Finally, augmenting State Defendants' successful efforts to suppress Plaintiffs' speech, Defendant Student Association piled on by pretextually punishing Plaintiffs for a rarely-enforced table reservation policy violation to prevent further speech. (*See* Plfts' Resp. to Student Association's Statement of Material Fact ("SA SOMF") at ¶ 10.) In reality the punishment was for Plaintiffs' disfavored viewpoints and speech. Further, Student Association's reluctance to discipline College Progressives stemmed from their political calculation over perceived racial disparities (*see id.* at ¶¶ 10, 17; Plfts' Resp. to Rose's SOMF at ¶¶ 117, 190). Like Rose's and Stenger's amnesty for those who took their desired course of action, Student Association refused to enforce even token discipline against the same favored progressive aggressors, despite knowledge of the call to disrupt the Laffer Event, characterizing such actions as "a political-viewpoint-targeted guilt-by-association sanctioning" of College Progressives. (*See* Plfts' Resp. to Rose SOMF at ¶ 115; Pltfs' Resp. to Stenger SOMF at ¶ 19.)

## LEGAL STANDARD

Summary judgment may be granted only if, upon viewing the evidence in the light most favorable to the nonmoving party, there is (1) "no genuine dispute as to any material fact," and (2) "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The party seeking summary judgment bears the burden to "demonstrate that no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). In determining whether the moving party meets its burden, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing the judgment." *Molina v. New York*, 697 F. Supp. 2d 276, 281 (N.D.N.Y. 2010) (Kahn, J.) (citing *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001)). Summary judgment is "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters,* 310 F.3d at 286 (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *New Hope Fam. Servs., Inc. v. Poole*, 626 F. Supp. 3d 575, 580 (N.D.N.Y. 2022) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994)).

## ARGUMENT

The Court should deny Defendants' motions in the entirety because, as detailed below, Defendants do not meet their burden of showing entitlement to summary judgment and a plethora of material fact disputes must be decided by the jury.

## I. Defendants are not entitled to summary judgment on any claim.

As depicted below, Plaintiffs assert various claims against State Defendants in their individual and their official capacities for unconstitutional suppression of speech and retaliation under the First Amendment and denial of equal protection under the Fourteenth Amendment, as well as a claim against Student Association for unconstitutional retaliation under the First Amendment:

<table>
<tr><th>Count</th><th>Claim</th><th>Defendant</th><th>Capacity</th><th>Event</th></tr>
<tr><td rowspan="3">I</td><td rowspan="3">1st Amendment – Speech Suppression</td><td>Stenger</td><td>Official</td><td rowspan="2">Tabling Event & Laffer Event</td></tr>
<tr><td>Rose</td><td rowspan="2">Official & Individual</td></tr>
<tr><td>Pelletier</td><td>Laffer Event</td></tr>
<tr><td rowspan="3">II</td><td rowspan="3">1st Amendment – Retaliation</td><td>Stenger</td><td rowspan="2">Official & Individual</td><td rowspan="3">Tabling Event & Laffer Event</td></tr>
<tr><td>Rose</td></tr>
<tr><td>Student Association</td><td>N/A</td></tr>
<tr><td rowspan="3">VI</td><td rowspan="3">14th Amendment – Equal Protection</td><td>Stenger</td><td>Official</td><td rowspan="2">Tabling Event & Laffer Event</td></tr>
<tr><td>Rose</td><td rowspan="2">Official & Individual</td></tr>
<tr><td>Pelletier</td><td>Laffer Event</td></tr>
</table>

For the reasons below, the Court should deny in their entirety each of the Defendants' motions for summary judgment.

### A. State Defendants are not entitled to summary judgment on Plaintiffs' speech suppression claim.

The Supreme Court has repeatedly made clear that the "right to free speech . . . includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." *Hill v. Colorado*, 530 U.S. 703, 716 (2000). Indeed, "any other rule 'would effectively empower a majority to silence dissidents simply as a matter of personal predilections, and the government might be inclined to 'regulate' offensive speech as 'a convenient guise for banning the expression of unpopular views.'" *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)).

In evaluating State Defendants' suppression of Plaintiffs' speech pursuant to the Speech Suppression Policy, the Court must (1) determine whether Plaintiffs' speech is protected, (2) "identify the nature of the forum," and (3) assess whether the government met its burden to justify its policy and action. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985); *Friend v. Gasparino*, 61 F.4th 77, 91 (2d Cir. 2023).

#### 1. The First Amendment clearly protects Plaintiffs' speech.

Since 1972, it has been clear that Supreme Court precedents "leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972). Here, Plaintiffs desired to engage in a time-honored form of expression that the First Amendment clearly protects: the promotion and giving of a public lecture.

This classic form of speech lies at the very "foundation of free government by free men." *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939).

At the Tabling Event, Plaintiffs sought to promote an upcoming lecture by renowned economic and presidential advisor Dr. Arthur Laffer, and Plaintiffs later attempted to engage in discussion at the Laffer Event on public issues (like tariffs and trade wars) before they were silenced by State Defendants. Although such "[s]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," *Snyder v. Phelps*, 562 U.S. 443, 452 (2011), the President of SUNY-Binghamton (alone) still contests whether College Republicans engaged in protected speech by organizing a table to promote an upcoming speaking event on campus. (*See* Dkt. No. 308-46 at 20.)[3]

Stenger argues that, "[b]y violating the reservation requirement" related to the Tabling Event, Plaintiffs did not engage in free speech, but rather in "impermissible disruption." (Dkt. No. 308-46 at 20 (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 198-99 (3d Cir. 2008).) But Stenger does not explain how the absence of a reservation and the presence of a small piece of furniture is tantamount to "impermissible disruption," or how it should negate Plaintiffs' constitutional rights where Plaintiffs had the right to speak freely. Nor does Stenger identify any facts indicating College Republicans were disruptive, much less to the extent of the protestors in *Startzell* who (like the disruptors at the Laffer Event) "used bullhorns

[3] Stenger does not contest whether Plaintiffs engaged in protected speech at the Laffer Event. (*See* Dkt. No. 308-46.) Rose and Pelletier do not contest whether Plaintiffs engaged in protected speech at either event. (*See* Dkt. Nos. 307-1, 313-48.)

and microphones" to "drown out the platform speakers," 533 F.3d at 199.

To the contrary, Stenger concedes that Plaintiffs engaged in protected speech, asserting that UPD officers "remained on scene, not to arrest or otherwise punish [College Republicans] members, but to protect them and allow their speech or expressive activity to continue." (Dkt. No. 308-46 at 20.) If anything, there is a genuine dispute among State Defendants themselves as to material facts related to disruption, since it is apparent from both the operative reservation policy and the video of the incident that there was ample room on the Spine for anyone who wished to engage in expressive conduct. (*See* Dkt. No. 307-54 at 2:07:36; Pltfs' Resp. to SA SOMF at ¶ 4; Pltfs' Resp. to Stenger SOMF at ¶¶ 29, 34.) And contrary to Stenger's account that College Republicans were "disruptive," Pelletier asserts a contrasting material fact that College Republicans ended the Tabling Event "before the protesting turned into a volatile disturbance" because they were "getting protested by 30 people from progressives." (Dkt. No. 307-1 at 23.)

**2. <u>The campus venues are designated public fora.</u>**

A designated public forum is created when the government "intend[s] to make [its] property 'generally available' to a class of speakers." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998) (quoting *Widmar v. Vincent*, 454 U.S. 263, 264 (1981)). To determine the government's intent, courts "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius*, 473 U.S. at 802 (citing *Perry Educ. Ass'n v. Perry Loc. Educators Ass'n*, 460 U.S. 37, 47 (1983)). The Supreme Court has ruled that "a state university create[s] a public forum for

registered student groups by implementing a policy that expressly ma[kes] its meeting facilities 'generally open' to such groups," *Forbes*, 523 U.S. at 678 (citing *Widmar*, 454 U.S. at 267), even if the relevant student group also "regularly sought and received permission to conduct its meetings in University facilities," *Widmar*, 454 U.S. at 265. "It is clear" that forum analysis is "fact intensive." *Wandering Dago v. N.Y. State Off. of Gen. Servs*, 992 F. Supp. 2d 102, 123 (N.D.N.Y. 2014).

The University's policy and consistent practice made the relevant spaces "generally open" for use by University students and registered student groups, including in coordination with off-campus groups, for a wide variety of speakers and events, and did not limit the types of speakers or subjects permitted in those spaces. University policy allowed Student Association chartered organizations and student groups the ability to utilize certain public spaces, including the Spine and individual rooms on campus, to engage in activities consistent with the groups goals and objectives. The operative policy at the time specifically allowed "Groups and individuals [] to freely associate in these locations [The Spine, Peace Quad, and Campus Perimeter] without a reservation" absent the use of physical equipment, and provided further that "[r]eservation requests are not required in advance for spontaneous expressive activities." (*See* Pltfs' Resp. to SA SOMF at ¶ 4; Pltfs' Resp. to Rose SOMF at ¶ 67.) College Republicans's group purposes and expressive activities clearly encompass the use of those spaces to engage in political speech.

