UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

YOUNG AMERICA'S FOUNDATION, *et al*.,

                         Plaintiffs,

-against-                                          3:20-CV-822 (LEK/TWD)

HARVEY STENGER, *et al.*,

                         Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

In recent years, the university has been at the center of the conversation around protest and free speech. As the Court noted previously, "[t]he tension between student activism and freedom of speech on college campuses is not a new phenomenon." Dkt. No. 70 ("August 2021 Order") at 24 (citing *Healy v. James*, 408 U.S. 169, 187 (1972)). This case tests the limits of a university's ability to regulate speech in an increasingly partisan world.

On July 22, 2020, Plaintiffs Young America's Foundation, Binghamton University College Republicans, and Jon Lizak commenced this action by filing a complaint against Defendants Harvey Stenger, Brian Rose, John Pelletier, College Progressives, Progressive Leaders of Tomorrow ("PLOT"), and the Student Association of Binghamton University, Inc. ("Student Association" or "SA"). Dkt. No. 1. The complaint centers around two related incidents on the campus of the State University of New York at Binghamton ("University") in relation to a planned guest lecture by economist Dr. Arthur Laffer. *See generally id.*

Following a motion to dismiss, the Court dismissed Defendants College Progressives and PLOT. Dkt. No. 223 ("March 2023 Order"); Dkt. No. 238 ("May 2023 Order"). Jon Lizak, the

former President of the College Republicans, was also dismissed as a plaintiff, and the Court

joined the then-current President, Rein Bey, as a plaintiff in this action. March 2023 Ord.; Dkt.

No. 261 ("November 2023 Order").

Plaintiffs then filed an amended complaint alleging a First Amendment suppression of

speech claim, First Amendment retaliation claim, and a Fourteenth Amendment equal protection

claim. Dkt. No. 262 ("Amended Complaint"). Now before the Court is Plaintiffs' motion to

substitute a party, Dkt. No. 343 ("Motion to Substitute"), and the four remaining Defendants'

motions for summary judgment, Dkt. No. 307 ("Pelletier Motion"), Dkt. No. 308 ("Stenger

Motion"), Dkt. No. 311 ("SA Motion"), Dkt. No. 313 ("Rose Motion"). Plaintiffs filed a joint

memorandum of law in response to the motions for summary judgment, Dkt. No. 321

("Response"), and each Defendant replied, Dkt. Nos. 333, 334, 336-1, 338.

For the reasons that follow, the Motion to Substitute is granted; the Pelletier Motion is

granted in part and denied in part; the Stenger Motion is granted in part and denied in part; the

Student Association Motion is granted in part and denied in part; and the Rose Motion is granted.

## II.    BACKGROUND

With their motions for summary judgment, Defendants have provided statements of

material facts. Dkt. No. 307-3 ("Pelletier SMF"); Dkt. No. 308-1 ("Stenger SMF"); Dkt. No.

311-30 ("SA SMF"); Dkt. No. 313-47 ("Rose SMF"). Plaintiffs filed a response to each

statement of material facts. Dkt. No. 324 ("Response to Pelletier SMF"); Dkt. No. 322

("Response to Stenger SMF"); Dkt. No. 325 ("Response to SA SMF"); Dkt. No. 323 ("Response

to Rose SMF"). Plaintiffs also filed a statement of additional facts, Dkt. No. 326 ("Plaintiffs'

Statement of Additional Facts" or "PSAF"), and the Student Association, Stenger, and Rose filed

responses to Plaintiffs' Statement of Additional Facts, Dkt. No. 336 ("SA Response to PSAF"), Dkt. Nos. 332, 337.

For purposes of summary judgment, the factual summary of this action is taken from the parties' various statements of material facts, the responses to the statements, and the exhibits included by parties. Disputes of material fact in the record are noted.

## A. The Parties

### 1. Plaintiffs

Plaintiff Binghamton University College Republicans ("College Republicans") are a registered student organization at the University. Stenger SMF ¶ 2. One of the College Republicans' stated purposes is to "make known and promote the principles of the Republican Party among members of the SUNY-Binghamton campus and community." *Id.* To that end, College Republicans advertise and host events on campus, which sometimes include inviting guest speakers. *See* Rose SMF ¶¶ 41, 45, 199–200. In September 2019, prior to the events relating to this action, the College Republicans hosted an event on campus called, "The Case Against Socialism," which proceeded without any major disruption. *Id.* ¶¶ 41, 44.

Plaintiff Young America's Foundation ("YAF") is a nonprofit organization that partners with student organizations on university campuses, including the College Republicans, to co-host speakers. Stenger SMF ¶ 1.

Plaintiff Rein Bey was the Vice President of the College Republicans during the Fall 2019 semester. Stenger SMF ¶ 3. Bey was President of the College Republicans during the Spring 2023 semester. *Id.* Bey is no longer a student at the University nor a member of the College Republicans. *Id.*

>    *2.  Defendants*

Defendant Harvey Stenger is and was the President of the University during all relevant events. Stenger SMF ¶ 4.

Defendant Brian Rose is and was the Vice President for Student Affairs at the University during all relevant events. *Id.* ¶ 5.

Defendant Student Association is an incorporated entity which oversees and charters subsidiary student organizations pursuant to the Student Association's criteria and rules. *Id.* ¶ 7. It also provides resources to those organizations. *Id.*; PSAF ¶ 10. The Student Association can discipline, sanction, suspend, or revoke the charters of University student organizations, Stenger SMF ¶ 21, although Plaintiffs assert that Stenger and Rose also maintained the power to discipline student organizations, Resp. to Stenger SMF ¶ 21; PSAF ¶ 7.

The parties dispute the nature of the Student Association's status in relation to the University. According to Defendants, the Student Association is separate and distinct from the University. Stenger SMF ¶ 7. Defendants state that the University does not exercise any control over the Student Association; it does not report to anyone at the University and the University cannot direct the Student Association to take any action. *Id.* ¶¶ 15, 17–18. According to Plaintiffs, the Student Association is an incorporated entity that derives its funding from the state of New York, but it depends on the University to collect all fees that provide its operating funds. Resp. to Stenger SMF ¶ 7; PSAF ¶ 10. Plaintiffs assert that Stenger and Rose maintain control of its finances and exercise control over key decisions by the Student Association. Resp. to Stenger SMF ¶ 7.

Defendant John Pelletier was the Chief of the University's Police Department ("UPD") during all relevant events. Stenger SMF ¶ 6. UPD was and is the primary law enforcement

agency on the University's campus. *Id.* ¶ 23. UPD was and is authorized to make arrests and charge individuals with New York State crimes. *Id.* ¶ 26. The parties dispute whether Stenger and Rose have the authority to direct UPD to arrest—or not arrest—University students. *Id.* ¶ 27; Resp. to Stenger SMF ¶ 27.

### 3. *Previously Dismissed Parties*

The College Progressives are a student group at the University. Stenger SMF ¶ 10.

PLOT is a community group that exists outside the University, *Id.* ¶ 8, although Plaintiffs assert that PLOT also exists within the University, since students and faculty have been members of PLOT, and the College Progressives operate in coordination with PLOT. Resp. to Stenger SMF ¶ 8.

### B. The Tabling Event

#### 1. *The Spine*

On the University's campus, there is an open-air, high-traffic walkway between the dining hall and lecture halls called the "Spine." Stenger SMF ¶ 28; Pelletier SMF ¶ 31. Student groups often set up tables on the Spine to promote events happening on campus, what is referred to as "tabling." Stenger SMF ¶¶ 29–30. The Spine is in high demand for tabling events due to its heavy pedestrian traffic. *Id.* ¶ 29; *but see* Resp. to Stenger SMF ¶ 29 (disputing).

There is a reservation requirement for tabling on certain sections of the Spine. Stenger SMF ¶ 31; Resp. to Stenger SMF ¶ 31; SA Resp. to PSAF ¶ 19. Reservations, both for tabling on the Spine and for events in classrooms or auditoriums, are made exclusively through the online platform "B-There." SA SMF ¶ 5.

Defendants assert that the reservation requirement comes from the University, Stenger SMF ¶ 31, while Plaintiffs state that it comes from the Student Association, Resp. to Stenger

SMF ¶ 31. Plaintiffs also assert that the Spine is a "large area, for much of which the Student Association does not purport to require reservations." *Id.* ¶ 29. According to Plaintiffs, "there is sufficient room for multiple groups to table simultaneously without mutual interference." *Id.*

### 2. *The November 14, 2019 Tabling Event*

On November 14, 2019, the College Republicans, along with another group not recognized by the Student Association called "Turning Point, USA," tabled on the Spine. ("Tabling Event"). Stenger SMF ¶ 33. They did not have a prior reservation. *Id.* The group tabled primarily to advertise an upcoming event on November 18, 2019 with guest speaker Dr. Arthur Laffer, co-hosted by YAF and the College Republicans ("Laffer Event"). PSAF ¶¶ 18, 19. There were approximately four or five people running the table, including College Republicans member Lacey Kestecher. Pelletier SMF ¶¶ 46, 39; Rose SMF ¶ 32. Among other things, the people tabling displayed flyers for the Laffer Event and a poster stating "I'M PRO CHOICE. PICK YOUR GUN" with pictures of three guns and their descriptions. Pelletier SMF ¶ 41. There had been a high school shooting that morning in California. Pelletier SMF ¶ 47.