The University's consistent practice also shows these spaces are "generally open" for expressive activities. The University (1) allowed YAF, an off-campus group,

to co-sponsor the Dr. Laffer Event (Pltfs' Resp. to Rose SOMF at ¶ 124); (2) provided (without a reservation) the adjacent lecture hall to College Progressives to organize their disruption (*id.* at ¶¶ 123-25, 127-28); and (3) permitted Congressman Thomas Reed to host an event on the Spine with Plaintiff College Republicans in January 2020 (*id.* at ¶ 190). That consistent practice made both the Spine and the lecture hall, at the very least, designated public fora. And this Court, like others, has found that outdoor areas of campus, like the Spine, are at least designated public fora, especially for the university's students. *See, e.g.*, *Davis v. Stratton*, 575 F. Supp. 2d 410, 418 (N.D.N.Y. 2008) (Kahn, J.) (finding quad of community college a designated public forum "subject to the same standard as traditional public fora"), *rev'd on other grounds*, 360 F. App'x 182, 183 (2d Cir. 2010) (noting the "correctness" of the "resolution of that issue" was "not disputed in this appeal"); *see also Bowman v. White*, 444 F.3d 967, 979 (8th Cir. 2006) (finding outdoor common areas clearly within the boundaries of a state university campus to be designated public fora); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 862 (N.D. Tex. 2004) (common outdoor areas are "irreducible public forums on the campus"); *Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003); *Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams*, 2012 WL 2160969, at *6 (S.D. Ohio June 12, 2012).

State Defendants' contention that both campus venues were not open for indiscriminate use by the general public is irrelevant. (Dkt. Nos. 308-46- at 18-19, 313-48 at 18, 20, & 307-1 at 20-23.)[4] The University need not open a forum "for *all*

[4] Contrary to suggestion (Dkt. Nos. 313-48 at 20, 307-1 at 21), the Court has not

types of speech by *all* speakers" to create a designated public forum. *See Just. for All v. Faulkner*, 410 F.3d 760, 766 (5th Cir. 2005). And the evidence shows that both venues were public fora for student groups. Defendant Rose admits that "College Republicans were permitted to be on the Spine and engage in speech" (*see* Dkt. No. 313-47 at ¶ 86), quarreling only that the use of physical tables was restricted by Student Association rules. The use of tables quickly became irrelevant, in any case, since as the police under Pelletier's command admitted, the attacking mob led by College Progressives collapsed the tables and College Republicans packed them up but wished to continue exercising their free speech rights in the face of the mob's violent assault. (*See* Pltfs' Resp. to Pelletier SOMF at ¶¶ 56, 61–62.)

Defendants have further admitted that the lecture hall was generally available to students either by reservation for a group activity or just by walking in and using the room. (Pltfs' Resp. to SA SOMF at ¶ 6.) And Defendants *sua sponte* granted College Progressives and their allied disruptors preferred access to the adjacent room without any reservation whatsoever. (Pltfs' Resp. To Rose SOMF at ¶¶ 124-25.)

Defendants' disputes about the nature of the fora create an issue of material fact. Forum analysis is fact intensive (Dkt. No. 70 at 22), and Defendants argue that the campus venues were not "generally open" to registered student groups. So the "drastic device of summary judgment" cannot be "precipitously imposed" here. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 336, 340, 343 (2d Cir. 2010)

---

*decided* the lecture hall is a limited public form; it merely considered it so for the limited "purposes of" a 12(b)(6) motion, which was denied. (*See* Dkt. No. 70 at 22-23.)

(quoting *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 7 (2d Cir. 1983)); *see also McDonald v. City of Pompano Beach, Fla.*, 556 F. Supp. 3d 1334, 1355 (S.D. Fla. 2021) (denying cross-motions for summary judgment given lack of evidence and "how often our appellate courts have warned us against deciding these uniquely fact-intensive questions prematurely") (collecting circuit cases and citing, among others, *Zalaski* and *Wandering Dago Inc.,* 992 F. Supp. 2d at 123).

**3. By attacking and silencing Plaintiffs, State Defendants violated Plaintiffs' First Amendment rights, no matter the fora.**

The evidence shows that State Defendants' Speech Suppression Policy and conduct violated the First Amendment no matter the fora. In designated public fora, content-based restrictions are subject to strict scrutiny. *Widmar*, 454 U.S. at 269–70. Strict scrutiny also applies to "restrictions on speech that fall[] within the designated category for which [a limited public] forum has been opened." *Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545-46 (2d Cir. 2002) (explaining that once the government "allows expressive activities of a certain genre" in a limited public forum, "it may not selectively deny access for other activities of that genre") (citations omitted). "No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling interest." *Deferio v. City of Syracuse*, 306 F. Supp. 3d 492, 512 (N.D.N.Y. 2018) (Kahn, J.), *aff'd*, 770 F. App'x 587 (2d Cir. 2019) (citing *Bible Believers*, 805 F.3d at 248). Otherwise, government regulation in a limited public forum must be viewpoint neutral and "reasonable in light of the forum's purpose."

*Amidon v. Student Ass'n of SUNY at Albany*, 508 F.3d 94, 100 (2d Cir. 2007).

Here, State Defendants' content-based restrictions did not meet strict scrutiny. For example, Rose admitted in his deposition that he refused to punish those engaged in suppressing College Republican's First Amendment rights because College Republicans "intended to try to stimulate a response." (*See* Pltfs' Resp. to Rose's SOMF at ¶ 115.) Rose also admitted that despite punishing other groups engaged in speech suppression on prior occasions without regard to viewpoint (*id.* at ¶ 117), in this instance the University did not seek to identify or punish those who suppressed Plaintiffs' speech (*see id.* at ¶¶ 115, 117). Similarly, the Student Association failed to discipline College Progressives for suppressing Plaintiffs' speech despite punishing similarly situated groups on prior occasions. (*See id.* at ¶ 190; Pltfs' Resp. to SA SOMF at ¶¶ 10, 17.) And the UPD, under Pelletier, prearranged for the evacuation of Dr. Laffer (and cancellation of his speech) without even attempting to develop a plan to allow him to speak through disruption, and allowed the University administration to overrule law enforcement's decision to arrest the disruptors of the Laffer Event. (*See* Pltfs' Resp. to Pelletier SOMF at ¶¶ 78–79(b), 81, 83, 85, 88, 93; Pltfs' Resp. to Rose SOMF at ¶¶ 124–25, 127–28, 136–38, 140–42.)

None of the State Defendants even attempt to identify any compelling interest, much less explain why their speech restrictions against Plaintiffs were narrowly tailored to be the least-restrictive means available to serve any compelling interest. That is fatal to summary judgment because the "entity that enacted a challenged regulation has the burden to demonstrate that the interest served justifies the

restriction imposed." *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006).

Nor could Defendants meet their burden. "Supreme Court precedent firmly establishes that the First Amendment does not countenance a heckler's veto" and "[p]unishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose." *Bible Believers,* 805 F.3d at 248 (collecting cases).

State Defendants' contention that the campus venues are limited public fora is a distinction without a difference. Plaintiffs used the relevant fora for exactly what the University established those fora to do—facilitate registered student organization speech in the marketplace of ideas. Thus, strict scrutiny applies, which cannot be met. Neither was State Defendants' conduct viewpoint-neutral or reasonable.

The Supreme Court in *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819 (1995) described viewpoint discrimination as an "egregious" subset of content discrimination that occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," and noted that such a violation of the First Amendment is "all the more blatant." 515 U.S. at 829 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)). The "heckler's veto is precisely that type of odious viewpoint discrimination." *Bible Believers*, 805 F.3d at 248. And viewpoint discrimination is "impermissible even in a limited public forum." *Ctr. For Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 430 n.2 (W.D.N.Y. 2017) (citing *Rosenberger*, 515 U.S. at 828–29). Indeed, this Court has recognized that "the case law is clear that 'the First Amendment does not permit a heckler's

veto.'" *Deferio,* 306 F. Supp. 3d at 516 (quoting *Bible Believers*, 805 F.3d at 252).

Here, State Defendants were personally involved in the violation of Plaintiffs' constitutional rights by endorsing the heckler's veto through unreasonable viewpoint discrimination. The evidence shows that State Defendants canceled Plaintiffs' tabling event because they viewed it as "intend[ing] to be provocative" (*see* Pltfs' Resp. to Rose's SOMF at ¶ 115), and because some found it offensive (*see* Pltfs' Resp. to Stenger's SOMF at ¶ 97; Pltfs' Resp. to Rose's SOMF at ¶ 132; Pltfs' Resp. to Pelletier's SOMF at ¶ 131; Pltfs' Add'l SOMF at ¶¶ 17, 37). Discriminating against speech because it is provocative or because some find it offensive is "the 'essence of viewpoint discrimination.'" *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

Contrary to Rose's contention that he was not personally involved in the Tabling Event, Rose admits that he traveled to the Tabling Event (*see* Dkt. No. 313-47 at ¶¶ 108–109) and the evidence confirms that he observed the College Progressives mob, and intentionally chose to not intervene when, pursuant to the Speech Suppression Policy created by University administration including himself and Stenger, UPD removed College Republicans but left the disruptors alone. (*See* Pltfs' Resp. to Rose SOMF at ¶¶ 103, 105–13, 115–17.) Indeed, Rose personally issued a public statement following the Tabling Event, but before the Laffer Event, in which he publicly promised impunity to the violent mob that had attacked the College Republicans, while castigating the victims of those attacks for exercising their free speech rights to argue for the defense of other constitutionally guaranteed rights. (*See id.* at ¶¶ 115, 117.) Rose's message in advance of the Laffer Event demonstrates

the Speech Suppression Policy in action in his message to the violent mob led by the College Progressive: if you attack College Republicans and threaten violence, you will not be disciplined, but if College Republicans speak, then the government will shut them down to avoid the political consequences of facing the very same angry mob whom Defendants' own actions encouraged. Indeed, that is exactly what happened after the Laffer Event when College Progressives and others shut down the speech and were spared any punishment by the University, as intended.