After several hours of tabling without incident, passersby began to protest. Pelletier SMF ¶ 42. The protestors collapsed the College Republicans' table. Dkt. No. 307-54 ("Tabling Video") at 0:50[1]; Rose SMF ¶ 97. Approximately four to eight UPD officers—every UPD officer on duty at the time—came to the Spine in response to calls that there was a disturbance between two groups of people. Pelletier SMF ¶¶ 43–44; Rose SMF ¶ 90. Pelletier was not on the Spine during the Tabling Event. Pelletier SMF ¶ 63. The UPD officers got between the College Republicans and the protestors to create distance between them. Tabling Vid. at 0:53; Pelletier SMF ¶ 56. The crowd of protestors grew from approximately thirty people to over a hundred,

---

[1] Citations to video exhibits are referenced as "hour : minute."

surrounding the College Republicans. Rose SMF ¶¶ 93–94. The protestors were agitated, ripping

up the posters and aggressively yelling in the faces of the College Republicans. Pelletier SMF ¶¶

47–48. At some point, a protestor ripped Kestecher's red "Trump 2020" hat off her head and

threw it into the crowd. *Id.* ¶ 48. The College Republicans felt that they were in danger. Pelletier

SMF ¶ 49; Resp. to Pelletier SMF ¶ 49. According to Pelletier, UPD officers determined that

they could not safely arrest protestors at the scene because it seemed likely that an arrest would

further escalate the protestors' conduct. Pelletier SMF ¶ 55.

At some point during the protest, the College Republicans were asked to relocate their

tabling because they did not have a reservation, but the College Republicans did not immediately

relocate. Pelletier SMF ¶ 52. Defendants differ with respect to whether University staff, Student

Association personnel, or UPD officers asked the College Republicans to relocate. *See* Rose

SMF ¶ 83; Stenger SMF ¶ 43; SA SMF ¶ 8; Pelletier SMF ¶ 51. According to Plaintiffs, UPD

officers instructed the College Republicans to leave the Spine. Resp. to Stenger SMF ¶ 43. Thirty

minutes after the UPD officers arrived, they eventually "convinced" the College Republicans to

leave for their safety. Dkt. No. 327-11 at 3; Pelletier SMF ¶ 60; *see* Tabling Vid. at 1:23–1:25.

Another student organization, Hillel Jewish Student Union ("Hillel"), had made a table

reservation on the Spine for the same day as the Tabling Event. Stenger SMF ¶ 34; Pelletier SMF

¶ 37. Defendants state that Hillel was unable to table on the Spine because the College

Republicans were tabling without a reservation. Stenger SMF ¶ 34; Pelletier SMF ¶ 37.

Conversely, Plaintiffs state that their lack of reservation posed no such barrier, as the Spine is a

"large throughway," and the College Republicans only occupied a "miniscule portion" of it.

Resp. to Pelletier SMF ¶ 37. Plaintiffs maintain that groups are able to table in parts of the Spine

without prior reservations. *Id.*

Rose was in his office when he was notified of the Tabling Event. Rose SMF ¶ 107. Rose then walked over to an area about fifty yards away and observed the last ten or twelve minutes of the incident, most of which was after the College Republicans had already left. *Id.* ¶¶ 108–09. Rose states that he was not aware of who was tabling, and did not know who left with UPD officers at the time. Dkt. No. 313-16 ("Rose Deposition") at 16:3–15.

### 3. *Events after the Tabling Event*

After the Tabling Event, the Student Association suspended the College Republicans' access to their B-There account until the Fall 2020 semester for tabling without a reservation. SA SMF ¶ 10; Pelletier SMF ¶ 66.

On November 15, 2019, Stenger released a statement regarding the Tabling Event. Rose SMF ¶ 111. Stenger noted that UPD's response was "appropriate." Dkt. No. 313-31 at 1. Stenger asked the students to remember the "damaging impact words and images can have—even if they are protected as free speech under the First Amendment." *Id.*

On the same day, Rose met with UPD supervisors, where they discussed whether to pursue student conduct charges against individuals. Rose SMF ¶¶ 112, 114.  Rose made the decision not to pursue student conduct charges. *Id.* ¶ 115. Rose claims his decision was based on the fact that the student conduct process takes months, which would likely not separate anybody from the University prior to the Laffer Event, nor would it deescalate the current tensions. *Id.* ¶ 116; *see* Rose Dep. at 29:5–13, 30:5–8.

Rose then released a statement regarding the tabling incident. Dkt. No. 313-32 ("Rose Statement") at 2–3. Rose wrote that the "tension between the groups tabling and protesters became volatile and University Police intervened to remove the tabling groups in the interest of the safety of all involved." *Id.* at 2. Rose also noted, "[s]elf-evidently from the nature of [the

College Republicans'] display and their refusal to comply with procedures for reserving the space in question, the group[] intended to be provocative." *Id.* As Rose describes, "[c]ounter-protesters began pulling down the tables and sweeping [away] the political literature . . . into boxes in an attempt to close down the tabling activity," but "[e]ventually the police directed the tabling group[] to abandon the area and escorted them away." *Id.* Rose then wrote:

> Had the group followed procedures, the University would have had the opportunity to plan for what was self-evidently a provocative presentation in a manner that may have facilitated expressive activity by both the tabling group[] and those who wish to demonstrate against them. Any future action taken against the College Republicans will pertain to their violation of University and [Student Association] policies and procedures and not to the content of their message.
>
> . . . .
>
> There were also protesters who acted in a manner that may have violated University rules. In the context of the incident and in keeping with the principles and values noted above, the University did not seek to identify or charge any protesters. To do so would have escalated an already volatile situation and run counter to the primary interest in safely de-escalating the situation. In other circumstances, the University has taken action against individuals infringing upon expressive activity without regard to viewpoint. Our response has and will continue to take into account the full context in each instance.

*Id.* at 3.

### C.  The Laffer Event

#### 1.  Preparation

On November 15, 2019, UPD saw social media postings indicating that the College Progressives might protest the Laffer Event on November 18, 2019. Pelletier SMF ¶ 70. On November 17, 2019, YAF forwarded an email to UPD about PLOT posting messages on Facebook calling on people to be violent at the Laffer Event. *Id.* ¶ 74.

Following the notice of planned protests, the University and UPD took several steps to prepare for the Laffer Event. Rose SMF ¶ 124. First, the event was moved to a larger lecture hall. *Id.* The original room only had one door in and out of the room and was in the basement, far from the fire exits. *Id.* ¶ 125. According to Defendants, the move was made because the original space would be more difficult to manage and protect the speaker. Pelletier SMF ¶ 81; Rose SMF ¶ 125; *but see* Resp. to Rose SMF ¶ 125 (disputing). The new lecture hall had multiple doors in case the police needed to arrest someone and take them out. Pelletier SMF ¶¶ 81; *but see* Resp. to Pelletier SMF ¶ 81 (disputing). It also allowed the UPD to escort Dr. Laffer in and out safely. Pelletier SMF ¶ 82.

Second, per Rose's suggestion, the University reserved an adjacent lecture hall to provide a space for demonstrators. Rose SMF ¶ 128. Defendants state that it is standard practice to give protestors their own designated space. *Id.*; *but see* Resp. to Rose SMF ¶ 128 (disputing). Third, UPD planned to deploy a large number of officers—almost every UPD officer available—to maintain order at the event. Rose SMF ¶¶ 124, 130. Fourth, the University instructed the College Republicans to make a statement at the lecture to inform attendees to reserve their questions until the end of the lecture. *Id.* ¶¶ 124, 133. Plaintiffs state that the College Republicans requested that a University administrator give the statement, but this request was refused. Resp. to Rose SMF ¶ 124.

Additionally, UPD installed cameras into the lecture hall to have a record of the event. Rose SMF ¶ 135. YAF also hired two private security guards to protect Dr. Laffer. Pelletier SMF ¶ 71.

### 2. The November 18, 2019 Laffer Event

On the morning of the Laffer Event, the University's Senior Director of Media and Public Relations forwarded to UPD, Rose, and other members of the University an email from the College Progressives and an online post ostensibly written on behalf of the College Progressives, PLOT, and other groups, saying that they "will be taking away . . . the College Republicans' space by disrupting their event." Dkt. No. 307-28 ("Protest Letter") at 4; Pelletier SMF ¶ 76. On the afternoon of the Laffer Event, UPD saw a social media post by PLOT promoting the disruption of the Laffer Event. Pelletier SMF ¶ 91.

Pelletier decided to personally meet Dr. Laffer at the airport when he arrived on November 18, 2019, to inform him that his lecture may be protested. *Id.* ¶ 93. In his deposition for this action, Dr. Laffer stated that Pelletier told him the University "did not want [him] to come," asked him to cancel the event, and "intimated" that he should return to his plane. Dkt. No. 327-25 ("Laffer Deposition") at 44:11–13, 45:13–15, 45:4–7.