The evidence also confirms that State Defendants encouraged and facilitated those who disagreed with the message of the Laffer Event, and ultimately shut down that event because of the hostile reaction (*see* Pltfs' Resp. to Pelletier SOMF at ¶¶ 78–79, 81, 83, 85, 88, 93, 96, 105–08, 114, 125; Pltfs' Resp. to Rose SOMF at ¶¶ 132, 138, 141, 150–52, 155, 162–63), which allowed the politically-motivated mob to dictate who could speak on campus. Indeed, the evidence shows that Rose encouraged Pelletier to dissuade Dr. Laffer from speaking on campus, observed the Laffer Event in real time, and then decided not to intervene despite noting UPD's lack of response. (*See* Pltfs' Resp. to Pelletier SOMF at ¶¶ 79(b), 93, 105–08, 114, 125; Pltfs' Resp. to Rose SOMF at ¶¶ 132, 140–41, 150–52, 155, 162–63.)

State Defendants' purported security concerns show exactly how they enforced a heckler's veto. "When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals." *See Bible Believers*, 805 F.3d at 252–53 (citing *Watson v. City of*

*Memphis*, 373 U.S. 526, 535-36 (1963)). "Nor can an officer sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule—only later to claim that the speaker's removal was necessary for his or her own protection." *Id.* But that is exactly what State Defendants did.

UPD effectuated a heckler's veto by enforcing Defendants' Speech Suppression Policy to remove Dr. Laffer after the mob had already twice drowned him out. (*See* Pltfs' Resp. to Pelletier SOMF at ¶¶ 81, 105–08, 114, 125; Pltfs' Resp. to Rose SOMF at ¶¶ 132, 150–52, 155, 162–63.) The evidence shows that PLOT and College Progressives attacked Plaintiffs' viewpoints because they linked those views with those of the Trump administration. (*See* Pltfs' Resp. to Rose SOMF at ¶¶ 150–51.) Indeed, before Dr. Laffer could even get to the topic of his discussion, the disruptor with a megaphone shouted, "We are tired of being oppressed and we are tired of getting murdered by this [Trump] Administration. . . . [t]hat you, this man, this liar, Arthur Laffer, supports." (*See id.*; *see also* Dkt. No. 307-55.)[5]

Defendants' actions and Speech Suppression Policy are also unreasonable given the nature of the lecture hall, the University's purpose as a marketplace of ideas, and the University's policy and practice of opening up the lecture hall to all types of registered student organization-sponsored speakers without restriction. (*See* Pltfs' Resp. to SA SOMF at ¶ 4.) For all these reasons, State Defendants fail to meet their burden of showing the absence of genuine disputes of material fact and

---

[5] The video of the Tabling Event was submitted to the Court on a USB drive. (See Dkt. No. 315.) Another video of the Laffer Event is also available on YouTube at https://www.youtube.com/watch?v=eTqlmDar_hg&t=44s.

entitlement to summary judgment on Plaintiffs' speech suppression claim.

### B. <u>State Defendants are not entitled to summary judgment on Plaintiffs' equal protection claim.</u>

"[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). And here, the evidence shows that State Defendants were personally involved in denying Plaintiffs equal protection of the law when they applied and enforced the Speech Suppression Policy and treated Plaintiffs' speech differently than others who were similarly situated. *See supra*; *see also Plyler v. Doe*, 457 U.S. 202, 216 (1982) (noting the Equal Protection Clause "directs that 'all persons similarly circumstanced shall be treated alike'"). By enforcing the Speech Suppression Policy, and thereby ratifying and effectuating a heckler's veto and permitting and joining disruptors (including College Progressives and PLOT) intent on suppressing Plaintiffs' speech, State Defendants deprived Plaintiffs' freedom of speech based on viewpoint. In doing so, State Defendants treated College Progressives and PLOT's views more favorably than those of Plaintiffs and Dr. Laffer.

Thus, the Court should deny summary judgment to State Defendants on Plaintiffs' equal protection claim. *See Cole-Hatchard v. Hoehmann*, 2020 WL 5645815, at *13 (S.D.N.Y. Sept. 21, 2020) ("Having denied defendants' motion for summary judgment with respect to plaintiff's First Amendment retaliation claims, defendants' motion is also denied to the extent it seeks summary judgment on

plaintiffs' equal protection claim."); *McNichol v. Falco*, 2020 WL 5802492, at *14 (S.D.N.Y. Sept. 28, 2020) (same).

### C. **<u>Defendants Stenger, Rose, and Student Association are not entitled to summary judgment on Plaintiff College Republicans's unconstitutional retaliation claim.</u>**

Stenger, Rose, and Student Association unconstitutionally retaliated against College Republicans by (i) depriving College Republicans of the ability to receive university funding and reserve rooms to host expressive events, and (ii) suspending College Republicans while failing to hold PLOT and College Progressives accountable for disrupting the Tabling and Laffer Events. (*See* Dkt. No. 262 at ¶¶ 141, 167, 169.)

To prevail on this claim at trial, College Republicans must show that (1) they have an interest protected by the First Amendment, (2) Stenger's, Rose's, and Student Association's actions were motivated by or substantially caused by College Republicans' exercise of their First Amendment rights, and (3) Stenger's, Rose's, and Student Association's actions chilled the exercise of Plaintiffs' First Amendment rights. *Kerman v. City of N.Y.*, 261 F.3d 229, 241–42 (2d Cir. 2001) (reversing summary judgment to defendant on First Amendment retaliation claim).

No Defendant disputes that College Republicans have a First Amendment interest in remaining a recognized student group. Nor could they. *See Amidon*, 508 F.3d at 100. And as detailed below, when the court reviews the evidence and "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn" in favor of Plaintiffs, *Molina*, 697 F. Supp. 2d at 281, Stenger, Rose, and Student Association fail to meet their burden of demonstrating no genuine issue of material fact on the other two elements, *Marvel Characters,* 310 F.3d at 286.

### 1. Genuine disputes of material fact preclude summary judgment to Stenger and Rose.

Stenger and Rose fail to establish entitlement to summary judgment on Plaintiffs' unconstitutional retaliation claim.[6] Contrary to Stenger's and Rose's argument (*see* Dkt. Nos. 308-46 at 22-23, 313-48 at 21-22), New York regulations and material facts establish their authority over, and close personal involvement in, retaliatory actions against College Republicans and corresponding failure to hold PLOT and College Progressives accountable.

Under New York law, "[n]o student . . . shall be subject to any limitation or penalty solely for the expression of his views nor for having assembled with others for such purpose." N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.4(a). Moreover, "[n]o person, either singly or in concert with others, shall . . . (i) . . . deliberately interfere with the freedom of any person to express his views, including invited speakers; . . . [or] (l) take any action, create, or participate in the creation of, any situation which recklessly or intentionally endangers mental or physical health." *Id.* at §§ 535.3(i), (l). Organizations operating on SUNY campuses are "prohibited from authorizing the conduct described" in § 535.3(l). *See id.* at § 535.10(a) And any student that violates these rules "shall . . . be subject to expulsion or such lesser disciplinary action as the facts of the case may warrant," *id.* at § 535.5(c), and any organization that violates § 535.3(l) "shall be subject to the rescission of permission

---

[6] Rose argues that YAF's claim for retaliation must be dismissed (Dkt. No. 313-48 at 23), but YAF does not assert a retaliation claim (Dkt. No. 262 at ¶¶ 165-69 (alleging retaliation against only College Republicans).

to operate upon the campus," *id.* at § 535.10(c). Notably, the chief administrative officer (or any designees)—*i.e.,* Stenger (the President) and Rose (the Vice President of Student Affairs)—"shall be responsible for the enforcement of these rules." *See id.* at § 535.7(a), § 535.10(b). Thus, as a matter of New York law, Stenger and Rose had the duty to enforce rules protecting student speech and also enforce disciplinary action against student violators. (Pltfs' Add'l SOMF at ¶ 5; Pltfs' Resp. to Stenger SOMF at ¶ 15.)