At the Laffer Event that evening, there were about nine UPD officers, including Pelletier, inside the lecture hall and fourteen officers in the surrounding hallways. Pelletier SMF ¶ 98. YAF and the College Republicans chose for the Laffer Event to be open to the public and not ticketed because they wanted to attract as many people as possible. Rose SMF ¶ 146. A large crowd entered the lecture hall. *Id.* ¶ 147. Dr. Laffer entered through a private entrance with his security team and UPD Investigator Joseph Gallagher. Pelletier SMF ¶ 109. College Republicans president John Restuccia introduced Dr. Laffer and told the audience that if they had any disagreements, they should reserve their questions to the end of the lecture. Rose SMF ¶ 149.

Seconds after Dr. Laffer began his lecture, a man in the audience stood up and started reading a speech off his phone about economics, racial oppression, President Trump, and the

justice system. Pelletier SMF ¶ 111; Dkt. No. 307-55 ("Laffer Video") at 0:27. Someone from the audience gave the disrupter a megaphone. Laffer Vid. at 0:27; Pelletier SMF ¶ 113. During the disruption, College Republicans walked in front of Dr. Laffer's podium and held up "free speech" signs. Laffer Vid. at 0:27–0:28; Pelletier SMF ¶ 120.

Over a minute into the disruption, UPD officers began to slowly approach the disrupter. Laffer Vid. at 0:28; Pelletier SMF ¶ 115. As they were approaching, approximately ten to fifteen audience members surrounded the disrupter, forming a human barrier to prevent the officers from reaching him. Laffer Vid. at 0:28; Pelletier SMF ¶¶ 115–16. Gallagher asked Dr. Laffer how he was doing, to which Dr. Laffer replied something to the effect of, "Let's give it ten minutes." Pelletier SMF ¶ 119. While UPD officers were pushing toward the crowd, Pelletier walked over to Gallagher and exchanged some words. Laffer Vid. at 0:29. UPD officers removed one protester from the lecture hall. *Id.* As the disrupter with the megaphone was being removed, Gallagher touched Dr. Laffer's back, said something to him, and then said something to Restuccia. *Id.* Restuccia nodded, made a hand-waving motion, and then Dr. Laffer, Gallagher, and members of the College Republicans left the lecture hall. *Id.*

According to Plaintiffs, UPD officers directed Dr. Laffer to leave. Resp. to Pelletier SMF ¶ 125. According to Defendants, Restuccia suggested that they leave, but Dr. Laffer was free to remain at the event. Rose SMF ¶¶ 162–63; *see also* Pelletier SMF ¶ 125.

Dr. Laffer left approximately two and a half minutes after the disruption began. Pelletier SMF ¶¶ 125–26. For the next several minutes, protesters took turns standing up and reading off their phone, passing around the megaphone, while UPD officers stood at the outskirts of the room and watched. Laffer Vid. at 0:29–0:36.

UPD officers arrested the man who originally disrupted the event and the man who handed him a megaphone, charging them with disorderly conduct. Pelletier SMF ¶¶ 117–18.

Rose was not present at the Laffer Event, but he watched from a UPD headquarters conference room. Rose SMF ¶¶ 166–67. Rose did not have audio of the lecture and was not directly communicating with anyone in the lecture hall. *Id.* ¶¶ 168–69.

### 3. *Events after the Laffer Event*

After the Laffer Event, Pelletier had a meeting with Stenger, Rose, and other university administrators. Pelletier SMF ¶ 129. Pelletier presented a list of the suspects that UPD was planning to arrest. Pelletier SMF ¶ 130. At first, Rose was in favor of arresting the suspects. Rose SMF ¶ 176. Then, Stenger's Chief of Staff communicated Stenger's desire to avoid further arrests. Stenger SMF ¶ 96; *but see* Resp. to Stenger SMF ¶ 96 (stating Stenger and Rose *directed* UPD not to make any additional arrests). Rose initially pushed back on Stenger's view not to arrest further individuals, but eventually supported the decision. Rose SMF ¶¶ 178–79. UPD did not make any further arrests. Pelletier SMF ¶ 132.

On November 22, 2019, a meeting was held between the University's administration and the Student Association. Rose SMF ¶ 188; SA SMF ¶ 17. In the meeting, Rose asked the Student Association if it was going to take action against the College Progressives, and the Student Association said that it would not. Rose SMF ¶ 189. The Student Association said it had no evidence of any organizational activity. *Id.* Rose then sent the Student Association a copy of the Protest Letter in which the College Progressives indicated their intent to disrupt the Laffer Event. Dkt. No. 313-38. The Student Association doubted that the Protest Letter was authentic, because it was unable to prove that the College Progressives authored it. Dkt. No. 313-25 at 101:13–22; Rose SMF ¶ 193. The SA also noted that the letter was not signed by any officer or member of

the College Progressives, although the signature block stated "BU Progressives." SA SMF ¶ 20; *see* Protest Letter at 4. Rose met with the Student Association multiple times afterwards to urge them to sanction the College Progressives, but the Student Association refused. Rose SMF ¶¶ 191, 194–95.

Since the Laffer Event, the College Republicans have invited other guest speakers to come to campus. Rose SMF ¶ 199. For example, the College Republicans tabled for and hosted Congressman Tom Reed on campus in January 2020. *Id.* ¶ 200.

In Spring 2020, College Republicans missed their annual re-registration period, despite several extensions and reminders. *Id.* ¶ 201. The Student Association subsequently froze the College Republicans privileges, including access to its budget. *Id.* ¶ 203; SA SMF ¶ 14. The SA notified the College Republicans of this temporary freeze, and then worked with the College Republicans to meet their re-registration requirements, and their charter was not revoked. SA SMF ¶¶ 15–16.

In the fall of 2019, an application was submitted to the Student Association to have YAF chartered as a student organization. *Id.* ¶ 22. After initial concerns about a provision in YAF's proposed constitution discussing the threat of communism, the Student Association approved YAF's constitution. *Id.* ¶ 23; Resp. to SA SMF ¶ 23. However, the Student Association's insurance carrier informed them that they could only include YAF under their policy if YAF arranged to have a faculty advisor or security at their speaking events. SA SMF ¶ 24. YAF has not agreed to this condition, and its charter application is still pending. *Id.* ¶ 25.

**D. The Amended Complaint**

In the Amended Complaint, Plaintiffs assert three causes of action: 1) First Amendment speech suppression claim against Stenger, Pelletier and Rose in their official capacities and

against Pelletier and Rose in their individual capacities; 2) First Amendment retaliation claim against Stenger and Rose in their official and individual capacities and against the Student Association; and 3) Fourteenth Amendment equal protection claim against Stenger, Pelletier and Rose in their official capacities and against Pelletier and Rose in their individual capacities. Am. Compl. ¶¶ 156–169, 188–194.

### III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, summary judgment cannot be granted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing a court of the basis for its motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

After the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" to defeat summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986). The nonmoving party may not rely on "mere conclusory allegations, speculation, or conjecture," *Fischer v. Forrest*, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" to support its claims, *Anderson*, 477 U.S. at 252. At the same time, a court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S 133, 150 (2000). The Court "may not make any credibility determinations or weigh the evidence." *Id.* Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Motion to Substitute

Plaintiffs move to substitute Shane Rossi in his official capacity as the current President of the College Republicans for Rein Bey, the former President of the College Republicans. Defendants oppose this request. Dkt. Nos. 344, 346, 347, 349-4. Previously, Plaintiffs moved to add Bey in her official capacity in place of formerly-dismissed Plaintiff Lizak, which the Court granted. *See* Dkt. No. 245-1 ("Motion to Amend Complaint") at 18–20; Nov. 2023 Ord. at 16–18.

Under Rule 17, "substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997). In the November 2023 Order, the Court found that the substitution of Lizak for Bey was "merely formal, [] as the substitution simply acts as a means to cure a potential pleading gap in the case caption . . . [and] in no way alters the original complaint's factual allegations as to the

events or the participants." Nov. 2023 Ord. at 18 (internal quotations omitted). Here, the instant Motion to Substitute involves substituting the former President of the College Republicans for the current President in their *official* capacities; it is purely formalistic, and it does not alter the factual allegations made in the Amended Complaint. Thus, for the same reasons as those explained in the November 2023 Order, the Motion to Substitute is granted.

### 1. *College Republicans' Standing*

Despite being a mere formality, Defendants argue that by substituting Rein Bey for Shane Rossi in their official capacities, the College Republicans lose their standing to sue. However, Defendants are muddling two separate and distinct issues. Whether the College Republicans have associational standing is irrelevant to whether Rossi may be substituted for Bey.