Stenger's and Rose's attempt to evade liability for their conduct by hiding behind the Student Association is also belied by the evidence, which shows their close personal involvement. After the Laffer Event, Pelletier presented Stenger and Rose with a list of ten positively identified suspects from the Laffer Event whom Pelletier recommended for arrest based on the professional judgment of UPD officers at the scene. (Pltfs' Resp. to Rose SOMF at ¶ 173.) That list included the vice president of College Progressives and a leader of PLOT. (*See id.*) Rose argued in blatantly politically-motivated terms that the Defendants wanted to avoid the political consequences of making the arrests, in particular the arrest of one of the College Progressive ringleaders since "she will be a lightning rod for more reaction from Progressives and their allies (*e.g.*, PLOT) when she is arrested." (*Id.*) And Rose further recognized the "arrest and charging of additional students will likely trigger a reaction from the Progressives and allies who will likely frame it as police/administration hostility toward students of color." (*Id.*)

Ultimately, Stenger ordered that no suspects be arrested and that no further

disciplinary action be pursued by him or Rose. (*See id.* at ¶¶ 132, 173-74, 180-81; *see also* Pltfs' Resp. to Stenger SOMF at ¶ 96; Pltfs' Resp. to Pelletier SOMF at ¶ 131.) Rose personally supported Stenger's direction to override the line police officers' professional judgment to arrest ten disruptors (Pltfs' Resp. to Rose SOMF at ¶ 173, 180-81), and thus enforced the Speech Suppression Policy by granting impunity to the disruptors. As a result of Stenger's order that no suspects be arrested, the University took ***zero*** disciplinary action against any of the identified disruptors (*id.* at ¶¶ 173; Pltfs' Resp. to Stenger SOMF at ¶ 48)—despite Stenger's admitted inability to imagine a situation where student conduct subject to arrest would not also require university disciplinary action (Pltfs' Resp. to Stenger SOMF at ¶ 48).

Rose admitted the College Progressives encouraged students to violate university policies. (Pltfs' Resp. to Rose SOMF at ¶ 117.) In contemporaneous documents, Rose even described College Progressives' written notice of their intended disruption as "smoking gun" evidence of that violation. (*Id.*) Rose also conceded that College Progressives violated university rules by inciting and participating in the disruption of the Laffer Event, and that he and Stenger had the ability (and responsibility) to personally override the Student Association's action or inaction on student organization discipline, and that he was concerned the Student Association's reluctance to discipline College Progressives took account of race. (Pltfs' Resp. to Rose SOMF at ¶ 190; *see id.* (a leader in Student Association conceded to Rose that Student Association was "afraid to take action against the Progressive[s] because [Student Association Leadership] were white and they were afraid of being painted

as racist").) Rose told College Republicans that he and Stenger believed that College Progressives encouraged students to violate University policies and that College Progressives would need to respond. (*Id.*) The juxtaposition between the termination of the College Republicans' club status with the complete failure to take any action against the College Progressives who "were active in encouraging disruption of the Laffer event" (*id.* at ¶ 173), shows the suppression of Plaintiffs' disfavored speech.

State Defendants had power to manage discipline of student organizations. (*See id.* at ¶¶ 7, 10-12; Pltfs' Resp. to Stenger SOMF at ¶¶ 7, 12, 15, 21-22, 26; N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.10.) Moreover, Rose supervised and was responsible for the Office of Student Conduct, which exercises the authority to discipline students. (Pltfs' Resp. to Rose SOMF at ¶ 7.) Still, State Defendants refused to override the Student Association's discriminatory decisions, despite Rose even acknowledging that the punishment of the College Republicans (as opposed to the impunity accorded the College Progressives) could be understood as "viewpoint discrimination" and "politically motivated." (*Id.* at ¶ 190.) Whereas, State Defendants judged that taking action to punish the College Republicans would incur no political consequences that State Defendants considered meaningful. By contrast, on November 19, 2019, the day after the Laffer Event, Student Association informed College Republicans of their suspension. (Pltfs' Resp. to SA SOMF at ¶ 10.)

A reasonable jury could infer from these facts that State Defendants retaliated against College Republicans because their protected speech "was followed closely by discriminatory treatment," or directly "through evidence of retaliatory animus."

*Wang v. Bethlehem Cent. Sch. Dist.*, 2022 WL 3154142, at *21 (N.D.N.Y. Aug. 8, 2022) (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297, 319 (2d Cir. 2015)). At minimum, genuinely disputed material facts related to causation preclude summary judgment.

In one sentence each, Stenger and Rose argue there was no adverse action against College Republicans. This argument is undeveloped, unavailing, and belied by the evidence. Stenger relies on *Toran v. Cnty. of Nassau*, but that court dismissed on the pleadings a failure to investigate claim because the plaintiff did not even allege that the government inadequately investigated or refused to accept her criminal complaint. 2024 WL 1158982, at *7 (E.D.N.Y. Mar. 18, 2024). And without more, Rose argues that none of the sanctions inflicted on Plaintiffs are adverse actions because they would not "deter a similarly situated person from exercising his or her constitutional rights." (Dkt. No. 313-48 at 21-22.) But as they concede, College Republicans need only show that Defendants' actions caused it "some injury." (Dkt Nos. 308-46 at 22, 313-48 at 21). The record abounds with evidence of the injury to College Republicans that would deter it from exercising its First Amendment rights in the future. (*See, e.g.*, Pltfs' Resp. to SA SOMF at ¶ 10 (loss of reservation privileges); Pltfs' Add'l SOMF at ¶ 13 (loss of funding).)

### 2. <u>Genuine disputes of material fact preclude summary judgment to Student Association.</u>

Student Association makes factual contentions in support of its motion. But none are supported by any legal authority, and genuine disputes of material fact preclude granting summary judgment to Student Association.

First, Student Association argues it is entitled to summary judgment because

it "acted consistently" with its "policies and those of the university regarding tabling/reservation requirements." (Dkt. No. 311-31 at 8.) But this is irrelevant to, and completely ignores, the central inquiry: whether Student Association's actions were "motivated by or substantially caused by" College Republicans' exercise of their First Amendment rights. *Kerman*, 261 F.3d at 241-42. Regardless of whether Student Association acted consistently with applicable tabling/reservation policies, summary judgment is not appropriate here because a reasonable jury could find that Student Association's enforcement of such policies was motivated or substantially caused by College Republicans' viewpoints. Indeed, Student Association terminated the College Republicans' club status yet took ***zero*** action against College Progressives (Pltfs' Resp. to SA SOMF at ¶ 10; Pltfs' Resp. to Rose SOMF at ¶ 117), and a Student Association leader even conceded to Rose that Student Association was "afraid to take action against the Progressive[s] because [Student Association Leadership] were white and they were afraid of being painted as racist" (Pltfs' Resp. to Rose SOMF at ¶ 190).

Student Association also creates a dispute of material fact. Contrary to its assertions, Rose admitted that "College Republicans were permitted to be on the Spine and engage in speech" (Dkt. No. 313-47 at ¶ 86), and quarreled only that the use of physical tables was restricted by Student Association rules. But the use of tables quickly became irrelevant anyway since, as the police under Pelletier's command admitted, the mob quickly collapsed the tables and College Republicans packed them up but wished to continue exercising their free speech rights in the face

of the mob's violent assault. (Pltfs' Resp. to Pelletier SOMF at ¶ 62.)

Second, Student Association argues there is "no evidence" that the decision not to sanction the College Progressives was "made in retaliation for the College Republicans' conservative views." (Dkt. No. 311-31 at 10.) But again, the Student Association creates a dispute of material fact because, as noted above, a Student Association leader conceded to Rose that Student Association was afraid to take action against the College Progressives for fear of being "painted as racist." (Pltfs' Resp. to Rose SOMF at ¶ 190.)

In sum, numerous genuine issues of material fact preclude summary judgment on Plaintiffs' substantive claims under the First and Fourteenth Amendments.

## II. State Defendants are not entitled to summary judgment on their damages-based defenses to Plaintiffs' individual capacity claims.

Plaintiffs assert the following claims against State Defendants in their individual capacities: Stenger for unconstitutional retaliation (Count II) related to the Tabling Event and Laffer Event; Rose for unconstitutional speech suppression (Count I), retaliation (Count II), and denial of equal protection (Count VI) related to the Tabling Event and Laffer Event; and Pelletier for speech suppression (Count I) and denial of equal protection (Count VI) related to the Laffer Event.[7]

State Defendants seek summary judgment on these individual capacity claims on only two grounds: (1) lack of personal involvement, and (2) qualified immunity.

[7] The Court denied Pelletier's motion to dismiss claims of speech suppression and denial of equal protection against him in his individual capacity. (Dkt. No. 70 at 33.) The Court later reinstated all individual capacity claims against Rose as well as the retaliation claim against Stenger in his individual capacity. (Dkt. No. 261 at 19.)

Notably, these defenses apply ***only*** to claims for damages; not to claims for declaratory and injunctive relief. (*See Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999) ("Qualified immunity shields the defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief."); Dkt. No. 70 at 16 n.2 (noting "[p]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983").) For the reasons below, the Court should deny summary judgment to State Defendants on their *damages*-based defenses.

### A. **State Defendants were personally involved in the violation of Plaintiffs' constitutional rights.**

In this Section 1983 case alleging constitutional violations, Plaintiffs need only show that Defendants "directly participated in the infraction," "failed to remedy the wrong" after learning about it, or "created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Those factors do not show a "special rule for supervisor liability" (*contra* Dkt. 308-46 at 27), but instead establish independent First and Fourteenth Amendment violations. The evidence shows that Stenger and Rose were personally involved in the violation of Plaintiffs' constitutional rights. *See supra*, Sections I.A (unconstitutional speech suppression), I.B (denial of equal protection), and I.C (retaliation).

The Court already found, assuming the truth of Plaintiffs' allegations, that Plaintiffs alleged "sufficient personal involvement to survive a futility analysis" as to Plaintiffs' First and Fourteenth Amendment claims. (*See* Dkt. No. 261 at 15-16.)