As the Court has previously explained in its May 2023 Order, the College Republicans have associational standing because it met the requirements laid out in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), and its progeny: (1) "the College Republicans identified in the Complaint at least one member who otherwise would have Article III standing to sue in his own right," May 2023 Ord. at 44–45, and (2) "the College Republicans, in bringing this suit on behalf of its members, seek to protect interests that are not only germane, but vitally central to its purpose of promoting the discussion of political ideas," *id.* at 46 (internal quotations omitted).[2]

Defendants argue that substituting Rossi for Bey would nullify the College Republicans' Article III standing because the first *Hunt* prong is no longer satisfied. Dkt. No. 349-4 at 7. Since

---

[2] The Court relies on its previous finding that the third prong in *Hunt*, which covers whether the member should be party to the suit, is a prudential concern and "need not be met to satisfy Article III's case-or-controversy requirement." May 2023 Ord. at 44 (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)).

Rossi was not involved in the events of this action and therefore would not have any individual injury of his own, Defendants contend that the College Republicans do not have a "member who otherwise would have Article III standing to sue in his own right." *See* Dkt. No. 347 at 2–3. However, this argument confuses the formal substitution of parties in their *official* capacity with a determination that an association's member has standing.

As the Court previously explained, Jon Lizak had standing in his own right when Plaintiffs first filed this suit. May 2023 Ord. at 44–45. Lizak then moved to dismiss his *individual* claims. *See* Dkt. No. 208-1 at 1 ("Lizak . . . now moves in his individual capacity for dismissal of his personal claims without prejudice."). At that point, the Court required Plaintiffs to show cause that there was some other member of the College Republicans who still had standing to sue in their own right. March 2023 Ord. at 22–24; *see Do No Harm v. Pfizer, Inc.*, 96 F.4th 106, 118 (2d Cir. 2024) ("[A]n association must identify by name at least one injured member for purposes of establishing Article III standing."). Plaintiffs then submitted evidence that Bey suffered an alleged injury, leading the Court to find that the College Republicans retained associational standing. May 2023 Ord. at 49. This occurred before Bey became a party to the action.

The fact that Bey became President of the College Republicans is irrelevant to the Court's finding that she suffered an alleged injury. Indeed, it could have been any other member that demonstrated standing. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("The association must allege that its members, or *any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.") (emphasis added). That Bey later joined this lawsuit in her *official* capacity as President is also irrelevant to whether a College Republicans' member had an

*individual* injury. The Motion to Substitute only involves substituting the former President for the current President in their *official* capacities. The previous motion to substitute Bey for Lizak involved the same formal substitution. Bey was not joined as a party asserting claims in her individual capacity, nor does Rossi seek to allege any claims in his individual capacity. *See* Mot. to Substitute at 3 ("As with Ms. Bey, Mr. Rossi is not asserting any claims in his individual capacity."). Thus, the formal substitution of Rossi for Bey does not change whether Bey had an individual injury—it does not affect the College Republicans' standing.[3]

Accordingly, because the Court already ruled that the College Republicans have associational standing based on the injury to Bey, and substituting Bey in her official capacity does not affect this ruling, the College Republicans' standing remains.[4]

_____

[3] Insofar as Defendants suggest that the College Republicans lose their standing to sue because "Bey has graduated and is no longer a member of [the College Republicans]," Dkt. No. 349-4 at 8, this argument must fail. If the Court were to accept Defendants' argument, a necessary consequence is that a student organization which maintains its standing via members that were previously injured will always lose standing as soon as those members graduate. This cannot be the rule. As Plaintiffs note, "any university could mire a case in delay and run out the clock for students to graduate after the expected four years, eliminating any judicial review." Mot. to Sub. at 1. A person's status as a university student, and thereby as a member of a student association, is transient by its nature. To assert a rule establishing that a student group cannot have associational standing unless a *current* member also had individual injury dating back to the injury *before* the lawsuit began would essentially eliminate associational standing for all university student groups. As this action has aptly shown, litigation will generally outstretch the length of an individual's membership in a university student group. The cases Defendants cite do not address university student groups nor discuss whether a member's graduation from an association negates the association's injury. Therefore, at least in this case involving a university student group, the Court cannot declare that the group's standing disappears simply because the litigation has dragged out for five years and Bey has graduated.

[4] In their opposition to Plaintiff's motion to substitute, Defendants raised the argument that associations lack standing to bring Section 1983 claims on behalf of its members. As the Court noted in its May 2023 Order: "It remains possible that *Aguayo* and its progeny may preclude the College Republicans from recovering under Section 1983 on behalf of its members, but that would be because of a failure to state cognizable claims under Section 1983, not because the Court lacks subject matter jurisdiction over the claims." May 2023 Ord. at 48; *see also New York v. Scalia*, 464 F. Supp. 3d 528, 548 n.13 (S.D.N.Y. 2020) ("[P]rudential standing doctrine does not implicate the Court's subject-matter jurisdiction but whether the plaintiff has a valid cause of

### B. Motions for Summary Judgment

Defendants move the Court for summary judgment on multiple grounds. First, Defendants Stenger, Rose, and Pelletier ("State Defendants") argue the claims against them in their official capacities are barred by sovereign immunity. Next, Defendants contend that Plaintiffs have failed to create a dispute of material fact on all three claims. Lastly, Defendants contend that Plaintiffs are not entitled to punitive damages.

#### 1. Claims Against State Defendants in Their Official Capacity

Plaintiffs sue State Defendants in their official capacities on all three remaining claims. State Defendants argue that any claims seeking declaratory and injunctive relief against them in their official capacities are barred by the Eleventh Amendment.[5] Stenger Mot. at 4.

It is well-settled that Congress did not abrogate states' sovereign immunity through Section 1983. *See Alabama v. Pugh*, 438 U.S. 781, 782 (1978) ("There can be no doubt, however, that [a Section 1983] suit against the State . . . is barred by the Eleventh Amendment."). However, "sovereign immunity [does] not bar actions seeking only prospective injunctive relief against state officials to prevent a continuing violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)). "A plaintiff who merely asserts he has suffered 'discrete acts of past discrimination and retaliation by [a] defendant' has not demonstrated an ongoing constitutional

---

action."). Accordingly, the Court will not consider whether an association lacks standing to bring a Section 1983 claim. Moreover, because Defendants did not raise this argument in their motions for summary judgment, the Court declines to entertain this defense when it considers whether the College Republicans failed to state a cognizable claim under Section 1983.

[5] Defendants also argue that official capacity claims seeking damages are barred by the Eleventh Amendment. Stenger Mot. at 4. However, Plaintiffs are not pursuing damages against State Defendants in their *official* capacities. *See* Resp. at 35 n.10; Am. Compl. ¶ 3 (seeking "a judgment awarding nominal, compensatory, and punitive damages against Defendants Stenger, Rose, and Pelletier *in their individual capacities only*") (emphasis added).

violation." *Kelsey v. Kessel*, No. 22-CV-3774, 2024 WL 1020522, at *4 (S.D.N.Y. Mar. 8, 2024)

(quoting *Pierre v. New York State Dep't of Corr. Servs.*, No. 05-CV-275, 2009 WL 1583475, at

*18 (S.D.N.Y. June 1, 2009)).

> a.   Claims for Injunctive Relief

Plaintiffs seek to enjoin Defendants from "disrupting and silencing Plaintiffs' speech,"

"enforcing the Speech Suppression Policy" and "retaliating against Plaintiffs' expressed views."

Am. Compl. at 41. Plaintiffs additionally seek an order that Defendants "reinstate College

Republicans as a registered student organization" and "recognize the [YAF] chapter as a

registered student organization." *Id.*

Here, Plaintiffs' claims seeking injunctive relief fail because there is no ongoing violation

of Plaintiffs' First Amendment rights. The material facts portray two related incidents, days apart

from each other, in which the alleged violations occurred. Such isolated incidents are insufficient

to establish an ongoing violation. *See Kelsey*, 2024 WL 1020522, at *4 (finding the Eleventh

Amendment bars prospective relief against state officials for claims that concern "isolated

incidents that occurred in the past").

Plaintiffs nevertheless contend that Defendants maintain and enforce an "unwritten and

disguised" policy in which they suppress conservative speech—the so-called "Speech

Suppression Policy." Resp. to Rose SMF ¶ 207. Plaintiffs claim that this policy operated in five

steps. *Id.* First, Defendants "[e]nable leftist disrupters . . . to attack Plaintiffs' free speech through

violence and threat of violence." *Id.* Second, Defendants "[u]se the threat of violence that they

themselves enabled as a pretext to suppress Plaintiffs' speech citing 'safety' concerns." *Id.* Third

and Fourth, Defendants "vilify Plaintiffs for daring to attempt to exercise their right to free

speech," followed by "reward[ing] the disrupters with virtual impunity." *Id.* Lastly, Defendants "congratulat[e] themselves for successfully suppressing Plaintiffs' speech." *Id.*

Plaintiffs seem to misunderstand the nature of a "policy." "[A] handful of isolated incidents [are] insufficient to create a material fact in dispute about the existence of any [] policy." *Escobar v. City of New York*, 766 F. Supp. 2d 415, 421 (E.D.N.Y. 2011). Plaintiffs' only "evidence" of this policy comes from the alleged incidents themselves. *See* Resp. at 1–2 (describing the Speech Suppression Policy with examples relating only to the Tabling Event and Laffer Event); *see also* Resp. to Rose SMF ¶¶ 207 ("[I]ts effects are plain to see in [] Defendants' encouragement and protection of the disruptions that curtailed Plaintiff's tabling efforts and prevented the Dr. Laffer Event."). Plaintiffs present no evidence that this purported "policy" existed or was enforced before or after these isolated incidents. Although Plaintiffs claim the Speech Suppression Policy "remains in effect," Resp. at 40, the uncontroverted evidence shows that Plaintiffs hosted events on campus without incident both before and after the Laffer Event. For example, approximately a month before the Tabling Event, the College Republicans hosted "The Case Against Socialism" without any major disruption. *See* Rose SMF ¶¶ 41, 44. After the Laffer Event, the College Republicans tabled for and hosted Congressman Tom Reed on campus. *See id.* ¶¶ 199–200. As such, the Court cannot find that the purported Speech Suppression Policy exists or that Defendants are continuously disrupting and silencing Plaintiffs' speech.