Because Plaintiffs' allegations of Stenger's and Rose's personal involvement are now supported by substantial evidence, there is no basis for granting summary judgment to Stenger or Rose on their lack of personal capacity defense to damages. And by not raising lack of personal involvement, Pelletier waives this defense at summary judgment. *See Vargas v. APL Ltd.*, 431 F. Supp. 3d 82, 88 n.10 (E.D.N.Y. 2019) ("Because [defendants] do not raise this argument in their motion papers, the argument is waived for summary judgment purposes.") (citing *Velez v. Reynolds*, 325 F. Supp. 2d 293, 315 n.13 (S.D.N.Y. 2004)).

**B. Rose and Pelletier are not entitled to qualified immunity.**

The undisputed facts show that Rose and Pelletier are not shielded by qualified immunity. (Dkt. Nos. 313-48 at 23-26, 307-1 at 16-19.) Especially when this Court, as it must, "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn" in favor of Plaintiffs. *Molina*, 697 F. Supp. 2d at 281. By not raising qualified immunity, Stenger waives this defense at summary judgment. *See Vargas*, 431 F. Supp. 3d at 88 n.10 (citing *Velez*, 325 F. Supp. 2d at 315 n.13).

When qualified immunity is invoked at summary judgment, the Court must consider whether (1) the evidence makes out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)). Rose and Pelletier "bear the burden" of proving their qualified immunity defense. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). To be clearly established, no case must have held "the very action in question" unlawful. *Jackler v. Byrne*, 658 F.3d 225, 243 (2d Cir. 2011). Rather "the contours of the right"

need only be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (cleaned up).

Rose and Pelletier seek qualified immunity by importing their account of the facts—not by identifying the absence of any clearly established law on speech suppression in any fora. Additionally, qualified immunity should have no application here for two reasons. First, qualified immunity is an atextual and ahistorical doctrine that has no basis in law. *See Ziglar v. Abbasi*, 582 U.S. 120, 157–60 (2017) (Thomas, J., concurring in part and in the judgment). Second, University officials had ample time to consider their response to both the Tabling and Laffer Events. There is no reason why those officials "who have time to make calculated choices about" student discipline should "receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.).

**1. <u>Defendants cannot meet their qualified immunity burden because Plaintiffs' right to freedom from viewpoint discrimination in any fora is clearly established.</u>**

Rose and Pelletier have not (and cannot) meet their burden of showing Plaintiffs lacked a clearly established right to freedom from viewpoint discrimination. The law is clear: viewpoint discrimination is unconstitutional in *any* forum. *See Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir. 2001) ("[W]e will uphold a governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral."); *Child. First Found., Inc. v. Martinez*, 169 F. App'x 637, 639 (2d Cir. 2006) ("[I]t is clearly established that, even in a nonpublic forum, restrictions on speech must be reasonable and viewpoint neutral.") (citing *McDonald*, 280 F.3d at

169); *see also Johnson,* 859 F.3d at 171-76 (ruling, in light of fora analysis authorities, "right not to be excluded, based on viewpoint differences or because of possible annoyance" from limited public forum sports event "was clearly established")).

Despite binding Second Circuit precedent, Rose (the Vice President for Student Affairs) argues "there is not clearly established law within which for [him] to act," and then he vaguely asserts without specifics—based on *dicta* in a non-binding Fifth Circuit decision about elementary school students—that his actions "would not fall into the rare exceptions" of cases that clearly establish the disputed conduct as unconstitutional. (*See* Dkt. No. 313-48 at 24-25 (citing *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014).) The foregoing binding authorities refute both arguments.

Pelletier's argument fares no better. Instead of addressing the central inquiry—whether Plaintiffs' right to freedom from viewpoint discrimination in any fora is clearly established—Pelletier attempts to recast the law and focus on his actions, contending (summarily and without legal authority) that there is "no clearly established law prohibiting [him] from removing the source of the protestors' ire . . . to protect the safety of himself (Pelletier), his officers, Laffer, and plaintiffs." (Dkt. No. 307-1 at 19.) But the Supreme Court has said the opposite: "constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Watson*, 373 U.S. at 535. Indeed, free speech "best serve[s] its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949).

Thus, Rose and Pelletier fail to show the absence of a clearly established

right—which they are required to do to satisfy their qualified-immunity burden.

### 2. **The evidence shows Rose and Pelletier violated Plaintiffs' clearly established rights, and a reasonable jury could find their actions were not objectively reasonable.**

The evidence shows State Defendants violated Plaintiffs' clearly established right to freedom from viewpoint discrimination in any fora.[8] Against a background of clearly established law, the availability of qualified immunity "generally turns on the [defendant's conduct's] 'objective legal reasonableness.'" *Johnson,* 859 F.3d 156 at 170 (quoting *Anderson v. Creighton*, 483 U.S. 635, 693 (1987)).

Taking an exceedingly narrow view, Rose argues that Plaintiffs' "failure to intervene" theory fails because he lacked an affirmative duty to prevent a third party from violating constitutional rights. (*See* Dkt. No. 313-48 at 25 (citing *Musso v. Hourigan*, 836 F.2d 736, 743 (2d Cir. 1988).) But Plaintiffs' claim is not based upon a single act, but rather the Speech Suppression Policy and Rose's course of conduct under that Policy. Rose witnessed the violations of Plaintiffs' constitutional rights and even ratified and condoned the disruptive tactics of the protestors (including by publicly announcing that there would be no punishment for disruption of the Tabling Event and by affirmatively providing College Progressives a staging ground from which to launch their disruption of the Laffer Event). *See supra*, Sections I.A–I.C. "[A] speech burden based on audience reactions is simply government hostility and

[8] At minimum, there is a genuine dispute of material fact as to whether State Defendants violated Plaintiffs' clearly established constitutional rights, which precludes summary judgment. *See Reynolds v. Vill. of Chittenango*, 2023 WL 6460417, at *11 (N.D.N.Y. Oct. 4, 2023) ("[B]ecause defendants' argument that they are entitled to qualified immunity relies on material facts that are in dispute, summary judgment is precluded and the motion is denied in this respect.").

intervention in a different guise"—"[t]he speech is targeted, after all, based on the government's disapproval of the speaker's choice of message." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018).

Pelletier unpersuasively argues it would have been objectively reasonable for him "to believe that Laffer could be escorted away for everyone's safety." (Dkt. No. 307-1 at 19.) But as explained above, State Defendants cannot use alleged security concerns as a pretext to ratify viewpoint-based heckler's vetoes. Indeed, "Supreme Court precedent firmly establishes that the First Amendment does not countenance a heckler's veto," and "[w]hen a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals." *See Bible Believers*, 805 F.3d at 252–53 (citing *Watson*, 373 U.S. at 535-36); *see also Manfredonia v. Barry*, 401 F. Supp. 762, 768 (E.D.N.Y. 1975) ("[A] police officer has the duty not to ratify and effectuate a heckler's veto nor may he join . . . (those) intent on suppressing ideas.") (quoting *Glasson v. City of Louisville*, 518 F.2d 899, 906 (6th Cir. 1975)); *Dunlap v. City of Chi.*, 435 F. Supp. 1295, 1298 (N.D. Ill. 1977) ("Section 1983 imposes an affirmative duty upon police officers to protect speakers who are airing opinions which may be unpopular."); *see also Peck v. United States*, 470 F. Supp. 1003, 1016 (S.D.N.Y. 1979) (acknowledging that case law "speak[s] of a duty of local law enforcement officers owed to private citizens to protect them in the exercise of their constitutional rights of expression" under § 1983 "inasmuch as failure to protect would be state action interfering with plaintiff's

constitutional rights").

Because a reasonable jury could find that Rose's and Pelletier's conduct in suppressing Plaintiffs' clearly established constitutional rights was not objectively reasonable, summary judgment on qualified immunity grounds is inappropriate.

## III. State Defendants are not entitled to summary judgment on any of their defenses to Plaintiffs' official capacity claims.

Plaintiffs assert claims against each of the State Defendants in their *official* capacities for unconstitutional suppression of speech and retaliation under the First Amendment (Counts I and II) and denial of equal protection under the Fourteenth Amendment (Count VI).[9] For the reasons below, the Court should deny State Defendants' summary judgment motions on the official capacity claims.[10]

### A. State Defendants violated Plaintiffs' constitutional rights under the unwritten Speech Suppression Policy.

To be held liable under Section 1983 in an official-capacity suit, the governmental entity's "'policy or custom' must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978)). When declaratory and injunctive relief are sought against a state official in their official capacity, "[a]ll that

---

[9] The Court previously denied State Defendants' motion to dismiss these claims. (*See* Dkt. No. 70 at 32-33.)

[10] Plaintiffs have never pursued damages against State Defendants in their official capacity. Rather, Plaintiffs have always sought "a judgment awarding nominal, compensatory, and punitive damages against Defendants Stenger, Rose, and Pelletier in their ***individual capacities only***." (Dkt. No. 262 at ¶ 3 (emphasis added); *see also id.* at ¶ 7 and p.41 at ¶ (G); *see also* Dkt No. 1 at ¶ 3; *id.*, p.41 at ¶ (G).) State Defendants' arguments that Plaintiffs cannot recover damages on their official capacity claims (*see* Dkt. No. 307-1 at 12; Dkt. No. 308-46 at 11; Dkt No. 313-48 at 13) are thus irrelevant and provide no basis to grant summary judgment.

a Plaintiff must show is that the official had: (1) a direct connection to, or responsibility for, the alleged illegal actions; and (2) the authority to perform the required act." (Dkt. No. 70 at 16 n.2 (quoting *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 102–03 (N.D.N.Y. 2013) (Kahn, J.) (cleaned up)).