None of the other purported adverse actions undertaken by Defendants support a finding of ongoing speech suppression or retaliation. The suspension of the College Republicans' B-There account only lasted one year, and Plaintiffs present no evidence that the suspension was extended or is ongoing. *See* SA SMF ¶ 10. The Student Association's freeze of the College

Republicans' budget was an administrative discipline for their failure to timely register. *See id.* ¶ 14; Rose SMF ¶ 203. Regardless, the College Republicans were able to re-register shortly thereafter, so there is no ongoing violation. *See* SA SMF ¶ 16. Further, Defendants' decision not to recognize YAF as a student organization is due to their lack of willingness to accept the insurance policy of the Student Association's liability carrier. *Id.* ¶¶ 24–25. Plaintiffs argue that the condition set by the insurance carrier was arbitrary, but even assuming this is true, actions of the insurance carrier of the Student Association is far removed from any ongoing violation by the State Defendants.

Accordingly, Plaintiffs' claims seeking injunctive relief against the State Defendants in their official capacities are barred by the Eleventh Amendment.[6]

### b. Claims for Declaratory Relief

Plaintiffs seek a declaration that Defendants "violated Plaintiffs' clearly established and fundamental constitutional rights." Am. Compl. at 41. Defendants argue that Plaintiffs' official capacity claims seeking declaratory relief are barred by the Eleventh Amendment because the Court cannot issue declaratory relief for past actions. Stenger Mot. at 5.

The Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). For the reasons stated above, the alleged violations are not

---

[6] Additionally, insofar as Plaintiffs' requested injunctive relief seeks the Student Association to recognize YAF, this must also be denied. The only remaining claim against the Student Association is the retaliation claim. *See* Am. Compl. ¶¶ 165–69. YAF, the only Plaintiff that would have standing to assert a claim seeking to be recognized as a registered student organization, does not assert a retaliation claim against the Student Association. *See* Resp. at 22 n.6. Thus, any injunctive relief against SA would be improper. Accordingly, all claims seeking injunctive relief are dismissed.

ongoing; they are based on past incidents. *See supra* Part IV.B.1.a. Such retrospective

declaratory relief against state officials is barred.

Accordingly, State Defendants are entitled to summary judgment with respect to all

claims against them in their official capacity. The remaining claims are a First Amendment

speech suppression claim against Pelletier and Rose in their individual capacities; a First

Amendment retaliation claim against Stenger and Rose in their individual capacities and the

Student Association; and a Fourteenth Amendment equal protection claim against Pelletier and

Rose in their individual capacities.

### 2. *First Amendment Suppression of Speech Claims*

Rose and Pelletier argue they are entitled to summary judgment on the speech

suppression claims in their individual capacities because Plaintiffs have failed to demonstrate a

genuine dispute of material fact. A plaintiff asserting a First Amendment claim under Section

1983 "must demonstrate that his conduct is deserving of First Amendment protection and that the

defendants' conduct . . . was motivated by or substantially caused by his exercise of free speech."

*Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir. 1991) (cleaned up). "Governmental interference

with such speech gives rise to a viable claim for violation of First Amendment rights." *Id.* As

explained in the August 2021 Order, whether the First Amendment protects particular speech

often depends on the type of forum in which the speaker's speech is restricted. *See* Aug. 2021

Ord. at 21 (citing *Huminski v. Corsones*, 396 F.3d 53, 89 (2d Cir. 2004)).

a.  Pelletier

Plaintiffs assert a speech suppression claim against Pelletier in regard to his actions at the Laffer Event. Am. Compl. ¶¶ 156–164.[7] Pelletier argues he is entitled to summary judgment on the speech suppression claim because he did not violate Plaintiffs' First Amendment rights and is otherwise entitled to qualified immunity. Pelletier Mot. at 8–21.

The Court previously determined that the lecture hall is a limited public forum, and nothing in the parties' filings changes that determination. *See* Aug. 2021 Ord. at 23. "A limited public forum is created only where the government 'makes its property generally available to a certain class of speakers.'" *Hotel Emps. & Rest. Union, Loc. 100 of New York & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998)). "In limited public fora, strict scrutiny is accorded only to restrictions on speech that fall[] *within the designated category for which the forum has been opened*." *Id.* at 546 (emphasis added). "Such restrictions must serve a compelling government interest and be narrowly tailored to achieve that interest." *Id.* at 545. "As to expressive uses *not* falling within the limited category for which the forum has been opened, restrictions need only be viewpoint neutral and reasonable." *Id.* at 546 (emphasis added). Here, Plaintiffs argue the "restriction" of speech was removing Dr. Laffer from the lecture hall. Since Dr. Laffer's lecture was indeed the designated category for which the forum had been opened, any restriction of the lecture is accorded strict scrutiny. As explained below, the restriction of speech did not serve a compelling government interest and thus cannot survive strict scrutiny.

---

[7] In the August 2021 Order, the Court dismissed the claims against Pelletier in his individual capacities related to the Tabling Event. Aug. 2021 Ord. at 32.

There is a genuine dispute of fact as to whether this was a Government-induced "restriction"—whether Pelletier "ordered" Dr. Laffer to leave, or whether Dr. Laffer left on his own accord. Multiple witnesses, including Dr. Laffer, affirm a Government-induced restriction, and the Laffer Video does not contradict this characterization. Laffer Dep. at 68:4–10; Dkt. No. 327-27 at 298:14–18; Dkt. No. 327-28 at 212:24–213:3; Laffer Vid. at 0:29. Indeed, if a jury credits the witnesses' testimony, the Laffer Video could confirm the story that Pelletier told Gallagher to escort Dr. Laffer out, followed by Gallagher ordering Dr. Laffer and the College Republicans to leave. Construed as such, Pelletier's action effectively amounted to a cancellation of the Laffer Event. In light of this evidence, Plaintiffs have met their burden of presenting a genuine dispute of fact that Pelletier and UPD ordered Dr. Laffer to leave.

Given the restriction of speech, Defendants cannot establish that this restriction served a compelling government interest; thus, this restriction cannot survive strict scrutiny. *See Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) ("[R]emoving[] or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose.") (collecting Supreme Court cases). Pelletier argues "[h]is actions and those of his officers were for the safety of everyone at the Laffer Event." Pelletier Mot. at 20. But the record does not establish any imminent danger or immediate threat to public safety. The protesters, while loud and disruptive, were not approaching Dr. Laffer or the College Republicans, but instead formed a wall in front of the disrupter. Dr. Laffer remained at the podium next to his security officer away from the protesters. The protesters were physical with UPD officers, but only to the extent of protecting the disrupter with the megaphone. The fact that Dr. Laffer said, "Let's give it ten minutes" further supports the fact that there was no immediate threat to their safety. *See* Pelletier SMF ¶

26

119. As such, it can hardly be said that there was any sort of danger or other immediate threat to public safety that could present a compelling government interest in canceling the lecture. *See Deferio v. City of Syracuse*, 306 F. Supp. 3d 492, 512 (N.D.N.Y. 2018), *aff'd*, 770 F. App'x 587 (2d Cir. 2019) ("[P]olice officers may not—as a first reaction in the name of safety—punish a person's protected speech in the face of limited hostilities."). Since the restriction did not serve a compelling government interest, it does not survive strict scrutiny. Accordingly, there is a genuine dispute of material fact as to whether Pelletier suppressed Plaintiffs' speech.

Nevertheless, Pelletier argues that he is entitled to summary judgment because the restriction of speech was reasonable and viewpoint-neutral. Pelletier Mot. at 20. As noted above, the restriction of speech falls within the designated category for which the forum has been opened, and thus strict scrutiny (and not the lower standard) applies. Nevertheless, the Court finds that even under the lower standard, Plaintiffs have presented a genuine dispute of fact that this cancellation was not "reasonable or viewpoint-neutral." *Johnson v. Perry*, 859 F.3d 156, 172 (2d Cir. 2017). Under this standard, "government officials may stop or disperse public demonstrations or protests where clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears." *Id.* at 171 (quoting *Papineau v. Parmley*, 465 F.3d 46, 56-57 (2d Cir. 2006)). Yet even under this standard, this restriction would not survive.