As detailed above, *see supra*, Sections I.A–I.C, the evidence shows that Stenger and Rose created and enforced the Speech Suppression Policy to violate Plaintiffs' constitutional rights. Under the Speech Suppression Policy, University officials, including State Defendants, were authorized to prohibit, chill, oppose, and shut down speech with which they, or other students and faculty, disagree. And State Defendants applied the Speech Suppression Policy against Plaintiffs, and Stenger and Rose have the ability to amend or repeal their application of the Speech Suppression Policy. N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.10.

**B. <u>State Defendants' other arguments are unavailing.</u>**

First, Stenger incorrectly argues that Plaintiffs cannot rely on the SUNY-Buffalo Settlement. (Dkt. No. 308-46 at 25.) But there can be no dispute that the SUNY-Buffalo Settlement ***is*** admissible to show State Defendants had actual or constructive knowledge of their legal obligation to "take all reasonable measures to enforce its policies against deliberately disrupting or preventing the freedom of any person to express his or her views." (*See* Pltfs' Add'l SOMF at ¶ 4; Pltfs' Resp. to Stenger SOMF at ¶¶ 106-08; *see Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008) ("A consent decree may properly be admitted to demonstrate that a defendant was aware of its legal obligations.") (citing *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (explaining civil settlements are akin to consent decrees,

which are admissible "for other purposes" under Rule 408)).)[11]

Second, State Defendants wrongly seek summary judgment under the Eleventh Amendment on grounds that Plaintiffs' allegations are not sufficient to establish a "policy or custom." (*See* Dkt. No. 308-46 at 24-25; Dkt. No. 313-48 at 11-12; Dkt. No. 307-1 at 13-14.) But sufficiency-of-allegations arguments[12] are moot at summary judgment, particularly because Plaintiffs' allegations are now supported by evidence (as detailed above) that shows at least a genuine dispute of material fact over the existence of the Speech Suppression Policy. *See supra,* Sections I.A–I.C. As such, State Defendants' cases involving *municipalities* at the pleading-stage[13] do not

[11] Stenger's other cases are overstated, inapposite, and/or do not support summary judgment. The language quoted by Stenger does not appear anywhere in *Tieman v. City of Newburgh*, and in any event that case involved the sufficiency of allegations at the pleading stage and does not support summary judgment here. 2015 WL 1379652 (S.D.N.Y. Mar. 26, 2015). While Stenger cites *Levick v. Maimonides Med. Ctr.* as "holding a settlement agreement is inadmissible under FRE 403 and 408," there, the court merely referenced in *dicta* —when ruling on a motion to compel discovery—that settlement agreements are "often excluded" or "generally held to be inadmissible. 2011 WL 1673782, at *2 (E.D.N.Y. May 3, 2011). In any case, and to Plaintiffs' point above, *Trebor Sportswear Co., Inc. v. Ltd. Stores, Inc.* recognizes that offers of compromise are admissible if "offered for 'another purpose,' *i.e.*, for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle." 865 F.2d 506, 510 (2d Cir. 1989) (citing Fed. R. Evid. 408(b)).

[12] State Defendants did not raise this argument in their motion to dismiss (*see* Dkt. No. 32-2), and the Court allowed Plaintiffs' claims against State Defendants in their official capacities to proceed (*see* Dkt. No. 70 at 32-33).

[13] *See* Dkt. No. 308-46 at 24-25 (citing *Montero v. City of Yonkers, New York*, 890 F.3d 386 (2d Cir. 2018); *McClean v. Cnty. of Westchester*, 2018 WL 6329420 (S.D.N.Y. Dec. 3, 2018); *Mandel v. Bd. of Trustees of California State Univ.*, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018); *Tieman v. City of Newburgh*, 2015 WL 1379652 (S.D.N.Y. Mar. 26, 2015)); Dkt. No. 313-48 at 11 (citing *Dubois v. Beaury*, 2021 WL 3207101, at *6 (N.D.N.Y. July 29, 2021)); Dkt. No. 307-1 at 13-14 (citing *Montero v. City of Yonkers, New York*, 890 F.3d 386, 403-04 (2d Cir. 2018); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991); *Santiago v. City of Rochester*, 2022 WL

support summary judgment in favor of the *State* Defendants under the Eleventh Amendment. Indeed, as this Court has recognized, the "requirement that a ***municipality*** cannot be held liable under § 1983 unless the violation of an individual's rights was the result of a custom or policy . . . ***has no bearing on states' sovereign immunity under the Eleventh Amendment***." *Rother*, 970 F. Supp. 2d at 90 n.14 (citing *Monell*, 436 U.S. at 690–695 (emphases added)).

Finally, Stenger and Rose argue they lack authority to both reinstate College Republicans as a registered student organization and recognize the Young Americans for Freedom chapter as a registered student organization, and thus these remedies are not applicable to them. (Dkt. No. 308-46 at 14-15; Dkt. No. 313-48 at 28.) Rose also argues he did not have "state law authority to adopt rules for the conduct of the State government." (Dkt. No. 313-48.) These are obviously wrong since, as the government-appointed President of SUNY-Binghamton, Stenger has plenary power over all student organizations, *see* N.Y. Comp. Codes R. & Regs. Tit. 8, § 535.10, and Stenger's delegation of this power to the Student Association for certain purposes (*see* Pltfs' Resp. to Stenger SOMF at ¶¶ 21–22) does not change this result. And indeed, Rose admitted under oath that he and Stenger have the power to withhold Student Association funds entirely and have the direct power to discipline student organizations, separate and apart from the Student Association. (*See id.*; *see also* Pltfs' Resp. to Rose SOMF at ¶¶ 7, 10–12.) Thus, there is at least a genuine dispute

856780, at *4 (W.D.N.Y. Mar. 23, 2022); *McClean v. Cnty. of Westchester*, 2018 WL 6329420 (S.D.N.Y. Dec. 3, 2018)).

of material fact regarding Stenger's and Rose's reinstatement authority.

### C. <u>State Defendants are not entitled to summary judgment on any of their remedies-based defenses to official capacity claims.</u>

Under the doctrine of *Ex parte Young*, Plaintiffs "may seek prospective injunctive and declaratory relief to address an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future." *Trello v. McKeighan*, 624 F. Supp. 3d 150, 155 (N.D.N.Y. 2022); *Williston v. Eggleston*, 379 F. Supp. 2d 561, 578 (S.D.N.Y. 2005) ("[W]here Plaintiffs allege an ongoing violation of federal law, prospective relief may take the form of declaratory as well as injunctive relief."). A "straightforward inquiry," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002), shows that Plaintiffs are entitled to pursue the prospective injunctive and declaratory relief that they have sought from the start of this case.

State Defendants seek dismissal of this relief under the Eleventh Amendment (*See* Dkt. No. 307-1 at 12; Dkt. No. 308-46 at 12; Dkt No. 313-48 at 13.) The Court should reject their distorted reading of the Amended Complaint. Plaintiffs give adequate notice of the specific conduct they seek to permanently enjoin:

A. Permanently enjoin Defendants from disrupting and silencing Plaintiffs' speech and related activities;

B. Permanently enjoin Defendants Stenger, Rose, and the new chief of UPD from ratifying heckler's vetoes or otherwise enforcing the Speech Suppression Policy;

C. Permanently enjoin Defendants Stenger, Rose, and Student Association from retaliating against Plaintiffs' expressed views;

D. Order Stenger, Rose, and Student Association to reinstate College Republicans as a registered student organization with all rights; and

E. Order Stenger, Rose, and Student Association to recognize the Young

Americans for Freedom chapter as a registered student organization. (*See* Dkt. No. 262 at 41.) Defendants' unconstitutional Speech Suppression Policy remains in effect. College Republicans and YAF had live claims to be reinstated and recognized as registered student organizations, respectively, and Plaintiffs fear "returning speakers to the SUNY-Binghamton campus absent a court order enjoining Defendants from continuing their pattern of illegal and unconstitutional conduct." (Dkt. No. 262 at ¶ 155; *id.* at ¶¶ 24, 154.) Indeed, only a few years before the Tabling and Laffer Events, SUNY stipulated and agreed under the SUNY-Buffalo Settlement to "take all reasonable measures to enforce its policies against deliberately disrupting or preventing the freedom of any person to express his or her views," though Stenger admitted he was not aware of the contents of the SUNY-Buffalo Settlement. (Plfts' Add'l SOMF at ¶ 4; Pltfs' Resp. to Stenger SOMF at ¶¶ 106-08.) Conspicuously, none of the State Defendants attest that the SUNY-Buffalo Settlement was enforced or adhered to at SUNY-Binghamton at the time of the Tabling and Laffer Events, let alone in the time since.

Plaintiffs also have viable declaratory relief claims because courts properly issue declaratory judgments for past violations of constitutional rights and because Plaintiffs' declaratory relief claims are tied to live equitable claims. First, courts can properly award "retrospective declaratory relief" for "Defendants' past conduct," *BD v. DeBuono*, 130 F. Supp. 2d 401, 430 (S.D.N.Y. 2000), and "a declaration is a permissible prelude to a claim for damages," *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 369 (7th Cir. 2012).