As explained above, there was no clear and present danger of riot or an immediate threat to public safety, so the harsh action of cancelling the lecture—if credited—was far from reasonable. Nor was this cancellation viewpoint-neutral. The protestor was allowed to disrupt the lecture for a minute before anyone attempted to intervene. Then, once Dr. Laffer and the College Republicans left the lecture hall, UPD officers abandoned all attempts to control the other

disrupters. The disrupters continued to exercise their opposing viewpoint for almost eight minutes, while Pelletier and UPD officers stood on the outskirts of the room and watched. *See Ctr. for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 430, 435 (W.D.N.Y. 2017) (finding Plaintiffs stated a First Amendment claim when a university did nothing to stop a "counter-demonstrators' disruption" from burdening students' exercise of protected speech). Crediting Plaintiffs' evidence, Pelletier excluded the College Republicans' speech but allowed the College Progressives' speech to remain. As such, the restriction was not reasonable or viewpoint-neutral.

Pelletier argues that even if his actions amount to a constitutional violation, he is entitled to qualified immunity. Pelletier Mot. at 8–11. Qualified immunity protects officials from damages liability if their "conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Defendants bear the burden of demonstrating that the challenged conduct was objectively reasonable in light of the law existing at the time. *See Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (citing *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000)). "The objective reasonableness test is met if officers of reasonable competence could disagree on the legality of the defendants' actions." *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000) (cleaned up).

Pelletier is not entitled to qualified immunity. It is clearly established that cancelling or excluding speech "will seldom, if ever, constitute the least restrictive means available to serve a

legitimate government purpose." *Bible Believers,* 805 F.3d at 248; *see Gregory v. City of Chicago*, 394 U.S. 111 (1969); *Cox v. Louisiana*, 379 U.S. 536 (1965); *Edwards v. South Carolina*, 372 U.S. 229 (1963); *Terminiello v. City of Chicago*, 337 U.S. 1 (1949); *Cantwell v. Connecticut*, 310 U.S. 296 (1940). Moreover, the Second Circuit has clearly established that restrictions of speech falling within the designated category for which the limited public forum was opened is subject to strict scrutiny. *Hotel Emps.*, 311 F.3d at 545 (citing *Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir.1991) and *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 229 (2d Cir.1996)).

There is no question that Dr. Laffer's lecture fell into the limited purpose category for which the forum was opened—it was the very reason the forum was opened. As such, it was not objectively reasonable to obstruct the very speech for which the forum was opened. *See Travis*, 927 F.2d at 693 ("[B]eing within the category for which use had been permitted, [the plaintiff] could not be denied access absent a sufficient constitutional justification."). Pelletier argues that "[i]t would have been objectively reasonable for Pelletier to believe that [Dr.] Laffer could be escorted away for everyone's safety." Pelletier Mot. at 11. But as explained above, there was no threat to public safety, so Pelletier's actions were not objectively reasonable. *See Johnson*, 859 F.3d at 176 (holding exclusion of speech based on viewpoint differences from a limited public forum where there was no clear and present danger or immediate threat to public safety was not reasonable).

Indeed, the jury must decide whether to credit any of Plaintiffs' evidence, but the Court finds there to be a genuine dispute of material fact as to whether Pelletier suppressed Plaintiffs' First Amendment rights by effectively cancelling the Laffer Event. Summary judgment against Pelletier in his individual capacity is denied.

b.  <u>Rose</u>

Plaintiffs assert a speech suppression claim against Rose for his actions in regard to both the Tabling Event and the Laffer Event. Rose retorts that he was not personally involved, and that the actions taken do not amount to a viable speech suppression claim. The Court concludes that Rose is entitled to summary judgment on both claims.

i.  *Tabling Event*

Rose argues that the claim against him with regards to the Tabling Event should be dismissed because he did not participate in the alleged speech suppression. Rose Mot. at 7–9. Previously, the Court dismissed claims against Rose for lack of personal involvement in the Tabling Event. Aug. 2021 Ord. at 18–19. Plaintiffs then filed the Motion to Amend Complaint, stating that they acquired evidence that "Rose traveled to the Tabling Event, observed the College Progressive mob, and intentionally chose not to intervene when . . . UPD removed [the] College Republicans but left the disrupters alone." Mot. to Am. Compl. at 14.

However, the evidence Plaintiffs present at summary judgment is insufficient to prove that Rose was personally involved in suppressing Plaintiffs' speech. As explained in the August 2021 Order, Plaintiffs must prove that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Aug. 2021 Ord. at 17 (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). Rose's testimony indicates that he went to the Tabling Event, but Rose did not make it to the scene until UPD officers were already overwhelmed and the College Republicans were surrounded by agitated protesters. Rose had no way of knowing the College Republicans would be tabling, especially given that they did not register their table. Moreover, the College Republicans and UPD officers were already leaving as Rose arrived. Rose did not even know it was the College Republicans that were leaving. Given

that every UPD officer on duty was already overwhelmed, it is not clear what Plaintiffs expect

Rose to have done at this point to "intervene." Indeed, Plaintiffs present no suggestion. *See* Resp.

at 17.

Moreover, if the alleged speech suppression occurred when UPD officers "allowed the

unruly mob of progressive students to destroy property, assault Plaintiffs, and grow to

unmanageable proportions" such that UPD officers "abandoned initial attempts to protect

College Republicans[] and instead ordered them to leave," Resp. to Pelletier SMF ¶ 56, PSAF ¶

21, Rose was not sufficiently involved. Rose did not arrive until these alleged actions occurred.

Thus, on the record before the Court, Plaintiffs have failed to establish Rose was personally

involved. Rose is entitled to summary judgment with regard to the Tabling Event.

### ii. *Laffer Event*

The Court also grants Rose summary judgment on the speech suppression claim in

relation to the Laffer Event. As outlined below, Plaintiffs point to numerous statements of

material fact that allegedly create a genuine dispute about Rose's actions, but none of these

statements are supported by the record.

Plaintiffs argue that Rose's preparation for the Laffer Event was designed to "enforce

their speech suppression policy and . . . use student safety as a pretext to ensure that the

anticipated disruption would cancel the Laffer Event." Resp. to Rose SMF ¶ 123. Although

theoretically possible, Plaintiffs citation for this statement does not support it, *see* Rose Dep. at

44:10–12, Laffer Dep. at 44:8–18, and there is no evidence in the record indicating that Rose was

personally planning to cancel the event. Unlike Pelletier, Rose neither told Dr. Laffer at the

airport to get back on the plane nor ordered UPD to take Dr. Laffer out of the lecture hall.

Plaintiffs argue that Rose "encouraged" Pelletier to dissuade Dr. Laffer from coming, but this too

is unsupported by the record. *See* Rose Dep. at 44:13–15 ("Q: Do you know if Chief Pelletier encouraged Dr. Laffer to not move forward with the speech? A: I do not.").

Although Plaintiffs stated that Rose "effectively supervise[d] UPD for the purpose of these events," the support for this proposition relates only to the decision not to arrest individuals after the event. Resp. to Rose SMF ¶ 132. Moreover, supervisory liability is insufficient to state a claim against a state official in their individual capacity. *Tangreti*, 983 F.3d at 618. During the Laffer Event, Rose was watching via live stream from a remote location—a stream which was not designed to direct UPD officers. *See* Rose SMF ¶ 135 (undisputed). It is also undisputed that prior to the Laffer Event, Rose was not privy to UPD's plan to manage the event. *See id.* ¶ 131 (undisputed).

Lastly, Plaintiffs' point to the Rose Statement, which was issued after the Tabling Event, where Rose described the College Republicans as "provocative" and the College Progressives as "[c]ounter-protesters." Rose Statement at 2. Plaintiffs contend that the Rose Statement implied that "if College Republicans speak, then the government will shut them down to avoid the political consequences of facing the very same angry mob whom Defendants' own actions encouraged." Resp. at 18. Regardless of whether that implication is correct, the Rose Statement does not demonstrate Rose's involvement in the speech suppression claim, as nothing in it establishes that Rose was personally directing UPD or was planning to cancel the Laffer Event. *See* Rose Statement at 2–3. Indeed, Rose does not even mention the Laffer Event. *See id.*

As the evidence before the Court does not establish a genuine dispute of material fact, Rose is entitled to summary judgment on the speech suppression claim.

### 3. First Amendment Retaliation Claims

Plaintiffs allege that "Stenger, Rose, and [the] Student Association unconstitutionally retaliated against College Republicans by (i) depriving College Republicans of the ability to receive university funding and reserve rooms to host expressive events, and (ii) suspending College Republicans while failing to hold PLOT and College Progressives accountable for disrupting the Tabling and Laffer Events." Resp. at 21; *see* Am. Compl. ¶¶ 165–69. Defendants argue they are entitled to summary judgment.

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir.2011)). The Court addresses each element in turn.