Second, "[d]eclaratory judgments form part of the injunctive relief allowed for"

under *Ex parte Young*, particularly when declaratory relief is paired with injunctive relief. *See Brown v. New York*, 975 F. Supp. 2d 209, 225 (N.D.N.Y. 2013) (ruling declaration that a statute was unconstitutional was prospective, where plaintiff requested order enjoining "continued effectuation" of same statute) (citing *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 744-46 (W.D. Tenn. 2012) (ruling declaration that state law provisions were unconstitutional under federal law was prospective, where plaintiff requested injunction prohibiting enforcement of same state law provisions); *see also Williston,* 379 F. Supp. 2d at 571 (ruling declaration that defendant had policy and practice that violated law was prospective where plaintiff alleged ongoing violation of federal law).

It is thus clear that an order declaring that Defendants violated Plaintiffs' clearly established constitutional rights by enforcing and applying the Speech Suppression Policy would give effect to a corresponding order enjoining such unconstitutional conduct in the future. None of the cases cited by State Defendants change this common sense understanding of equitable remedies, much less support their request to prematurely dismiss Plaintiffs' remedies before trial.[14]

[14] Stenger and Pelletier cite *Pierre v. N.Y. State Dep't of Corr. Servs.*, where plaintiff's claims under the Americans With Disabilities Act were barred under the Eleventh Amendment because plaintiff alleged a single incident of disability discrimination "in conjunction with" "conclusory language requesting unspecified injunctive relief." 2009 WL 1583475, at *18 (S.D.N.Y. June 1, 2009). Pelletier and Rose rely on *Levine v. New York State Police*, in which the court ruled (at the pleading stage) that certain state defendants were immune because ongoing violations were not plausibly alleged and plaintiff merely requested "injunctive and declaratory relief and such other relief as this [c]ourt deems equitable." 2022 WL 4465588, at *11 (N.D.N.Y. Sept. 26, 2022). And Stenger cites *Quinn v. Green Tree Credit Corp.*, which concerned the "continuing violation" exception for the limitations period to bring a

State Defendants' motions on this point should thus be denied.

## IV. <u>Defendants are not entitled to summary judgment on any of their other arguments.</u>

### A. <u>Plaintiffs do not seek "obey-the-law" injunctions and, in any case, State Defendants' challenge is premature.</u>

As detailed above, Plaintiffs give adequate notice of the specific conduct they seek to permanently enjoin. Same as earlier in this case, State Defendants prematurely attempt to dismiss such relief as lacking requisite specificity under Federal Rule of Civil Procedure 65(d). (*See* Dkt Nos. 308-46 at 26, 313-48 at 27-28, 307-1 at 30-32; *see also* Dkt. No. 32-2 at 25-26.)

Under *Chachkes* and *A-1 Jewelry*, the Court previously declined to address as premature the same "obey-the-law" injunction arguments raised here by State Defendants. (*See* Dkt. No. 70 at 31 (citing *Chachkes v. David*, 2021 WL 101130, at *14 (S.D.N.Y. Jan. 12, 2021); *City of N.Y. v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007).) The reasoning of *Chachkes* and *A-1 Jewelry* foreclose State Defendants' arguments as premature once again.

In *Chachkes*, the court rejected as "premature" the defendants' motion to dismiss injunction claims because the (i) plaintiff made clear those claims were merely "forms of relief" that he may be entitled to "should he prevail on his other claims," and (ii) plaintiff had not yet moved for an injunction. 2021 WL 101130, at *14. So too here, Plaintiffs have not moved for an interim injunction and instead seek

---

sex discrimination claim under Title VII of the Civil Rights Act of 1964 against a private employer. *See* 159 F.3d 759, 765-66 (2d Cir. 1998), *abrogation recognized, Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 103 (2d Cir. 2020).

a permanent injunction, as a form of relief, if they prevail on their substantive claims at trial. (*See* Dkt. No. 262 at ¶ 3.) And in *A-1 Jewelry*, the court rejected an argument that the injunctive relief sought was vague or unconstitutional because "[i]t is the court that will craft any remedy" and it is "[o]nly when that remedy has been determined" that defendants may "contest its application on grounds of vagueness or some other violation of Rule 65(d)." 247 F.R.D. at 353; *see also Yunus v. Robinson*, 2019 WL 168544, at *18 (S.D.N.Y. Jan. 11, 2019) (rejecting argument that injunctive relief claim was "impermissibly vague" because, "as a matter of law," it would be possible to "tailor sufficiently specific injunctive relief").

Because a "permanent injunction is ordinarily issued only 'after a full trial on the merits,'" *Chappell & Co. v. Frankel*, 367 F.2d 197, 203 (2d Cir. 1966), State Defendants' Rule 65(d) arguments remain premature at the summary judgment stage, *see Beebe v. Birkett*, 749 F. Supp. 2d 580, 599 (E.D. Mich. 2010) (denying summary judgment to defendant on plaintiff's claim for injunctive relief as "premature" given the "unresolved issues on the merits" and that plaintiff had not moved for an injunction) (citing *F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 323 (S.D.N.Y. 2008) (explaining that, where plaintiff's claims "have not been completely resolved on summary judgment, the scope of the permanent injunction that will ultimately issue is as yet undetermined and entry would be premature").

Contrary to Pelletier's assertion, the Eleventh Circuit's decision in *Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006) does not stand for the broad proposition that "obey-the-law" injunctions are "unenforceable in the context of First Amendment

Claims." (*See* Dkt. No. 307-1 at 32.) And even if *Elend* were binding on the Court, it is not analogous because the Eleventh Circuit rejected—in the context of an Article III standing challenge—a proposed injunction requiring that "the Secret Service shall ensure there's no violation of the First Amendment" because "[s]uch an injunction would merely command the Secret Service to obey the law." *Elend*, 471 F.3d at 1209–10. By contrast, Plaintiffs give adequate notice of the specific conduct they seek to permanently enjoin, which is plainly permissible at this stage. State Defendants' other non-binding and inapposite cases do not compel a different result.[15]

**B. <u>A reasonable jury could award punitive damages.</u>**

Pelletier attempts to strike Plaintiffs' request for punitive damages on grounds that (i) "as a matter of law the conduct at issue does not rise to the level warranting

[15] *See Rowe v. N.Y. State Div. of Budget*, 2012 WL 4092856, at *7 (N.D.N.Y. Sept. 17, 2012) (Kahn, J.) (rejecting—on motion to dismiss and cross-motion for leave to file amended complaint in Americans with Disabilities Act case—general request to enjoin defendants to cease "discriminatory/retaliatory" behavior and practices); *see also Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (vacating two paragraphs of issued permanent injunction, not as improper "obey-the-law" injunction, but on grounds of being "overbroad," "vague," and not "narrowly tailored" in violation of Rule 65(d)); *Burrell v. DOCCS*, 655 F. Supp. 3d 112, 134 (N.D.N.Y. 2023) (discussing "obey-the-law" injunction in *dicta*, but denying prison inmate's motion for preliminary injunction because plaintiff could not establish likelihood of success on merits of underlying claim and because injunctive relief request was moot); *Akinlawon v. Mayo*, 2024 WL 1053170, at *7 (N.D.N.Y. Mar. 11, 2024) (discussing "obey-the-law" injunction in *dicta*, but denying prison inmate's motion for injunctive relief as "inappropriate" because plaintiff's underlying claims were "dismissed for failure to state a claim" and those individuals had "been dismissed as defendants"); *Dublino v. McCarthy*, 2019 WL 2053829, at *20 (N.D.N.Y. May 9, 2019) (denying prison inmate's motion for preliminary injunction for "several reasons," including that plaintiff requested injunctive relief against non-parties, failed to show likelihood of success on the merits, and did not explain how requested injunctive relief bore any relationship to the remaining claims).

punitive damages," and (ii) the "deterrence objective cannot be satisfied" because Pelletier has retired from University PD. (Dkt No. 307-1 at 31–32.) Both arguments are meritless and should be rejected.

Punitive damages are available in a § 1983 action and Plaintiffs' "evidence ***need only be enough 'to permit the factfinder to infer*** that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference." *Cameron v. City of N.Y.*, 598 F.3d 50, 69 (2d Cir. 2010) (quoting *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 122 (2d Cir. 2006)) (emphasis added). If such evidence is presented, summary judgment is "inappropriate." *Abboud v. Cnty. of Onondaga, N.Y.*, 341 F. Supp. 3d 164, 187 (N.D.N.Y. 2018) (quoting *Meyers*, 442 F.3d at 122).

Here, there is more than enough evidence to permit the jury to infer that Pelletier was either motivated by evil motive or intent or was recklessly or callously indifferent to Plaintiffs' constitutional rights. Pelletier's approach to Plaintiffs' efforts to speak freely in government-maintained public fora was:

1. Enabling the disruption and attack of Plaintiffs' protected speech through violence and threat of violence by:

    - Refusing to make arrests at the Tabling Event (*see* Pltfs' Resp. to Stenger SOMF at ¶ 101–02(1));

    - Refusing to use standard police procedures to contain the crowd at the Tabling Event and Laffer Event, despite adequate resources (*see id.*);

    - Conceding that, at the Laffer Event, he had not given "clearer guidance to officers about expectations" related to arrest and removal (Pltfs' Resp. to Pelletier SOMF at ¶ 79(a)); and

    - Allowing Stenger and Rose to overrule his own independent

judgment to make eight additional arrests after the Laffer Event or even to pursue justice as to the two arrests made (*id.* at ¶ 131; Pltfs' Resp. to Stenger SOMF at ¶¶ 101–02).