#### a. Protected Speech

"Generally, speech on any matter of political, social, or other concern to the community is protected by the First Amendment." *Tolbert v. Rochester City Sch. Dist.*, No. 19-CV-6433, 2020 WL 1467280, at *6 (W.D.N.Y. Mar. 26, 2020) (quoting *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006)). Here, there is no real debate that both Dr. Laffer's lecture and the College Republicans' promotion of it during the Tabling Event (as well as their promotion of gun rights) was protected speech. *See Ctr. for Bio-Ethical Reform*, 234 F. Supp. 3d at 428, 435 (finding "photo-murals with large, horrific images [] compar[ing] abortion to historically-recognized genocides" on a university campus was protected speech).

Accordingly, the College Republicans' speech during the Laffer Event and Tabling Event was protected speech.

b.  <u>Adverse Action</u>

Defendants argue that Plaintiffs did not suffer any adverse action because the suspension of College Republicans' B-There account did not chill their speech and the failure to hold the protesters accountable does not amount to an adverse action. *See* Rose Mot. at 15–17; Stenger Mot. at 15–17.

"[A]n adverse action in a First Amendment retaliation case is 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Cox*, 654 F.3d at 273 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006). The standard is "objective." *Id.*

Defendants present uncontroverted evidence that the College Republicans conducted tabling and other events just months after the suspension of their B-There account. *See* Rose SMF ¶ 199–200. Although this is indicative of whether the College Republicans were *subjectively* chilled, this is less relevant to whether the action would *objectively* chill "a similarly situated individual of ordinary firmness." *Cox*, 654 F.3d at 273; *see Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) ("[O]ur Circuit has permitted retaliation claims to proceed when a reasonable [person] would be deterred, even though the particular plaintiff continued to [exercise speech]").

Objectively, a student organization's suspension from booking tabling spots and rooms for events would prevent the student organization from exercising protected speech in those manners. Even if the suspension was practically unenforced, a reasonable student organization faced with such a suspension would likely be chilled at the face of such a sanction. Accordingly,

34

the Court finds that the suspension of the College Republicans' B-There account for one academic year is an adverse action.

Insofar as Plaintiffs allege that Defendants' failure to prosecute the College Progressives constitutes an adverse action, this claim fails. There is no evidence of the Speech Suppression Policy, and the alleged failure to investigate or prosecute in this one instance is insufficient to state a claim. *See Toran v. County of Nassau*, No. 21-CV-5159, 2024 WL 1158982, at *7 (E.D.N.Y. Mar. 18, 2024) (finding no adverse action when "defendants failed to investigate and prosecute criminal complaints").[8]

### c. Causal Connection

Finally, Plaintiff must establish that "there was a causal connection between this adverse action and the protected speech." *Cox*, 654 F.3d at 272. This requires a plaintiff to show "some evidence of retaliatory intent to cause the adverse effect." *Brandon*, 938 F.3d at 40. A causal connection for retaliation claims can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence . . . ; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

### i. The Student Association

The Student Association argues that there is no causal connection between the B-There sanction and the protected speech because it acted consistently with its policies regarding the

---

[8] Plaintiffs also seem to suggest that they suffered an adverse action when Defendants restricted their funds after they failed to re-register their organization. Since the Court finds that there is no causal connection to the restriction of the College Republicans' funds after their failure to register, *see infra* Part IV.B.3.c.i., the Court need not determine whether the restriction of funds constitutes an adverse action.

tabling requirements. SA Mot. at 8. Conversely, Plaintiffs argue that there is sufficient evidence to conclude that the Student Association sanctioned the College Republicans because of their viewpoints. Resp. at 26–28. The Court finds there is a genuine dispute of material fact as to whether the B-There sanction imposed by the Student Association was a result of retaliation for Plaintiffs' exercise of protected speech.

For one, there is evidence that the reservation requirement was unclear and not straightforward to apply. *See* Rose Dep. 157:16–17 ("I didn't believe the existing language was as clear as it could be."). Further, Plaintiffs have shown that the Spine is a large area with plenty of space to table, and groups are able to table in some parts of the Spine without a prior reservation. PSAF ¶ 19. Indeed, the record is far from clear as to which parts of the Spine require reservation and which parts do not. Defendants contend that the College Republicans' table was a clear violation because it prevented Hillel, another student group, from tabling on the Spine. But given the vast amount of space on the Spine, as well as the difficulty of knowing how and where the reservation requirement applied, Defendants' contention is dubious. Moreover, Defendants acknowledge that the College Republicans would have been allowed to exercise their speech without a reservation if "they did not have a table." Rose SMF ¶ 70.

Further, Plaintiffs have presented evidence that shows inconsistent enforcement of their policies, suggesting that the Student Association used the reservation policy as a pretext to discipline the College Republicans based on animus toward their viewpoint. The primary support comes from the fact that the Student Association refused to sanction the College Progressives. The facts show that the Student Association had possession of the Protest Letter, showing their participation in the protest. Rose SMF ¶ 189; Dkt. No. 313-38. While the Student Association disputed the authenticity of the letter, SA SMF ¶ 19; Resp. to SA SMF ¶ 19, they did not conduct

any investigation into the College Progressives' actions. Resp. to SA SMF 10. According to Rose's testimony, the Student Association was "afraid to take action against the [College] Progressive[s] because they were white and they were afraid of being painted as racist." Rose Dep. at 128:22–24. There is also evidence that one of the Student Association staff members was loosely involved with the College Progressives' plans to disrupt, and that the Student Association tried to cancel the Laffer Event by imposing the B-There sanction. *See* Resp. to SA SMF ¶ 10; PSAF ¶ 30; Dkt. No. 327-20 at 2–3. Accordingly, Plaintiffs' evidence creates a genuine dispute of material fact as to whether the Student Association retaliated against the College Republicans because they exercised protected speech. Summary judgment on the retaliation claim against the Student Association with regard to the suspension of their B-There account is denied.

However, insofar as the College Republicans' claim extends to the freezing of their funding, the Court finds no causal connection exists. The suspension of their B-There account did not affect their funding. SA SMF ¶ 11. The uncontroverted facts show that the College Republicans failed to re-register, leading to the administrative sanction of freezing their account. Rose SMF ¶ 203; SA SMF ¶ 14. In any event, the College Republicans were able to submit late registration and regain access to their account shortly thereafter. SA SMF ¶¶ 15–16. Therefore, summary judgment is granted on the retaliation claim insofar as it relates to the freezing of College Republicans' funding.

## ii.    *Stenger*

With respect to the First Amendment retaliation claim against Stenger, he argues there is no causation because he did not issue the B-There sanction and did not have the authority to lift the sanction or discipline the protesters. Stenger Mot. at 15–16. Stenger also contends that even if he had the authority, he was not personally involved as a supervisor. *Id.* at 20–22. Conversely,

Plaintiffs argue that Stenger not only had the authority to lift the sanction but also used that authority by directing that there be no discipline towards the College Progressives. Resp. at 22–26. The Court finds that Stenger was not personally involved in the B-There sanction; thus, Plaintiffs have not presented a genuine dispute of material fact as to whether Stenger retaliated against the College Republicans based on their protected speech.

Initially, Plaintiffs contend that Stenger had the authority under New York law to lift the sanction and discipline the individual protesters. First, Plaintiffs point to New York law, which declares that the "chief administrative officer at each State-operated institution shall be responsible for the enforcement" of anyone who "deliberately interfere[s] with the freedom of any person to express his views, including invited speakers." N.Y. Comp. Codes R. & Regs. ("N.Y.C.C.R.R.") tit. 8, § 535.10, 535.3(i); *see* Resp. at 22. This can include imposing "disciplinary action" to any disrupter. 8 N.Y.C.C.R.R. § 535.5(c). Plaintiffs also state that Stenger and the University's administration had control over the Student Association because they had the power to limit its finances and thereby influence its decisions. *See* Resp. to Stenger SMF ¶ 51.

However, the Court need not determine whether Stenger had the authority to override the Student Association's disciplinary decisions. Even if the disciplining of student organizations fell within Stenger's authority, this alone does not demonstrate that he was personally involved in the Student Association's decision to sanction the College Republicans. To find Stenger liable, a violation must be based on his "own individual actions," not his supervisory authority. *Tangreti*, 983 F.3d at 618. The mere power to exercise control over the Student Association is not sufficient.