2. Threatening violence as a pretext to suppress Plaintiffs' speech when he allowed UPD to "convince[] the BU College Republicans" at the Tabling Event to "leave for their safety" (Pltfs' Resp. to Stenger SOMF at ¶¶ 101–02); when UPD, acting under his authority, told the tabling College Republicans that the police could not protect them on government property (*see id.*); and when he attempted to intimidate Dr. Laffer to cancel his speech and return to his plane (Pltfs' Resp. to Pelletier SOMF at ¶ 93);

3. Vilifying Plaintiffs for daring to attempt to exercise their free speech rights, when he criticized the tabling students for speaking about political topics and in defense of constitutional rights (*see* Pltfs' Resp. to Stenger's SOMF at ¶¶ 101–02);

4. Agreeing not to arrest disruptors and providing virtual impunity (*see* Pltfs' Resp. to Pelleter's SOMF at ¶ 131); and

5. Congratulating his own officers for successfully suppressing Plaintiffs' speech (*see* Pltfs' Resp. to Stenger's SOMF at ¶¶ 101–02).

Because Plaintiffs present evidence "at least minimally sufficient to support" the inference that Pelletier acted recklessly or with malice, the Court should allow the punitive damages claim to proceed to trial. *See Cameron*, 598 F.3d at 69 (reversing district court for not issuing punitive damages instruction to jury where "question of fact as to malice was presented"); *Aponte v. Perez*, 75 F.4th 49, 56 (2d Cir. 2023) (ruling plaintiff was "entitled to a jury trial to establish the availability of punitive damages"); *Abboud*, 341 F. Supp. 3d at 187 (denying summary judgment to defendants on punitive damages request under First Amendment where evidence was sufficient to infer malice); *Karam v. Cnty. of Rensselaer, N.Y.*, 2016 WL 51252, at *23 (N.D.N.Y. Jan. 4, 2016) (denying summary judgment to defendant on punitive damages request under First Amendment because of "material question of fact").

Pelletier's deterrence argument also provides no basis to prematurely dismiss punitive damages claims. The Supreme Court has long recognized that punitive damages are "awarded in the jury's discretion" to (1) "punish [the defendant] for his outrageous conduct" and (2) "deter him and ***others like him*** from similar conduct in the future." *Smith v. Wade*, 461 U.S. 30, 54 (1983) (emphasis added and citation omitted). Pelletier's argument wholly ignores the punitive element, and his retirement is completely irrelevant because a punitive damages award by the jury would deter ***other*** state actors, like Pelletier was, from violating the constitutional rights of students and student organizations across SUNY. Thus, Pelletier's request to strike before trial Plaintiffs' request for punitive damages should be denied.[16]

### C. College Republicans are entitled to seek nominal, compensatory, and punitive damages at trial.

Rose's attempt to preemptively nullify nominal and punitive damages fails for two reasons. First, College Republicans will be entitled to nominal damages if they prove constitutional violations at trial. *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 64 (2d Cir. 2014) ("It is well established that 'an award of nominal damages is ***not discretionary*** where a substantive constitutional right has been violated.'")

[16] Pelletier provides zero legal authority to support a ruling to the contrary. Pelletier cites *Meyers*, which actually supports Plaintiffs' argument. There, the Second Circuit found that "the district court's statement that punitive damages were unwarranted on the merits as, at best, premature," and remanded the case for a jury trial because the "record remain[ed] to be developed as to whether punitive damages [were] warranted." 442 F.3d 101, 121-23 (2d Cir. 2006). And Pelletier conveniently omits that the "sole issue" in *Lee v. Edwards* was not the threshold question of whether the defendant's conduct warranted punitive damages, but rather "whether the jury's $200,000 punitive damages award for malicious prosecution [was] excessive." 101 F.3d 805, 808 (2d Cir. 1996).

(emphasis added and citations omitted). And second, the "availability of compensatory damages in a § 1983 suit is not a prerequisite to punitive damages." *See, e.g.*, *Aponte*, 75 F.4th at 56 (citing *Meyers*, 442 F.3d at 121 ("The fact that the constitutional violation does not warrant an award of compensatory damages is not a basis for denying an award of punitive damages.")).

Rose's attempt to negate all compensatory damages for College Republicans is also meritless. The denial of College Republicans' First Amendment rights and of a "particular opportunity to express [its] views" creates compensatory damages for out-of-pocket loss as well as "other monetary harms" and "impairment of reputation." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649-50 (2d Cir. 1998) ("ILGO is still entitled to recover if the City unlawfully denied the organization the opportunity to express its message in the way it preferred.") (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Dellums v. Powell*, 566 F.2d 167, 196 (D.C. Cir. 1977))). Rose's argument is based solely on the deposition testimony of Mr. Raj Kannappan of Young America's Foundation, who believed the $37,717.93 alleged in the complaint did not come from College Republicans' funds. However, Mr. Kannappan's testimony does not establish that College Republicans did not suffer *any* compensatory damages. Rose ignores that College Republicans raised $15,000 to sponsor their part of the Laffer Event. (*See* Plfts' Add'l SOMF at ¶ 13; Pltfs' Resp. to Rose SOMF at ¶ 205.) College Republicans had a right to benefit from these funds and are entitled to recover for this loss, the loss of the ability to receive its allocation of the student activity fee, the time members spent preparing for the

disrupted Laffer Event, and the damage to its reputation from Defendants' actions. The Court should thus reject Rose's attempt to nullify before trial all damages available to College Republicans.

**D. <u>State Defendants' standing argument is still meritless.</u>**

Earlier in the case, the Court rejected standing arguments raised by State Defendants in opposition to adding Rein Bey as a plaintiff in her official capacity as then-President of the College Republicans. (Dkt. No. 261 at 16-18.) Finding Plaintiffs had the "stronger argument," the Court ruled that Bey had the "authority to litigate this action in her official capacity as 'president or treasurer' of the College Republicans." *Id.* at 17 (citing N.Y. Gen. Ass'ns Law § 12).

While State Defendants are correct that Bey is no longer the current President of the College Republicans, Plaintiffs have filed concurrently with its opposition papers a letter requesting a non-dispositive motion conference with the Court to discuss Plaintiffs' request to file a procedural motion to substitute Ms. Bey for Mr. Shane Rossi, as a plaintiff in his *official* capacity as the current President of College Republicans following his recent election in April 2024. (*See* Omnibus Declaration of Steven Miller at ¶ 41.)

In granting Plaintiffs' previous request, the Court recognized that Federal Rules of Civil Procedure 17(b)(3) and 21 are construed liberally and that substitution for the then-current President of the College Republicans was "merely formal," "in no way alter[ed] the original complaint's factual allegations as to the events or the participants," and did not "change any aspect of the factual allegations." *See id.* at 18 (citing *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d

Cir. 1997). Because substituting Bey for Rossi is no different than before, and merely addresses a non-jurisdictional and correctable pleading irregularity,[17] the Court should again deny State Defendants' motion on standing grounds.

The Court should also reject Rose's separate argument that claims against him by Bey should be dismissed for lack of standing because she was not injured. In adding Bey in her official capacity, the Court already rejected this argument and the "lengthy factual analysis" proffered by State Defendants. *Id.* Indeed, Plaintiffs had already made clear that Bey was "not asserting claims in her individual capacity." (*See* Dkt No. 245-1 at 23.) Similarly, Rossi's joinder will be in his *official* capacity and he will not be asserting any claims in his individual capacity. Rose's argument should accordingly be rejected again.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court recognize the numerous genuine disputes of material fact, and accordingly deny each of the Defendants' motions for summary judgment and submit this case to a jury to make fact determinations at trial.

---

[17] *See Sackman v. Maritas*, 595 N.Y.S.2d 655, 656 (Sup. Ct. Nassau Cnty. 1992) (finding plaintiff corrected non-jurisdictional and correctable pleading error by submitting affidavit and seeking amendment); *Toll Land V Ltd. P'ship v. Plan. Bd. of Vill. of Tarrytown*, 12 N.Y.S. 3d 874, 883 (Sup. Ct. Westchester Cnty. 2015) (noting an unincorporated association failing to appear by its president or treasurer is a "curable pleading defect"); *Concerned Citizens of Albany-Shaker Rd. v. State*, 528 N.Y.S.2d 230, 232 (3d Dep't 1988) (finding pleading deficiency "correctible"); *Stephentown Concerned Citizens v. Herrick*, 636 N.Y.S.2d 470, 471 n.2 (3d Dep't 1996).

Respectfully submitted this 5th day of July, 2024

*/s/ Andrew C. Hruska*
ANDREW C. HRUSKA
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
ahruska@kslaw.com

*/s/ Kyle J. Maury*
KYLE J. MAURY*
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
(512) 457-2000
kmaury@kslaw.com

*/s/ Tyson C. Langhofer*
TYSON C. LANGHOFER*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(480) 444-0020
tlanghofer@ADFlegal.org

(*Admitted *pro hac vice*)

*Counsel for Plaintiffs*