Plaintiffs contend that Stenger is liable for his individual actions because he ordered Pelletier and Rose not to take disciplinary action on any of the individual students. Although Stenger asserts that he only made his "personal desire" known, Stenger SMF ¶ 96, Pelletier and Rose nonetheless followed his directions as if it was a command from a superior. *See* Rose SMF ¶¶ 178–79; Pelletier SMF ¶¶ 129–32; Dkt. No. 327-7 ("Pelletier Deposition") at 255:11–13 ("I'm management confidential, work at the pleasure of the president."); Rose Dep. at 86:20–22 ("[O]nce my boss tells me that's not the way I prefer to go, I'm typically going to try to support that position."). As Pelletier testified, once Stenger made his preference known, UPD did not follow through on charges for any of the proposed individuals, nor did Rose take disciplinary action against any of the students. Pelletier Dep. at 240:1–8; Dkt. No. 327-12 ("Gallagher Deposition") at 113:16–24 ("We were instructed that we weren't going to be filing charges with any subjects because [Pelletier] told the investigators that arrests weren't going to happen. . . . President Stenger did not want them arrested."); Rose SMF ¶ 179–82.[9]

However, although Stenger's directions to Pelletier and Rose demonstrate his personal involvement in the decision not to discipline individual students, it is not sufficient to show Stenger's personal involvement in the disciplining of the College Republicans. There is no evidence in the record that Stenger exerted any influence over the Student Association. Indeed, there is no link between Stenger's individual actions and the Student Association's decision to sanction the College Republicans. Summary judgment on the retaliation claim against Stenger in his individual capacity is granted.

---

[9] As noted previously, the alleged failure to investigate or prosecute one instance is insufficient to state a claim. *See Toran*, 2024 WL 1158982, at *7 ("Courts have found similar allegations that defendants failed to investigate and prosecute criminal complaints were insufficient to plausibly allege a First Amendment retaliation claim.").

###### iii.  Rose

Rose likewise argues he is entitled to summary judgment on the retaliation claim. Rose Mot. at 15–17. Plaintiffs argue that, like Stenger, Rose also had the authority to lift the B-There sanction and discipline College Progressives but did not, which indicates that the sanction was applied to retaliate against Plaintiffs' speech. The Court disagrees, and grants Rose summary judgment on the retaliation claim.

Plaintiffs argue that Rose's decision not to pursue individual student charges against College Progressives members after the Tabling Event was an example of the Speech Suppression Policy. Resp. to Rose SMF ¶ 115. Yet, as noted above, Plaintiffs have not satisfied their evidentiary burden of proving this unwritten policy exists. *See supra* Part IV.B.1.a.

Plaintiffs also contend that Rose was afraid that "the College Progressives and their allies would attack him if he were to enforce College Republicans free speech rights." Resp. to Rose SMF ¶ 116. However, this is not supported by the evidence. Plaintiffs' support for this proposition is only the Rose Deposition, where Rose instead states his concern was that it would take months before a hearing would occur and it would not de-escalate the current tensions. *See* Rose Dep. at 28:20–29:13; Rose SMF ¶ 116.

Plaintiffs argue that the Rose Statement after the Tabling Event provides support for the inference that the B-There sanction was applied (and not withdrawn) in retaliation for the College Republicans' protected speech. Resp. to Rose SMF ¶ 117. Plaintiffs contend that this is evidence that Rose disagreed with their speech, as Rose called the College Republicans' peaceful promotion of Second Amendment rights "provocative" and described the College Progressives as "[c]ounter-protesters." Rose Statement at 2. Plaintiffs argue that Rose acknowledged

disciplining protesters on other occasions, but that he would not discipline the College

Progressives because Defendants disagreed with their viewpoint. Resp. to Rose SMF ¶ 117.

The Rose Statement alone does not create a dispute of material fact that Rose failed to

override the Student Association's imposed sanction because of the College Republicans'

speech. For one, Rose was neither involved nor consulted about the decision to revoke the

College Republicans' B-There account. Rose SMF ¶ 187 (undisputed). Additionally, Rose's

description of the College Republicans' poster as "provocative" does not automatically amount

to viewpoint discrimination. Indeed, Rose states that had the University been given advanced

notice, it would have had the opportunity to plan "in a manner that may have facilitated

expressive activity" of their "provocative presentation." Rose Statement at 3. The reference to

the "provocative" display was not to retaliate against their viewpoint; it was reminding the

College Republicans they need to register their table in advance so that the University can be

better prepared to protect their speech if it is likely to be protested. Consequently, Plaintiffs'

interpretation of the Rose Statement as retaliating against the College Republicans for being

"provocative" is distorted.

Furthermore, Rose's actions after the Laffer Event dispel any notion that he explicitly

allowed the sanction to remain due to the College Republicans' viewpoint. In fact, Rose was

initially in favor of pressing charges against the protesters. Even assuming Rose has the same

authority as Stenger, Rose's individual involvement consisted almost exclusively of his attempt

to convince the Student Association to lift the sanctions on the College Republicans and to

sanction College Progressives. Rose SMF ¶¶ 191, 194.

Plaintiffs nevertheless argue that Rose's failure to override Stenger and the Student

Association's decision amounted to a constitutional violation. *See* Resp. at 23–26. But Plaintiffs

provide no support for the assertion that a University Vice President's failure to override the President's decision amounts to a constitutional violation. Indeed, the Court finds that Rose's efforts (albeit ultimately unsuccessful) to convince the Student Association of sanctioning College Progressives—which are undisputed by Plaintiffs—lean against finding a constitutional violation. Since the Court finds that there is no constitutional violation, it needed not address Rose's qualified immunity argument.

Accordingly, Rose is entitled to summary judgment on the retaliation claim.

### 4. *Fourteenth Amendment Equal Protection Claims*

As noted in the August 2021 Order, "When a plaintiff's equal protection claims are based on alleged First Amendment violations, the former coalesce with the latter." Aug. 2021 Ord. at 30 (quoting *Gentile v. Nulty*, 769 F. Supp. 2d 573, 582–83 (S.D.N.Y. 2011)) (cleaned up).

Because the Court granted Stenger and Rose summary judgment on the First Amendment claims, it must similarly grant summary judgment with respect to the Equal Protection claim. The Court denied summary judgment on the respective First Amendment claims against Pelletier and the Student Association, so the Court denies summary judgment with respect to the Equal Protection claims against them.

### 5. *Damages*

Rose and Pelletier argue that Plaintiffs are not entitled to certain damages. Rose Mot. at 23; Pelletier Mot. at 22–23. As the Court has already granted Rose summary judgment on the claims against him, the Court need not address his argument.

Pelletier argues the claim against him does not support an award of punitive damages. Pelletier Mot. at 22–23. "Punitive damages are meant to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Milfort v. Prevete*, 3 F. Supp. 3d

14, 23 (E.D.N.Y. 2014) (internal quotations omitted). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999)).

Pelletier contends that an "evil motive or callous indifference" cannot be inferred from his conduct. Pelletier Mot. at 23. With reference to the above discussion, the Court finds there to be sufficient evidence for a jury to infer an element of conscious wrongdoing. Indeed, drawing all inferences in favor of Plaintiffs, Pelletier's preparation for the Laffer Event was designed to cancel Dr. Laffer's speech, which implies conscious wrongdoing or at least indifference. *See supra* Part IV.B.2.a; *see also* Dkt. No. 327-19 at 14 ("UPD seemed indifferent to the planning of this event"). Pelletier's mental state is further supported by Pelletier "quite forceful[ly]" telling Dr. Laffer "to return to [his] plane." Laffer Dep. at 45:19, 45:4–7; *cf. Kenney v. Clay*, 172 F. Supp. 3d 628, 642 (N.D.N.Y. 2016) (finding the plaintiff's claim for punitive damages survives for trial when the defendants action involved "substantial coercion").

Pelletier also contends that there is no deterrence effect since he has already retired from UPD. This argument is misplaced. The deterrence effect behind punitive damages is not designed just to deter him personally, but also to "deter *others* from similar behavior." *Milfort*, 3 F. Supp. 3d at 23 (emphasis added) (quoting *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 309 (S.D.N.Y. 2001); *see Smith v. Wade*, 461 U.S. 30, 54, (1983) ("Punitive damages are awarded in the jury's discretion to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future.") (cleaned up). Accordingly, the Court declines to grant summary judgment on the issue of punitive damages.

V.    **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Motion to Substitute, Dkt. No. 343, is **GRANTED**; and it is further

**ORDERED**, that Plaintiff Rein Bey is **TERMINATED** as a party in this action; and it is further

**ORDERED**, that the Clerk **ADD** Shane Rossi, in his official capacity as President of the College Republicans of Binghamton University, as a party to this action; and it is further

**ORDERED**, that the Pelletier Motion for summary judgment, Dkt. No. 307, is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that the Stenger Motion for summary judgment, Dkt. No. 308, is **GRANTED**; and it is further

**ORDERED**, that the Student Association Motion for summary judgment, Dkt. No. 311, is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that the Rose Motion for summary judgment, Dkt. No. 313, is **GRANTED**; and it is further

**ORDERED**, that the following claims are **DISMISSED**: all claims against Defendants Stenger, Rose, and Pelletier in their official capacities; all claims seeking declaratory and injunctive relief; the First Amendment speech suppression claim against Rose in his individual capacity; the First Amendment retaliation claim against Stenger and Rose in their individual capacities; and the Fourteenth Amendment equal protection claim against Stenger and Rose in their individual capacities; and it is further

**ORDERED**, that Defendants Harvey Stenger and Brian Rose are **TERMINATED** from the docket; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    March 20, 2025
             Albany, New York

                              LAWRENCE E. KAHN
                              United States District Judge